Nos. 21-1141 (L) and 21-1143

**UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT**

--------------

No. 21-1141(L)
(0:17-cv-02094-JMC)

--------------

HARRY PENNINGTON, III, TIMOTHY LORENTZ, on behalf of themselves and all others similarly situated,

Plaintiffs-Appellants,

v.

FLUOR CORPORATION, FLUOR ENTERPRISES, INC., SCANA CORPORATION, FLUOR DANIEL MAINTENANCE SERVICES, INC., SOUTH CAROLINA ELECTRIC & GAS COMPANY,

Defendants-Appellees,

--------------

No. 21-1143
(0:17-cv-02201-JMC)

---------------

LAWRENCE BUTLER, LAKEISHA DARWISH, JIMI CHE SUTTON,

Plaintiff-Appellants,

v.

FLUOR CORPORATION, FLUOR ENTERPRISES, INC.,

Defendants-Appellees.

*ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA, ROCK HILL DIVISION*

-------------

**JOINT APPENDIX VOLUME I OF XI (JA1-JA531)**

-------------

Isaac Raisner
RAISNER ROUPINIAN LLP

J. Hagood Tighe
FISHER & PHILLIPS LLP

Charles T. Speth
OGLETREE, DEAKINS, NASH,

270 Madison Avenue,
Suite 1801
New York, NY 10016
isr@raisnerroupinian.com
Phone: (212) 221-1747
Fax: (212) 221-1747

*Counsel for Appellants*

1320 Main Street
Suite 750
Columbia, SC 29201
htighe@fisherphillips.com
Phone: (803) 255-0000
Fax: (803) 255-0202

*Counsel for Appellees
Fluor Corporation, Fluor
Enterprises, Inc., and
Fluor Daniel
Maintenance Services,
Inc.*

SMOAK & STEWART,
P.C.
First Base Building
ted.speth@ogletree.com
2142 Boyce Street
Suite 401
Columbia, SC 29201
Phone: (803) 252-1300
Fax: (803) 254-7517

*Counsel for Appellees
SCANA Corporation
and South Carolina
Electric & Gas
Company*

## TABLE OF CONTENTS

| File Date | ECF No. (*Pennington* ECF unless otherwise indicated[1]) | Description[2] | JA Page No. |
|---|---|---|---|
| **VOLUME I** | | | |
| -- | -- | Pennington District Court Docket Sheet | **1** |
| -- | -- | Butler District Court Docket Sheet | **69** |
| 08/08/2017 | 1 | Pennington Plaintiffs' Complaint | **141** |
| 08/18/2017 | 1 in *Butler* | Butler Plaintiffs' Complaint | **149** |
| 09/13/2017 | 9-3 | Exhibit C to SCANA Corporation's Answer to Pennington Complaint: WARN Notice | **160** |
| 10/25/2017 | 41 | Pennington Plaintiffs' Amended Complaint | **162** |
| 10/30/2017 | 32 in *Butler* | Fluor Corporation and FEI's Answer to Butler Plaintiffs' Complaint | **186** |
| 11/20/2017 | 68 | Fluor Defendants' Answer to Pennington Plaintiffs' Amended Complaint | **193** |
| 12/29/2017 | 71 | Pennington's Response in Opposition to SCANA Defendants' Motion to Dismiss | **204** |
| 02/16/2018 | 86 (43 in *Butler*) | District Court's Order Consolidating Actions | **245** |
| 03/01/2018 | 91 (46 in *Butler*) | Transcript of Hearing on Motions to Dismiss | **253** |

[1] The *Pennington* case is No. 0:17-cv-02094-JMC. The *Butler* case is No. 0:17-cv-02201-JMC. After the cases were consolidated, most of the filings were entered on both dockets. For those filings, ECF numbers for both dockets are provided. Where filings were only entered on a single docket, the ECF number for that case is listed.

[2] The "SCANA Defendants" are SCANA Corporation and South Carolina Energy & Gas Company. The "Fluor Defendants" are Fluor Corporation, Fluor Enterprises, Inc. ("FEI") and Fluor Daniel Maintenance Services, Inc. ("FDMS").

| File Date | ECF No. (*Pennington* ECF unless otherwise indicated[1]) | Description[2] | JA Page No. |
|---|---|---|---|
| 03/02/2018 | 92 | SCANA Defendants' Supplemental Reply in Support of Motion to Dismiss Pennington Plaintiffs' Am. Complaint | **355** |
| 05/30/2018 | 109 | District Court's Order Denying SCANA Defendants' Motion to Dismiss | **361** |
| 06/13/2018 | 114 | SCANA Defendants' Answer to Pennington Plaintiffs' Amended Complaint | **375** |
| 06/13/2018 | 116 | Pennington Plaintiffs' Response in Opposition to Fluor Defendants' Motion for Judgment on the Pleadings | **397** |
| 02/18/2020 | 206 (160 in *Butler*) | Confidentiality Order | **416** |
| 08/31/2020 | 230 (186 in *Butler*) | District Court's Order Granting Motions for Protective Order | **431** |
| 10/02/2020 | 233 (189 in *Butler*) | Fluor Defendants' Motion for Summary Judgment | **434** |
| 10/02/2020 | 233-2 (189-2 in *Butler*) | Exhibit 1 to Fluor Defendants' Memorandum in Support of Motion for Summary Judgment: Summary of Plaintiff Testimony | **437** |
| 10/02/2020 | 233-30 (189-30 in *Butler*) | Exhibit 29 to Fluor Defendants' Memorandum in Support of Motion for Summary Judgment: Amended EPC Agreement | **443** |
| 10/02/2020 | 233-32 (189-32 in *Butler*) | Exhibit 31 to Fluor Defendants' Memorandum in Support of Motion for Summary Judgment: PSC Hearing Transcript 4.12.17 | **481** |

| File Date | ECF No. (*Pennington* ECF unless otherwise indicated[1]) | Description[2] | JA Page No. |
|---|---|---|---|
| | | **VOLUME II** | |
| 10/02/2020 | 233-33 (189-33 in *Butler*) | Exhibit 32 to Fluor Defendants' Memorandum in Support of Motion for Summary Judgment: Amended Subcontract | **532** |
| 10/02/2020 | 233-35 (189-35 in *Butler*) | Exhibit 34 to Fluor Defendants' Memorandum in Support of Motion for Summary Judgment: Flowers Emails with Byrne re Form 8-K | **836** |
| 10/02/2020 | 233-36 (189-36 in *Butler*) | Exhibit 35 to Fluor Defendants' Memorandum in Support of Motion for Summary Judgment: Interim Assessment Agreement (IAA) | **838** |
| 10/02/2020 | 233-37 (189-37 in *Butler*) | Exhibit 36 to Fluor Defendants' Memorandum in Support of Motion for Summary Judgment: Amendment No. 1 to IAA | **871** |
| 10/02/2020 | 233-38 (189-38 in *Butler*) | Exhibit 37 to Fluor Defendants' Memorandum in Support of Motion for Summary Judgment: Amendment No. 2 to IAA | **882** |
| 10/02/2020 | 233-47 (189-47 in *Butler*) | Exhibit 47 to Fluor Defendants' Memorandum in Support of Motion for Summary Judgment: Declaration of Alan Torres | **891** |
| 10/02/2020 | 233-48 (189-48 in *Butler*) | Exhibit 48 to Fluor Defendants' Memorandum in Support of Motion for Summary Judgment: Declaration of Jeffrey Archie | **895** |
| 10/02/2020 | 233-49 (189-49 in *Butler*) | Exhibit 49 to Fluor Defendants' Memorandum in Support of Motion for Summary Judgment: Declaration of Kyle Young | **898** |
| 10/02/2020 | 233-50 (189-50 in *Butler*) | Exhibit 50 to Fluor Defendants' Memorandum in Support of Motion for Summary Judgment: Declaration of Zach Ashcraft | **902** |

| File Date | ECF No. (*Pennington* ECF unless otherwise indicated[1]) | Description[2] | JA Page No. |
|---|---|---|---|
| 10/02/2020 | 233-51 (189-51 in *Butler*) | Exhibit 51 to Fluor Defendants' Memorandum in Support of Motion for Summary Judgment: Declaration of Jeremy Bloom | **906** |
| 10/02/2020 | 233-52 (189-52 in *Butler*) | Exhibit 52 to Fluor Defendants' Memorandum in Support of Motion for Summary Judgment: Letter to VC Summer Contractors 4.3.17 | **910** |
| 10/02/2020 | 233-53 (189-53 in *Butler*) | Exhibit 53 to Fluor Defendants' Memorandum in Support of Motion for Summary Judgment: Transition to Fluor Project Management | **911** |
| 10/02/2020 | 233-54 (189-54 in *Butler*) | Exhibit 54 to Fluor Defendants' Memorandum in Support of Motion for Summary Judgment: Path Forward for VC Summer | **913** |
| 10/02/2020 | 233-64 (189-64 in *Butler*) | Exhibit 64 to Fluor Defendants' Memorandum in Support of Motion for Summary Judgment: 4.4.2017 VC Summer Program Plan | **915** |
| 10/02/2020 | 233-66 (189-66 in *Butler*) | Exhibit 66 to Fluor Defendants' Memorandum in Support of Motion for Summary Judgment: Declaration of John Shepherd | **930** |
| 10/02/2020 | 233-67 (189-67 in *Butler*) | Exhibit 67 to Fluor Defendants' Memorandum in Support of Motion for Summary Judgment: New Nuclear Update dated 6.26.17 | **931** |
| 10/02/2020 | 233-68 (189-68 in *Butler*) | Exhibit 68 to Fluor Defendants' Memorandum in Support of Motion for Summary Judgment: 4.20.17 Email re Message to All Employees New Nuclear update | **932** |
| 10/02/2020 | 233-74 (189-74 in *Butler*) | Exhibit 74 to Fluor Defendants' Memorandum in Support of Motion for Summary Judgment: 7.26.2016 Email re URGENT VCS Site Equipment Request | **935** |

| File Date | ECF No. (*Pennington* ECF unless otherwise indicated[1]) | Description[2] | JA Page No. |
|---|---|---|---|
| 10/02/2020 | 233-75 (189-75 in *Butler*) | Exhibit 75 to Fluor Defendants' Memorandum in Support of Motion for Summary Judgment: Declaration of Bernard Hydrick Jr | **942** |
| 10/02/2020 | 233-77 (189-77 in *Butler*) | Exhibit 77 to Fluor Defendants' Memorandum in Support of Motion for Summary Judgment: 7.20.17 Monthly Progress Report | **945** |
| 10/02/2020 | 233-78 (189-78 in *Butler*) | Exhibit 78 to Fluor Defendants' Memorandum in Support of Motion for Summary Judgment: Email from Laura Ware re Major Milestone 7.17.17 | **1050** |
| 10/02/2020 | 233-79 (189-79 in *Butler*) | Exhibit 79 to Fluor Defendants' Memorandum in Support of Motion for Summary Judgment: 6.30.17 Email re Thanks to Jim Mangelson and Team for Milestone | **1051** |
| 10/02/2020 | 233-81 (189-81 in *Butler*) | Exhibit 81 to Fluor Defendants' Memorandum in Support of Motion for Summary Judgment: 7.28.17 Email re Work Package | **1052** |
| 10/02/2020 | 233-82 (189-82 in *Butler*) | Exhibit 82 to Fluor Defendants' Memorandum in Support of Motion for Summary Judgment: 8.1.17 PSC Hearing transcript | **1053** |
| 10/02/2020 | 233-84 (189-84 in *Butler*) | Exhibit 84 to Fluor Defendants' Memorandum in Support of Motion for Summary Judgment: 5.24.17 Email re SCANA Planning | **1142** |
| 10/02/2020 | 233-89 (189-89 in *Butler*) | Exhibit 89 to Fluor Defendants' Memorandum in Support of Motion for Summary Judgment: Letter from SCANA to WEC dated 7.31.17 | **1144** |
| 10/02/2020 | 233-90 (189-90 in *Butler*) | Exhibit 90 to Fluor Defendants' Memorandum in Support of Motion for Summary Judgment: SCANA Corp 2nd quarter 2017 ECC | **1146** |

| File Date | ECF No. (*Pennington* ECF unless otherwise indicated[1]) | Description[2] | JA Page No. |
|---|---|---|---|
| 10/02/2020 | 233-92 (189-92 in *Butler*) | Exhibit 92 to Fluor Defendants' Memorandum in Support of Motion for Summary Judgment: July 31 FAQ | **1156** |
| 10/02/2020 | 233-93 (189-93 in *Butler*) | Exhibit 93 to Fluor Defendants' Memorandum in Support of Motion for Summary Judgment: 7.31.17 Email re Notification to Fluor Craft and FNM | **1158** |
| 10/02/2020 | 233-94 (189-94 in *Butler*) | Exhibit 94 to Fluor Defendants' Memorandum in Support of Motion for Summary Judgment: Construction Project update 7.31.17 | **1160** |
| 10/02/2020 | 233-95 (189-95 in *Butler*) | Exhibit 95 to Fluor Defendants' Memorandum in Support of Motion for Summary Judgment: Field Non Manual update 7.31.17 | **1161** |
| 10/02/2020 | 233-96 (189-96 in *Butler*) | Exhibit 96 to Fluor Defendants' Memorandum in Support of Motion for Summary Judgment: 8.1.17 Email re VC Summer Demobilization | **1164** |
| 10/02/2020 | 233-97 (189-97 in *Butler*) | Exhibit 97 to Fluor Defendants' Memorandum in Support of Motion for Summary Judgment: 8.4.17 Email re HR leadership Call 8.9 | **1166** |
| 10/02/2020 | 233-98 (189-98 in *Butler*) | Exhibit 98 to Fluor Defendants' Memorandum in Support of Motion for Summary Judgment: 8.10.17 Email re Urgent VC Summer Processing Out | **1169** |
| 10/02/2020 | 233-99 (189-99 in *Butler*) | Exhibit 99 to Fluor Defendants' Memorandum in Support of Motion for Summary Judgment: 8.1.17 Email re VC Summer Craft | **1172** |

| File Date | ECF No. (*Pennington* ECF unless otherwise indicated[1]) | Description[2] | JA Page No. |
|---|---|---|---|
| **VOLUME III** | | | |
| 10/02/2020 | 233-100 (189-100 in *Butler*) | Exhibit 100 to Fluor Defendants' Memorandum in Support of Motion for Summary Judgment: FLUOR Motion for Judgment on pleadings | **1173** |
| 10/02/2020 | 233-105 (189-105 in *Butler*) | Exhibit 105 to Fluor Defendants' Memorandum in Support of Motion for Summary Judgment: Organizational chart | **1202** |
| 10/02/2020 | 235-3 (191 in *Butler*) | Exhibit 2 to Plaintiffs' Memorandum of Law in Support of Motion for Partial Summary Judgment: Transcript Excerpts from the Deposition of David C. Durham | **1203** |
| 10/02/2020 | 235-5 (191-5 in *Butler*) | Exhibit 4 to Plaintiffs' Memorandum of Law in Support of Motion for Partial Summary Judgment: Transcript Excerpts from the Deposition of Alan Torres | **1223** |
| 10/02/2020 | 235-10 (191-10 in *Butler*) | Exhibit 9 to Plaintiffs' Memorandum of Law in Support of Motion for Partial Summary Judgment: Transcript Excerpts from the Deposition of Rodney Cavalieri | **1313** |
| 10/02/2020 | 235-12 (191-12 in *Butler*) | Exhibit 11 to Plaintiffs' Memorandum of Law in Support of Motion for Partial Summary Judgment: Transcript Excerpts from the Deposition of Michael Crosby | **1355** |
| 10/02/2020 | 235-14 (191-14 in *Butler*) | Exhibit 13 to Plaintiffs' Memorandum of Law in Support of Motion for Partial Summary Judgment: Transcript Excerpts from the Deposition of Carl Churchman | **1381** |

| File Date | ECF No. (*Pennington* ECF unless otherwise indicated[1]) | Description[2] | JA Page No. |
|---|---|---|---|
| 10/02/2020 | 235-15 (191-15 in *Butler*) | Exhibit 14 to Plaintiffs' Memorandum of Law in Support of Motion for Partial Summary Judgment: Transcript Excerpts from the Deposition of William A. Macecevic, III | **1387** |
| 10/02/2020 | 235-18 (191-18 in *Butler*) | Exhibit 17 to Plaintiffs' Memorandum of Law in Support of Motion for Partial Summary Judgment: Transcript Excerpts from the Deposition of Timothy Lorentz | **1393** |
| 10/02/2020 | 235-23 (191-23 in *Butler*) | Exhibit 22 to Plaintiffs' Memorandum of Law in Support of Motion for Partial Summary Judgment: Transcript Excerpts from the Deposition of Lonnie Carter | **1445** |
| 10/02/2020 | 235-25 (191-25 in *Butler*) | Exhibit 24 to Plaintiffs' Memorandum of Law in Support of Motion for Partial Summary Judgment: Transcript Excerpts from the Deposition of David T. Seaton | **1464** |
| 10/02/2020 | 235-27 (191-27 in Butler) | Exhibit 26 to Plaintiffs' Memorandum of Law in Support of Motion for Partial Summary Judgment: Transcript Excerpts from the Rule 30(b)(6) Deposition of Iris Griffin | **1478** |
| 10/02/2020 | 235-47 (191-47 in *Butler*) | Exhibit 46 to Plaintiffs' Memorandum of Law in Support of Motion for Partial Summary Judgment: Transcript Excerpts from the Rule 30(b)(6) Deposition of Annmarie Higgins | **1487** |
| 10/02/2020 | 235-55 (191-55 in *Butler*) | Exhibit 54 to Plaintiffs' Memorandum of Law in Support of Motion for Partial Summary Judgment: Transcript Excerpts from the Rule 30(b)(6) Deposition of Michael A. Philpott | **1517** |

| File Date | ECF No. (*Pennington* ECF unless otherwise indicated[1]) | Description[2] | JA Page No. |
|---|---|---|---|
| 10/02/2020 | 236-2 (192 in *Butler*) | Exhibit A to SCANA Defendants' Memorandum in Support of Motion for Summary Judgment: Transcript Excerpts from the Deposition of Plaintiff Harry Pennington, III | **1520** |
| 10/02/2020 | 236-3 (192-3 in *Butler*) | Exhibit B to SCANA Defendants' Memorandum in Support of Motion for Summary Judgment: Transcript Excerpts from the Deposition of Plaintiff Timothy Lorentz | **1530** |
| 10/02/2020 | 236-5 (192-5 in *Butler*) | Exhibit D to SCANA Defendants' Memorandum in Support of Motion for Summary Judgment: Order Approving Interim Assessment Agreements | **1540** |
| 10/02/2020 | 236-7 (192-7 in *Butler*) | Exhibit F to SCANA Defendants' Memorandum in Support of Motion for Summary Judgment: Transcript Excerpts from the Deposition of John Shepherd | **1574** |
| **VOLUME IV** | | | |
| 10/02/2020 | 236-8 (192-8 in *Butler*) | Exhibit G to SCANA Defendants' Memorandum in Support of Motion for Summary Judgment: EPC Agreement | **1580** |
| 10/02/2020 | 236-11 (192-11 in Butler) | Exhibit J to SCANA Defendants' Memorandum in Support of Motion for Summary Judgment: Transcript Excerpts from the Deposition of David C. Durham | **2016** |
| 10/02/2020 | 236-12 (192-12 in *Butler*) | Exhibit K to SCANA Defendants' Memorandum in Support of Motion for Summary Judgment: Transcript Excerpts from the Deposition of William A. Macecevic, III | **2035** |

| File Date | ECF No. (*Pennington* ECF unless otherwise indicated[1]) | Description[2] | JA Page No. |
|---|---|---|---|
| 10/02/2020 | 236-19 (192-19 in *Butler*) | Exhibit R to SCANA Defendants' Memorandum in Support of Motion for Summary Judgment: Transcript Excerpts from the Deposition of Michael Crosby. | **2054** |
| 10/02/2020 | 236-22 (192-22 in *Butler*) | Exhibit U to SCANA Defendants' Memorandum in Support of Motion for Summary Judgment: Westinghouse Employee List | **2059** |
| 10/02/2020 | 236-23 (192-23 in *Butler*) | Exhibit V to SCANA Defendants' Memorandum in Support of Motion for Summary Judgment: Transcript Excerpts from the Deposition of Plaintiff Lawrence W. Butler | **2071** |
| 10/02/2020 | 236-24 (192-24 in *Butler*) | Exhibit W to SCANA Defendants' Memorandum in Support of Motion for Summary Judgment: Transcript Excerpts from the Deposition of Plaintiff Jimi Che Sutton | **2081** |
| 10/02/2020 | 236-26 (192-26 in *Butler*) | Exhibit Y to SCANA Defendants' Memorandum in Support of Motion for Summary Judgment: Transcript Excerpts from the Deposition of James Bland | **2089** |
| 10/02/2020 | 236-27 (192-27 in *Butler*) | Exhibit Z to SCANA Defendants' Memorandum in Support of Motion for Summary Judgment: Transcript Excerpts from the Deposition of Sean Donahoe | **2101** |

| File Date | ECF No. (*Pennington* ECF unless otherwise indicated[1]) | Description[2] | JA Page No. |
|---|---|---|---|
| 10/02/2020 | 236-28 (192-28 in *Butler*) | Exhibit AA to SCANA Defendants' Memorandum in Support of Motion for Summary Judgment: Transcript Excerpts from the Deposition of Thomas Sauer | **2106** |
| 10/02/2020 | 236-29 (192-29 in *Butler*) | Exhibit BB to SCANA Defendants' Memorandum in Support of Motion for Summary Judgment: Transcript Excerpts from the Deposition of Dewaii Tate | **2117** |
| 10/02/2020 | 236-31 (192-31 in *Butler*) | Exhibit DD to SCANA Defendants' Memorandum in Support of Motion for Summary Judgment: Transcript Excerpts from the Deposition of Brian Dunne | **2129** |
| 10/30/2020 | 244-1 (200-1 in *Butler*) | Exhibit A to Fluor's Response in Opposition to Plaintiffs' Motion for Partial Summary Judgment; Keen Deposition excerpts | **2132** |
| 10/30/2020 | 248-1 (204-1 in *Butler*) | Exhibit A to SCANA Defendants' Response to Plaintiffs' Motion for Partial Summary Judgment: Transcript Excerpts from the Rule 30(b)(6) Deposition of Ronald A. Jones | **2143** |
| 10/30/2020 | 248-2 (204-2 in *Butler*) | Exhibit B to SCANA Defendants' Response to Plaintiffs' Motion for Partial Summary Judgment: Transcript Excerpts from the Deposition of William Marion Cherry | **2157** |
| 10/30/2020 | 248-3 (204-3 in *Butler*) | Exhibit C to SCANA Defendants' Response to Plaintiffs' Motion for Partial Summary Judgment: Transcript Excerpts from the Deposition of Alan Torres | **2161** |

| File Date | ECF No. (*Pennington* ECF unless otherwise indicated[1]) | Description[2] | JA Page No. |
|---|---|---|---|
| 10/30/2020 | 248-4 (204-4 in *Butler*) | Exhibit D to SCANA Defendants' Response to Plaintiffs' Motion for Partial Summary Judgment: Transcript Excerpts from the Deposition of Timothy Lorentz | **2168** |
| 10/30/2020 | 248-5 (204-1 in *Butler*) | Exhibit E to SCANA Defendants' Response to Plaintiffs' Motion for Partial Summary Judgment: Transcript Excerpts from the Deposition of Rodney Cavalieri | **2193** |
| 10/30/2020 | 248-6 (204-6 in *Butler*) | Exhibit F to SCANA Defendants' Response to Plaintiffs' Motion for Partial Summary Judgment: Transcript Excerpts from the Deposition of Nicole Keen | **2215** |
| 10/30/2020 | 248-7 (204-7 in *Butler*) | Exhibit G to SCANA Defendants' Response to Plaintiffs' Motion for Partial Summary Judgment: Transcript Excerpts from the Deposition of Thomas Sauer | **2227** |
| **VOLUME V** | | | |
| 10/30/2020 | 248-8 (204-8 in *Butler*) | Exhibit H to SCANA Defendants' Response to Plaintiffs' Motion for Partial Summary Judgment: Transcript Excerpts from the Deposition of Dewaii Tate | **2244** |
| 10/30/2020 | 248-9 (204-9 in *Butler*) | Exhibit I to SCANA Defendants' Response to Plaintiffs' Motion for Partial Summary Judgment: Transcript Excerpts from the Deposition of Plaintiff Lawrence W. Butler | **2262** |

| File Date | ECF No. (*Pennington* ECF unless otherwise indicated[1]) | Description[2] | JA Page No. |
|---|---|---|---|
| 10/30/2020 | 248-10 (204-10 in *Butler*) | Exhibit J to SCANA Defendants' Response to Plaintiffs' Motion for Partial Summary Judgment: Transcript Excerpts from the Rule 30(b)(6) and Fact Witness Depositions of Plaintiff Annmarie Higgins | **2282** |
| 10/30/2020 | 248-11 (204-11 in *Butler*) | Exhibit K to SCANA Defendants' Response to Plaintiffs' Motion for Partial Summary Judgment: Transcript Excerpts from the Deposition of David C. Durham | **2298** |
| 10/30/2020 | 248-12 (204-12 in *Butler*) | Exhibit L to SCANA Defendants' Response to Plaintiffs' Motion for Partial Summary Judgment: Transcript Excerpts from the Deposition of William A. Macecevic, III | **2321** |
| 10/30/2020 | 248-13 (204-13 in *Butler*) | Exhibit M to SCANA Defendants' Response to Plaintiffs' Motion for Partial Summary Judgment: Transcript Excerpts from the Deposition of Garry Flowers | **2338** |
| 10/30/2020 | 248-14 (204-14 in *Butler*) | Exhibit N to SCANA Defendants' Response to Plaintiffs' Motion for Partial Summary Judgment: Transcript Excerpts from the Deposition of Plaintiff Lakeisha Darwish | **2341** |
| 10/30/2020 | 248-15 (204-15 in Butler) | Exhibit O to SCANA Defendants' Response to Plaintiffs' Motion for Partial Summary Judgment: Transcript Excerpts from the Deposition of Plaintiff Harry Pennington, III | **2348** |
| 10/30/2020 | 248-16 (204-16 in *Butler*) | Exhibit P to SCANA Defendants' Response to Plaintiffs' Motion for Partial Summary Judgment: Transcript Excerpts from the Deposition of James Bland | **2360** |

| File Date | ECF No. (*Pennington* ECF unless otherwise indicated[1]) | Description[2] | JA Page No. |
|---|---|---|---|
| 10/30/2020 | 248-17 (204-17 in *Butler*) | Exhibit Q to SCANA Defendants' Response to Plaintiffs' Motion for Partial Summary Judgment: Transcript Excerpts from the Deposition of Sean Donahoe | **2375** |
| 10/30/2020 | 248-18 (204-18 in *Butler*) | Exhibit R to SCANA Defendants' Response to Plaintiffs' Motion for Partial Summary Judgment: Transcript Excerpts from the Deposition of Brian Dunne | **2385** |
| 10/30/2020 | 248-19 (204-19 in *Butler*) | Exhibit S to SCANA Defendants' Response to Plaintiffs' Motion for Partial Summary Judgment: Transcript Excerpts from the Deposition of Plaintiff Jimi Che Sutton | **2395** |
| 10/30/2020 | 248-20 (204-20 in *Butler*) | Exhibit T to SCANA Defendants' Response to Plaintiffs' Motion for Partial Summary Judgment: Transcript Excerpts from the Deposition of Kimberly Bentz | **2409** |
| 10/30/2020 | 248-21 (204-21 in *Butler*) | Exhibit U to SCANA Defendants' Response to Plaintiffs' Motion for Partial Summary Judgment: Transcript Excerpts from the Deposition of John Shepherd | **2422** |
| 10/30/2020 | 248-22 (204-22 in Butler) | Exhibit V to SCANA Defendants' Response to Plaintiffs' Motion for Partial Summary Judgment: Transcript Excerpts from the Rule 30(b)(6) Deposition of Garry Flowers | **2425** |
| 10/30/2020 | 248-23 (204-23 in *Butler*) | Exhibit W to SCANA Defendants' Response to Plaintiffs' Motion for Partial Summary Judgment: Transcript Excerpts from the Deposition of Bruce E. Hinkley | **2429** |

| File Date | ECF No. (*Pennington* ECF unless otherwise indicated[1]) | Description[2] | JA Page No. |
|---|---|---|---|
| 10/30/2020 | 248-24 (204-24 in *Butler*) | Exhibit X to SCANA Defendants' Response to Plaintiffs' Motion for Partial Summary Judgment: WEC Corporate Ownership Statement | **2433** |
| 10/30/2020 | 250-61 (206-61 in *Butler*) | Exhibit 142 to Plaintiffs' Memorandum in Opposition to Fluor Defendants' Motion for Summary Judgment: Letter to Lorentz | **2460** |
| 11/30/2020 | 223 in *Butler* | Plaintiffs' Motion to Supplement Summary Judgment Record and Correct Two Clerical Errors | **2462** |
| 12/28/2020 | 234 in *Butler* | Text Order Granting Plaintiffs' Consent Motion to Correct and Supplement | **2469** |
| 01/06/2021 | 277 (236 in *Butler*) | District Court's Order Granting SCANA Defendants' Motion for Summary Judgment, Granting Fluor Defendants' Motion for Summary Judgment, and Denying Plaintiffs' Motion for Partial Summary Judgment | **2470** |
| 01/06/2021 | 278 | Judgment in *Pennington* | **2522** |
| 01/06/2021 | 237 in *Butler* | Judgment in *Butler* | **2523** |
| 01/15/2021 | 279 | Official Transcript of Hearing on Motions for Summary Judgment Held on December 1, 2020 | **2524** |
| 02/04/2021 | 282 | Pennington Plaintiffs' Notice of Appeal | **2665** |
| 02/04/2021 | 240 in *Butler* | Butler Plaintiffs' Notice of Appeal | **2667** |

| File Date | ECF No. (*Pennington* ECF unless otherwise indicated[1]) | Description[2] | JA Page No. |
|---|---|---|---|
| **VOLUME VI (SEALED)** | | | |
| 10/02/2020 | 234-1 (190-1 in *Butler*) | Exhibit 2 to Fluor Defendants' Memorandum in Support of Motion for Summary Judgment: Transcript Excerpts from the Deposition of Plaintiff Harry Pennington, III | **2669** |
| 10/02/2020 | 234-2 (190-2 in *Butler*) | Exhibit 3 to Fluor Defendants' Memorandum in Support of Motion for Summary Judgment: Transcript Excerpts from the Deposition of Plaintiff Timothy Lorentz | **2709** |
| 10/02/2020 | 234-3 (190-3 in *Butler*) | Exhibit 4 to Fluor Defendants' Memorandum in Support of Motion for Summary Judgment: Transcript Excerpts from the Deposition of Dewaii Tate | **2728** |
| 10/02/2020 | 234-4 (190-4 in *Butler*) | Exhibit 5 to Fluor Defendants' Memorandum in Support of Motion for Summary Judgment: Transcript Excerpts from the Deposition of James Bland | **2760** |
| 10/02/2020 | 234-5 (190-5 in *Butler*) | Exhibit 6 to Fluor Defendants' Memorandum in Support of Motion for Summary Judgment: Transcript Excerpts from the Deposition of Rodney Cavalieri | **2789** |
| 10/02/2020 | 234-6 (190-6 in *Butler*) | Exhibit 7 to Fluor Defendants' Memorandum in Support of Motion for Summary Judgment: Transcript Excerpts from the Deposition of Sean Donahoe | **2815** |
| 10/02/2020 | 234-7 (190-7 in *Butler*) | Exhibit 8 to Fluor Defendants' Memorandum in Support of Motion for Summary Judgment: Transcript Excerpts from the Deposition of Brian Dunne | **2864** |

| **File Date** | **ECF No. (*Pennington* ECF unless otherwise indicated[1])** | **Description[2]** | **JA Page No.** |
|---|---|---|---|
| 10/02/2020 | 234-8 (190-8 in *Butler*) | Exhibit 9 to Fluor Defendants' Memorandum in Support of Motion for Summary Judgment: Transcript Excerpts from the Deposition of Thomas Sauer | **2904** |
| 10/02/2020 | 234-9 (190-9 in *Butler*) | Exhibit 10 to Fluor Defendants' Memorandum in Support of Motion for Summary Judgment: Transcript Excerpts from the Deposition of Plaintiff Lawrence W. Butler | **2941** |
| 10/02/2020 | 234-10 (190-10 in *Butler*) | Exhibit 11 to Fluor Defendants' Memorandum in Support of Motion for Summary Judgment: Transcript Excerpts from the Deposition of Plaintiff Lakeisha Darwish | **2989** |
| 10/02/2020 | 234-11 (190-11 in *Butler*) | Exhibit 12 to Fluor Defendants' Memorandum in Support of Motion for Summary Judgment: Transcript Excerpts from the Deposition of Plaintiff Jimi Che Sutton | **3018** |
| 10/02/2020 | 234-12 (190-12 in *Butler*) | Exhibit 13 to Fluor Defendants' Memorandum in Support of Motion for Summary Judgment: Transcript Excerpts from the Deposition of Kimberly Bentz | **3065** |
| 10/02/2020 | 234-13 (190-13 in *Butler*) | Exhibit 14 to Fluor Defendants' Memorandum in Support of Motion for Summary Judgment: Transcript Excerpts from the Deposition of Nicole Keen | **3102** |
| 10/02/2020 | 234-14 (190-14 in *Butler*) | Exhibit 15 to Fluor Defendants' Memorandum in Support of Motion for Summary Judgment: Transcript Excerpts from the Deposition of Bruce E. Hinkley | **3122** |

| File Date | ECF No. (*Pennington* ECF unless otherwise indicated[1]) | Description[2] | JA Page No. |
|---|---|---|---|
| 10/02/2020 | 234-15 (190-15 in *Butler*) | Exhibit 16 to Fluor Defendants' Memorandum in Support of Motion for Summary Judgment: Stephen M. Kiernan Declaration Part One | **3136** |
| | | **VOLUME VII (SEALED)** | |
| 10/02/2020 | 234-16 (190-16 in *Butler*) | Exhibit 16 to Fluor Defendants' Memorandum in Support of Motion for Summary Judgment: Stephen M. Kiernan Declaration Part Two | **3320** |
| 10/02/2020 | 234-17 (190-17 in *Butler*) | Exhibit 17 to Fluor Defendants' Memorandum in Support of Motion for Summary Judgment: Garry Flowers Declaration | **3504** |
| 10/02/2020 | 234-18 (190-18 in *Butler*) | Exhibit 18 to Fluor Defendants' Memorandum in Support of Motion for Summary Judgment: Transcript Excerpts from the Deposition of David C. Durham | **3536** |
| | | **VOLUME VIII (SEALED)** | |
| 10/02/2020 | 234-19 (190-19 in *Butler*) | Exhibit 19 to Fluor Defendants' Memorandum in Support of Motion for Summary Judgment: Subcontract agreement VC Summer and Fluor | **3580** |
| 10/02/2020 | 234-20 (190-20 in *Butler*) | Exhibit 20 to Fluor Defendants' Memorandum in Support of Motion for Summary Judgment: Ellen Cartee Declaration Part One | **4000** |
| | | **VOLUME IX (SEALED)** | |
| 10/02/2020 | 234-21 (190-21 in *Butler*) | Exhibit 20 to Fluor Defendants' Memorandum in Support of Motion for Summary Judgment: Ellen Cartee Declaration Part two | **4221** |

| File Date | ECF No. (*Pennington* ECF unless otherwise indicated[1]) | Description[2] | JA Page No. |
|---|---|---|---|
| 10/02/2020 | 234-22 (190-22 in *Butler*) | Exhibit 22 to Fluor Defendants' Memorandum in Support of Motion for Summary Judgment: Subcontract Agreement FLR 000456 | **4268** |
| 10/02/2020 | 234-26 (190-26 in *Butler*) | Exhibit 24 to Fluor Defendants' Memorandum in Support of Motion for Summary Judgment: Transcript Excerpts from the Rule 30(b)(6) Deposition of Garry Flowers | **4269** |
| 10/02/2020 | 234-27 (190-27 in *Butler*) | Exhibit 25 to Fluor Defendants' Memorandum in Support of Motion for Summary Judgment: Transcript Excerpts from the Deposition of David T. Seaton | **4281** |
| 10/02/2020 | 234-28 (190-28 in *Butler*) | Exhibit 26 to Fluor Defendants' Memorandum in Support of Motion for Summary Judgment: Transcript Excerpts from the Deposition of John Shepherd | **4309** |
| 10/02/2020 | 234-29 (190-29 in *Butler*) | Exhibit 27 to Fluor Defendants' Memorandum in Support of Motion for Summary Judgment: Transcript Excerpts from the Deposition of William Marion Cherry | **4325** |
| 10/02/2020 | 234-30 (190-30 in *Butler*) | Exhibit 28 to Fluor Defendants' Memorandum in Support of Motion for Summary Judgment: Transcript Excerpts from the Deposition of Garry Flowers | **4328** |
| 10/02/2020 | 234-31 (190-31 in *Butler*) | Exhibit 30 to Fluor Defendants' Memorandum in Support of Motion for Summary Judgment: Transcript Excerpts from the Rule 30(b)(6) Deposition of Stephen Kiernan | **4459** |

| File Date | ECF No. (*Pennington* ECF unless otherwise indicated[1]) | Description[2] | JA Page No. |
|---|---|---|---|
| 10/02/2020 | 234-32 (190-32 in *Butler*) | Exhibit 33 to Fluor Defendants' Memorandum in Support of Motion for Summary Judgment: Transcript Excerpts from the Rule 30(b)(6) Deposition of Ronald A. Jones | **4469** |
| 10/02/2020 | 234-33 (190-33 in *Butler*) | Exhibit 38 to Fluor Defendants' Memorandum in Support of Motion for Summary Judgment: Transcript Excerpts from the Deposition of Alan Torres | **4474** |
| 10/02/2020 | 234-34 (190-34 in *Butler*) | Exhibit 40 to Fluor Defendants' Memorandum in Support of Motion for Summary Judgment: Transcript Excerpts from the Deposition of William A. Macecevic, III | **4483** |
| 10/02/2020 | 234-35 (190-35 in *Butler*) | Exhibit 41 to Fluor Defendants' Memorandum in Support of Motion for Summary Judgment: Transcript Excerpts from the Deposition of Kyle M. Young | **4500** |
| 10/02/2020 | 234-36 (190-36 in *Butler*) | Exhibit 42 to Fluor Defendants' Memorandum in Support of Motion for Summary Judgment: Transcript Excerpts from the Rule 30(b)(6) Deposition of Kyle M. Young | **4509** |
| 10/02/2020 | 234-37 (190-37 in Butler) | Exhibit 43 to Fluor Defendants' Memorandum in Support of Motion for Summary Judgment: Transcript Excerpts from the Rule 30(b)(6) Deposition of Iris Griffin | **4519** |
| 10/02/2020 | 234-38 (190-38 in *Butler*) | Exhibit 44 to Fluor Defendants' Memorandum in Support of Motion for Summary Judgment: Transcript Excerpts from the Deposition of Carl Churchman | **4537** |

| File Date | ECF No. (*Pennington* ECF unless otherwise indicated[1]) | Description[2] | JA Page No. |
|---|---|---|---|
| 10/02/2020 | 234-39 (190-39 in *Butler*) | Exhibit 45 to Fluor Defendants' Memorandum in Support of Motion for Summary Judgment: Declaration of Michael Philpott | **4546** |
| 10/02/2020 | 234-40 (190-40 in *Butler*) | Exhibit 46 to Fluor Defendants' Memorandum in Support of Motion for Summary Judgment: Declaration of Michael Philpott | **4562** |
| 10/02/2020 | 234-41 (190-41 in *Butler*) | Exhibit 55 to Fluor Defendants' Memorandum in Support of Motion for Summary Judgment: 4.12.17 Email re Draft Shell Summer Transition | **4570** |
| 10/02/2020 | 234-42 (190-42 in *Butler*) | Exhibit 56 to Fluor Defendants' Memorandum in Support of Motion for Summary Judgment: 4.4.17 Transition plan Draft | **4571** |
| 10/02/2020 | 234-43 (190-43 in *Butler*) | Exhibit 57 to Fluor Defendants' Memorandum in Support of Motion for Summary Judgment: 4.12.17 Transition plan Draft | **4586** |
| 10/02/2020 | 234-44 (190-44 in *Butler*) | Exhibit 58 to Fluor Defendants' Memorandum in Support of Motion for Summary Judgment: 4.17.17 Transition Plan Draft | **4611** |
| 10/02/2020 | 234-45 (190-45 in *Butler*) | Exhibit 59 to Fluor Defendants' Memorandum in Support of Motion for Summary Judgment: 5.5.17 Transition Project Plan Update Part One of Two | **4653** |
| 10/02/2020 | 234-46 (190-46 in *Butler*) | Exhibit 59 to Fluor Defendants' Memorandum in Support of Motion for Summary Judgment: 5.5.17 Transition Project Plan Update Part Two of Two | **4692** |
| 10/02/2020 | 234-47 (190-47 in *Butler*) | Exhibit 60 to Fluor Defendants' Memorandum in Support of Motion for Summary Judgment: VC Summer Project Plan | **4733** |

| File Date | ECF No. (*Pennington* ECF unless otherwise indicated[1]) | Description[2] | JA Page No. |
|---|---|---|---|
| 10/02/2020 | 234-48 (190-48 in *Butler*) | Exhibit 61 to Fluor Defendants' Memorandum in Support of Motion for Summary Judgment: Fluor Proposed Scope of Work for VC Summer 6.2.17 | **4735** |
| 10/02/2020 | 234-49 (1949 in *Butler*) | Exhibit 62 to Fluor Defendants' Memorandum in Support of Motion for Summary Judgment: Rotating Schedule Evaluation | **4773** |
| 10/02/2020 | 234-50 (190-50 in Butler) | Exhibit 63 to Fluor Defendants' Memorandum in Support of Motion for Summary Judgment: Transcript Excerpts from the Rule 30(b)(6) Deposition of Annmarie Higgins | **4782** |
| 10/02/2020 | 234-51 (190-51 in Butler) | Exhibit 65 to Fluor Defendants' Memorandum in Support of Motion for Summary Judgment: 7.31 Email re Meeting Tuesday | **4788** |
| 10/02/2020 | 234-52 (190-52 in *Butler*) | Exhibit 69 to Fluor Defendants' Memorandum in Support of Motion for Summary Judgment: 3.30.17 Email re VCS High Level Communications Update | **4789** |
| 10/02/2020 | 234-53 (190-53 in *Butler*) | Exhibit 70 to Fluor Defendants' Memorandum in Support of Motion for Summary Judgment: 6.22.17 Email re Judy VC Summer Info | **4792** |
| 10/02/2020 | 234-54 (190-54 in *Butler*) | Exhibit 71 to Fluor Defendants' Memorandum in Support of Motion for Summary Judgment: 7.5.17 Email re Request for Approval of Staff | **4798** |
| 10/02/2020 | 234-55 (190-55 in *Butler*) | Exhibit 72 to Fluor Defendants' Memorandum in Support of Motion for Summary Judgment: 7.11.17 Email re 9636 Balswer Darren Site Services | **4800** |

| File Date | ECF No. (*Pennington* ECF unless otherwise indicated[1]) | Description[2] | JA Page No. |
|---|---|---|---|
| 10/02/2020 | 234-56 (190-56 in *Butler*) | Exhibit 73 to Fluor Defendants' Memorandum in Support of Motion for Summary Judgment: 7.27.17 Email re Hireright | **4808** |
| 10/02/2020 | 234-57 (190-57 in *Butler*) | Exhibit 76 to Fluor Defendants' Memorandum in Support of Motion for Summary Judgment: Transcript Excerpts from the Rule 30(b)(6) Deposition of Iris Griffin | **4809** |
| 10/02/2020 | 234-58 (190-58 in *Butler*) | Exhibit 80 to Fluor Defendants' Memorandum in Support of Motion for Summary Judgment: ORS Site Visit Documents | **4825** |
| 10/02/2020 | 234-59 (190-59 in *Butler*) | Exhibit 83 to Fluor Defendants' Memorandum in Support of Motion for Summary Judgment: 5.25.17 Email re Brabec | **4827** |
| 10/02/2020 | 234-60 (190-60 in *Butler*) | Exhibit 85 to Fluor Defendants' Memorandum in Support of Motion for Summary Judgment: Transcript Excerpts from the Deposition of Michael Crosby | **4828** |
| 10/02/2020 | 234-61 (190-61 in *Butler*) | Exhibit 86 to Fluor Defendants' Memorandum in Support of Motion for Summary Judgment: Santee Cooper Powerpoint | **4831** |
| | | **VOLUME X (SEALED)** | |
| 10/02/2020 | 234-62 (190-62 in *Butler*) | Exhibit 87 to Fluor Defendants' Memorandum in Support of Motion for Summary Judgment: Board Powerpoint 4.22.17 | **4876** |
| 10/02/2020 | 234-63 (190-63 in *Butler*) | Exhibit 88 to Fluor Defendants' Memorandum in Support of Motion for Summary Judgment: Email re June 13, 2017 Meeting with SCANA | **4888** |

| File Date | ECF No. (*Pennington* ECF unless otherwise indicated[1]) | Description[2] | JA Page No. |
|---|---|---|---|
| 10/02/2020 | 234-64 (190-64 in *Butler*) | Exhibit 91 to Fluor Defendants' Memorandum in Support of Motion for Summary Judgment: Letter to SCANA Advisory Board Members | **4889** |
| 10/02/2020 | 234-65 (190-65 in *Butler*) | Exhibit 101 to Fluor Defendants' Memorandum in Support of Motion for Summary Judgment: Butler Offer Letter | **4891** |
| 10/02/2020 | 234-66 (190-66 in Butler) | Exhibit 102 to Fluor Defendants' Memorandum in Support of Motion for Summary Judgment: Pennington Notification of Employment Status | **4892** |
| 10/02/2020 | 234-67 (190-67 in *Butler*) | Exhibit 103 to Fluor Defendants' Memorandum in Support of Motion for Summary Judgment: Darwish Notification of Employment Status | **4893** |
| 10/02/2020 | 234-68 (190-68 in Butler) | Exhibit 104 to Fluor Defendants' Memorandum in Support of Motion for Summary Judgment: Sutton Offer Letter | **4894** |
| 10/02/2020 | 234-69 (190-69 in *Butler*) | Exhibit 106 to Fluor Defendants' Memorandum in Support of Motion for Summary Judgment: FDMS Governance Documents | **4895** |
| 10/02/2020 | 234-70 (190-70 in *Butler*) | Exhibit 107 to Fluor Defendants' Memorandum in Support of Motion for Summary Judgment: FEI Governance Documents | **4915** |
| 10/02/2020 | 237 (193 in *Butler*) | Plaintiffs' Memorandum of Law in Support of Motion For Partial Summary Judgment | **4948** |

| File Date | ECF No. (*Pennington* ECF unless otherwise indicated[1]) | Description[2] | JA Page No. |
|---|---|---|---|
| 10/02/2020 | 237-2 (193-2 in *Butler*) | Exhibit 3 to Plaintiffs' Memorandum of Law in Support of Motion for Partial Summary Judgment: Transcript Excerpts from the Rule 30(b)(6) Deposition of Ronald A. Jones | **5001** |
| 10/02/2020 | 237-3 (193-3 in *Butler*) | Exhibit 5 to Plaintiffs' Memorandum of Law in Support of Motion for Partial Summary Judgment: Transcript Excerpts from the Deposition of Kyle M. Young | **5035** |
| 10/02/2020 | 237-4 (193-4 in *Butler*) | Exhibit 6 to Plaintiffs' Memorandum of Law in Support of Motion for Partial Summary Judgment: Young Email with Oversight Plan | **5143** |
| 10/02/2020 | 237-5 (193-5 in *Butler*) | Exhibit 7 to Plaintiffs' Memorandum of Law in Support of Motion for Partial Summary Judgment: Excerpts from Committee Meeting | **5202** |
| 10/02/2020 | 237-6 (193-6 in *Butler*) | Exhibit 8 to Plaintiffs' Memorandum of Law in Support of Motion for Partial Summary Judgment: Team Agenda [*excerpts] | **5208** |
| 10/02/2020 | 237-9 (193-9 in *Butler*) | Exhibit 15  Plaintiffs' Memorandum of Law in Support of Motion for Partial Summary Judgment: Transcript Excerpts from the Deposition of Bruce E. Hinkley | **5226** |
| 10/02/2020 | 237-10 (193-10 in *Butler*) | Exhibit 16 to Plaintiffs' Memorandum of Law in Support of Motion for Partial Summary Judgment: Transcript Excerpts from the Deposition of Nicole Keen | **5236** |
| 10/02/2020 | 237-11 (193-11 in *Butler*) | Exhibit 18 to Plaintiffs' Memorandum of Law in Support of Motion for Partial Summary Judgment: Compilation of Emails [*excerpt] | **5257** |

| File Date | ECF No. (*Pennington* ECF unless otherwise indicated[1]) | Description[2] | JA Page No. |
|---|---|---|---|
| 10/02/2020 | 237-14 (193-14 in *Butler* | Exhibit 21 to Plaintiffs' Memorandum of Law in Support of Motion for Partial Summary Judgment: Cover of Plan of the Day Agenda | **5258** |
| 10/02/2020 | 237-25 (193-25 in *Butler*) | Exhibit 37 to Plaintiffs' Memorandum of Law in Support of Motion for Partial Summary Judgment: Transcript Excerpts from the Rule 30(b)(6) Deposition of Kyle M. Young | **5260** |
| 10/02/2020 | 237-27 (193-27 in *Butler*) | Exhibit 41 to Plaintiffs' Memorandum of Law in Support of Motion for Partial Summary Judgment: Carter Email to Board | **5283** |
| 10/02/2020 | 237-28 (193-28 in Butler) | Exhibit 42 to Plaintiffs' Memorandum of Law in Support of Motion for Partial Summary Judgment: Carter Email to Marsh | **5285** |
| 10/02/2020 | 237-29 (193-29 in *Butler*) | Exhibit 44 to Plaintiffs' Memorandum of Law in Support of Motion for Partial Summary Judgment: Transcript Excerpts from the Deposition of Garry Flowers | **5288** |
| 10/02/2020 | 237-34 (193-34 in *Butler*) | Exhibit 52 to Plaintiffs' Memorandum of Law in Support of Motion for Partial Summary Judgment: Starks Email | **5296** |
| 10/30/2020 | 249 (205 in Butler) | Plaintiff's Response in Opposition to SCANA Defendants' Motion for Summary Judgment and Memorandum in Support | **5299** |
| 10/30/2020 | 249-1 (205-1 in *Butler*) | Exhibit 56 to Plaintiffs' Opposition to SCANA Defendants' Motion for Summary Judgment: Transcript Excerpts from the Rule 30(b)(6) Deposition of Ronald A. Jones | **5342** |

| File Date | ECF No. (*Pennington* ECF unless otherwise indicated[1]) | Description[2] | JA Page No. |
|---|---|---|---|
| 10/30/2020 | 249-4 (205-4 in *Butler*) | Exhibit 63 to Plaintiffs' Opposition to SCANA Defendants' Motion for Summary Judgment: MRT Agenda 11/16/16 [*excerpts] | **5351** |
| 10/30/2020 | 249-5 (205-5 in *Butler*) | Exhibit 64 to Plaintiffs' Opposition to SCANA Defendants' Motion for Summary Judgment: MRT Agenda 12/21/16 [*excerpts] | **5363** |
| 10/30/2020 | 249-6 (205-6 in *Butler*) | Exhibit 65 to Plaintiffs' Opposition to SCANA Defendants' Motion for Summary Judgment: MRT Agenda 2/22/17 [*excerpts] | **5372** |
| 10/30/2020 | 249-7 (205-7 in Butler) | Exhibit 66 to Plaintiffs' Opposition to SCANA Defendants' Motion for Summary Judgment: MRT Agenda 3/1/17 [*excerpts] | **5380** |
| 10/30/2020 | 249-8 (205-8 in *Butler*) | Exhibit 67 to Plaintiffs' Opposition to SCANA Defendants' Motion for Summary Judgment: MRT Agenda 3/8/17 [*excerpts] | **5386** |
| 10/30/2020 | 249-9 (205-9 in *Butler*) | Exhibit 68 to Plaintiffs' Opposition to SCANA Defendants' Motion for Summary Judgment: MRT Agenda 3/15/17 [*excerpts] | **5396** |
| 10/30/2020 | 249-10 (205-10 in *Butler*) | Exhibit 69 to Plaintiffs' Opposition to SCANA Defendants' Motion for Summary Judgment: MRT Agenda 3/30/17 and 4/5/17 [*excerpts] | **5406** |
| 10/30/2020 | 249-11 (205-11 in Butler) | Exhibit 70 to Plaintiffs' Opposition to SCANA Defendants' Motion for Summary Judgment: MRT Agenda 4/13/17 [*excerpts] | **5410** |

| File Date | ECF No. (*Pennington* ECF unless otherwise indicated[1]) | Description[2] | JA Page No. |
|---|---|---|---|
| 10/30/2020 | 249-13 (205-13 in *Butler*) | Exhibit 72 to Plaintiffs' Opposition to SCANA Defendants' Motion for Summary Judgment: MRT Agenda 5/17/17 [*excerpts] | **5417** |
| 10/30/2020 | 249-14 (205-14 in Butler) | Exhibit 73 to Plaintiffs' Opposition to SCANA Defendants' Motion for Summary Judgment: MRT Agenda 5/24/17 [*excerpts] | **5424** |
| 10/30/2020 | 249-15 (205-15 in *Butler*) | Exhibit 74 to Plaintiffs' Opposition to SCANA Defendants' Motion for Summary Judgment: MRT Agenda 6/7/17 [*excerpts] | **5430** |
| 10/30/2020 | 249-16 (205-16 in *Butler*) | Exhibit 75 to Plaintiffs' Opposition to SCANA Defendants' Motion for Summary Judgment: MRT Agenda 6/14/17 [*excerpts] | **5434** |
| 10/30/2020 | 249-17 (205-17 in *Butler*) | Exhibit 77 to Plaintiffs' Opposition to SCANA Defendants' Motion for Summary Judgment: Press Release | **5438** |
| 10/30/2020 | 251 (207 in *Butler*) | Plaintiffs' Memorandum in Opposition to the Fluor Defendants' Motion for Summary Judgment | **5445** |
| 10/30/2020 | 251-10 (207-10 in *Butler*) | Exhibit 100 to Plaintiffs' Memorandum of Law in Opposition to Fluor Defendants' Motion for Summary Judgment: Fluor Earnings Call | **5496** |
| **VOLUME XI (SEALED)** | | | |
| 10/30/2020 | 251-34 (207-34 in *Butler*) | Exhibit 131 to Plaintiffs' Memorandum of Law in Opposition to Fluor Defendants' Motion for Summary Judgment: Chats between Flowers and Shepherd | **5511** |

| File Date | ECF No. (*Pennington* ECF unless otherwise indicated[1]) | Description[2] | JA Page No. |
|---|---|---|---|
| 10/30/2020 | 251-36 (207-36 in *Butler*) | Exhibit 133 to Plaintiffs' Memorandum of Law in Opposition to Fluor Defendants' Motion for Summary Judgment: Transcript Excerpts from the Rule 30(b)(6) Deposition of Michael A. Philpott | **5565** |
| 10/30/2020 | 251-38 (207-38 in *Butler*) | Exhibit 135 to Plaintiffs' Memorandum of Law in Opposition to Fluor Defendants' Motion for Summary Judgment: Chats between Flowers and Seaton | **5573** |
| 10/30/2020 | 251-41 (207-41 in *Butler*) | Exhibit 138 to Plaintiffs' Memorandum of Law in Opposition to Fluor Defendants' Motion for Summary Judgment: Chats between Seaton and Flowers | **5575** |
| 11/13/2020 | 253-1 (209-1 in *Butler*) | Exhibit A to Fluor's Reply in Support of Motion for Summary Judgment: Transcript Excerpts from the Rule 30(b)(6) Deposition of Stephen M. Kiernan | **5586** |
| 11/13/2020 | 253-2 (209-2 in *Butler*) | Exhibit B to Fluor's Reply in Support of Motion for Summary Judgment: Transcript Excerpts from the Deposition of David T. Seaton | **5589** |
| 11/13/2020 | 253-3 (209-3 in *Butler*) | Exhibit C to Fluor's Reply in Support of Motion for Summary Judgment: Transcript Excerpts from the Deposition of Garry Flowers | **5597** |
| 11/13/2020 | 253-4 (209-4 in *Butler*) | Exhibit D to Fluor's Reply in Support of Motion for Summary Judgment: John Shepherd Supplemental Declaration | **5602** |

| File Date | ECF No. (*Pennington* ECF unless otherwise indicated[1]) | Description[2] | JA Page No. |
|---|---|---|---|
| 11/13/2020 | 253-5 (209-5 in *Butler*) | Exhibit E to Fluor's Reply in Support of Motion for Summary Judgment: Transcript Excerpts from the Rule 30(b)(6) Deposition of Ronald A. Jones | **5679** |
| 11/13/2020 | 253-6 (209-6 in *Butler*) | Exhibit F to Fluor's Reply in Support of Motion for Summary Judgment: Jim Hanna Declaration | **5681** |
| 11/13/2020 | 255 (211 in *Butler*) | Plaintiffs' Reply (to SCANA Defendants' Response) in Support of Motion for Partial Summary Judgment | **5707** |
| 11/13/2020 | 257 (213 in *Butler*) | Plaintiffs' Reply (to Fluor Defendants' Response) in Support of Motion for Partial Summary Judgment | **5372** |

APPEAL,CLOSED

# U.S. District Court
# District of South Carolina (Rock Hill)
# CIVIL DOCKET FOR CASE #: 0:17-cv-02094-JMC

Pennington v. Fluor Corporation et al
Assigned to: Honorable J Michelle Childs
related Case: 0:17-cv-02201-JMC
Case in other court: USCA, 21-01141
Cause: 29:2101 WARN Act

Date Filed: 08/08/2017
Date Terminated: 01/06/2021
Jury Demand: None
Nature of Suit: 790 Labor: Other
Jurisdiction: Federal Question

**Plaintiff**

**Harry Pennington , III**
*on behalf of himself and all others similarly situated*

represented by

**Lucy Clark Sanders**
Bloodgood and Sanders
242 Mathis Ferry Road
Suite 201
Mount Pleasant, SC 29464
843-972-0313
Fax: 843-352-2714
Email: lsanders@bloodgoodsanders.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jack A Raisner**
Raisner Roupinian LLP
500 Fifth Avenue
Suite 1600
New York, NY 10110
212-221-1747
Fax: 212-221-1747
Email: jar@raisnerroupinian.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Nancy Bloodgood**
Bloodgood and Sanders
242 Mathis Ferry Road
Suite 201

Mount Pleasant, SC 29464
843-972-0313
Fax: 843-352-2714
Email:
nbloodgood@bloodgoodsanders.com
*ATTORNEY TO BE NOTICED*

**Rene S Roupinian**
Raisner Roupinian LLP
500 Fifth Avenue
Suite 1600
New York, NY 10110
212-221-1747
Fax: 212-221-1747
Email: rsr@raisnerroupinian.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Timothy Lorentz** *on behalf of himself and all others similarly situated*

represented by

**Lucy Clark Sanders**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jack A Raisner**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Nancy Bloodgood**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Rene S Roupinian**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

V.

**Movant**

**Jimmy Addison** represented by **William Alexander Coates**
Roe Cassidy Coates and Price
PO Box 10529
Greenville, SC 29603
864-349-2600
Fax: 864-349-0303
Email: wac@roecassidy.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Movant**

**Kevin Marsh** represented by **Derk Bleckman Kekkert Van Raalte , IV**
Brady Hair Law Offices
2500 City Hall La, 3rd Floor (29406)
PO Box 61896
North Charleston, SC 29419
843-572-8700
Fax: 843-572-8715
Email: derk@bradyhair.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Movant**

**Stephen Byrne** represented by **James Mixon Griffin**
Griffin Davis LLC
4408 Forest Drive
Suite 300
Columbia, SC 29206
803-744-0800
Fax: 803-744-0805
Email: jgriffin@griffindavislaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Margaret Nicole Fox**
Griffin Davis LLC
4408 Forest Drive
Suite 300
Columbia, SC 29206
803-744-0800
Fax: 803-744-0805

Email: mfox@griffindavislaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Fluor Corporation**   represented by   **John Hagood Tighe**
Fisher and Phillips
PO Box 11612
Columbia, SC 29211
803-255-0000
Fax: 803-255-0202
Email: htighe@fisherphillips.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Matthew Robert Korn**
Fisher and Phillips LLP
1320 Main Street
Suite 750
Columbia, SC 29201
803-255-0000
Email: mkorn@fisherphillips.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**David Kresser**
Fisher and Phillips LLP
1075 Peachtree Street NE
Suite 3500
Atlanta, GA 30326
404-231-1400
Email: dkresser@fisherphillips.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Kathleen McLeod Caminiti**
Fisher and Phillips LLP (NJ)
430 Mountain Avenue
Suite 303
Murray Hill, NJ 07974

908-516-1050
Email: kcaminiti@fisherphillips.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Fluor Enterprises Inc** represented by **John Hagood Tighe**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Matthew Robert Korn**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**David Kresser**
(See above for address)
*PRO HAC VICE*

**Kathleen McLeod Caminiti**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Defendant**

**SCANA Corporation** represented by **Charles T Speth , II**
Ogletree Deakins Nash Smoak and Stewart PC
First Base Building
2142 Boyce Street
Suite 401
Columbia, SC 29201
803-252-1300
Email: ted.speth@ogletreedeakins.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**D Michael Henthorne**
Ogletree Deakins Nash Smoak and Stewart PC
First Base Building

2142 Boyce Street
Suite 401
Columbia, SC 29201
803-252-1300
Fax: 803-254-6517
Email:
michael.henthorne@ogletreedeakins.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**James H Fowles , III**
Ogletree Deakins Nash Smoak and Stewart
PC
First Base Building
2142 Boyce Street
Suite 401
Columbia, SC 29201
803-252-1300
Fax: 803-254-6517
Email:
james.fowles@ogletreedeakins.com
*TERMINATED: 06/13/2019*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**James Roy Silvers**
Ogletree Deakins Nash Smoak and Stewart
(GREN)
300 North Main Street
Suite 500
Greenville, SC 29601
864-271-1300
Email: james.silvers@ogletree.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Piper Reiff Byzet**
Ogletree Deakins Nash Smoak and Stewart
PO Box 1808
Charleston, SC 29402
843-720-0863
Fax: 843-853-9992

Email: piper.byzet@ogletreedeakins.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Christopher Ray Thomas**
Ogletree Deakins Nash Smoak and Stewart PC
First Base Building
2142 Boyce Street
Suite 401
Columbia, SC 29201
803-252-1300
Email: christopher.r.thomas@ogletreedeakins.com
*ATTORNEY TO BE NOTICED*

**Defendant**

**Fluor Daniel Maintenance Services Inc** represented by **John Hagood Tighe**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Matthew Robert Korn**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**South Carolina Electric & Gas Company** represented by **Charles T Speth , II**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**D Michael Henthorne**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**James H Fowles , III**
(See above for address)
*TERMINATED: 06/13/2019*
*LEAD ATTORNEY*

*ATTORNEY TO BE NOTICED*

**James Roy Silvers**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Piper Reiff Byzet**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Christopher Ray Thomas**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Amicus**

**Associated Builders and Contractors Inc** represented by **William H Foster , III**
Littler Mendelson PC (GVL)
110 E Court Street
Suite 201
Greenville, SC 29601
864-775-3191
Fax: 864-752-1065
Email: bfoster@littler.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 08/08/2017 | 1 | COMPLAINT against Fluor Corporation, Fluor Enterprises Inc, SCANA Corporation ( Filing fee $ 400 receipt number 0420-7297691.), filed by Harry Pennington, III. Service due by 11/6/2017(asni, ) (Entered: 08/09/2017) |
| 08/08/2017 | 2 | Summons Issued as to Fluor Corporation, Fluor Enterprises Inc, SCANA Corporation. (asni, ) (Entered: 08/09/2017) |
| 08/08/2017 | 3 | Local Rule 26.01 Answers to Interrogatories by Harry Pennington, III.(asni, ) (Entered: 08/09/2017) |

| | | |
|---|---|---|
| 08/29/2017 | 5 | SUMMONS Returned Executed by Harry Pennington, III. All Defendants. (Attachments: # 1 Exhibit 1 - Proof of Service on Flour Corporation, # 2 Exhibit 2 and 3 - Proof of Service on Flour Enterprises and SCANA Corporation)(Sanders, Lucy) (Entered: 08/29/2017) |
| 09/01/2017 | 6 | MOTION to Appear Pro Hac Vice by Jack A. Raisner ( Filing fee $ 250 receipt number 0420-7340885) by Harry Pennington, III. Response to Motion due by 9/15/2017. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. (Attachments: # 1 Supporting Documents Affidavit in Support of Motion, # 2 Supporting Documents Certificate of Good Standing)Proposed order is being emailed to chambers with copy to opposing counsel.(Sanders, Lucy) (Entered: 09/01/2017) |
| 09/01/2017 | 7 | Withdrawal of Motions: 6 MOTION to Appear Pro Hac Vice by Jack A. Raisner ( Filing fee $ 250 receipt number 0420-7340885) filed by Harry Pennington, III.. (Sanders, Lucy) (Entered: 09/01/2017) |
| 09/13/2017 | 9 | ANSWER to 1 Complaint by SCANA Corporation. (Attachments: # 1 Exhibit A - Cover Page for Proposed Sealed Document, # 2 Exhibit B - Letter to Pls Counsel dated Sept 5 2017, # 3 Exhibit C - Example WARN Notice to SCEG Employees, # 4 Exhibit D - Notice to SCDEW)(Thomas, Christopher) (Entered: 09/13/2017) |
| 09/13/2017 | 10 | Local Rule 26.01 Answers to Interrogatories by SCANA Corporation.(Thomas, Christopher) (Entered: 09/13/2017) |
| 09/13/2017 | 11 | MOTION to Seal Document by SCANA Corporation. Response to Motion due by 9/27/2017. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. (Attachments: # 1 Memo in Support)No proposed order. (Thomas, Christopher) (Entered: 09/13/2017) |
| 09/14/2017 | 13 | **CONFERENCE AND SCHEDULING ORDER Rule 26(f) Conference Deadline 10/4/2017, 26(a) Initial Disclosures due by 10/18/2017, Rule 26 Report due by 10/18/2017, Motions to Amend Pleadings due by** |

| | | |
|---|---|---|
| | | **11/28/2017, Plaintiffs ID of Expert Witness due by 12/28/2017, Defendants ID of Expert Witnesses Due by 1/29/2018, Records Custodian Affidavit due by 1/29/2018, Discovery due by 2/28/2018, Motion in Limine due by 5/4/2018, Motions due by 3/14/2018, Rule 26(a)(3) Disclosures due by 5/4/2018, Pretrial Briefs due by 5/29/2018, Jury Selection Deadline 6/5/2018, Signed by Honorable J Michelle Childs on 9/14/2017. (asni, )** (Entered: 09/14/2017) |
| 09/14/2017 | 14 | **MEDIATION ORDER Mediation Due by 3/7/2018, Signed by Honorable J Michelle Childs on 9/14/2017. (asni, )** (Entered: 09/14/2017) |
| 09/15/2017 | 16 | MOTION to Appear Pro Hac Vice by Jack A. Raisner ( Filing fee $ 250 receipt number 0420-7361723) by Harry Pennington, III. Response to Motion due by 9/29/2017. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. (Attachments: # 1 Supporting Documents Affidavit in Support of Motion, # 2 Supporting Documents Certificate of Good Standingt)Proposed order is being emailed to chambers with copy to opposing counsel.(Sanders, Lucy) (Entered: 09/15/2017) |
| 09/15/2017 | 17 | MOTION to Appear Pro Hac Vice by Rene S. Roupinian ( Filing fee $ 250 receipt number 0420-7361764) by Harry Pennington, III. Response to Motion due by 9/29/2017. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. (Attachments: # 1 Supporting Documents Affidavit in Support of Motion, # 2 Supporting Documents Certificate of Good Standing)Proposed order is being emailed to chambers with copy to opposing counsel.(Sanders, Lucy) (Entered: 09/15/2017) |
| 09/18/2017 | 18 | **TEXT ORDER granting 16 Motion to Appear Pro Hac Vice.; granting 17 Motion to Appear Pro Hac Vice. Signed by Honorable J Michelle Childs on 9/18/2017.(asni, )** (Entered: 09/18/2017) |
| 10/04/2017 | 21 | MOTION to Certify Class , MOTION to Appoint Counsel ( Response to Motion due by 10/18/2017. Add an additional 3 days only if served by mail or otherwise |

| | | |
|---|---|---|
| | | allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. ) by Harry Pennington, III. (Attachments: # 1 Memo in Support, # 2 Exhibit A - Pennington Complaint, # 3 Exhibit B - Butler Complaint, # 4 Exhibit C - Plaintiff's Declaration, # 5 Exhibit D - Roupinian Declaration, # 6 Exhibit E - Email from Counsel, # 7 Exhibit F - Proposed Notice, # 8 Exhibit G - Proposed Order, # 9 Exhibit H - Unpublished Cases)Proposed order is being emailed to chambers with copy to opposing counsel.Associated Cases: 0:17-cv-02094-JMC, 0:17-cv-02201-JMC(Sanders, Lucy) supplemental document 82 added on 1/23/2018 (asni, ). supplemental document 115 added on 6/14/2018 (asni, ). (Entered: 10/04/2017) |
| 10/04/2017 | 22 | ANSWER to 1 Complaint by Fluor Corporation, Fluor Enterprises Inc.(Tighe, John) (Entered: 10/04/2017) |
| 10/04/2017 | 23 | Local Rule 26.01 Answers to Interrogatories by Fluor Corporation, Fluor Enterprises Inc.(Tighe, John) (Entered: 10/04/2017) |
| 10/05/2017 | 24 | **CONFERENCE AND SCHEDULING ORDER Rule 26(f) Conference Deadline 10/25/2017, 26(a) Initial Disclosures due by 11/8/2017, Rule 26 Report due by 11/8/2017, Motions to Amend Pleadings due by 12/19/2017, Plaintiffs ID of Expert Witness due by 1/18/2018, Defendants ID of Expert Witnesses Due by 2/20/2018, Records Custodian Affidavit due by 2/20/2018, Discovery due by 3/22/2018, Motion in Limine due by 5/4/2018, Motions due by 4/5/2018, Rule 26(a)(3) Disclosures due by 5/4/2018, Pretrial Briefs due by 5/29/2018, Jury Selection Deadline 6/5/2018, Signed by Honorable J Michelle Childs on 10/5/2017. (asni, )** (Entered: 10/05/2017) |
| 10/05/2017 | 25 | **MEDIATION ORDER Mediation Due by 3/29/2018, Signed by Honorable J Michelle Childs on 10/5/2017. (asni, )** Modified to edit text on 10/5/2017 (asni, ). (Main Document 25 replaced on 10/5/2017) (asni, ). Modified to correct mediation deadline to 2018 not 2017 on 10/5/2017 (asni, ). (Entered: 10/05/2017) |
| 10/11/2017 | 27 | MOTION to Appear Pro Hac Vice by Kathleen McLeod Caminiti ( Filing fee $ 250 receipt number 0420- |

| | | |
|---|---|---|
| | | 7402940) by Fluor Corporation, Fluor Enterprises Inc. Response to Motion due by 10/25/2017. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. (Attachments: # 1 Affidavit, # 2 Supporting Documents Certificate of Good Standing, # 3 Supporting Documents Court Admissions, # 4 Supporting Documents Present & Previous SC PHV Admissions)No proposed order. (Tighe, John) (Entered: 10/11/2017) |
| 10/11/2017 | 28 | MOTION to Appear Pro Hac Vice by David R. Kresser ( Filing fee $ 250 receipt number 0420-7402961) by Fluor Corporation, Fluor Enterprises Inc. Response to Motion due by 10/25/2017. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. (Attachments: # 1 Affidavit, # 2 Supporting Documents Certificate of Good Standing, # 3 Supporting Documents Court Admissions, # 4 Supporting Documents Present & Previous SC PHV Admissions)No proposed order.(Tighe, John) (Entered: 10/11/2017) |
| 10/11/2017 | 29 | **TEXT ORDER granting 27 Motion to Appear Pro Hac Vice.; granting 28 Motion to Appear Pro Hac Vice. Signed by Honorable J Michelle Childs on 10/11/2017.(asni, )** (Entered: 10/11/2017) |
| 10/12/2017 | 30 | MOTION for Judgment on the Pleadings by SCANA Corporation. Response to Motion due by 10/26/2017. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. No proposed order.(Speth, Charles) (Entered: 10/12/2017) |
| 10/13/2017 | 31 | Consent MOTION for Extension of Time to File Response/Reply as to 21 MOTION to Certify Class MOTION to Appoint Counsel by Fluor Corporation, Fluor Enterprises Inc. Response to Motion due by 10/27/2017. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. (Attachments: # 1 Exhibit Proposed Order for Extension of Time)Proposed order is being emailed to chambers with copy to opposing counsel. (Tighe, John) (Entered: 10/13/2017) |

| | | |
|---|---|---|
| 10/13/2017 | 32 | **TEXT ORDER granting 31 Motion for Extension of Time to File Response/Reply re 21 MOTION to Certify Class, MOTION to Appoint Counsel, Response to Motion due by 11/8/2017. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. Signed by Honorable J Michelle Childs on 10/13/2017.(asni, )** (Entered: 10/13/2017) |
| 10/13/2017 | 33 | MOTION to Stay by Fluor Corporation, Fluor Enterprises Inc. Response to Motion due by 10/27/2017. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. No proposed order.(Tighe, John) (Entered: 10/13/2017) |
| 10/13/2017 | 34 | **ORDER granting 11 Motion to Seal Document. Signed by Honorable J Michelle Childs on 10/13/2017.(asni, )** (Entered: 10/13/2017) |
| 10/13/2017 | 35 | Sealed Document. (Thomas, Christopher) (Entered: 10/13/2017) |
| 10/18/2017 | 36 | MOTION to Stay by SCANA Corporation. Response to Motion due by 11/1/2017. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. No proposed order. (Thomas, Christopher) (Entered: 10/18/2017) |
| 10/18/2017 | 37 | RESPONSE in Opposition re 21 MOTION to Certify Class MOTION to Appoint Counsel Response filed by SCANA Corporation.Reply to Response to Motion due by 10/25/2017 Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6. (Attachments: # 1 Exhibit A - Declaration of Alan Torres)(Thomas, Christopher) (Entered: 10/18/2017) |
| 10/18/2017 | 38 | Rule 26(f) Report by SCANA Corporation.(Thomas, Christopher) (Entered: 10/18/2017) |
| 10/18/2017 | 39 | Rule 26 Outline of Discovery Plan by SCANA Corporation.(Thomas, Christopher) (Entered: 10/18/2017) |
| 10/18/2017 | 40 | Local Rule 26.03 Answers to Interrogatories by SCANA |

| | | |
|---|---|---|
| | | Corporation.(Thomas, Christopher) (Entered: 10/18/2017) |
| 10/25/2017 | 41 | AMENDED COMPLAINT against All Defendants, filed by Harry Pennington, III. Service due by 1/23/2018 (Attachments: # 1 Summons (Amended), # (Sanders, Lucy) Modified delete attachment 2 and file separately as entry 44 on 10/26/2017 (asni, ). (Entered: 10/25/2017) |
| 10/25/2017 | 43 | AMENDED Summons Issued as to Fluor Corporation, Fluor Daniel Maintenance Services Inc, Fluor Enterprises Inc, SCANA Corporation, South Carolina Electric & Gas Company. (asni, ) (Entered: 10/25/2017) |
| 10/25/2017 | 44 | AMENDED Local Rule 26.01 Answers to Interrogatories by Harry Pennington, III.(asni, ) (Entered: 10/25/2017) |
| 10/27/2017 | 47 | RESPONSE in Opposition re 33 MOTION to Stay Response filed by Harry Pennington, III.Reply to Response to Motion due by 11/3/2017 Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6. (Attachments: # 1 Exhibit A - Unpublished Case, # 2 Exhibit B - Unpublished Case, # 3 Exhibit C - Unpublished Case, # 4 Exhibit D - Unpublished Case)(Sanders, Lucy) (Entered: 10/27/2017) |
| 10/31/2017 | 48 | Consent MOTION for Extension of Time to File Response/Reply as to 30 MOTION for Judgment on the Pleadings and for Suspension of Briefing on Class Certification until Resolution of Certain Motions Pending in the Related Warn Act Cases by Harry Pennington, III. Response to Motion due by 11/14/2017. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. No proposed order.(Sanders, Lucy) (Entered: 10/31/2017) |
| 10/31/2017 | 49 | SUPPLEMENTAL RESPONSE in Support re 21 MOTION to Certify Class MOTION to Appoint Counsel Response filed by Harry Pennington, III. (Attachments: # 1 Exhibit A - Case in Support)(Sanders, Lucy) (Entered: 10/31/2017) |

| | | |
|---|---|---|
| 11/01/2017 | 50 | RESPONSE in Opposition re 36 MOTION to Stay Response filed by Harry Pennington, III.Reply to Response to Motion due by 11/8/2017 Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6. (Attachments: # 1 Exhibit A - Unpublished Case, # 2 Exhibit B - Unpublished Case, # 3 Exhibit C - Unpublished Case)(Sanders, Lucy) (Entered: 11/01/2017) |
| 11/02/2017 | 51 | **TEXT ORDER granting 48 Motion for Extension of Time to File Response/Reply re 30 MOTION for Judgment on the Pleadings and Suspension of Briefing of Class Certification until Resolution of Certain Motions Pending in the Related Warn Act Cases. Response to Motion due by 11/6/2017. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. Signed by Honorable J Michelle Childs on 11/2/2017.(asni, )** (Entered: 11/02/2017) |
| 11/07/2017 | 54 | SUMMONS Returned Executed by Harry Pennington, III. *(Amended Summons and Complaint)* Fluor Corporation served on 10/30/2017, answer due 11/20/2017; Fluor Daniel Maintenance Services Inc served on 10/30/2017, answer due 11/20/2017; Fluor Enterprises Inc served on 10/30/2017, answer due 11/20/2017; SCANA Corporation served on 10/30/2017, answer due 11/20/2017. (Attachments: # 1 Exhibit A - Proof of Service on Fluor Defendants, # 2 Exhibit B - Proof of Service on SCANA)(Sanders, Lucy) (Entered: 11/07/2017) |
| 11/08/2017 | 55 | Local Rule 26.03 Answers to Interrogatories by Fluor Corporation, Fluor Daniel Maintenance Services Inc, Fluor Enterprises Inc.(Tighe, John) (Entered: 11/08/2017) |
| 11/08/2017 | 56 | Rule 26 Outline of Discovery Plan by Fluor Corporation, Fluor Daniel Maintenance Services Inc, Fluor Enterprises Inc.(Tighe, John) (Entered: 11/08/2017) |
| 11/08/2017 | 57 | Joint Rule 26(f) Report by Fluor Corporation, Fluor Daniel Maintenance Services Inc, Fluor Enterprises Inc. (Tighe, John) (Entered: 11/08/2017) |

| | | |
|---|---|---|
| 11/08/2017 | 60 | *Plaintiffs'* Local Rule 26.03 Answers to Interrogatories by Harry Pennington, III.(Sanders, Lucy) (Entered: 11/08/2017) |
| 11/08/2017 | 61 | *Plaintiffs'* Rule 26 Outline of Discovery Plan by Harry Pennington, III.(Sanders, Lucy) (Entered: 11/08/2017) |
| 11/08/2017 | 62 | Rule 26(f) Report by Harry Pennington, III.(Sanders, Lucy) (Entered: 11/08/2017) |
| 11/10/2017 | 64 | SUMMONS Returned Executed by Harry Pennington, III. South Carolina Electric & Gas Company served on 10/30/2017, answer due 11/20/2017. (Attachments: # 1 Affidavit Affidavit of Service)(Sanders, Lucy) (Entered: 11/10/2017) |
| 11/10/2017 | 65 | STIPULATION *Regarding the Amended Complaint and Other Pending Motions* by Fluor Corporation, Fluor Daniel Maintenance Services Inc, Fluor Enterprises Inc, SCANA Corporation, South Carolina Electric & Gas Company. (Thomas, Christopher) (Entered: 11/10/2017) |
| 11/20/2017 | 68 | ANSWER to 41 Amended Complaint, by Fluor Corporation, Fluor Daniel Maintenance Services Inc, Fluor Enterprises Inc.(Tighe, John) (Entered: 11/20/2017) |
| 12/04/2017 | 69 | MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM by SCANA Corporation, South Carolina Electric & Gas Company. Response to Motion due by 12/18/2017. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. (Attachments: # 1 Exhibit A - Copies of Complaints - Guippone; In re Transcare; Grimes)No proposed order.(Thomas, Christopher) (Entered: 12/04/2017) |
| 12/29/2017 | 71 | RESPONSE in Opposition re 69 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM Response filed by Timothy Lorentz, Harry Pennington, III.Reply to Response to Motion due by 1/5/2018 Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6. (Attachments: # 1 Exhibit A-Unpublished Cases)(Sanders, Lucy) (Main Document 71 replaced on 1/3/2018) (asni, ). Modified to |

| | | |
|---|---|---|
| | | replace document to correct filing signature on 1/3/2018 (asni, ). (Entered: 12/29/2017) |
| 01/03/2018 | 72 | NOTICE of Hearing on Motion 21 MOTION to Appoint Counsel only : Motion Hearing set for 1/23/2017 02:30 PM in Columbia # 3, Matthew J. Perry Court House, 901 Richland St, Columbia before Honorable J Michelle Childs. (asni, ) (Entered: 01/03/2018) |
| 01/03/2018 | 73 | NOTICE of Hearing on Motion 69 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM : Motion Hearing set for 2/14/2018 10:00 AM in Columbia # 3, Matthew J. Perry Court House, 901 Richland St, Columbia before Honorable J Michelle Childs. (asni, ) ****This hearing will only include the pending motion to dismiss**** (Entered: 01/03/2018) |
| 01/03/2018 | 74 | NOTICE OF RESCHEDULED HEARING MOTION to Appoint Counsel only : Motion Hearing set for 1/23/2017 02:30 PM cancelled and rescheduled to: Motion Hearing to Appoint Counsel set for 1/23/2018 02:30 PM in Columbia # 3, Matthew J. Perry Court House, 901 Richland St, Columbia before Honorable J Michelle Childs. ****PLEASE NOTE THIS NOTICE ONLY CHANGES THE YEAR FROM 2017 TO 2018****(asni, ) (Entered: 01/03/2018) |
| 01/03/2018 | 75 | MOTION for Extension of Time to File Response/Reply as to 69 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM and MOTION for Leave to File Excess Pages ( Response to Motion due by 1/17/2018. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. ) by SCANA Corporation, South Carolina Electric & Gas Company. No proposed order.(Thomas, Christopher) (Entered: 01/03/2018) |
| 01/04/2018 | 76 | **TEXT ORDER granting 75 Motion for Extension of Time to File Response/Reply re 69 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM; granting 75 Motion for Leave to File Excess Pages ( Replies due by 1/12/2018). Signed by Honorable J Michelle Childs on 1/4/2018.(asni, )** (Entered: 01/04/2018) |

| | | |
|---|---|---|
| 01/12/2018 | 78 | REPLY to Response to Motion re 69 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM Response filed by SCANA Corporation, South Carolina Electric & Gas Company. (Thomas, Christopher) (Entered: 01/12/2018) |
| 01/23/2018 | 82 | SUPPLEMENT by Timothy Lorentz, Harry Pennington, III to 21 MOTION to Certify Class MOTION to Appoint Counsel . (Attachments: # 1 Exhibit Pennington Amended Complaint, # 2 Exhibit Gladden Amended Complaint, # 3 Exhibit Unpublished Cases (Schley-Cole case), # 4 Exhibit Unpublished Cases (Johnson case), # 5 Exhibit Unpublished Cases (It's My Party))(Sanders, Lucy) (Entered: 01/23/2018) |
| 01/23/2018 | 83 | **Minute Entry. Proceedings held before Honorable J Michelle Childs: taking under advisement (21) Motion to Certify Class; Motion to Appoint Counsel in case 0:17-cv-02094-JMC; (5) Motion to Appoint Counsel in case 0:17-cv-02201-JMC; Motion Hearing held on 1/23/2018. Written order forthcoming. Court Reporter Carly Horenkamp. Associated Cases: 0:17-cv-02094-JMC, 0:17-cv-02201-JMC(mbro, )** (Entered: 01/24/2018) |
| 01/24/2018 | 84 | **TEXT ORDER: This matter is before the court in consideration of the logistical issues created by the motions hearing scheduled for 10 a.m. on February 14, 2018, in Butler v. Fluor Corp., C/A No. 0:17-cv-02201-JMC (D.S.C. 2017) ("Butler"), and Pennington v. Fluor Corp., C/A No. 0:17-cv-02094-JMC (D.S.C. 2017) ("Pennington"). The court will hear arguments on the Motions to Dismiss filed by Fluor Corporation and Fluor Enterprises, Inc. in Butler (ECF No. 17) and by SCANA Corporation and South Carolina Electric & Gas Company in Pennington (ECF No. 69). Upon its review, the court observes substantive differences in the basis for each Motion. Accordingly, the court will hear argument starting at 10 a.m. on the Motion to Dismiss filed in Butler followed by argument on the Motion to Dismiss filed in Pennington. Signed by Honorable J Michelle Childs on 1/24/2018. Associated Cases: 0:17-** |

| | | |
|---|---|---|
| | | **cv-02094-JMC, 0:17-cv-02201-JMC(asni, )** (Entered: 01/24/2018) |
| 02/14/2018 | 85 | **Minute Entry. Proceedings held before Honorable J Michelle Childs: taking under advisement (69) Motion to Dismiss for Failure to State a Claim in case 0:17-cv-02094-JMC; (17) Motion to Dismiss; Motion to Dismiss for Failure to State a Claim; Motion to Dismiss for Lack of Jurisdiction in case 0:17-cv-02201-JMC; Motion Hearing held on 2/14/2018. Written order forthcoming. Court Reporter Carly Horenkamp. Associated Cases: 0:17-cv-02094-JMC, 0:17-cv-02201-JMC(mbro, )** (Entered: 02/14/2018) |
| 02/16/2018 | 86 | **ORDER in case 0:17-cv-02094-JMC; denying (17) Motion to Dismiss; Motion to Dismiss for Failure to State a Claim; Motion to Dismiss for Lack of Jurisdiction in case, The court sua sponte consolidates Pennington v. Fluor Corp., C/A No. 0:17-cv-02094-JMC (D.S.C. 2017) with Butler v. Fluor Corp., C/A No. 0:17-cv-02201- JMC (D.S.C. 2017) for purposes of discovery and pretrial motions. The court further sua sponte stays both actions until the court enters its opinion(s) adjudicating the Motion to Dismiss, Motion to Certify Class and Motion to Appoint Counsel currently pending in the Pennington case C/A No. 0:17-cv-02094-JMC, ECF Nos. 21 & 69. Signed by Honorable J Michelle Childs on 2/16/2018.Associated Cases: 0:17-cv-02201-JMC, 0:17-cv-02094-JMC(mbro, )** (Main Document 86 replaced on 2/20/2018) (asni, ). (Entered: 02/16/2018) |
| 02/27/2018 | 89 | SUPPLEMENTAL RESPONSE in Opposition re (21 in 0:17-cv-02094-JMC, 21 in 0:17-cv-02094-JMC) MOTION to Certify Class MOTION to Appoint Counsel *Butler Plaintiffs' First Supplement to Their Replies to Pennington's Motion and its Supplements under FRCP 23 for Class Certification and Related Relief and Opposition to the Butler Motion to Appoint Interim Class Counsel* Response filed by Timothy Lorentz, Harry Pennington, III, Lawrence Butler, Lakeisha Darwish, Darron Eigner, Jr, Bernard A Johnson, Harry Pennington, III, Jimi Che Sutton.Reply to Response to |

| | | |
|---|---|---|
| | | Motion due by 3/6/2018 Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6. (Attachments: # 1 Exhibit A-Declaration of Ercole in Support, # 2 Exhibit B-Complaint for Violation of the WARN Act, # 3 Exhibit C-Preliminary Statement of Debtors to Dismiss, # 4 Exhibit D-Notice of WARN Class Action, # 5 Exhibit E-Unpublished and Out of Circuit Cases)Associated Cases: 0:17-cv-02201-JMC, 0:17-cv-02094-JMC(Yarborough, David) (Entered: 02/27/2018) |
| 02/27/2018 | 90 | SUPPLEMENTAL RESPONSE in Opposition re 69 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM Response filed by Timothy Lorentz, Harry Pennington, III.Reply to Response to Motion due by 3/6/2018 Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6. (Attachments: # 1 Exhibit A February 26, 2018 NLRB Decision)(asni, ) refiled by the clerk to correct event type. (Entered: 02/28/2018) |
| 03/01/2018 | 91 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings. Hearing on Motions held on 2-14-18 at 10:00 a.m., before Judge J. Michelle Childs. Court Reporter/Transcriber Carly Horenkamp, Telephone number/E-mail carleen_horenkamp@scd.uscourts.gov. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Parties have 7 calendar days from the filing of the transcript to file with the court a Notice of Intent to Request Redaction.. Redaction Request due 3/22/2018. Redacted Transcript Deadline set for 4/2/2018. Release of Transcript Restriction set for 5/30/2018. (chor, ) (Entered: 03/01/2018) |
| 03/02/2018 | 92 | REPLY by SCANA Corporation, South Carolina Electric & Gas Company to 90 Response in Opposition to Motion, . (Attachments: # 1 Exhibit A - Excerpts from 2-14-18 Hearing Transcript)(Thomas, Christopher) (Entered: 03/02/2018) |
| 03/02/2018 | 93 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of |

| | | |
|---|---|---|
| | | Proceedings. Excerpt of Hearing on Motions (First 10 Pages) held on 1-23-18, before Judge J. Michelle Childs. Court Reporter/Transcriber Carly Horenkamp, Telephone number/E-mail carleen_horenkamp@scd.uscourts.gov. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Parties have 7 calendar days from the filing of the transcript to file with the court a Notice of Intent to Request Redaction.. Redaction Request due 3/23/2018. Redacted Transcript Deadline set for 4/2/2018. Release of Transcript Restriction set for 5/31/2018. (chor, ) (Entered: 03/02/2018) |
| 03/05/2018 | 94 | **TEXT ORDER: This matter is before the court based on the need to correct the posture of the consolidated cases in light of the Order that was entered on February 16, 2018 (the "February Order"). See Butler v. Fluor Corp., C/A No. 0:17-cv-02201-JMC, ECF No. 43 (D.S.C. 2017) ("Butler"), and Pennington v. Fluor Corp., C/A No. 0:17-cv-02094-JMC, ECF No. 86 (D.S.C. 2017) ("Pennington"). In the February Order, the court sua sponte stayed "both actions until the court enters its opinion(s) adjudicating the Motion to Dismiss, Motion to Certify Class and Motion to Appoint Counsel currently pending in the Pennington case." Id. (referencing Pennington, C/A No. 0:17-cv-02094-JMC, ECF Nos. 21 & 69). After entering the February Order, the court recollected that Pennington Plaintiffs had moved to suspend briefing on their Motion to Certify Class until after the court issued its decision on the Motion to Dismiss. Pennington, C/A No. 0:17-cv-02094-JMC, ECF No. 48 at 2. Although the court did not specifically grant this Motion, see Pennington, C/A No. 0:17-cv-02094-JMC, ECF No. 51, it is informed that at least one party has been proceeding as if the Motion was granted. Therefore, the court advises the parties that after it enters an order addressing the pending Motion to Dismiss, Pennington, C/A No. 0:17-cv-** |

| | | |
|---|---|---|
| | | **02094-JMC, ECF No. 69, the court will announce a schedule for supplemental briefing as to the pending Motion to Certify Class and Motion to Appoint Counsel. Id. at ECF No. 21. In this regard, the court stays any action in the Butler and Pennington matters that is unrelated to these pending Motions. Signed by Honorable J Michelle Childs on 3/5/2018. Associated Cases: 0:17-cv-02201-JMC, 0:17-cv-02094-JMC(asni, )** (Entered: 03/05/2018) |
| 03/08/2018 | 96 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings. Hearing on Motions held on 1-23-18, before Judge J. Michelle Childs. Court Reporter/Transcriber Carly Horenkamp, Telephone number/E-mail carleen_horenkamp@scd.uscourts.gov. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Parties have 7 calendar days from the filing of the transcript to file with the court a Notice of Intent to Request Redaction.. Redaction Request due 3/29/2018. Redacted Transcript Deadline set for 4/9/2018. Release of Transcript Restriction set for 6/6/2018. Associated Cases: 0:17-cv-02094-JMC, 0:17-cv-02201-JMC(chor, ) (Entered: 03/08/2018) |
| 05/22/2018 | 106 | MOTION to Set a Deadline for Filing a Responsive Brief to Fluor's Motion for Judgment on the Pleadings (Partial Consent) re 105 MOTION for Judgment on the Pleadings by Timothy Lorentz, Harry Pennington, III. Response to Motion due by 6/5/2018. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. No proposed order.(Sanders, Lucy) (Main Document 106 replaced on 5/23/2018) (asni, ). Modified to replace document at the request of the attorney on 5/23/2018 (asni, ). (Entered: 05/22/2018) |
| 05/24/2018 | 107 | **TEXT ORDER: This matter is before the court based on the need to correct the posture of the consolidated cases in light of the Motion for Judgment on the Pleadings that was filed by Defendants Fluor** |

**Corporation, Fluor Enterprises, Inc. and Fluor Daniel Maintenance Services, Inc. (collectively "Fluor Defendants"). See Pennington v. Fluor Corp., C/A No. 0:17-cv-02094-JMC, ECF No. 105 (D.S.C. 2017) ("Pennington"). In response to this Motion, Pennington Plaintiffs filed a Partial Consent Motion to Set a Deadline for Filing a Responsive Brief to Fluor's Motion for Judgment on the Pleadings. Id. at ECF No. 106. Upon review, the court observes that on March 5, 2018, it entered a Text Order that (1) expressly "stays any action in the Butler and Pennington matters that is unrelated to the[] pending Motions" to Dismiss, to Certify Class and to Appoint Counsel and (2) advises the parties that after the court addresses the pending Motion to Dismiss, it "will announce a schedule for supplemental briefing as to the pending Motion to Certify Class and Motion to Appoint Counsel." Id. at ECF No. 94; see also Butler v. Fluor Corp., C/A No. 0:17-cv-02201-JMC, ECF No. 48 (D.S.C. 2017) ("Butler"). Therefore, the court in its inherent authority INSTRUCTS the Clerk of Court to remove Fluor Defendant's Motion (ECF No. 105 (Pennington)) and Certificate of Service (ECF No. 55 (Butler)) from the court's CM/ECF docket. E.g., Moser v. Universal Eng'g Corp., 11 F.3d 720, 723 (10th Cir. 1993) ("The inherent authority of the district court to... and control its docket is well established. This power derives from the need for courts 'to manage their own affairs so as to achieve the orderly and expeditious disposition of cases,' and extends beyond the powers enumerated in the Federal Rules of Civil Procedure.") (internal and external citations omitted). Accordingly, the court DENIES AS MOOT Pennington Plaintiff's Motion to Set a Deadline. 106 The court anticipates filing its order addressing the pending Motion to Dismiss in the near future and lifting the stay as outlined in the March Text Order. This ruling does not preclude Fluor Defendants from refiling their Motion once the court has lifted the stay. Signed by Honorable J Michelle Childs on**

| | | |
|---|---|---|
| | | **5/24/2018.Associated Cases: 0:17-cv-02201-JMC, 0:17-cv-02094-JMC(asni, )** (Entered: 05/24/2018) |
| 05/24/2018 | 108 | DELETION OF DOCKET ENTRY NUMBER 105 Reason: per text order (ECF No. 107) (asni, ) (Entered: 05/24/2018) |
| 05/30/2018 | 109 | **ORDER AND OPINION denying 69 MOTION TO DISMISS. The court further lifts the stay in this action and INSTRUCTS the parties that the following briefing schedule should be used as it relates to 21 MOTION to Certify Class MOTION to Appoint Counsel. (Supplement to Motion due by 6/13/2018, Response to Motion due by 6/27/2018 Reply due by 7/6/2018. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45.) Signed by Honorable J Michelle Childs on 5/30/2018. (asni, )** (Entered: 05/30/2018) |
| 05/30/2018 | 110 | MOTION for Judgment on the Pleadings by Fluor Corporation, Fluor Daniel Maintenance Services Inc, Fluor Enterprises Inc. Response to Motion due by 6/13/2018. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. (Attachments: # 1 Exhibit A - Hearing Transcript 2.14.18, # 2 Exhibit B - Hearing Transcript August 2017, # 3 Supporting Documents 2018 WL 1374066 Doosan Machine Tools, # 4 Supporting Documents 2011 WL 4435756 Fitchett v. Cty of Horry, # 5 Supporting Documents 1999 WL 1939429 Cont'l Cleaning v. UPS, # 6 Supporting Documents 2018 WL 369154 Catlin Specialty v. Lowcountry Oyster, # 7 Supporting Documents 2013 WL 4585873 Lewis v. Excel Mech, # 8 Supporting Documents 2018 WL 1193230 Kozel v. Kozel, # 9 Supporting Documents 2016 WL 8792243 FLowers v. Here to Serve)No proposed order.(Tighe, John) (Entered: 05/30/2018) |
| 06/13/2018 | 114 | ANSWER to 41 Amended Complaint, by SCANA Corporation, South Carolina Electric & Gas Company. (Thomas, Christopher) (Entered: 06/13/2018) |
| 06/13/2018 | 115 | SUPPLEMENT by Timothy Lorentz, Harry Pennington, |

| | | |
|---|---|---|
| | | III to (21 in 0:17-cv-02094-JMC, 21 MOTION to Certify Class MOTION to Appoint Counsel *and In Opposition to Butler Motion to Appoint Interim Class Counsel*. (Attachments: # 1 Exhibit A- Supplemental Declaration of Jack Raisner, # 2 Exhibit B - Supplemental Declaration of Harry Pennington III, # 3 Exhibit C - Declaration of Timothy Lorentz, # 4 Exhibit D - Proposed Notice to Class, # 5 Exhibit E - Proposed Revised Order, # 6 Exhibit F - Unpublished Cases)Associated Cases: 0:17-cv-02094-JMC, (Sanders, Lucy) (Entered: 06/13/2018) |
| 06/13/2018 | 116 | RESPONSE in Opposition re (110 in 0:17-cv-02094-JMC) MOTION for Judgment on the Pleadings Response filed by Timothy Lorentz, Harry Pennington, III.Reply to Response to Motion due by 6/20/2018 Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6. (Attachments: # 1 Exhibit A -Unpublished Cases)Associated Cases: 0:17-cv-02094-JMC,(Sanders, Lucy) (Entered: 06/13/2018) |
| 06/13/2018 | 117 | RESPONSE to Motion re 110 MOTION for Judgment on the Pleadings Response filed by SCANA Corporation, South Carolina Electric & Gas Company.Reply to Response to Motion due by 6/20/2018 Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6. (Thomas, Christopher) (Entered: 06/13/2018) |
| 06/20/2018 | 118 | REPLY to Response to Motion re 110 MOTION for Judgment on the Pleadings Response filed by Fluor Corporation, Fluor Daniel Maintenance Services Inc, Fluor Enterprises Inc. (Tighe, John) (Entered: 06/20/2018) |
| 06/26/2018 | 120 | Consent MOTION for Extension of Time to File Response/Reply as to 21 MOTION to Certify Class by SCANA Corporation, South Carolina Electric & Gas Company. Response to Motion due by 7/10/2018. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. No proposed order.Associated Cases: 0:17-cv-02094-JMC, 0:17-cv-02201-JMC(Thomas, Christopher) (Entered: 06/26/2018) |

| | | |
|---|---|---|
| 06/26/2018 | 121 | **TEXT ORDER granting (120) Motion for Extension of Time to File Response/Reply re (21 in 0:17-cv-02094-JMC) MOTION to Certify Class (62 in 0:17-cv-02201-JMC) MOTION to Certify Class granting (68) Motion for Extension of Time to File Response/Reply re (21 in 0:17-cv-02094-JMC) Response to Motion due by 7/6/2018. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. Replies due by 7/16/2018. Signed by Honorable J Michelle Childs on 6/26/2018.Associated Cases: 0:17-cv-02201-JMC, 0:17-cv-02094-JMC(asni, )** (Entered: 06/26/2018) |
| 06/29/2018 | 122 | NOTICE of Request for Protection from Court Appearance by John Hagood Tighe for August 7-15, 2018 (Tighe, John) (Entered: 06/29/2018) |
| 07/06/2018 | 123 | RESPONSE in Opposition re 21 MOTION to Certify Class MOTION to Appoint Counsel Response filed by SCANA Corporation, South Carolina Electric & Gas Company.Reply to Response to Motion due by 7/13/2018 Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6. (Attachments: # 1 Exhibit 1 - Alan Torres Declaration, # 2 Exhibit 2 - Zachary Ashcraft Declaration, # 3 Exhibit 3 - Kyle Young Declaration, # 4 Exhibit 4 - Kevin Kochems Declaration)(Thomas, Christopher) (Entered: 07/06/2018) |
| 07/06/2018 | 124 | RESPONSE in Opposition re 21 MOTION to Certify Class MOTION to Appoint Counsel Response filed by Fluor Corporation, Fluor Daniel Maintenance Services Inc, Fluor Enterprises Inc.Reply to Response to Motion due by 7/13/2018 Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6. (Tighe, John) (Entered: 07/06/2018) |
| 07/09/2018 | 125 | CERTIFICATE OF SERVICE by Fluor Corporation, Fluor Daniel Maintenance Services Inc, Fluor Enterprises Inc (Tighe, John) (Entered: 07/09/2018) |
| 07/09/2018 | 126 | CERTIFICATE OF SERVICE by Fluor Corporation, Fluor Daniel Maintenance Services Inc, Fluor |

| | | |
|---|---|---|
| | | Enterprises Inc *(Corrected)* (Tighe, John) (Entered: 07/09/2018) |
| 07/12/2018 | 127 | NOTICE of Appearance by Nancy Bloodgood on behalf of Timothy Lorentz, Harry Pennington, III (Bloodgood, Nancy) (Entered: 07/12/2018) |
| 07/13/2018 | 128 | **ORDER AND OPINION denying 110 Motion for Judgment on the Pleadings. Signed by Honorable J Michelle Childs on 7/13/2018.(asni, )** (Entered: 07/13/2018) |
| 07/16/2018 | 130 | REPLY to Response to Motion re 21 MOTION to Certify Class MOTION to Appoint Counsel *(Reply to Response filed by SCANA)* Response filed by Timothy Lorentz, Harry Pennington, III. (Attachments: # 1 Exhibit A - Unpublished Case)(Sanders, Lucy) (Entered: 07/16/2018) |
| 07/16/2018 | 131 | REPLY to Response to Motion re 21 MOTION to Certify Class MOTION to Appoint Counsel *(Reply to Response filed by Fluor)* Response filed by Timothy Lorentz, Harry Pennington, III. (Attachments: # 1 Exhibit A - Unpublished Cases)(Sanders, Lucy) (Entered: 07/16/2018) |
| 07/17/2018 | 133 | **ORDER AND OPINION granting 21 Motion to Certify Class. Signed by Honorable J Michelle Childs on 7/17/2018.(asni, )** (Entered: 07/17/2018) |
| 07/18/2018 | 134 | **ORDER AND OPINION granting 21 Motion to Appoint Counsel in case 0:17-cv-02094-JMC, granting 62 Motion to Appoint Counsel in case 0:17-cv-2201-JMC. Signed by Honorable J Michelle Childs on 7/18/2018.Associated Cases: 0:17-cv-02094-JMC, 0:17-cv-02201-JMC(asni, )** (Entered: 07/18/2018) |
| 07/26/2018 | 135 | **CONFERENCE AND SCHEDULING ORDER Liability Discovery due by 8/20/2018, Plaintiffs ID of Expert Witness due by 3/8/2019, Defendants ID of Expert Witnesses due by 5/8/2019, Discovery regarding liability and class certification due by 6/17/2019, Records Custodian Affidavit due by 4/20/2020, Motions due by 7/17/2019, Damages** |

| | | |
|---|---|---|
| | | **Discovery commence by 10/2/2019, Discovery regarding damages portion of case due by 4/20/2020, Rule 26(a)(3) Disclosures due by 5/11/2020, Motions in limine due by 6/29/2020, Pretrial Briefs due by 5/30/2020, Bench Trial Deadline 7/6/2020, Mediation Due by 5/11/2020, Signed by Honorable J Michelle Childs on 7/26/2018. Associated Cases: 0:17-cv-02094-JMC, 0:17-cv-02201-JMC(asni, )** (Entered: 07/26/2018) |
| 10/23/2018 | 137 | Joint MOTION for Confidentiality Order by Timothy Lorentz, Harry Pennington, III. Response to Motion due by 11/6/2018. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. (Attachments: # 1 Exhibit A - Proposed Confidentiality Order)Proposed order is being emailed to chambers with copy to opposing counsel.Associated Cases: 0:17-cv-02094-JMC, 0:17-cv-02201-JMC(Sanders, Lucy) (Entered: 10/23/2018) |
| 10/23/2018 | 138 | **CONFIDENTIALITY ORDER granting (137) Motion for Confidentiality Order in case 0:17-cv-02094-JMC; granting (83) Motion for Confidentiality Order in case 0:17-cv-02201-JMC. Signed by Honorable J Michelle Childs on 10/23/2018.Associated Cases: 0:17-cv-02094-JMC, 0:17-cv-02201-JMC(asni, )** (Entered: 10/23/2018) |
| 10/23/2018 | 139 | NOTICE of Appearance by Matthew Robert Korn on behalf of Fluor Corporation, Fluor Daniel Maintenance Services Inc, Fluor Enterprises Inc (Korn, Matthew) (Entered: 10/23/2018) |
| 01/30/2019 | 140 | NOTICE of Request for Protection from Court Appearance by John Hagood Tighe for from July 13, 2019 through July 24, 2019. (Tighe, John) (Entered: 01/30/2019) |
| 02/01/2019 | 141 | MOTION to Compel by Fluor Corporation, Fluor Daniel Maintenance Services Inc, Fluor Enterprises Inc. Response to Motion due by 2/15/2019. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. (Attachments: # 1 Exhibit A - Eigner Requests, # 2 |

| | | |
|---|---|---|
| | | Exhibit B - Johnson Requests, # 3 Exhibit C - Eigner Responses, # 4 Exhibit D - Johnson Responses, # 5 Exhibit E - October 12, 2018 Letter to Ercole and Moylan, # 6 Exhibit F - October 19, 2018 Letter from Ercole, # 7 Exhibit G - November 7, 2018 Letter to Ercole and Moylan, # 8 Exhibit H - November 15, 2018 Letter from Ercole, # 9 Exhibit I - November 15, 2018 Email to Ercole and Moylan, # 10 Exhibit J - November 28, 2018 Email to Ercole and Moylan, # 11 Exhibit K - December 14, 2018 Emails to Ercole and Moylan, # 12 Exhibit L - January 4, 2019 Email to Ercole and Moylan, # 13 Exhibit M - January 11, 2019 Emails between Tighe, Ercole and Moylan, # 14 Exhibit N - January 17, 2019 Email from Moylan, # 15 Exhibit O - January 18, 2019 Email from Moylan, # 16 Exhibit P - January 28, 2019 Email to Moylan, # 17 Exhibit Q - January 30, 2019 Emai from Ercole, # 18 Supporting Documents 2014 WL 37662 LaFleur v. Dollar Tree, # 19 Supporting Documents 2014 WL 2207994 Cochran v. Volvo, # 20 Supporting Documents 2013 WL 2099496 Curtis v. Time Warner, # 21 Supporting Documents 2017 WL 2437082 Ashmore v. Williams)Proposed order is being emailed to chambers with copy to opposing counsel.Associated Cases: 0:17-cv-02201-JMC, 0:17-cv-02094-JMC(Korn, Matthew) (Entered: 02/01/2019) |
| 02/15/2019 | 142 | RESPONSE in Opposition re (87 in 0:17-cv-02201-JMC, 141 in 0:17-cv-02094-JMC) MOTION to Compel Response filed by Lawrence Butler, Lakeisha Darwish, Darron Eigner, Jr, Bernard A Johnson, Jimi Che Sutton.Reply to Response to Motion due by 2/22/2019 Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6. Associated Cases: 0:17-cv-02201-JMC, 0:17-cv-02094-JMC(Bryant, Christopher) (Entered: 02/15/2019) |
| 02/20/2019 | 143 | MOTION for a Supplemental Order Approving the Sending of Notice of Class Certification and Related Relief re (133 in 0:17-cv-02094-JMC) Order on Motion to Certify Class by Timothy Lorentz, Harry Pennington, III. Response to Motion due by 3/6/2019. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. |

| | | |
|---|---|---|
| | | (Attachments: # 1 Exhibit A - Unpublished Cases, # 2 Exhibit B - Proposed Notice, # 3 Exhibit C - Proposed Order)Proposed order is being emailed to chambers with copy to opposing counsel.Associated Cases: 0:17-cv-02094-JMC, 0:17-cv-02201-JMC(Sanders, Lucy) (Entered: 02/20/2019) |
| 02/22/2019 | 144 | REPLY to Response to Motion re (87 in 0:17-cv-02201-JMC, 141 in 0:17-cv-02094-JMC) MOTION to Compel Response filed by Fluor Corporation, Fluor Daniel Maintenance Services Inc, Fluor Enterprises Inc. (Attachments: # 1 Supporting Documents 2012 WL 252632 - Brown v. Tethys)Associated Cases: 0:17-cv-02201-JMC, 0:17-cv-02094-JMC(Korn, Matthew) (Entered: 02/22/2019) |
| 02/22/2019 | 146 | REPLY to Response to Motion re (87 in 0:17-cv-02201-JMC, 141 in 0:17-cv-02094-JMC) MOTION to Compel Response filed by SCANA Corporation, South Carolina Electric & Gas Company. Associated Cases: 0:17-cv-02094-JMC, 0:17-cv-02201-JMC(Henthorne, D) (Entered: 02/22/2019) |
| 03/06/2019 | 147 | RESPONSE in Opposition re (89 in 0:17-cv-02201-JMC, 143 in 0:17-cv-02094-JMC) MOTION for a Supplemental Order Approving the Sending of Notice of Class Certification and Related Relief re (133 in 0:17-cv-02094-JMC) Order on Motion to Certify Class Response filed by SCANA Corporation, South Carolina Electric & Gas Company.Reply to Response to Motion due by 3/13/2019 Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6. Associated Cases: 0:17-cv-02094-JMC, 0:17-cv-02201-JMC(Henthorne, D) (Entered: 03/06/2019) |
| 03/06/2019 | 148 | RESPONSE in Opposition re (143 in 0:17-cv-02094-JMC, 89 in 0:17-cv-02201-JMC) MOTION for a Supplemental Order Approving the Sending of Notice of Class Certification and Related Relief re (133 in 0:17-cv-02094-JMC) Order on Motion to Certify Class Response filed by Fluor Corporation, Fluor Daniel Maintenance Services Inc, Fluor Enterprises Inc.Reply to Response to Motion due by 3/13/2019 Add an additional 3 days only if served by mail or otherwise |

| | | |
|---|---|---|
| | | allowed under Fed. R. Civ. P. 6. (Attachments: # 1 Exhibit Red-line Version of Proposed Notice, # 2 Supporting Documents 2017 WL 749362 - Mullis v. Wings, # 3 Supporting Documents 2015 WL 8042021 - Reynolds v. Wyndham, # 4 Supporting Documents 2015 WL 3767436 - Schmidt v. Charleston Collision, # 5 Supporting Documents 2015 WL 6157306 - McCoy v. RP, # 6 Supporting Documents 2018 WL 4087931 - Weckesser v. Knighter Enterprises, # 7 Supporting Documents 2018 WL 2088011 - Wade v. Furmanite, # 8 Supporting Documents 2014 WL 5396165 - Murphy)Associated Cases: 0:17-cv-02094-JMC, 0:17-cv-02201-JMC(Korn, Matthew) (Entered: 03/06/2019) |
| 03/08/2019 | 149 | MOTION to Amend/Correct (81 in 0:17-cv-02201-JMC, 135 in 0:17-cv-02094-JMC) Scheduling Order by Lawrence Butler, Lakeisha Darwish, Darron Eigner, Jr, Bernard A Johnson, Jimi Che Sutton. Response to Motion due by 3/22/2019. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. (Attachments: # 1 Exhibit A)Proposed order is being emailed to chambers with copy to opposing counsel.Associated Cases: 0:17-cv-02201-JMC, 0:17-cv-02094-JMC refiled by the clerk to correct event. (asni, ) (Entered: 03/11/2019) |
| 03/11/2019 | 150 | **AMENDED CONFERENCE AND SCHEDULING ORDER ( Plaintiffs ID of Expert Witness due by 8/5/2019, Defendants ID of Expert Witnesses Due by 10/5/2019, Records Custodian Affidavit due by 9/17/2020, Discovery due by 9/17/2020, Motion in Limine due by 11/26/2020, Motions due by 12/14/2019, Rule 26(a)(3) Disclosures due by 10/8/2020, Pretrial Briefs due by 11/27/2020, Bench Trial Deadline 12/3/2020, Mediation Due by 10/8/2020 and all other deadlines as set out in the order) granting (95 in 0:17-cv-02201-JMC, 149 in 0:17-cv-02094-JMC) MOTION to Amend/Correct (81 in 0:17-cv-02201-JMC, 135 in 0:17-cv-02094-JMC) Scheduling Order. Signed by Honorable J Michelle Childs on 3/11/2019. Associated Cases: 0:17-cv-02201-JMC, 0:17-cv-02094-JMC(asni, )** (Entered: 03/11/2019) |

| | | |
|---|---|---|
| 03/13/2019 | 151 | REPLY to Response to Motion re (89 in 0:17-cv-02201-JMC) MOTION for a Supplemental Order Approving the Sending of Notice of Class Certification and Related Relief re (133 in 0:17-cv-02094-JMC) Order on Motion to Certify Class Response filed by Timothy Lorentz, Harry Pennington, III. (Attachments: # 1 Exhibit A - Proposed Amended Notice, # 2 Exhibit B - Unpublished Cases)Associated Cases: 0:17-cv-02094-JMC, 0:17-cv-02201-JMC(Sanders, Lucy) (Entered: 03/13/2019) |
| 04/01/2019 | 153 | NOTICE of Request for Protection from Court Appearance by D Michael Henthorne for 04/15/19-04/19/19 Associated Cases: 0:17-cv-02094-JMC, 0:17-cv-02201-JMC(Henthorne, D) (Entered: 04/01/2019) |
| 04/02/2019 | 154 | Joint MOTION for Confidentiality Order by Fluor Corporation, Fluor Daniel Maintenance Services Inc, Fluor Enterprises Inc. Response to Motion due by 4/16/2019. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. (Attachments: # 1 Proposed Order Red-line Version)Proposed order is being emailed to chambers with copy to opposing counsel.Associated Cases: 0:17-cv-02094-JMC, 0:17-cv-02201-JMC(Tighe, John) (Entered: 04/02/2019) |
| 04/03/2019 | 155 | **ORDER granting (154) Motion for Confidentiality Order in case 0:17-cv-02094-JMC; granting (100) Motion for Confidentiality Order in case 0:17-cv-02201-JMC Signed by Honorable J Michelle Childs on 4/3/2019.Associated Cases: 0:17-cv-02094-JMC, 0:17-cv-02201-JMC(asni, )** (Entered: 04/03/2019) |
| 05/03/2019 | 156 | **ORDER GRANTING IN PART DENYING IN PART MOTION to Compel (141 in 0:17-cv-02094-JMC, 87 in 0:17-cv-02201-JMC) Specifically, the court GRANTS Defendants' Motions to the extent that (1) Eigner and Johnson must respond to discovery requests, but DENIES WITHOUT PREJUDICE (1) Fluor Defendants' request to dismiss Eigner and Johnson from the action, and (2) Fluor Defendants' request for an award of attorney's fees and costs relating to the Motions to Compel (ECF Nos. 87, 141). Therefore, the court ORDERS Eigner and** |

| | | |
|---|---|---|
| | | **Johnson to adequately respond to Fluor Defendants' discovery requests by May 10, 2019, at 5:00 p.m., and ORDERS the removal of Eigner and Johnson as named Plaintiffs in this action if they do not respond by May 10, 2019, at 5:00 p.m. ( Specific Document due by 5/10/2019). Signed by Honorable J Michelle Childs on 5/3/2019. Associated Cases: 0:17-cv-02094-JMC, 0:17-cv-02201-JMC(asni, )** (Entered: 05/03/2019) |
| 06/04/2019 | 158 | DELETION OF DOCKET ENTRY NUMBER 158 Reason: proposed order for the judges signature was incorporated into a joint stipulation by the attorneys. Attorneys instructed to file the joint stipulation signed by attorneys only and submit a proposed order to the judges email for review and signature. (asni, ) (Entered: 06/04/2019) |
| 06/04/2019 | 159 | JOINT STIPULATION by Fluor Corporation, Fluor Daniel Maintenance Services Inc, Fluor Enterprises Inc. (Attachments: # 1 Proposed Order)Associated Cases: 0:17-cv-02094-JMC, 0:17-cv-02201-JMC(Tighe, John) (Entered: 06/04/2019) |
| 06/05/2019 | 160 | **ORDER APPROVING JOINT STIPULATION CONCERNING INADVERTENT PRODUCTION OF PRIVILEGED MATERIALS. Signed by Honorable J Michelle Childs on 6/5/2019. Associated Cases: 0:17-cv-02094-JMC, 0:17-cv-02201-JMC(asni, )** (Entered: 06/05/2019) |
| 06/05/2019 | 161 | MOTION to Remove Named Plaintiffs Darron Eigner, Jr., and Bernard A. Johnson re (156 in 0:17-cv-02094-JMC, 156 in 0:17-cv-02094-JMC, 156 in 0:17-cv-02094-JMC, 104 in 0:17-cv-02201-JMC, 104 in 0:17-cv-02201-JMC, 104 in 0:17-cv-02201-JMC) Order,,,, Terminate Motions,,,, Set Deadlines,,, by Fluor Corporation, Fluor Daniel Maintenance Services Inc, Fluor Enterprises Inc. Response to Motion due by 6/19/2019. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. No proposed order.Associated Cases: 0:17-cv-02201-JMC, 0:17-cv-02094-JMC(Korn, Matthew) (Entered: 06/05/2019) |

| | | |
|---|---|---|
| 06/12/2019 | 162 | MOTION to Withdraw as Attorney *and Substitute Counsel* by SCANA Corporation, South Carolina Electric & Gas Company. Response to Motion due by 6/26/2019. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. No proposed order.Associated Cases: 0:17-cv-02094-JMC, 0:17-cv-02201-JMC(Henthorne, D) (Entered: 06/12/2019) |
| 06/13/2019 | 163 | **TEXT ORDER granting (162) Motion to Withdraw as Attorney. in case 0:17-cv-02094-JMC; granting (110) Motion to Withdraw as Attorney. in case 0:17-cv-02201-JMC Signed by Honorable J Michelle Childs on 6/13/2019.Associated Cases: 0:17-cv-02094-JMC, 0:17-cv-02201-JMC(asni, )** (Entered: 06/13/2019) |
| 06/20/2019 | 166 | NOTICE of Request for Protection from Court Appearance by Lucy Clark Sanders for July 5, 2019 - July 12, 2019 Associated Cases: 0:17-cv-02094-JMC, 0:17-cv-02201-JMC(Sanders, Lucy) (Entered: 06/20/2019) |
| 06/20/2019 | 167 | **ORDER granting in part and denying in part 143 Motion Plaintiffs' Motion for a Supplemental Order Approving the Sending of Notice of Class Certification and Related Relief (ECF Nos. 89, 143), Attaching the Approved Notice to the Court's Order and Opinion, and Ordering Fluor Defendants, SCANA Defendants, and Pennington Plaintiffs to Comply with a List of Mandates Set Forth Within the Conclusion of the Court's Order and Opinion in case 0:17-cv-02094-JMC; granting in part and denying in part 89 Motion Plaintiffs' Motion for a Supplemental Order Approving the Sending of Notice of Class Certification and Related Relief (ECF Nos. 89, 143), Attaching the Approved Notice to the Court's Order and Opinion, and Ordering Fluor Defendants, SCANA Defendants, and Pennington Plaintiffs to Comply with a List of Mandates Set Forth Within the Conclusion of the Court's Order and Opinion in case 0:17-cv-02201-JMC Signed by Honorable J Michelle Childs on 6/20/2019. (Attachments: # 1 Class** |

| | | |
|---|---|---|
| | | **Notice)Associated Cases: 0:17-cv-02094-JMC, 0:17-cv-02201-JMC(asni, )** (Entered: 06/20/2019) |
| 06/21/2019 | 169 | **ORDER AND OPINION: The court DIRECTS the Clerk of Court for the United States District Court for the District of South Carolina to REMOVE Eigner and Johnson as named Plaintiffs in this action. Lastly, the court ORDERS Fluor Defendants and Butler Plaintiffs to provide briefing regarding the issue of attorney's fees under Rule 37 of the Federal Rules of Civil Procedure. Fluor Defendants' brief is due by June 28, 2019, while Butler Plaintiffs' response is due by July 5, 2019. Fluor Defendants may reply to Butler Plaintiffs' response by July 10, 2019, if they so choose. granting 161 Motion to Remove Named Plaintiffs Darron Eigner, Jr. and Bernard A. Johnson in case 0:17-cv-02094-JMC; granting 109 Motion Fluor Defendants Motions to Remove Named Plaintiffs Darron Eigner, Jr. and Bernard A. Johnson in case 0:17-cv-02201-JMC. Signed by Honorable J Michelle Childs on 6/21/2019.Associated Cases: 0:17-cv-02094-JMC, 0:17-cv-02201-JMC(asni, )** (Entered: 06/21/2019) |
| 06/28/2019 | 172 | REPLY by Fluor Corporation, Fluor Daniel Maintenance Services Inc, Fluor Enterprises Inc to (169 in 0:17-cv-02094-JMC) Order on Motion for Miscellaneous Relief,,,, . (Attachments: # 1 Affidavit in Support of Claim for Attorney Fees, # 2 Exhibit - Attachment to Affidavit)Associated Cases: 0:17-cv-02094-JMC, 0:17-cv-02201-JMC(Korn, Matthew) (Entered: 06/28/2019) |
| 07/10/2019 | 175 | REPLY by Fluor Corporation, Fluor Daniel Maintenance Services Inc, Fluor Enterprises Inc to (126 in 0:17-cv-02201-JMC) Response in Opposition to Motion, . Associated Cases: 0:17-cv-02094-JMC, 0:17-cv-02201-JMC(Korn, Matthew) (Entered: 07/10/2019) |
| 08/05/2019 | 178 | Consent MOTION to Consolidate Cases by Fluor Corporation, Fluor Daniel Maintenance Services Inc, Fluor Enterprises Inc. Response to Motion due by 8/19/2019. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. (Attachments: # 1 Proposed Order, # 2 |

| | | |
|---|---|---|
| | | Supporting Documents 1997 WL 499937 - Rule v. Best, # 3 Supporting Documents 2013 WL 2285937 - Workman v. Nationwide)Proposed order is being emailed to chambers with copy to opposing counsel.Associated Cases: 0:19-cv-00346-JMC, 0:17-cv-02094-JMC, 0:17-cv-02201-JMC(Tighe, John) (Entered: 08/05/2019) |
| 08/05/2019 | 179 | **ORDER granting (178) Motion to Consolidate Cases in case 0:17-cv-02094-JMC; granting (131) Motion to Consolidate Cases in case 0:17-cv-02201-JMC; granting (25) Motion to Consolidate Cases in case 0:19-cv-00346-JMC Signed by Honorable J Michelle Childs on 8/5/2019.Associated Cases: 0:19-cv-00346-JMC, 0:17-cv-02094-JMC, 0:17-cv-02201-JMC(asni, )** (Entered: 08/05/2019) |
| 08/12/2019 | 181 | STATUS REPORT by Harry Pennington, III. (Gaffney, Amy) (Entered: 08/12/2019) |
| 08/12/2019 | 182 | MOTION to Set Aside (179 in 0:17-cv-02094-JMC, 132 in 0:17-cv-02201-JMC, 27 in 0:19-cv-00346-JMC) Order on Motion to Consolidate Cases, by Timothy Lorentz, Harry Pennington, III. Response to Motion due by 8/26/2019. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. (Attachments: # 1 Exhibit A - Unpublished Cases)No proposed order.Associated Cases: 0:17-cv-02094-JMC, 0:17-cv-02201-JMC, 0:19-cv-00346-JMC(Sanders, Lucy) (Entered: 08/12/2019) |
| 08/14/2019 | 183 | **TEXT ORDER granting 182 Motion to Stay Consolidation Order on the bases that Plaintiffs' counsel Lucy Sanders did not consent. Therefore, Plaintiffs' counsel is offered an opportunity to response to motion to consolidate due by August 21, 2019. Signed by Honorable J Michelle Childs on 8/14/2019.(asni, )** Modified to correct linkage on 8/15/2019 (asni, ). (Entered: 08/14/2019) |
| 08/21/2019 | 185 | DELETION OF DOCKET ENTRY NUMBER 185 Reason: document was filed in this case in error (asni, ) (Entered: 08/21/2019) |

| | | |
|---|---|---|
| 08/21/2019 | 187 | RESPONSE to Motion re (131 in 0:17-cv-02201-JMC) Consent MOTION to Consolidate Cases Response filed by Timothy Lorentz, Harry Pennington, III.Reply to Response to Motion due by 8/28/2019 Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6. Associated Cases: 0:17-cv-02094-JMC, 0:17-cv-02201-JMC(Sanders, Lucy) (Entered: 08/21/2019) |
| 08/28/2019 | 188 | MOTION to Substitute Attorney by Lawrence Butler, Lakeisha Darwish, Darron Eigner, Jr, Bernard A Johnson, Jimi Che Sutton. Response to Motion due by 9/11/2019. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. No proposed order.Associated Cases: 0:17-cv-02201-JMC, 0:17-cv-02094-JMC(Buckner, Perry) (Entered: 08/28/2019) |
| 08/28/2019 | 189 | NOTICE of Appearance by Reynolds Hedland Blankenship, Jr on behalf of Lawrence Butler, Lakeisha Darwish, Darron Eigner, Jr, Bernard A Johnson, Jimi Che Sutton Associated Cases: 0:17-cv-02201-JMC, 0:17-cv-02094-JMC(Blankenship, Reynolds) (Entered: 08/28/2019) |
| 08/29/2019 | 190 | **TEXT ORDER granting (188) Motion to Substitute Attorney. in case 0:17-cv-02094-JMC; granting (141) Motion to Substitute Attorney. in case 0:17-cv-02201-JMC Signed by Honorable J Michelle Childs on 8/29/2019.Associated Cases: 0:17-cv-02201-JMC, 0:17-cv-02094-JMC(asni, )** (Entered: 08/29/2019) |
| 09/13/2019 | 192 | Consent MOTION to Amend/Correct *the Scheduling Order* by Fluor Corporation, Fluor Daniel Maintenance Services Inc, Fluor Enterprises Inc. Response to Motion due by 9/27/2019. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. (Attachments: # 1 Proposed Order)Proposed order is being emailed to chambers with copy to opposing counsel.Associated Cases: 0:17-cv-02094-JMC, 0:17-cv-02201-JMC(Tighe, John) (Entered: 09/13/2019) |
| 09/27/2019 | 193 | Consent MOTION to Amend/Correct *Scheduling Order* |

| | | |
|---|---|---|
| | | by Timothy Lorentz, Harry Pennington, III. Response to Motion due by 10/11/2019. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. No proposed order.Associated Cases: 0:17-cv-02094-JMC, 0:17-cv-02201-JMC(Sanders, Lucy) (Entered: 09/27/2019) |
| 09/30/2019 | 194 | NOTICE of Hearing: Scheduling Conference set for 10/2/2019 02:30 PM before Honorable J Michelle Childs. This hearing will be conducted by telephone. Plaintiff's counsel shall initiate the call and have all parties on the line prior to contacting the court at 803-765-6475.Associated Cases: 0:17-cv-02201-JMC, 0:17-cv-02094-JMC(asni, ) (Entered: 09/30/2019) |
| 10/02/2019 | 196 | **Minute Entry. Proceedings held before Honorable J Michelle Childs: Scheduling Conference held on 10/2/2019. Court Reporter Jenny Williams. Associated Cases: 0:17-cv-02094-JMC, 0:17-cv-02201-JMC(mbro, )** (Entered: 10/02/2019) |
| 10/03/2019 | 197 | **FOURTH AMENDED SCHEDULING ORDER ( Plaintiffs ID of Expert Witness due by 2/5/2020, Defendants ID of Expert Witnesses Due by 4/3/2020, Records Custodian Affidavit due by 3/10/2021, Discovery due by 8/31/2020, Motions due by 6/15/2020, Rule 26(a)(3) Disclosures due by 3/19/2021, Bench Trial Deadline 4/2021, Mediation Due by 3/19/2021 and all other deadlines as set out in scheduling order) Signed by Honorable J Michelle Childs on 10/3/2019. Associated Cases: 0:17-cv-02094-JMC, 0:17-cv-02201-JMC(asni, )** (Entered: 10/03/2019) |
| 12/06/2019 | 198 | Consent MOTION to Amend/Correct *the Scheduling Order* by Fluor Corporation, Fluor Daniel Maintenance Services Inc, Fluor Enterprises Inc. Response to Motion due by 12/20/2019. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. (Attachments: # 1 Proposed Order)Proposed order is being emailed to chambers with copy to opposing counsel.Associated Cases: 0:17-cv-02094-JMC, 0:17-cv-02201-JMC(Tighe, John) (Entered: 12/06/2019) |

| | | |
|---|---|---|
| 12/09/2019 | 199 | **FIFTH AMENDED CONFERENCE AND SCHEDULING ORDER( Plaintiffs ID of Expert Witness due by 12/11/2020, Defendants ID of Expert Witnesses Due by 1/15/2021, Records Custodian Affidavit due by 3/10/2021, Discovery due by 2/26/2021, Motions due by 6/15/2020, Rule 26(a)(3) Disclosures due by 3/19/2021, Bench Trial Deadline 4/1/2021, Mediation Due by 3/19/2021 and all other deadlines as set out in scheduling order ) granting (198 in 0:17-cv-02094-JMC, 152 in 0:17-cv-02201-JMC) Consent MOTION to Amend/Correct Scheduling Order. Signed by Honorable J Michelle Childs on 12/9/2019. Associated Cases: 0:17-cv-02094-JMC, 0:17-cv-02201-JMC(asni, )** (Main Document 199 replaced on 1/16/2020) (asni, ). (Entered: 12/09/2019) |
| 01/10/2020 | 200 | NOTICE of Hearing on Motion Motion Hearing set for 8/31/2020 09:30 AM in Columbia # 3, Matthew J. Perry Court House, 901 Richland St, Columbia before Honorable J Michelle Childs. Associated Cases: 0:17-cv-02201-JMC, 0:17-cv-02094-JMC(asni, ) (Entered: 01/10/2020) |
| 01/22/2020 | 201 | NOTICE of Change of Address by Lucy Clark Sanders Associated Cases: 0:17-cv-02094-JMC, 0:17-cv-02201-JMC(Sanders, Lucy) (Entered: 01/22/2020) |
| 01/23/2020 | 203 | Joint MOTION *to Appoint Mediator* by Fluor Corporation, Fluor Daniel Maintenance Services Inc, Fluor Enterprises Inc. Response to Motion due by 2/6/2020. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. (Attachments: # 1 Exhibit A - Curriculum Vitae, # 2 Proposed Order)Proposed order is being emailed to chambers with copy to opposing counsel.Associated Cases: 0:17-cv-02094-JMC, 0:17-cv-02201-JMC(Tighe, John) (Entered: 01/23/2020) |
| 01/27/2020 | 204 | **ORDER granting (203) Motion to Approve Mediator in case 0:17-cv-02094-JMC; granting (157) Motion to approve mediator in case 0:17-cv-02201-JMC Signed by Honorable J Michelle Childs on** |

| | | |
|---|---|---|
| | | **1/27/2020.Associated Cases: 0:17-cv-02094-JMC, 0:17-cv-02201-JMC(asni, )** (Entered: 01/27/2020) |
| 02/17/2020 | 205 | Joint MOTION for Confidentiality Order by SCANA Corporation, South Carolina Electric & Gas Company. Response to Motion due by 3/2/2020. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. (Attachments: # 1 Proposed Order)Proposed order is being emailed to chambers with copy to opposing counsel.Associated Cases: 0:17-cv-02094-JMC, 0:17-cv-02201-JMC(Thomas, Christopher) (Entered: 02/17/2020) |
| 02/18/2020 | 206 | **CONFIDENTIALITY ORDER, Signed by Honorable J Michelle Childs on February 18, 2020. (kbos)** (Entered: 02/18/2020) |
| 03/24/2020 | 207 | Joint MOTION to Amend/Correct (153 in 0:17-cv-02201-JMC, 153 in 0:17-cv-02201-JMC) Scheduling Order,,, Terminate Motions,, by SCANA Corporation, South Carolina Electric & Gas Company. Response to Motion due by 4/7/2020. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. (Attachments: # 1 Proposed Order)Proposed order is being emailed to chambers with copy to opposing counsel.Associated Cases: 0:17-cv-02094-JMC, 0:17-cv-02201-JMC(Thomas, Christopher) (Entered: 03/24/2020) |
| 03/25/2020 | 208 | **SIXTH AMENDED SCHEDULING ORDER( Plaintiffs ID of Expert Witness due by 1/1/2021, Defendants ID of Expert Witnesses Due by 2/5/2021, Records Custodian Affidavit due by 3/31/2021, Discovery due by 3/19/2021, Motions due by 7/6/2020, Rule 26(a)(3) Disclosures due by 4/9/2021, Bench Trial Deadline 4/1/2021, Mediation Due by 4/9/2021 and all other deadlines as set out in order ) granting (161 in 0:17-cv-02201-JMC, 207 in 0:17-cv-02094-JMC) Joint MOTION to Amend/Correct (153 in 0:17-cv-02201-JMC, 153 in 0:17-cv-02201-JMC) Scheduling Order. Signed by Honorable J Michelle Childs on 3/25/2020. Associated Cases: 0:17-cv-02094-JMC, 0:17-cv-02201-JMC(asni, )** (Entered: 03/25/2020) |

| | | |
|---|---|---|
| 04/09/2020 | 209 | **TEXT ORDER: The parties are directed to file a joint status report due by April 23, 2020 ( Status Report due by 4/23/2020). Signed by Honorable J Michelle Childs on 4/9/2020. Associated Cases: 0:17-cv-02094-JMC, 0:17-cv-02201-JMC(asni, )** (Entered: 04/09/2020) |
| 04/21/2020 | 210 | STATUS REPORT by SCANA Corporation, South Carolina Electric & Gas Company. Associated Cases: 0:17-cv-02094-JMC, 0:17-cv-02201-JMC(Thomas, Christopher) (Entered: 04/21/2020) |
| 04/21/2020 | 211 | Joint MOTION to Amend/Correct (162 in 0:17-cv-02201-JMC, 162 in 0:17-cv-02201-JMC) Scheduling Order,,, Terminate Motions,, by SCANA Corporation, South Carolina Electric & Gas Company. Response to Motion due by 5/5/2020. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. (Attachments: # 1 Proposed Order)Proposed order is being emailed to chambers with copy to opposing counsel.Associated Cases: 0:17-cv-02094-JMC, 0:17-cv-02201-JMC(Thomas, Christopher) (Entered: 04/21/2020) |
| 04/22/2020 | 212 | NOTICE of Cancellation of Hearing: Motion Hearing set for 8/31/2020 09:30 AM in Columbia # 3, Matthew J. Perry Court House, 901 Richland St, Columbia before Honorable J Michelle Childs. Associated Cases: 0:17-cv-02094-JMC, 0:17-cv-02201-JMC(asni, ) (Entered: 04/22/2020) |
| 04/22/2020 | 213 | **SEVENTH AMENDED CONFERENCE AND SCHEDULING ORDER( Plaintiffs ID of Expert Witness due by 1/1/2021, Defendants ID of Expert Witnesses Due by 2/5/2021, Records Custodian Affidavit due by 3/31/2021, Discovery due by 3/19/2021, Rule 26(a)(3) Disclosures due by 4/9/2021, Bench Trial Deadline 4/5/2021 Mediation Due by 4/9/2021 and all other deadlines as set out in this order ) GRANTING (165 in 0:17-cv-02201-JMC, 211 in 0:17-cv-02094-JMC) Joint MOTION to Amend/Correct (162 in 0:17-cv-02201-JMC, 162 in 0:17-cv-02201-JMC) Scheduling Order. Signed by** |

| | | |
|---|---|---|
| | | **Honorable J Michelle Childs on 4/22/2020. Associated Cases: 0:17-cv-02094-JMC, 0:17-cv-02201-JMC(asni, )** (Entered: 04/22/2020) |
| 04/22/2020 | 214 | NOTICE of Hearing on Motion Motion Hearing set for 10/2/2020 09:30 AM in Columbia # 3, Matthew J. Perry Court House, 901 Richland St, Columbia before Honorable J Michelle Childs. (asni, ) (Entered: 04/22/2020) |
| 06/23/2020 | 215 | DEFENDANT'S ID OF EXPERT WITNESSES by SCANA Corporation, South Carolina Electric & Gas Company.(Henthorne, D) (Entered: 06/23/2020) |
| 07/14/2020 | 217 | Joint MOTION for Hearing *via Telephone* by SCANA Corporation, South Carolina Electric & Gas Company. Response to Motion due by 7/28/2020. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. No proposed order.Associated Cases: 0:17-cv-02094-JMC, 0:17-cv-02201-JMC(Henthorne, D) (Entered: 07/14/2020) |
| 07/15/2020 | 218 | NOTICE of Hearing: Status Conference set for 7/15/2020 01:00 PM before Honorable J Michelle Childs. This hearing will be conducted via telephone. Counsel for Defendant, Mr. Henthorne shall arrange a call-in number and provide all counsel and the court with call-in instructions ASAP. Please note that all counsel who intend to speak should be on a landline and not utilizing a cell phone or speakerphone. Associated Cases: 0:17-cv-02094-JMC, 0:17-cv-02201-JMC(asni, ) (Entered: 07/15/2020) |
| 07/15/2020 | 219 | **Minute Entry. Proceedings held before Honorable J Michelle Childs: granting (217) Motion for Hearing in case 0:17-cv-02094-JMC; granting (171) Motion for Hearing; Status Conference held. Court Reporter Kathleen Richardson. Associated Cases: 0:17-cv-02201-JMC, 0:17-cv-02094-JMC(asni, )** (Entered: 07/15/2020) |
| 07/23/2020 | 220 | MOTION for Protective Order by Jimmy Addison. Response to Motion due by 8/6/2020. Add an additional |

| | | |
|---|---|---|
| | | 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. No proposed order.Associated Cases: 0:17-cv-02094-JMC, 0:17-cv-02201-JMC(Coates, William) (Entered: 07/23/2020) |
| 07/29/2020 | 223 | MOTION for Protective Order by Stephen Byrne. Response to Motion due by 8/12/2020. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. No proposed order.Associated Cases: 0:17-cv-02201-JMC, 0:17-cv-02094-JMC(asni, ) refiled by the clerk to include both related cases (Entered: 08/07/2020) |
| 08/04/2020 | 221 | Joint MOTION to Amend/Correct (213 in 0:17-cv-02094-JMC, 213 in 0:17-cv-02094-JMC, 167 in 0:17-cv-02201-JMC, 167 in 0:17-cv-02201-JMC) Scheduling Order,,, Terminate Motions,, by SCANA Corporation, South Carolina Electric & Gas Company. Response to Motion due by 8/18/2020. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. (Attachments: # 1 Proposed Order)Proposed order is being emailed to chambers with copy to opposing counsel.Associated Cases: 0:17-cv-02094-JMC, 0:17-cv-02201-JMC(Thomas, Christopher) (Entered: 08/04/2020) |
| 08/07/2020 | 222 | MOTION for Protective Order by Kevin Marsh. Response to Motion due by 8/21/2020. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. No proposed order.Associated Cases: 0:17-cv-02201-JMC, 0:17-cv-02094-JMC(asni, ) refiled by the clerk to include both related cases (Entered: 08/07/2020) |
| 08/07/2020 | 224 | **EIGHT AMENDED CONFERENCE AND SCHEDULING ORDER Plaintiffs ID of Expert Witness due by 1/1/2021, Defendants ID of Expert Witnesses Due by 2/5/2021, Records Custodian Affidavit due by 3/31/2021, Discovery due by 3/19/2021, Rule 26(a)(3) Disclosures due by 4/9/2021, Bench Trial Deadline 4/5/2021, Mediation Due by 4/9/2021, and all other deadlines as set out in this order Signed by Honorable J Michelle Childs on** |

| | | |
|---|---|---|
| | | **8/7/2020. Associated Cases: 0:17-cv-02201-JMC, 0:17-cv-02094-JMC(asni, )** (Entered: 08/07/2020) |
| 08/07/2020 | 226 | NOTICE OF RESCHEDULED HEARING Motion Hearing set for 10/2/2020 09:30 AM in Columbia # 3, Matthew J. Perry Court House, 901 Richland St, Columbia before Honorable J Michelle Childs. cancelled and rescheduled to: Motion Hearing set for 11/2/2020 10:00 AM in Columbia # 3, Matthew J. Perry Court House, 901 Richland St, Columbia before Honorable J Michelle Childs. Associated Cases: 0:17-cv-02201-JMC, 0:17-cv-02094-JMC(asni, ) (Entered: 08/07/2020) |
| 08/31/2020 | 230 | **ORDER granting (220) Motion for Protective Order; granting (222) Motion for Protective Order; granting (223) Motion for Protective Order in case 0:17-cv-02094-JMC; granting (175) Motion for Protective Order; granting (178) Motion for Protective Order; granting (179) Motion for Protective Order in case 0:17-cv-02201-JMC Signed by Honorable J Michelle Childs on 8/31/2020.Associated Cases: 0:17-cv-02201-JMC, 0:17-cv-02094-JMC(asni, )** (Entered: 09/01/2020) |
| 09/22/2020 | 231 | Joint MOTION for Leave to File Excess Pages by Fluor Corporation, Fluor Daniel Maintenance Services Inc, Fluor Enterprises Inc. Response to Motion due by 10/6/2020. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. (Attachments: # 1 Proposed Order)Proposed order is being emailed to chambers with copy to opposing counsel.Associated Cases: 0:17-cv-02094-JMC, 0:17-cv-02201-JMC(Tighe, John) (Entered: 09/22/2020) |
| 09/23/2020 | 232 | **TEXT ORDER granting (231) Motion for Leave to File Excess Pages in case 0:17-cv-02094-JMC; granting (187) Motion for Leave to File Excess Pages in case 0:17-cv-02201-JMC Signed by Honorable J Michelle Childs on 9/23/2020.Associated Cases: 0:17-cv-02201-JMC, 0:17-cv-02094-JMC(asni, )** (Entered: 09/23/2020) |
| 10/02/2020 | 233 | MOTION for Summary Judgment by Fluor Corporation, |

| | | |
|---|---|---|
| | | Fluor Daniel Maintenance Services Inc, Fluor Enterprises Inc. Response to Motion due by 10/16/2020. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. (Attachments: # 1 Memo in Support, # 2 Exhibit 1 - Summary of Plaintiff Testimony, # 3 Exhibit 2 - Pennington Deposition Excerpts, # 4 Exhibit 3 - Lorentz Deposition Excerpts, # 5 Exhibit 4 - Tate Deposition Excerpts, # 6 Exhibit 5 - Bland Deposition Excerpts, # 7 Exhibit 6 - Cavalieri Deposition Excerpts, # 8 Exhibit 7 - Donahue Deposition Excerpts, # 9 Exhibit 8 - Dunne Deposition Excerpts, # 10 Exhibit 9 - Sauer Deposition Excerpts, # 11 Exhibit 10 - Butler Deposition Excerpts, # 12 Exhibit 11 - Darwish Deposition Excerpts, # 13 Exhibit 12 - Sutton Deposition Excerpts, # 14 Exhibit 13 - Bentz Deposition Excerpts, # 15 Exhibit 14 - Keen Deposition Excerpts, # 16 Exhibit 15 - Hinkley Deposition Excerpts, # 17 Exhibit 16 - Kiernan Declaration, # 18 Exhibit 17 - Flowers Declaration, # 19 Exhibit 18 - Durham Deposition Excerpts, # 20 Exhibit 19 - Subcontract Agreement VC Summer and Fluor, # 21 Exhibit 20 - Cartee Declaration, # 22 Exhibit 21 - Records Custodian Declaration, # 23 Exhibit 22 - Subcontract Agreement FLR000456, # 24 Exhibit 23 - Torres Deposition Excerpts, # 25 Exhibit 24 - Flowers 30b6 Deposition Excerpts, # 26 Exhibit 25 - Seaton Deposition Excerpts, # 27 Exhibit 26 - Shepherd Deposition Excerpts, # 28 Exhibit 27 - Cherry Deposition Excerpts, # 29 Exhibit 28 - Flowers Deposition Excerpts, # 30 Exhibit 29 - Amended EPC Agreement, # 31 Exhibit 30 - Kiernan Deposition Excerpts, # 32 Exhibit 31 - PSC Hearing Transcript 4.12.17, # 33 Exhibit 32 - Amended and Restate Subcontract dated 2.24.17, # 34 Exhibit 33 - Jones Deposition Excerpts, # 35 Exhibit 34 - Flowers Dep. P-121, # 36 Exhibit 35 - Interim Assessment Agreement (IAA), # 37 Exhibit 36 - Amendment No. 1 to IAA, # 38 Exhibit 37 - Amendment No. 2 to IAA, # 39 Exhibit 38 - Torres Deposition Excerpts, # 40 Exhibit 40 - Macecevic Deposition Excerpts, # 41 Exhibit 41 - Young Deposition Excerpts, # 42 Exhibit 42 - Young 30b6 Deposition Excerpts, # 43 Exhibit 43 - Griffin |

| | | |
|---|---|---|
| | | Deposition Excerpts, # 44 Exhibit 44 - Churchman Deposition Excerpts, # 45 Exhibit 45 - Philpott Declaration, # 46 Exhibit 46 - Philpott Deposition Excerpts, # 47 Exhibit 47 - Torres Declaration, # 48 Exhibit 48 - Archie Declaration, # 49 Exhibit 49 - Young Declaration, # 50 Exhibit 50 - Ashcraft Declaration, # 51 Exhibit 51 - Bloom Declaration, # 52 Exhibit 52 - Letter to VC Summer contractors dated, # 53 Exhibit 53 - Transition to Fluor Project Mgt, # 54 Exhibit 54 - Path Forward for VC Summer, # 55 Exhibit 55 - April 12, 2017 Email re draft shell of Summer transition, # 56 Exhibit 56 - April 4, 2017 transition plan draft, # 57 Exhibit 57 - April 12, 2017 initial plan draft, # 58 Exhibit 58 - April 17, 2017 initial plan draft, # 59 Exhibit 59 - May 5, 2017 transition project plan update, # 60 Exhibit 60 - VC Summer Transition Project Plan, # 61 Exhibit 61 - Fluor Proposed Scope of Work for VC Summer June 2, 2017, # 62 Exhibit 62 - Rotating Schedule Evaluations, # 63 Exhibit 63 - Higgins Deposition Excerpts, # 64 Exhibit 64 - April 4, 2017 VC Summer Program Plan, # 65 Exhibit 65 - July 31 Email re meeting Tuesday, # 66 Exhibit 66 - Shepherd Declaration, # 67 Exhibit 67 - New Nuclear Update dated 6.26.17, # 68 Exhibit 68 - April 20, 2017 Email re message to all employees New Nuclear update, # 69 Exhibit 69 - March 30, 2017 email re VCS High Level Communications update, # 70 Exhibit 70 - June 22, 2017 Email re Judy VC Summer info, # 71 Exhibit 71 - July 5, 2017 email re request for approval of staff, # 72 Exhibit 72 - July 11, 2017 email re 9636 Balswer Darren Site services super NS Candidate, # 73 Exhibit 73 - July 27, 2017 email re Hireright, # 74 Exhibit 74 - July 26, 2016 email re URGENT VCS Site equipment request: rigging for CA 20, # 75 Exhibit 75 - Hydrick Declaration, # 76 Exhibit 76 - Griffin Deposition Excerpts, # 77 Exhibit 77 - July 20, 2017 monthly progress report, # 78 Exhibit 78 - Email from Laura Ware re Major Milestone 7.17.17, # 79 Exhibit 79 - June 30, 2017 email re Thanks to Jim Mangelsen and team for Milestone, # 80 Exhibit 80 - ORS Site Visit Documents, # 81 Exhibit 81 - July 28, 2017 Email re work package, # 82 Exhibit 82 - PSC Hearing transcript 8.1.17, # 83 |

| | | |
|---|---|---|
| | | Exhibit 83 - May 25, 2017 email re Brabec, # 84 Exhibit 84 - May 24, 2017 email re SCANA planning, # 85 Exhibit 85 - Crosby Deposition Excerpts, # 86 Exhibit 86 - Santee Cooper Powerpoint re energy costs, # 87 Exhibit 87 - SCANA-WARN_920081, # 88 Exhibit 88 - Email re June 13, 2017 meeting with Scana (P-20), # 89 Exhibit 89 - Letter from SCANA to WEC dated 7.31.17, # 90 Exhibit 90 - SCANA Corp 2nd quarter 2017 Earnings Conference Call, # 91 Exhibit 91 - Letter to SCANA Advisory Board Members, # 92 Exhibit 92 - July 31 FAQ, # 93 Exhibit 93 - July 31, 2017 email re notification to Fluor Craft and FNM, # 94 Exhibit 94 - Construction Project Update dated 7.31.17, # 95 Exhibit 95 - Field Non Manual update July 31, 2017, # 96 Exhibit 96 - August 1, 2017 email re VC Summer Demobilization, # 97 Exhibit 97 - August 4, 2017 email re HR Leadership call on Aug 9, # 98 Exhibit 98 - August 10, 2017 Email re Urgent VC Summer out processing info, # 99 Exhibit 99 - August 1, 2017 email re VC Summer craft, # 100 Exhibit 100 - ECF 105, # 101 Exhibit 101 - Butler offer letter, # 102 Exhibit 102 - Pennington Notification of employment status, # 103 Exhibit 103 - Darwish Notification of emp, # 104 Exhibit 104 - Sutton Offer Letter, # 105 Exhibit 105 - Organizational Chart, # 106 Exhibit 106 - FDMS Governance Documents, # 107 Exhibit 107 - FEI Governance Document)No proposed order.Associated Cases: 0:17-cv-02094-JMC, 0:17-cv-02201-JMC(Tighe, John) (Entered: 10/02/2020) |
| 10/02/2020 | 234 | Sealed Document. (Attachments: # 1 Exhibit 2 - Pennington Deposition Excerpts, # 2 Exhibit 3 - Lorentz Deposition Excerpts, # 3 Exhibit 4 - Tate Deposition Excerpts, # 4 Exhibit 5 - Bland Deposition Excerpts, # 5 Exhibit 6 - Cavalieri Deposition Excerpts, # 6 Exhibit 7 - Donahue Deposition Excerpts, # 7 Exhibit 8 - Dunne Deposition Excerpts, # 8 Exhibit 9 - Sauer Deposition Excerpts, # 9 Exhibit 10 - Butler Deposition Excerpts, # 10 Exhibit 11 - Darwish Deposition Excerpts, # 11 Exhibit 12 - Sutton Deposition Excerpts, # 12 Exhibit 13 - Bentz Deposition Excerpts, # 13 Exhibit 14 - Keen Deposition Excerpts, # 14 Exhibit 15 - Hinkley Deposition Excerpts, # 15 Exhibit 16 - Kiernan |

Declaration PART ONE OF TWO, # 16 Exhibit 16 - Kiernan Declaration PART TWO OF TWO, # 17 Exhibit 17 - Flower Declaration, # 18 Exhibit 18 - Durham Deposition Excerpts, # 19 Exhibit 19 - Subcontract Agreement VC Summer and Fluor, # 20 Exhibit 20 - Cartee Declaration PART ONE OF TWO, # 21 Exhibit 20 - Cartee Declaration PART TWO OF TWO, # 22 Exhibit 22 - Subcontract Agreement FLR000456, # 23 Exhibit 23 - Torres Deposition Ex 209 - PART ONE OF THREE, # 24 Exhibit 23 - Torres Deposition Ex 209 - PART TWO OF THREE, # 25 Exhibit 23 - Torres Deposition Ex 209 - PART THREE OF THREE, # 26 Exhibit 24 - Flowers 30b6 Deposition Excerpts, # 27 Exhibit 25 - Seaton Deposition Excerpts, # 28 Exhibit 26 - Shepherd Deposition Excerpts, # 29 Exhibit 27 - Cherry Deposition Excerpts, # 30 Exhibit 28 - Flowers Deposition Excerpts, # 31 Exhibit 30 - Kiernan Deposition Excerpts, # 32 Exhibit 33 - Jones Deposition Excerpts, # 33 Exhibit 38 - Torres Deposition Excerpts, # 34 Exhibit 40 - Macecevic Deposition Excerpts, # 35 Exhibit 41 - Young Deposition excerpts 8.3.20, # 36 Exhibit 42 - Young 30b6 Deposition excerpts, # 37 Exhibit 43 - Griffon Deposition Excerpts, # 38 Exhibit 44 - Churchman Deposition Excerpts, # 39 Exhibit 45 - Philpott Declaration, # 40 Exhibit 46 - Philpott Deposition Excerpts, # 41 Exhibit 55 - April 12, 2017 email re draft shell Summer Transition, # 42 Exhibit 56 - April 4, 2017 transition plan draft, # 43 Exhibit 57 - April 12, 2017 transition plan draft, # 44 Exhibit 58 - April 17, 2017 transition plan draft, # 45 Exhibit 59 - May 5, 2017 transition project plan update PART ONE OF TWO, # 46 Exhibit 59 - May 5, 2017 transition project plan update PART TWO OF TWO, # 47 Exhibit 60 - VC Summer Transition Project Plan, # 48 Exhibit 61 - Fluor Proposed Scope of Work for VC Summer 6.2.17, # 49 Exhibit 62 - Rotating schedule evaluationst, # 50 Exhibit 63 - Higgins Deposition Excerpts, # 51 Exhibit 65 - July 31 email re meeting Tuesday, # 52 Exhibit 69 - March 30, 2017 Email re VCS High Level Communications update, # 53 Exhibit 70 - June 22, 2017 email re Judy VC Summer info, # 54 Exhibit 71 - July 5, 2017 email re request for approval of staff, # 55 Exhibit

| | | |
|---|---|---|
| | | 72 - July 11, 2017 email re 9636 Balswer Darren SIte services Super NS candidate, # 56 Exhibit 73 - July 27, 2017 email re Hireright, # 57 Exhibit 76 - Griffin deposition excerpts, # 58 Exhibit 80 - ORS Site Visit Documents, # 59 Exhibit 83 - May 25, 2017 email re Brabec, # 60 Exhibit 85 - Crosby Deposition Excerpts, # 61 Exhibit 86 - Santee Cooper Powerpoint re energy costs, # 62 Exhibit 87 - Board Powerpoint 4.22.17, # 63 Exhibit 88 - P-20 email re June 13, 2017 meeting with SCANA, # 64 Exhibit 91 - Letter to SCANA advisory board members, # 65 Exhibit 101 - Butler Offer Letter, # 66 Exhibit 102 - Pennington notification of employment status, # 67 Exhibit 103 - Darwish notification of employment status, # 68 Exhibit 104 - Sutton Offer letter, # 69 Exhibit 106 - FDMS Governance Documents, # 70 Exhibit 107 - FEI Governance Documents)Associated Cases: 0:17-cv-02094-JMC, 0:17-cv-02201-JMC(Tighe, John) (Entered: 10/02/2020) |
| 10/02/2020 | 235 | MOTION for Summary Judgment by Timothy Lorentz, Harry Pennington, III, Lawrence Butler, Lakeisha Darwish, Jimi Che Sutton. Response to Motion due by 10/16/2020. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. (Attachments: # 1 Memo in Support, # 2 Exhibit 1 - Excerpts from EPC, # 3 Exhibit 2 - Excerpts from Deposition of David C. Durham, # 4 Exhibit 3 - Excerpts from 30(b)(6) Deposition of Ronald A. Jones, # 5 Exhibit 4 - Excerpts from Deposition of Alan Torres, # 6 Exhibit 5 - Excerpts from Deposition of Kyle M. Young, # 7 Exhibit 6 - Young Email with Oversight Plan, # 8 Exhibit 7 - Excerpts from Committee Meeting, # 9 Exhibit 8 - Team Agenda, # 10 Exhibit 9 - Excerpts from Deposition of Rodney Cavalieri, # 11 Exhibit 10 - David Email, # 12 Exhibit 11 - Excerpts from Deposition of Michael Crosby, # 13 Exhibit 12 - FNM Organization Charts, # 14 Exhibit 13 - Excerpts from Deposition of Carl Churchman, # 15 Exhibit 14 - Excerpts from Deposition of William A. Macecevic, # 16 Exhibit 15 - Excerpts from Deposition of Bruce E. Hinkley, # 17 Exhibit 16 - Excerpts from Deposition of Nicole Keen, # 18 Exhibit 17 - Excerpts from Deposition of Timothy Lorentz, # 19 Exhibit 18 - |

| | | |
|---|---|---|
| | | Compilation of Emails, # 20 Exhibit 19 - Monthly Meeting Minutes, # 21 Exhibit 20 - Excerpts from Deposition of John Shepherd, # 22 Exhibit 21 - Cover of POD Agenda, # 23 Exhibit 22 - Excerpts from Deposition of Lonnie Carter, # 24 Exhibit 23 - Press Release, # 25 Exhibit 24 - Excerpts from Deposition of David T. Seaton, # 26 Exhibit 25 - Fluor Invoice, # 27 Exhibit 26 - Excerpts from Deposition of Iris Griffin, # 28 Exhibit 27 - WEC Estimate, # 29 Exhibit 28 - Crosby Notes, # 30 Exhibit 29 - Torres Email to Knight, # 31 Exhibit 30 - IAA, # 32 Exhibit 31 - Torres Email to Wicker, # 33 Exhibit 32 - Organization Chart, # 34 Exhibit 33 - Smith Email, # 35 Exhibit 34 - SCANA List, # 36 Exhibit 35 - Fluor List, # 37 Exhibit 36 - Shepherd Email to Young, # 38 Exhibit 37 - Excerpts from 30(b)(6) Deposition of Kyle M. Young, # 39 Exhibit 38 - Excerpt from Marsh PSC Briefing, # 40 Exhibit 39 - Torres Email to Young, # 41 Exhibit 40 - Excerpts from 30(b)(6) Deposition of Stephen M. Kiernan, # 42 Exhibit 41 - Carter Email to Board, # 43 Exhibit 42 - Carter Email to Marsh, # 44 Exhibit 43 - Excerpts from Deposition of William Marion Cherry, # 45 Exhibit 44 - Excerpts from Deposition of Garry Flowers, # 46 Exhibit 45 - Email with Draft Letter, # 47 Exhibit 46 - Excerpts from 30(b)(6) Deposition of Annmarie Higgins, # 48 Exhibit 47 - Higgins Email to Kriger, # 49 Exhibit 48 - Higgins Email to Senn, # 50 Exhibit 49 - Packet with Archie Letter, # 51 Exhibit 50 - Shepherd Email to B. Durham, # 52 Exhibit 51 - Excerpts from Deposition of Stephen A. Byrne, # 53 Exhibit 52 - Starks Email, # 54 Exhibit 53 - Shepherd Email to Torres, # 55 Exhibit 54 - Excerpts from 30(b)(6) Deposition of Michael A. Philpott, # 56 Exhibit 55 - Leadership Notes)No proposed order.Associated Cases: 0:17-cv-02094-JMC, 0:17-cv-02201-JMC(Sanders, Lucy) supplement 263 added on 11/30/2020 (asni, ). (Entered: 10/02/2020) |
| 10/02/2020 | 236 | MOTION for Summary Judgment by SCANA Corporation, South Carolina Electric & Gas Company. Response to Motion due by 10/16/2020. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. |

(Attachments: # 1 Memo in Support, # 2 Exhibit A - Plaintiff Harry Penningtons Deposition Transcript (excerpts), # 3 Exhibit B - Plaintiff Timothy Lorentz Deposition Transcript (excerpts), # 4 Exhibit C - SCANA_DEFS_000004-000005 (Letter Dated March 27, 2017), # 5 Exhibit D - FLR000368-000400 (Order Approving Interim Assessment Agreements), # 6 Exhibit E - Garry Flowers Deposition Transcript (excerpts), # 7 Exhibit F - John Shepherds Deposition Transcript (excerpts), # 8 Exhibit G - SCANA_DEFS_000028-0000462 (EPC Agreement), # 9 Exhibit H - Ronald Jones Deposition Transcript (excerpts), # 10 Exhibit I - Plaintiff Rodney Cavalieris Deposition Transcript (excerpts), # 11 Exhibit J - David Durhams Deposition Transcript (excerpts), # 12 Exhibit K - William Macecevics Deposition Transcript (excerpts), # 13 Exhibit L - William Marion Cherrys Deposition Transcript (excerpts), # 14 Exhibit M - Bruce Hinkleys Deposition Transcript (excerpts), # 15 Exhibit N - SCANA_DEFS_000501-000515 (Interim Assessment Agreement - IAA), # 16 Exhibit O - SCANA_DEFS_000522-000529 (IAA Amendment No. 1), # 17 Exhibit P - SCANA_DEFS_000516-000521 (IAA Amendment No. 2), # 18 Exhibit Q - David Seatons Deposition Transcript (excerpts), # 19 Exhibit R - Michael Crosbys Deposition Transcript (excerpts), # 20 Exhibit S - Annmarie Higgins Deposition Transcript (excerpts), # 21 Exhibit T - Alan Torres Deposition Transcript (excerpts), # 22 Exhibit U - Westinghouse Employee List, # 23 Exhibit V - Plaintiff Lawrence Butlers Deposition Transcript (excerpts), # 24 Exhibit W - Plaintiff Jimi Che Suttons Deposition Transcript (excerpts), # 25 Exhibit X - Plaintiff Kimberly Betnz Deposition Transcript (excerpts), # 26 Exhibit Y - Plaintiff James Blands Deposition Transcript (excerpts), # 27 Exhibit Z - Plaintiff Sean Donahoes Deposition Transcript (excerpts), # 28 Exhibit AA - Plaintiff Thomas Sauers Deposition Transcript (excerpts), # 29 Exhibit BB - Plaintiff Dewaii Tates Deposition Transcript (excerpts), # 30 Exhibit CC - Garry Flowers Rule 30(b)(6) Deposition Transcript (excerpts), # 31 Exhibit DD - Plaintiff Brian Dunnes Deposition

| | | |
|---|---|---|
| | | Transcript (excerpts), # 32 Exhibit EE - Plaintiff Lakeisha Darwishs Deposition Transcript (excerpts))No proposed order.Associated Cases: 0:17-cv-02094-JMC, 0:17-cv-02201-JMC(Speth, Charles) (Entered: 10/02/2020) |
| 10/02/2020 | 237 | Sealed Document in re document (235 in 0:17-cv-02094-JMC). (Attachments: # 1 Exhibit 1 - Excerpts from EPC, # 2 Exhibit 3 - Excerpts from 30(b)(6) Deposition of Ronald A. Jones, # 3 Exhibit 5 - Excerpts from Deposition of Kyle M. Young, # 4 Exhibit 6 - Young Email with Oversight Plan, # 5 Exhibit 7 - Excerpts from Committee Meeting, # 6 Exhibit 8 - Team Agenda, # 7 Exhibit 10 - David Email, # 8 Exhibit 12 - FNM Organization Charts, # 9 Exhibit 15 - Excerpts from Deposition of Bruce E. Hinkley, # 10 Exhibit 16 - Excerpts from Deposition of Nicole Keen, # 11 Exhibit 18 - Compilation of Emails, # 12 Exhibit 19 - Monthly Meeting Minutes, # 13 Exhibit 20 - Excerpts from Deposition of John Shepherd, # 14 Exhibit 21 - Cover of POD Agenda, # 15 Exhibit 25 - Fluor Invoice, # 16 Exhibit 27 - WEC Estimate, # 17 Exhibit 28 - Crosby Notes, # 18 Exhibit 29 - Torres Email to Knight, # 19 Exhibit 31 - Torres Emails to Wicker, # 20 Exhibit 32 - Organization Chart, # 21 Exhibit 33 - Smith Email, # 22 Exhibit 34 - SCANA List, # 23 Exhibit 35 - Fluor List, # 24 Exhibit 36 - Shepherd Email to Young, # 25 Exhibit 37 - Excerpts from 30(b)(6) Deposition of Kyle M. Young, # 26 Exhibit 39 - Torres Email to Young, # 27 Exhibit 41 - Carter Email to Board, # 28 Exhibit 42 - Carter Email to Marsh, # 29 Exhibit 44 - Excerpts from Deposition of Garry Flowers, # 30 Exhibit 45 - Email with Draft Letter, # 31 Exhibit 47 - Higgins Emails to Kriger, # 32 Exhibit 48 - Higgins Emails to Senn, # 33 Exhibit 49 - Packet with Archie Letter, # 34 Exhibit 52 - Starks Email, # 35 Exhibit 53 - Shepherd Email to Torres, # 36 Exhibit 55 - Leadership Notes)Associated Cases: 0:17-cv-02094-JMC, 0:17-cv-02201-JMC(Sanders, Lucy) (Entered: 10/02/2020) |
| 10/06/2020 | 238 | Joint MOTION for Extension of Time by Lawrence Butler. Response to Motion due by 10/20/2020. Add an additional 3 days only if served by mail or otherwise |

|  |  |  |
|---|---|---|
|  |  | allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. Proposed order is being emailed to chambers with copy to opposing counsel.Associated Cases: 0:17-cv-02201-JMC, 0:17-cv-02094-JMC(Blankenship, Reynolds) (Entered: 10/06/2020) |
| 10/08/2020 | 239 | **TEXT ORDER granting MOTION for Extension of Time to File Response/Reply as to (194 in 0:17-cv-02201-JMC, 238 in 0:17-cv-02094-JMC) (192 in 0:17-cv-02201-JMC, 236 in 0:17-cv-02094-JMC) MOTION for Summary Judgment (191 in 0:17-cv-02201-JMC, 235 in 0:17-cv-02094-JMC) MOTION for Summary Judgment (189 in 0:17-cv-02201-JMC, 233 in 0:17-cv-02094-JMC) MOTION for Summary Judgment.( Response to Motion due by 10/30/2020. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45., Replies due by 11/13/2020). Signed by Honorable J Michelle Childs on 10/8/2020. Associated Cases: 0:17-cv-02201-JMC, 0:17-cv-02094-JMC(asni, )** (Entered: 10/08/2020) |
| 10/09/2020 | 240 | MOTION for Leave to File *Amicus Curiae Brief* by Associated Builders and Contractors Inc. Response to Motion due by 10/23/2020. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. (Attachments: # 1 Exhibit A - Brief Amicus Curiae of Associated Builders and Contractors, Inc. in Support of Defendants Motions for Summary Judgment)No proposed order.Associated Cases: 0:17-cv-02094-JMC, 0:17-cv-02201-JMC(Foster, William) (Entered: 10/09/2020) |
| 10/13/2020 | 241 | NOTICE OF RESCHEDULED HEARING Motion Hearing set for 11/2/2020 10:00 AM in Columbia # 3, Matthew J. Perry Court House, 901 Richland St, Columbia before Honorable J Michelle Childs. cancelled and rescheduled to: Motion Hearing set for 12/1/2020 10:00 AM in Columbia #1, Matthew J. Perry Court House, 901 Richland St, Columbia before Honorable J Michelle Childs. ***Counsel will be allowed to participate via video-conference. The court will provide further instructions.*** Associated Cases: 0:17-cv- |

| | | |
|---|---|---|
| | | 02201-JMC, 0:17-cv-02094-JMC(asni, ) (Entered: 10/13/2020) |
| 10/13/2020 | 242 | **TEXT ORDER granting 240 Motion for Leave to File Amicus Curiae Brief. Signed by Honorable J Michelle Childs on 10/13/2020. (jowa)** (Entered: 10/13/2020) |
| 10/27/2020 | 243 | AMICUS BRIEF by Associated Builders and Contractors Inc *Brief Amicus Curiae of Associated Builders and Contractors, Inc. in Support of Defendants Motions for Summary Judgment*. Associated Cases: 0:17-cv-02094-JMC, 0:17-cv-02201-JMC(Foster, William) (Entered: 10/27/2020) |
| 10/30/2020 | 244 | RESPONSE in Opposition re (191 in 0:17-cv-02201-JMC, 235 in 0:17-cv-02094-JMC) MOTION for Summary Judgment Response filed by Fluor Corporation, Fluor Daniel Maintenance Services Inc, Fluor Enterprises Inc.Reply to Response to Motion due by 11/6/2020 Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6. (Attachments: # 1 Exhibit A - N. Keen transcript excerpts)Associated Cases: 0:17-cv-02094-JMC, 0:17-cv-02201-JMC(Tighe, John) (Entered: 10/30/2020) |
| 10/30/2020 | 245 | Sealed Document in re document (244 in 0:17-cv-02094-JMC). Associated Cases: 0:17-cv-02094-JMC, 0:17-cv-02201-JMC(Tighe, John) (Entered: 10/30/2020) |
| 10/30/2020 | 246 | RESPONSE to Motion re (189 in 0:17-cv-02201-JMC, 233 in 0:17-cv-02094-JMC) MOTION for Summary Judgment Response filed by SCANA Corporation, South Carolina Electric & Gas Company.Reply to Response to Motion due by 11/6/2020 Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6. Associated Cases: 0:17-cv-02094-JMC, 0:17-cv-02201-JMC(Speth, Charles) (Entered: 10/30/2020) |
| 10/30/2020 | 247 | RESPONSE in Opposition re (236 in 0:17-cv-02094-JMC, 192 in 0:17-cv-02201-JMC) MOTION for Summary Judgment Response filed by Timothy Lorentz, Harry Pennington, III, Lawrence Butler, Lakeisha Darwish, Jimi Che Sutton.Reply to Response to Motion |

| | | |
|---|---|---|
| | | due by 11/6/2020 Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6. (Attachments: # 1 Exhibit 56 - Excerpts from 30(b)(6) Deposition of Ronald Jones, # 2 Exhibit 57 - EPC Amendment, # 3 Exhibit 58 - Excerpts from Deposition of David Durham, # 4 Exhibit 59 - Excerpts from Deposition of Marion Cherry, # 5 Exhibit 60 - Excerpts from Deposition of Nicole Keen, # 6 Exhibit 61 - Excerpts from Deposition of William Macecevic, # 7 Exhibit 62 - Excerpts from Deposition of Bruce Hinkley, # 8 Exhibit 63 - MRT Agenda 11/16/16, # 9 Exhibit 64 - MRT Agenda 12/21/16, # 10 Exhibit 65 - MRT Agenda 2/22/17, # 11 Exhibit 66 - MRT Agenda 3/1/17, # 12 Exhibit 67 - MRT Agenda 3/8/17, # 13 Exhibit 68 - MRT Agenda 3/15/17, # 14 Exhibit 69 - MRT Agenda 3/30/17 and 4/5/17, # 15 Exhibit 70 - MRT Agenda 4/13/17, # 16 Exhibit 71 - MRT Agenda 5/10/17, # 17 Exhibit 72 - MRT Agenda 5/17/17, # 18 Exhibit 73 - MRT Agenda 5/24/17, # 19 Exhibit 74 - MRT Agenda 6/7/17, # 20 Exhibit 75 - MRT Agenda 6/14/17, # 21 Exhibit 76 - Excerpts from 30(b)(6) Deposition of Garry Flowers, # 22 Exhibit 77 - Press Release, # 23 Exhibit 78 - Excerpts from 30(b)(6) Deposition of Annmarie Higgins, # 24 Exhibit 79 - Fluor Demobilization Report, # 25 Exhibit 80 - Task 00008 Estimate, # 26 Exhibit 81 - Task 00008 Phase 2 Approval)Associated Cases: 0:17-cv-02094-JMC, 0:17-cv-02201-JMC(Sanders, Lucy) (Entered: 10/30/2020) |
| 10/30/2020 | 248 | RESPONSE to Motion re (191 in 0:17-cv-02201-JMC, 235 in 0:17-cv-02094-JMC) MOTION for Summary Judgment Response filed by SCANA Corporation, South Carolina Electric & Gas Company.Reply to Response to Motion due by 11/6/2020 Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6. (Attachments: # 1 Exhibit A - Ron Jones Deposition Excerpts, # 2 Exhibit B - Marion Cherry Deposition Excerpts, # 3 Exhibit C - Alan Torres Deposition Excerpts, # 4 Exhibit D - Plaintiff Tim Lorentz Deposition Excerpts, # 5 Exhibit E - Plaintiff Rodney Cavalieri Deposition Excerpts, # 6 Exhibit F - Nicole Keen Deposition Excerpts, # 7 Exhibit G - Plaintiff Thomas Sauer Deposition Excerpts, # 8 Exhibit |

| | | |
|---|---|---|
| | | H - Plaintiff. Dewaii Tate Deposition Excerpts, # 9 Exhibit I - Plaintiff. Lawrence Butler Deposition Excerpts, # 10 Exhibit J - AnnMarie Higgins Deposition Excerpts, # 11 Exhibit K - David Durham Deposition Excerpts, # 12 Exhibit L - William Macecevic Deposition Excerpts, # 13 Exhibit M - Garry Flowers Deposition Excerpts, # 14 Exhibit N - Plaintiff Lakeisha Darwish Deposition Excerpts, # 15 Exhibit O - Plaintiff Harry Pennington Deposition Excerpts, # 16 Exhibit P - Plaintiff James Bland Deposition Excerpts, # 17 Exhibit Q - Plaintiff Sean Donahoe Deposition Excerpts, # 18 Exhibit R - Plaintiff Brian Dunne Deposition Excerpts, # 19 Exhibit S - Plaintiff Jimi Sutton Deposition Excerpts, # 20 Exhibit T - Plaintiff Kimberly Bentz Deposition Excerpts, # 21 Exhibit U - John Shepherd Deposition Excerpts, # 22 Exhibit V - Garry Flowers 30(b)(6) Deposition Excerpts, # 23 Exhibit W - Bruce Hinkley Deposition Excerpts, # 24 Exhibit X - WEC Corporate Ownership Statement)Associated Cases: 0:17-cv-02094-JMC, 0:17-cv-02201-JMC(Speth, Charles) (Entered: 10/30/2020) |
| 10/30/2020 | 249 | Sealed Document in re document (247 in 0:17-cv-02094-JMC). (Attachments: # 1 Exhibit 56 - Excerpts from 30(b)(6) Deposition of Ronald Jones, # 2 Exhibit 57 - EPC Amendment, # 3 Exhibit 60 - Excerpts from Deposition of Nicole Keen, # 4 Exhibit 63 - MRT Agenda 11/16/16, # 5 Exhibit 64 - MRT Agenda 12/21/16, # 6 Exhibit 65 - MRT Agenda 2/22/17, # 7 Exhibit 66 - MRT Agenda 3/1/17, # 8 Exhibit 67 - MRT Agenda 3/8/17, # 9 Exhibit 68 - MRT Agenda 3/15/17, # 10 Exhibit 69 - MRT Agenda 3/30/17 and 4/5/17, # 11 Exhibit 70 - MRT Agenda 4/13/17, # 12 Exhibit 71 - MRT Agenda 5/10/17, # 13 Exhibit 72 - MRT Agenda 5/17/17, # 14 Exhibit 73 - MRT Agenda 5/24/17, # 15 Exhibit 74 - MRT Agenda 6/7/17, # 16 Exhibit 75 - MRT Agenda 6/14/17, # 17 Exhibit 77 - Press Release, # 18 Exhibit 78 - Excerpts from 30(b)(6) Deposition of Annmarie Higgins, # 19 Exhibit 79 - Fluor Demobilization Report, # 20 Exhibit 80 - Task 00008 Estimate, # 21 Exhibit 81 - Task 00008 Phase 2 Approval)Associated Cases: 0:17-cv-02094-JMC, 0:17-cv-02201-JMC(Sanders, Lucy) (Entered: 10/30/2020) |

| | | |
|---|---|---|
| 10/30/2020 | 250 | RESPONSE in Opposition re (189 in 0:17-cv-02201-JMC, 233 in 0:17-cv-02094-JMC) MOTION for Summary Judgment *Plaintiffs' Memorandum in Opposition to the Fluor Defendants' Motion for Summary Judgment* Response filed by Timothy Lorentz, Harry Pennington, III, Lawrence Butler, Lakeisha Darwish, Jimi Che Sutton.Reply to Response to Motion due by 11/6/2020 Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6. (Attachments: # 1 Exhibit 82 - Excerpts from Deposition of David C. Durham, # 2 Exhibit 83 - Excerpts from Deposition of Lonnie Carter, # 3 Exhibit 84 - PSC Order, # 4 Exhibit 85 - Excerpts from Deposition of Alan Torres, # 5 Exhibit 86 - SCANA Corp 10-Q, # 6 Exhibit 87 - SCE&G Press Release, # 7 Exhibit 88 - Santee Cooper June 14, 2016 Inter-Office Communication, # 8 Exhibit 89 - Article SC&G Co Elects Feixed Price, # 9 Exhibit 90 - Article SCE&G asking for $852 million more to finish Summer nuclear plants, # 10 Exhibit 91 - Article Costs for proposed South Carolina nuclear units rise $800M, # 11 Exhibit 92 - Article Electric Energy Online, # 12 Exhibit 93 - Website Fluor Nuclear New Build Design & Construction, # 13 Exhibit 94 - Direct Testimony of S. Byrne, # 14 Exhibit 95 - Excerpts from Deposition of Garry Flowers, # 15 Exhibit 96 - Excerpts from Deposition of Michael Crosby, # 16 Exhibit 97 - Smith Email to Torres, # 17 Exhibit 98 - Flowers Email to Crosby, # 18 Exhibit 99 - Excerpts from Deposition of David T. Seaton, # 19 Exhibit 100 - Thomson Reuters Prelim Transcript, # 20 Exhibit 101 - Close Paper, # 21 Exhibit 102 - Chats between Garry Flowers and Jeffrey Benjamin, # 22 Exhibit 103 - Byrne Email to Crosby, # 23 Exhibit 104 - Excerpts from Deposition of Lawrence Butler, # 24 Exhibit 105 - Chats between David Seaton and Garry Flowers, # 25 Exhibit 106 - Chats between Garry Flowers and David Seaton, # 26 Exhibit 107 - Leadership Meeting Notes, # 27 Exhibit 108 - Excerpts from Deposition of Carl Churchman, # 28 Exhibit 109 - Garry Flowers Notes, # 29 Exhibit 110 - Toshiba Presentation (BUTLER-SC_00114606), # 30 Exhibit 111 - Chats between David Seaton and Garry Flowers, # |

31 Exhibit 112 - Excerpts from Deposition of Bruce E. Hinkley, # 32 Exhibit 113 - Dusek Email to Pimentel (with Attachment), # 33 Exhibit 114 - Excerpts from Deposition of John Shepherd, # 34 Exhibit 115 - Thomson Reuters Streetevents Edited Transcript (P-139), # 35 Exhibit 116 - O'Banion Email to Bauerlin, # 36 Exhibit 117 - Thomson Reuters Final Transcript (P-143), # 37 Exhibit 118 - Carter Email to Marsh (with Attachment), # 38 Exhibit 119 - Santee Cooper Board of Directors Telephonic Meeting, # 39 Exhibit 120 - Shepherd Email to Flowers, # 40 Exhibit 121 - 2010 2nd Quarter Presidents Meeting Agenda, # 41 Exhibit 122 - Santee Cooper Board of Directors Telephonic Meeting, # 42 Exhibit 123 - Basis of Estimate for Rolling 7's Craft Work Week, # 43 Exhibit 124 - Glover Email to Kiernan (P-279), # 44 Exhibit 125 - Young Email to Byrne (with Attachment), # 45 Exhibit 126 - VCS Skin in the Game Presentation, # 46 Exhibit 127 - McClure Email to Shepherd re Draft Template for Skin in the Game, # 47 Exhibit 128 - Excerpts from Deposition of Lakeisha Darwish, # 48 Exhibit 129 - Flowers Email to Shepherd, # 49 Exhibit 130 - Flowers Email to Seaton (with Attachment), # 50 Exhibit 131 - Chats between Garry Flowers and John Shepherd, # 51 Exhibit 132 - Hanna Email to Meyer (without Attachments), # 52 Exhibit 133 - Excerpts from Deposition of Michael A. Philpott, # 53 Exhibit 134 - Carter Email to Addison, # 54 Exhibit 135 - Chats between Garry Flowers and David Seaton, # 55 Exhibit 136 - Chats between David Seaton and Garry Flowers, # 56 Exhibit 137 - Baxley Email to Dembla, # 57 Exhibit 138 - Chats between David Seaton and Garry Flowers, # 58 Exhibit 139 - Excerpts from Deposition of Brian Dunne, # 59 Exhibit 140 - Excerpts from Deposition of Nicole Keen, # 60 Exhibit 141 - Excerpts from Deposition of Sean Donahoe, # 61 Exhibit 142 - Letter to Timothy Lorentz (P000010), # 62 Exhibit 143 - Excerpts from Deposition of Thomas Sauer, # 63 Exhibit 144 - Excerpts from Deposition of James Bland, # 64 Exhibit 145 - Excerpts from Deposition of Dewaii Tate, # 65 Exhibit 146 - Excerpts from Deposition of Kimberly Bentz, # 66 Exhibit 147 - Excerpts from Deposition of Harry Pennington)Associated Cases: 0:17-

| | | |
|---|---|---|
| | | cv-02094-JMC, 0:17-cv-02201-JMC(Yarborough, David) (Entered: 10/30/2020) |
| 10/30/2020 | 251 | Sealed Document in re document (206 in 0:17-cv-02201-JMC, 250 in 0:17-cv-02094-JMC). (Attachments: # 1 Exhibit 82 - Excerpts from Deposition of David C. Durham, # 2 Exhibit 83 - Excerpts from Deposition of Lonnie Carter, # 3 Exhibit 85 - Excerpts from Deposition of Alan Torres, # 4 Exhibit 88 - Santee Cooper June 14, 2016 Inter-Office Communication, # 5 Exhibit 95 - Excerpts from Deposition of Garry Flowers, # 6 Exhibit 96 - Excerpts from Deposition of Michael Crosby, # 7 Exhibit 97 - Smith Email to Torres, # 8 Exhibit 98 - Flowers Email to Crosby (P-33), # 9 Exhibit 99 - Excerpts from Deposition of David T. Seaton, # 10 Exhibit 100 - Thomson Reuters Prelim Transcript (P-184), # 11 Exhibit 101 - Close Paper (P-111), # 12 Exhibit 102 - Chats between Garry Flowers and Jeffrey Benjamin (P-112), # 13 Exhibit 103 - Byrne Email to Crosby (P-054), # 14 Exhibit 105 - Chats between David Seaton and Garry Flowers (P-113), # 15 Exhibit 106 - Chats between Garry Flowers and David Seaton (P-176), # 16 Exhibit 107 - Leadership Meeting Notes (P-165), # 17 Exhibit 108 - Excerpts from Deposition of Carl Churchman, # 18 Exhibit 109 - Garry Flowers Notes (P-115), # 19 Exhibit 111 - Chats between David Seaton and Garry Flowers (P-120), # 20 Exhibit 112 - Excerpts from Deposition of Bruce E. Hinkley, # 21 Exhibit 113 - Dusek Email to Pimentel (with Attachment) [FLE_VCS_0667803-67804], # 22 Exhibit 116 - O'Banion Email to Bauerlin (P-108), # 23 Exhibit 118 - Carter Email to Marsh (with Attachment) (P-257), # 24 Exhibit 119 - Santee Cooper Board of Directors Telephonic Meeting (P-014), # 25 Exhibit 120 - Shepherd Email to Flowers (P-275), # 26 Exhibit 121 - 2010 2nd Quarter Presidents Meeting Agenda (P-170), # 27 Exhibit 122 - Santee Cooper Board of Directors Telephonic Meeting (P-012), # 28 Exhibit 123 - Basis of Estimate for Rolling 7's Craft Work Week (P-280), # 29 Exhibit 125 - Young Email to Byrne (with Attachment) (P-015), # 30 Exhibit 126 - VCS Skin in the Game Presentation (FLE_VCS_0147002), # 31 Exhibit 127 - McClure Email to Shepherd re Draft Template for Skin |

| | | |
|---|---|---|
| | | in the Game (FLE_VCS_0147001), # 32 Exhibit 129 - Flowers Email to Shepherd (P-131), # 33 Exhibit 130 - Flowers Email to Seaton (with Attachment) (P-132), # 34 Exhibit 131 - Chats between Garry Flowers and John Shepherd (P-127), # 35 Exhibit 132 - Hanna Email to Meyer (without Attachments) (P-226), # 36 Exhibit 133 - Excerpts from Deposition of Michael A. Philpott, # 37 Exhibit 134 - Carter Email to Addison (P-023), # 38 Exhibit 135 - Chats between Garry Flowers and David Seaton (P-187), # 39 Exhibit 136 - Chats between David Seaton and Garry Flowers (P-128), # 40 Exhibit 137 - Baxley Email to Dembla (P-031), # 41 Exhibit 138 - Chats between David Seaton and Garry Flowers (P-191), # 42 Exhibit 140 - Excerpts from Deposition of Nicole Keen, # 43 Exhibit 141 - Excerpts from Deposition of Sean Donahoe)Associated Cases: 0:17-cv-02094-JMC, 0:17-cv-02201-JMC(Yarborough, David) (Entered: 10/30/2020) |
| 11/13/2020 | 252 | REPLY to Response to Motion re (189 in 0:17-cv-02201-JMC, 233 in 0:17-cv-02094-JMC) MOTION for Summary Judgment Response filed by Fluor Corporation, Fluor Daniel Maintenance Services Inc, Fluor Enterprises Inc. (Attachments: # 1 Exhibit A - Kiernan Deposition Excerpts, # 2 Exhibit B - Seaton Deposition Excerpts, # 3 Exhibit C - Flowers Deposition Excerpts, # 4 Exhibit D - Shepherd Supplemental Declaration, # 5 Exhibit E - Jones Deposition Excerpts, # 6 Exhibit F - Declaration of Jim Hanna)Associated Cases: 0:17-cv-02094-JMC, 0:17-cv-02201-JMC(Tighe, John) (Entered: 11/13/2020) |
| 11/13/2020 | 253 | Sealed Document in re document (252 in 0:17-cv-02094-JMC). (Attachments: # 1 Exhibit A - Kiernan Deposition Excerpts, # 2 Exhibit B - Seaton Deposition Excerpts, # 3 Exhibit C - Flowers Deposition Excerpts, # 4 Exhibit D - Shepherd Supplemental Declaration, # 5 Exhibit E - Jones Deposition Excerpts, # 6 Exhibit F - Declaration of Jim Hanna)Associated Cases: 0:17-cv-02094-JMC, 0:17-cv-02201-JMC(Tighe, John) (Entered: 11/13/2020) |
| 11/13/2020 | 254 | REPLY to Response to Motion re (191 in 0:17-cv- |

| | | |
|---|---|---|
| | | 02201-JMC, 235 in 0:17-cv-02094-JMC) MOTION for Summary Judgment *(Plaintiffs' Reply to SCANA Defendants' Response)* Response filed by Timothy Lorentz, Harry Pennington, III, Lawrence Butler, Lakeisha Darwish, Jimi Che Sutton. (Attachments: # 1 Exhibit 148 - Excerpts from Deposition of Timothy Lorentz, # 2 Exhibit 149 - Excerpts from Deposition of William A. Macecevic, III, # 3 Exhibit 150 - Excerpts from 30(b)(6) Deposition of Ronald A. Jones)Associated Cases: 0:17-cv-02094-JMC, 0:17-cv-02201-JMC(Sanders, Lucy) (Entered: 11/13/2020) |
| 11/13/2020 | 255 | Sealed Document in re document (254 in 0:17-cv-02094-JMC). (Attachments: # 1 Exhibit 150 - Excerpts from 30(b)(6) Deposition of Ronald A. Jones)Associated Cases: 0:17-cv-02094-JMC, 0:17-cv-02201-JMC(Sanders, Lucy) (Entered: 11/13/2020) |
| 11/13/2020 | 256 | REPLY to Response to Motion re (191 in 0:17-cv-02201-JMC, 235 in 0:17-cv-02094-JMC) MOTION for Summary Judgment *(Plaintiffs' Reply to Fluor Defendants' Response)* Response filed by Timothy Lorentz, Harry Pennington, III, Lawrence Butler, Lakeisha Darwish, Jimi Che Sutton. Associated Cases: 0:17-cv-02094-JMC, 0:17-cv-02201-JMC(Sanders, Lucy) (Entered: 11/13/2020) |
| 11/13/2020 | 257 | Sealed Document in re document (256 in 0:17-cv-02094-JMC). Associated Cases: 0:17-cv-02094-JMC, 0:17-cv-02201-JMC(Sanders, Lucy) (Entered: 11/13/2020) |
| 11/13/2020 | 258 | REPLY by Timothy Lorentz, Harry Pennington, III, Lawrence Butler, Lakeisha Darwish, Jimi Che Sutton *in Opposition to Brief Amicus Curiae of Associated Builders and Contractors, Inc in Support of Defendants' Motions for Summary Judgment*. Associated Cases: 0:17-cv-02094-JMC, 0:17-cv-02201-JMC(Sanders, Lucy) (Entered: 11/13/2020) |
| 11/13/2020 | 259 | REPLY to Response to Motion re (236 in 0:17-cv-02094-JMC, 192 in 0:17-cv-02201-JMC) MOTION for Summary Judgment Response filed by SCANA Corporation, South Carolina Electric & Gas Company. |

| | | |
|---|---|---|
| | | (Attachments: # 1 Exhibit A - Plaintiffs' First Request for Production of Documents, # 2 Exhibit B - Plaintiff Timothy Lorentz Deposition Transcript (excerpts), # 3 Exhibit C - William Macecevic Deposition Transcript (excerpts), # 4 Exhibit D - David Durham Deposition Transcript (excerpts), # 5 Exhibit E - Plaintiff Rodney Cavalieri Deposition Transcript (excerpts), # 6 Exhibit F - John Shepherd Deposition Transcript (excerpts), # 7 Exhibit G - Alan Torres Deposition Transcript (excerpts), # 8 Exhibit H - Plaintiff Lawrence Butler Deposition Transcript (excerpts), # 9 Exhibit I - Plaintiff Lakeisha Darwish Deposition Transcript (excerpts), # 10 Exhibit J - Plaintiff Harry Pennington Deposition Transcript (excerpts), # 11 Exhibit K - Plaintiff Jimi Sutton Deposition Transcript (excerpts), # 12 Exhibit L - Plaintiff James Bland Deposition Transcript (excerpts), # 13 Exhibit M - Plaintiff Sean Donahoe Deposition Transcript (excerpts), # 14 Exhibit N - Plaintiff Brian Dunne Deposition Transcript (excerpts), # 15 Exhibit O - Plaintiff Thomas Sauer Deposition Transcript (excerpts), # 16 Exhibit P - Plaintiff Dewaii Tate Deposition Transcript (excerpts), # 17 Exhibit Q - Plaintiff Nicole Keen Deposition Transcript (excerpts), # 18 Exhibit R - Iris Griffin 30(b)(6) Deposition Transcript (excerpts), # 19 Exhibit S - Kyle Young Deposition Transcript (excerpts))Associated Cases: 0:17-cv-02094-JMC, 0:17-cv-02201-JMC(Speth, Charles) (Entered: 11/13/2020) |
| 11/18/2020 | 261 | NOTICE OF RESCHEDULED HEARING Motion Hearing set for 12/1/2020 10:00 AM in Columbia #1, Matthew J. Perry Court House, 901 Richland St, Columbia before Honorable J Michelle Childs. cancelled and rescheduled to: Motion Hearing set for 12/1/2020 10:00 AM in Columbia # 3, Matthew J. Perry Court House, 901 Richland St, Columbia before Honorable J Michelle Childs. ***PLEASE NOTE THIS IS A COURTROOM LOCATION CHANGE ONLY FOR COUNSEL PARTICIPATING IN PERSON.***Associated Cases: 0:17-cv-02201-JMC, 0:17-cv-02094-JMC(asni, ) (Entered: 11/18/2020) |
| 11/24/2020 | 262 | NOTICE OF RESCHEDULED HEARING Motion Hearing set for 12/1/2020 10:00 AM in Columbia # 3, |

| | | |
|---|---|---|
| | | Matthew J. Perry Court House, 901 Richland St, Columbia before Honorable J Michelle Childs. cancelled and rescheduled to: Motion Hearing set for 12/1/2020 10:00 AM in Columbia #1, Matthew J. Perry Court House, 901 Richland St, Columbia before Honorable J Michelle Childs. ***PLEASE NOTE THIS IS A COURTROOM LOCATION CHANGE ONLY FOR COUNSEL PARTICIPATING IN PERSON.***Associated Cases: 0:17-cv-02201-JMC, 0:17-cv-02094-JMC(asni, ) (Entered: 11/24/2020) |
| 11/27/2020 | 263 | SUPPLEMENT by Timothy Lorentz, Harry Pennington, III, Lawrence Butler, Lakeisha Darwish, Jimi Che Sutton to (235 in 0:17-cv-02094-JMC) MOTION for Summary Judgment . (Attachments: # 1 Exhibit 151 - Information, # 2 Exhibit 152 - Marsh Plea Agreement)Associated Cases: 0:17-cv-02094-JMC, 0:17-cv-02201-JMC(Sanders, Lucy) (Entered: 11/27/2020) |
| 11/30/2020 | 264 | **TEXT ORDER: This matter is before the court to address the motion hearing set for 10:00 a.m. on December 1, 2020. (See ECF Nos. 218 (Butler), 262 (Pennington).) The court has reviewed all the parties' submissions. Accordingly, the court intends to proceed using the following schedule for arguments: 10:00 a.m. Introductory Comments from Judge Childs. 10:05 a.m. Plaintiffs' Argument 10:35 a.m. Defendant SCANA's Argument 11:05 a.m. Defendant Fluor's Argument 11:35 a.m. Recess 11:45 a.m. Plaintiffs' Reply 12:05 a.m. Defendant SCANA's Reply 12:25 p.m. Defendant Fluor's Reply 12:45 p.m. Court's Final Questions. Signed by Honorable J Michelle Childs on 11/30/2020. Associated Cases: 0:17-cv-02201-JMC, 0:17-cv-02094-JMC(asni, )** (Entered: 11/30/2020) |
| 11/30/2020 | 265 | REPLY by SCANA Corporation, South Carolina Electric & Gas Company to (263 in 0:17-cv-02094-JMC, 219 in 0:17-cv-02201-JMC) Supplement, . Associated Cases: 0:17-cv-02094-JMC, 0:17-cv-02201-JMC(Henthorne, D) (Entered: 11/30/2020) |
| 11/30/2020 | 266 | **AMENDED TEXT ORDER: This matter is before the court to address the motion hearing set for 10:00** |

| | | |
|---|---|---|
| | | **a.m. on December 1, 2020. (See ECF Nos. 218 (Butler), 262 (Pennington).) The court has reviewed all the parties' submissions. Accordingly, the court intends to proceed using the following schedule for arguments: 10:00 a.m. Introductory Comments from Judge Childs 10:05 a.m. Pennington Plaintiffs' Argument 10:35 a.m. Butler Plaintiffs' Argument 10:55 a.m. Defendant SCANA's Argument 11:25 a.m. Defendant Fluor's Argument 11:55 a.m. Recess 12:05 p.m. Pennington Plaintiffs' Reply 12:25 p.m. Butler Plaintiffs' Reply 12:40 p.m. Defendant SCANA's Reply 1:00 p.m. Defendant Fluor's Reply 1:20 p.m. Court's Final Questions. Signed by Honorable J Michelle Childs on 11/30/2020. Associated Cases: 0:17-cv-02201-JMC, 0:17-cv-02094-JMC(asni, )** (Entered: 11/30/2020) |
| 11/30/2020 | 267 | MOTION to Amend/Correct *Summary Judgment Hearing Schedule* by Fluor Corporation, Fluor Daniel Maintenance Services Inc, Fluor Enterprises Inc. Response to Motion due by 12/14/2020. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. No proposed order.Associated Cases: 0:17-cv-02094-JMC, 0:17-cv-02201-JMC(Tighe, John) (Entered: 11/30/2020) |
| 12/01/2020 | 268 | **Minute Entry. Proceedings held before Honorable J Michelle Childs: Motion Hearing held on 12/1/2020 re 236 MOTION for Summary Judgment filed by SCANA Corporation, South Carolina Electric & Gas Company, 233 MOTION for Summary Judgment filed by Fluor Daniel Maintenance Services Inc, Fluor Enterprises Inc, Fluor Corporation, 235 MOTION for Summary Judgment filed by Lakeisha Darwish, Harry Pennington, III, Lawrence Butler, Jimi Che Sutton, Timothy Lorentz. Oral arguments. Court takes motions under advisement. Court Reporter Kathleen Richardson. (kbos)** (Entered: 12/01/2020) |
| 12/02/2020 | 269 | **TEXT ORDER: Before the court are Defendants' Motions to Amend the schedule of arguments for the** |

| | | |
|---|---|---|
| | | **December 1, 2020 motions hearing, or in the alternative revert to a prior schedule that allotted Plaintiffs less time to argue. (ECF Nos. 223, 224.) The court finds the Motions to Amend are moot, and observes the court allowed extended time for all parties during the December 1, 2020 hearing, finding as moot (267) Motion to Amend/Correct in case 0:17-cv-02094-JMC; finding as moot (224) Motion to Amend/Correct in case 0:17-cv-02201-JMC. Signed by Honorable J Michelle Childs on December 2, 2020.Associated Cases: 0:17-cv-02201-JMC, 0:17-cv-02094-JMC(kbos)** (Entered: 12/02/2020) |
| 12/11/2020 | 270 | REPLY by Fluor Corporation, Fluor Daniel Maintenance Services Inc, Fluor Enterprises Inc to (219 in 0:17-cv-02201-JMC) Supplement, . Associated Cases: 0:17-cv-02094-JMC, 0:17-cv-02201-JMC(Tighe, John) (Entered: 12/11/2020) |
| 12/11/2020 | 271 | RESPONSE in Opposition re (223 in 0:17-cv-02201-JMC) MOTION to Amend/Correct Response filed by Fluor Corporation, Fluor Daniel Maintenance Services Inc, Fluor Enterprises Inc.Reply to Response to Motion due by 12/18/2020 Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6. Associated Cases: 0:17-cv-02094-JMC, 0:17-cv-02201-JMC(Tighe, John) (Entered: 12/11/2020) |
| 12/14/2020 | 272 | Joint MOTION to Stay by Timothy Lorentz, Harry Pennington, III. Response to Motion due by 12/29/2020. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. (Attachments: # 1 Proposed Order)Proposed order is being emailed to chambers with copy to opposing counsel.Associated Cases: 0:17-cv-02094-JMC, 0:17-cv-02201-JMC(Sanders, Lucy) (Entered: 12/14/2020) |
| 12/15/2020 | 273 | **ORDER granting (272) Motion to Stay in case 0:17-cv-02094-JMC; granting (229) Motion to Stay in case 0:17-cv-02201-JMC. The court will not stay the trial deadline absent extraordinary circumstances. Signed by Honorable J Michelle Childs on** |

| | | |
|---|---|---|
| | | **12/15/2020.Associated Cases: 0:17-cv-02201-JMC, 0:17-cv-02094-JMC(asni, )** (Entered: 12/15/2020) |
| 12/18/2020 | 275 | REPLY by Timothy Lorentz, Harry Pennington, III, Lawrence Butler, Lakeisha Darwish, Jimi Che Sutton to (270 in 0:17-cv-02094-JMC) Reply . Associated Cases: 0:17-cv-02094-JMC, 0:17-cv-02201-JMC(Sanders, Lucy) (Entered: 12/18/2020) |
| 01/06/2021 | 277 | **ORDER AND OPINION granting(233) Motion for Summary Judgment; denying(235) Motion for Summary Judgment; granting(236) Motion for Summary Judgment in case 0:17-cv-02094-JMC; granting(189) Motion for Summary Judgment; denying(191) Motion for Summary Judgment; granting(192) Motion for Summary Judgment in case 0:17-cv-02201-JMC ; denying 219 Plaintiff's Request to Supplement and dismissing the case with prejudice. Signed by Honorable J Michelle Childs on 6/1/2021.Associated Cases: 0:17-cv-02094-JMC, 0:17-cv-02201-JMC(asni, )** (Entered: 01/06/2021) |
| 01/06/2021 | 278 | SUMMARY JUDGMENT in favor of defendants against plaintiffs and dismissing the case with prejudice. (asni, ) (Entered: 01/06/2021) |
| 01/15/2021 | 279 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings. Motion hearing held on December 1, 2020, before Judge J. Michelle Childs. Court Reporter/Transcriber Kathleen Richardson, RMR, CRR, Telephone number/E-mail Kathleen_Richardson@scd.uscourts.gov. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Parties have 7 calendar days from the filing of the transcript to file with the court a Notice of Intent to Request Redaction.. Redaction Request due 2/5/2021. Redacted Transcript Deadline set for 2/16/2021. Release of Transcript Restriction set for 4/15/2021. (kari, ) (Entered: 01/15/2021) |
| 01/20/2021 | 280 | BILL OF COSTS by Fluor Corporation, Fluor Daniel |

| | | |
|---|---|---|
| | | Maintenance Services Inc, Fluor Enterprises Inc.Objections to Bill of Costs deadline 2/3/2021. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6. Associated Cases: 0:17-cv-02094-JMC, 0:17-cv-02201-JMC(Tighe, John) (Entered: 01/20/2021) |
| 02/04/2021 | 281 | Costs Taxed in amount of $ $50,424.42 against Plaintiffs Associated Cases: 0:17-cv-02094-JMC, 0:17-cv-02201-JMC(asni, ) (Entered: 02/04/2021) |
| 02/04/2021 | 282 | NOTICE OF APPEAL as to 278 Summary Judgment, 277 Order on Motion for Summary Judgment,,,,,,, by Timothy Lorentz, Harry Pennington, III. - Filing fee $ 505, receipt number 0420-9631095. The Docketing Statement form, Transcript Order form and CJA 24 form may be obtained from the Fourth Circuit website at www.ca4.uscourts.gov (Sanders, Lucy) (Entered: 02/04/2021) |
| 02/04/2021 | 283 | Transmittal Sheet for Notice of Appeal to USCA re 282 Notice of Appeal, The Clerk's Office hereby certifies the record and the docket sheet available through ECF to be the certified list in lieu of the record and/or the certified copy of the docket entries. (asni, ) (Entered: 02/04/2021) |
| 02/09/2021 | 286 | ORDER of USCA consolidating Case No. 21-1143 and Case No. 21-1141(L). as to (282 in 0:17-cv-02094-JMC) Notice of Appeal, filed by Harry Pennington, III, Timothy Lorentz, (240 in 0:17-cv-02201-JMC) Notice of Appeal, filed by Lakeisha Darwish, Lawrence Butler, Jimi Che Sutton (asni, ) (Entered: 02/09/2021) |

---

| PACER Service Center |
|---|
| Transaction Receipt |
| 03/20/2021 19:53:05 |

| **Pages:** | | | |
|---|---|---|---|

APPEAL,CLOSED

# U.S. District Court
# District of South Carolina (Rock Hill)
# CIVIL DOCKET FOR CASE #: 0:17-cv-02201-JMC

Butler et al v. Fluor Corporation et al
Assigned to: Honorable J Michelle Childs
related Case: 0:17-cv-02094-JMC
Case in other court: USCA, 21-01143
Cause: 29:2101 WARN Act

Date Filed: 08/18/2017
Date Terminated: 01/06/2021
Jury Demand: None
Nature of Suit: 790 Labor: Other
Jurisdiction: Federal Question

**Plaintiff**

**Lawrence Butler** represented by **Amy Lohr Gaffney**
Gaffney Lewis and Edwards LLC
3700 Forest Drive
Suite 400
Columbia, SC 29204
803-790-8838
Fax: 803-790-8841
Email: agaffney@glelawfirm.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Christopher James Bryant**
Perkins Coie LLP
700 Thirteenth Street NW
Suite 800
Washington, DC 20005
202-654-6289
Fax: 202-624-9513
Email: chris@yarboroughapplegate.com
*TERMINATED: 08/29/2019*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**David B Yarborough , Jr**
Yarborough Applegate
291 E Bay Street

Floor 2
Charleston, SC 29401
843-972-0150
Fax: 843-277-6691
Email: david@yarboroughapplegate.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Perry McPherson Buckner , IV**
Yarborough Applegate LLC
291 E Bay Street
Floor 2
Charleston, SC 29401
843-972-0150
Email: perry@yarboroughapplegate.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Regina Hollins Lewis**
Gaffney Lewis LLC
3700 Forest Drive
Suite 400
Columbia, SC 29204
803-790-8838
Email: rlewis@gaffneylewis.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Reynolds Hedland Blankenship , Jr**
Yarborough Applegate LLC
291 E Bay Street
Floor 2
Charleston, SC 29401
843-972-0150
Fax: 843-277-6691
Email:
reynolds@yarboroughapplegate.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Susan Rawls Edwards**
Gaffney Lewis and Edwards LLC

3700 Forest Drive
Suite 400
Columbia, SC 29204
803-790-8838
Email: sedwards@glelawfirm.com
*TERMINATED: 06/25/2019*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**William E Applegate , IV**
Yarborough Applegate
291 E Bay Street
Floor 2
Charleston, SC 29401
843-972-0150
Fax: 843-277-6691
Email: william@yarboroughapplegate.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Charles A Ercole**
Klehr Harrison Harvey Branzburg LLP
1835 Market Street
Suite 1400
Philadelphia, PA 19103
215-569-4282
Email: cercole@klehr.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Lee D Moylan**
Klehr Harrison Harvey Branzburg LLP
1835 Market Street
Suite 1400
Philadelphia, PA 19103
215-569-4140
Fax: 215-568-6603
Email: lmoylan@klehr.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Rona J Rosen**

Klehr Harrison Harvey Branzburg LLP
1835 Market Street
Suite 1400
Philadelphia, PA 19103
215-569-4145
Email: rrosen@klehr.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Lakeisha Darwish**    represented by   **Amy Lohr Gaffney**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Christopher James Bryant**
(See above for address)
*TERMINATED: 08/29/2019*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**David B Yarborough , Jr**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Perry McPherson Buckner , IV**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Regina Hollins Lewis**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Reynolds Hedland Blankenship , Jr**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Susan Rawls Edwards**

(See above for address)
*TERMINATED: 06/25/2019*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**William E Applegate , IV**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Charles A Ercole**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Lee D Moylan**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Rona J Rosen**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Darron Eigner, Jr** *TERMINATED: 06/21/2019* represented by **Amy Lohr Gaffney**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Christopher James Bryant**
(See above for address)
*TERMINATED: 08/29/2019*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**David B Yarborough , Jr**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Perry McPherson Buckner , IV**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Regina Hollins Lewis**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Reynolds Hedland Blankenship , Jr**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Susan Rawls Edwards**
(See above for address)
*TERMINATED: 06/25/2019*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**William E Applegate , IV**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Charles A Ercole**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Lee D Moylan**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Rona J Rosen**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

| | | |
|---|---|---|
| **Bernard A Johnson**<br>*TERMINATED: 06/21/2019* | represented by | **Amy Lohr Gaffney**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED*<br><br>**Christopher James Bryant**<br>(See above for address)<br>*TERMINATED: 08/29/2019*<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED*<br><br>**David B Yarborough , Jr**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED*<br><br>**Perry McPherson Buckner , IV**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED*<br><br>**Regina Hollins Lewis**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED*<br><br>**Reynolds Hedland Blankenship , Jr**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED*<br><br>**Susan Rawls Edwards**<br>(See above for address)<br>*TERMINATED: 06/25/2019*<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED*<br><br>**William E Applegate , IV**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |

**Charles A Ercole**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Lee D Moylan**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Rona J Rosen**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Jimi Che Sutton** represented by **Amy Lohr Gaffney**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Christopher James Bryant**
(See above for address)
*TERMINATED: 08/29/2019*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**David B Yarborough , Jr**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Perry McPherson Buckner , IV**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Regina Hollins Lewis**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Reynolds Hedland Blankenship , Jr**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Susan Rawls Edwards**
(See above for address)
*TERMINATED: 06/25/2019*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**William E Applegate , IV**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Charles A Ercole**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Lee D Moylan**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Rona J Rosen**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

V.

**Movant**

**Jimmy Addison**        represented by    **William Alexander Coates**
Roe Cassidy Coates and Price
PO Box 10529
Greenville, SC 29603
864-349-2600
Fax: 864-349-0303
Email: wac@roecassidy.com

*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Movant**

**Stephen Byrne** represented by **James Mixon Griffin**
Griffin Davis LLC
4408 Forest Drive
Suite 300
Columbia, SC 29206
803-744-0800
Fax: 803-744-0805
Email: jgriffin@griffindavislaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Margaret Nicole Fox**
Griffin Davis LLC
4408 Forest Drive
Suite 300
Columbia, SC 29206
803-744-0800
Fax: 803-744-0805
Email: mfox@griffindavislaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Movant**

**Kevin Marsh** represented by **Derk Bleckman Kekkert Van Raalte , IV**
Brady Hair Law Offices
2500 City Hall La, 3rd Floor (29406)
PO Box 61896
North Charleston, SC 29419
843-572-8700
Fax: 843-572-8715
Email: derk@bradyhair.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Fluor Corporation** represented by **John Hagood Tighe**
Fisher and Phillips
PO Box 11612
Columbia, SC 29211
803-255-0000
Fax: 803-255-0202
Email: htighe@fisherphillips.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Matthew Robert Korn**
Fisher and Phillips LLP
1320 Main Street
Suite 750
Columbia, SC 29201
803-255-0000
Email: mkorn@fisherphillips.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**David Kresser**
Fisher and Phillips LLP
1075 Peachtree Street NE
Suite 3500
Atlanta, GA 30326
404-231-1400
Email: dkresser@fisherphillips.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Kathleen McLeod Caminiti**
Fisher and Phillips LLP (NJ)
430 Mountain Avenue
Suite 303
Murray Hill, NJ 07974
908-516-1050
Email: kcaminiti@fisherphillips.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Fluor Enterprises** represented by **John Hagood Tighe**

**Inc**                             (See above for address)
                                    *LEAD ATTORNEY*
                                    *ATTORNEY TO BE NOTICED*

                                    **Matthew Robert Korn**
                                    (See above for address)
                                    *LEAD ATTORNEY*
                                    *ATTORNEY TO BE NOTICED*

                                    **David Kresser**
                                    (See above for address)
                                    *PRO HAC VICE*
                                    *ATTORNEY TO BE NOTICED*

                                    **Kathleen McLeod Caminiti**
                                    (See above for address)
                                    *PRO HAC VICE*
                                    *ATTORNEY TO BE NOTICED*

V.

**Interested Party**

**Harry Pennington , III**    represented by    **Amy Lohr Gaffney**
                                    Gaffney Lewis LLC
                                    3700 Forest Drive
                                    Suite 400
                                    Columbia, SC 29204
                                    803-790-8838
                                    Fax: 803-790-8841
                                    Email: agaffney@glelawfirm.com
                                    *LEAD ATTORNEY*
                                    *ATTORNEY TO BE NOTICED*

                                    **Lucy Clark Sanders**
                                    Bloodgood and Sanders
                                    242 Mathis Ferry Road
                                    Suite 201
                                    Mount Pleasant, SC 29464
                                    843-972-0313
                                    Fax: 843-352-2714
                                    Email: lsanders@bloodgoodsanders.com

*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Interested Party**

**Timothy Lorentz** represented by **Amy Lohr Gaffney**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Lucy Clark Sanders**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Interested Party**

**SCANA Corporation** represented by **Charles T Speth , II**
Ogletree Deakins Nash Smoak and Stewart PC (Cola)
First Base Building
2142 Boyce Street
Suite 401
Columbia, SC 29201
803-252-1300
Email: ted.speth@ogletreedeakins.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Christopher Ray Thomas**
Ogletree Deakins Nash Smoak and Stewart PC
First Base Building
2142 Boyce Street
Suite 401
Columbia, SC 29201
803-252-1300
Email: christopher.r.thomas@ogletreedeakins.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**D Michael Henthorne**
Ogletree Deakins Nash Smoak and Stewart

PC (Cola)
First Base Building
2142 Boyce Street
Suite 401
Columbia, SC 29201
803-252-1300
Fax: 803-254-6517
Email:
michael.henthorne@ogletreedeakins.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**James H Fowles , III**
Ogletree Deakins Nash Smoak and Stewart
PC (Cola)
First Base Building
2142 Boyce Street
Suite 401
Columbia, SC 29201
803-252-1300
Fax: 803-254-6517
Email:
james.fowles@ogletreedeakins.com
*TERMINATED: 06/13/2019*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**James Roy Silvers**
Ogletree Deakins Nash Smoak and Stewart
(GREN)
300 North Main Street
Suite 500
Greenville, SC 29601
864-271-1300
Email: james.silvers@ogletree.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Piper Reiff Byzet**
Ogletree Deakins Nash Smoak and Stewart
PO Box 1808
Charleston, SC 29402

843-720-0863
Fax: 843-853-9992
Email: piper.byzet@ogletreedeakins.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Interested Party**

**South Carolina Electric & Gas Company** represented by **Charles T Speth , II**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Christopher Ray Thomas**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**D Michael Henthorne**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**James H Fowles , III**
(See above for address)
*TERMINATED: 06/13/2019*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**James Roy Silvers**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Piper Reiff Byzet**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amicus**

**Associated Builders and Contractors Inc** represented by **William H Foster , III**
Littler Mendelson PC (GVL)
110 E Court Street

Suite 201
Greenville, SC 29601
864-775-3191
Fax: 864-752-1065
Email: bfoster@littler.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 08/18/2017 | 1 | COMPLAINT against Fluor Corporation, Fluor Enterprises Inc ( Filing fee $ 400 receipt number 0420-7315623.), filed by Lakeisha Darwish, Darron Eigner, Jr, Lawrence Butler, Jimi Che Sutton, Bernard A Johnson. Service due by 11/16/2017(asni, ) (Entered: 08/18/2017) |
| 08/18/2017 | 2 | Summons Issued as to Fluor Corporation, Fluor Enterprises Inc. (asni, ) (Entered: 08/18/2017) |
| 08/18/2017 | 3 | Local Rule 26.01 Answers to Interrogatories by Lawrence Butler, Lakeisha Darwish, Darron Eigner, Jr, Bernard A Johnson, Jimi Che Sutton.(asni, ) (Entered: 08/18/2017) |
| 08/29/2017 | 5 | MOTION to Appoint Counsel by Lawrence Butler, Lakeisha Darwish, Darron Eigner, Jr, Bernard A Johnson, Jimi Che Sutton. Response to Motion due by 9/12/2017. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. (Attachments: # 1 Exhibit supporting caselaw, # 2 Exhibit supporting caselaw, # 3 Exhibit supporting caselaw, # 4 Exhibit supporting caselaw, # 5 Exhibit supporting caselaw, # 6 Exhibit supporting caselaw, # 7 Exhibit supporting caselaw)No proposed order.(Gaffney, Amy)supplemental document 38 added on 1/23/2018 (asni, ) supplemental document 65 added on 6/15/2018 (asni, ). (Entered: 08/29/2017) |
| 08/30/2017 | 6 | WAIVER OF SERVICE by Lakeisha Darwish, Darron Eigner, Jr, Lawrence Butler, Jimi Che Sutton, Bernard A Johnson. Fluor Corporation waiver executed on 8/30/2017, answer due 10/30/2017; Fluor Enterprises Inc |

| | | |
|---|---|---|
| | | waiver executed on 8/30/2017, answer due 10/30/2017. (Gaffney, Amy) (Entered: 08/30/2017) |
| 09/14/2017 | 9 | MOTION to Appear Pro Hac Vice by Charles A. Ercole ( Filing fee $ 250 receipt number 0420-7359872) by Lawrence Butler, Lakeisha Darwish, Darron Eigner, Jr, Bernard A Johnson, Jimi Che Sutton. Response to Motion due by 9/28/2017. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. (Attachments: # 1 Affidavit Application/Affidavit, # 2 Exhibit Certificate of Good Standing)Proposed order is being emailed to chambers with copy to opposing counsel.(Gaffney, Amy) (Entered: 09/14/2017) |
| 09/14/2017 | 10 | MOTION to Appear Pro Hac Vice by Lee D. Moylan ( Filing fee $ 250 receipt number 0420-7359873) by Lawrence Butler, Lakeisha Darwish, Darron Eigner, Jr, Bernard A Johnson, Jimi Che Sutton. Response to Motion due by 9/28/2017. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. (Attachments: # 1 Affidavit Application/Affidavit, # 2 Exhibit Certificate of Good Standing)Proposed order is being emailed to chambers with copy to opposing counsel.(Gaffney, Amy) (Entered: 09/14/2017) |
| 09/15/2017 | 11 | **TEXT ORDER granting 9 Motion to Appear Pro Hac Vice.; granting 10 Motion to Appear Pro Hac Vice. Signed by Honorable J Michelle Childs on 9/15/2017.(asni, )** (Entered: 09/15/2017) |
| 09/26/2017 | 12 | MOTION to Appear Pro Hac Vice by Kathleen McLeod Caminiti ( Filing fee $ 250 receipt number 0420-7379623) by Fluor Corporation, Fluor Enterprises Inc. Response to Motion due by 10/10/2017. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. (Attachments: # 1 Affidavit, # 2 Supporting Documents Certificate of Good Standing, # 3 Supporting Documents Court Admissions, # 4 Supporting Documents Present & Previous SC PHV Admissions)No proposed order. (Tighe, John) (Entered: 09/26/2017) |

| | | |
|---|---|---|
| 09/26/2017 | 13 | MOTION to Appear Pro Hac Vice by David R. Kresser ( Filing fee $ 250 receipt number 0420-7379642) by Fluor Corporation, Fluor Enterprises Inc. Response to Motion due by 10/10/2017. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. (Attachments: # 1 Affidavit, # 2 Supporting Documents Certificate of Good Standing, # 3 Supporting Documents Court Admissions)No proposed order.(Tighe, John) (Entered: 09/26/2017) |
| 09/27/2017 | 14 | **TEXT ORDER granting 12 Motion to Appear Pro Hac Vice.; granting 13 Motion to Appear Pro Hac Vice. Signed by Honorable J Michelle Childs on 9/27/2017.(asni, )** (Entered: 09/27/2017) |
| 10/03/2017 | 15 | STIPULATION of Dismissal With Prejudice as to second cause of action by Lawrence Butler, Lakeisha Darwish, Darron Eigner, Jr, Bernard A Johnson, Jimi Che Sutton. (Gaffney, Amy) (Entered: 10/03/2017) |
| 10/04/2017 | 17 | MOTION to Dismiss , MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM , MOTION to Dismiss for Lack of Jurisdiction ( Response to Motion due by 10/18/2017. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. ) by Fluor Corporation, Fluor Enterprises Inc. (Attachments: # 1 Memo in Support)No proposed order.(Tighe, John) (Entered: 10/04/2017) |
| 10/04/2017 | 18 | Local Rule 26.01 Answers to Interrogatories by Fluor Corporation, Fluor Enterprises Inc.(Tighe, John) (Entered: 10/04/2017) |
| 10/05/2017 | 19 | DELETION OF DOCKET ENTRY NUMBER 16 Reason: document was filed in the wrong case. (asni, ) (Entered: 10/05/2017) |
| 10/05/2017 | 20 | RESPONSE in Opposition re 5 MOTION to Appoint Counsel Response filed by Harry Pennington, III.Reply to Response to Motion due by 10/12/2017 Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6. (Attachments: # 1 Supporting Documents Memorandum in Opposition, # 2 Exhibit A - Pennington Complaint, # 3 Exhibit B - |

| | | |
|---|---|---|
| | | Butler Complaint, # 4 Exhibit C - Plaintiff's Declaration, # 5 Exhibit D - Roupinian Declaration, # 6 Exhibit E - Email from Counsel, # 7 Exhibit F - Proposed Notice, # 8 Exhibit G - Proposed Order, # 9 Exhibit H - Unpublished Cases)(Sanders, Lucy) (Main Document 20 replaced on 10/12/2017) (asni, ). (Attachment 1 replaced on 10/12/2017) (asni, ). (Entered: 10/05/2017) |
| 10/12/2017 | 23 | REPLY to Response to Motion re 5 MOTION to Appoint Counsel Response filed by Lawrence Butler, Lakeisha Darwish, Darron Eigner, Jr, Bernard A Johnson, Harry Pennington, III, Jimi Che Sutton. (Attachments: # 1 Affidavit Declaration of Charles Ercole, # 2 Supporting Documents In re MF Global, # 3 Supporting Documents Transcript of Theilmann, # 4 Supporting Documents In re Transcare, # 5 Supporting Documents In re Truland Group Inc, # 6 Supporting Documents Woolery v. Matlin, # 7 Supporting Documents Blair v. Infineon, # 8 Supporting Documents Certificate of No Objection, # 9 Supporting Documents Order: Callahan v. Taylor Bean & Whittaker, # 10 Supporting Documents Order appointing interim class counsel: Kearney, # 11 Supporting Documents Order: Kettell v. Bill Heard, # 12 Supporting Documents Correspondence of 10/9/17, # 13 Supporting Documents In re: Bear Stearns, # 14 Supporting Documents Portions of Doc 52 in King v. LMCHH PCP)(Gaffney, Amy) Modified to correct filing date on 10/13/2017 (asni, ). (Entered: 10/13/2017) |
| 10/13/2017 | 24 | DELETION OF DOCKET ENTRY NUMBER 21 Reason: Corrected Filing Document Number 23 Modified filing date to that of original filing: 10/12/2017 (asni, ) (Entered: 10/13/2017) |
| 10/18/2017 | 26 | STIPULATION re 20 Response in Opposition to Motion,, by Fluor Corporation, Fluor Enterprises Inc. (Tighe, John) (Entered: 10/18/2017) |
| 10/18/2017 | 27 | RESPONSE in Opposition re 17 MOTION to Dismiss MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM MOTION to Dismiss for Lack of Jurisdiction Response filed by Lawrence Butler, Lakeisha Darwish, Darron Eigner, Jr, Bernard A Johnson, Jimi Che |

| | | |
|---|---|---|
| | | Sutton.Reply to Response to Motion due by 10/25/2017 Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6. (Attachments: # 1 Exhibit Out of Circuit Cases)(Bryant, Christopher) (Main Document 27 replaced on 10/19/2017) (asni, ). (Entered: 10/18/2017) |
| 10/24/2017 | 28 | NOTICE of Appearance by Amy Lohr Gaffney on behalf of Lawrence Butler, Lakeisha Darwish, Darron Eigner, Jr, Bernard A Johnson, Jimi Che Sutton (Gaffney, Amy) (Entered: 10/24/2017) |
| 10/25/2017 | 30 | REPLY to Response to Motion re 17 MOTION to Dismiss MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM MOTION to Dismiss for Lack of Jurisdiction Response filed by Fluor Corporation, Fluor Enterprises Inc. (Tighe, John) (Entered: 10/25/2017) |
| 10/30/2017 | 32 | *Defendants'* ANSWER to 1 Complaint by Fluor Corporation, Fluor Enterprises Inc.(Tighe, John) (Entered: 10/30/2017) |
| 10/31/2017 | 33 | SUPPLEMENTAL RESPONSE in Opposition re 5 MOTION to Appoint Counsel Response filed by Harry Pennington, III.Reply to Response to Motion due by 11/7/2017 Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6. (Attachments: # 1 Exhibit A - Case in Support)(Sanders, Lucy) (Entered: 10/31/2017) |
| 11/02/2017 | 34 | REPLY to Response to Motion re 5 MOTION to Appoint Counsel *Reply to Pennington's Supplemental* Response filed by Lawrence Butler, Lakeisha Darwish, Darron Eigner, Jr, Bernard A Johnson, Jimi Che Sutton. (Bryant, Christopher) (Entered: 11/02/2017) |
| 01/03/2018 | 36 | NOTICE of Hearing on Motion 17 MOTION to Dismiss MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM MOTION to Dismiss for Lack of Jurisdictio : Motion Hearing set for 2/14/2018 10:00 AM in Columbia # 3, Matthew J. Perry Court House, 901 Richland St, Columbia before Honorable J Michelle Childs. (asni, ) (Entered: 01/03/2018) |
| 01/03/2018 | 37 | NOTICE of Hearing on Motion 5 MOTION to Appoint |

| | | |
|---|---|---|
| | | Counsel : Motion Hearing set for 1/23/2018 02:30 PM in Columbia # 3, Matthew J. Perry Court House, 901 Richland St, Columbia before Honorable J Michelle Childs. (asni, ) (Entered: 01/03/2018) |
| 01/23/2018 | 38 | SUPPLEMENT as to by Harry Pennington, III to 5 MOTION to Appoint Counsel. (Attachments: # 1 Exhibit A - Pennington Amended Complaint, # 2 Exhibit B - Gladden Amended Complaint, # 3 Exhibit C-Unpublished Cases (Schley-Cole case), # 4 Exhibit D - Unpublished Cases (Johnson Case), # 5 Exhibit E - Unpublished Cases (It's My Party case))(Sanders, Lucy) (Entered: 01/23/2018) |
| 01/23/2018 | 39 | **Minute Entry. Proceedings held before Honorable J Michelle Childs: taking under advisement (21) Motion to Certify Class; Motion to Appoint Counsel in case 0:17-cv-02094-JMC; (5) Motion to Appoint Counsel in case 0:17-cv-02201-JMC; Motion Hearing held on 1/23/2018. Written order forthcoming. Court Reporter Carly Horenkamp. Associated Cases: 0:17-cv-02094-JMC, 0:17-cv-02201-JMC(mbro, )** (Entered: 01/24/2018) |
| 01/24/2018 | 40 | **ORDER denying without prejudice 5 Motion to Appoint Interim Class Counsel of Butler Plaintiffs. Signed by Honorable J Michelle Childs on 1/24/2018. (asni, )** (Entered: 01/24/2018) |
| 01/24/2018 | 41 | **TEXT ORDER: This matter is before the court in consideration of the logistical issues created by the motions hearing scheduled for 10 a.m. on February 14, 2018, in Butler v. Fluor Corp., C/A No. 0:17-cv-02201-JMC (D.S.C. 2017) ("Butler"), and Pennington v. Fluor Corp., C/A No. 0:17-cv-02094-JMC (D.S.C. 2017) ("Pennington"). The court will hear arguments on the Motions to Dismiss filed by Fluor Corporation and Fluor Enterprises, Inc. in Butler (ECF No. 17) and by SCANA Corporation and South Carolina Electric & Gas Company in Pennington (ECF No. 69). Upon its review, the court observes substantive differences in the basis for each Motion. Accordingly, the court will hear argument starting at 10 a.m. on the Motion to Dismiss filed in** |

| | | |
|---|---|---|
| | | **Butler followed by argument on the Motion to Dismiss filed in Pennington. Signed by Honorable J Michelle Childs on 1/24/2018. Associated Cases: 0:17-cv-02094-JMC, 0:17-cv-02201-JMC(asni, )** (Entered: 01/24/2018) |
| 02/14/2018 | 42 | **Minute Entry. Proceedings held before Honorable J Michelle Childs: taking under advisement (69) Motion to Dismiss for Failure to State a Claim in case 0:17-cv-02094-JMC; (17) Motion to Dismiss; Motion to Dismiss for Failure to State a Claim; Motion to Dismiss for Lack of Jurisdiction in case 0:17-cv-02201-JMC; Motion Hearing held on 2/14/2018. Written order forthcoming. Court Reporter Carly Horenkamp. Associated Cases: 0:17-cv-02094-JMC, 0:17-cv-02201-JMC(mbro, )** (Entered: 02/14/2018) |
| 02/16/2018 | 43 | **ORDER in case 0:17-cv-02094-JMC; denying (17) Motion to Dismiss; Motion to Dismiss for Failure to State a Claim; Motion to Dismiss for Lack of Jurisdiction in case, The court sua sponte consolidates Pennington v. Fluor Corp., C/A No. 0:17-cv-02094-JMC (D.S.C. 2017) with Butler v. Fluor Corp., C/A No. 0:17-cv-02201- JMC (D.S.C. 2017) for purposes of discovery and pretrial motions. The court further sua sponte stays both actions until the court enters its opinion(s) adjudicating the Motion to Dismiss, Motion to Certify Class and Motion to Appoint Counsel currently pending in the Pennington case C/A No. 0:17-cv-02094-JMC, ECF Nos. 21 & 69. Signed by Honorable J Michelle Childs on 2/16/2018.Associated Cases: 0:17-cv-02201-JMC, 0:17-cv-02094-JMC(mbro, )** (Main Document 43 replaced on 2/20/2018) (asni, ). (Entered: 02/16/2018) |
| 02/27/2018 | 45 | SUPPLEMENTAL RESPONSE in Opposition re (21 in 0:17-cv-02094-JMC, 21 in 0:17-cv-02094-JMC) MOTION to Certify Class MOTION to Appoint Counsel *Butler Plaintiffs' First Supplement to Their Replies to Pennington's Motion and its Supplements under FRCP 23 for Class Certification and Related Relief and Opposition to the Butler Motion to Appoint Interim Class Counsel* Response filed by Timothy Lorentz, |

| | | |
|---|---|---|
| | | Harry Pennington, III, Lawrence Butler, Lakeisha Darwish, Darron Eigner, Jr, Bernard A Johnson, Harry Pennington, III, Jimi Che Sutton.Reply to Response to Motion due by 3/6/2018 Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6. (Attachments: # 1 Exhibit A-Declaration of Ercole in Support, # 2 Exhibit B-Complaint for Violation of the WARN Act, # 3 Exhibit C-Preliminary Statement of Debtors to Dismiss, # 4 Exhibit D-Notice of WARN Class Action, # 5 Exhibit E-Unpublished and Out of Circuit Cases)Associated Cases: 0:17-cv-02201-JMC, 0:17-cv-02094-JMC(Yarborough, David) (Entered: 02/27/2018) |
| 03/01/2018 | 46 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings. Hearing on Motions held on 2-14-18 at 10:00 a.m., before Judge J. Michelle Childs. Court Reporter/Transcriber Carly Horenkamp, Telephone number/E-mail carleen_horenkamp@scd.uscourts.gov. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Parties have 7 calendar days from the filing of the transcript to file with the court a Notice of Intent to Request Redaction.. Redaction Request due 3/22/2018. Redacted Transcript Deadline set for 4/2/2018. Release of Transcript Restriction set for 5/30/2018. (chor, ) (Entered: 03/01/2018) |
| 03/02/2018 | 47 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings. Excerpt of Hearing on Motions (First 10 Pages) held on 1-23-18, before Judge J. Michelle Childs. Court Reporter/Transcriber Carly Horenkamp, Telephone number/E-mail carleen_horenkamp@scd.uscourts.gov. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Parties have 7 calendar days from the filing of the transcript to file with the court a Notice of Intent to Request Redaction.. Redaction Request due 3/23/2018. Redacted Transcript |

| | | |
|---|---|---|
| | | Deadline set for 4/2/2018. Release of Transcript Restriction set for 5/31/2018. (chor, ) (Entered: 03/02/2018) |
| 03/05/2018 | 48 | **TEXT ORDER: This matter is before the court based on the need to correct the posture of the consolidated cases in light of the Order that was entered on February 16, 2018 (the "February Order"). See Butler v. Fluor Corp., C/A No. 0:17-cv-02201-JMC, ECF No. 43 (D.S.C. 2017) ("Butler"), and Pennington v. Fluor Corp., C/A No. 0:17-cv-02094-JMC, ECF No. 86 (D.S.C. 2017) ("Pennington"). In the February Order, the court sua sponte stayed "both actions until the court enters its opinion(s) adjudicating the Motion to Dismiss, Motion to Certify Class and Motion to Appoint Counsel currently pending in the Pennington case." Id. (referencing Pennington, C/A No. 0:17-cv-02094-JMC, ECF Nos. 21 & 69). After entering the February Order, the court recollected that Pennington Plaintiffs had moved to suspend briefing on their Motion to Certify Class until after the court issued its decision on the Motion to Dismiss. Pennington, C/A No. 0:17-cv-02094-JMC, ECF No. 48 at 2. Although the court did not specifically grant this Motion, see Pennington, C/A No. 0:17-cv-02094-JMC, ECF No. 51, it is informed that at least one party has been proceeding as if the Motion was granted. Therefore, the court advises the parties that after it enters an order addressing the pending Motion to Dismiss, Pennington, C/A No. 0:17-cv-02094-JMC, ECF No. 69, the court will announce a schedule for supplemental briefing as to the pending Motion to Certify Class and Motion to Appoint Counsel. Id. at ECF No. 21. In this regard, the court stays any action in the Butler and Pennington matters that is unrelated to these pending Motions. Signed by Honorable J Michelle Childs on 3/5/2018. Associated Cases: 0:17-cv-02201-JMC, 0:17-cv-02094-JMC(asni, )** (Entered: 03/05/2018) |
| 03/08/2018 | 50 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings. Hearing on Motions held on 1-23-18, |

| | | |
|---|---|---|
| | | before Judge J. Michelle Childs. Court Reporter/Transcriber Carly Horenkamp, Telephone number/E-mail carleen_horenkamp@scd.uscourts.gov. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Parties have 7 calendar days from the filing of the transcript to file with the court a Notice of Intent to Request Redaction.. Redaction Request due 3/29/2018. Redacted Transcript Deadline set for 4/9/2018. Release of Transcript Restriction set for 6/6/2018. Associated Cases: 0:17-cv-02094-JMC, 0:17-cv-02201-JMC(chor, ) (Entered: 03/08/2018) |
| 05/24/2018 | 56 | **TEXT ORDER: This matter is before the court based on the need to correct the posture of the consolidated cases in light of the Motion for Judgment on the Pleadings that was filed by Defendants Fluor Corporation, Fluor Enterprises, Inc. and Fluor Daniel Maintenance Services, Inc. (collectively "Fluor Defendants"). See Pennington v. Fluor Corp., C/A No. 0:17-cv-02094-JMC, ECF No. 105 (D.S.C. 2017) ("Pennington"). In response to this Motion, Pennington Plaintiffs filed a Partial Consent Motion to Set a Deadline for Filing a Responsive Brief to Fluor's Motion for Judgment on the Pleadings. Id. at ECF No. 106. Upon review, the court observes that on March 5, 2018, it entered a Text Order that (1) expressly "stays any action in the Butler and Pennington matters that is unrelated to the[] pending Motions" to Dismiss, to Certify Class and to Appoint Counsel and (2) advises the parties that after the court addresses the pending Motion to Dismiss, it "will announce a schedule for supplemental briefing as to the pending Motion to Certify Class and Motion to Appoint Counsel." Id. at ECF No. 94; see also Butler v. Fluor Corp., C/A No. 0:17-cv-02201-JMC, ECF No. 48 (D.S.C. 2017) ("Butler"). Therefore, the court in its inherent authority INSTRUCTS the Clerk of Court to remove Fluor Defendant's Motion (ECF No. 105 (Pennington)) and Certificate of Service (ECF No. 55 (Butler)) from the court's** |

| | | |
|---|---|---|
| | | **CM/ECF docket. E.g., Moser v. Universal Eng'g Corp., 11 F.3d 720, 723 (10th Cir. 1993) ("The inherent authority of the district court to... and control its docket is well established. This power derives from the need for courts 'to manage their own affairs so as to achieve the orderly and expeditious disposition of cases,' and extends beyond the powers enumerated in the Federal Rules of Civil Procedure.") (internal and external citations omitted). Accordingly, the court DENIES AS MOOT Pennington Plaintiff's Motion to Set a Deadline. 106 The court anticipates filing its order addressing the pending Motion to Dismiss in the near future and lifting the stay as outlined in the March Text Order. This ruling does not preclude Fluor Defendants from refiling their Motion once the court has lifted the stay. Signed by Honorable J Michelle Childs on 5/24/2018.Associated Cases: 0:17-cv-02201-JMC, 0:17-cv-02094-JMC(asni, )** (Entered: 05/24/2018) |
| 05/24/2018 | 57 | DELETION OF DOCKET ENTRY NUMBER 55 Reason: per text order (ECF No. 56) (asni, ) (Entered: 05/24/2018) |
| 05/30/2018 | 58 | **TEXT ORDER: This matter is before the court to address the posture of this case after entry of the Order denying the Motion to Dismiss filed in the related matter Pennington v. Fluor Corp., C/A No. 0:17-cv-02094-JMC, ECF No. 109 (D.S.C. 2017). In accordance with its Text Order entered on March 5, 2018 (ECF No. 48), the court lifts the stay in this action and INSTRUCTS the parties that the following briefing schedule should be used as it relates to any renewed motion by Plaintiffs' counsel for the court to certify class and/or appoint counsel: (1) Plaintiffs shall file any motion to certify class and/or motion to appoint counsel on or by June 13, 2018; Defendants shall file any opposition to the motion to certify class and/or appoint counsel on or by June 27, 2018; and Plaintiffs shall file any reply to the opposition to their motion to certify class and/or appoint counsel on or by July 6, 2018. (Motions due by 6/13/2018, Response to Motion due by 6/27/2018,** |

| | | |
|---|---|---|
| | | **Reply due by 7/6/2018). Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45.) Signed by Honorable J Michelle Childs on 5/30/2018. (asni, )** (Entered: 05/30/2018) |
| 05/31/2018 | 59 | CERTIFICATE OF SERVICE by Fluor Corporation, Fluor Enterprises Inc (Tighe, John) (Entered: 05/31/2018) |
| 06/13/2018 | 62 | MOTION to Certify Class by Lawrence Butler, Lakeisha Darwish, Darron Eigner, Jr, Bernard A Johnson, Jimi Che Sutton. Response to Motion due by 6/27/2018. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. (Attachments: # 1 Memo in Support Memorandum of Law, # 2 Exhibits to Memo, # 3 Exhibits to Memo)No proposed order.(Gaffney, Amy) (Entered: 06/13/2018) |
| 06/13/2018 | 65 | SUPPLEMENTAL RESPONSE in Opposition re 5 MOTION to Appoint Counsel *Supplemental* Response filed by Harry Pennington, III, Timothy Lorentz.Reply to Response to Motion due by 6/21/2018 Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6. (Attachments: # 1 Exhibit A- Supplemental Declaration of Jack Raisner, # 2 Exhibit B - Supplemental Declaration of Harry Pennington III, # 3 Exhibit C - Declaration of Timothy Lorentz, # 4 Exhibit D - Proposed Notice to Class, # 5 Exhibit E - Proposed Revised Order, # 6 Exhibit F - Unpublished Cases)(Sanders, Lucy) (Main Document 65 replaced on 6/14/2018) (asni, ). Modified to correct filing date and case number on 6/14/2018 (asni, ). (Entered: 06/14/2018) |
| 06/14/2018 | 64 | DELETION OF DOCKET ENTRY NUMBER 64 Reason: filed in the wrong case. (asni, ) (Entered: 06/14/2018) |
| 06/14/2018 | 66 | DELETION OF DOCKET ENTRY NUMBER 63 Reason: document filed with wrong event code and case number. Corrected Filing Document Number 65 Modified filing date to that of original filing: 6/13/2018 (asni, ) (Entered: 06/14/2018) |

| | | |
|---|---|---|
| 06/26/2018 | 68 | Consent MOTION for Extension of Time to File Response/Reply as to 62 MOTION to Certify Class by SCANA Corporation, South Carolina Electric & Gas Company. Response to Motion due by 7/10/2018. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. No proposed order.Associated Cases: 0:17-cv-02094-JMC, 0:17-cv-02201-JMC(Thomas, Christopher) (Entered: 06/26/2018) |
| 06/26/2018 | 69 | **TEXT ORDER granting (120) Motion for Extension of Time to File Response/Reply re (21 in 0:17-cv-02094-JMC) MOTION to Certify Class (62 in 0:17-cv-02201-JMC) MOTION to Certify Class granting (68) Motion for Extension of Time to File Response/Reply re (21 in 0:17-cv-02094-JMC) Response to Motion due by 7/6/2018. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. Replies due by 7/16/2018. Signed by Honorable J Michelle Childs on 6/26/2018.Associated Cases: 0:17-cv-02201-JMC, 0:17-cv-02094-JMC(asni, )** (Entered: 06/26/2018) |
| 06/29/2018 | 70 | NOTICE of Request for Protection from Court Appearance by John Hagood Tighe for August 7-15, 2018 (Tighe, John) (Entered: 06/29/2018) |
| 07/06/2018 | 71 | RESPONSE to Motion re 62 MOTION to Certify Class Response filed by Fluor Corporation, Fluor Enterprises Inc.Reply to Response to Motion due by 7/13/2018 Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6. (Tighe, John) (Entered: 07/06/2018) |
| 07/06/2018 | 72 | JOINT STIPULATION by Fluor Corporation, Fluor Enterprises Inc. (Attachments: # 1 Exhibit A - Notice of WARN Class Action, # 2 Proposed Order Proposed Order)(Tighe, John) (Entered: 07/06/2018) |
| 07/09/2018 | 73 | CERTIFICATE OF SERVICE by Fluor Corporation, Fluor Enterprises Inc (Tighe, John) (Entered: 07/09/2018) |
| | | |

| | | |
|---|---|---|
| 07/13/2018 | 74 | REPLY to Response to Motion re 62 MOTION to Certify Class Response filed by Lawrence Butler, Lakeisha Darwish, Darron Eigner, Jr, Bernard A Johnson, Timothy Lorentz, Harry Pennington, III. (Attachments: # 1 Affidavit Declaration of Ercole) (Gaffney, Amy) (Entered: 07/13/2018) |
| 07/16/2018 | 76 | RESPONSE in Opposition re 62 MOTION to Certify Class *and Opposition to Parties' Joint Stipulation* Response filed by Timothy Lorentz, Harry Pennington, III.Reply to Response to Motion due by 7/23/2018 Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6. (Attachments: # 1 Exhibit A - Unpublished Cases)(Sanders, Lucy) (Entered: 07/16/2018) |
| 07/18/2018 | 78 | **ORDER AND OPINION granting 21 Motion to Appoint Counsel in case 0:17-cv-02094-JMC, granting (62) Motion to Appoint Counsel in case 0:17-cv-2201-JMC. Signed by Honorable J Michelle Childs on 7/18/2018.Associated Cases: 0:17-cv-02094-JMC, 0:17-cv-02201-JMC(asni, )** (Entered: 07/18/2018) |
| 07/18/2018 | 79 | **TEXT ORDER: This matter is before the court pursuant to Plaintiffs' Motion to Certify Class (ECF No. 62). On July 17, 2018, the court certified the class in the related case (Civil Action No.: 0:17-cv-02094-JMC, ECF No. 133). On July 18, 2018, the court consolidated this case and the related case for all purposes (ECF No. 134). Therefore, Plaintiffs' Motion to Certify Class in this case is DENIED as MOOT 62 . Signed by Honorable J Michelle Childs on 7/18/2018.(asni, )** (Entered: 07/18/2018) |
| 07/26/2018 | 81 | **CONFERENCE AND SCHEDULING ORDER Liability Discovery due by 8/20/2018, Plaintiffs ID of Expert Witness due by 3/8/2019, Defendants ID of Expert Witnesses due by 5/8/2019, Discovery regarding liability and class certification due by 6/17/2019, Records Custodian Affidavit due by 4/20/2020, Motions due by 7/17/2019, Damages Discovery commence by 10/2/2019, Discovery regarding damages portion of case due by 4/20/2020,** |

| | | |
|---|---|---|
| | | **Rule 26(a)(3) Disclosures due by 5/11/2020, Motions in limine due by 6/29/2020, Pretrial Briefs due by 5/30/2020, Bench Trial Deadline 7/6/2020, Mediation Due by 5/11/2020, Signed by Honorable J Michelle Childs on 7/26/2018. Associated Cases: 0:17-cv-02094-JMC, 0:17-cv-02201-JMC(asni, )** (Entered: 07/26/2018) |
| 10/23/2018 | 83 | Joint MOTION for Confidentiality Order by Timothy Lorentz, Harry Pennington, III. Response to Motion due by 11/6/2018. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. (Attachments: # 1 Exhibit A - Proposed Confidentiality Order)Proposed order is being emailed to chambers with copy to opposing counsel.Associated Cases: 0:17-cv-02094-JMC, 0:17-cv-02201-JMC(Sanders, Lucy) (Entered: 10/23/2018) |
| 10/23/2018 | 84 | **CONFIDENTIALITY ORDER granting (137) Motion for Confidentiality Order in case 0:17-cv-02094-JMC; granting (83) Motion for Confidentiality Order in case 0:17-cv-02201-JMC. Signed by Honorable J Michelle Childs on 10/23/2018.Associated Cases: 0:17-cv-02094-JMC, 0:17-cv-02201-JMC(asni, )** (Entered: 10/23/2018) |
| 10/23/2018 | 85 | NOTICE of Appearance by Matthew Robert Korn on behalf of Fluor Corporation, Fluor Enterprises Inc (Korn, Matthew) (Entered: 10/23/2018) |
| 01/30/2019 | 86 | NOTICE of Request for Protection from Court Appearance by John Hagood Tighe for from July 13, 2019 through July 24, 2019. (Tighe, John) (Entered: 01/30/2019) |
| 02/01/2019 | 87 | MOTION to Compel by Fluor Corporation, Fluor Daniel Maintenance Services Inc, Fluor Enterprises Inc. Response to Motion due by 2/15/2019. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. (Attachments: # 1 Exhibit A - Eigner Requests, # 2 Exhibit B - Johnson Requests, # 3 Exhibit C - Eigner Responses, # 4 Exhibit D - Johnson Responses, # 5 Exhibit E - October 12, 2018 Letter to Ercole and |

| | | |
|---|---|---|
| | | Moylan, # 6 Exhibit F - October 19, 2018 Letter from Ercole, # 7 Exhibit G - November 7, 2018 Letter to Ercole and Moylan, # 8 Exhibit H - November 15, 2018 Letter from Ercole, # 9 Exhibit I - November 15, 2018 Email to Ercole and Moylan, # 10 Exhibit J - November 28, 2018 Email to Ercole and Moylan, # 11 Exhibit K - December 14, 2018 Emails to Ercole and Moylan, # 12 Exhibit L - January 4, 2019 Email to Ercole and Moylan, # 13 Exhibit M - January 11, 2019 Emails between Tighe, Ercole and Moylan, # 14 Exhibit N - January 17, 2019 Email from Moylan, # 15 Exhibit O - January 18, 2019 Email from Moylan, # 16 Exhibit P - January 28, 2019 Email to Moylan, # 17 Exhibit Q - January 30, 2019 Emai from Ercole, # 18 Supporting Documents 2014 WL 37662 LaFleur v. Dollar Tree, # 19 Supporting Documents 2014 WL 2207994 Cochran v. Volvo, # 20 Supporting Documents 2013 WL 2099496 Curtis v. Time Warner, # 21 Supporting Documents 2017 WL 2437082 Ashmore v. Williams)Proposed order is being emailed to chambers with copy to opposing counsel.Associated Cases: 0:17-cv-02201-JMC, 0:17-cv-02094-JMC(Korn, Matthew) (Entered: 02/01/2019) |
| 02/15/2019 | 88 | RESPONSE in Opposition re (87 in 0:17-cv-02201-JMC, 141 in 0:17-cv-02094-JMC) MOTION to Compel Response filed by Lawrence Butler, Lakeisha Darwish, Darron Eigner, Jr, Bernard A Johnson, Jimi Che Sutton.Reply to Response to Motion due by 2/22/2019 Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6. Associated Cases: 0:17-cv-02201-JMC, 0:17-cv-02094-JMC(Bryant, Christopher) (Entered: 02/15/2019) |
| 02/20/2019 | 89 | MOTION for a Supplemental Order Approving the Sending of Notice of Class Certification and Related Relief re (133 in 0:17-cv-02094-JMC) Order on Motion to Certify Class by Timothy Lorentz, Harry Pennington, III. Response to Motion due by 3/6/2019. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. (Attachments: # 1 Exhibit A - Unpublished Cases, # 2 Exhibit B - Proposed Notice, # 3 Exhibit C - Proposed Order)Proposed order is being emailed to chambers with |

| | | |
|---|---|---|
| | | copy to opposing counsel.Associated Cases: 0:17-cv-02094-JMC, 0:17-cv-02201-JMC(Sanders, Lucy) (Entered: 02/20/2019) |
| 02/22/2019 | 90 | REPLY to Response to Motion re (87 in 0:17-cv-02201-JMC, 141 in 0:17-cv-02094-JMC) MOTION to Compel Response filed by Fluor Corporation, Fluor Daniel Maintenance Services Inc, Fluor Enterprises Inc. (Attachments: # 1 Supporting Documents 2012 WL 252632 - Brown v. Tethys)Associated Cases: 0:17-cv-02201-JMC, 0:17-cv-02094-JMC(Korn, Matthew) (Entered: 02/22/2019) |
| 02/22/2019 | 92 | REPLY to Response to Motion re (87 in 0:17-cv-02201-JMC, 141 in 0:17-cv-02094-JMC) MOTION to Compel Response filed by SCANA Corporation, South Carolina Electric & Gas Company. Associated Cases: 0:17-cv-02094-JMC, 0:17-cv-02201-JMC(Henthorne, D) (Entered: 02/22/2019) |
| 03/06/2019 | 93 | RESPONSE in Opposition re (89 in 0:17-cv-02201-JMC, 143 in 0:17-cv-02094-JMC) MOTION for a Supplemental Order Approving the Sending of Notice of Class Certification and Related Relief re (133 in 0:17-cv-02094-JMC) Order on Motion to Certify Class Response filed by SCANA Corporation, South Carolina Electric & Gas Company.Reply to Response to Motion due by 3/13/2019 Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6. Associated Cases: 0:17-cv-02094-JMC, 0:17-cv-02201-JMC(Henthorne, D) (Entered: 03/06/2019) |
| 03/06/2019 | 94 | RESPONSE in Opposition re (143 in 0:17-cv-02094-JMC, 89 in 0:17-cv-02201-JMC) MOTION for a Supplemental Order Approving the Sending of Notice of Class Certification and Related Relief re (133 in 0:17-cv-02094-JMC) Order on Motion to Certify Class Response filed by Fluor Corporation, Fluor Daniel Maintenance Services Inc, Fluor Enterprises Inc.Reply to Response to Motion due by 3/13/2019 Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6. (Attachments: # 1 Exhibit Red-line Version of Proposed Notice, # 2 Supporting Documents 2017 WL 749362 - Mullis v. |

| | | |
|---|---|---|
| | | Wings, # 3 Supporting Documents 2015 WL 8042021 - Reynolds v. Wyndham, # 4 Supporting Documents 2015 WL 3767436 - Schmidt v. Charleston Collision, # 5 Supporting Documents 2015 WL 6157306 - McCoy v. RP, # 6 Supporting Documents 2018 WL 4087931 - Weckesser v. Knighter Enterprises, # 7 Supporting Documents 2018 WL 2088011 - Wade v. Furmanite, # 8 Supporting Documents 2014 WL 5396165 - Murphy)Associated Cases: 0:17-cv-02094-JMC, 0:17-cv-02201-JMC(Korn, Matthew) (Entered: 03/06/2019) |
| 03/08/2019 | 95 | MOTION to Amend/Correct (81 in 0:17-cv-02201-JMC, 135 in 0:17-cv-02094-JMC) Scheduling Order by Lawrence Butler, Lakeisha Darwish, Darron Eigner, Jr, Bernard A Johnson, Jimi Che Sutton. Response to Motion due by 3/22/2019. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. (Attachments: # 1 Exhibit A)Proposed order is being emailed to chambers with copy to opposing counsel.Associated Cases: 0:17-cv-02201-JMC, 0:17-cv-02094-JMC refiled by the clerk to correct event. (asni, ) (Entered: 03/11/2019) |
| 03/11/2019 | 96 | **AMENDED CONFERENCE AND SCHEDULING ORDER ( Plaintiffs ID of Expert Witness due by 8/5/2019, Defendants ID of Expert Witnesses Due by 10/5/2019, Records Custodian Affidavit due by 9/17/2020, Discovery due by 9/17/2020, Motion in Limine due by 11/26/2020, Motions due by 12/14/2019, Rule 26(a)(3) Disclosures due by 10/8/2020, Pretrial Briefs due by 11/27/2020, Bench Trial Deadline 12/3/2020, Mediation Due by 10/8/2020 and all other deadlines as set out in the order) granting (95 in 0:17-cv-02201-JMC, 149 in 0:17-cv-02094-JMC) MOTION to Amend/Correct (81 in 0:17-cv-02201-JMC, 135 in 0:17-cv-02094-JMC) Scheduling Order. Signed by Honorable J Michelle Childs on 3/11/2019. Associated Cases: 0:17-cv-02201-JMC, 0:17-cv-02094-JMC(asni, )** (Entered: 03/11/2019) |
| 03/13/2019 | 97 | REPLY to Response to Motion re (89 in 0:17-cv-02201-JMC) MOTION for a Supplemental Order Approving |

| | | |
|---|---|---|
| | | the Sending of Notice of Class Certification and Related Relief re (133 in 0:17-cv-02094-JMC) Order on Motion to Certify Class Response filed by Timothy Lorentz, Harry Pennington, III. (Attachments: # 1 Exhibit A - Proposed Amended Notice, # 2 Exhibit B - Unpublished Cases)Associated Cases: 0:17-cv-02094-JMC, 0:17-cv-02201-JMC(Sanders, Lucy) (Entered: 03/13/2019) |
| 04/01/2019 | 99 | NOTICE of Request for Protection from Court Appearance by D Michael Henthorne for 04/15/19-04/19/19 Associated Cases: 0:17-cv-02094-JMC, 0:17-cv-02201-JMC(Henthorne, D) (Entered: 04/01/2019) |
| 04/02/2019 | 100 | Joint MOTION for Confidentiality Order by Fluor Corporation, Fluor Daniel Maintenance Services Inc, Fluor Enterprises Inc. Response to Motion due by 4/16/2019. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. (Attachments: # 1 Proposed Order Red-line Version)Proposed order is being emailed to chambers with copy to opposing counsel.Associated Cases: 0:17-cv-02094-JMC, 0:17-cv-02201-JMC(Tighe, John) (Entered: 04/02/2019) |
| 04/03/2019 | 101 | **ORDER granting (154) Motion for Confidentiality Order in case 0:17-cv-02094-JMC; granting (100) Motion for Confidentiality Order in case 0:17-cv-02201-JMC Signed by Honorable J Michelle Childs on 4/3/2019.Associated Cases: 0:17-cv-02094-JMC, 0:17-cv-02201-JMC(asni, )** (Entered: 04/03/2019) |
| 04/30/2019 | 102 | MOTION to Appear Pro Hac Vice by Rona J. Rosen ( Filing fee $ 250 receipt number 0420-8418004) by Lawrence Butler, Lakeisha Darwish, Darron Eigner, Jr, Bernard A Johnson, Jimi Che Sutton. Response to Motion due by 5/14/2019. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. (Attachments: # 1 Affidavit Application for PHV Admission, # 2 Exhibit Certificate of Good Standing)Proposed order is being emailed to chambers with copy to opposing counsel. (Gaffney, Amy) (Entered: 04/30/2019) |
| 05/01/2019 | 103 | **TEXT ORDER granting 102 Motion to Appear Pro** |

| | | |
|---|---|---|
| | | **Hac Vice. Signed by Honorable J Michelle Childs on 5/1/2019.(asni, )** (Entered: 05/01/2019) |
| 05/03/2019 | 104 | **ORDER GRANTING IN PART DENYING IN PART MOTION to Compel (141 in 0:17-cv-02094-JMC, 87 in 0:17-cv-02201-JMC) Specifically, the court GRANTS Defendants' Motions to the extent that (1) Eigner and Johnson must respond to discovery requests, but DENIES WITHOUT PREJUDICE (1) Fluor Defendants' request to dismiss Eigner and Johnson from the action, and (2) Fluor Defendants' request for an award of attorney's fees and costs relating to the Motions to Compel (ECF Nos. 87, 141). Therefore, the court ORDERS Eigner and Johnson to adequately respond to Fluor Defendants' discovery requests by May 10, 2019, at 5:00 p.m., and ORDERS the removal of Eigner and Johnson as named Plaintiffs in this action if they do not respond by May 10, 2019, at 5:00 p.m. ( Specific Document due by 5/10/2019). Signed by Honorable J Michelle Childs on 5/3/2019. Associated Cases: 0:17-cv-02094-JMC, 0:17-cv-02201-JMC(asni, )** (Entered: 05/03/2019) |
| 06/04/2019 | 106 | DELETION OF DOCKET ENTRY NUMBER 106 Reason: proposed order for the judges signature was incorporated into a joint stipulation by the attorneys. Attorneys instructed to file the joint stipulation signed by attorneys only and submit a proposed order to the judges email for review and signature. (asni, ) (Entered: 06/04/2019) |
| 06/04/2019 | 107 | JOINT STIPULATION by Fluor Corporation, Fluor Daniel Maintenance Services Inc, Fluor Enterprises Inc. (Attachments: # 1 Proposed Order)Associated Cases: 0:17-cv-02094-JMC, 0:17-cv-02201-JMC(Tighe, John) (Entered: 06/04/2019) |
| 06/05/2019 | 108 | **ORDER APPROVING JOINT STIPULATION CONCERNING INADVERTENT PRODUCTION OF PRIVILEGED MATERIALS. Signed by Honorable J Michelle Childs on 6/5/2019. Associated Cases: 0:17-cv-02094-JMC, 0:17-cv-02201-JMC(asni, )** (Entered: 06/05/2019) |

| | | |
|---|---|---|
| 06/05/2019 | 109 | MOTION to Remove Named Plaintiffs Darron Eigner, Jr., and Bernard A. Johnson re (156 in 0:17-cv-02094-JMC, 156 in 0:17-cv-02094-JMC, 156 in 0:17-cv-02094-JMC, 104 in 0:17-cv-02201-JMC, 104 in 0:17-cv-02201-JMC, 104 in 0:17-cv-02201-JMC) Order,,,, Terminate Motions,,,, Set Deadlines,,, by Fluor Corporation, Fluor Daniel Maintenance Services Inc, Fluor Enterprises Inc. Response to Motion due by 6/19/2019. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. No proposed order.Associated Cases: 0:17-cv-02201-JMC, 0:17-cv-02094-JMC(Korn, Matthew) (Entered: 06/05/2019) |
| 06/12/2019 | 110 | MOTION to Withdraw as Attorney *and Substitute Counsel* by SCANA Corporation, South Carolina Electric & Gas Company. Response to Motion due by 6/26/2019. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. No proposed order.Associated Cases: 0:17-cv-02094-JMC, 0:17-cv-02201-JMC(Henthorne, D) (Entered: 06/12/2019) |
| 06/13/2019 | 111 | **TEXT ORDER granting (162) Motion to Withdraw as Attorney. in case 0:17-cv-02094-JMC; granting (110) Motion to Withdraw as Attorney. in case 0:17-cv-02201-JMC Signed by Honorable J Michelle Childs on 6/13/2019.Associated Cases: 0:17-cv-02094-JMC, 0:17-cv-02201-JMC(asni, )** (Entered: 06/13/2019) |
| 06/20/2019 | 114 | NOTICE of Request for Protection from Court Appearance by Lucy Clark Sanders for July 5, 2019 - July 12, 2019 Associated Cases: 0:17-cv-02094-JMC, 0:17-cv-02201-JMC(Sanders, Lucy) (Entered: 06/20/2019) |
| 06/20/2019 | 115 | **ORDER granting in part and denying in part 143 Motion Plaintiffs' Motion for a Supplemental Order Approving the Sending of Notice of Class Certification and Related Relief (ECF Nos. 89, 143), Attaching the Approved Notice to the Court's Order and Opinion, and Ordering Fluor Defendants,** |

| | | |
|---|---|---|
| | | **SCANA Defendants, and Pennington Plaintiffs to Comply with a List of Mandates Set Forth Within the Conclusion of the Court's Order and Opinion in case 0:17-cv-02094-JMC; granting in part and denying in part 89 Motion Plaintiffs' Motion for a Supplemental Order Approving the Sending of Notice of Class Certification and Related Relief (ECF Nos. 89, 143), Attaching the Approved Notice to the Court's Order and Opinion, and Ordering Fluor Defendants, SCANA Defendants, and Pennington Plaintiffs to Comply with a List of Mandates Set Forth Within the Conclusion of the Court's Order and Opinion in case 0:17-cv-02201-JMC Signed by Honorable J Michelle Childs on 6/20/2019. (Attachments: # 1 Class Notice)Associated Cases: 0:17-cv-02094-JMC, 0:17-cv-02201-JMC(asni, )** (Entered: 06/20/2019) |
| 06/21/2019 | 117 | **ORDER AND OPINION: The court DIRECTS the Clerk of Court for the United States District Court for the District of South Carolina to REMOVE Eigner and Johnson as named Plaintiffs in this action. Lastly, the court ORDERS Fluor Defendants and Butler Plaintiffs to provide briefing regarding the issue of attorney's fees under Rule 37 of the Federal Rules of Civil Procedure. Fluor Defendants' brief is due by June 28, 2019, while Butler Plaintiffs' response is due by July 5, 2019. Fluor Defendants may reply to Butler Plaintiffs' response by July 10, 2019, if they so choose. granting 161 Motion to Remove Named Plaintiffs Darron Eigner, Jr. and Bernard A. Johnson in case 0:17-cv-02094-JMC; granting 109 Motion Fluor Defendants Motions to Remove Named Plaintiffs Darron Eigner, Jr. and Bernard A. Johnson in case 0:17-cv-02201-JMC. Signed by Honorable J Michelle Childs on 6/21/2019.Associated Cases: 0:17-cv-02094-JMC, 0:17-cv-02201-JMC(asni, )** (Entered: 06/21/2019) |
| 06/24/2019 | 121 | MOTION to Withdraw as Attorney by Lawrence Butler, Lakeisha Darwish, Darron Eigner, Jr, Bernard A Johnson. Response to Motion due by 7/8/2019. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. |

| | | |
|---|---|---|
| | | No proposed order.(Lewis, Regina) (Entered: 06/24/2019) |
| 06/25/2019 | 122 | **TEXT ORDER granting 121 Motion to Withdraw as Attorney. Signed by Honorable J Michelle Childs on 6/25/2019.(asni, )** (Entered: 06/25/2019) |
| 06/28/2019 | 124 | REPLY by Fluor Corporation, Fluor Daniel Maintenance Services Inc, Fluor Enterprises Inc to (169 in 0:17-cv-02094-JMC) Order on Motion for Miscellaneous Relief,,,, . (Attachments: # 1 Affidavit in Support of Claim for Attorney Fees, # 2 Exhibit - Attachment to Affidavit)Associated Cases: 0:17-cv-02094-JMC, 0:17-cv-02201-JMC(Korn, Matthew) (Entered: 06/28/2019) |
| 07/05/2019 | 126 | RESPONSE in Opposition re 117 Order Response filed by Lawrence Butler, Lakeisha Darwish, Darron Eigner, Jr, Bernard A Johnson, Timothy Lorentz.Reply to Response to Motion due by 7/12/2019 Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6. (Attachments: # 1 Affidavit Ercole Declaration, # 2 Exhibit Exhibit A to Ercole Declaration, # 3 Exhibit Exhibit B to Ercole Declaration, # 4 Exhibit Cited authority)(Gaffney, Amy) (Entered: 07/05/2019) |
| 07/10/2019 | 128 | REPLY by Fluor Corporation, Fluor Daniel Maintenance Services Inc, Fluor Enterprises Inc to (126 in 0:17-cv-02201-JMC) Response in Opposition to Motion, . Associated Cases: 0:17-cv-02094-JMC, 0:17-cv-02201-JMC(Korn, Matthew) (Entered: 07/10/2019) |
| 08/05/2019 | 131 | Consent MOTION to Consolidate Cases by Fluor Corporation, Fluor Daniel Maintenance Services Inc, Fluor Enterprises Inc. Response to Motion due by 8/19/2019. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. (Attachments: # 1 Proposed Order, # 2 Supporting Documents 1997 WL 499937 - Rule v. Best, # 3 Supporting Documents 2013 WL 2285937 - Workman v. Nationwide)Proposed order is being emailed to chambers with copy to opposing counsel.Associated Cases: 0:19-cv-00346-JMC, 0:17-cv-02094-JMC, 0:17-cv-02201-JMC(Tighe, John) (Entered: 08/05/2019) |

| | | |
|---|---|---|
| 08/05/2019 | 132 | **ORDER granting (178) Motion to Consolidate Cases in case 0:17-cv-02094-JMC; granting (131) Motion to Consolidate Cases in case 0:17-cv-02201-JMC; granting (25) Motion to Consolidate Cases in case 0:19-cv-00346-JMC Signed by Honorable J Michelle Childs on 8/5/2019.Associated Cases: 0:19-cv-00346-JMC, 0:17-cv-02094-JMC, 0:17-cv-02201-JMC(asni, )** (Entered: 08/05/2019) |
| 08/10/2019 | 134 | STATUS REPORT by Lawrence Butler, Lakeisha Darwish. (Gaffney, Amy) (Entered: 08/10/2019) |
| 08/12/2019 | 135 | MOTION to Set Aside (179 in 0:17-cv-02094-JMC, 132 in 0:17-cv-02201-JMC, 27 in 0:19-cv-00346-JMC) Order on Motion to Consolidate Cases, by Timothy Lorentz, Harry Pennington, III. Response to Motion due by 8/26/2019. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. (Attachments: # 1 Exhibit A - Unpublished Cases)No proposed order.Associated Cases: 0:17-cv-02094-JMC, 0:17-cv-02201-JMC, 0:19-cv-00346-JMC(Sanders, Lucy) (Entered: 08/12/2019) |
| 08/14/2019 | 136 | **TEXT ORDER granting 135 Motion to Stay Consolidation Order on the bases that Plaintiffs' counsel Lucy Sanders did not consent. Therefore, Plaintiffs' counsel is offered an opportunity to response to motion to consolidate due by August 21, 2019. Signed by Honorable J Michelle Childs on 8/14/2019.(asni, )** (Entered: 08/14/2019) |
| 08/21/2019 | 138 | DELETION OF DOCKET ENTRY NUMBER 138 Reason: document was filed in this case in error (asni, ) (Entered: 08/21/2019) |
| 08/21/2019 | 140 | RESPONSE to Motion re (131 in 0:17-cv-02201-JMC) Consent MOTION to Consolidate Cases Response filed by Timothy Lorentz, Harry Pennington, III.Reply to Response to Motion due by 8/28/2019 Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6. Associated Cases: 0:17-cv-02094-JMC, 0:17-cv-02201-JMC(Sanders, Lucy) (Entered: 08/21/2019) |
| | | |

| | | |
|---|---|---|
| 08/28/2019 | 141 | MOTION to Substitute Attorney by Lawrence Butler, Lakeisha Darwish, Darron Eigner, Jr, Bernard A Johnson, Jimi Che Sutton. Response to Motion due by 9/11/2019. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. No proposed order.Associated Cases: 0:17-cv-02201-JMC, 0:17-cv-02094-JMC(Buckner, Perry) (Entered: 08/28/2019) |
| 08/28/2019 | 142 | NOTICE of Appearance by Reynolds Hedland Blankenship, Jr on behalf of Lawrence Butler, Lakeisha Darwish, Darron Eigner, Jr, Bernard A Johnson, Jimi Che Sutton Associated Cases: 0:17-cv-02201-JMC, 0:17-cv-02094-JMC(Blankenship, Reynolds) (Entered: 08/28/2019) |
| 08/29/2019 | 143 | **TEXT ORDER granting (188) Motion to Substitute Attorney. in case 0:17-cv-02094-JMC; granting (141) Motion to Substitute Attorney. in case 0:17-cv-02201-JMC Signed by Honorable J Michelle Childs on 8/29/2019.Associated Cases: 0:17-cv-02201-JMC, 0:17-cv-02094-JMC(asni, )** (Entered: 08/29/2019) |
| 09/13/2019 | 146 | Consent MOTION to Amend/Correct *the Scheduling Order* by Fluor Corporation, Fluor Daniel Maintenance Services Inc, Fluor Enterprises Inc. Response to Motion due by 9/27/2019. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. (Attachments: # 1 Proposed Order)Proposed order is being emailed to chambers with copy to opposing counsel.Associated Cases: 0:17-cv-02094-JMC, 0:17-cv-02201-JMC(Tighe, John) (Entered: 09/13/2019) |
| 09/27/2019 | 147 | Consent MOTION to Amend/Correct *Scheduling Order* by Timothy Lorentz, Harry Pennington, III. Response to Motion due by 10/11/2019. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. No proposed order.Associated Cases: 0:17-cv-02094-JMC, 0:17-cv-02201-JMC(Sanders, Lucy) (Entered: 09/27/2019) |
| 09/30/2019 | 148 | NOTICE of Hearing: Scheduling Conference set for 10/2/2019 02:30 PM before Honorable J Michelle |

| | | |
|---|---|---|
| | | Childs. This hearing will be conducted by telephone. Plaintiff's counsel shall initiate the call and have all parties on the line prior to contacting the court at 803-765-6475.Associated Cases: 0:17-cv-02201-JMC, 0:17-cv-02094-JMC(asni, ) (Entered: 09/30/2019) |
| 10/02/2019 | 150 | **Minute Entry. Proceedings held before Honorable J Michelle Childs: Scheduling Conference held on 10/2/2019. Court Reporter Jenny Williams. Associated Cases: 0:17-cv-02094-JMC, 0:17-cv-02201-JMC(mbro, )** (Entered: 10/02/2019) |
| 10/03/2019 | 151 | **FOURTH AMENDED SCHEDULING ORDER ( Plaintiffs ID of Expert Witness due by 2/5/2020, Defendants ID of Expert Witnesses Due by 4/3/2020, Records Custodian Affidavit due by 3/10/2021, Discovery due by 8/31/2020, Motions due by 6/15/2020, Rule 26(a)(3) Disclosures due by 3/19/2021, Bench Trial Deadline 4/2021, Mediation Due by 3/19/2021 and all other deadlines as set out in scheduling order) Signed by Honorable J Michelle Childs on 10/3/2019. Associated Cases: 0:17-cv-02094-JMC, 0:17-cv-02201-JMC(asni, )** (Entered: 10/03/2019) |
| 12/06/2019 | 152 | Consent MOTION to Amend/Correct *the Scheduling Order* by Fluor Corporation, Fluor Daniel Maintenance Services Inc, Fluor Enterprises Inc. Response to Motion due by 12/20/2019. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. (Attachments: # 1 Proposed Order)Proposed order is being emailed to chambers with copy to opposing counsel.Associated Cases: 0:17-cv-02094-JMC, 0:17-cv-02201-JMC(Tighe, John) (Entered: 12/06/2019) |
| 12/09/2019 | 153 | **FIFTH AMENDED CONFERENCE AND SCHEDULING ORDER( Plaintiffs ID of Expert Witness due by 12/11/2020, Defendants ID of Expert Witnesses Due by 1/15/2021, Records Custodian Affidavit due by 3/10/2021, Discovery due by 2/26/2021, Motions due by 6/15/2020, Rule 26(a)(3) Disclosures due by 3/19/2021, Bench Trial Deadline 4/1/2021, Mediation Due by 3/19/2021 and all other** |

| | | |
|---|---|---|
| | | **deadlines as set out in scheduling order ) granting (198 in 0:17-cv-02094-JMC, 152 in 0:17-cv-02201-JMC) Consent MOTION to Amend/Correct Scheduling Order. Signed by Honorable J Michelle Childs on 12/9/2019. Associated Cases: 0:17-cv-02094-JMC, 0:17-cv-02201-JMC(asni, )** (Main Document 153 replaced on 1/16/2020) (asni, ). (Entered: 12/09/2019) |
| 01/10/2020 | 154 | NOTICE of Hearing on Motion Motion Hearing set for 8/31/2020 09:30 AM in Columbia # 3, Matthew J. Perry Court House, 901 Richland St, Columbia before Honorable J Michelle Childs. Associated Cases: 0:17-cv-02201-JMC, 0:17-cv-02094-JMC(asni, ) (Entered: 01/10/2020) |
| 01/22/2020 | 155 | NOTICE of Change of Address by Lucy Clark Sanders Associated Cases: 0:17-cv-02094-JMC, 0:17-cv-02201-JMC(Sanders, Lucy) (Entered: 01/22/2020) |
| 01/23/2020 | 157 | Joint MOTION *to Appoint Mediator* by Fluor Corporation, Fluor Daniel Maintenance Services Inc, Fluor Enterprises Inc. Response to Motion due by 2/6/2020. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. (Attachments: # 1 Exhibit A - Curriculum Vitae, # 2 Proposed Order)Proposed order is being emailed to chambers with copy to opposing counsel.Associated Cases: 0:17-cv-02094-JMC, 0:17-cv-02201-JMC(Tighe, John) (Entered: 01/23/2020) |
| 01/27/2020 | 158 | **ORDER granting (203) Motion to Approve Mediator in case 0:17-cv-02094-JMC; granting (157) Motion to approve mediator in case 0:17-cv-02201-JMC Signed by Honorable J Michelle Childs on 1/27/2020.Associated Cases: 0:17-cv-02094-JMC, 0:17-cv-02201-JMC(asni, )** (Entered: 01/27/2020) |
| 02/17/2020 | 159 | Joint MOTION for Confidentiality Order by SCANA Corporation, South Carolina Electric & Gas Company. Response to Motion due by 3/2/2020. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. (Attachments: # 1 Proposed Order)Proposed order is being emailed to |

| | | |
|---|---|---|
| | | chambers with copy to opposing counsel.Associated Cases: 0:17-cv-02094-JMC, 0:17-cv-02201-JMC(Thomas, Christopher) (Entered: 02/17/2020) |
| 02/18/2020 | 160 | **CONFIDENTIALITY ORDER, Signed by Honorable J Michelle Childs on February 18, 2020. (kbos)** (Entered: 02/18/2020) |
| 03/24/2020 | 161 | Joint MOTION to Amend/Correct (153 in 0:17-cv-02201-JMC, 153 in 0:17-cv-02201-JMC) Scheduling Order,,, Terminate Motions,, by SCANA Corporation, South Carolina Electric & Gas Company. Response to Motion due by 4/7/2020. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. (Attachments: # 1 Proposed Order)Proposed order is being emailed to chambers with copy to opposing counsel.Associated Cases: 0:17-cv-02094-JMC, 0:17-cv-02201-JMC(Thomas, Christopher) (Entered: 03/24/2020) |
| 03/25/2020 | 162 | **SIXTH AMENDED SCHEDULING ORDER( Plaintiffs ID of Expert Witness due by 1/1/2021, Defendants ID of Expert Witnesses Due by 2/5/2021, Records Custodian Affidavit due by 3/31/2021, Discovery due by 3/19/2021, Motions due by 7/6/2020, Rule 26(a)(3) Disclosures due by 4/9/2021, Bench Trial Deadline 4/1/2021, Mediation Due by 4/9/2021 and all other deadlines as set out in order ) granting (161 in 0:17-cv-02201-JMC, 207 in 0:17-cv-02094-JMC) Joint MOTION to Amend/Correct (153 in 0:17-cv-02201-JMC, 153 in 0:17-cv-02201-JMC) Scheduling Order. Signed by Honorable J Michelle Childs on 3/25/2020. Associated Cases: 0:17-cv-02094-JMC, 0:17-cv-02201-JMC(asni, )** (Entered: 03/25/2020) |
| 04/09/2020 | 163 | **TEXT ORDER: The parties are directed to file a joint status report due by April 23, 2020 ( Status Report due by 4/23/2020). Signed by Honorable J Michelle Childs on 4/9/2020. Associated Cases: 0:17-cv-02094-JMC, 0:17-cv-02201-JMC(asni, )** (Entered: 04/09/2020) |
| 04/21/2020 | 164 | STATUS REPORT by SCANA Corporation, South |

| | | |
|---|---|---|
| | | Carolina Electric & Gas Company. Associated Cases: 0:17-cv-02094-JMC, 0:17-cv-02201-JMC(Thomas, Christopher) (Entered: 04/21/2020) |
| 04/21/2020 | 165 | Joint MOTION to Amend/Correct (162 in 0:17-cv-02201-JMC, 162 in 0:17-cv-02201-JMC) Scheduling Order,,, Terminate Motions,, by SCANA Corporation, South Carolina Electric & Gas Company. Response to Motion due by 5/5/2020. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. (Attachments: # 1 Proposed Order)Proposed order is being emailed to chambers with copy to opposing counsel.Associated Cases: 0:17-cv-02094-JMC, 0:17-cv-02201-JMC(Thomas, Christopher) (Entered: 04/21/2020) |
| 04/22/2020 | 166 | NOTICE of Cancellation of Hearing: Motion Hearing set for 8/31/2020 09:30 AM in Columbia # 3, Matthew J. Perry Court House, 901 Richland St, Columbia before Honorable J Michelle Childs. Associated Cases: 0:17-cv-02094-JMC, 0:17-cv-02201-JMC(asni, ) (Entered: 04/22/2020) |
| 04/22/2020 | 167 | **SEVENTH AMENDED CONFERENCE AND SCHEDULING ORDER( Plaintiffs ID of Expert Witness due by 1/1/2021, Defendants ID of Expert Witnesses Due by 2/5/2021, Records Custodian Affidavit due by 3/31/2021, Discovery due by 3/19/2021, Rule 26(a)(3) Disclosures due by 4/9/2021, Bench Trial Deadline 4/5/2021 Mediation Due by 4/9/2021 and all other deadlines as set out in this order ) GRANTING (165 in 0:17-cv-02201-JMC, 211 in 0:17-cv-02094-JMC) Joint MOTION to Amend/Correct (162 in 0:17-cv-02201-JMC, 162 in 0:17-cv-02201-JMC) Scheduling Order. Signed by Honorable J Michelle Childs on 4/22/2020. Associated Cases: 0:17-cv-02094-JMC, 0:17-cv-02201-JMC(asni, )** (Entered: 04/22/2020) |
| 04/22/2020 | 168 | NOTICE of Hearing on Motion Motion Hearing set for 10/2/2020 09:30 AM in Columbia # 3, Matthew J. Perry Court House, 901 Richland St, Columbia before Honorable J Michelle Childs. (asni, ) (Entered: 04/22/2020) |

| | | |
|---|---|---|
| 07/02/2020 | 169 | MOTION to Compel by Lawrence Butler, Lakeisha Darwish, Darron Eigner, Jr, Bernard A Johnson, Timothy Lorentz, Harry Pennington, III. Response to Motion due by 7/16/2020. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. (Attachments: # 1 Exhibit Request for Production, # 2 Exhibit Response to Request for Production, # 3 Exhibit Correspondence to Counsel, # 4 Exhibit Correspondence to Counsel, # 5 Exhibit Case Management Order, # 6 Exhibit Case Management Order, # 7 Exhibit Correspondence re Extension)No proposed order.(Gaffney, Amy) (Entered: 07/02/2020) |
| 07/14/2020 | 171 | Joint MOTION for Hearing *via Telephone* by SCANA Corporation, South Carolina Electric & Gas Company. Response to Motion due by 7/28/2020. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. No proposed order.Associated Cases: 0:17-cv-02094-JMC, 0:17-cv-02201-JMC(Henthorne, D) (Entered: 07/14/2020) |
| 07/15/2020 | 172 | NOTICE of Hearing: Status Conference set for 7/15/2020 01:00 PM before Honorable J Michelle Childs. This hearing will be conducted via telephone. Counsel for Defendant, Mr. Henthorne shall arrange a call-in number and provide all counsel and the court with call-in instructions ASAP. Please note that all counsel who intend to speak should be on a landline and not utilizing a cell phone or speakerphone. Associated Cases: 0:17-cv-02094-JMC, 0:17-cv-02201-JMC(asni, ) (Entered: 07/15/2020) |
| 07/15/2020 | 173 | **Minute Entry. Proceedings held before Honorable J Michelle Childs: granting (217) Motion for Hearing in case 0:17-cv-02094-JMC; granting (171) Motion for Hearing; Status Conference held. Court Reporter Kathleen Richardson. Associated Cases: 0:17-cv-02201-JMC, 0:17-cv-02094-JMC(asni, )** (Entered: 07/15/2020) |
| 07/15/2020 | 174 | **TEXT ORDER: This matter is before the court** |

| | | |
|---|---|---|
| | | **pursuant to Plaintiffs' Motion to Compel (ECF No. 169). Plaintiffs request the court to compel Defendant SCANA Corporation (SCANA) to produce eight (8) deposition transcripts of SCANA officials originating from previous litigation in the South Carolina State Probate Court. (*Id.* at 8 para. 26.) Plaintiffs claim these transcripts should be produced as discovery relevant to their WARN Act claims because they "involve SCANA's failed construction and ultimate abandonment of two nuclear reactors located at the V.C. Summer nuclear generating station in Fairfield County, South Carolina." (*Id.* at 14 para. 47.) SCANA claims it is not obligated to disclose four of these transcripts because the transcripts are subject to confidentiality orders by the State Probate Court. (*Id.* at 9 para. 27.) On July 14, 2020, the parties submitted a Joint Motion for a Hearing via telephone (ECF No. 171). In the Joint Motion, the parties claim SCANA disclosed the four transcripts which were not subject to a confidentiality order, on July 7, 2020. (*Id.* at 2 para. 3.) In the hearing conducted by telephone on July 15, 2020 (ECF No. 172), SCANA relayed its concerns about violating the state court confidentiality orders. However, SCANA stated that it would comply with any order of this court to turn over the transcripts, only asking that Plaintiffs be required to abide by the Confidentiality Orders in place as to the four confidential transcripts. In consideration of the foregoing, the court GRANTS Plaintiffs' Motion to Compel SCANA to produce the four undisclosed transcripts to Plaintiffs (ECF No. 169), subject to Confidentiality Orders (ECF Nos. 84, 160) agreed to in this lawsuit. In relation to the four disclosed transcripts, the court determines the Motion to Compel to be MOOT. Signed by Honorable J Michelle Childs on 07/15/20.(vdou, )** (Entered: 07/15/2020) |
| 07/23/2020 | 175 | MOTION for Protective Order by Jimmy Addison. Response to Motion due by 8/6/2020. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. No proposed |

| | | |
|---|---|---|
| | | order.Associated Cases: 0:17-cv-02094-JMC, 0:17-cv-02201-JMC(Coates, William) (Entered: 07/23/2020) |
| 07/29/2020 | 179 | MOTION for Protective Order by Stephen Byrne. Response to Motion due by 8/12/2020. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. No proposed order.Associated Cases: 0:17-cv-02201-JMC, 0:17-cv-02094-JMC(asni, ) refiled by the clerk to include both related cases (Entered: 08/07/2020) |
| 08/04/2020 | 177 | Joint MOTION to Amend/Correct (213 in 0:17-cv-02094-JMC, 213 in 0:17-cv-02094-JMC, 167 in 0:17-cv-02201-JMC, 167 in 0:17-cv-02201-JMC) Scheduling Order,,, Terminate Motions,, by SCANA Corporation, South Carolina Electric & Gas Company. Response to Motion due by 8/18/2020. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. (Attachments: # 1 Proposed Order)Proposed order is being emailed to chambers with copy to opposing counsel.Associated Cases: 0:17-cv-02094-JMC, 0:17-cv-02201-JMC(Thomas, Christopher) (Entered: 08/04/2020) |
| 08/07/2020 | 178 | MOTION for Protective Order by Kevin Marsh. Response to Motion due by 8/21/2020. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. No proposed order.Associated Cases: 0:17-cv-02201-JMC, 0:17-cv-02094-JMC(asni, ) refiled by the clerk to include both related cases (Entered: 08/07/2020) |
| 08/07/2020 | 180 | **EIGHT AMENDED CONFERENCE AND SCHEDULING ORDER Plaintiffs ID of Expert Witness due by 1/1/2021, Defendants ID of Expert Witnesses Due by 2/5/2021, Records Custodian Affidavit due by 3/31/2021, Discovery due by 3/19/2021, Rule 26(a)(3) Disclosures due by 4/9/2021, Bench Trial Deadline 4/5/2021, Mediation Due by 4/9/2021, and all other deadlines as set out in this order Signed by Honorable J Michelle Childs on 8/7/2020. Associated Cases: 0:17-cv-02201-JMC, 0:17-cv-02094-JMC(asni, )** (Entered: 08/07/2020) |
| | | |

| | | |
|---|---|---|
| 08/07/2020 | 182 | NOTICE OF RESCHEDULED HEARING Motion Hearing set for 10/2/2020 09:30 AM in Columbia # 3, Matthew J. Perry Court House, 901 Richland St, Columbia before Honorable J Michelle Childs. cancelled and rescheduled to: Motion Hearing set for 11/2/2020 10:00 AM in Columbia # 3, Matthew J. Perry Court House, 901 Richland St, Columbia before Honorable J Michelle Childs. Associated Cases: 0:17-cv-02201-JMC, 0:17-cv-02094-JMC(asni, ) (Entered: 08/07/2020) |
| 08/31/2020 | 186 | **ORDER granting (220) Motion for Protective Order; granting (222) Motion for Protective Order; granting (223) Motion for Protective Order in case 0:17-cv-02094-JMC; granting (175) Motion for Protective Order; granting (178) Motion for Protective Order; granting (179) Motion for Protective Order in case 0:17-cv-02201-JMC Signed by Honorable J Michelle Childs on 8/31/2020.Associated Cases: 0:17-cv-02201-JMC, 0:17-cv-02094-JMC(asni, )** (Entered: 09/01/2020) |
| 09/22/2020 | 187 | Joint MOTION for Leave to File Excess Pages by Fluor Corporation, Fluor Daniel Maintenance Services Inc, Fluor Enterprises Inc. Response to Motion due by 10/6/2020. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. (Attachments: # 1 Proposed Order)Proposed order is being emailed to chambers with copy to opposing counsel.Associated Cases: 0:17-cv-02094-JMC, 0:17-cv-02201-JMC(Tighe, John) (Entered: 09/22/2020) |
| 09/23/2020 | 188 | **TEXT ORDER granting (231) Motion for Leave to File Excess Pages in case 0:17-cv-02094-JMC; granting (187) Motion for Leave to File Excess Pages in case 0:17-cv-02201-JMC Signed by Honorable J Michelle Childs on 9/23/2020.Associated Cases: 0:17-cv-02201-JMC, 0:17-cv-02094-JMC(asni, )** (Entered: 09/23/2020) |
| 10/02/2020 | 189 | MOTION for Summary Judgment by Fluor Corporation, Fluor Daniel Maintenance Services Inc, Fluor Enterprises Inc. Response to Motion due by 10/16/2020. Add an additional 3 days only if served by mail or |

otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. (Attachments: # 1 Memo in Support, # 2 Exhibit 1 - Summary of Plaintiff Testimony, # 3 Exhibit 2 - Pennington Deposition Excerpts, # 4 Exhibit 3 - Lorentz Deposition Excerpts, # 5 Exhibit 4 - Tate Deposition Excerpts, # 6 Exhibit 5 - Bland Deposition Excerpts, # 7 Exhibit 6 - Cavalieri Deposition Excerpts, # 8 Exhibit 7 - Donahue Deposition Excerpts, # 9 Exhibit 8 - Dunne Deposition Excerpts, # 10 Exhibit 9 - Sauer Deposition Excerpts, # 11 Exhibit 10 - Butler Deposition Excerpts, # 12 Exhibit 11 - Darwish Deposition Excerpts, # 13 Exhibit 12 - Sutton Deposition Excerpts, # 14 Exhibit 13 - Bentz Deposition Excerpts, # 15 Exhibit 14 - Keen Deposition Excerpts, # 16 Exhibit 15 - Hinkley Deposition Excerpts, # 17 Exhibit 16 - Kiernan Declaration, # 18 Exhibit 17 - Flowers Declaration, # 19 Exhibit 18 - Durham Deposition Excerpts, # 20 Exhibit 19 - Subcontract Agreement VC Summer and Fluor, # 21 Exhibit 20 - Cartee Declaration, # 22 Exhibit 21 - Records Custodian Declaration, # 23 Exhibit 22 - Subcontract Agreement FLR000456, # 24 Exhibit 23 - Torres Deposition Excerpts, # 25 Exhibit 24 - Flowers 30b6 Deposition Excerpts, # 26 Exhibit 25 - Seaton Deposition Excerpts, # 27 Exhibit 26 - Shepherd Deposition Excerpts, # 28 Exhibit 27 - Cherry Deposition Excerpts, # 29 Exhibit 28 - Flowers Deposition Excerpts, # 30 Exhibit 29 - Amended EPC Agreement, # 31 Exhibit 30 - Kiernan Deposition Excerpts, # 32 Exhibit 31 - PSC Hearing Transcript 4.12.17, # 33 Exhibit 32 - Amended and Restate Subcontract dated 2.24.17, # 34 Exhibit 33 - Jones Deposition Excerpts, # 35 Exhibit 34 - Flowers Dep. P-121, # 36 Exhibit 35 - Interim Assessment Agreement (IAA), # 37 Exhibit 36 - Amendment No. 1 to IAA, # 38 Exhibit 37 - Amendment No. 2 to IAA, # 39 Exhibit 38 - Torres Deposition Excerpts, # 40 Exhibit 40 - Macecevic Deposition Excerpts, # 41 Exhibit 41 - Young Deposition Excerpts, # 42 Exhibit 42 - Young 30b6 Deposition Excerpts, # 43 Exhibit 43 - Griffin Deposition Excerpts, # 44 Exhibit 44 - Churchman Deposition Excerpts, # 45 Exhibit 45 - Philpott Declaration, # 46 Exhibit 46 - Philpott Deposition

Excerpts, # 47 Exhibit 47 - Torres Declaration, # 48
Exhibit 48 - Archie Declaration, # 49 Exhibit 49 - Young
Declaration, # 50 Exhibit 50 - Ashcraft Declaration, # 51
Exhibit 51 - Bloom Declaration, # 52 Exhibit 52 - Letter
to VC Summer contractors dated, # 53 Exhibit 53 -
Transition to Fluor Project Mgt, # 54 Exhibit 54 - Path
Forward for VC Summer, # 55 Exhibit 55 - April 12,
2017 Email re draft shell of Summer transition, # 56
Exhibit 56 - April 4, 2017 transition plan draft, # 57
Exhibit 57 - April 12, 2017 initial plan draft, # 58
Exhibit 58 - April 17, 2017 initial plan draft, # 59
Exhibit 59 - May 5, 2017 transition project plan update,
# 60 Exhibit 60 - VC Summer Transition Project Plan, #
61 Exhibit 61 - Fluor Proposed Scope of Work for VC
Summer June 2, 2017, # 62 Exhibit 62 - Rotating
Schedule Evaluations, # 63 Exhibit 63 - Higgins
Deposition Excerpts, # 64 Exhibit 64 - April 4, 2017 VC
Summer Program Plan, # 65 Exhibit 65 - July 31 Email
re meeting Tuesday, # 66 Exhibit 66 - Shepherd
Declaration, # 67 Exhibit 67 - New Nuclear Update
dated 6.26.17, # 68 Exhibit 68 - April 20, 2017 Email re
message to all employees New Nuclear update, # 69
Exhibit 69 - March 30, 2017 email re VCS High Level
Communications update, # 70 Exhibit 70 - June 22, 2017
Email re Judy VC Summer info, # 71 Exhibit 71 - July
5, 2017 email re request for approval of staff, # 72
Exhibit 72 - July 11, 2017 email re 9636 Balswer Darren
Site services super NS Candidate, # 73 Exhibit 73 - July
27, 2017 email re Hireright, # 74 Exhibit 74 - July 26,
2016 email re URGENT VCS Site equipment request:
rigging for CA 20, # 75 Exhibit 75 - Hydrick
Declaration, # 76 Exhibit 76 - Griffin Deposition
Excerpts, # 77 Exhibit 77 - July 20, 2017 monthly
progress report, # 78 Exhibit 78 - Email from Laura
Ware re Major Milestone 7.17.17, # 79 Exhibit 79 - June
30, 2017 email re Thanks to Jim Mangelsen and team for
Milestone, # 80 Exhibit 80 - ORS Site Visit Documents,
# 81 Exhibit 81 - July 28, 2017 Email re work package,
# 82 Exhibit 82 - PSC Hearing transcript 8.1.17, # 83
Exhibit 83 - May 25, 2017 email re Brabec, # 84 Exhibit
84 - May 24, 2017 email re SCANA planning, # 85
Exhibit 85 - Crosby Deposition Excerpts, # 86 Exhibit

| | | |
|---|---|---|
| | | 86 - Santee Cooper Powerpoint re energy costs, # 87 Exhibit 87 - SCANA-WARN_920081, # 88 Exhibit 88 - Email re June 13, 2017 meeting with Scana (P-20), # 89 Exhibit 89 - Letter from SCANA to WEC dated 7.31.17, # 90 Exhibit 90 - SCANA Corp 2nd quarter 2017 Earnings Conference Call, # 91 Exhibit 91 - Letter to SCANA Advisory Board Members, # 92 Exhibit 92 - July 31 FAQ, # 93 Exhibit 93 - July 31, 2017 email re notification to Fluor Craft and FNM, # 94 Exhibit 94 - Construction Project Update dated 7.31.17, # 95 Exhibit 95 - Field Non Manual update July 31, 2017, # 96 Exhibit 96 - August 1, 2017 email re VC Summer Demobilization, # 97 Exhibit 97 - August 4, 2017 email re HR Leadership call on Aug 9, # 98 Exhibit 98 - August 10, 2017 Email re Urgent VC Summer out processing info, # 99 Exhibit 99 - August 1, 2017 email re VC Summer craft, # 100 Exhibit 100 - ECF 105, # 101 Exhibit 101 - Butler offer letter, # 102 Exhibit 102 - Pennington Notification of employment status, # 103 Exhibit 103 - Darwish Notification of emp, # 104 Exhibit 104 - Sutton Offer Letter, # 105 Exhibit 105 - Organizational Chart, # 106 Exhibit 106 - FDMS Governance Documents, # 107 Exhibit 107 - FEI Governance Document)No proposed order.Associated Cases: 0:17-cv-02094-JMC, 0:17-cv-02201-JMC(Tighe, John) (Entered: 10/02/2020) |
| 10/02/2020 | 190 | Sealed Document. (Attachments: # 1 Exhibit 2 - Pennington Deposition Excerpts, # 2 Exhibit 3 - Lorentz Deposition Excerpts, # 3 Exhibit 4 - Tate Deposition Excerpts, # 4 Exhibit 5 - Bland Deposition Excerpts, # 5 Exhibit 6 - Cavalieri Deposition Excerpts, # 6 Exhibit 7 - Donahue Deposition Excerpts, # 7 Exhibit 8 - Dunne Deposition Excerpts, # 8 Exhibit 9 - Sauer Deposition Excerpts, # 9 Exhibit 10 - Butler Deposition Excerpts, # 10 Exhibit 11 - Darwish Deposition Excerpts, # 11 Exhibit 12 - Sutton Deposition Excerpts, # 12 Exhibit 13 - Bentz Deposition Excerpts, # 13 Exhibit 14 - Keen Deposition Excerpts, # 14 Exhibit 15 - Hinkley Deposition Excerpts, # 15 Exhibit 16 - Kiernan Declaration PART ONE OF TWO, # 16 Exhibit 16 - Kiernan Declaration PART TWO OF TWO, # 17 Exhibit 17 - Flower Declaration, # 18 Exhibit 18 - Durham |

Deposition Excerpts, # 19 Exhibit 19 - Subcontract
Agreement VC Summer and Fluor, # 20 Exhibit 20 -
Cartee Declaration PART ONE OF TWO, # 21 Exhibit
20 - Cartee Declaration PART TWO OF TWO, # 22
Exhibit 22 - Subcontract Agreement FLR000456, # 23
Exhibit 23 - Torres Deposition Ex 209 - PART ONE OF
THREE, # 24 Exhibit 23 - Torres Deposition Ex 209 -
PART TWO OF THREE, # 25 Exhibit 23 - Torres
Deposition Ex 209 - PART THREE OF THREE, # 26
Exhibit 24 - Flowers 30b6 Deposition Excerpts, # 27
Exhibit 25 - Seaton Deposition Excerpts, # 28 Exhibit 26
- Shepherd Deposition Excerpts, # 29 Exhibit 27 -
Cherry Deposition Excerpts, # 30 Exhibit 28 - Flowers
Deposition Excerpts, # 31 Exhibit 30 - Kiernan
Deposition Excerpts, # 32 Exhibit 33 - Jones Deposition
Excerpts, # 33 Exhibit 38 - Torres Deposition Excerpts,
# 34 Exhibit 40 - Macecevic Deposition Excerpts, # 35
Exhibit 41 - Young Deposition excerpts 8.3.20, # 36
Exhibit 42 - Young 30b6 Deposition excerpts, # 37
Exhibit 43 - Griffon Deposition Excerpts, # 38 Exhibit
44 - Churchman Deposition Excerpts, # 39 Exhibit 45 -
Philpott Declaration, # 40 Exhibit 46 - Philpott
Deposition Excerpts, # 41 Exhibit 55 - April 12, 2017
email re draft shell Summer Transition, # 42 Exhibit 56 -
April 4, 2017 transition plan draft, # 43 Exhibit 57 -
April 12, 2017 transition plan draft, # 44 Exhibit 58 -
April 17, 2017 transition plan draft, # 45 Exhibit 59 -
May 5, 2017 transition project plan update PART ONE
OF TWO, # 46 Exhibit 59 - May 5, 2017 transition
project plan update PART TWO OF TWO, # 47 Exhibit
60 - VC Summer Transition Project Plan, # 48 Exhibit
61 - Fluor Proposed Scope of Work for VC Summer
6.2.17, # 49 Exhibit 62 - Rotating schedule evaluationst,
# 50 Exhibit 63 - Higgins Deposition Excerpts, # 51
Exhibit 65 - July 31 email re meeting Tuesday, # 52
Exhibit 69 - March 30, 2017 Email re VCS High Level
Communications update, # 53 Exhibit 70 - June 22, 2017
email re Judy VC Summer info, # 54 Exhibit 71 - July 5,
2017 email re request for approval of staff, # 55 Exhibit
72 - July 11, 2017 email re 9636 Balswer Darren SIte
services Super NS candidate, # 56 Exhibit 73 - July 27,
2017 email re Hireright, # 57 Exhibit 76 - Griffin

| | | |
|---|---|---|
| | | deposition excerpts, # 58 Exhibit 80 - ORS Site Visit Documents, # 59 Exhibit 83 - May 25, 2017 email re Brabec, # 60 Exhibit 85 - Crosby Deposition Excerpts, # 61 Exhibit 86 - Santee Cooper Powerpoint re energy costs, # 62 Exhibit 87 - Board Powerpoint 4.22.17, # 63 Exhibit 88 - P-20 email re June 13, 2017 meeting with SCANA, # 64 Exhibit 91 - Letter to SCANA advisory board members, # 65 Exhibit 101 - Butler Offer Letter, # 66 Exhibit 102 - Pennington notification of employment status, # 67 Exhibit 103 - Darwish notification of employment status, # 68 Exhibit 104 - Sutton Offer letter, # 69 Exhibit 106 - FDMS Governance Documents, # 70 Exhibit 107 - FEI Governance Documents)Associated Cases: 0:17-cv-02094-JMC, 0:17-cv-02201-JMC(Tighe, John) (Entered: 10/02/2020) |
| 10/02/2020 | 191 | MOTION for Summary Judgment by Timothy Lorentz, Harry Pennington, III, Lawrence Butler, Lakeisha Darwish, Jimi Che Sutton. Response to Motion due by 10/16/2020. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. (Attachments: # 1 Memo in Support, # 2 Exhibit 1 - Excerpts from EPC, # 3 Exhibit 2 - Excerpts from Deposition of David C. Durham, # 4 Exhibit 3 - Excerpts from 30(b)(6) Deposition of Ronald A. Jones, # 5 Exhibit 4 - Excerpts from Deposition of Alan Torres, # 6 Exhibit 5 - Excerpts from Deposition of Kyle M. Young, # 7 Exhibit 6 - Young Email with Oversight Plan, # 8 Exhibit 7 - Excerpts from Committee Meeting, # 9 Exhibit 8 - Team Agenda, # 10 Exhibit 9 - Excerpts from Deposition of Rodney Cavalieri, # 11 Exhibit 10 - David Email, # 12 Exhibit 11 - Excerpts from Deposition of Michael Crosby, # 13 Exhibit 12 - FNM Organization Charts, # 14 Exhibit 13 - Excerpts from Deposition of Carl Churchman, # 15 Exhibit 14 - Excerpts from Deposition of William A. Macecevic, # 16 Exhibit 15 - Excerpts from Deposition of Bruce E. Hinkley, # 17 Exhibit 16 - Excerpts from Deposition of Nicole Keen, # 18 Exhibit 17 - Excerpts from Deposition of Timothy Lorentz, # 19 Exhibit 18 - Compilation of Emails, # 20 Exhibit 19 - Monthly Meeting Minutes, # 21 Exhibit 20 - Excerpts from Deposition of John Shepherd, # 22 Exhibit 21 - Cover of |

| | | |
|---|---|---|
| | | POD Agenda, # 23 Exhibit 22 - Excerpts from Deposition of Lonnie Carter, # 24 Exhibit 23 - Press Release, # 25 Exhibit 24 - Excerpts from Deposition of David T. Seaton, # 26 Exhibit 25 - Fluor Invoice, # 27 Exhibit 26 - Excerpts from Deposition of Iris Griffin, # 28 Exhibit 27 - WEC Estimate, # 29 Exhibit 28 - Crosby Notes, # 30 Exhibit 29 - Torres Email to Knight, # 31 Exhibit 30 - IAA, # 32 Exhibit 31 - Torres Email to Wicker, # 33 Exhibit 32 - Organization Chart, # 34 Exhibit 33 - Smith Email, # 35 Exhibit 34 - SCANA List, # 36 Exhibit 35 - Fluor List, # 37 Exhibit 36 - Shepherd Email to Young, # 38 Exhibit 37 - Excerpts from 30(b)(6) Deposition of Kyle M. Young, # 39 Exhibit 38 - Excerpt from Marsh PSC Briefing, # 40 Exhibit 39 - Torres Email to Young, # 41 Exhibit 40 - Excerpts from 30(b)(6) Deposition of Stephen M. Kiernan, # 42 Exhibit 41 - Carter Email to Board, # 43 Exhibit 42 - Carter Email to Marsh, # 44 Exhibit 43 - Excerpts from Deposition of William Marion Cherry, # 45 Exhibit 44 - Excerpts from Deposition of Garry Flowers, # 46 Exhibit 45 - Email with Draft Letter, # 47 Exhibit 46 - Excerpts from 30(b)(6) Deposition of Annmarie Higgins, # 48 Exhibit 47 - Higgins Email to Kriger, # 49 Exhibit 48 - Higgins Email to Senn, # 50 Exhibit 49 - Packet with Archie Letter, # 51 Exhibit 50 - Shepherd Email to B. Durham, # 52 Exhibit 51 - Excerpts from Deposition of Stephen A. Byrne, # 53 Exhibit 52 - Starks Email, # 54 Exhibit 53 - Shepherd Email to Torres, # 55 Exhibit 54 - Excerpts from 30(b)(6) Deposition of Michael A. Philpott, # 56 Exhibit 55 - Leadership Notes)No proposed order.Associated Cases: 0:17-cv-02094-JMC, 0:17-cv-02201-JMC(Sanders, Lucy) supplement 219 added on 11/30/2020 (asni, ). (Entered: 10/02/2020) |
| 10/02/2020 | 192 | MOTION for Summary Judgment by SCANA Corporation, South Carolina Electric & Gas Company. Response to Motion due by 10/16/2020. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. (Attachments: # 1 Memo in Support, # 2 Exhibit A - Plaintiff Harry Penningtons Deposition Transcript (excerpts), # 3 Exhibit B - Plaintiff Timothy Lorentz |

| | | Deposition Transcript (excerpts), # 4 Exhibit C - SCANA_DEFS_000004-000005 (Letter Dated March 27, 2017), # 5 Exhibit D - FLR000368-000400 (Order Approving Interim Assessment Agreements), # 6 Exhibit E - Garry Flowers Deposition Transcript (excerpts), # 7 Exhibit F - John Shepherds Deposition Transcript (excerpts), # 8 Exhibit G - SCANA_DEFS_000028-0000462 (EPC Agreement), # 9 Exhibit H - Ronald Jones Deposition Transcript (excerpts), # 10 Exhibit I - Plaintiff Rodney Cavalieris Deposition Transcript (excerpts), # 11 Exhibit J - David Durhams Deposition Transcript (excerpts), # 12 Exhibit K - William Macecevics Deposition Transcript (excerpts), # 13 Exhibit L - William Marion Cherrys Deposition Transcript (excerpts), # 14 Exhibit M - Bruce Hinkleys Deposition Transcript (excerpts), # 15 Exhibit N - SCANA_DEFS_000501-000515 (Interim Assessment Agreement - IAA), # 16 Exhibit O - SCANA_DEFS_000522-000529 (IAA Amendment No. 1), # 17 Exhibit P - SCANA_DEFS_000516-000521 (IAA Amendment No. 2), # 18 Exhibit Q - David Seatons Deposition Transcript (excerpts), # 19 Exhibit R - Michael Crosbys Deposition Transcript (excerpts), # 20 Exhibit S - Annmarie Higgins Deposition Transcript (excerpts), # 21 Exhibit T - Alan Torres Deposition Transcript (excerpts), # 22 Exhibit U - Westinghouse Employee List, # 23 Exhibit V - Plaintiff Lawrence Butlers Deposition Transcript (excerpts), # 24 Exhibit W - Plaintiff Jimi Che Suttons Deposition Transcript (excerpts), # 25 Exhibit X - Plaintiff Kimberly Betnz Deposition Transcript (excerpts), # 26 Exhibit Y - Plaintiff James Blands Deposition Transcript (excerpts), # 27 Exhibit Z - Plaintiff Sean Donahoes Deposition Transcript (excerpts), # 28 Exhibit AA - Plaintiff Thomas Sauers Deposition Transcript (excerpts), # 29 Exhibit BB - Plaintiff Dewaii Tates Deposition Transcript (excerpts), # 30 Exhibit CC - Garry Flowers Rule 30(b)(6) Deposition Transcript (excerpts), # 31 Exhibit DD - Plaintiff Brian Dunnes Deposition Transcript (excerpts), # 32 Exhibit EE - Plaintiff Lakeisha Darwishs Deposition Transcript (excerpts))No proposed order.Associated Cases: 0:17-cv-02094-JMC, |
|---|---|---|

| | | |
|---|---|---|
| | | 0:17-cv-02201-JMC(Speth, Charles) (Entered: 10/02/2020) |
| 10/02/2020 | 193 | Sealed Document in re document (235 in 0:17-cv-02094-JMC). (Attachments: # 1 Exhibit 1 - Excerpts from EPC, # 2 Exhibit 3 - Excerpts from 30(b)(6) Deposition of Ronald A. Jones, # 3 Exhibit 5 - Excerpts from Deposition of Kyle M. Young, # 4 Exhibit 6 - Young Email with Oversight Plan, # 5 Exhibit 7 - Excerpts from Committee Meeting, # 6 Exhibit 8 - Team Agenda, # 7 Exhibit 10 - David Email, # 8 Exhibit 12 - FNM Organization Charts, # 9 Exhibit 15 - Excerpts from Deposition of Bruce E. Hinkley, # 10 Exhibit 16 - Excerpts from Deposition of Nicole Keen, # 11 Exhibit 18 - Compilation of Emails, # 12 Exhibit 19 - Monthly Meeting Minutes, # 13 Exhibit 20 - Excerpts from Deposition of John Shepherd, # 14 Exhibit 21 - Cover of POD Agenda, # 15 Exhibit 25 - Fluor Invoice, # 16 Exhibit 27 - WEC Estimate, # 17 Exhibit 28 - Crosby Notes, # 18 Exhibit 29 - Torres Email to Knight, # 19 Exhibit 31 - Torres Emails to Wicker, # 20 Exhibit 32 - Organization Chart, # 21 Exhibit 33 - Smith Email, # 22 Exhibit 34 - SCANA List, # 23 Exhibit 35 - Fluor List, # 24 Exhibit 36 - Shepherd Email to Young, # 25 Exhibit 37 - Excerpts from 30(b)(6) Deposition of Kyle M. Young, # 26 Exhibit 39 - Torres Email to Young, # 27 Exhibit 41 - Carter Email to Board, # 28 Exhibit 42 - Carter Email to Marsh, # 29 Exhibit 44 - Excerpts from Deposition of Garry Flowers, # 30 Exhibit 45 - Email with Draft Letter, # 31 Exhibit 47 - Higgins Emails to Kriger, # 32 Exhibit 48 - Higgins Emails to Senn, # 33 Exhibit 49 - Packet with Archie Letter, # 34 Exhibit 52 - Starks Email, # 35 Exhibit 53 - Shepherd Email to Torres, # 36 Exhibit 55 - Leadership Notes)Associated Cases: 0:17-cv-02094-JMC, 0:17-cv-02201-JMC(Sanders, Lucy) (Entered: 10/02/2020) |
| 10/06/2020 | 194 | Joint MOTION for Extension of Time by Lawrence Butler. Response to Motion due by 10/20/2020. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. Proposed order is being emailed to chambers with copy to opposing counsel.Associated Cases: 0:17-cv-02201- |

| | | |
|---|---|---|
| | | JMC, 0:17-cv-02094-JMC(Blankenship, Reynolds) (Entered: 10/06/2020) |
| 10/08/2020 | 195 | **TEXT ORDER granting MOTION for Extension of Time to File Response/Reply as to (194 in 0:17-cv-02201-JMC, 238 in 0:17-cv-02094-JMC) (192 in 0:17-cv-02201-JMC, 236 in 0:17-cv-02094-JMC) MOTION for Summary Judgment (191 in 0:17-cv-02201-JMC, 235 in 0:17-cv-02094-JMC) MOTION for Summary Judgment (189 in 0:17-cv-02201-JMC, 233 in 0:17-cv-02094-JMC) MOTION for Summary Judgment.( Response to Motion due by 10/30/2020. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45., Replies due by 11/13/2020). Signed by Honorable J Michelle Childs on 10/8/2020. Associated Cases: 0:17-cv-02201-JMC, 0:17-cv-02094-JMC(asni, )** (Entered: 10/08/2020) |
| 10/09/2020 | 196 | MOTION for Leave to File *Amicus Curiae Brief* by Associated Builders and Contractors Inc. Response to Motion due by 10/23/2020. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. (Attachments: # 1 Exhibit A - Brief Amicus Curiae of Associated Builders and Contractors, Inc. in Support of Defendants Motions for Summary Judgment)No proposed order.Associated Cases: 0:17-cv-02094-JMC, 0:17-cv-02201-JMC(Foster, William) (Entered: 10/09/2020) |
| 10/13/2020 | 197 | NOTICE OF RESCHEDULED HEARING Motion Hearing set for 11/2/2020 10:00 AM in Columbia # 3, Matthew J. Perry Court House, 901 Richland St, Columbia before Honorable J Michelle Childs. cancelled and rescheduled to: Motion Hearing set for 12/1/2020 10:00 AM in Columbia #1, Matthew J. Perry Court House, 901 Richland St, Columbia before Honorable J Michelle Childs. ***Counsel will be allowed to participate via video-conference. The court will provide further instructions.*** Associated Cases: 0:17-cv-02201-JMC, 0:17-cv-02094-JMC(asni, ) (Entered: 10/13/2020) |
| 10/13/2020 | 198 | **TEXT ORDER granting 196 Motion for Leave to** |

| | | |
|---|---|---|
| | | **File Amicus Curiae Brief. Signed by the Honorable J. Michelle Childs on 10/13/2020. (jowa)** (Entered: 10/13/2020) |
| 10/27/2020 | 199 | AMICUS BRIEF by Associated Builders and Contractors Inc *Brief Amicus Curiae of Associated Builders and Contractors, Inc. in Support of Defendants Motions for Summary Judgment*. Associated Cases: 0:17-cv-02094-JMC, 0:17-cv-02201-JMC(Foster, William) (Entered: 10/27/2020) |
| 10/30/2020 | 200 | RESPONSE in Opposition re (191 in 0:17-cv-02201-JMC, 235 in 0:17-cv-02094-JMC) MOTION for Summary Judgment Response filed by Fluor Corporation, Fluor Daniel Maintenance Services Inc, Fluor Enterprises Inc.Reply to Response to Motion due by 11/6/2020 Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6. (Attachments: # 1 Exhibit A - N. Keen transcript excerpts)Associated Cases: 0:17-cv-02094-JMC, 0:17-cv-02201-JMC(Tighe, John) (Entered: 10/30/2020) |
| 10/30/2020 | 201 | Sealed Document in re document (244 in 0:17-cv-02094-JMC). Associated Cases: 0:17-cv-02094-JMC, 0:17-cv-02201-JMC(Tighe, John) (Entered: 10/30/2020) |
| 10/30/2020 | 202 | RESPONSE to Motion re (189 in 0:17-cv-02201-JMC, 233 in 0:17-cv-02094-JMC) MOTION for Summary Judgment Response filed by SCANA Corporation, South Carolina Electric & Gas Company.Reply to Response to Motion due by 11/6/2020 Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6. Associated Cases: 0:17-cv-02094-JMC, 0:17-cv-02201-JMC(Speth, Charles) (Entered: 10/30/2020) |
| 10/30/2020 | 203 | RESPONSE in Opposition re (236 in 0:17-cv-02094-JMC, 192 in 0:17-cv-02201-JMC) MOTION for Summary Judgment Response filed by Timothy Lorentz, Harry Pennington, III, Lawrence Butler, Lakeisha Darwish, Jimi Che Sutton.Reply to Response to Motion due by 11/6/2020 Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6. (Attachments: # 1 Exhibit 56 - Excerpts from 30(b)(6) Deposition of Ronald Jones, # 2 Exhibit 57 - EPC |

| | | |
|---|---|---|
| | | Amendment, # 3 Exhibit 58 - Excerpts from Deposition of David Durham, # 4 Exhibit 59 - Excerpts from Deposition of Marion Cherry, # 5 Exhibit 60 - Excerpts from Deposition of Nicole Keen, # 6 Exhibit 61 - Excerpts from Deposition of William Macecevic, # 7 Exhibit 62 - Excerpts from Deposition of Bruce Hinkley, # 8 Exhibit 63 - MRT Agenda 11/16/16, # 9 Exhibit 64 - MRT Agenda 12/21/16, # 10 Exhibit 65 - MRT Agenda 2/22/17, # 11 Exhibit 66 - MRT Agenda 3/1/17, # 12 Exhibit 67 - MRT Agenda 3/8/17, # 13 Exhibit 68 - MRT Agenda 3/15/17, # 14 Exhibit 69 - MRT Agenda 3/30/17 and 4/5/17, # 15 Exhibit 70 - MRT Agenda 4/13/17, # 16 Exhibit 71 - MRT Agenda 5/10/17, # 17 Exhibit 72 - MRT Agenda 5/17/17, # 18 Exhibit 73 - MRT Agenda 5/24/17, # 19 Exhibit 74 - MRT Agenda 6/7/17, # 20 Exhibit 75 - MRT Agenda 6/14/17, # 21 Exhibit 76 - Excerpts from 30(b)(6) Deposition of Garry Flowers, # 22 Exhibit 77 - Press Release, # 23 Exhibit 78 - Excerpts from 30(b)(6) Deposition of Annmarie Higgins, # 24 Exhibit 79 - Fluor Demobilization Report, # 25 Exhibit 80 - Task 00008 Estimate, # 26 Exhibit 81 - Task 00008 Phase 2 Approval)Associated Cases: 0:17-cv-02094-JMC, 0:17-cv-02201-JMC(Sanders, Lucy) (Entered: 10/30/2020) |
| 10/30/2020 | 204 | RESPONSE to Motion re (191 in 0:17-cv-02201-JMC, 235 in 0:17-cv-02094-JMC) MOTION for Summary Judgment Response filed by SCANA Corporation, South Carolina Electric & Gas Company.Reply to Response to Motion due by 11/6/2020 Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6. (Attachments: # 1 Exhibit A - Ron Jones Deposition Excerpts, # 2 Exhibit B - Marion Cherry Deposition Excerpts, # 3 Exhibit C - Alan Torres Deposition Excerpts, # 4 Exhibit D - Plaintiff Tim Lorentz Deposition Excerpts, # 5 Exhibit E - Plaintiff Rodney Cavalieri Deposition Excerpts, # 6 Exhibit F - Nicole Keen Deposition Excerpts, # 7 Exhibit G - Plaintiff Thomas Sauer Deposition Excerpts, # 8 Exhibit H - Plaintiff. Dewaii Tate Deposition Excerpts, # 9 Exhibit I - Plaintiff. Lawrence Butler Deposition Excerpts, # 10 Exhibit J - AnnMarie Higgins Deposition Excerpts, # 11 Exhibit K - David Durham Deposition |

| | | |
|---|---|---|
| | | Excerpts, # 12 Exhibit L - William Macecevic Deposition Excerpts, # 13 Exhibit M - Garry Flowers Deposition Excerpts, # 14 Exhibit N - Plaintiff Lakeisha Darwish Deposition Excerpts, # 15 Exhibit O - Plaintiff Harry Pennington Deposition Excerpts, # 16 Exhibit P - Plaintiff James Bland Deposition Excerpts, # 17 Exhibit Q - Plaintiff Sean Donahoe Deposition Excerpts, # 18 Exhibit R - Plaintiff Brian Dunne Deposition Excerpts, # 19 Exhibit S - Plaintiff Jimi Sutton Deposition Excerpts, # 20 Exhibit T - Plaintiff Kimberly Bentz Deposition Excerpts, # 21 Exhibit U - John Shepherd Deposition Excerpts, # 22 Exhibit V - Garry Flowers 30(b)(6) Deposition Excerpts, # 23 Exhibit W - Bruce Hinkley Deposition Excerpts, # 24 Exhibit X - WEC Corporate Ownership Statement)Associated Cases: 0:17-cv-02094-JMC, 0:17-cv-02201-JMC(Speth, Charles) (Entered: 10/30/2020) |
| 10/30/2020 | 205 | Sealed Document in re document (247 in 0:17-cv-02094-JMC). (Attachments: # 1 Exhibit 56 - Excerpts from 30(b)(6) Deposition of Ronald Jones, # 2 Exhibit 57 - EPC Amendment, # 3 Exhibit 60 - Excerpts from Deposition of Nicole Keen, # 4 Exhibit 63 - MRT Agenda 11/16/16, # 5 Exhibit 64 - MRT Agenda 12/21/16, # 6 Exhibit 65 - MRT Agenda 2/22/17, # 7 Exhibit 66 - MRT Agenda 3/1/17, # 8 Exhibit 67 - MRT Agenda 3/8/17, # 9 Exhibit 68 - MRT Agenda 3/15/17, # 10 Exhibit 69 - MRT Agenda 3/30/17 and 4/5/17, # 11 Exhibit 70 - MRT Agenda 4/13/17, # 12 Exhibit 71 - MRT Agenda 5/10/17, # 13 Exhibit 72 - MRT Agenda 5/17/17, # 14 Exhibit 73 - MRT Agenda 5/24/17, # 15 Exhibit 74 - MRT Agenda 6/7/17, # 16 Exhibit 75 - MRT Agenda 6/14/17, # 17 Exhibit 77 - Press Release, # 18 Exhibit 78 - Excerpts from 30(b)(6) Deposition of Annmarie Higgins, # 19 Exhibit 79 - Fluor Demobilization Report, # 20 Exhibit 80 - Task 00008 Estimate, # 21 Exhibit 81 - Task 00008 Phase 2 Approval)Associated Cases: 0:17-cv-02094-JMC, 0:17-cv-02201-JMC(Sanders, Lucy) (Entered: 10/30/2020) |
| 10/30/2020 | 206 | RESPONSE in Opposition re (189 in 0:17-cv-02201-JMC, 233 in 0:17-cv-02094-JMC) MOTION for Summary Judgment *Plaintiffs' Memorandum in* |

| | | |
|---|---|---|
| | | *Opposition to the Fluor Defendants' Motion for Summary Judgment* Response filed by Timothy Lorentz, Harry Pennington, III, Lawrence Butler, Lakeisha Darwish, Jimi Che Sutton.Reply to Response to Motion due by 11/6/2020 Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6. (Attachments: # 1 Exhibit 82 - Excerpts from Deposition of David C. Durham, # 2 Exhibit 83 - Excerpts from Deposition of Lonnie Carter, # 3 Exhibit 84 - PSC Order, # 4 Exhibit 85 - Excerpts from Deposition of Alan Torres, # 5 Exhibit 86 - SCANA Corp 10-Q, # 6 Exhibit 87 - SCE&G Press Release, # 7 Exhibit 88 - Santee Cooper June 14, 2016 Inter-Office Communication, # 8 Exhibit 89 - Article SC&G Co Elects Feixed Price, # 9 Exhibit 90 - Article SCE&G asking for $852 million more to finish Summer nuclear plants, # 10 Exhibit 91 - Article Costs for proposed South Carolina nuclear units rise $800M, # 11 Exhibit 92 - Article Electric Energy Online, # 12 Exhibit 93 - Website Fluor Nuclear New Build Design & Construction, # 13 Exhibit 94 - Direct Testimony of S. Byrne, # 14 Exhibit 95 - Excerpts from Deposition of Garry Flowers, # 15 Exhibit 96 - Excerpts from Deposition of Michael Crosby, # 16 Exhibit 97 - Smith Email to Torres, # 17 Exhibit 98 - Flowers Email to Crosby, # 18 Exhibit 99 - Excerpts from Deposition of David T. Seaton, # 19 Exhibit 100 - Thomson Reuters Prelim Transcript, # 20 Exhibit 101 - Close Paper, # 21 Exhibit 102 - Chats between Garry Flowers and Jeffrey Benjamin, # 22 Exhibit 103 - Byrne Email to Crosby, # 23 Exhibit 104 - Excerpts from Deposition of Lawrence Butler, # 24 Exhibit 105 - Chats between David Seaton and Garry Flowers, # 25 Exhibit 106 - Chats between Garry Flowers and David Seaton, # 26 Exhibit 107 - Leadership Meeting Notes, # 27 Exhibit 108 - Excerpts from Deposition of Carl Churchman, # 28 Exhibit 109 - Garry Flowers Notes, # 29 Exhibit 110 - Toshiba Presentation (BUTLER-SC_00114606), # 30 Exhibit 111 - Chats between David Seaton and Garry Flowers, # 31 Exhibit 112 - Excerpts from Deposition of Bruce E. Hinkley, # 32 Exhibit 113 - Dusek Email to Pimentel (with Attachment), # 33 Exhibit 114 - Excerpts from |

| | | |
|---|---|---|
| | | Deposition of John Shepherd, # 34 Exhibit 115 - Thomson Reuters Streetevents Edited Transcript (P-139), # 35 Exhibit 116 - O'Banion Email to Bauerlin, # 36 Exhibit 117 - Thomson Reuters Final Transcript (P-143), # 37 Exhibit 118 - Carter Email to Marsh (with Attachment), # 38 Exhibit 119 - Santee Cooper Board of Directors Telephonic Meeting, # 39 Exhibit 120 - Shepherd Email to Flowers, # 40 Exhibit 121 - 2010 2nd Quarter Presidents Meeting Agenda, # 41 Exhibit 122 - Santee Cooper Board of Directors Telephonic Meeting, # 42 Exhibit 123 - Basis of Estimate for Rolling 7's Craft Work Week, # 43 Exhibit 124 - Glover Email to Kiernan (P-279), # 44 Exhibit 125 - Young Email to Byrne (with Attachment), # 45 Exhibit 126 - VCS Skin in the Game Presentation, # 46 Exhibit 127 - McClure Email to Shepherd re Draft Template for Skin in the Game, # 47 Exhibit 128 - Excerpts from Deposition of Lakeisha Darwish, # 48 Exhibit 129 - Flowers Email to Shepherd, # 49 Exhibit 130 - Flowers Email to Seaton (with Attachment), # 50 Exhibit 131 - Chats between Garry Flowers and John Shepherd, # 51 Exhibit 132 - Hanna Email to Meyer (without Attachments), # 52 Exhibit 133 - Excerpts from Deposition of Michael A. Philpott, # 53 Exhibit 134 - Carter Email to Addison, # 54 Exhibit 135 - Chats between Garry Flowers and David Seaton, # 55 Exhibit 136 - Chats between David Seaton and Garry Flowers, # 56 Exhibit 137 - Baxley Email to Dembla, # 57 Exhibit 138 - Chats between David Seaton and Garry Flowers, # 58 Exhibit 139 - Excerpts from Deposition of Brian Dunne, # 59 Exhibit 140 - Excerpts from Deposition of Nicole Keen, # 60 Exhibit 141 - Excerpts from Deposition of Sean Donahoe, # 61 Exhibit 142 - Letter to Timothy Lorentz (P000010), # 62 Exhibit 143 - Excerpts from Deposition of Thomas Sauer, # 63 Exhibit 144 - Excerpts from Deposition of James Bland, # 64 Exhibit 145 - Excerpts from Deposition of Dewaii Tate, # 65 Exhibit 146 - Excerpts from Deposition of Kimberly Bentz, # 66 Exhibit 147 - Excerpts from Deposition of Harry Pennington)Associated Cases: 0:17-cv-02094-JMC, 0:17-cv-02201-JMC(Yarborough, David) (Entered: 10/30/2020) |
| 10/30/2020 | 207 | Sealed Document in re document (206 in 0:17-cv- |

02201-JMC, 250 in 0:17-cv-02094-JMC). (Attachments: # 1 Exhibit 82 - Excerpts from Deposition of David C. Durham, # 2 Exhibit 83 - Excerpts from Deposition of Lonnie Carter, # 3 Exhibit 85 - Excerpts from Deposition of Alan Torres, # 4 Exhibit 88 - Santee Cooper June 14, 2016 Inter-Office Communication, # 5 Exhibit 95 - Excerpts from Deposition of Garry Flowers, # 6 Exhibit 96 - Excerpts from Deposition of Michael Crosby, # 7 Exhibit 97 - Smith Email to Torres, # 8 Exhibit 98 - Flowers Email to Crosby (P-33), # 9 Exhibit 99 - Excerpts from Deposition of David T. Seaton, # 10 Exhibit 100 - Thomson Reuters Prelim Transcript (P-184), # 11 Exhibit 101 - Close Paper (P-111), # 12 Exhibit 102 - Chats between Garry Flowers and Jeffrey Benjamin (P-112), # 13 Exhibit 103 - Byrne Email to Crosby (P-054), # 14 Exhibit 105 - Chats between David Seaton and Garry Flowers (P-113), # 15 Exhibit 106 - Chats between Garry Flowers and David Seaton (P-176), # 16 Exhibit 107 - Leadership Meeting Notes (P-165), # 17 Exhibit 108 - Excerpts from Deposition of Carl Churchman, # 18 Exhibit 109 - Garry Flowers Notes (P-115), # 19 Exhibit 111 - Chats between David Seaton and Garry Flowers (P-120), # 20 Exhibit 112 - Excerpts from Deposition of Bruce E. Hinkley, # 21 Exhibit 113 - Dusek Email to Pimentel (with Attachment) [FLE_VCS_0667803-67804], # 22 Exhibit 116 - O'Banion Email to Bauerlin (P-108), # 23 Exhibit 118 - Carter Email to Marsh (with Attachment) (P-257), # 24 Exhibit 119 - Santee Cooper Board of Directors Telephonic Meeting (P-014), # 25 Exhibit 120 - Shepherd Email to Flowers (P-275), # 26 Exhibit 121 - 2010 2nd Quarter Presidents Meeting Agenda (P-170), # 27 Exhibit 122 - Santee Cooper Board of Directors Telephonic Meeting (P-012), # 28 Exhibit 123 - Basis of Estimate for Rolling 7's Craft Work Week (P-280), # 29 Exhibit 125 - Young Email to Byrne (with Attachment) (P-015), # 30 Exhibit 126 - VCS Skin in the Game Presentation (FLE_VCS_0147002), # 31 Exhibit 127 - McClure Email to Shepherd re Draft Template for Skin in the Game (FLE_VCS_0147001), # 32 Exhibit 129 - Flowers Email to Shepherd (P-131), # 33 Exhibit 130 - Flowers Email to Seaton (with Attachment) (P-132), #

| | | |
|---|---|---|
| | | 34 Exhibit 131 - Chats between Garry Flowers and John Shepherd (P-127), # 35 Exhibit 132 - Hanna Email to Meyer (without Attachments) (P-226), # 36 Exhibit 133 - Excerpts from Deposition of Michael A. Philpott, # 37 Exhibit 134 - Carter Email to Addison (P-023), # 38 Exhibit 135 - Chats between Garry Flowers and David Seaton (P-187), # 39 Exhibit 136 - Chats between David Seaton and Garry Flowers (P-128), # 40 Exhibit 137 - Baxley Email to Dembla (P-031), # 41 Exhibit 138 - Chats between David Seaton and Garry Flowers (P-191), # 42 Exhibit 140 - Excerpts from Deposition of Nicole Keen, # 43 Exhibit 141 - Excerpts from Deposition of Sean Donahoe)Associated Cases: 0:17-cv-02094-JMC, 0:17-cv-02201-JMC(Yarborough, David) (Entered: 10/30/2020) |
| 11/13/2020 | 208 | REPLY to Response to Motion re (189 in 0:17-cv-02201-JMC, 233 in 0:17-cv-02094-JMC) MOTION for Summary Judgment Response filed by Fluor Corporation, Fluor Daniel Maintenance Services Inc, Fluor Enterprises Inc. (Attachments: # 1 Exhibit A - Kiernan Deposition Excerpts, # 2 Exhibit B - Seaton Deposition Excerpts, # 3 Exhibit C - Flowers Deposition Excerpts, # 4 Exhibit D - Shepherd Supplemental Declaration, # 5 Exhibit E - Jones Deposition Excerpts, # 6 Exhibit F - Declaration of Jim Hanna)Associated Cases: 0:17-cv-02094-JMC, 0:17-cv-02201-JMC(Tighe, John) (Entered: 11/13/2020) |
| 11/13/2020 | 209 | Sealed Document in re document (252 in 0:17-cv-02094-JMC). (Attachments: # 1 Exhibit A - Kiernan Deposition Excerpts, # 2 Exhibit B - Seaton Deposition Excerpts, # 3 Exhibit C - Flowers Deposition Excerpts, # 4 Exhibit D - Shepherd Supplemental Declaration, # 5 Exhibit E - Jones Deposition Excerpts, # 6 Exhibit F - Declaration of Jim Hanna)Associated Cases: 0:17-cv-02094-JMC, 0:17-cv-02201-JMC(Tighe, John) (Entered: 11/13/2020) |
| 11/13/2020 | 210 | REPLY to Response to Motion re (191 in 0:17-cv-02201-JMC, 235 in 0:17-cv-02094-JMC) MOTION for Summary Judgment *(Plaintiffs' Reply to SCANA Defendants' Response)* Response filed by Timothy |

| | | |
|---|---|---|
| | | Lorentz, Harry Pennington, III, Lawrence Butler, Lakeisha Darwish, Jimi Che Sutton. (Attachments: # 1 Exhibit 148 - Excerpts from Deposition of Timothy Lorentz, # 2 Exhibit 149 - Excerpts from Deposition of William A. Macecevic, III, # 3 Exhibit 150 - Excerpts from 30(b)(6) Deposition of Ronald A. Jones)Associated Cases: 0:17-cv-02094-JMC, 0:17-cv-02201-JMC(Sanders, Lucy) (Entered: 11/13/2020) |
| 11/13/2020 | 211 | Sealed Document in re document (254 in 0:17-cv-02094-JMC). (Attachments: # 1 Exhibit 150 - Excerpts from 30(b)(6) Deposition of Ronald A. Jones)Associated Cases: 0:17-cv-02094-JMC, 0:17-cv-02201-JMC(Sanders, Lucy) (Entered: 11/13/2020) |
| 11/13/2020 | 212 | REPLY to Response to Motion re (191 in 0:17-cv-02201-JMC, 235 in 0:17-cv-02094-JMC) MOTION for Summary Judgment *(Plaintiffs' Reply to Fluor Defendants' Response)* Response filed by Timothy Lorentz, Harry Pennington, III, Lawrence Butler, Lakeisha Darwish, Jimi Che Sutton. Associated Cases: 0:17-cv-02094-JMC, 0:17-cv-02201-JMC(Sanders, Lucy) (Entered: 11/13/2020) |
| 11/13/2020 | 213 | Sealed Document in re document (256 in 0:17-cv-02094-JMC). Associated Cases: 0:17-cv-02094-JMC, 0:17-cv-02201-JMC(Sanders, Lucy) (Entered: 11/13/2020) |
| 11/13/2020 | 214 | REPLY by Timothy Lorentz, Harry Pennington, III, Lawrence Butler, Lakeisha Darwish, Jimi Che Sutton *in Opposition to Brief Amicus Curiae of Associated Builders and Contractors, Inc in Support of Defendants' Motions for Summary Judgment*. Associated Cases: 0:17-cv-02094-JMC, 0:17-cv-02201-JMC(Sanders, Lucy) (Entered: 11/13/2020) |
| 11/13/2020 | 215 | REPLY to Response to Motion re (236 in 0:17-cv-02094-JMC, 192 in 0:17-cv-02201-JMC) MOTION for Summary Judgment Response filed by SCANA Corporation, South Carolina Electric & Gas Company. (Attachments: # 1 Exhibit A - Plaintiffs' First Request for Production of Documents, # 2 Exhibit B - Plaintiff Timothy Lorentz Deposition Transcript (excerpts), # 3 |

| | | |
|---|---|---|
| | | Exhibit C - William Macecevic Deposition Transcript (excerpts), # 4 Exhibit D - David Durham Deposition Transcript (excerpts), # 5 Exhibit E - Plaintiff Rodney Cavalieri Deposition Transcript (excerpts), # 6 Exhibit F - John Shepherd Deposition Transcript (excerpts), # 7 Exhibit G - Alan Torres Deposition Transcript (excerpts), # 8 Exhibit H - Plaintiff Lawrence Butler Deposition Transcript (excerpts), # 9 Exhibit I - Plaintiff Lakeisha Darwish Deposition Transcript (excerpts), # 10 Exhibit J - Plaintiff Harry Pennington Deposition Transcript (excerpts), # 11 Exhibit K - Plaintiff Jimi Sutton Deposition Transcript (excerpts), # 12 Exhibit L - Plaintiff James Bland Deposition Transcript (excerpts), # 13 Exhibit M - Plaintiff Sean Donahoe Deposition Transcript (excerpts), # 14 Exhibit N - Plaintiff Brian Dunne Deposition Transcript (excerpts), # 15 Exhibit O - Plaintiff Thomas Sauer Deposition Transcript (excerpts), # 16 Exhibit P - Plaintiff Dewaii Tate Deposition Transcript (excerpts), # 17 Exhibit Q - Plaintiff Nicole Keen Deposition Transcript (excerpts), # 18 Exhibit R - Iris Griffin 30(b)(6) Deposition Transcript (excerpts), # 19 Exhibit S - Kyle Young Deposition Transcript (excerpts))Associated Cases: 0:17-cv-02094-JMC, 0:17-cv-02201-JMC(Speth, Charles) (Entered: 11/13/2020) |
| 11/18/2020 | 217 | NOTICE OF RESCHEDULED HEARING Motion Hearing set for 12/1/2020 10:00 AM in Columbia #1, Matthew J. Perry Court House, 901 Richland St, Columbia before Honorable J Michelle Childs. cancelled and rescheduled to: Motion Hearing set for 12/1/2020 10:00 AM in Columbia # 3, Matthew J. Perry Court House, 901 Richland St, Columbia before Honorable J Michelle Childs. ***PLEASE NOTE THIS IS A COURTROOM LOCATION CHANGE ONLY FOR COUNSEL PARTICIPATING IN PERSON.***Associated Cases: 0:17-cv-02201-JMC, 0:17-cv-02094-JMC(asni, ) (Entered: 11/18/2020) |
| 11/24/2020 | 218 | NOTICE OF RESCHEDULED HEARING Motion Hearing set for 12/1/2020 10:00 AM in Columbia # 3, Matthew J. Perry Court House, 901 Richland St, Columbia before Honorable J Michelle Childs. cancelled and rescheduled to: Motion Hearing set for 12/1/2020 |

| | | |
|---|---|---|
| | | 10:00 AM in Columbia #1, Matthew J. Perry Court House, 901 Richland St, Columbia before Honorable J Michelle Childs. ***PLEASE NOTE THIS IS A COURTROOM LOCATION CHANGE ONLY FOR COUNSEL PARTICIPATING IN PERSON.***Associated Cases: 0:17-cv-02201-JMC, 0:17-cv-02094-JMC(asni, ) (Entered: 11/24/2020) |
| 11/27/2020 | 219 | SUPPLEMENT by Timothy Lorentz, Harry Pennington, III, Lawrence Butler, Lakeisha Darwish, Jimi Che Sutton to (235 in 0:17-cv-02094-JMC) MOTION for Summary Judgment . (Attachments: # 1 Exhibit 151 - Information, # 2 Exhibit 152 - Marsh Plea Agreement)Associated Cases: 0:17-cv-02094-JMC, 0:17-cv-02201-JMC(Sanders, Lucy) (Entered: 11/27/2020) |
| 11/30/2020 | 220 | **TEXT ORDER: This matter is before the court to address the motion hearing set for 10:00 a.m. on December 1, 2020. (See ECF Nos. 218 (Butler), 262 (Pennington).) The court has reviewed all the parties' submissions. Accordingly, the court intends to proceed using the following schedule for arguments: 10:00 a.m. Introductory Comments from Judge Childs. 10:05 a.m. Plaintiffs' Argument 10:35 a.m. Defendant SCANA's Argument 11:05 a.m. Defendant Fluor's Argument 11:35 a.m. Recess 11:45 a.m. Plaintiffs' Reply 12:05 a.m. Defendant SCANA's Reply 12:25 p.m. Defendant Fluor's Reply 12:45 p.m. Court's Final Questions. Signed by Honorable J Michelle Childs on 11/30/2020. Associated Cases: 0:17-cv-02201-JMC, 0:17-cv-02094-JMC(asni, )** (Entered: 11/30/2020) |
| 11/30/2020 | 221 | REPLY by SCANA Corporation, South Carolina Electric & Gas Company to (263 in 0:17-cv-02094-JMC, 219 in 0:17-cv-02201-JMC) Supplement, . Associated Cases: 0:17-cv-02094-JMC, 0:17-cv-02201-JMC(Henthorne, D) (Entered: 11/30/2020) |
| 11/30/2020 | 222 | **AMENDED TEXT ORDER: This matter is before the court to address the motion hearing set for 10:00 a.m. on December 1, 2020. (See ECF Nos. 218 (Butler), 262 (Pennington).) The court has reviewed all the parties' submissions. Accordingly, the court** |

| | | |
|---|---|---|
| | | **intends to proceed using the following schedule for arguments: 10:00 a.m. Introductory Comments from Judge Childs 10:05 a.m. Pennington Plaintiffs' Argument 10:35 a.m. Butler Plaintiffs' Argument 10:55 a.m. Defendant SCANA's Argument 11:25 a.m. Defendant Fluor's Argument 11:55 a.m. Recess 12:05 p.m. Pennington Plaintiffs' Reply 12:25 p.m. Butler Plaintiffs' Reply 12:40 p.m. Defendant SCANA's Reply 1:00 p.m. Defendant Fluor's Reply 1:20 p.m. Court's Final Questions. Signed by Honorable J Michelle Childs on 11/30/2020. Associated Cases: 0:17-cv-02201-JMC, 0:17-cv-02094-JMC(asni, )** (Entered: 11/30/2020) |
| 11/30/2020 | 223 | MOTION to Amend/Correct by Lawrence Butler, Lakeisha Darwish. Response to Motion due by 12/14/2020. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. (Attachments: # 1 Exhibit Excerpts from deposition)No proposed order.(Gaffney, Amy) (Entered: 11/30/2020) |
| 11/30/2020 | 224 | MOTION to Amend/Correct *Summary Judgment Hearing Schedule* by Fluor Corporation, Fluor Daniel Maintenance Services Inc, Fluor Enterprises Inc. Response to Motion due by 12/14/2020. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. No proposed order.Associated Cases: 0:17-cv-02094-JMC, 0:17-cv-02201-JMC(Tighe, John) (Entered: 11/30/2020) |
| 12/01/2020 | 225 | **Minute Entry. Proceedings held before Honorable J Michelle Childs: Motion Hearing held on 12/1/2020 re 189 MOTION for Summary Judgment filed by Fluor Daniel Maintenance Services Inc, Fluor Enterprises Inc, Fluor Corporation, 192 MOTION for Summary Judgment filed by SCANA Corporation, South Carolina Electric & Gas Company, 191 MOTION for Summary Judgment filed by Lakeisha Darwish, Harry Pennington, III, Lawrence Butler, Jimi Che Sutton, Timothy Lorentz.Oral arguments. Court takes motions under** |

| | | |
|---|---|---|
| | | **advisement. Court Reporter Kathleen Richardson. (kbos)** (Entered: 12/01/2020) |
| 12/02/2020 | 226 | **TEXT ORDER: Before the court are Defendants' Motions to Amend the schedule of arguments for the December 1, 2020 motions hearing, or in the alternative revert to a prior schedule that allotted Plaintiffs less time to argue. (ECF Nos. 223, 224.) The court finds the Motions to Amend are moot, and observes the court allowed extended time for all parties during the December 1, 2020 hearing, finding as moot (267) Motion to Amend/Correct in case 0:17-cv-02094-JMC; finding as moot (224) Motion to Amend/Correct in case 0:17-cv-02201-JMC. Signed by Honorable J Michelle Childs on December 2, 2020.Associated Cases: 0:17-cv-02201-JMC, 0:17-cv-02094-JMC(kbos)** (Entered: 12/02/2020) |
| 12/11/2020 | 227 | REPLY by Fluor Corporation, Fluor Daniel Maintenance Services Inc, Fluor Enterprises Inc to (219 in 0:17-cv-02201-JMC) Supplement, . Associated Cases: 0:17-cv-02094-JMC, 0:17-cv-02201-JMC(Tighe, John) (Entered: 12/11/2020) |
| 12/11/2020 | 228 | RESPONSE in Opposition re (223 in 0:17-cv-02201-JMC) MOTION to Amend/Correct Response filed by Fluor Corporation, Fluor Daniel Maintenance Services Inc, Fluor Enterprises Inc.Reply to Response to Motion due by 12/18/2020 Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6. Associated Cases: 0:17-cv-02094-JMC, 0:17-cv-02201-JMC(Tighe, John) (Entered: 12/11/2020) |
| 12/14/2020 | 229 | Joint MOTION to Stay by Timothy Lorentz, Harry Pennington, III. Response to Motion due by 12/29/2020. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. (Attachments: # 1 Proposed Order)Proposed order is being emailed to chambers with copy to opposing counsel.Associated Cases: 0:17-cv-02094-JMC, 0:17-cv-02201-JMC(Sanders, Lucy) (Entered: 12/14/2020) |
| 12/15/2020 | 230 | **ORDER granting (272) Motion to Stay in case 0:17-** |

| | | |
|---|---|---|
| | | **cv-02094-JMC; granting (229) Motion to Stay in case 0:17-cv-02201-JMC. The court will not stay the trial deadline absent extraordinary circumstances. Signed by Honorable J Michelle Childs on 12/15/2020.Associated Cases: 0:17-cv-02201-JMC, 0:17-cv-02094-JMC(asni, )** (Entered: 12/15/2020) |
| 12/18/2020 | 232 | REPLY by Timothy Lorentz, Harry Pennington, III, Lawrence Butler, Lakeisha Darwish, Jimi Che Sutton to (270 in 0:17-cv-02094-JMC) Reply . Associated Cases: 0:17-cv-02094-JMC, 0:17-cv-02201-JMC(Sanders, Lucy) (Entered: 12/18/2020) |
| 12/18/2020 | 233 | MOTION to Amend/Correct by Lawrence Butler, Lakeisha Darwish, Darron Eigner, Jr, Bernard A Johnson. Response to Motion due by 1/4/2021. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. (Attachments: # 1 Exhibit Deposition excerpts)No proposed order.(Gaffney, Amy) (Entered: 12/18/2020) |
| 12/28/2020 | 234 | **TEXT ORDER: Before the court is Plaintiffs' Motion to Supplement the Record and Correct Briefing. (ECF No. 233.) Plaintiffs assert that Defendants have consented to the Motion. (Id. at 1-2.) Plaintiffs essentially seek to add two pages of deposition testimony to the record, correct two other clerical errors, and withdraw their prior Motion to Amend/Correct. (Id. at 1-2, 4.) Under Rule 56(e) of the Federal Rules of Civil Procedure, "[i]f a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact... the court may... give [the party] an opportunity to properly support or address the fact" or "issue any other appropriate order." The court thus finds it appropriate to allow Plaintiffs to supplement the record and correct two clerical errors as specified in their consent Motion. (ECF No. 233.) Further, Plaintiffs may withdraw their previous Motion to Amend/Correct. (ECF No. 223.) Plaintiffs' Motion to Supplement the Record and Correct Briefing is therefore GRANTED. (ECF No. 233 ). Signed by** |

| | | |
|---|---|---|
| | | **Honorable J Michelle Childs on 12/24/2020.(asni, )** (Entered: 12/28/2020) |
| 01/06/2021 | 236 | **ORDER AND OPINION granting(233) Motion for Summary Judgment; denying(235) Motion for Summary Judgment; granting(236) Motion for Summary Judgment in case 0:17-cv-02094-JMC; granting(189) Motion for Summary Judgment; denying(191) Motion for Summary Judgment; granting(192) Motion for Summary Judgment in case 0:17-cv-02201-JMC ; denying 219 Plaintiff's Request to Supplement and dismissing the case with prejudice. Signed by Honorable J Michelle Childs on 6/1/2021.Associated Cases: 0:17-cv-02094-JMC, 0:17-cv-02201-JMC(asni, )** (Entered: 01/06/2021) |
| 01/06/2021 | 237 | SUMMARY JUDGMENT in favor of defendants against plaintiffs dismissing the case with prejudice. (asni, ) (Entered: 01/06/2021) |
| 01/20/2021 | 238 | BILL OF COSTS by Fluor Corporation, Fluor Daniel Maintenance Services Inc, Fluor Enterprises Inc.Objections to Bill of Costs deadline 2/3/2021. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6. Associated Cases: 0:17-cv-02094-JMC, 0:17-cv-02201-JMC(Tighe, John) (Entered: 01/20/2021) |
| 02/04/2021 | 239 | Costs Taxed in amount of $ $50,424.42 against Plaintiffs Associated Cases: 0:17-cv-02094-JMC, 0:17-cv-02201-JMC(asni, ) (Entered: 02/04/2021) |
| 02/04/2021 | 240 | NOTICE OF APPEAL as to 237 Summary Judgment, 236 Order on Motion for Summary Judgment,,,,,,,, by Lawrence Butler, Lakeisha Darwish, Jimi Che Sutton. - Filing fee $ 505, receipt number 0420-9631061. The Docketing Statement form, Transcript Order form and CJA 24 form may be obtained from the Fourth Circuit website at www.ca4.uscourts.gov (Gaffney, Amy) (Entered: 02/04/2021) |
| 02/04/2021 | 241 | Transmittal Sheet for Notice of Appeal to USCA re 240 Notice of Appeal, The Clerk's Office hereby certifies the record and the docket sheet available through ECF to be |

| | | |
|---|---|---|
| | | the certified list in lieu of the record and/or the certified copy of the docket entries. (asni, ) (Entered: 02/04/2021) |
| 02/09/2021 | 244 | ORDER of USCA consolidating Case No. 21-1143 and Case No. 21-1141(L). as to (282 in 0:17-cv-02094-JMC) Notice of Appeal, filed by Harry Pennington, III, Timothy Lorentz, (240 in 0:17-cv-02201-JMC) Notice of Appeal, filed by Lakeisha Darwish, Lawrence Butler, Jimi Che Sutton (asni, ) (Entered: 02/09/2021) |

| PACER Service Center |
|---|
| Transaction Receipt |
| 03/20/2021 19:54:39 |

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
ROCK HILL DIVISION**

HARRY PENNINGTON III, on behalf of himself and all others similarly situated,

Plaintiff,

v.

FLUOR CORPORATION, FLUOR ENTERPRISES, INC. and SCANA CORPORATION,

Defendants.

CASE NO. 0:17-02094-JMC

**CLASS ACTION COMPLAINT FOR
VIOLATION OF WARN ACT, 29 U.S.C. § 2101, *ET SEQ.***

Plaintiff Harry Pennington III ("Plaintiff") alleges on behalf of himself and a class of similarly situated former employees of Fluor Enterprises, Inc., Fluor Corporation (together, "Fluor") and SCANA Corporation ("SCANA" and together with Fluor, the "Defendants"), by and through his counsel as follows:

**NATURE OF THE ACTION**

1. Plaintiff was an employee of Defendants for purposes of the WARN Act until his termination along with approximately 5000 other employees on or about July 31, 2017.

2. Plaintiff did not receive any advance written notice of his termination.

3. Plaintiff brings this action on behalf of himself, and the other similarly situated former employees of Defendants who worked at, reported to, or received assignments from the VC Summer Nuclear Station (the "Facility"), located at Highway 215 & Bradham Blvd, Jenkinsville, South Carolina 29065, who were terminated without cause, as part of, or as the foreseeable result of, plant closings or mass layoffs ordered by Defendants on or around July 31, 2017, and who were not provided 60 days advance written notice of their terminations by Defendant, as required by the Worker Adjustment and Retraining Notification Act ("WARN Act"), 29 U.S.C. § 2101 *et seq*.

4. Plaintiff and all similarly situated employees seek to recover 60 days wages and benefits, pursuant to the WARN Act, from Defendants.

**JURISDICTION AND VENUE**

5. This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 2104(a)(5).

6. Venue is proper in this District pursuant to 29 U.S.C. § 2104(a)(5) and 28 U.S.C. § 1391.

7. Assignment in the Rock Hill Division is appropriate because a substantial part of the events or omissions giving rise to the claim occurred in Jenkensville, South Carolina, which is in Fairfield County.

**THE PARTIES**

***Plaintiff***

8. Plaintiff Harry Pennington III was an employee of Defendants and worked at the VC Summer Nuclear Station until his termination on or about July 31, 2017.

***Defendants***

9. Defendant Fluor Corporation is a Delaware corporation with its principal place of business located at 6700 Las Colinas Boulevard Irving, Texas 75039.

10. Defendant Fluor Enterprises, Inc., is a California corporation with its principal place of business located at 3 Polaris Way Aliso Viejo, California 92698.

11. Upon information and belief, Fluor Enterprises, Inc. is a subsidiary of Fluor Corporation.

12. Defendant SCANA Corporation is a South Carolina corporation with its principal place of business located at 100 SCANA Parkway, Cayce, South Carolina 29033.

13. Upon information and belief, SCANA Corporation was responsible for funding the payroll of the terminated employees and ordered the termination of Plaintiff and all similarly situated employees.

14. Upon information and belief, Defendants conducted or transacted business in this district.

15. On or about July 31, 2017, Defendants terminated without notice the employment of approximately 5000 employees who worked at, reported to, or received assignments from the Facility.

**WARN CLASS ALLEGATIONS, 29 U.S.C. § 2104**

16. Plaintiff brings the First Claim for Relief for violation of 29 U.S.C. § 2101 *et seq.*, on behalf of himself and on behalf of all other similarly situated former employees, pursuant to 29 U.S.C. § 2104(a)(5) and Fed. R. Civ P. 23(a), who worked at, reported to, or received assignments from one of Defendants' Facilities and were terminated without cause on or about July 31, 2017, and within 30 days of that date, or were terminated without cause as the

reasonably foreseeable consequence of the mass layoffs and/or plant closings ordered by Defendants on or about July 31, 2017, and who are affected employees, within the meaning of 29 U.S.C. § 2101(a)(5) (the "WARN Class").

17.     The persons in the WARN Class identified above ("WARN Class Members") are so numerous that joinder of all members is impracticable.  Although the precise number of such persons is unknown, the facts on which the calculation of that number can be based are presently within the sole control of Defendant.

18.     On information and belief, Defendants employed approximately 5,000 employees at the Facility.

19.     On information and belief, the identity of the members of the class and the recent residence address of each of the WARN Class Members is contained in the books and records of Defendants.

20.     On information and belief, the rate of pay and benefits that were being paid by Defendants to each WARN Class Member at the time of his/her termination is contained in the books and records of the Defendant.

21.     Common questions of law and fact exist as to members of the WARN Class, including, but not limited to, the following:

(a)     whether the members of the WARN Class were employees of the Defendants who worked at, reported to, or received assignments from Defendants' Facility;

(b)     whether Defendants unlawfully terminated the employment of the members of the WARN Class without cause on their part and without giving them 60 days advance written notice in violation of the WARN Act; and

(c)      whether Defendants unlawfully failed to pay the WARN Class members 60 days wages and benefits as required by the WARN Act.

22.      The Plaintiff's claims are typical of those of the WARN Class.  The Plaintiff, like other WARN Class members, worked at, reported to, or received assignments from the Defendants' Facility and was terminated without cause on or about July 31, 2017, due to the mass layoffs and/or plant closings ordered by Defendants.

23.      The Plaintiff will fairly and adequately protect the interests of the WARN Class. The Plaintiff has retained counsel competent and experienced in complex class actions, including the WARN Act and employment litigation.

24.      On or about July 31, 2017, Defendants terminated the Plaintiff's employment as part of a mass layoff or a plant closing as defined by 29 U.S.C. § 2101(a)(2), (3), for which he was entitled to receive 60 days advance written notice under the WARN Act.

25.      Class certification of these claims is appropriate under Fed. R. Civ. P. 23(b)(3) because questions of law and fact common to the WARN Class predominate over any questions affecting only individual members of the WARN Class, and because a class action is superior to other available methods for the fair and efficient adjudication of this litigation – particularly because this is a WARN Act litigation, where individual plaintiffs may lack the financial resources to vigorously prosecute a lawsuit in federal court against a corporate defendant, and damages suffered by individual WARN Class members are small compared to the expense and burden of individual prosecution of this litigation.

26. Concentrating all the potential litigation concerning the WARN Act rights of the members of the Class in this Court will obviate the need for unduly duplicative litigation that might result in inconsistent judgments, will conserve the judicial resources and the resources of the parties, and is the most efficient means of resolving the WARN Act rights of all the members of the Class.

27. The Plaintiff intends to send notice to all members of the WARN Class to the extent required by Rule 23.

**CLAIMS FOR RELIEF**

**Violation of the WARN Act, 29 U.S.C. § 2104**

28. Plaintiff realleges and incorporates by reference all allegations in all preceding paragraphs.

29. At all relevant times, Defendants employed more than 100 employees who in the aggregate worked at least 4,000 hours per week, exclusive of hours of overtime, within the United States.

30. At all relevant times, Defendants were an "employer," as that term is defined in 29 U.S.C. § 2101 (a)(1) and 20 C.F.R. § 639(a), and continued to operate as a business until it decided to order mass layoffs or plant closings at the Facilities.

31. On or about July 31, 2017, Defendants ordered mass layoffs and/or plant closings at the Facility, as those terms are defined by 29 U.S.C. § 2101(a)(2).

32. The mass layoffs or plant closings at the Facility resulted in "employment losses," as that term is defined by 29 U.S.C. §2101(a)(2) for at least fifty of Defendants' employees as well as thirty-three percent (33%) of Defendants' workforce at the Facilities, excluding "part-time employees," as that term is defined by 29 U.S.C. § 2101(a)(8).

33. The Plaintiff and the Class Members were terminated by Defendants without cause on their part, as part of or as the reasonably foreseeable consequence of the mass layoffs or plant closings ordered by Defendants at the Facilities.

34. The Plaintiff and the Class Members are "affected employees" of Defendants, within the meaning of 29 U.S.C. § 2101(a)(5).

35. Defendants were required by the WARN Act to give the Plaintiff and the Class Members at least 60 days advance written notice of their terminations.

36. Defendants failed to give the Plaintiff and the Class members written notice that complied with the requirements of the WARN Act.

37. The Plaintiff and each of the Class Members, are "aggrieved employees" of the Defendants as that term is defined in 29 U.S.C. § 2104(a)(7).

38. Defendants failed to pay the Plaintiff and each of the Class Members their respective wages, salary, commissions, bonuses, accrued holiday pay and accrued vacation for 60 days following their respective terminations, and failed to make the pension and 401(k) contributions and provide employee benefits under COBRA for 60 days from and after the dates of their respective terminations.

39. The relief sought in this proceeding is equitable in nature.

**PRAYER FOR RELIEF**

WHEREFORE, the Plaintiff, individually and on behalf of all other similarly situated persons, pray for the following relief as against Defendants:

A. Certification of this action as a class action;

B. Designation of the Plaintiff as the Class Representative;

C. Appointment of the undersigned attorneys as Class Counsel;

D. A judgment in favor of the Plaintiff and the other similarly situated former employees equal to the sum of: their unpaid wages, salary, commissions, bonuses, accrued holiday pay, accrued vacation pay, pension and 401(k) contributions and other COBRA benefits, for 60 days, that would have been covered and paid under the then-applicable employee benefit plans had that coverage continued for that period, all determined in accordance with the WARN Act, 29 U.S.C. § 2104(a)(1)(A); and

E. Such other and further relief as this Court may deem just and proper.

DATED: August 8, 2017

Respectfully submitted,

By: **s/ Lucy C. Sanders**
Lucy C. Sanders, Esq.
**BLOODGOOD & SANDERS, LLC**
242 Mathis Ferry Road, Suite 201
Mt. Pleasant, South Carolina 29464
Telephone: (843) 972-0313

Jack A. Raisner, Esq.
René S. Roupinian, Esq.
**OUTTEN & GOLDEN LLP**
685 Third Avenue, 25th Floor
New York, NY 10017
Telephone: (212) 245-1000
*Pro Hac Vice Motion Forthcoming*

*Attorneys for Plaintiff and the putative class*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF SOUTH CAROLINA

ROCK HILL DIVISION

Lawrence Butler, Lakeisha Darwish, Darron Eigner, Jr., Bernard A. Johnson, and Jimi Che Sutton,

Plaintiffs,

v.

Fluor Corporation and Fluor Enterprises, Inc.,

Defendants.

Civil Action No.: 0:17-02201-JMC

**COMPLAINT**
**(Jury Trial Demanded)**

Plaintiffs, all individually and on behalf of a class all other similarly situated individuals, by way of their Complaint in the above-captioned matter, would allege and show unto this Honorable Court the following:

**Nature of Claims**

1. Fluor Corporation, along with its subsidiary, Fluor Enterprises, Inc. (collectively referred to as "Fluor" or "Defendants"), operated as a single employer and the plaintiffs, Lawrence Butler, Lakeisha Darwish, Darron Eigner, Bernard A. Johnson, and Jimi Che Sutton (collectively, "Plaintiffs"), as well as almost 4,000 other employees, were employed by Fluor.

2. Plaintiffs bring this action on behalf of themselves and other similarly situated former employees who worked for Fluor and were terminated without cause, as part of, or as the result of, plant closings, mass layoffs and terminations ordered by Fluor and who were not

provided 60 days advance written notice of their terminations by Defendants, as required by the Worker Adjustment and Retraining Notification Act ("WARN Act"), 29 U.S.C. § 2101 et seq.

3. Defendants violated the WARN Act by knowingly failing to give Plaintiffs and other persons similarly situated, who are members of the class Plaintiffs seek to represent, at least 60 days prior notice of termination of their employment as required by that statute. As a consequence, Plaintiffs and the other similarly situated individuals are entitled to recover from Defendants, under the WARN Act, their wages and other employee benefits for 60 working days following the termination of their employment, which wages and benefits have not been paid.

**Parties, Jurisdiction, and Venue**

4. Plaintiff Lawrence Butler worked at the VC Summer Location (defined below) until his termination on July 31, 2017.

5. Plaintiff Lakeisha Darwish worked at the VC Summer Location (defined below) until her termination on July 31, 2017.

6. Plaintiff Darron Eigner, Jr. worked at the VC Summer Location (defined below) until his termination on July 31, 2017.

7. Plaintiff Bernard A. Johnson worked at the VC Summer Location (defined below) until his termination on July 31, 2017.

8. Jimi Che Sutton worked at the VC Summer Location (defined below) until his termination on July 31, 2017.

9. Defendant Fluor Corporation is a private corporation organized and existing under the laws of Delaware and having its principal place of business at 6700 Las Colinas Boulevard Irving, Texas 75039.

10. Defendant Fluor Enterprises, Inc. is a private corporation organized and existing under the laws of California and having business operations in the State of South Carolina, including Fairfield County, SC. Fluor Enterprises is a subsidiary of Fluor Corporation.

11. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 2104(a)(5), because this action is based, in part, on the WARN Act.

12. In addition, this Court has supplemental jurisdiction, pursuant to 28 U.S.C. § 1367, over Plaintiffs' pendent claims, which are brought pursuant to the common law of the State of South Carolina, because those claims arise out of the same transaction or occurrence as the federal claims alleged herein.

13. Venue is proper in this Court pursuant to 28 U.S.C. § 1391, because Defendants are located within this judicial district and division, and the unlawful labor practices giving rise to Plaintiffs' claims were committed in the Rock Hill Division of this Court.

**Facts**

14. Plaintiffs were employed by Defendants until their terminations on July 31, 2017, working at the V.C. Summer Nuclear Station in Jenkinsville, South Carolina located at 14368 Highway 213 ("VC Summer Location").

15. Plaintiffs seek to represent each and every individual employed by Defendants within ninety (90) days of July 31, 2017, who worked at the VC Summer Location, who were terminated without sufficient notice under the WARN Act.

16. On or about July 31, 2017, South Carolina Electric & Gas Company ("SCE&G"), stopped all construction at the VC Summer Location.

17. On that same day, Fluor permanently laid off almost 4,000 of its hourly and

salaried employees working at the VC Summer Location.

18. No employees of Defendants were given notice of the layoff, as required by WARN, at any time up to and including July 31, 2017.

19. Also, at all pertinent times hereto, Defendants were an "employer" under the relevant state wage payment laws.

20. As part of their employment with Defendants, Plaintiffs and the putative WARN Class members were each promised certain payments in the form of wages and/or salary.

21. Plaintiffs and the putative WARN Class members fully complied with all terms of their employment, and, yet, the Defendants made the deliberate decision to not honor the payments to be made to them under the terms of their employment.

**WARN Class Allegations**

22. Plaintiffs, on behalf of themselves and all other similarly situated individuals, repeat and re-allege the allegations of the preceding paragraphs as though set forth fully herein.

**Definition of the Class**

23. Plaintiffs and the other similarly situated former employees constitute a Class within the meaning of Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure.

24. Plaintiffs bring the first claim for relief for violation of WARN, on behalf of themselves and on behalf of all other similarly situated former employees, pursuant to 29 U.S.C. § 2104(a)(5) and Rule 23(a), who worked for Fluor within 90 days of July 31, 2017, and were terminated without cause on or about July 31, 2017, and within 30 days of that date, or were terminated without cause as the reasonably foreseeable consequence of the mass layoffs ordered

by Fluor on or about July 31, 2017, and who are affected employees, within the meaning of 29 U.S.C. § 2101(a)(5) (the "WARN Class").

**Numerosity**

25. The WARN Class is so numerous as to render joinder of all members impracticable as there are about 400 former employees believed to be in the Class. The identities of a majority of the Class members are presently unknown but are ascertainable through appropriate discovery.

**Existence and Predominance of Common Issues**

26. Common questions of law and fact are applicable to all WARN Class members.

27. The common questions of law and fact arise from and concern the following facts and actions:

a. all WARN Class members are former employees of Defendants;

b. all WARN Class members enjoyed the protection of the WARN Act;

c. Defendants terminated the employment of all the WARN Class members;

d. Defendants terminated the employment of the WARN Class members without providing at least 60 days' prior written notice as required by the WARN Act; and

e. Defendants failed to pay wages to the WARN Class members and failed to provide other employee benefits for the 60-working-day period following their respective terminations of their employment in violation of the WARN Act.

28. The questions of law and fact common to the WARN Class members, as described above, predominate over any questions affecting only individual members, and thus,

this class action is superior to other available methods for the fair and efficient adjudication of this controversy.

**Typicality**

29. Plaintiffs' claims are typical of the claims of other WARN Class members. All such claims arise out of Defendants' failure to provide notice under the WARN Act and to timely disclose to employees that they would be laid off as a result of the plant closing and/or mass layoffs. Plaintiffs and other WARN Class members have suffered a common injury arising out of Defendants' common course of conduct as alleged herein.

**Adequate Representation**

30. Plaintiffs will fairly and adequately protect and represent the interests of the WARN Class members and have no interest antagonistic to or in conflict with those of other WARN Class members.

31. Plaintiffs have the time and resources to prosecute this action and have retained qualified counsel who have had extensive experience in matters involving employee rights and the WARN Act. Plaintiffs intend to prosecute this action vigorously for the benefit of the WARN Class members.

**Superiority**

32. A class action is superior to other available methods for a fair and efficient adjudication of this controversy because individual joinder of all WARN Class members is impractical. Furthermore, damages suffered by WARN Class members may be relatively small when compared to the expense and burden of individual litigation, which would make it difficult or impossible for individual WARN Class members to obtain relief. The interests of judicial

economy favor adjudicating the claims of the WARN Class on a class-wide basis rather than an individual basis.

**Risks of Inconsistent or Varying Adjudication**

33. Class treatment is proper in this proceeding in order to avoid inconsistent or varying adjudications with respect to individual WARN Class members, to conserve the judicial resources and the resources of the parties, and to provide the most efficient means of resolving the rights of all the members of the WARN Class.

34. Pursuant to Fed. R. Civ. P. 23(a), the Class meets all the requirements for class certification.

35. Class certification is also authorized by the WARN Act, 29 U.S.C. § 2104(a)(5).

## Claims for Relief

## FOR FIRST CAUSE OF ACTION

### Violation of the WARN Act (Individual and Class Action)

36. Plaintiffs, on behalf of themselves and all other similarly situated individuals, repeat and re-allege the allegations of the preceding paragraphs as though set forth fully herein.

37. At all relevant times, Fluor employed more than 100 employees who in the aggregate worked at least 4,000 hours per week, exclusive of hours of overtime, within the United States.

38. At all relevant times, Fluor was an "employer," as that term is defined in 29 U.S.C. § 2101(a)(1) and 20 C.F.R. § 639(a), and continued to operate as a business until it decided to order mass layoffs or plant closings at the VC Summer Location.

39. On or about July 31, 2017, Fluor ordered mass layoffs and/or plant closings at the VC Summer Location, as those terms are defined by 29 U.S.C. § 2101(a)(2).

40. The mass layoffs or plant closings at the VC Summer Location resulted in "employment losses," as that term is defined by 29 U.S.C. § 2101(a)(2) for at least fifty of Fluor's employees as well as thirty-three percent (33%) of Fluor's workforce at the VC Summer Location, excluding "part-time employees," as that term is defined by 29 U.S.C. § 2101(a)(8).

41. The Plaintiffs and the WARN Class members were terminated by Fluor without cause on their part, as part of or as the reasonably foreseeable consequence of the mass layoffs or plant closings ordered by Fluor at the VC Summer Location.

42. The Plaintiffs and the WARN Class members are "affected employees" of Fluor, within the meaning of 29 U.S.C. § 2101(a)(5).

43. Fluor was required by WARN to give the Plaintiffs and the WARN Class members at least 60 days advance written notice of their terminations.

44. Fluor failed to give the Plaintiffs and the WARN Class members written notice that complied with the requirements of the WARN Act.

45. Plaintiffs, and each of the WARN Class members, are "aggrieved employees" of Fluor as that term is defined in 29 U.S.C. § 2104 (a)(7).

46. As a result of the violation of the WARN Act, Defendants are liable to the affected employees, including but not limited to Plaintiffs for attorneys' fees, full back pay and benefits for sixty days preceding July 31, 2017, and this amount cannot be reduced by the amount of any unemployment benefits, severance payment, or interim earnings.

**FOR A SECOND CAUSE OF ACTION**

**Violation of Public Policy of the State of South Carolina**
**(Individual and Class Action)**

47. Plaintiffs, on behalf of themselves and all other similarly situated individuals, repeat and re-allege the allegations of the preceding paragraphs as though set forth fully herein.

48. To the extent Plaintiffs and the members of the Plaintiff class, among others, cannot recover under the WARN Act, this law constitutes the public policy of the State of South Carolina and therefore Plaintiffs and members of the Plaintiff class, among others, have an independent cause of action for termination in violation of public policy.

49. As a result of this, Defendants are liable to Plaintiffs and members of the Plaintiff class, among others, for 60 days of wages, and all other damages this Court deems just and proper.

**WHEREFORE**, Plaintiffs, the WARN Class members, demand judgment, against Defendant as follows:

A. Certification of this action as a Class Action;

B. Designation of the Plaintiffs as the Class Representatives;

C. Appointment of the undersigned attorneys as Class Counsel;

D. A declaratory judgment that Defendants have violated the provisions of the WARN Act, and have deprived Plaintiffs and the members of the WARN Class of their rights to compensation;

E. An award of monetary damages to Plaintiffs and the members of the WARN Class for the sixty-day period when they should have been notified under the WARN Act;

F. Attorneys' fees and costs; and

G. Such further relief as the Court deems just and proper.

Respectfully Submitted,

GAFFNEY LEWIS & EDWARDS, LLC

*s/ Amy L. Gaffney*
Amy L. Gaffney
Federal I.D. Number: 6316
Gaffney Lewis & Edwards, LLC
3700 Forest Drive, Suite 400
Columbia, SC 29204
(803) 790-8838
(803) 790-8841—facsimile
agaffney@glelawfirm.com

YARBOROUGH APPLEGATE LLC

*s/ David Yarborough*
David B. Yarborough, Jr.
Federal I.D. Number: 7336
William E. Applegate, IV
Federal I.D. Number: 9261
Christopher J. Bryant
Federal I.D. Number: 12538
291 East Bay Street
Charleston, SC 29401
(843) 972-0150
(843) 277-6691 –facsimile
david@yarboroughapplegate.com
william@yarboroughapplegate.com
chris@yarboroughapplegate.com

KLEHR HARRISON HARVEY
BRANZBURG, LLP

*s/ Lee D. Moylan*___________________
Charles A. Ercole, Esq. (#69192)*
Lee D. Moylan, Esquire (#80915)*
1835 Market Street, 14th Floor
Philadelphia, PA 19103
(215) 569-2700
(215) 568-6603-facsimile
cercole@klehr.com/lmoylan@klehr.com
*Attorneys for Plaintiffs*
**Pro Hac Vice* Applications to be Filed

August 18, 2017

0:17-cv-02094-JMC Date Filed 09/13/17 Entry Number 9-3 Page 1 of 2

# EXHIBIT C



**Annmarie Higgins**
Vice President, Human Resources

July 31, 2017

John Doe
1234 First Street
Columbia, SC 29201

Dear John Doe:

This notice is being provided pursuant to the Worker Adjustment and Retraining Notification Act of 1988 ("WARN"), which requires employers to give official notice to affected employees of a pending plant closing or mass layoff, as defined by the Act.

As discussed in the meeting today, SCANA, the parent company of SCE&G, has decided to stop the construction of both Unit 2 and Unit 3 and file a petition for approval of abandonment with the Public Service Commission of South Carolina. Unfortunately, this process is expected to involve immediate, total, and permanent termination of the new nuclear construction project at VC Summer Nuclear Station, Highway 215 & Bradham Blvd., Jenkinsville, SC 29065, which will require that numerous SCE&G jobs be eliminated. Also, SCE&G's corporate affiliates will be required to eliminate certain positions as a result of the termination of the new nuclear construction project. Unfortunately, your employment will end as a part of this process. Please know that we did not make this decision lightly, and we deeply regret the impact that the decision will have on many of our employees. The company is taking numerous measures to help you through this transition.

The terminations resulting from this process will commence on September 30, 2017. Your expected termination date is September 30, 2017. There will not be bumping rights, however you may apply for open SCANA positions and will be given special consideration throughout your severance period. Some employees may be asked to assist with the orderly shutdown of New Nuclear. If you are one of those employees, you will be notified personally as soon as possible, and your termination date may be extended briefly.

We appreciate your service and contributions to the Company. We will be providing additional information as it becomes available. If you need further information, you should call your HR Business Partner Team: Dana Roberts, (803) 931-5595; Mark Bauerlin, (803) 931-5519; Melanie Sumner, (803) 345-4045; or Christian Mann, (803) 345-4104.

Sincerely,

Annmarie Higgins

Annmarie Higgins
Vice President, Human Resources

100 SCANA Parkway • Cayce, SC • P (803) 217-7082
Mailing Address 220 Operation Way • MC D302 • Cayce SC • 29033-3701

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**

HARRY PENNINGTON III and TIMOTHY LORENTZ, on behalf of themselves and all others similarly situated,

Plaintiffs,

v.

FLUOR CORPORATION, FLUOR ENTERPRISES, INC., FLOUR DANIEL MAINTENANCE SERVICES, INC., SCANA CORPORATION, and SOUTH CAROLINA ELECTRIC & GAS COMPANY,

Defendants.

CASE NO. 0:17-02094-JMC

**AMENDED CLASS ACTION COMPLAINT FOR**
**VIOLATION OF WARN ACT, 29 U.S.C. § 2101, *ET SEQ.***

Plaintiffs Harry Pennington III and Timothy Lorentz ("Plaintiffs") allege on behalf of themselves and subclasses of similarly situated former employees of Defendants Fluor Corporation, Fluor Enterprises, Inc., and Fluor Daniel Maintenance Services, Inc. (together, "Fluor") and of non-defendant Westinghouse Electric Company LLC and its subsidiaries ("WEC" or "Westinghouse"), against Fluor and Defendants SCANA Corporation and its subsidiary, South Carolina Electric & Gas Company (together, "SCANA" or the "SCANA Defendants"), as follows:

**NATURE OF THE ACTION**

1. Plaintiff Pennington was an employee of Defendants Fluor and SCANA for purposes of the WARN Act until his termination along with approximately 5,000 other similarly situated employees on or about July 31, 2017.

2. Plaintiff Lorentz was an employee of non-defendant WEC and the SCANA Defendants for purposes of the WARN Act until his termination along with approximately 600 other similarly situated employees on or about July 31, 2017.

3. Plaintiffs did not receive any advance written notice of their termination.

4. Plaintiffs bring this action on behalf of themselves, and the other similarly situated former employees of SCANA who worked at, reported to, or received assignments from the Virgil C. Summer Nuclear Generating Station ("VC Summer" or the "Facility"), located at Highway 215 & Bradham Blvd., Jenkinsville, South Carolina 29065, who were terminated without cause, as part of, or as the foreseeable result of, plant closings or mass layoffs ordered by Defendants on or around July 31, 2017, and who were not provided 60 days advance written notice of their terminations by SCANA or their immediate employers Fluor and WEC, as required by the Worker Adjustment and Retraining Notification Act ("WARN Act"), 29 U.S.C. § 2101 *et seq*.

5. The WARN Act provides that two or more independent contracting companies may be held jointly and severally liable as a "single employer," and also provides that parents and subsidiaries may be held jointly and severally liable as a "single employer". 20 C.F.R. § 639.3(a)(2).

6. Fluor and its subsidiaries were a single employer of the persons they employed at VC Summer, and together with the SCANA Defendants, a single employer of those employees.

7. Non-defendants WEC and its subsidiaries were a single employer of the persons they employed at VC Summer, and together with the SCANA Defendants, a single employer of those employees.

8. Both Plaintiffs and all similarly situated employees seek to recover 60 days wages and benefits pursuant to the WARN Act from SCANA, and Plaintiff Pennington seeks such recovery jointly and severally against Fluor.

9. Plaintiff Pennington filed the original Complaint in this action on August 8, 2017.

10. At least one action has been filed under the WARN Act on behalf of employees of debtors WEC and its subsidiaries based on the July 31, 2017 VC Summer terminations in the United States Bankruptcy Court of the Southern District of New York. (*Fleetwood. et al., v. WECTEC, LLC. et al.*, 17-ap-01110-MEW)(Bankr. S.D.N.Y).

**JURISDICTION AND VENUE**

11. This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 2104(a)(5).

12. Venue is proper in this District pursuant to 29 U.S.C. § 2104(a)(5) and 28 U.S.C. § 1391.

13. Assignment in the Rock Hill Division is appropriate because a substantial part of the events or omissions giving rise to the claim occurred in Jenkinsville, South Carolina, which is in Fairfield County.

## THE PARTIES

***Plaintiffs***

14. Plaintiff Harry Pennington III worked as a Heavy Equipment Operator at VC Summer until his termination on or about July 31, 2017. His immediate employer was Fluor Daniel Maintenance Services, Inc.

15. Plaintiff Timothy Lorenz worked as a Project Manager. His immediate employer was Westinghouse Electric Company LLC.

***Defendants***

16. Defendant Fluor Corporation is a Delaware corporation with its principal place of business located at 6700 Las Colinas Boulevard, Irving, Texas 75039.

17. Defendant Fluor Enterprises, Inc. is a California corporation with its principal place of business located at 3 Polaris Way, Aliso Viejo, California 92698.

18. Defendant Fluor Daniel Maintenance Services, Inc. is a Delaware corporation with its principal place of business located at 6700 Las Colinas Boulevard, Irving, Texas 75039.

19. Upon information and belief, Fluor Enterprises, Inc. and Fluor Daniel Maintenance Services, Inc. are subsidiaries of Fluor Corporation.

20. Defendant SCANA Corporation is a South Carolina corporation with its principal place of business located at 100 SCANA Parkway, Cayce, South Carolina 29033.

21. South Carolina Electric & Gas Company ("SCE&G") is a regulated public utility wholly-owned by SCANA Corporation engaged in the generation, transmission, distribution and sale of electricity, primarily in South Carolina.

22. SCE&G is incorporated in South Carolina and maintains its principal executive offices at 220 Operation Way, Cayce, South Carolina 29033-3701.

23. On or about July 31, 2017, SCANA together with Fluor terminated without notice the employment of approximately 5,000 employees, including the Plaintiff Pennington, and SCANA together with non-defendant WEC, terminated the employment of approximately 600 employees , including the Plaintiff Lorentz.

**SUBSTANTIVE ALLEGATIONS**

24. Defendant SCANA, an energy-based holding company and its principal subsidiary, South Carolina Electric & Gas Company, are engaged in the generation, transmission, distribution and sale of electricity, primarily in South Carolina.

25. SCANA petitioned the South Carolina state legislature in 2007 for permission to proceed at the existing V.C. Summer Nuclear Station with a multi-billion dollar two-reactor expansion (the "Summer Project"). Defendants would be 60% owners of the Summer Project, and South Carolina Public Service Authority (Santee Cooper), a state agency (together with SCANA, the "Owners"), would be the 40% owner .

26. The Summer Project was initially expected to cost about $9 billion. But by 2017, delays and cost overruns had driven up the cost estimates to $20 billion or more.

27. A major reason that state regulators and utility staffers went ahead with the SCANA Summer Project was that state lawmakers had passed the Base Load Review Act (the "BLRA") in 2007, which provided huge incentives to build large-scale power plants.

28. The BLRA demanded only limited accountability from the utility company builders themselves. The BLRA put the risk for the Summer Project onto electric customers by ensuring that the utility could recoup its costs. As is customary in massive projects, it was assumed rate-payers could and should absorb all costs because they would be compensated by cheaper power over a 50-70 year period. The BLRA, however, imposed costs on the electric rate-payers even if the project was cancelled.

29. When SCANA terminated the project in July 2017, it indeed proposed to charge its losses to electric rate-payers (who were already paying on average an extra $27 a month for the reactors) for the next 60 years pursuant to the BLRA.

30. When SCANA applied to build the reactors in 2007, it used a generic schedule that was non-specific and inadequate to reflect the construction time and costs necessary to complete the Summer Project. SCANA knew its schedule was not legitimate.

31. In 2008, SCANA Corporation, for itself and as agent for Santee Cooper, entered into an agreement with a consortium (the "Consortium") comprising WEC and Chicago Bridge & Iron Company ("CB&I")—the owner of Stone & Webster ("S&W"). The parties entered into an *Engineering, Procurement, and Construction Agreement* in May 2008 (the "EPC Agreement") under which the Consortium would build the Summer Project, featuring two AP-1000 nuclear reactors known as VC Summer 2 and 3.

32. The Summer Project, along with a comparable agreement to build similar reactors in Georgia, represented the first new nuclear power plant construction in the U.S. in 30 years.

33. Under the EPC Agreement, the Consortium had to substantially complete the first VC Summer 2 by April 1, 2016 and VC Summer 3 by January 1, 2019.

34.     Under the EPC Agreement, WEC was generally responsible for the design, manufacture, and procurement of the nuclear reactor, steam turbines, and generators, while S&W was responsible for on-site construction and procurement of auxiliary equipment.

35.     As delays and cost overruns mounted, disputes arose between SCANA and the Consortium members regarding the pace of the projects and which parties bore the ultimate responsibility for cost increases.  The Owners and the Consortium members alleged claims against each other and commenced litigation to resolve the apportionment of increased costs.

36.     In or around 2015, WEC sought to resolve existing and potential litigation by acquiring CB&I and S&W.

37.     Although WEC remained the primary contractor to SCANA, a new subcontractor was appointed to WEC, Fluor Corporation, a U.S.-based global engineering and construction company.  Fluor would provide staffing for craft (manual labor) employees and would take primary responsibility for on-site construction while WEC focused on engineering and project management.  WEC transferred to Fluor many of the S&W craft employees it had acquired.

38.     Fluor took responsibility for the craft, field engineers, and project controls personnel including the costs and scheduling of personnel.

39.     In acquiring S&W, Westinghouse generally accepted liability for the cost overruns on the Summer Project, by agreeing to build it for a "fixed-price" at SCANA's option.

40.     In May 2016, SCANA exercised that option, ostensibly capping the Owners' costs for the Summer Project at close to $14 billion.

41. In December 2016, Westinghouse and Fluor were concluding work on an Estimate to Complete report ("ETC") pursuant to the EPC agreement. The ETC would forecast the actual number of hours and costs required to complete the Summer Project. The ETC was not formally circulated as it was being audited and verified in early 2017 but upon information and belief, its results were known by the parties.

42. Upon information and belief, the ETC forecast that an additional $6.1 billion beyond the $14 billion fixed price estimate would be necessary to complete the Summer Project (for which WEC would be liable). That amount would comprise $3.7 billion in additional labor costs; $1.8 billion in additional equipment prices and vendor costs; and $600 million in additional risk and contingency planning—including warranty and fee claims. It would also take at least three more years to complete.

43. Learning of this, WEC's parent Toshiba and WEC determined WEC could not sustain these costs under the fixed price agreement.

44. In early 2017, WEC experienced cash shortfalls related to the Summer Project and a deepening liquidity crisis. Although WEC sought additional emergency funding from its parent, Toshiba, in March 2017, Toshiba stated it could not provide it without collateral, including potentially through debtor-in-possession funding in a chapter 11 reorganization process, which WEC then initiated.

45. On March 29, 2017, WEC and its subsidiaries filed their voluntary petitions for relief under Chapter 11 of Title 11 of the United States Bankruptcy Code in the Southern District of New York.

46. With its bankruptcy filing of March 29, 2017, the WEC debtors had the possibility of rejecting the fixed price provision of the contract. To forestall the rejection decision, the parties entered into an Interim Assessment period in which SCANA would fund the operational costs of the Summer Project until alternatives for completing it could be developed.

47. SCANA used the Interim Assessment period (which was extended until August 10, 2017) to determine if it were feasible for it to complete the project using an owner-directed model.

48. Under that model, SCANA began to take complete control over the manufacture and construction of the Summer Project.

49. SCANA operationalized the owner-directed model as of March 29, 2017 because, on information and belief, the Summer Project failed due to, in large measure deficiencies in the "client-contractor model" for construction that SCANA adopted in launching the Summer Project.

50. Under the "client-contractor" model, there were two separate, parallel hierarchies of managers who attempted to direct the Summer Project construction.

51. On the one hand SCANA had its own pyramidal workforce consisting of its general manager of nuclear construction atop dozens of its own employees reporting up to him who oversaw every facet of the on –site construction.

52. On the other hand, WEC, the primary contractor together with its subsidiaries and its main subcontractor, Defendant Fluor, maintained a pyramidal hierarchy headed by a WEC product director and Fluor construction director, and hundreds of managers and thousands of craft level employees reporting up to them. (The division of responsibilities between WEC and Fluor were set out in their own agreement).

53. Given the independent hierarchies in that model, no entity or person filled the functional role of a Chief Executive Officer responsible for the whole project and to whom all lines of supervision reported.

54. As a result of the separate structures, neither Fluor, WEC, or SCANA was ever fully in charge of the project.

55. No entity was fully accountable for the cost under this structure. SCANA could pass its responsibility to rate-payers under the BLRA and then it pass all future accountability to WEC under the fixed price contract.

56. At the point of the bankruptcy, SCANA became financially accountable for the ongoing costs and plan of completion. With WEC sidelined under bankruptcy court protection, SCANA recognized it needed to immediately take full charge of the project to make it appear viable.

57. Until the petition was filed, WEC laid out the construction costs, with SCANA periodically reimbursing only a fraction of those amounts. Now SCANA was responsible for paying the large payroll of thousands of craft employees. Side-stepping WEC and the prior hierarchies, SCANA began paying Fluor's payroll directly to Fluor.

58. As a result of becoming responsible for all the costs of completing the project, SCANA made clear it had veto power over any decision that might add cost or cause delay to the Summer Project, and began to exercise that prerogative.

59. SCANA's assumption of control over construction at the site on a decision-by-decision basis was tied to its complete overhaul and restructuring of the "client" based model to the "owner-directed" model. SCANA articulated this restructuring in open discussions with Fluor and WEC, and in writing.

60. Upon the bankruptcy filing, SCANA became responsible for completing the unfinished ETC roadmap for the completion of the project. SCANA redrafted the ETC to spell out the new single hierarchy in which it assumed complete control over all significant decisions made from the ground-level up on the construction site.

61. SCANA, in the ETC, reassigned Fluor and WEC employees in a line of supervision interspersed with SCANA's own managers to whom Fluor and WEC employees would report at various levels. SCANA created organization charts to reflect the structure.

62. Not waiting for the ETC to be formally promulgated, SCANA began taking ownership of operational decision-making to give effect to the owner-directed model.

63. Until the bankruptcy filing, SCANA's general manager and cadre of overseers, many of whom were subject matter specialists and had even worked for Fluor or WEC at the Summer Project, oversaw the work of Fluor and WEC.

64. SCANA's ground-level overseers attended all significant construction events, such as crane lifts and major concrete placements, and they attended the continual meetings across the site that took place throughout the day between Fluor and WEC and their respective crews dealing with the operational nuts-and-bolts of the constructions tasks.

65. Prior to the bankruptcy filing, SCANA's overseers normally kept silent at these events and meetings; instead, they made notes and sent messages up the SCANA reporting chain.

66. These messages might then be discussed when SCANA's top project directors interfaced with their counterparts at Fluor and WEC at the daily Plan of the Day ("POD") meeting. The POD meeting was held weekday mornings at 9 a.m. and lasted about an hour

67. POD meetings were typically attended by SCANA's top operational officers: Alan Torres, SCANA's General Manager of Nuclear Construction at the VC Summer Unit 2 and 3, and/or Kyle Young, SCANA's Manager, Nuclear Plant Construction and /or Brian Merriman, SCANA's Project Manager/Engineer IV. Attending from Fluor were Bruce Hinkley, Fluor's Construction Director and/or John Shepherd, Fluor's V.P. and Site Director, and from WEC were Carl D. Churchman, WEC's Consortium VP and Project Director for VC Summer 2/3 and/or Rod Cavalieri, WEC's Director of Project Management.

| SCANA | FLUOR | WEC |
| --- | --- | --- |
| • Alan Torres, General Manager of Nuclear Construction at the VC Summer Unit 2 and 3.<br>• Kyle Young, Manager, Nuclear Plant Construction.<br>• Brian Merriman, Project Manager/ Engineer IV. | • Bruce Hinkley, Construction Director.<br>• John Shepherd, V.P. and Site Director. | • Carl D. Churchman, Consortium VP and Project Director for VC Summer 2/3.<br>• Rod Cavalieri, Director of Project Management. |

68. The SCANA, Fluor and WEC leaders would typically attend the POD meetings along with nine or 10 of their second-tier managers so that the conference room would fill with about 30-40 people. Plaintiff Lorentz attended many POD meetings with his WEC supervisors, Churchman and Cavalieri.

69. The purpose of the POD meetings prior to the bankruptcy was for Fluor/WEC to inform SCANA of what they planned to do and to invite comments, consistent with client–contractor relationship. The parties dialoged about any issues that had "bubbled up" from their respective phalanxes of managers in the field, consistent with Fluor/WEC's correction action processes and procedures. It was understood that Fluor/WEC had control over the manner and means in which the construction work was done and over their own personnel.

70. Prior to the bankruptcy, SCANA could, as client, flag discrepancies or mistakes such as a bad weld, and file a condition report seeking corrective action.

71. Consistent with their own correction action processes and procedures, Fluor/WEC would address and resolve those issues. It was understood that Fluor/WEC had control over the manner and means in which the construction was performed in the first instance. While SCANA raised issues in its role as client, Fluor/WEC controlled the decision to take corrective actions.

72. That changed after the bankruptcy filing. SCANA became outspoken and forceful at the POD meetings. For the first time, SCANA's input into day-to-day operations became proactive, intrusive, and decisional, in keeping with its assumption of CEO-type control and leadership.

73. After the bankruptcy, SCANA field monitors, who had previously been silent, became vocal in directing Fluor/WEC personnel. If a SCANA overseer expressed disagreement with how Fluor/WEC was performing a task, such as using a piece of equipment, SCANA overseers could and often would say so on the spot, and it was taken as a directive.

74. Fluor/WEC personnel reasonably understood that the SCANA overseer's disagreement, if not complied with, would immediately upstream to SCANA's project director, Al Torres who would demand action from his Fluor or WEC counterparts, such as Carl Churchman or Bruce Hinkley, either at the next morning's POD meeting or in a call or message, who would then require compliance from the crew.

75. After March 29, SCANA gave specific orders and directions concerning virtually all facets of the project, including construction, and safety - particularly concerning anything that would cause a delay or add cost.

76. Prior to the bankruptcy filing, Fluor or WEC set the levels of craft personnel needed to perform assignments. If more workers were needed in Fluor's or WEC's view, they had the authority to set headcount levels and engage in hiring. After the bankruptcy, they lost that authority. They had to requisition new hires from SCANA and obtain SCANA approval.

77. Prior to the bankruptcy filing, WEC identified specialized jobs that required highly-skilled employees and had the right to hire that manpower of its own accord. For example, WEC engaged about 120 specialists to work on the Nuclear Steam Supply System – the heart of the reactor's generator – by entering into a contract with Bechtel. After the bankruptcy filing, SCANA, however, decided against it and terminated the agreement forcing WEC to let go the 120 individuals.

78. SCANA's subordination of Fluor's and WEC's independence and autonomy in hiring and procurement was consistent with new ETC organization charts showing changes to the duties, titles, authority, and assignments of Fluor and WEC personnel.

79. Under the ETC, Fluor was made construction manager reporting directly to SCANA, taking the place of WEC and its subsidiaries.

80. After the bankruptcy, if Fluor or WEC needed several dozen employees, for example boilermakers, the decision, which they had once tightly-held, now had to be approved by SCANA.

81. Upon information and belief, SCANA prevailed on Fluor to remove one of its managers over the construction site. When Fluor sought to replace the person by hiring a WEC manager, Fluor had to, and did seek prior approval from SCANA.

82.     Taking control of operations after the bankruptcy, SCANA prospectively intervened in controlling the work.  If Fluor or WEC wished to perform a particular task, such as a major concrete placement on a Friday or Saturday, Al Torres might call them and tell them not to do so, and say he wanted it done on a different day, such as a Thursday or Monday, which they would then do.

83.     Prior to the bankruptcy, it was up to the Project Management Office maintained by WEC to approve all overtime.  WEC maintained final approval of overtime for the entire site.  After the petition filing, SCANA took away that authority from WEC, and WEC and Fluor employees had to go directly to SCANA which decided when they worked overtime and for how many hours.  Thus, SCANA exercised control over their job schedules, duties and performance.

84.     SCANA's control over work schedules extended to policies for days off.  SCANA directed that the Memorial Day weekend would be treated as a three-day weekend, but that the following Saturday would be a work day – a type of decision formerly left to WEC.

85.     At all times, SCANA provided the facilities, equipment, tools and materials necessary to complete the work.  Although Fluor and WEC personnel manned the equipment room, the construction helmets, vests and other safety gear and protective clothing that were dispensed were paid for by SCANA.  Requisitions for the equipment were sent to and paid for by SCANA

86.     Heavy construction equipment, which was generally rented, was paid for by SCANA.

87.     The construction work took place on SCANA's premises where hundreds of SCANA's own employees worked.  Some operated the pre-existing nuclear reactor, V.C. Summer 1, but others were dedicated to the construction of reactors 2 and 3.  All of WEC's and Fluor's employees at the site were dedicated solely to the building of the Summer Project for the Owners.

88.     Besides micro-managing schedules and controlling the manner and means of discrete construction tasks after the bankruptcy filing, SCANA was rearranging the priorities for the project's critical path toward completion which formerly had been in the bailiwick of WEC/Fluor.  The effect was that SCANA obliterated the functional independence of the Fluor and WEC contractors and took control over the work and workforce.

89.     Although SCANA began implementing its owner-directed model after the bankruptcy, no one stepped forward to help fund it.

90.     On information and belief, under the EPC Agreement, Santee Cooper could not remove itself from the VC Summer project, however, until a designated point in time.  With the bankruptcy of Westinghouse and the Interim Assessment period expiring, however, that exit point was calendared.  As expected, when that point arrived in late July 2017, Santee Cooper took the opportunity to withdraw its 40 percent ownership from the project, which foreseeably doomed it.

91.    As SCANA recognized from at least March 2017, mass layoffs and shutdowns were almost inevitable at the Summer Project in mid-summer.  Out of the four options SCANA faced, the three most-likely scenarios demanded them.  While it may have been possible to find funding to replace WEC/Toshiba, and continue to build both Units 2 and 3, SCANA knew realistically that it was more probable that either: 1) only Unit 2 would go forward; or 2) Unit 3 would also go forward, but only after a long delay (requiring a shut down or layoff); or 3) neither would go forward (requiring a total shutdown).

92.    Given the greater probability of those options, SCANA and any responsible party aware of the circumstances would have recognized the need to provide notice 60 days prior to implementing those options.

93.    On July 31, 2017, SCANA sent a WARN Act notice to the South Carolina Department of Employment and Workforce that it "had decided to stop work on the construction of both Units."

94.    SCANA stated that its "complete termination of the construction project will affect 617 SCE&G employees," none of whom it chose to terminate at that point.

95.    On that day, SCE&G informed Fluor and Westinghouse of its decision to abandon the project.  SCE&G asked them to cease all work on the project immediately.  SCANA suddenly stopped paying the cost of employing over 5,000 employees on the site.

96.    In the four months leading to that day, the contractors obeyed SCANA's order to stop work and terminated the employees.  SCANA controlled the decision to terminate all the employees on the site without advance notice.

97. SCANA had the ability to comply with the WARN Act by letting it be known 60 days prior to July 31, 2017 that unless the continuance of both reactors was deemed feasible at the end of the Interim Assessment period, a mass layoff would occur. Alternatively, it could have postponed notice until the shutdown or mass layoff decision was made, and then provided 60 days' notice for terminations to take place after the orderly wind-down of the site was completed, to be paid for out of SCANA's wind-down budget.

98. The day after the shutdown, SCE&G acknowledged at the August 1 ex parte briefing before the Public Service Commission of South Carolina, that its evaluation team "arrived at substantial completion dates for Unit 2 of December 31, 2022, and for Unit 3 of March 31, 2024 forecast the further cost of completion of the units of approximately $8.8 billion."

99. At that briefing, SCE&G acknowledged it was responsible for the operational costs that its owner-directed model incurred: "when we learned that Westinghouse intended to reject our fixed-price contract, our first objective was to determine if it was feasible to complete the project using an owner-directed model and what it would cost for us to do so."

**WARN CLASS ALLEGATIONS**

100. Plaintiff Pennington brings the First Claim for Relief for violation of 29 U.S.C. § 2101 *et seq*., on behalf of himself and on behalf of a subclass all other similarly situated persons whose immediate employer was Fluor, pursuant to 29 U.S.C. § 2104(a)(5) and Fed. R. Civ. P. 23(a), who worked at, reported to, or received assignments from the VC Summer Facility and were terminated without cause on or about July 31, 2017, and within 30 days of that date, or were terminated without cause as the reasonably foreseeable consequence of the mass layoffs

and/or plant closings ordered by Defendants on or about July 31, 2017, and who are affected employees, within the meaning of 29 U.S.C. § 2101(a)(5) (the "Pennington Subclass").

101. Plaintiff Lorentz brings the Claim for Relief for violation of 29 U.S.C. § 2101 *et seq*., on behalf of himself and on behalf of a subclass all other similarly situated former persons whose immediate employer was WEC or its subsidiaries, pursuant to 29 U.S.C. § 2104(a)(5) and Fed. R. Civ. P. 23(a), who worked at, reported to, or received assignments from the VC Summer Facility and were terminated without cause on or about July 31, 2017, and within 30 days of that date, or were terminated without cause as the reasonably foreseeable consequence of the mass layoffs and/or plant closings ordered by the SCANA Defendants on or about July 31, 2017, and who are affected employees, within the meaning of 29 U.S.C. § 2101(a)(5) (the "Lorentz Subclass," and together with the Pennington Subclass, the "WARN Class").

102. The persons in the WARN Class identified above ("WARN Class Members") are so numerous that joinder of all members is impracticable. Although the precise number of such persons is unknown, the facts on which the calculation of that number can be based are presently within the sole control of SCANA and/or Fluor.

103. On information and belief, SCANA was a single employer of approximately 5,000 employees of Defendant Fluor and 600 employees of non-defendant WEC at the Facility.

104. On information and belief, the identity of the members of the class and the recent residence address of each of the WARN Class Members is contained in the books and records of Defendants SCANA and/or Fluor.

105. On information and belief, the rate of pay and benefits that were being paid by Defendants SCANA and Fluor to each WARN Class Member at the time of his/her termination is contained in the books and records of the Defendants.

106.    Common questions of law and fact exist as to members of the WARN Class, including, but not limited to, the following:

(a)    whether the members of the WARN Class were employees of the Defendants who worked at, reported to, or received assignments from Defendants SCANA and Fluor in the case of the Pennington subclass, and Defendant SCANA and non-defendant WEC in the case of the Lorentz subclass;

(b)    whether Defendants unlawfully terminated the employment of the members of the WARN Class without cause on their part and without giving them 60 days advance written notice in violation of the WARN Act; and

(c)    whether Defendants unlawfully failed to pay the WARN Class members 60 days wages and benefits as required by the WARN Act.

107.    The Plaintiffs' claims are typical of those of the WARN Class.  The Plaintiffs like other WARN Class members, worked at, reported to, or received assignments from the Defendants' Facility and were terminated without cause on or about July 31, 2017, due to the mass layoffs and/or plant closings ordered by SCANA.

108.    The claims of Plaintiffs Pennington and Lorentz are typical of claims of those of the respective Pennington Subclass and Lorentz Subclass.

109.    The Plaintiffs will fairly and adequately protect the interests of the WARN Class. The Plaintiffs have retained counsel competent and experienced in complex class actions, including the WARN Act and employment litigation.

110.    On or about July 31, 2017, Defendants terminated the Plaintiff Pennington's employment as part of a mass layoff or a plant closing as defined by 29 U.S.C. § 2101(a)(2), (3), for which he was entitled to receive 60 days advance written notice under the WARN Act.

111. On or about July 31, 2017, Defendant SCANA along with WEC terminated the Plaintiff Lorentz's employment as part of a mass layoff or a plant closing as defined by 29 U.S.C. § 2101(a)(2), (3), for which he was entitled to receive 60 days advance written notice under the WARN Act.

112. Class certification of these claims is appropriate under Fed. R. Civ. P. 23(b)(3) because questions of law and fact common to the WARN Class predominate over any questions affecting only individual members of the WARN Class, and because a class action is superior to other available methods for the fair and efficient adjudication of this litigation – particularly because this is a WARN Act litigation, where individual plaintiffs may lack the financial resources to vigorously prosecute a lawsuit in federal court against a corporate defendant, and damages suffered by individual WARN Class members are small compared to the expense and burden of individual prosecution of this litigation.

113. Concentrating all the potential litigation concerning the WARN Act rights of the members of the Class in this Court will obviate the need for unduly duplicative litigation that might result in inconsistent judgments, will conserve the judicial resources and the resources of the parties, and is the most efficient means of resolving the WARN Act rights of all the members of the Class.

114. The Plaintiffs intend to send notice to all members of the WARN Class to the extent required by Rule 23.

**CLAIMS FOR RELIEF**

**Violation of the WARN Act, 29 U.S.C. § 2104**

115. Plaintiffs reallege and incorporate by reference all allegations in all preceding paragraphs.

116. At all relevant times, Defendants employed more than 100 employees who in the aggregate worked at least 4,000 hours per week, exclusive of hours of overtime.

117. At all relevant times, Defendants were an "employer," as that term is defined in 29 U.S.C. § 2101 (a)(1) and 20 C.F.R. § 639.3(a)(1) and (2) at the VC Summer Facility.

118. At all relevant times, Defendants SCANA and Fluor, on the one hand, and SCANA and WEC, on the other hand, were a "single employer." 20 C.F.R. § 639.3(a)(2) with respect to the employees who worked at the VC Summer Facility.

119. On or about July 31, 2017, Defendants ordered mass layoffs and/or plant closings at the Facility, as those terms are defined by 29 U.S.C. § 2101(a)(2).

120. The mass layoffs or plant closings at the Facility resulted in "employment losses," as that term is defined by 29 U.S.C. §2101(a)(2) for at least fifty of Defendants' employees as well as thirty-three percent (33%) of Defendants' workforce at the Facilities, excluding "part-time employees," as that term is defined by 29 U.S.C. § 2101(a)(8).

121. The Plaintiffs and the Class Members were terminated by Defendants without cause on their part, as part of or as the reasonably foreseeable consequence of the mass layoffs or plant closings ordered by Defendants SCANA and Fluor, or SCANA and non-defendant WEC, at the VC Summer Facility.

122. The Plaintiffs and the Class Members are "affected employees" of Defendants, within the meaning of 29 U.S.C. § 2101(a)(5).

123. Defendants were required by the WARN Act to give the Plaintiffs and the Class Members at least 60 days advance written notice of their terminations.

124. Defendants failed to give the Plaintiffs and the Class members written notice that complied with the requirements of the WARN Act.

125. The Plaintiffs and each of the Class Members, are "aggrieved employees" of the Defendants as that term is defined in 29 U.S.C. § 2104(a)(7).

126. Defendants failed to pay the Plaintiffs and each of the Class Members their respective wages, salary, commissions, bonuses, accrued holiday pay and accrued vacation for 60 days following their respective terminations, and failed to make the pension and 401(k) contributions and provide employee benefits under COBRA for 60 days from and after the dates of their respective terminations.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiffs, individually and on behalf of all other similarly situated persons, pray for the following relief as against Defendants, jointly and severally:

A. Certification of this action as a class action;

B. Designation of Plaintiffs as Class Representatives of their respective subclasses;

C. Appointment of the undersigned attorneys as Class Counsel;

D. A judgment in favor of the Plaintiffs and the other similarly situated former employees equal to the sum of: their unpaid wages, salary, commissions, bonuses, accrued holiday pay, accrued vacation pay, pension and 401(k) contributions and other COBRA benefits, for 60 days, that would have been covered and paid under the then-applicable employee benefit plans had that coverage continued for that period, all determined in accordance with the WARN Act, 29 U.S.C. § 2104(a)(1)(A);

E. Reasonable attorneys' fees and the costs and disbursements that Plaintiffs will incur in prosecuting this action, as authorized by the federal WARN Act; and

F. Such other and further relief as this Court may deem just and proper.

DATED: October 25, 2017

Respectfully submitted,

By: s/ Lucy C. Sanders

Lucy C. Sanders, Esq.
**BLOODGOOD & SANDERS, LLC**
242 Mathis Ferry Road, Suite 201
Mt. Pleasant, South Carolina 29464
Telephone: (843) 972-0313

s/ Jack A. Raisner

Jack A. Raisner, Esq.
René S. Roupinian, Esq.
**OUTTEN & GOLDEN LLP**
685 Third Avenue, 25th Floor
New York, NY 10017
Telephone: (212) 245-1000

*Attorneys for Plaintiffs and the putative class*

**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF SOUTH CAROLINA**
**ROCK HILL DIVISION**

| | | |
|---|---|---|
| Lawrence Butler, Lakeisha Darwish, Darron Eigner, Jr., Bernard A. Johnson And Jimi Che Sutton,<br><br>Plaintiffs,<br><br>vs.<br><br>Fluor Corporation and Fluor Enterprises, Inc.<br><br>Defendants, | ) | CA No. 0:17-02201-JMC<br><br>**ANSWER AND SEPARATE DEFENSES OF DEFENDANTS FLUOR CORPORATION AND FLUOR ENTERPRISES, INC.** |

Defendants Fluor Corporation and Fluor Enterprises, Inc. ("Fluor")[1] hereby file their Answer and Separate Defenses to Plaintiffs' Complaint as follows:

1. Fluor admits that the five (5) named Plaintiffs were employees of Fluor Daniel Maintenance Services, Inc. at the VC Summer Location. Fluor denies the remaining allegations in Paragraph 1 of the Complaint.

2. Fluor admits that Plaintiffs bring this action as alleged in Paragraph 2 of the Complaint under the Worker Adjustment and Retraining Notification Act ("WARN Act"), 29

[1] Fluor states that the five (5) named Plaintiffs were employed at the VC Summer Location by Fluor Daniel Maintenance Services, Inc., a Fluor affiliated company. Defense counsel will agree to accept service of an amended summons and complaint or to substitution of the proper party-Defendant. Fluor further states that Plaintiffs Butler and Darwish are not proper Plaintiffs or class representatives because they did not suffer an "employment loss" and are not "affected employees" entitled to WARN Act notice or damages. They were recalled from layoff within a few weeks of the VC Summer Location closure ordered by SCE&G, the owner of that Location.

U.S.C. § 2102 *et seq*. Fluor denies that it violated the WARN Act and the remaining allegations in Paragraph 2 of the Complaint.

3. Fluor denies the allegations in Paragraph 3 of the Complaint.

4. Fluor admits that this named Plaintiff worked at the VC Summer Location until SCE&G's unexpected order halting all construction which resulted in Plaintiff's layoff on July 31, 2017. Fluor denies the remaining allegations in Paragraph 4 of the Complaint.

5. Fluor admits that this named Plaintiff worked at the VC Summer Location until SCE&G's unexpected order halting all construction which resulted in Plaintiff's layoff on July 31, 2017. Fluor denies the remaining allegations in Paragraph 5 of the Complaint.

6. Fluor admits that this named Plaintiff worked at the VC Summer Location until SCE&G's unexpected order halting all construction which resulted in Plaintiff's layoff on July 31, 2017. Fluor denies the remaining allegations in Paragraph 6 of the Complaint.

7. Fluor admits that this named Plaintiff worked at the VC Summer Location until SCE&G's unexpected order halting all construction which resulted in Plaintiff's layoff on July 31, 2017. Fluor denies the remaining allegations in Paragraph 7 of the Complaint.

8. Fluor admits that this named Plaintiff worked at the VC Summer Location until SCE&G's unexpected order halting all construction which resulted in Plaintiff's layoff on July 31, 2017. Fluor denies the remaining allegations in Paragraph 8 of the Complaint.

9. Fluor admits the allegations in Paragraph 9 of the Complaint.

10. Fluor admits the allegations in Paragraph 10 of the Complaint.

11. Fluor admits the allegations in Paragraph 11 of the Complaint.

12. Fluor denies the allegations in Paragraph 12 of the Complaint. Fluor further states that Plaintiff's state law claims have been dismissed with prejudice. [Doc. No. 15.]

13. Fluor admits that venue is proper in this Court. Fluor denies it committed any unlawful labor practices as alleged in the Complaint.

14. Fluor admits that Plaintiffs worked at the VC Summer Location until July 31, 2017. Fluor denies the remaining allegations in Paragraph 14 of the Complaint.

15. Fluor admits Plaintiffs seek to represent the workers defined in Paragraph 15 of the Complaint. Fluor denies that it violated the WARN Act and the remaining allegations in Paragraph 15 of the Complaint.

16. Fluor admits the allegations in Paragraph 16 of the Complaint.

17. Fluor denies the allegations in Paragraph 17 of the Complaint.

18. Fluor denies the allegations in Paragraph 18 of the Complaint.

19. Fluor denies the allegations in Paragraph 19 of the Complaint and further states that Plaintiffs have dismissed all state law claims with prejudice. [Doc. No. 15.]

20. Fluor denies the allegations in Paragraph 20 of the Complaint.

21. Fluor denies the allegations in Paragraph 21 of the Complaint.

22. Paragraph 22 of the Complaint requires no response. Fluor incorporates response numbers 1-21 above.

23. Fluor denies the allegations in Paragraph 23 of the Complaint.

24. Fluor admits that Plaintiffs bring this first claim under the WARN Act. Fluor denies

that it violated the WARN Act and the remaining allegations in Paragraph 24 of the Complaint.

25.    Fluor denies the allegations in Paragraph 25 of the Complaint.

26.    Fluor denies the allegations in Paragraph 26 of the Complaint.

27.    Fluor denies the allegations in Paragraph 27 of the Complaint.

28.    Fluor denies the allegations in Paragraph 28 of the Complaint.

29.    Fluor denies the allegations in Paragraph 29 of the Complaint.

30.    Fluor denies the allegations in Paragraph 30 of the Complaint.

31.    Fluor is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 31 of the Complaint and therefore denies those allegations.

32.    Fluor denies the allegations in Paragraph 32 of the Complaint.

33.    Fluor denies the allegations in Paragraph 33 of the Complaint.

34.    Fluor denies the allegations in Paragraph 34 of the Complaint.

35.    Fluor denies the allegations in Paragraph 35 of the Complaint.

36.    Paragraph 36 of the Complaint requires no response.  Fluor incorporates response numbers 1-35 above.

37.    Fluor admits the allegations in Paragraph 37 of the Complaint as to Fluor Enterprises, Inc. and denies the allegations as to Fluor Corporation.

38.    Fluor denies the allegations in Paragraph 38 of the Complaint.

39.    Fluor denies the allegations in Paragraph 39 of the Complaint.

40. Fluor denies the allegations in Paragraph 40 of the Complaint.

41. Fluor denies the allegations in Paragraph 41 of the Complaint.

42. Fluor denies the allegations in Paragraph 42 of the Complaint.

43. Fluor denies the allegations in Paragraph 43 of the Complaint.

44. Fluor denies the allegations in Paragraph 44 of the Complaint.

45. Fluor denies the allegations in Paragraph 45 of the Complaint.

46. Fluor denies the allegations in Paragraph 46 of the Complaint.

47. Paragraph 47 of the Complaint requires no response. Fluor incorporates response numbers 1-46 above.

48. Fluor denies the allegations in Paragraph 48 of the Complaint.

49. Fluor denies the allegations in Paragraph 49 of the Complaint.

50. Answering the "Prayer for relief" section in Plaintiffs' Complaint, Fluor denies that Plaintiffs are entitled to any of the relief requested, including but not limited to subparts A-G. Any allegation of the Complaint not specifically admitted is denied.

**SEPARATE DEFENSES**

1. The Complaint fails to state a claim upon which relief can be granted.

2. Fluor did not order a "plant closing" or "mass layoff" in violation of the WARN Act and, therefore, for this reason alone Fluor did not violate the WARN Act. *See* 29 U.S.C. § 2102(a).

3. The layoffs of Plaintiffs and other employees at the VC Summer Location were caused by business circumstances that were not reasonably foreseeable as of the time that any WARN Act notice might have been required and, therefore, for this reason alone Fluor did not violate the WARN Act. *See* 29 U.S.C. § 2102(b)(2)(A).

4. Plaintiff and other employees were hired with the understanding that their employment was limited to the duration of the project. Employees who worked at the project and who were laid off on or about July 31, 2017 were laid off at the completion of the VC Summer Location project as ordered by SCE&G. For this reason alone Fluor did not violate the WARN Act. *See* 29 U.S.C. § 2103(1).

5. WARN Act liability, if any is proven by Plaintiffs, is subject to reduction and offset pursuant to 29 U.S.C § 2104(2).

6. All acts or omissions in this matter were taken in good faith and based on reasonable grounds for believing that the WARN Act was not violated. Therefore, any WARN Act liability or damages sought should be eliminated or reduced. *See* 29 U.S.C. § 2104(4).

7. Plaintiffs' claims are barred to the extent they are brought outside any applicable statutes of limitations.

8. Defendant Fluor Corporation and Fluor Enterprises, Inc. are not proper party-Defendants. See footnote 1.

9. Plaintiffs' class action WARN Act claims should be dismissed based on the first-to-file rule. *See* Fluor's Motion to Dismiss, Doc. No. 17.

[SIGNATURES ON NEXT PAGE]

0:17-cv-02201-JMC Date Filed 10/30/17 Entry Number 32 Page 7 of 7

Respectfully submitted,

s/ J. Hagood Tighe

J. Hagood Tighe (FID 6506)
FISHER & PHILLIPS LLP
1320 Main Street, Suite 750
Columbia, South Carolina 29201
Phone: (803) 255-0000
Fax: (803) 255-0202
htighe@fisherphillips.com

Kathleen McLeod Caminiti
(Admitted *pro hac vice*)
FISHER & PHILLIPS LLP
430 Mountain Avenue, Suite 303
Murray Hill, NJ 07974
Phone: (908) 516-1062
Facsimile: (908) 516-1101
kcaminiti@fisherphillips.com

David R. Kresser
(Admitted *pro hac vice*)
FISHER & PHILLIPS LLP
1074 Peachtree Street, NE, Suite 3500
Atlanta, GA 30309
Phone: (404) 240-4221
dkresser@fisherphillips.com

*Attorneys for Defendants*

Dated this 30th day of October 2017.

**UNITED STATES DISTRICT COURT**
**DISTRICT OF SOUTH CAROLINA**
**ROCK HILL DIVISION**

| | | |
|---|---|---|
| HARRY PENNINGTON, III and TIMOTHY LORENTZ, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>FLUOR CORPORATION, FLUOR ENTERPRISES, INC., FLUOR DANIEL MAINTENANCE SERVICES, INC., SCANA CORPORATION, and SOUTH CAROLINA ELECTRIC & GAS COMPANY,<br><br>Defendants. | ) | Civil Action No. 0:17-cv-02094-JMC<br><br>THE FLUOR DEFENDANTS' ANSWER AND SEPARATE DEFENSES TO THE AMENDED CLASS ACTION COMPLAINT |

Defendants Fluor Corporation, Fluor Enterprises, Inc. and Fluor Daniel Maintenance Services, Inc. (collectively "Fluor") hereby file their Answer and Separate Defenses to Plaintiffs' Amended Class Action Complaint for Violation of WARN Act, 29 U.S.C. § 2101, *et seq.* ("Amended Complaint") (Dkt. No. 41). As an initial matter, Fluor states that the Amended Complaint violates the language and spirit of Rule 8, Fed.R.Civ.P., that requires a "short and plain statement" of the claim and grounds for the Court's jurisdiction. Plaintiffs' Amended Complaint contains 126 paragraphs and is 24 pages long. Fluor, however, answers each of the numbered paragraphs as follows:

1. Fluor admits that Plaintiff Pennington was an employee of Fluor Daniel Maintenance Services, Inc. and that he was laid off on or about July 31, 2017. Fluor denies the remaining allegations in Paragraph 1 of the Amended Complaint.

2. Fluor is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 2 of the Amended Complaint and therefore denies those allegations.

3. Fluor denies the allegations in Paragraph 3 of the Amended Complaint.

4. Fluor admits that Plaintiffs bring this action as alleged in Paragraph 4 of the Amended Complaint. Fluor denies that it violated the Worker Adjustment and Retraining Notification Act ("WARN Act"), 29 U.S.C. § 201, *et seq.* and denies the remaining allegations in Paragraph 4 of the Amended Complaint.

5. Paragraph 5 of the Amended Complaint calls for a legal conclusion. To the extent a response is required, Fluor denies the allegations in Paragraph 5 of the Amended Complaint.

6. Fluor denies the allegations in Paragraph 6 of the Amended Complaint.

7. Fluor is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 7 of the Amended Complaint and therefore denies those allegations.

8. Fluor admits that Plaintiffs seek to recover 60 days wages and benefits pursuant to the WARN Act from SCANA and that Plaintiff Pennington seeks such recovery jointly and severally against Fluor. Fluor denies that Plaintiffs and Plaintiff Pennington are entitled to any such recovery and denies the remaining allegations in Paragraph 8 of the Amended Complaint.

9. Fluor admits the allegations in Paragraph 9 of the Amended Complaint.

10. Fluor is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 10 of the Amended Complaint and therefore denies those allegations.

11. Fluor admits the allegations in Paragraph 11 of the Amended Complaint.

12. Fluor admits the allegations in Paragraph 12 of the Amended Complaint.

13. Fluor admits that assignment in the Rock Hill Division of this Court is appropriate. Fluor denies that any events or omissions give rise to a WARN Act claim in this case.

14. Fluor admits that Plaintiff Harry Pennington III was employed by Fluor Daniel Maintenance Services, Inc. at the VC Summer Project until his layoff on or about July 31, 2017. Fluor denies the remaining allegations in Paragraph 14 of the Amended Complaint.

15. Fluor is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 15 of the Amended Complaint and therefore denies those allegations.

16.     Fluor admits the allegations in Paragraph 16 of the Amended Complaint.

17.     Fluor denies the allegations in Paragraph 17 of the Amended Complaint.

18.     Fluor admits the allegations in Paragraph 18 of the Amended Complaint.

19.     Fluor denies the allegations in Paragraph 19 of the Amended Complaint.

20.     Upon information and belief, Fluor admits the allegations in Paragraph 20 of the Amended Complaint.

21.     Fluor is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 21 of the Amended Complaint and therefore denies those allegations.

22.     Fluor is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 22 of the Amended Complaint and therefore denies those allegations.

23.     Fluor denies the allegations in Paragraph 23 of the Amended Complaint.

24.     Fluor is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 24 of the Amended Complaint and therefore denies those allegations.

25.     Fluor denies that it was an owner of the VC Summer Project.  Fluor is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 25 of the Amended Complaint and therefore denies those allegations.

26.     Fluor is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 26 of the Amended Complaint and therefore denies those allegations.

27.     Fluor is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 27 of the Amended Complaint and therefore denies those allegations.

28.     Fluor is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 28 of the Amended Complaint and therefore denies those allegations.

29.     Fluor is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 29 of the Amended Complaint and therefore denies those allegations.

30.     Fluor is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 30 of the Amended Complaint and therefore denies those allegations.

31. Fluor is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 31 of the Amended Complaint and therefore denies those allegations.

32. Fluor is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 32 of the Amended Complaint and therefore denies those allegations.

33. Fluor is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 33 of the Amended Complaint and therefore denies those allegations.

34. Fluor is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 34 of the Amended Complaint and therefore denies those allegations.

35. Fluor is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 35 of the Amended Complaint and therefore denies those allegations.

36. Fluor is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 36 of the Amended Complaint and therefore denies those allegations.

37. Fluor admits that Fluor Daniel Maintenance Services, Inc. was a contractor at the VC Summer Project and employed craft employees on the Project. Fluor denies the remaining allegations in Paragraph 37 of the Amended Complaint.

38. Fluor admits the allegations in Paragraph 38 of the Amended Complaint.

39. Fluor is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 39 of the Amended Complaint and therefore denies those allegations.

40. Fluor is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 40 of the Amended Complaint and therefore denies those allegations.

41. Fluor admits that input was provided upon request regarding the ETC. Fluor is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 41 and therefore denies those allegations.

42. Fluor is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 42 of the Amended Complaint and therefore denies those allegations.

43. Fluor is without knowledge or information sufficient to form a belief as to the truth of the

allegations in Paragraph 43 of the Amended Complaint and therefore denies those allegations.

44.        Fluor is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 44 of the Amended Complaint and therefore denies those allegations.

45.        Upon information and belief, Fluor admits the allegations in Paragraph 45 of the Amended Complaint.

46.        Fluor is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 46 of the Amended Complaint and therefore denies those allegations.

47.        Fluor is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 47 of the Amended Complaint and therefore denies those allegations.

48.        Fluor denies the allegations in Paragraph 48 of the Amended Complaint.

49.        Fluor is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 49 of the Amended Complaint and therefore denies those allegations.

50.        Fluor denies the allegations in Paragraph 50 of the Amended Complaint.

51.        Fluor denies the allegations in Paragraph 51 of the Amended Complaint.

52.        Fluor admits that an agreement existed with WEC.  Fluor denies the remaining allegations in Paragraph 52 of the Amended Complaint.

53.        Fluor denies the allegations in Paragraph 53 of the Amended Complaint.

54.        Fluor admits that it was not "fully in charge of the project."  Fluor is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 54 of the Amended Complaint and therefore denies those allegations.

55.        Fluor denies the allegations in Paragraph 55 of the Amended Complaint.

56.        Fluor denies the allegations in Paragraph 56 of the Amended Complaint.

57.        Fluor admits that SCANA began directly reimbursing approved payroll.  Fluor is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 57 of the Amended Complaint and therefore denies those allegations.

58.        Fluor denies the allegations in Paragraph 58 of the Amended Complaint.

59.    Fluor denies the allegations in Paragraph 59 of the Amended Complaint.

60.    Fluor is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 60 of the Amended Complaint and therefore denies those allegations.

61.    Fluor denies the allegations in Paragraph 61 of the Amended Complaint.

62.    Fluor is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 62 of the Amended Complaint and therefore denies those allegations.

63.    Fluor denies the allegations in Paragraph 63 of the Amended Complaint.

64.    Fluor denies the allegations in Paragraph 64 of the Amended Complaint.

65.    Fluor denies the allegations in Paragraph 65 of the Amended Complaint.

66.    Fluor admits that Plan of the Day ("POD") meetings were typically held on weekday mornings and lasted about an hour.  Fluor denies the remaining allegations in Paragraph 66 of the Amended Complaint.

67.    Fluor admits the allegations in Paragraph 67 of the Amended Complaint.

68.    Fluor admits the allegations in Paragraph 68 of the Amended Complaint.

69.    Fluor denies the allegations in Paragraph 69 of the Amended Complaint.

70.    Fluor admits the allegations in Paragraph 70 of the Amended Complaint.

71.    Fluor admits that steps were taken to address and resolve issues regarding contractor obligations on the VC Summer Project.  Fluor denies the remaining allegations in Paragraph 71 of the Amended Complaint.

72.    Fluor denies the allegations in Paragraph 72 of the Amended Complaint.

73.    Fluor denies the allegations in Paragraph 73 of the Amended Complaint.

74.    Fluor denies the allegations in Paragraph 74 of the Amended Complaint.

75.    Fluor denies the allegations in Paragraph 75 of the Amended Complaint.

76.    Fluor denies the allegations in Paragraph 76 of the Amended Complaint.

77.    Fluor is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 77 of the Amended Complaint and therefore denies those allegations.

78. Fluor denies the allegations in Paragraph 78 of the Amended Complaint.

79. Fluor denies the allegations in Paragraph 79 of the Amended Complaint.

80. Fluor denies the allegations in Paragraph 80 of the Amended Complaint.

81. Fluor admits that SCANA asked that a manager be removed and that request was granted. Fluor denies the remaining allegations in Paragraph 81 of the Amended Complaint.

82. Fluor admits that Al Torres might call concerning a concrete placement schedule. Fluor denies the remaining allegations in Paragraph 82 of the Amended Complaint.

83. Fluor denies the allegations in Paragraph 83 of the Amended Complaint.

84. Fluor admits that SCANA directed the 2017 Memorial Day weekend be a three-day weekend. Fluor is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 84 of the Amended Complaint and therefore denies those allegations.

85. Fluor denies the allegations in Paragraph 85 of the Amended Complaint.

86. Fluor denies the allegations in Paragraph 86 of the Amended Complaint.

87. Fluor admits that all of the Fluor Daniel Maintenance Services, Inc. and Fluor Enterprises, Inc. employees at the VC Summer Project were dedicated solely to construction of the Project and that the construction work took place on SCANA's premises. Fluor is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 87 of the Amended Complaint and therefore denies those allegations.

88. Fluor denies the allegations in Paragraph 88 of the Amended Complaint.

89. Fluor is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 89 of the Amended Complaint and therefore denies those allegations.

90. Fluor is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 90 of the Amended Complaint and therefore denies those allegations.

91. Fluor denies the allegations in Paragraph 91 of the Amended Complaint.

92. Fluor denies the allegations in Paragraph 92 of the Amended Complaint.

93. Upon information and belief, Fluor admits the allegations in Paragraph 93 of the Amended

0:17-cv-02094-JMC    Date Filed 11/20/17    Entry Number 68    Page 8 of 11

Complaint.

94.     Upon information and belief, Fluor admits the allegations in Paragraph 94 of the Amended Complaint.

95.     Fluor admits that on July 31, 2017, SCE&G ordered that all construction on the VC Summer Project be halted immediately.  Fluor is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 95 of the Amended Complaint and therefore denies those allegations.

96.     Fluor Enterprises, Inc. and Fluor Daniel Maintenance Services, Inc. admit that they had no choice but to lay off employees at the VC Summer Project as a result of SCE&G's unexpected order to immediately halt all construction work at the Project.  Fluor is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 96 of the Amended Complaint and therefore denies those allegations.

97.     Fluor is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 97 of the Amended Complaint and therefore denies those allegations.

98.     Fluor is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 98 of the Amended Complaint and therefore denies those allegations.

99.     Fluor is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 99 of the Amended Complaint and therefore denies those allegations.

100.     Fluor admits that Plaintiff Pennington brings the First Claim for Relief as alleged in Paragraph 100 of the Amended Complaint.  Fluor denies that it violated the WARN Act and denies the remaining allegations in Paragraph 100 of the Amended Complaint.

101.     Fluor admits that Plaintiff Lorentz brings the Claim for Relief as alleged in Paragraph 101 of the Amended Complaint.  Fluor denies that it violated the WARN Act and denies the remaining allegations in Paragraph 101 of the Amended Complaint.

102.     Fluor denies the allegations in Paragraph 102 of the Amended Complaint.

103.     Fluor denies the allegations in Paragraph 103 of the Amended Complaint.

104.   Fluor Daniel Maintenance Services, Inc. admits that it possesses last known contact information for its employees laid off at the VC Summer Project on or about July 31, 2017. Fluor is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 104 of the Amended Complaint and therefore denies those allegations.

105.   Fluor Daniel Maintenance Services, Inc. admits that it possesses rate of pay and benefit information related to its employees laid off at the VC Summer Project on or about July 31, 2017. Fluor is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 105 of the Amended Complaint and therefore denies those allegations.

106.   Fluor denies the allegations in Paragraph 106 of the Amended Complaint.

107.   Fluor denies the allegations in Paragraph 107 of the Amended Complaint.

108.   Fluor denies the allegations in Paragraph 108 of the Amended Complaint.

109.   Fluor is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 109 of the Amended Complaint and therefore denies those allegations.

110.   Fluor Daniel Maintenance Services, Inc. admits that it laid off Plaintiff Pennington on or about July 31, 2017. Fluor denies the remaining allegations in Paragraph 110 of the Amended Complaint.

111.   Fluor is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 111 of the Amended Complaint and therefore denies those allegations.

112.   Fluor denies the allegations in Paragraph 112 of the Amended Complaint.

113.   Fluor denies the allegations in Paragraph 113 of the Amended Complaint.

114.   Fluor is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 114 of the Amended Complaint and therefore denies those allegations.

115.   Paragraph 115 of the Amended Complaint requires no response. Fluor incorporates response numbers 1 through 114 above.

116.   Fluor Enterprises, Inc. and Fluor Daniel Maintenance Services, Inc. admit that at all relevant times they employed more than 100 employees who in the aggregate worked at least 4,000 hours per week, exclusive of overtime. Fluor Corporation denies this allegation. Fluor is without knowledge or

0:17-cv-02094-JMC Date Filed 11/20/17 Entry Number 68 Page 10 of 11

information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 116 of the Amended Complaint and therefore denies those allegations.

117. Fluor Enterprises, Inc. and Fluor Daniel Maintenance Services, Inc. admit the allegations in Paragraph 117 of the Amended Complaint as to them. Fluor Corporation denies the allegations in Paragraph 117 of the Amended Complaint. Fluor is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 117 of the Amended Complaint and therefore denies those allegations.

118. Fluor denies the allegations in Paragraph 118 of the Amended Complaint.

119. Fluor denies the allegations in Paragraph 119 of the Amended Complaint.

120. Fluor denies the allegations in Paragraph 120 of the Amended Complaint.

121. Fluor denies the allegations in Paragraph 121 of the Amended Complaint.

122. Fluor denies the allegations in Paragraph 122 of the Amended Complaint.

123. Fluor denies the allegations in Paragraph 123 of the Amended Complaint.

124. Fluor denies the allegations in Paragraph 124 of the Amended Complaint.

125. Fluor denies the allegations in Paragraph 125 of the Amended Complaint.

126. Fluor denies the allegations in Paragraph 126 of the Amended Complaint.

127. Answering the "Prayer for Relief" section of the Amended Complaint, Fluor denies that Plaintiffs are entitled to any of the relief requested from Fluor, including subparts A-F. Any allegation of the Amended Complaint not specifically admitted is denied.

**SEPARATE DEFENSES**

1. The Amended Complaint fails to state a claim upon which relief can be granted.

2. Fluor did not order a "plant closing" or "mass layoff" in violation of the WARN Act and, therefore, for this reason alone Fluor did not violate the WARN Act. *See* 29 U.S.C. § 2102(a).

3. The layoffs of Plaintiff Pennington and other employees at the VC Summer Project were caused by business circumstances that were not reasonably foreseeable as of the time that any WARN Act notice might have been required and, therefore, for this reason alone Fluor did not violate the WARN Act.

*See* 29 U.S.C. § 2102(b)(2)(A).

4. Plaintiff Pennington and other employees were hired with the understanding that their employment was limited to the duration of the project. Employees who worked at the project and who were laid off on or about July 31, 2017 were laid off at the completion of the VC Summer Project as ordered by SCE&G. For this reason alone Fluor did not violate the WARN Act. *See* 29 U.S.C. § 2103(1).

5. WARN Act liability, if any is proven by Plaintiffs, is subject to reduction and offset pursuant to 29 U.S.C § 2104(2).

6. All acts or omissions in this matter were taken in good faith and based on reasonable grounds for believing that the WARN Act was not violated. Therefore, any WARN Act liability or damages sought should be eliminated or reduced. *See* 29 U.S.C. § 2104(4).

7. Plaintiffs' claims are barred to the extent they are brought outside any applicable statutes of limitations.

8. Defendant Fluor Corporation and Fluor Enterprises, Inc. are not proper party-Defendants to this action.

9. Fluor Corporation is not an employer as defined in the WARN Act.

Respectfully submitted,

s/ J. Hagood Tighe
J. Hagood Tighe (FID 6506)
htighe@fisherphillips.com
FISHER & PHILLIPS LLP
1320 Main Street, Suite 750
Columbia, South Carolina 29201
Phone: (803) 255-0000
Fax: (803) 255-0202

*Attorney for Defendants Fluor Corporation and Fluor Enterprises, Inc. and Fluor Daniel Maintenance Services, Inc.*

Dated this 20th day of November, 2017.

**UNITED STATES DISTRICT COURT**
**DISTRICT OF SOUTH CAROLINA**
**ROCK HILL DIVISION**

HARRY PENNINGTON III and TIMOTHY LORENTZ, on behalf of themselves and all others similarly situated,

Plaintiffs,

v.

FLUOR CORPORATION, FLUOR ENTERPRISES, INC., FLUOR DANIEL MAINTENANCE SERVICES, INC., SCANA CORPORATION, and SOUTH CAROLINA ELECTRIC & GAS COMPANY,

Defendants.

CASE NO. 0:17-02094-JMC

**PLAINTTIFFS' OPPOSITION TO DEFENDANTS SCANA CORPORATION'S AND SOUTH CAROLINA ELECTRIC AND GAS COMPANY'S MOTION TO DISMISS AND MEMORANDUM IN SUPPORT**

## TABLE OF CONTENTS

SUMMARY OF ARGUMENT .......... 1
PROCEDURAL HISTORY .......... 2
STATEMENT OF FACTS .......... 3
STANDARD OF REVIEW .......... 12
ARGUMENT .......... 12
I. The WARN Act's Joint- or Single Employment Standard. .......... 12
II. The Complaint States a Joint Employment Claim under the DOL Test. .......... 21
A. The Common Ownership Factor is Satisfied by the Allegations. .......... 21
B. De Facto Control is Established by the Allegations .......... 24
C. A Unity of Personnel Policies Existed in the Plant Closing Context. .......... 30
D. Dependency of Operations is Sufficiently Alleged. .......... 33
CONCLUSION .......... 35

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Administaff Companies, Inc. v. New York Joint Bd., Shirt & Leisurewear Div.*, 337 F.3d 454 (5th Cir. 2003) ....25, 27

*In re APA Transp. Corp. Consol. Litig.*, 541 F.3d 233 (3d Cir. 2008)....25, 33

*In re APA Transp. Corp. Consol. Litig.*, No. CIV. 02-3480 (GEB), 2006 WL 3534029 (D.N.J. Dec. 7, 2006), *aff'd in part, rev'd in part,* 541 F.3d 233 (3d Cir. 2008)....21

*Blough v. Voisard Mfg., Inc.*, No. 1:14 CV 263, 2015 WL 366934 (N.D. Ohio Jan. 27, 2015)....21, 33

*Coppola v. Bear Stearns & Co.*, 499 F.3d 144 (2d Cir. 2007)....16

*E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435 (4th Cir. 2011)....12

*Garner v. Behrman Bros. IV, LLC*, 260 F. Supp. 3d 369 (S.D.N.Y. 2017)....12

*Grimes v. Evergreen Recreational Vehicles, LLC*, No. 3:16-CV-472-TLS, 2016 WL 7188171 (N.D. Ind. Dec. 12, 2016)....20

*Guippone v. BH S & B Holdings LLC*, 737 F.3d 221 (2d Cir. 2013)....19, 27

*Hall v. DIRECTV, LLC*, 846 F.3d 757 (4th Cir. 2017)....19, 20

*Hampton v. Navigation Capital Partners, Inc.*, 64 F. Supp. 3d 622 (D. Del. 2014)....15

*Hiles v. Inoveris, LLC*, No. 2:09-CV-53, 2009 WL 3671007 (S.D. Ohio Nov. 4, 2009)....20

*Local Union 7107 v. Clinchfield Coal Co.*, 124 F.3d 639 (4th Cir. 1997)....21

*Long v. Dunlop Sports Grp. Americas, Inc.*, 506 F.3d 299 (4th Cir. 2007)....13

*Martin-Smith v. Ramcor Servs. Grp., Inc.*,
No. 2:10-CV-00403-PMP, 2012 WL 4472036 (D. Nev. Sept. 25, 2012) ..............................32

*McKinney v. Carlton Manor Nursing & Rehab. Ctr., Inc.*,
868 F.3d 461 (6th Cir. 2017) ..........................................................................13, 25

*Local 2-1971 of Pace Int'l Union v. Cooper*,
364 F. Supp. 2d 546 (W.D.N.C. 2005) ........................................................16, 17, 21

*Pearson v. Component Tech. Corp.*,
247 F.3d 471 (3d Cir. 2001)........................................................................... *passim*

*Realty Agency, Inc. v. Weaver*,
186 N.Y.S.2d 428 (1st Dep't) *rev'd and remanded*, 164 N.E.2d 837 (1959).........................17

*Revolutions Med. Corp. v. Strategic Prod. Dev., Inc.*,
No. 2:12-CV-2793-RMG, 2013 WL 12156812 (D.S.C. Jan. 4, 2013)..................................35

*Reyes v. Remington Hybrid Seed Co.*,
495 F.3d 403 (7th Cir. 2007) ..................................................................................19

*Salinas v. Commercial Interiors, Inc.*,
848 F.3d 125 (4th Cir. 2017) ........................................................................... *passim*

*In re Shelby Yarn Co.*,
306 B.R. 523 (W.D.N.C. 2004) ....................................................................... *passim*

*Sides v. Macon Cty. Greyhound Park, Inc.*,
725 F.3d 1276 (11th Cir. 2013) ..............................................................................14

*In re Tweeter OPCO, LLC.*,
453 B.R. 534 (Bankr. D. Del. 2011) .........................................................................23

*United Paperworkers International Union v. Alden Corrugated Container Corp.*,
901 F. Supp. 426 (D. Mass. 1995) ..........................................................................17

*Vogt v. Greenmarine Holding, LLC*,
318 F. Supp. 2d 136 (S.D.N.Y. 2004).................................................................27, 30

*Washington v. Aircap Indus. Corp.*,
831 F. Supp. 1292 (D.S.C. 1993)...............................................................................21

**Statutes**

29 U.S.C. § 2101(a) ...................................................................................................14

29 U.S.C. § 2101(a)(2)..................................................................................................13

29 U.S.C. § 2102(a) ...................................................................................................13

29 U.S.C. § 203(g) .....19

29 U.S.C. § 2104(a)(1).....25, 26

Fair Labor Standards Act (FLSA)..... *passim*

Family and Medical Leave Act .....18

Worker Adjustment and Retraining Notification Act, 29 U.S.C. § 2101 *et seq.* ..... *passim*

**Other Authorities**

*Affiliated Corporation Liability Under the WARN Act,*
52 Rutgers L. Rev. 495, 495–96 (2000).....12

20 C.F.R. § 639.1 .....13

20 C.F.R. § 639.3 .....14, 22

20 C.F.R. § 639.3(a)(2) .....15, 35

20 C.F.R. § 639.3(e).....31

29 C.F.R. § 791.2(a).....15

54 Fed. Reg. 16042-01 .....14, 16, 18, 30

Fed. R. Civ. P. 12(b)(6).....3, 12

Fed. R. Civ. P. 12(c) .....3

*WARN's Place in the FLSA /Employment Discrimination Dichotomy: Why A Warning Cannot Be Waived,*
27 Cardozo L. Rev. 2929, 2957–60 (2006) .....13, 18

## SUMMARY OF ARGUMENT

SCANA Corporation ("SCANA") and South Carolina Electric and Gas Company ("SCE&G," which hereafter is referred to with SCANA Corporation as "SCANA") brought in thousands of workers to build more nuclear reactors at SCANA's V.C. Summer site. Most of the employees came through contractors, others were SCANA's own. SCANA stopped them all from working without notice. In moving to dismiss the contract workers' WARN Act Complaint against it, SCANA primarily relies on misstatements of the law and omission of the relevant allegations in the Complaint.

SCANA's main contention is that Plaintiff *must* allege that it is an owner of Westinghouse and Fluor in order for it to be their joint employer under the WARN Act. But, the WARN Act and its regulations do not limit joint employers to parents. Ownership is among the least important factors in the balancing test for joint employment. Indeed, the first words of the Department of Labor ("DOL's") rule are "independent contractors." The rule treats contracting parties that are not sufficiently separate as potential joint employers – as every court to address the issue appears to have recognized. SCANA's textual arguments are refuted by the very sources it cites. SCANA creates convenient shortcuts and rules of thumb that are found nowhere in the law. More importantly, SCANA never addresses the Complaint's main allegations.

The Complaint describes what was initially a blurry employment relationship. For a long time it was unclear who was in charge of construction at the V.C. Summer ("Summer" or "Summer Project") nuclear reactor site. Westinghouse was the general contractor and Fluor a subcontractor. SCANA was the owner and operator of the site. SCANA assigned to the construction hundreds of its own employees, mainly to shadow those brought in through contractors. Months prior to the shutdown, Westinghouse filed for bankruptcy which diminished

its financial responsibility and control. SCANA assumed complete, owner-directed control over the construction, culminating in its order that all employees stop work and leave the site.

SCANA offers no meaningful explanation as to why the Complaint's detailed allegations about its control over the project and decision to halt it do not raise an inference that SCANA was a joint employer of the thousands of employees it had brought in to work, paid, and then stopped from working. These plant-closing allegations state a joint employer claim under the WARN Act.

It is true that this is a case of first impression in several respects, but in others it is not unique at all. The Fourth Circuit has not addressed the WARN Act's joint employer rule. The Summer Project was the first nuclear reactor construction project since the WARN Act was passed in 1988. No reported case grapples with a dysfunctional relationship like this one. Nevertheless, as in other WARN Act cases, employees have been harmed due to no fault of their own. Here, thousands of employees were left jobless without any warning.

The Department of Labor's WARN regulations invite courts to draw on applicable joint employer principles from other statutes such as the Fair Labor Standards Act. Whether this Court analyzes the Complaint using the conventional WARN five-factor test alone, or in harmony with the Fourth Circuit's joint employment principles, it will find the Complaint well-founded and its allegations sufficient to state a claim against SCANA and SCE&G.

**PROCEDURAL HISTORY**

Plaintiff Harry Pennington III, filed his original Complaint on August 8, 2017, seeking recovery against Defendants Fluor Corporation, Fluor Enterprises, Inc., and SCANA for violations of the WARN Act. (ECF No. 1). SCANA filed its Answer on September 13, 2017

(ECF No. 9), and Defendants Fluor Corporation and Fluor Enterprises, Inc., filed their Answer and Separate Defenses on October 4, 2017 (ECF No. 22).

On October 12, 2017, SCANA filed a Motion for Judgment on the Pleadings, under Fed. R. Civ. P. 12(c). On October 25, 2017, Plaintiff filed an Amended Complaint which added Plaintiff Timothy Lorentz and two defendants, Fluor Daniel Maintenance Services, Inc., and SCE&G as well as substantial new allegations regarding SCANA. (ECF No. 41). On December 4, 2017, SCANA and SCE&G filed the instant Motion to Dismiss under Fed. R. Civ. P. 12(b)(6).

**STATEMENT OF FACTS**

In 2008, SCANA Corporation, for itself and as agent for Santee Cooper, entered into an agreement with a consortium (the "Consortium") comprising Westinghouse Electric Company, LLC ("WEC") and Chicago Bridge & Iron Company ("CB&I")—the owner of Stone & Webster ("S&W"). The parties entered into an *Engineering, Procurement, and Construction Agreement* in May 2008 (the "EPC Agreement") under which the Consortium would build the Summer Project, featuring two AP-1000 nuclear reactors known as VC Summer 2 and 3. (ECF No. 41 (Amended Complaint) ¶ 31). The Summer Project, along with a comparable agreement to build similar reactors in Georgia, represented the first new nuclear power plant construction in the U.S. in 30 years. (*Id.* ¶ 32).

Although WEC remained the primary contractor to SCANA, a new subcontractor was appointed to WEC, Fluor Corporation, a U.S.-based global engineering and construction company. Fluor would provide staffing for craft (manual labor) employees and would take primary responsibility for on-site construction while WEC focused on engineering and project management. WEC transferred to Fluor many of the S&W craft employees it had acquired. (*Id.*

¶ 37). Fluor took responsibility for the craft, field engineers, and project controls personnel including the costs and scheduling of personnel. (*Id.* ¶ 38).

In acquiring S&W, Westinghouse generally accepted liability for the cost overruns on the Summer Project, by agreeing to build it for a "fixed-price" at SCANA's option. (*Id.* ¶ 39). In May 2016, SCANA exercised that option, ostensibly capping the Owners' (including SCANA's) costs for the Summer Project at close to $14 billion. (*Id.* ¶ 40). Learning of this, WEC's parent Toshiba and WEC determined WEC could not sustain these costs under the fixed price agreement. (*Id.* ¶ 43).

In early 2017, WEC experienced cash shortfalls related to the Summer Project and a deepening liquidity crisis. Although WEC sought additional emergency funding from its parent, Toshiba, in March 2017, Toshiba stated it could not provide it without collateral, including potentially through debtor-in-possession funding in a chapter 11 reorganization process, which WEC then initiated. (*Id.* ¶ 44). On March 29, 2017, WEC and its subsidiaries filed their voluntary petitions for relief under Chapter 11 of Title 11 of the United States Bankruptcy Code in the Southern District of New York. (*Id.* ¶ 45).

With its bankruptcy filing of March 29, 2017, the WEC debtors had the possibility of rejecting the fixed price provision of the contract. To forestall the rejection decision, the parties agreed to an Interim Assessment period in which SCANA would fund the operational costs of the Summer Project until alternatives for completing it were developed. (*Id.* ¶ 46). SCANA used the Interim Assessment period (which was extended until August 10, 2017) to determine if it were feasible for it to complete the project using an owner-directed model. (*Id.* ¶ 47). Under that model, SCANA began to take complete control over the manufacture and construction of the Summer Project. (*Id.* ¶ 48). SCANA operationalized the owner-directed model as of March 29,

2017 because, on information and belief, the Summer Project failed due to, in large measure deficiencies in the "client-contractor model" for construction that SCANA adopted in launching the Summer Project. (*Id.* ¶ 49). Under the "client-contractor" model, there were two separate, parallel hierarchies of managers attempting to direct the Summer Project. (*Id.* ¶ 50).

On the one hand SCANA had its own pyramid-shaped workforce structure consisting of its general manager of nuclear construction atop dozens of its own employees reporting up to him who oversaw every facet of the on–site construction. (*Id.* ¶ 51). On the other hand, WEC, the primary contractor together with its subsidiaries and its main subcontractor, Defendant Fluor, maintained a pyramidal hierarchy headed by a WEC product director and Fluor construction director, with hundreds of managers and thousands of craft workers reporting to them. (*Id.* ¶ 52).

Given the independent hierarchies, no entity or person filled the functional role of a Chief Executive Officer for the whole project to whom all supervisory lines reported. (*Id.* ¶ 53).

As a result of the separate structures, neither Fluor, WEC, or SCANA was ever fully in charge of the project. (*Id.* ¶ 54). No entity was fully accountable for the cost under this structure. SCANA could pass its responsibility to rate-payers under the BLRA and then it passed all future accountability to WEC under the fixed price contract. (*Id.* ¶ 55). After the bankruptcy filing, SCANA became financially accountable for the ongoing costs and plan of completion. With WEC sidelined under bankruptcy court protection, SCANA recognized it needed to immediately take full charge of the project to make it appear viable. (*Id.* ¶ 56).

Until the petition was filed, WEC laid out the construction costs, with SCANA periodically reimbursing only a fraction of those amounts. Now SCANA was responsible for paying the large payroll of thousands of craft employees. Side-stepping WEC and the prior

hierarchies, SCANA began paying Fluor's payroll directly to Fluor. (*Id.* ¶ 57). As a result of its becoming responsible for all the costs of completing the project, SCANA made clear it had veto power over any decision that might add cost or cause delay to the Summer Project, and began to exercise that prerogative. (*Id.* ¶ 58). SCANA's assumption of control over construction at the site on a decision-by-decision basis was tied to its complete overhaul and restructuring of the "client" based model to the "owner-directed" model. SCANA articulated this restructuring in open discussions with Fluor and WEC, and in writing. (*Id.* ¶ 59).

Upon the bankruptcy filing, SCANA became responsible for completing the unfinished ETC roadmap for the completion of the project. SCANA redrafted the ETC to spell out the new single hierarchy in which it assumed complete control over all significant decisions made from the ground-level up on the construction site. (*Id.* ¶ 60). SCANA, in the ETC, reassigned Fluor and WEC employees in a line of supervision interspersed with SCANA's own managers to whom Fluor and WEC employees would report at various levels. SCANA created organization charts to reflect the structure. (*Id.* ¶ 61).

Not waiting for the ETC to be formally promulgated, SCANA began taking ownership of operational decision-making to give effect to the owner-directed model. (*Id.* ¶ 62). Until the bankruptcy filing, SCANA's general manager and cadre of overseers, many of whom were subject matter specialists and had even worked for Fluor or WEC at the Summer Project, oversaw the work of Fluor and WEC. (*Id.* ¶ 63).

SCANA's ground-level overseers attended all significant construction events, such as crane lifts and major concrete placements, and they attended the continual meetings across the site that took place throughout the day between Fluor and WEC and their respective crews dealing with the operational nuts-and-bolts of the constructions tasks. (*Id.* ¶ 64). Prior to the

bankruptcy filing, SCANA's overseers normally kept silent at these events and meetings; instead, they made notes and sent messages up the SCANA reporting chain. (*Id.* ¶ 65). These messages might then be discussed when SCANA's top project directors interfaced with their counterparts at Fluor and WEC at the daily Plan of the Day ("POD") meeting.

The POD meeting was held weekday mornings at 9 a.m. and lasted about an hour. (*Id.* ¶ 66). POD meetings were typically attended by SCANA's top operational officers. (*Id.* ¶ 67).

The SCANA, Fluor and WEC leaders would typically attend the POD meetings along with nine or 10 of their second-tier managers so that the conference room would fill with about 30-40 people. Plaintiff Lorentz attended many POD meetings with his WEC supervisors, Churchman and Cavalieri. (*Id.* ¶ 68). The purpose of the POD meetings prior to the bankruptcy was for Fluor/WEC to inform SCANA of what they planned to do and to invite comments, consistent with client– contractor relationship. The parties dialoged about any issues that had "bubbled up" from their respective phalanxes of managers in the field, consistent with Fluor/ WEC's correction action processes and procedures. It was understood that Fluor/WEC had control over the manner and means in which the construction work was done and over their own personnel. (*Id.* ¶ 69).

Prior to the bankruptcy, SCANA could, as client, flag discrepancies or mistakes such as a bad weld, and file a condition report seeking corrective action. (*Id.* ¶ 70). Consistent with their own correction action processes and procedures, Fluor/WEC would address and resolve those issues. It was understood that Fluor/WEC had control over the manner and means in which the construction was performed in the first instance. While SCANA raised issues in its role as client, Fluor/WEC controlled the decision to take corrective actions. (*Id.* ¶ 71).

That changed after the bankruptcy filing. SCANA became outspoken and forceful at the POD meetings. For the first time, SCANA's input into day-to-day operations became proactive, intrusive, and decisional, in keeping with its assumption of CEO-type control and leadership. (*Id.* ¶ 72). After the bankruptcy, SCANA field monitors, who had previously been silent, became vocal in directing Fluor/WEC personnel. If a SCANA overseer expressed disagreement with how Fluor/WEC was performing a task, such as using a piece of equipment, SCANA overseers could and often would say so on the spot, and it was taken as a directive. (*Id.* ¶ 73).

Fluor/WEC personnel reasonably understood that the SCANA overseer's disagreement, if not complied with, would immediately go upstream to SCANA's project director, Al Torres who would demand action from his Fluor or WEC counterparts, such as Carl Churchman or Bruce Hinkley, either at the next morning's POD meeting or in a call or message, who would then require compliance from the crew. (*Id.* ¶ 74).

After March 29, SCANA gave specific orders and directions concerning virtually all facets of the project, including construction, and safety – particularly concerning anything that would cause a delay or add cost. (*Id.* ¶ 75). Prior to the bankruptcy filing, Fluor or WEC set the levels of craft personnel needed to perform assignments. If more workers were needed in Fluor's or WEC's view, they had the authority to set headcount levels and engage in hiring. Afterwards, that authority ended. New hires had to be requisitioned from and approved by SCANA. (*Id.* ¶ 76).

Pre-bankruptcy filing, WEC identified certain jobs requiring highly- skilled employees and had the right to hire them of its own accord. For example, WEC engaged about 120 specialists to work on the Nuclear Steam Supply System – the heart of the reactor's generator –

by entering into a contract with Bechtel. Afterwards, SCANA, however, decided against it and terminated the agreement forcing WEC to let go the 120 individuals. (Id. ¶ 77).

SCANA's subordination of Fluor's and WEC's independence and autonomy in hiring and procurement was consistent with new ETC organization charts showing changes to the duties, titles, authority, and assignments of Fluor and WEC personnel. (*Id.* ¶ 78). Under the ETC, Fluor was made construction manager reporting directly to SCANA, taking the place of WEC and its subsidiaries. (*Id.* ¶ 79). Afterwards, if Fluor or WEC needed several dozen employees, for example boilermakers, the decision, which they had once tightly-held, now had to be approved by SCANA. (*Id.* ¶ 80). Upon information and belief, SCANA prevailed on Fluor to remove one of its managers over the construction site. When Fluor sought to replace the person by hiring a WEC manager, Fluor had to, and did seek prior approval from SCANA. (*Id.* ¶ 81).

Taking control of operations after the bankruptcy, SCANA prospectively intervened in controlling the work. If Fluor or WEC wished to perform a particular task, such as a major concrete placement on a Friday or Saturday, Al Torres might call them and tell them not to do so, and say he wanted it done on a different day, such as a Thursday or Monday, which they would then do. (*Id.* ¶ 82). Prior to the bankruptcy, the Project Management Office maintained by WEC approved all overtime for the entire site. Afterwards, SCANA took away that authority from WEC, and WEC and Fluor employees had to go directly to SCANA which decided when they worked overtime and for how many hours. Thus, SCANA exercised control over their job schedules, duties, and performance. (*Id.* ¶ 83).

SCANA's control over work schedules extended to policies for days off. SCANA directed that the Memorial Day weekend would be treated as a three-day weekend, but that the following Saturday would be a work day – a type of decision formerly left to WEC. (*Id.* ¶ 84).

At all times, SCANA provided the facilities, equipment, tools, and materials necessary to complete the work. Although Fluor and WEC personnel manned the equipment room, the construction helmets, vests and other safety gear and protective clothing that were dispensed were paid for by SCANA. Requisitions for the equipment were sent to and paid for by SCANA. (*Id.* ¶ 85). Heavy construction equipment, which was generally rented, was paid for by SCANA. (*Id.* ¶ 86). The construction work took place on SCANA's premises where hundreds of SCANA's own employees worked. Some operated the pre-existing nuclear reactor, V.C. Summer 1, but others were dedicated to building reactors 2 and 3. All of WEC's and Fluor's on-site employees were dedicated to the building of the Summer Project. (*Id.* ¶ 87).

Besides micro-managing schedules and controlling the manner and means of discrete construction tasks after the bankruptcy filing, SCANA was rearranging the priorities for the project's critical path toward completion which formerly had been in the bailiwick of WEC/ Fluor. SCANA thus obliterated the functional independence of the Fluor and WEC contractors and took control over the work and workforce. (*Id.* ¶ 88).

Although SCANA began implementing its owner-directed model after the bankruptcy, no one stepped forward to help fund it. (*Id.* ¶ 89). On information and belief, under the EPC Agreement, Santee Cooper could not remove itself from the Summer Project, however, until a designated point in time. With the bankruptcy of Westinghouse and the Interim Assessment period expiring, however, that exit point was calendared. As expected, when that point arrived in late July 2017, Santee Cooper took the opportunity to withdraw its 40 percent ownership from the project, which foreseeably doomed it. (*Id.* ¶ 90). As SCANA recognized from at least March 2017, mass layoffs and shutdowns were almost inevitable at the Summer Project in mid-summer. They were demanded by the three most-likely options (out of the four) SCANA faced.

While it may have been possible to find funding to replace WEC/Toshiba, and continue to build both Units 2 and 3, SCANA knew realistically that it was more probable that either: 1) only Unit 2 would go forward; or 2) Unit 3 would also go forward, but only after a long delay (requiring a shut down or layoff); or 3) neither would go forward (requiring a total shutdown). (*Id.* ¶ 91). Given the greater probability of those options, SCANA and any other responsible party would have recognized the need to give notice 60 days prior to implementing those options. (*Id.* ¶ 92).

On July 31, 2017, SCANA sent a WARN Act notice to the South Carolina Department of Employment and Workforce that it "had decided to stop work on the construction of both Units." (*Id.* ¶ 93). SCANA stated that its "complete termination of the construction project will affect 617 SCE&G employees," none of whom it chose to terminate at that point. (*Id.* ¶ 94). On that day, SCE&G informed Fluor and Westinghouse of its decision to abandon the project. SCE&G asked them to cease all work on the project immediately. SCANA suddenly stopped paying the cost of employing over 5,000 employees on the site. (*Id.* ¶ 95).

In the four months leading to that day, the contractors obeyed SCANA's order to stop work and terminated the employees. SCANA controlled the decision to terminate all the employees on the site without advance notice. (*Id.* ¶ 96). SCANA had the ability to comply with the WARN Act by letting it be known 60 days prior to July 31, 2017 that unless the continuance of both reactors was deemed feasible at the end of the Interim Assessment period, a mass layoff would occur. Alternatively, it could have postponed notice until the shutdown decision was made, then given full notice for terminations in an orderly site wind-down under SCANA's wind-down budget. (*Id.* ¶ 97).

The day after the shutdown, SCE&G acknowledged at the August 1 ex parte briefing before the Public Service Commission of South Carolina, that its evaluation team "arrived at

substantial completion dates for Unit 2 of December 31, 2022, and for Unit 3 of March 31, 2024 [and] forecast the further cost of completion of the units of approximately $8.8 billion." (*Id.* ¶ 98). There, SCE&G acknowledged it was responsible for the operational costs that its owner-directed model incurred: "when we learned that Westinghouse intended to reject our fixed-price contract, our first objective was to determine if it was feasible to complete the project using an owner-directed model and what it would cost for us to do so." (*Id.* ¶ 99).

## STANDARD OF REVIEW

"When ruling on a Rule 12(b)(6) motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint and draw all reasonable inferences in favor of the plaintiff. To survive the motion, a complaint must contain sufficient facts to state a claim that is plausible on its face. Nevertheless, a complaint need only give the defendant fair notice of what the claim is and the grounds upon which it rests." *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.,* 637 F.3d 435, 440 (4th Cir. 2011) (internal citations and quotation marks omitted).

## ARGUMENT

### I. The WARN Act's Joint- or Single Employment Standard.

The WARN Act "was enacted in the wake of numerous plant closings in the 1970s and 1980s, in order to soften the blow of job loss to workers and their families by providing some advance notice to allow for transition time to different employment." *Garner v. Behrman Bros. IV, LLC*, 260 F. Supp. 3d 369, 375–76 (S.D.N.Y. 2017). In passing the WARN Act, Congress "placed no restrictions on an employer's ability to shut down its business." The Act merely creates a minimum labor standard requiring *notice* of plant closings. *Affiliated Corporation Liability Under the Warn Act,* 52 Rutgers L. Rev. 495, 495–96 (2000). An employer can satisfy WARN by sending employees a cost-free email.

Congress found the lack of such notice has a deleterious impact on workers' and their families' health and economic well-being and causes their communities and society harm as well. *See WARN's Place in the FLSA / Employment Discrimination Dichotomy: Why A Warning Cannot Be Waived,* 27 Cardozo L. Rev. 2929, 2957–60 (2006). Providing workers a minimum transition period, however, gives them "time to adjust to the prospective loss of employment, to seek and obtain alternative jobs and, if necessary, to enter skill training or retraining that will allow these workers to successfully compete in the job market." 20 C.F.R. § 639.1.

Congress thus mandated that "[a]n employer shall not order a plant closing or mass layoff until the end of a 60–day period after the employer serves written notice of such an order." 29 U.S.C. § 2102(a). The Act defines a "plant closing" as a "shutdown" that "results in an employment loss ... for 50 or more employees." 29 U.S.C. § 2101(a)(2); *Long v. Dunlop Sports Grp. Americas, Inc.*, 506 F.3d 299, 301 (4th Cir. 2007).

Defendant SCANA does not deny it was an employer and that it ordered a plant closing when it terminated the Summer Project – it contends only that it did not employ the Plaintiffs and similarly situated workers who were directly employed by Westinghouse and Fluor for WARN purposes.

Seeking WARN damages from SCANA makes "considerable sense" because SCANA, as the employer that ordered the plant closing, was the employer in the best position to warn employees about the closing. *See McKinney v. Carlton Manor Nursing & Rehab. Ctr., Inc.*, 868 F.3d 461, 463 (6th Cir. 2017) ("The entity in the best position to warn employees about a closing is the employer, who runs the company and who decides to close it."). The WARN Act, as interpreted by the Department of Labor ("DOL") in binding regulations, requires notice from joint or single employers to those employees who will be terminated based on their direction.

"Employer," as defined in WARN is a "business enterprise" that "employs" a requisite number of employees. 29 U.S.C. § 2101(a). Although Congress did not provide more detail, it instructed the DOL to provide interpretive regulations. Those regulations were promulgated with notice and comment, and have been accorded deference. *Sides v. Macon Cty. Greyhound Park, Inc.*, 725 F.3d 1276, 1284 (11th Cir. 2013) ("Where there is statutory ambiguity we defer to the interpretation of the WARN Act by the agency charged with its implementation, the Department of Labor.").

The WARN Regulation interprets "employer" to include an entity affiliated with the nominal or immediate employer. It states that "employer" may include a parent or independent contractor. Joint employment, then, depends on whether the entities are "separate" which turns on their degree of independence. The rule, at 20 C.F.R. § 639.3, provides that

> Under existing legal rules, independent contractors and subsidiaries which are wholly or partially owned by a parent company are treated as separate employers or as a part of the parent or contracting company depending upon the degree of their independence from the parent.

The DOL accorded further meaning to "separate," by integrating the understanding of that term developed in other joint employment jurisprudence. In its WARN guidance, the DOL stated that "[t]o the extent that existing law recognizes the joint employer doctrine or the special situation of the garment industry, nothing in the [WARN] regulation prevents application of that law." 54 Fed. Reg. 16042-01, at 16045.

The DOL thus advised that it was not intending to create a special definition to determine whether related entities are separate for WARN purposes. As guideposts, the DOL referenced the Fair Labor Standards Act (FLSA) and similar standards. "[T]he definition is intended only to summarize existing law that has developed under State Corporations laws and such statutes as

the NLRA, the Fair Labor Standards Act (FLSA) and the Employee Retirement Income Security Act (ERISA)." *Id*.

The DOL thus dispelled the notion that it set out to "create new law in this area[,] especially for WARN purposes[,] when relevant concepts of State and federal law adequately cover the issue." Its WARN joint employer rule makes "no change … in the definition [and]… is not intended to foreclose any application of existing [case] law or to identify the source of legal authority for making determinations on whether related entities are separate." *Id*.

In its FLSA standard, the DOL contrasts "joint employment" with "separate employment." Separate employment exists when "all the relevant facts establish that two or more employers are acting entirely independently of each other and are completely disassociated with respect to the" individual's employment. *Id.* "Joint employment" exists when "employment by one employer is not completely disassociated from employment by the other employer(s)." 29 C.F.R. § 791.2(a).

At first glance, the DOL WARN Regulation appears to have simplified the "separate employers" issue by furnishing a five-factor test. That test states that "[s]ome of the factors to be considered in making this determination are (i) common ownership, (ii) common directors and/or officers, (iii) de facto exercise of control, (iv) unity of personnel policies emanating from a common source, and (v) the dependency of operations." 20 C.F.R. § 639.3(a)(2). But, these factors "are meant as a nonexhaustive list" so as to allow courts to "[exercise] the flexibility that this area of law requires." *Pearson v. Component Tech. Corp.,* 247 F.3d 471, 491 (3d Cir. 2001); *Hampton v. Navigation Capital Partners, Inc.*, 64 F. Supp. 3d 622, 627 (D. Del. 2014).

These terse, generic factors have required much supplementation when applied to the wide variety of multi-employer arrangements that have generated WARN events. When lenders

have caused shutdowns by recouping their collateral, courts have set forth reasons for protecting them and insisted on a high degree of integration known as entanglement – a "lender can become so entangled with its borrower's affairs so as to engender WARN Act liability." *Pearson*, 247 F.3d at 491–92 (citing *Adams v. Erwin Weller Co.*, 87 F.3d 269, 271 (8th Cir.1996)); *Coppola v. Bear Stearns & Co.*, 499 F.3d 144, 148 (2d Cir. 2007) (indicating same). SCANA attempts to cloak itself in this level of protection in the opening paragraph its brief, but never explains why it should be treated so favorably. (ECF No. 69 at 3). On the other hand, where one person was the driving force behind a web of financially dependent companies, the Court refused to strike the claims that he be personally liable as a single employer with the companies. *Local 2-1971 of Pace Int'l Union v. Cooper*, 364 F. Supp. 2d 546, 565 (W.D.N.C. 2005). Of course, Plaintiffs do not seek to impose personal liability. But, SCANA was not a mere lender, it was the owner of the project, and the facts demonstrate entanglement, particularly when the entire employment is considered including the final 60 days when notice was required and SCANA was in full control.

The DOL "guidance" flatly rejected employers' reliance on handy, manipulatable indicia to establish themselves as a separate employer such as having separate payroll systems, or holding oneself out to the public as separate. *See* 54 Fed. Reg. 16042-01, 16,045. Yet, throughout SCANA's brief it attempts to rely on such indicia as determinative of the relationship, all while ignoring the weight of the allegations in the Complaint. For example, SCANA contends that its separate payroll processing (something it left to contractors) is so important that overlooking separate payroll processing will subject every client of an independent contractor to WARN liability. (ECF No. 69 at 14).

Instead of such indicia, the DOL guides courts to focus on all the "circumstances of the case" to see if they are "marked by an absence of an "arms length relationship found among

unintegrated companies." *United Paperworkers International Union v. Alden Corrugated Container Corp*., 901 F. Supp. 426, 438 (D. Mass. 1995); *Pearson,* 247 F.3d at 495–96 ("The question of whether entities constitute a "single employer" for WARN Act purposes "is ultimately an inquiry into whether ... two nominally separate entities operated at arm's length" or whether, following an "assessment of the amount of control" exercised by one entity over another, there is deemed to exist "functional integration"); *In re Shelby Yarn Co.,* 306 B.R. 523, 539 (W.D.N.C. 2004) ("evidence was sufficient to raise the general question whether Ward and ADS truly were 'separate employers' dealing with each other at arm's length.")[1]

In the Fourth Circuit, the Court of Appeals has not decided a WARN claim involving multiple employers. Two District Courts on summary judgment have denied a parent or grandparent's claim to being separate from its operating entity. *In re Shelby Yarn Co.,* 306 B.R. at 538; *Local 2-1971 of Pace Int'l Union v. Cooper*, 364 F. Supp. 2d at 564–66 ("Given the need to consider the purposes of the federal statute, [courts] have crafted what [they] termed a "less rigorous" veil-piercing standard tailored to [WARN Act] cases in order the fulfill that statute's goals.").

The Fourth Circuit has carefully defined what constitutes a separate employer under FLSA's joint employer standard, particularly in the contractor context. Its six-factor test offers a relevant framework for analyzing contractor relationships.[2] Consulting the Fourth Circuit's

[1] An "arm's length transaction" has been defined by Black (Law Dictionary, Fourth Ed.) as: beyond the reach of personal influence or control. *See also Realty Agency, Inc. v. Weaver*, 186 N.Y.S.2d 428 (1st Dep't), 430 *rev'd and remanded*, 164 N.E.2d 837 (1959) ("'Parties are said to deal 'at arm's length' when each stands upon the strict letter of his rights, and conducts the business in a formal manner, without trusting to the other's fairness or integrity, and without being subject to the other's control or overmastering influence.'") (quoting Black).

[2] According to the court in *Salinas v. Commercial Interiors, Inc.*, 848 F.3d 125, 141–42 (4th Cir. 2017):

FLSA test respects the DOL's declaration that its WARN test "is not intended to foreclose any application of existing [case] law or to identify the source of legal authority for making determinations on whether related entities are separate." 54 Fed. Reg. 16042-01, 16,045. In fact, WARN and FLSA are kindred statutes. *See WARN's Place in the FLSA / Employment Discrimination Dichotomy: Why A Warning Cannot Be Waived,* 27 Cardozo L. Rev. 2929, 2957–60. Both statutes are codified as labor standards legislation in title 29 of the U.S. Code. Here Congress set a minimum floor for advance notice in WARN, just as it set a minimum wage in FLSA, and minimum time off in the Family and Medical Leave Act. *Id.* WARN's standard was said to be "squarely in the tradition" of social reforms such as the minimum wage. *Id.* Both WARN and FLSA claims have readily ascertainable damage values (*id.* at 2957-58) and given the small individual amounts of these claims, both statutes provide for collective or representative actions to feasibly enforce them. *Id.* at 2961-62.

---

In answering this question [of joint liability under FLSA] courts should consider six factors:

(1) Whether, formally or as a matter of practice, the putative joint employers jointly determine, share, or allocate the power to direct, control, or supervise the worker, whether by direct or indirect means;

(2) Whether, formally or as a matter of practice, the putative joint employers jointly determine, share, or allocate the power to—directly or indirectly—hire or fire the worker or modify the terms or conditions of the worker's employment;

(3) The degree of permanency and duration of the relationship between the putative joint employers;

(4) Whether, through shared management or a direct or indirect ownership interest, one putative joint employer controls, is controlled by, or is under common control with the other putative joint employer;

(5) Whether the work is performed on premises owned or controlled by one or more of the putative joint employers, independently or in connection with one another; and

(6) Whether, formally or as a matter of practice, the putative joint employers jointly determine, share, or allocate responsibility over functions ordinarily carried out by an employer, such as handling payroll; providing workers' compensation insurance; paying payroll taxes; or providing the facilities, equipment, tools, or materials necessary to complete the work.

Although WARN does not contain as broad a definition of "employ" as does FLSA ("to suffer or permit to work," 29 U.S.C. § 203(g)), the Fourth Circuit's interpretation of "separate" in the DOL's joint employment rule in FLSA is similar to how courts have interpreted "separate" under the DOL's WARN Act's regulation. *See Salinas v. Commercial Interiors, Inc.*, 848 F.3d 125, 133 (4th Cir. 2017).

WARN's balancing test applies the factors in a fact-specific inquiry. No one factor set out by the DOL is controlling, and all factors need not be present for liability to attach. *Guippone v. BH S & B Holdings LLC*, 737 F.3d 221, 226 (2d Cir. 2013). The same is true under FLSA, "because the status of a particular employment relationship is highly fact-dependent, we emphasized that the absence of a single factor—or even a majority of factors—is not determinative of whether joint employment does or does not exist." *Hall v. DIRECTV, LLC*, 846 F.3d 757, 770 (4th Cir. 2017) (citing *Salinas v. Commercial Interiors, Inc.*, 848 F.3d at 142).

The balancing tests under both statutes is not a "mechanical exercise" nevertheless one factor stands out – that of "control." WARN liability may be warranted "even in the absence of the other factors." *Pearson,* 247 F.3d at 504 (cited *in Guippone v. BH S & B Holdings LLC*, 737 F.3d at 228). The same is true for FLSA liability. The factors "offer [ ] a way to think about [whether entities are joint or separate employers,] not an algorithm." *Hall v. DIRECTV, LLC*, 846 F.3d at 771. "A score of 5 to 3 decides a baseball game," not whether two entities constitute joint employers under the relevant totality-of-the-circumstances test. *Reyes v. Remington Hybrid Seed Co.*, 495 F.3d 403, 407 (7th Cir. 2007), as amended (Aug. 30, 2007). "Accordingly, toting up a score is not enough. Rather, one factor alone—such as DIRECTV's supervision and control of Plaintiffs' schedules—can give rise to a reasonable inference that plaintiffs will be able to

develop evidence establishing a joint employer relationship." *Hall v. DIRECTV, LLC*, 846 F.3d at 771 (internal citation and quotations omitted).

Given the fact-bound joint employer determination involves the weighing of evidence and the need to discover it, motions to dismiss are particularly inappropriate under both WARN and FLSA. *Compare* WARN: *Hiles v. Inoveris, LLC*, No. 2:09-CV-53, 2009 WL 3671007, at *3 (S.D. Ohio Nov. 4, 2009) ("de facto employer is a fact-sensitive question which ... should not be answered until the Plaintiffs have had some opportunity to conduct discovery … particularly where, as here, the defendants are in control of such information or it is otherwise unavailable to the plaintiffs"), *with* FLSA: *Hall v. DIRECTV, LLC*, 846 F.3d at 771 ("particularly true at the pleading stage, when plaintiffs have had no opportunity for discovery as to payroll and taxation documents, disciplinary records, internal corporate communications, or leadership and ownership structures ... at the pleading stage, plaintiffs relying on a joint employer theory are not required to determine conclusively which [defendant] was their employer ... or describe in detail the employer's corporate structure") (internal citations and quotations omitted).

Thus, Courts have allowed WARN Act complaints with single or joint employer allegations to precede past the pleading stage even with minimal allegations regarding the relationship between the joint employers. *See Grimes v. Evergreen Recreational Vehicles, LLC*, No. 3:16-CV-472-TLS, 2016 WL 7188171, at *3 (N.D. Ind. Dec. 12, 2016) (denying parent company's motion to dismiss because the complaint alleged on information and belief that there was de facto control and there were sufficient other allegations to support the inference that discovery would establish liability).

Finally, both WARN and FLSA must be treated as remedial. As this Court noted, "WARN is a remedial statute and must be construed broadly with its exceptions narrowly

construed." *Washington v. Aircap Indus. Corp.*, 831 F. Supp. 1292, 1295 (D.S.C. 1993); *Local Union 7107 v. Clinchfield Coal Co.,* 124 F.3d 639, 640 (4th Cir. 1997) (same). Similarly, the Fourth Circuit has been "guided by the Supreme Court's direction that the FLSA "must not be interpreted or applied in a narrow, grudging manner." Rather, "because the Act is remedial and humanitarian in purpose, it should be broadly interpreted and applied to effectuate its goals." *Salinas v. Commercial Interiors, Inc.,* 848 F.3d at 140 (internal citations omitted). With respect to joint employment, the Third Circuit notes: "[b]ecause a plant closure often presages a corporation's demise, leaving workers with no source of satisfaction from their employer, plaintiffs have frequently sought damages from affiliated corporations." *Pearson,* 247 F.3d at 476–77.

## II. The Complaint States a Joint Employment Claim under the DOL Test.

### A. The Common Ownership Factor is Satisfied by the Allegations.

Common ownership is the least important factor in the law, but the most important in SCANA's eyes. *See Local 2-1971 of Pace Int'l Union v. Cooper,* 364 F. Supp. 2d at 564–65 ("Common ownership is the least important factor") (citation omitted).[3] SCANA argues ownership is the *sine qua non* of the WARN Act, without which joint employment does not exist. (ECF No. 69 at 9) ("a 'weighing' of factors should not be necessary at all if a plaintiff fails to assert any common ownership whatsoever").

[3] Pre-discovery, Plaintiffs do not allege there were"common directors and/or officers", which with "common ownership" is often considered to be of lesser importance among the DOL factors. *In re APA Transp. Corp. Consol. Litig.*, No. CIV. 02-3480 (GEB), 2006 WL 3534029, at *12 (D.N.J. Dec. 7, 2006), *aff'd in part, rev'd in part,* 541 F.3d 233 (3d Cir. 2008). "The last three factors—de facto exercise of control, unity of personnel policies emanating from a common source, and dependency of operations-are often the determinative factors. *Blough v. Voisard Mfg., Inc.,* No. 1:14 CV 263, 2015 WL 366934, at *8 (N.D. Ohio Jan. 27, 2015).

SCANA bases its contention on one phrase in the rule which it wrests out of context and misreads. *See* 20 C.F.R § 639.3. SCANA claims the Regulation only pertains to independent contractors and subsidiaries that "are wholly or partially owned by a parent company." SCANA's interpretation violates the rule against rendering a statutory phrase superfluous. If independent contractors must be owned by a parent company, then they too would be just subsidiaries. The rule of construction requires the sentence be read in its entirety to ensure that undue emphasis is not placed on the phrase "owned by a parent" and the words "independent contractors" are not rendered superfluous. Read in context, the DOL's specification of contractors shows concern for two types of companies: a "contracting company" and a "parent company." On the one hand, according to the rule, "independent contractors" are employed by a "contracting company," on the other hand "subsidiaries" are owned by a "parent company." ("Under existing legal rules, *independent contractors* and **subsidiaries** which are wholly or partially owned by a **parent company** are treated as separate employers or as a part of the **parent** or *contracting company* depending upon the degree of their independence from the parent") (emphasis added). The phrase SCANA quotes: "are wholly of partially owned by a parent company" can only modify "subsidiaries" not both subsidiaries *and* independent contractors, otherwise, the phrase "contracting company" is also rendered superfluous. While the final word of the rule "the degree of their independence from the *parent*" discontinues the lock-step parallelism (i.e., it substitutes "parent" for the cumbersome repetition of "parent company or contracting company"), SCANA does not purport that this elision justifies its excising contracting companies from the rule.

SCANA's brief relies on two independent contractor cases without questioning how those cases could have made it to summary judgment and appeal without there being any allegation or involvement of parent or common owner. (ECF No. 69 at 12 (citing *Administaff*

*Companies, Inc. v. New York Joint Bd., Shirt & Leisurewear Div.*, 337 F.3d 454, 457 (5th Cir. 2003), and ECF No. 69 at 3 (citing *Martin-Smith v. Ramcor Servs. Grp., Inc.*, No. 2:10-CV-00403-PMP, 2012 WL 4472036, at *5 (D. Nev. Sept. 25, 2012))). SCANA points to no source that interprets the DOL rule to apply only to parents, as SCANA has done.

Pointlessly, SCANA attaches several of the undersigned's WARN complaints in other cases brought against parent entities, which, unsurprisingly, allege ownership. SCANA does not explain how they disprove that WARN's joint employer rule includes independent contractors.

Finally, SCANA purports to prove that ownership is required to establish WARN Act liability against a joint or single employer by lifting a sentence from the lengthy WARN opinion, *Pearson*. (ECF No. 69 at 8 (citing 247 F.3d at 505)). SCANA claims *Pearson* "require[s] that two corporations be highly integrated with respect to ownership and operations before they will be considered a single employer for WARN Act purposes." *Pearson,* to the contrary, recognized ownership "is typically referred to as the least important of the factors." 247 F.3d at 494 (citation omitted). *Pearson* held that "by itself, ownership—and even ownership coupled with common management—is not a sufficient basis for liability. *Id.* (internal citation omitted); *In re Shelby Yarn Co.,* 306 B.R. at 538 (same).

Even if SCANA were correct, that ownership is important, the Complaint satisfies this prong. The *Pearson* Court held that financial control can substitute for the common ownership factor. *See Pearson,* 247 F.3d at 494 ("'financial control' will suffice to satisfy the 'common ownership' prong of the integrated enterprise test, and it is likely that the DOL factors should be interpreted similarly...."); *see also In re Tweeter OPCO, LLC.,* 453 B.R. 534, 542 (Bankr. D. Del. 2011) ("Financial control itself is sufficient to satisfy the common ownership factor.").

Here, Plaintiff alleges that SCANA's contract with Westinghouse forced it into

bankruptcy, after which SCANA assumed complete financial control over the Summer Project, which of course, it owned:

> With its bankruptcy filing of March 29, 2017, the WEC debtors had the possibility of rejecting the fixed price provision of the contract. To forestall the rejection decision, the parties entered into an Interim Assessment period in which SCANA would fund the operational costs of the Summer Project until alternatives for completing it could be developed. (Amended Complaint at ¶ 46).

As per the Complaint, SCANA had complete financial control over the employment relationship after March 29, 2017:

> Until the petition was filed, WEC laid out the construction costs, with SCANA periodically reimbursing only a fraction of those amounts. Now SCANA was responsible for paying the large payroll of thousands of craft employees. Side-stepping WEC and the prior hierarchies, SCANA began paying Fluor's payroll directly to Fluor. (*Id.* ¶ 57).

SCANA ostensibly recognizes that its direct payment of payroll and all the construction costs is highly material to the question of financial control when it takes pains to dispute this fact. (*See* ECF No. 69 at 6 n.3) ("they always funded the project, regardless of any alleged change in the nature of the project or relationships among the parties."). But, the Complaint's allegations must be taken as true. SCANA will later have to overcome at trial the public hearing statements SCE&G made supporting this allegation. (*See* Amended Complaint at ¶ 98 (At that briefing, SCE&G acknowledged it was responsible for the operational costs that its owner-directed model incurred: "when we learned that Westinghouse intended to reject our fixed-price contract, our first objective was to determine if it was feasible to complete the project using an owner-directed model and what it would cost for us to do so.")). Saddled with fiscal responsibility, SCANA decided it had to tighten its managerial and financial control.

**B. De Facto Control is Established by the Allegations**

The de facto control factor turns on whether one company "was the decision-maker responsible for the employment practice giving rise to the litigation." *Pearson*, 247 F.3d at 503–

04; *In re APA Transp. Corp. Consol. Litig.*, 541 F.3d 233, 245 (3d Cir. 2008), as amended (Oct. 27, 2008) (same). A "particularly striking" showing of de facto control can warrant liability even in the absence of the other factors. *Pearson*, 247 F.3d at 504. The *Pearson* Court stated that an affiliated company may be subject to WARN liability when it "flow[s] naturally and foreseeably" from its actions "that employees will be terminated, giving rise to the WARN action." *Id.* (citing *United States v. Applewhaite,* 195 F. 3d 679, 690 (3d Cir.1999)).

The WARN Act imposes liability on employers who close plants without notice. "[A]ny employer *who orders a plant closing* or mass layoff in violation of section 3 of this Act [(the 60–day notice provision)] shall be liable to each aggrieved employee who suffers an employment loss as a result of such closing or layoff for [back pay and benefits]." 29 U.S.C. § 2104(a)(1) (emphasis added); *In re Shelby Yarn Co.,* 306 B.R. at 539 (imposing liability on the parent that specifically carried out the actual plant closing). *Cf. Administaff Companies, Inc. v. New York Joint Bd., Shirt & Leisurewear Div.*, 337 F.3d at 456 (holding Administaff could not be liable for the lack of WARN Act notice because it did not order the closing of its client's New Jersey facility). This makes sense, because, as noted above, "the entity in the best position to warn employees about a closing is the employer, who runs the company and who decides to close it." *Mckinney v. Carlton Manor Nursing &, Rehab. Ctr., Inc,* 868 F.3d 461, 463 (6th Cir. 2017).

The Complaint adequately alleges that SCANA ordered the closing of Summer on July 31, 2017 by using SCANA's own words:

> On July 31, 2017, SCANA sent a WARN Act notice to the South Carolina Department of Employment and Workforce that it "had decided to stop work on the construction of both Units." (Amended Complaint ¶ 92).
>
> SCANA stated that its "complete termination of the construction project will affect 617 SCE&G employees," none of whom it chose to terminate at that point. (*Id.* ¶ 93).

> That day, SCE&G told Fluor and Westinghouse of its decision to abandon the project. SCE&G asked them to cease all work on the project immediately. SCANA suddenly stopped paying the cost of employing over 5,000 employees on the site. (*Id.* ¶ 94).

As SCANA acknowledges, the complaint alleges "control" in the sense of SCANA unexpectedly shutting down the project. (ECF No. 69 at 19). SCANA provides a diffuse response as to why that allegation is not sufficient to support a finding of de facto control. First, SCANA criticizes the Complaint's failure to assert that SCANA directed Westinghouse to file for bankruptcy three months earlier, which is irrelevant. (ECF No. 69 at 11). Next, SCANA notes that the Complaint fails to allege that SCANA and SCE&G "specifically directed Fluor or Westinghouse to terminate the employment of their respective employees." *Id*. In fact, the Complaint specifically alleges that SCANA ordered the plant closing. It alleges not only that SCANA shut down the Summer Project, but that it ordered the employees to stop work and go away. (Amended Complaint ¶ 96 ("the contractors obeyed SCANA's order to stop work and terminated the employees")). That employment decision establishes WARN liability. If the employees found continued work with Westinghouse or Fluor, it might preclude liability as to them. But the vast majority that suffered an employment loss "as a result of [the] plant closing," 29 U.S.C. § 2104(a)(1), have redress against SCANA for abruptly separating them from their jobs, thereby overmastering Westinghouse's and Fluor's separate legal identities. *Pearson*, 247 F.3d at 503–04.

Even SCANA acknowledges that the Complaint alleges SCANA and SCE&G exercised control then unexpectedly shut down the project. (ECF No. 69 at 19).

SCANA picks at nits when complaining the allegations it shut down Summer do not contain the words "mass layoffs" or "terminations" *in haec verba.* (ECF No. 69 at 6). The order to close a plant sufficiently states a WARN claim even if another entity actually terminates the

employees at its own behest. *In re Shelby Yarn Co.,* 306 B.R. at 538. The same hyper-technical contention that SCANA makes led the Second Circuit to vacate summary judgment in *Guippone v. BH S & B Holdings LLC,* 737 F.3d at 227. There, the Court concluded that the fact the parent authorized the layoff (but did not "order" it) was sufficient to allow a jury to conclude that, in fact, the parent directed the layoff which the subsidiary carried out. As an affiliated company closely associated with Westinghouse and connected by contract at Summer, SCANA's decision to shut down the facilities is sufficient to support a WARN complaint. *See Vogt v. Greenmarine Holding, LLC*, 318 F. Supp. 2d 136, 144 (S.D.N.Y. 2004) ("plaintiffs allege that Greenmarine's Management Committee made decisions resulting [ ] in the plant closings"). All that is required at this stage is that the Complaint give notice of the claim and raise a plausible inference that discovery will demonstrate SCANA's liability. Plaintiff cannot be expected to spell out the precise details of SCANA's orders prior to discovery when they are known only to SCANA.

SCANA does not benefit from its reliance on *Administaff Companies,* 337 F.3d 454, a case that helps Plaintiffs. There, the owner client, TCS, made the decision to close the business. Administaff provided TCS human resources services, and so "co-employed" TCS employees for benefit plan purposes. Unlike here, where the owner client is being sued by the service companies' employees, in *Administaff*, the facts were reversed. Administaff was sued by TCS's employees. Administaff was held not liable because TCS, not Administaff, made the decision to shut down the company. Here, SCANA made that decision, hence, under *Administaff* it should be held liable.

Doubling down on its contention that WARN does not recognize contract-based employer liability, SCANA argues that a "principal client" cannot be liable to the employees of its contractor. SCANA points to the DOL's illustration of WARN's unforeseeable business

circumstances exception, which is an affirmative defense. (ECF No. 69 at 18-19). The Regulation poses the example of a "principal client" who suddenly terminates a contract thus giving its service company grounds to seek the exception and avoid liability. The employees of the service company appear to be left with no one to sue. SCANA celebrates this outcome, as if Congress' purpose in creating "WARN's structure" was to elevate defenses over employees' rights. Not raised by the illustration, however, is the question of whether the principal client, in making the sudden decision, can be held liable as a joint employer. That was outside the scope of the cursory illustration of the affirmative defense.

Ultimately, SCANA ignores but cannot evade the substantial allegations of its ultimate assumption of control over the employees.

- SCANA had its own pyramidal workforce consisting of its general manager of nuclear construction atop dozens of its own employees reporting up to him who oversaw every facet of the on–site construction. (Amended Complaint ¶ 51)

- As result of the separate structures, neither Fluor, WEC, or SCANA was ever fully in charge of the project. It was never clear who was in charge of the project. The clear line between owner and contractors were missing. (*Id.* ¶ 53)

- Given the independent hierarchies in that model, no entity or person filled the functional role of a Chief Executive Officer responsible for the whole project and to whom all lines of supervision reported. As result of the separate structures, neither Fluor, WEC, or SCANA was ever fully in charge of the project. (*Id.* ¶ 54)

- SCANA's assumption of control over construction at the site on a decision-by-decision basis was tied to its complete overhaul and restructuring of the "client" based model to the "owner-directed" model. SCANA articulated this restructuring in open discussions with Fluor and WEC, and in writing. (*Id.* ¶ 59)

- Upon the bankruptcy filing, SCANA became responsible for completing the unfinished ETC roadmap for the completion of the project. SCANA redrafted the ETC to spell out the new single hierarchy in which it assumed complete control over all significant decisions made from the ground-level up on the construction site. (*Id.* ¶ 60)

- SCANA, in the ETC, reassigned Fluor and WEC employees in a line of supervision interspersed with SCANA's own managers to whom Fluor and WEC employees would report at various levels. It created organization charts to reflect the structure. (*Id.* ¶ 61)

- SCANA became outspoken and forceful at the POD meetings. For the first time, SCANA's input into day-to-day operations became proactive, intrusive, and decisional, in keeping with its assumption of CEO-type control and leadership. (*Id.* ¶ 72)

- Post-bankruptcy, SCANA field monitors, who had previously been silent, became vocal in directing Fluor/WEC personnel. If a SCANA overseer disagreed with how Fluor/WEC was performing a task, such as using some equipment, SCANA overseers could and often would say so on the spot, and it was taken as a directive. (*Id.* ¶ 73)

- After March 29, SCANA gave specific orders and directions concerning virtually all facets of the project, including construction, and safety – particularly concerning anything that would cause a delay or add cost. (*Id.* ¶ 75)

SCANA cannot characterize as "normal" the de facto control it exercised *before* March 29 at the project – when both SCANA and Westinghouse each had hundreds of employees at the site, who oversaw thousands more, without anyone being fully in charge. (Amended Complaint ¶ 53). Whatever might have been "normal" about the original contractor-directed structure it ended when SCANA veered down the "owner-directed" path and ordered the closure of the project. Thus, a finding that SCANA was a joint employer—will not "deal a fatal blow to—the "traditional" benefits of general contractor-subcontractor relationships"; it would simply ensure that employees and communities receive a minimum notice period to prepare for the blow of sudden mass unemployment. *See Salinas*, 848 F.3d at 144. It is both fair and consistent with the purposes of WARN to impose that duty on companies who enter a prolonged, co-dependent managerial relationship. That relationship satisfies the de facto control factor here.

SCANA's brief avoids mentioning any of the owner-directed allegations discussed above. What these allegations show is the level of entanglement and disregard by SCANA of Westinghouse's and Fluor's corporate personalities by overriding their ability to manage-out their workforces' presence at Summer leading up to the point of shut down. This, by itself, supports a joint employer finding. *See Pearson*, 247 F.3d at 503–04.

**C. A Unity of Personnel Policies Existed in the Plant Closing Context.**

In many WARN joint employment cases, a parent investment firm closes its portfolio operating company. Typically, there is little to no overlap in operations or personnel policies between the private equity parent and manufacturing or services portfolio company. Usually, the only personnel policy relevant to WARN liability is the transaction-specific parental decision to close the operating company. *See Vogt v. Greenmarine Holding, LLC*, 318 F. Supp. 2d at 143. Here, SCANA was responsible for that personnel policy.

Beyond that, "unity of personnel policies" may look to centralized hiring and firing, payment of wages, and personnel and benefits recordkeeping. *Id. at* 142–43. SCANA argues "payment of wages" weighs against its liability because it did not process payroll. SCANA places too much weight on that twig. The DOL considered and rejected a commenter's request that separate payroll processing be used to define separate employment entities. 54 Fed. Reg. 16042-01, at 16045. SCANA disagrees with the Complaint's allegation that SCANA not Westinghouse laid out payroll after March 29, 2017. (Amended Complaint ¶ 57). SCANA argues the contractors paid it, and SCANA reimbursed it. (ECF No. 69 at 14). But these allegations, as well as all of the following, must be taken as true.

After the bankruptcy, SCANA maintained centralized control over hiring and firing:

- Westinghouse and Fluor had to requisition new hires from SCANA and obtain SCANA approval. (Amended Complaint ¶ 76)
- If, for example, several dozen boilermakers, were needed, the decision, which once had been Westinghouse, now had to be approved by SCANA. (*Id.* ¶ 80)
- When Fluor sought to replace the person by hiring a WEC manager, Fluor had to, and did seek prior approval from SCANA. (*Id.* ¶ 81)
- After the bankruptcy filing, SCANA terminated about 120 individuals specialized workers Westinghouse had hired. (*Id.* ¶ 77)

- SCANA independently and autonomously drew up new organization charts showing changes to the duties, titles, authority, and assignments of Fluor and WEC personnel. (*Id.* ¶ 78)
- Prior to the bankruptcy, WEC approved all overtime. After the petition filing, SCANA took away that authority from WEC. SCANA decided when employees worked overtime and for how many hours. (*Id.* ¶ 83)
- SCANA's control over work schedules extended to policies for days off. SCANA directed that the Memorial Day weekend would be treated as a three-day weekend, but that the following Saturday would be a work day – a type of decision formerly left to WEC. (*Id.* ¶ 84)
- SCANA's control over work schedules extended to policies for days off. SCANA directed that the Memorial Day weekend would be treated as a three-day weekend, but that the following Saturday would be a work day – a type of decision formerly left to WEC. (*Id.* ¶ 83)

These allegations raise a more-than-plausible inference that SCANA unified, set, and maintained centralized personnel policies after March 29, 2017 at Summer, which speaks to both the issue of unified personnel policies and de facto control.

Faced with these allegations, SCANA once again seeks a magic bullet. SCANA argues that notice must only be given to "affected" employees, and the definition of "affected" excludes those who have a separate employment relationship. It argues that extending liability to a contractor under these circumstances would make any contractor liable for simply paying salaries. (ECF No. 69 at 14). But, SCANA's argument ignores the multi-factorial nature of the test and the variable fact patterns that arise. It ignores the fact that another employment relation may not be truly "separate" because there is a joint- or single employer relationship. 20 C.F.R. § 639.3(e). (ECF No. 69 at 14). To use buzz words such as "client" or contractual conventions to exonerate the company responsible for making every critical employment decision including the decision to shut down the plant invites mischief. It "would not only flaunt the statutory language but would also invite resort to arrangements separating real estate and operational aspects of

businesses solely to evade WARN." *In re Shelby Yarn Co.,* 306 B.R. at 539 (citing *Local 217, Hotel & Restaurant Employees Union v. MHM, Inc.,* 976 F.2d 805, 808 (2d Cir. 1992)); *IBT v. AmerDel Serv. Co.,* 50 F.3d 770, 776 (9th Cir.1995)).

Even if SCANA was not engaged in a subterfuge, the "prevalence of an industry-wide custom" that might generally exonerate an outsourced personnel function "is subject to conflicting inferences." *Salinas*, 848 F.3d at 143–44. As the Salinas panel reasoned: "[w]hile, on the one hand, it may be 'unlikely' that a prevalent action is 'a mere subterfuge to avoid complying with labor laws,' on the other hand, the very prevalence of a custom may 'be attributable to widespread evasion of labor laws.'" Hence, the Court must look past the labels at the "entire employment." *Id*. at 150 (citation omitted).

SCANA relies on *Ramcor*, where again, the client that owned the facilities – the government – was not under scrutiny. Rather, the subcontractor employees sued the general contractor although there was no allegation that the general contractor supervised them. *See Martin-Smith v. Ramcor Servs. Grp., Inc.*, No. 2:10-CV-00403-PMP, 2012 WL 4472036, at *5 (D. Nev. Sept. 25, 2012). Although the *Ramcor* Court found normal industry practice allowed some client control over contractor, this goes only so far. Where no industry norm exists for a once-in-a-generation project such as Summer, there is nothing to excuse the outright, freewheeling exercise of control SCANA resorted to here.

The structure of the Summer Project defied conventions and easy labelling. It was the first nuclear reactor construction project in the 30 years since WARN was enacted. (Amended Complaint ¶ 32). In *Ramcor*, it was unknown what, if anything, the general contractor's supervisors did at the VA hospital facility where the subcontractor employees worked. Here, the Complaint alleges in detail what happened at Summer. SCANA and Westinghouse together tried

to build a historic project, each committing billions of dollars and hundreds of employees, to work side by side to construct new, mammoth reactors. That SCANA ultimately took full control over the project as it careened towards disaster is understandable. However, it is also a basis for finding that SCANA was the employer of all the employees working on the project and that SCANA should have issued WARN notice to give these employees fair warning that they would be terminated.

**D. Dependency of Operations is Sufficiently Alleged.**

To determine whether a dependency of operations exists between the two companies, courts look to the "existence of arrangements such as the sharing of administrative or purchasing services, interchanges of employees or equipment, and commingled finances." *In re APA Transp. Corp. Consol. Litig.*, 541 F.3d at 245 (internal quotation marks omitted). It is here that the "normal" levels of behavior are looked to. Dependency of operations "cannot be established [merely] by the parent corporation's exercise of its ordinary powers of ownership, *i.e.*; to vote in directors and set general policies." *Pearson,* 247 F.3d at 501. Instead, this factor requires that "plaintiffs [ ] establish the existence of what was known at common law as a 'master-servant' agency relationship." *Id.*; *Blough v. Voisard Mfg., Inc.,* No. 1:14 CV 263, 2015 WL 366934, at *8 (N.D. Ohio Jan. 27, 2015).

Here, Westinghouse and Fluor depended on the arrangement with SCANA, and SCANA depended on the arrangement to feasibly operate the Summer Project. (Amended Complaint ¶¶ 43-44, 47, 87). The construction work took place on SCANA's premises where hundreds of SCANA's own employees worked. Some operated the pre-existing nuclear reactor, V.C. Summer 1, but others were dedicated to the construction of reactors 2 and 3. All of WEC's and

Fluor's employees at the site were dedicated solely to the building of the Summer Project for the Owners. (*Id.* ¶ 86).

Indeed, the entire Westinghouse company was dependent on this arrangement working feasibly. (*Id.* ¶¶ 39,40 43- 47). When SCANA went from the ordinary client overseeing its contractor to an owner-directed structure, it exceeded ordinary powers of a client and became the master owner directing its servants because its contractual reticence had failed, and the boundaries no longer pertained:

- At all times, SCANA provided the facilities, equipment, tools and materials necessary to complete the work. Although Fluor and WEC personnel manned the equipment room, the construction helmets, vests and other safety gear and protective clothing that were dispensed were paid for by SCANA. Requisitions for the equipment were sent to and paid for by SCANA. (*Id.* ¶ 85)

- Taking control of operations after the bankruptcy, SCANA prospectively intervened in controlling the work. If Fluor or WEC wished to perform a particular task, such as a major concrete placement on a Friday or Saturday, Al Torres might call them and tell them not to do so, and say he wanted it done on a different day, such as a Thursday or Monday, which they would then do. (*Id.* ¶ 82)

Besides micro-managing schedules and controlling the manner and means of discrete construction tasks after the bankruptcy filing, SCANA was rearranging the priorities for the project's critical path toward completion which formerly had been in the bailiwick of WEC/Fluor. (*Id.* ¶¶ 87-91).

The Summer Project was not a quotidian independent contractor workplace where a discreet service is rendered in a year or two or even five. Summer began in 2007. (*Id.* ¶ 25). The day after the shutdown, SCE&G indicated that substantial completion dates for Unit 2 might not be until at least December 31, 2022, and for Unit 3, March 31, 2024. (*Id.* ¶ 97). That is over 15 years. The heart of a person's entire career. Workers moved from around the country to establish their lives in the Project. Billions of dollars were invested by SCANA and

Westinghouse. Exercising its newfound owner-directed powers, SCANA unilaterally dealt the entire workforce a devastating blow by ordering it to stop work and leave SCANA's site without notice. (*Id.* ¶ 95). At that point SCANA was more than just a client, it was a master.

Under any rubric, WARN alone, or WARN infused with FLSA's relevant considerations, the Complaint sufficiently alleges SCANA was a joint employer of the terminated employees. SCANA had ownership in the form of financial control over WEC and FLUOR, it exercised control over all the employees, and controlled personnel policies for the entire V.C. Summer Project. The operations there, as well as the solvency of WEC in its entirely, depended on SCANA. *See* 20 C.F.R. 639.3(a)(2). SCANA used its power to direct and supervise the Project workers and to hire and fire them. It had a long-term relationship of almost 10 years with them, which was projected to continue for another five years or so. All of the work was performed on SCANA's Summer premises, and it was responsible for providing the facilities, equipment, and tools, and, for all practical purposes, making payroll. *See Salinas*, 848 F.3d at 141–42.

**CONCLUSION**

Wherefore, for all the foregoing reasons, SCANA's motion should be denied in its entirety. In the alternative, if the motion is granted in whole or in part, leave to replead should be granted. *See, e.g.*, *Revolutions Med. Corp. v. Strategic Prod. Dev., Inc.*, No. 2:12-CV-2793-RMG, 2013 WL 12156812, at *4 (D.S.C. Jan. 4, 2013).

Date: January 2, 2018

By: /s/ Lucy C. Sanders

Lucy C. Sanders
**BLOODGOOD & SANDERS, LLC**
242 Mathis Ferry Road, Suite 201
Mt. Pleasant, South Carolina 29464
Telephone: (843) 972-0313
Facsimile: (843) 352-2714
E-mail: lsanders@bloodgoodsanders.com

/s/ René S. Roupinian
Jack A. Raisner
René S. Roupinian
OUTTEN & GOLDEN LLP
685 Third Avenue, 25th Floor
New York, New York 10017
Telephone:(212) 245-1000
Facsimile: (646) 509-2060
E-mail: jar@outtengolden.com
rsr@outtengolden.com

*Attorneys for Plaintiffs and the putative class*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
ROCK HILL DIVISION**

Lawrence Butler, Lakeisha Darwish, Darron Eigner, Jr., Bernard A. Johnson, and Jimi Che Sutton,

Plaintiffs,

v.

Fluor Corporation and Fluor Enterprises, Inc.,

Defendants.

Civil Action No.: 0:17-cv-02201-JMC

**ORDER**

---

Harry Pennington III and Timothy Lorentz, on behalf of themselves and all others similarly situated,

Plaintiffs,

v.

Fluor Corporation, Fluor Enterprises, Inc., Fluor Daniel Maintenance Services, Inc., SCANA Corporation, and South Carolina Electric & Gas Company,

Defendants.

Civil Action No.: 0:17-cv-02094-JMC

**ORDER**

---

Plaintiffs Lawrence Butler, Lakeisha Darwish, Darron Eigner, Jr., Bernard A. Johnson, and Jimi Che Sutton (collectively the "Butler Plaintiffs") filed this action against Defendants Fluor Corporation and Fluor Enterprises, Inc. (the "Fluor Defendants") alleging that the termination of their employment on July 31, 2017, was in violation of the Worker Adjustment and Retraining Notification Act, 29 U.S.C. §§ 2101–2109 (the "WARN Act"). (ECF No. 1.)

This matter is before the court by way of Fluor Defendants' Motion to Dismiss pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure. (ECF No. 17.) In their Motion, Fluor

Defendants argue that the court "lacks subject-matter jurisdiction over this [putative] class action based on the first-to-file rule." (ECF No. 17-1 at 1.)

**I. BACKGROUND RELEVANT TO INSTANT MOTION**

This case arises out of the decision by South Carolina Electric & Gas Company ("SCE&G") on July 31, 2017, to stop all construction at the V.C. Summer Nuclear Station ("VC Summer") in Jenkinsville, South Carolina. (ECF No. 1 at 3 ¶ 16.) As a result of SCE&G's decision, Butler Plaintiffs allege that Fluor Defendants also on July 31, 2017, laid off approximately 4,000 employees who had been working and/or receiving assignments at VC Summer. (*Id.* ¶ 17.)

On August 8, 2017, Interested Party Pennington filed a Complaint in this court against Fluor Defendants and SCANA Corporation alleging violation of the WARN Act. *Pennington v. Fluor Corp.*, C/A No. 0:17-cv-02094-JMC, ECF No. 1 (D.S.C. 2017) ("*Pennington*"). Interested Party Pennington sought to represent "all other similarly situated former employees, pursuant to 29 U.S.C. § 2104(a)(5) and Fed. R. Civ P. 23(a), who worked at, reported to, or received assignments from one of Defendants' Facilities and were terminated without cause on or about July 31, 2017, and within 30 days of that date, or were terminated without cause as the reasonably foreseeable consequence of the mass layoffs and/or plant closings ordered by Defendants on or about July 31, 2017, . . . ." (ECF No. 1 at 3–4 ¶ 16 (*Pennington*).) On August 18, 2017, Butler Plaintiffs filed the instant WARN Act action against just Fluor Defendants. (ECF No. 1.) Butler Plaintiffs seek to represent "all other similarly situated former employees, pursuant to 29 U.S.C. § 2104(a)(5) and Rule 23(a), who worked for Fluor within 90 days of July 31, 2017, and were terminated without cause on or about July 31, 2017, and within 30 days of that date, or were terminated without cause as the reasonably foreseeable consequence of the

mass layoffs ordered by Fluor on or about July 31, 2017, . . . ." (ECF No. 1 at 4–5 ¶ 24.) In their respective Complaints, Interested Party Pennington and Butler Plaintiffs both allege that Fluor Defendants knowingly failed to give their employees at least 60 days prior notice of termination of their employment as required by the WARN Act. (ECF No. 1 at 2 ¶ 3; ECF No. 1 at 2 ¶ 3 (Pennington).)

On October 4, 2017, Fluor Defendants filed the instant Motion to Dismiss. (ECF No. 17.) Thereafter, on October 18, 2017, Butler Plaintiffs filed opposition to Fluor Defendants' Motion. (ECF No. 27.) On February 14, 2018, the court heard argument from the parties on Fluor Defendants' Motion. (ECF No. 42.)

## II.    JURISDICTION

This court has jurisdiction over Butler Plaintiffs' WARN Act cause of action via 28 U.S.C. § 1331, as it arises under a law of the United States, and also via 29 U.S.C. § 2104(a)(5), which empowers district courts to hear claims alleging violation of the WARN Act.

## III.    LEGAL STANDARD

Article III of the Constitution limits the jurisdiction of the federal courts to the consideration of "cases" and "controversies." U.S. Const. art. III, § 2. "Federal courts are courts of limited subject matter jurisdiction, and as such there is no presumption that the court has jurisdiction." *Pinkley, Inc. v. City of Fredrick, Md.*, 191 F.3d 394, 399 (4th Cir. 1999). A Rule 12(b)(1) motion for lack of subject matter jurisdiction raises the fundamental question of whether a court has jurisdiction to adjudicate the matter before it. Fed. R. Civ. P. 12(b)(1). In determining whether jurisdiction exists, the court is to "regard the pleadings' allegations as mere evidence on the issue, and may consider evidence outside the pleadings without converting the proceeding to one for summary judgment." *Richmond, Fredericksburg & Potomac R.R. Co. v.*

*United States*, 945 F.2d 765, 768 (4th Cir. 1991) (citing *Adams v. Bain*, 697 F.2d 1213, 1219 (4th Cir. 1982)). "The moving party should prevail only if the material jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of law." *Id.* (citation omitted). The plaintiff bears the burden of proof on questions of subject matter jurisdiction. *See Evans v. B.F. Perkins Co.*, 166 F.3d 642, 647 (4th Cir. 1999).

## IV. ANALYSIS

A. The Parties' Arguments

Because *Pennington* was filed first, Fluor Defendants argue that Plaintiffs' WARN Act claims "are subject to dismissal for lack of subject matter jurisdiction based on the first-to-file rule." (ECF No. 17-1 at 5.) More specifically, Fluor Defendants argue that in the Fourth Circuit, "where duplicative suits are filed, 'as a principle of sound judicial discretion, the first suit should have priority,' absent convenience favoring the second action." (*Id.* (quoting *Ellicott Mach. Corp. v. Modern Welding Co.*, 502 F.2d 178, 180 n.2 (4th Cir. 1974)).) Accordingly, Fluor Defendants argue that *Pennington* should be permitted to proceed and this action should be dismissed. (*Id.* at 6.) In support of their arguments, Fluor Defendants assert that the factors considered by the court in a first-to-file analysis require dismissal of this matter. (*Id.* at 6–9.) In the alternative to dismissal, Fluor Defendants are amenable to either staying the WARN Act claims in this matter (*id.* at 9–10) or consolidating this matter and the *Pennington* case. (ECF No. 30 at 5.)

Plaintiffs oppose Fluor Defendants' Motion to Dismiss on the basis that "(1) the first-to-file jurisdictional bar Defendants cite is a statutory bar that applies only to False Claims Act ("FCA") cases; (2) there is no binding authority applying a common law first-to-file rule to cases pending in the same court; and (3) using the discretionary first-to-file rule to dismiss an opt-out

class action raises fairness and due process concerns." (ECF No. 27 at 2.) Plaintiffs next argue that Fluor Defendants cannot rely on the statutory first-to-file cases cited because they relied on the FCA and "do not concern the WARN Act." (*Id.* at 3.) Plaintiffs further argue that Fluor Defendants cannot use common law application of the first-to-file rule because it "applies only when duplicative cases are pending in different courts, not in the same court as here." (*Id.* at 4 (citing, *e.g.*, *Walker v. Serv. Corp. Int'l*, No. 4:10-cv-00048, 2011 WL 1370575, at *10 (W.D. Va. Apr. 12, 2011) (applying the first-filed rule to dismiss second action filed in different federal court)).) Finally, Plaintiffs argue that the court should not grant Fluor Defendants' Motion because WARN Act classes are opt out classes and the dismissal of this matter would "render the WARN Act's opt-out provision meaningless or deprive individuals of the process afforded to them by the WARN Act." (*Id.* at 7.)

B. The Court's Review

*1. The First-to-File Rule Generally*

The first-to-file rule provides that "when multiple suits are filed in different Federal courts upon the same factual issues, the first or prior action is permitted to proceed to the exclusion of another subsequently filed."[1] *Allied–Gen. Nuclear Servs. v. Commonwealth Edison*

[1] "Procedurally, the court first considers whether the two competing actions are substantively the same or sufficiently similar to come within the ambit of the first-to-file rule." *Harris*, 2013 WL 5720355, at *3 (citation omitted). "If they do, the court then considers whether any exception to the rule should be applied." *Id.* (citation omitted). "To determine if there is sufficient similarity to bring the first-to-file rule into play, courts have considered three factors: (1) the chronology of the filings, (2) the similarity of the parties involved, and (3) the similarity of the issues at stake." *Id.* (citations omitted). "The actions being assessed need not be identical if there is substantial overlap with respect to the issues and parties." *Id.* (citation omitted). "One final factor courts use in considering the applicability of the first-to-file rule is 'whether the balance of convenience weighs in favor of allowing the second-filed action to proceed.'" *Id.* at *5 (citation omitted). In determining the balance of convenience, courts look to the same factors relevant to transfer of venue pursuant to 28 U.S.C. § 1404(a). *Nexsen Pruet, LLC v. Westport Ins. Corp.*, C/A No. 3:10–895–JFA, 2010 WL 3169378, at *2 (D.S.C. Aug. 5, 2010) (citations omitted). These

*Co.*, 675 F.2d 610, 611 n.1 (4th Cir. 1982) (citing *Carbide & Carbon Chems. Corp. v. U.S. Indus. Chems., Inc.*, 140 F.2d 47, 49 (4th Cir. 1944)). "The policy underlying the first-to-file rule is the avoidance of duplicative litigation and the conservation of judicial resources." *Harris v. McDonnell*, C/A No. 5:13-cv-00077, 2013 WL 5720355, at *3 (W.D. Va. Oct. 18, 2013) (citation omitted). "Application of the rule is discretionary, not mandatory." *Id.* (citation omitted). The Fourth Circuit "has no unyielding 'first-to-file' rule." *CACI Int'l, Inc. v. Pentagen Techs. Int'l, Ltd.*, 70 F.3d 111, 1995 WL 679952, at *6 (4th Cir. 1995) (unpublished) (citing *Carbide*, 140 F.2d at 49 ("[T]he pendency of a prior suit involving the same issues does not require the dismissal of a suit for declaratory judgment.")). When a case falls within the ambit of the first-to-file rule, courts generally will stay, dismiss, or transfer the second-filed case. *Harris*, 2013 WL 5720355, at *3.

2. *Application of the First-to-File Rule in this Case*

Fluor Defendants move to dismiss this action pursuant to the first-to-file rule. As observed above, the Court of Appeals for the Fourth Circuit does not rigidly adhere to the first-to-file rule. Moreover, it does not appear that the Fourth Circuit has addressed the applicability of the first-to-file rule when two WARN Act cases are pending in the same district and are before the same judge in the same district. *But see U.S. ex rel. Palmieri v. Alpharma, Inc.*, 928 F. Supp. 2d 840, 846 n.8 (D. Md. 2013) ("However, the [False Claims Act's] first-to-file rule, by its text, is not limited to first-filed actions pending in the same court or before the same judge.");

---

factors are: "(1) the ease of access to the sources of proof; (2) the convenience of the parties and witnesses; (3) the cost of obtaining the attendance of the witnesses; (4) the availability of compulsory process; (5) the possibility of a view by the jury; (6) the interest in having local controversies decided at home; and (7) the interests of justice." *Id.* (citing *Stewart Org., Inc. v. Ricoh Corp.*, 487 U.S. 22, 29 (1988); *Landers v. Dawson Constr. Plant, Ltd.,* 201 F.3d 436 (4th Cir. 1999) (unpublished table decision)). The moving party bears the burden of clearly establishing that these factors favor transfer. *Id.* (citation omitted).

*see also Guill v. All. Res. Partners, L.P.*, Case No. 16-CV-0424-NJR-DGW, 2017 WL 1132613, at *2 (S.D. Ill. Mar. 27, 2017) ("Some courts have applied the first-to-file rule notwithstanding the fact that two actions had both been filed in the same district.") (listing cases). Upon consideration of the foregoing, even if the first-to-file rule factors were satisfied, this court in its discretion would not apply the rule because the purpose of the first-to-file rule–to avoid duplicative litigation and conserve judicial resources–can be accomplished without dismissing this matter. Accordingly, the court **DENIES** Fluor Defendants' Motion to Dismiss.

*3. Consolidation of the Butler and Pennington Cases*

At the February 14, 2018 motion hearing, counsel for the parties suggested to the court that consolidation of the *Butler* and *Pennington* matters is a viable option to conserve resources and efficiently move the cases forward. Rule 42(a) of the Federal Rules of Civil Procedure provides that where actions involve a common question of law or fact, the court may "(1) join for hearing or trial any or all matters at issue in the actions; (2) consolidate the actions; or (3) issue any other orders to avoid unnecessary cost or delay." Fed. R. Civ. P. 42(a). "District courts have broad discretion under F[ed]. R. Civ. P. 42(a) to consolidate causes pending in the same district." *A/S J. Ludwig Mowinckles Rederi v. Tidewater Constr. Corp.*, 559 F.2d 928, 933 (4th Cir. 1977) (citation omitted). "[C]onsolidation is appropriate when to do so will 'foster clarity, efficiency and the avoidance of confusion and prejudice.'" *Workman v. Nationwide Mut. Ins. Co.*, C/A Nos. 4:12-cv-02567-JMC, 4:11-cv-01734-JMC, 2013 WL 2285937, at *3 (D.S.C. May 23, 2013) (citation omitted).

After considering the parties' respective positions, the court is persuaded that the *Butler* and *Pennington* cases should be consolidated for purposes of discovery and pretrial motions because they involve common questions of law and fact regarding the applicability of the

WARN Act to the terminations of employees at VC Summer. The court finds any potential prejudice does not outweigh the benefit of judicial economy provided by consolidation. Based on the foregoing, the court sua sponte consolidates the *Butler* and *Pennington* cases for purposes of discovery and pretrial motions.[2] *E.g.*, *In re Pepco Emp't Litig.*, C/A No. 86-0603(RCL), 1990 WL 236073, at *1 (D.D.C. Dec. 20, 1990) ("Although this circuit does not appear yet to have ruled on whether a court may sua sponte order consolidation, the court holds that the plain language of Rule 42(a) and the weight of authority give it the power to issue such an order.) (citing Fed. R. Civ. P. 42(a)).

## V. CONCLUSION

Upon careful consideration of the entire record and the arguments of the parties, the court hereby **DENIES** Fluor Defendants' Motion to Dismiss the action against them pursuant to the first-to-file rule. (ECF No. 17.) The court sua sponte consolidates *Pennington v. Fluor Corp.*, C/A No. 0:17-cv-02094-JMC (D.S.C. 2017) with *Butler v. Fluor Corp.*, C/A No. 0:17-cv-02201-JMC (D.S.C. 2017) for purposes of discovery and pretrial motions. The court further sua sponte stays both actions until the court enters its opinion(s) adjudicating the Motion to Dismiss, Motion to Certify Class and Motion to Appoint Counsel currently pending in the *Pennington* case. *See Pennington*, C/A No. 0:17-cv-02094-JMC, ECF Nos. 21 & 69.

**IT IS SO ORDERED.**

J. Michelle Childs
United States District Judge

February 16, 2018
Columbia, South Carolina

[2] At the close of discovery, and after the court has issued an opinion on any dispositive motion filed, the court will decide to what extent, if at all, the trial of these cases shall proceed together.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
ROCK HILL DIVISION
CASE NO. 0:17-CV-02094-JMC; 0:17-CV-02201-JMC

HARRY PENNINGTON III and TIMOTHY LORENTZ, *on behalf of themselves and all others similarly situated*,

Plaintiffs,

FEBRUARY 14, 2018
10:00 A.M.

v.

CASE NO. 0:17-CV-02094-JMC

FLUOR CORPORATION, FLUOR ENTERPRISES, INC., FLUOR DANIEL MAINTENANCE SERVICES, INC., SCANA CORPORATION, and SOUTH CAROLINA ELECTRIC & GAS COMPANY,

Defendants.

---

LAWRENCE BUTLER, LAKEISHA DARWISH, DARRON EIGNER, JR., BERNARD A. JOHNSON, AND JIMI CHE SUTTON,

Plaintiffs,

v.

CASE NO. 0:17-CV-02201-JMC

FLUOR CORPORATION and FLUOR ENTERPRISES, INC.,

Defendants.

PAGES 1 THROUGH 87

---

TRANSCRIPT OF HEARING ON MOTIONS
BEFORE THE HONORABLE J. MICHELLE CHILDS
UNITED STATES DISTRICT JUDGE

(Appearances contained on following pages)

APPEARANCES FOR PENNINGTON V. FLUOR:

| | |
|---|---|
| FOR THE PLAINTIFFS: (Pennington and Lorentz) | Mr. Jack A. Raisner, Esq.<br>Mr. Rene S. Roupinian, Esq.<br>OUTTEN & GOLDEN, LLP<br>685 Third Avenue<br>25th Floor<br>New York, NY 10017<br><br>Ms. Lucy Clark Sanders, Esq.<br>BLOODGOOD & SANDERS<br>242 Mathis Ferry Road<br>Suite 201<br>Mount Pleasant, SC 29464 |
| FOR THE DEFENDANTS: (Fluor Corp., Fluor Enterprises, Inc., and Fluor Daniel Maint., | Mr. John Hagood Tighe, Esq.<br>Mr. Matthew R. Korn, Esq.<br>FISHER & PHILLIPS, LLP<br>320 Main Street<br>Suite 750<br>Columbia, SC 29201<br><br>Mr. David Kresser, Esq.<br>FISHER & PHILLIPS LLP<br>1075 Peachtree Street NE<br>Suite 3500<br>Atlanta, GA 30326 |
| FOR THE DEFENDANTS: (SCANA Corp. and South Carolina Electric & Gas Co.) | Mr. Charles T. Speth, II, Esq.<br>Mr. D. Michael Henthorne, Esq.<br>OGLETREE DEAKINS NASH SMOAK & STEWART, PC<br>First Base Building<br>2142 Boyce Street<br>Suite 401<br>Columbia, SC 29201<br><br>Mr. Will Brumbach, Esq.<br>Assistant General Counsel<br>SCANA CORP.<br>Mail Code C-222<br>220 Operation Way<br>Cayce, SC 29033-3701 |

(Appearances continue on next page)

USCA4 Appeal: 21-1141 Doc: 30-1 Filed: 04/19/2021 Pg: 287 of 563

APPEARANCES FOR BUTLER V. FLUOR:

FOR THE PLAINTIFFS: (Butler, et al.)

Mr. Charles A. Ercole, Esq.
Mr. Lee D. Moylan, Esq.
KLEHR HARRISON HARVEY BRANZBURG LLP
1835 Market Street
Suite 1400
Philadelphia, PA 19103

Ms. Amy Lohr Gaffney, Esq.
GAFFNEY LEWIS AND EDWARDS LLC
3700 Forest Drive
Suite 400
Columbia, SC 29204

FOR THE DEFENDANTS: (Fluor Corp., Fluor Enterprises, Inc.)

Mr. John Hagood Tighe, Esq.
Mr. Matthew R. Korn, Esq.
FISHER PHILLIPS, LLP
320 Main Street
Suite 750
Columbia, SC 29201

Mr. David Kresser, Esq.
FISHER PHILLIPS LLP
1075 Peachtree Street NE
Suite 3500
Atlanta, GA 30326

STENOGRAPHICALLY REPORTED BY:

Ms. Carly L. Horenkamp, RMR, CRR, CRC
Official Court Reporter
U.S. DISTRICT COURT
901 Richland Street
Columbia, SC 29201
954.557.5504

10:02 (Open Court, 10:02 a.m.)

THE COURT: Thank you. Please take your seats. Okay. Good morning, everyone.

ALL COUNSEL: Good morning, Your Honor.

THE COURT: And we are here on the matters of Harry Pennington and Timothy Lorentz, on behalf of themselves and all others similarly situated, versus Fluor Corporation, et al. And this is for Civil Action No. 0:17-CV-02094-JMC.

And then also the matter of Lawrence Butler, et al., individually and on behalf of all those similarly situated, versus Fluor Corporation and Fluor Enterprises, that being Civil Action No. 0:17-CV-02201.

And we have two motions to dismiss by defendants SCANA Corporation and South Carolina Electric & Gas in the Pennington case as well as another motion to dismiss. And I believe that we noticed that we would deal with the Pennington case first this morning; is that correct?

MR. TIGHE: I believe your Honor said the Butler case.

THE COURT: The Butler case. Okay. So we'll do the Butler case first, I'm duly prepared for both, and so we'll do that first and then followed by the Pennington case. So you all can set up and then just indicate who is here in the courtroom, because you might only have one arguing, but if not, that's fine as well.

So the Butler case first.

10:04

MR. TIGHE: May it please the Court.

THE COURT: Yes.

MR. TIGHE: Your Honor, my name is Hagood Tighe and my firm represents Fluor in this matter. Good morning and Happy Valentine's.

THE COURT: Same to you.

MR. TIGHE: Thank you. Our goal today in filing this motion to dismiss is very simple. Fluor is trying to find the most efficient way for us to defend our claims and conserve and be efficient of both the parties' time, the attorneys' time, and of course the Court's time.

Fluor did not order the closing that's being litigated today and Fluor did not know in advance that the closing was going to take place, and so again our goal is to have the most efficient way to demonstrate to the Court that Fluor did not violate the WARN Act.

Our motion is a motion to dismiss, to stay, or to consolidate, and I'd like to point out on the front end that any of those options are suitable to Fluor, and in fact, both we and Butler's counsel have already indicated that they would consent to a consolidation of the Butler matter with the Pennington matter, and because of that I am going to -- since we agree on that, I'm just going to move to the motion to dismiss, if that's okay with Your Honor.

THE COURT: Certainly. Okay.

10:05

MR. TIGHE: And I'd like to cut straight to the heart of what I think the issue is here. The parties have all briefed the first-to-file rule. I think we all know what the first-to-file rule is. The key issue before the Court today is whether that rule should apply when we have two cases that are substantially the same, in the same court and before the same judge, and I think the "before the same judge" part is the key part.

The general rule that's been stated by the Fourth Circuit and by this Court, and I'm summarizing, is where two district federal courts have concurrent jurisdiction over litigation covering substantially the same issues, the first-to-file rule has been used in the discretion of the Court to dismiss or stay the later-filed suit in deference to the first-filed action.

And in this situation, we've got two cases that are substantially similar, if not almost exactly the same, bringing up the same sorts of claims, the same cause of action, and in the hearing that we had last time I think everybody agreed that the cases were largely the same.

None of the cases that have been cited by the attorneys on the other side indicate that there's any limitation or restriction on this Court applying the first-to-file rule in this matter and in fact --

THE COURT: Isn't the discretionary rule, specifically

10:06 in the Fourth Circuit, it's not an unyielding rule?

MR. TIGHE: Yes, ma'am, you're exactly correct. The Fourth Circuit has said, and the cases that both we and opposing counsel have cited have made it clear, that this is purely within the discretion of the Court.

And the primary justification for judges when deciding whether or not to apply this rule in all cases has to do with avoiding duplicative actions, duplicative litigation; and then the second, of course, is to conserve judicial resources. And here in this case I think we've got both of those principles at hand.

THE COURT: But when you're usually looking at this rule, it's a little different in this situation because you're usually looking at cases filed in different federal courts perhaps.

MR. TIGHE: Yes, ma'am.

THE COURT: Maybe even in different federal jurisdictions.

MR. TIGHE: Yes, ma'am, that is correct, it usually does come up in that context, but there are a number of cases where it has come up within both the same district and the same court and the courts have applied it. And I'm going to hand up some cases along those lines in just a few minutes if that's okay.

THE COURT: Sure.

10:07

MR. TIGHE: You know, one thing I would point out, and this does relate to the question you are asking, and that is, you know, why is that a concern here today before Your Honor?

And one of the reasons is, and I think we saw it when we were here for the hearing a couple of weeks ago, and I think we're going to see it as we proceed, that this is already getting fairly complicated. We've got two parallel actions going forward, we've had motions being filed in both cases, we've had attorneys in one case filing motions in the other case, and it's been very difficult for me to keep track with what's going on, and I applaud the clerk's office for being able to keep it straight.

THE COURT: But is that cured by the agreement for consolidation?

MR. TIGHE: It certainly could be if the case -- yes, ma'am?

THE COURT: Well, and then the agreement for consolidation and then the Court's ultimate decision about appointing counsel.

MR. TIGHE: Yes, ma'am, I think both of those will go hand-in-hand.

THE COURT: Okay. Continue on.

MR. TIGHE: Thank you. So there are -- as I was saying, Your Honor, there are several cases that I'd like to bring to your attention, and with your permission I'd like to

10:08 hand copies up. Is that okay?

THE COURT: Yes.

MR. TIGHE: Your Honor, the first case that I'd like to mention is the *Humphrey* case. Now, the *Humphrey* case, and I've provided the order from that, which is the top one on the stack that you've received, the *Humphrey* case is another case that is pending in this same district by a former employee who worked out at Fluor and at the site, and in that case they did not bring a WARN case to begin with, but they filed a motion to amend to bring a WARN Act -- to amend their complaint to bring another WARN Act class action. Had they been permitted to do that, that would have been the third WARN Act class action that we have governing the same facts at issues today.

In that case, Judge Wooten applied the first-to-file rule to find that that case should not be permitted and therefore denied the plaintiffs' motion to amend in that situation.

There are also three other cases that I'd like to draw to the Court's attention that deal with situations where we have matters pending in the same district and before the same judge.

And the first case is the *Guill*, G-U-I-L-L -- I think I'm saying that right, but no idea -- the *Guill* case, and that is a case, it is an unpublished decision, but it is a decision involving two WARN Act cases, and the same sorts of arguments

10:10 were presented before the court in that case that are presented here, and the judge in that case indicated that there was no Seventh Circuit authority -- because that's where they were, in the Seventh Circuit there -- that prevented the judge from applying the first-to-file rule in the case there before the same judge. And similarly, there's no Fourth Circuit authority that would prevent Your Honor from exercising her discretion to do the same.

The second case that I'd point out is the *MF Global* case, and I've also provided the order in that case, and I realize that the plaintiffs' attorneys -- many of the plaintiffs' attorneys who are here today were involved in that case, and that order does address who should be lead counsel and things of that nature, but it also addresses the argument on first to file.

And there are a number of instances in that, and I'll quote, where the judge said at the beginning of his opinion, "For the reasons explained below, and in the exercise of the Court's discretion, the Court concludes that the last-filed case should be dismissed." And then there are several other comments and other discussion in there about whether the latter-filed case should be dismissed. Again, this is another case where we had two matters pending before the same judge.

Also relating to Your Honor's question earlier, the judge pointed out on page 624, and I'll quote, when talking

10:11

about the risk of duplicative litigation even before the same judge, the judge said, "Each action will likely involve identical motion practice, discovery, and, possibly, trial or settlement discussions. This Court is unable to find any additional benefit in permitting the Greene action to proceed." The Green action being the latter-filed action in that case. So again, we've got a WARN Act -- WARN Act cases before the same judge and the first-to-file rule was applied.

Finally, I'd like to point the Court to the *ACE Property & Casualty Insurance Company versus Specialty Logging* case, which was a case that was decided by Your Honor. This is an unpublished decision and it's the last one in the group that I've handed up to you. In that case, the court had two matters pending before it. These were not WARN claims, but had two matters pending before it. One was the *ACE Property & Casualty Insurance Company versus Specialty Logging* case and the second was the *Skipper versus ACE Property* case.

And as the docket makes clear, both of these matters were pending before the court at the time the motion to dismiss was heard, and in that opinion, the court cited to the first-to-file rule, summarizing it as I did earlier, and pointing out that Your Honor does have the discretion to decide how to apply it in deciding to use the first-to-file rule. And one of the justifications pointed out in there is what we have already discussed this morning, and that is the general

10:13 principle of avoiding duplicative litigation.

All three of these cases I think demonstrate that the Court has the discretion to apply the first-to-file rule even in cases like the one we're talking about today to then decide whether to dismiss, consolidate, or stay.

I will point out that there won't be any prejudice to the plaintiffs in the other case -- excuse me, in the Butler case. The Pennington matter is a class action, or is filed as a class action, so the putative plaintiffs would be covered under that if and when the class is certified, so we're not preventing anybody from having their day in court.

Also, as I stated to begin with, you know, we have already indicated that we are willing, and I think the Butler plaintiffs are as well, to consent to a consolidation, but if that is not appealing to the Court, we would ask that you would consider dismissing the matter using the first-to-file rule.

I'd be happy to answer any other questions Your Honor might have.

THE COURT: No, that's sufficient for now.

MR. TIGHE: Thank you, ma'am.

THE COURT: Thank you. Okay. And you want to just introduce who else is appearing in court with you?

MR. TIGHE: Yes, ma'am. Dave Kresser from Fisher and Phillips is appearing with me, and Matt Korn, both -- both with Fisher and Phillips.

10:14

THE COURT: Okay. Welcome.

MR. TIGHE: Thank you, ma'am.

THE COURT: All right.

MS. GAFFNEY: Thank you, Your Honor. May it please the Court. Amy Gaffney on behalf of the Butler plaintiffs.

THE COURT: Okay.

MS. GAFFNEY: And with me today are Lee Moylan and Charles Ercole from the Klehr Harrison law firm in Philadelphia. Mr. Ercole will be arguing in opposition to Fluor's motion.

THE COURT: Okay. Thank you.

MR. ERCOLE: Good morning, Your Honor.

THE COURT: Good morning.

MR. ERCOLE: May it please the Court.

THE COURT: Yes.

MR. ERCOLE: We agree with Mr. Tighe that they -- Fluor has the right to have to only litigate one WARN Act case. We've discussed this with them from the moment they filed their motion. They filed it on the same day that Pennington filed their opposition to our motion for class certification, both making essentially the same argument about first to file. We've briefed that extensively as to why it shouldn't apply. The Court is correct, it's discretionary. When it's before the same judge, you do not have the issues of duplicative actions, inconsistent decisions. It's not in a different jurisdiction

10:15 so we don't have a situation with convenience of witnesses or location of evidence.

So it was a little curious to us to note that Fluor, A, responded with that motion initially as opposed to just addressing the class action motions; and then at the January 23 argument two weeks ago, Fluor admitted in open court that they don't have a dog in this fight about who was going to be appointed class counsel. And so we asked them again to withdraw the motion because, effectively, by asking to dismiss our case, they are getting involved in who gets appointed class counsel.

If the Court consolidates, or once it decides the class certification, it will address all of Fluor's concerns about having a single action.

And the point about at the end that he made that the Butler plaintiffs will be adequately representative, we understand that there will be a class certification. We've already given plenty of reasons, one of the primary ones being the fact that we have the most plaintiffs. Of all the other three cases combined, we have more plaintiffs than they do. We have over 400 plaintiffs who should be entitled to their counsel.

And the cases that are cited, and again, *MF Global* is the classic one, that although technically Judge Glenn ultimately applied the first-to-file rule as a technical matter

10:16 for dismissing the later-filed case, in all of those cases, all the WARN Act cases, the reason why the decision is made is not because of first to file, it's because of how much more qualified the earlier-filed teams were.

So in this case you had three premiere WARN Act firms: Outten Golden, Klehr Harrison, and Lankenau Miller. And the later-filed case, the Greene action, was the Harwood firm, who, as Judge Glenn noted in oral argument, had never filed a WARN Act case.

So again, the basic situation where later-filed cases are dismissed is not always because of the first-to-file rule. It's not a silver bullet. There are other factors in play. And if the earlier-filed case has a qualified firm or the most qualified firm, best suited for pursuing that litigation with the largest number of plaintiffs, then yes, that case, the later-filed case should be dismissed.

That's not the situation here, and again, we'll get into that as part of the class certification motion as long as the Court denies Fluor's motion to dismiss today.

So again, I think we've addressed it on our papers. I don't know if there are specific questions the Court has about either other issues that have been raised. And our position is you should not exercise discretion and dismiss Fluor's motion.

THE COURT: Okay. And then why don't you speak from your own position about what your agreement is as you see it

10:18 with respect to consolidation.

MR. ERCOLE: Yes. Now, we would -- we would agree -- I mean, we agreed from the beginning, we would agree to a consolidation. We would have agreed to a stay of any other proceedings until the Court sorts out the class certification and appointment of counsel issue. We think that is an appropriate way to proceed. I said that -- again, two weeks ago I said that as part of our argument, was that ultimately consolidation is probably the answer, and then the question is, who gets appointed lead counsel? The Court can indicate who should be the lead counsel and what other firms should be involved.

THE COURT: Okay. And you do see this motion only as an issue dismissing your case based on the first to file, no substantive matters.

MR. ERCOLE: Correct. They've raised nothing but the first-to-file rule. I know he made a little -- Mr. Tighe made a little opening argument that they have not violated WARN, and that's the merits, we'll get into that at some point, but yes.

THE COURT: Okay.

MR. ERCOLE: Okay?

THE COURT: Just wanted clarification. Okay.

MR. ERCOLE: Thank you, Your Honor.

THE COURT: Mr. Tighe, do you have anything else?

MR. TIGHE: No, ma'am, unless you have any questions.

10:19

THE COURT: I don't. Thank you.

All right. So we'll move to the next matter then.

MR. TIGHE: Your Honor, if you'll give us a minute, we're going to swap seats around a little bit.

THE COURT: Absolutely. Take your time. And I was just about to say, you all are welcome to come to the podium or at your seats, whichever is more comfortable.

MR. SPETH: I do that because of my eyes, Your Honor, I can see better.

(Pause.)

THE COURT: Okay. Are the parties ready to proceed to the Pennington matter?

MR. SPETH: The defendant is, Your Honor.

THE COURT: Okay.

MR. SPETH: May it please the Court, I am Ted Speth. I represent South Carolina Electric & Gas Company and Fluor Corporation in the Pennington matter. Accompanying today is Mr. Will Brumbach, who is in-house counsel with SCANA Corporation. Mr. Michael Henthorne, who practices with my law firm. And Ms. Melissa Jump (sp), who is a paralegal with my law firm also.

THE COURT: Okay. Thank you.

MR. SPETH: Today during my argument I will mention probably multiple times SCE&G and SCANA. For the purposes of the motion today and the issues before the Court today, those

10:21 two entities stand in the same place, so when I mention one, it applies to both.

And there's one claim in the Pennington case, and that is under the federal Workers Adjustment and Retraining Act, often referred to as the WARN Act, W-A-R-N, and that's how I will also refer to that statute as we go through today's argument.

There are three topics that I plan to discuss, and of course if the Court has others or wishes to rearrange how I address these topics, I'm glad to accommodate you in any way.

The first topic I would like to address would be the proper legal analysis of who is an employer in an alleged multi-entity situation under the WARN Act.

Then second, I will review the material facts that are involved in this case, and in doing so, I also will note that probably the majority, if not the vast majority of the facts that are alleged in the amended complaint, have nothing do with the underlying legal issues in the case.

And then the third topic I will address, or area I will address, is generally the plaintiffs' position in their memorandum opposing our motion on the joint employer situation, and specifically the application, or perhaps the inapplication, of the *Salinas versus Commercial Interior* case, which is the Fourth Circuit decision upon which the plaintiffs relied, which was decided in 2017.

10:23 First, let me discuss the proper legal analysis for the -- where there are allegations against multiple entities for liability purposes. The question is, when can multiple businesses be held jointly or severally liable to a group of employees for some sort of unlawful conduct by one of those entities?

There are two separate and distinct legal theories that have been developed in this multi-entity or multi-employer situation which analyze the conduct and determine who would be unlawful. These theories are the single employer analysis is the first one; and the second analysis is the joint employer analysis. In both of these situations, at the outset, the two entities are claiming that they are completely separate and distinct from one another, and probably appear to be so on first blush.

The simple case in analyzing these two theories is a 1982 case, decision by the Third Circuit Court of Appeals in the *NLRB versus Browning-Ferris Industries*, which is cited multiple times in our memorandum. In that decision, the NLRB -- and this was not a WARN case; it was a case on the National Labor Relations Act -- discussed these two theories, how they are distinctly different, and what legal analysis and legal factors should apply in applying both of those theories to a multi-employer situation.

In addressing the single employer situation, what the

10:25 court said is the two entities which initially appear to be two separate entities apart from one another, that when you peel the onion back, they merge together to be one entity. When you really look behind the curtain or, as I say, peel the onion back, they then really are not two separate entities, but one single entity operating and functioning as one single entity.

In the joint employer situation, the two entities sitting out here separate are exactly that —— they are exactly what they claim and appear to be, and that is they are two completely separate entities from a functional and operational standpoint.

However, what the analysis does -- it does not look at every relationship so much as it looks at the relationship of the employee who is claiming the unlawful activity. So you have sort of a triangle here. You have two entities which don't ever merge, they stay completely apart, and down at the bottom you've got an employee who says one or both of those entities treated me unlawfully.

And to determine whether there is a joint employer relationship between these two, what the court looks at, according to the *BFI* case, is, have both of those entities agreed, either by formal agreement or practice, that they both can assert control over the essential terms and conditions of that employee's work environment and that employee's work itself? So those are the two theories that are at work.

10:26

Now, one thing that is very important at the outset in looking at these theories is sort of the focus that the Court has, because the focus on these two theories is entirely different. When you look at the single employer situation, the focus is at the enterprise level. In fact, if you looked at Browning-Ferris cases, in many of the cases -- or virtually all of the cases on the National Labor Relations Act, they reference this test as the enterprise test, not the single employer test.

Now, those two have sort of merged since WARN has come around, and the Department of Labor has issued regulations that are very similar to the enterprise test, but it looks at enterprise, that is, it looks at the top level of the corporations. When you look at the top level, at the top officers, the top actions, these top strategic planning, are they really one in the same? Are they dependent upon one another? So it's at that level that the single employer analysis and factors are applied.

The joint employer analysis is at what I would say is the bottom level. It looks not at what the two entities are doing at the top level, because it is determined that they are independent of one another. They're not operating jointly or in conjunction. You look at what they're doing on the project, on the site, on the job, in the plant, and specifically, you look at how the employee is being treated by both of these

10:28 entities. So in that, the focus is not on the entities and how they interact, the focus is on how they interact with the employee or employees who are making the claim. And that's an important and critical distinction in these two processes or these two analyses.

Now, with that in mind, I'd like to address the single employer test and then after that I will address the joint employer test.

First, the single employer test under WARN is well defined. The Department of Labor, after the WARN Act was enacted, took it upon itself to issue specific regulations as to how to analyze a single employer situation, and that's a five-factor test which we discussed at great length in the memorandum and then, quite frankly, has been used by every single court that has issued a WARN decision under the single employer analysis.

And the plaintiffs indicate in their brief that this may be an area where there's very little at least case guidance or judicial decisions. That just simply is not the case. The Circuit Court of Appeals for the Second, Third, the Fifth, and the Ninth all have issued decisions under the single employer analysis under WARN itself, all of which are consistent with SCANA's position in this case.

District Courts in the First, Fourth, Seventh, Eighth, and Eleventh Circuits have also issued decisions on the single

10:29 employer analysis under WARN, all of which are consistent with SCANA's position in this case.

The only circuit that does not have a published decision, either by a district court or the circuit court, is the Tenth.

In the memorandum that had been filed with the Court, there are no less than 20 WARN single employer cases cited, so this area has a great deal of analyses and has been subject to analysis and court orders for quite some time.

The first place I think the Court should look in determining the analysis to apply are the regulations themselves. I mean, the Department of Labor issued specific regulations under WARN dealing with this specific issue. The regulation that I would point the Court to was 20 CFR 639.3(a)(2). And if I may, I have a copy of that regulation. I'd like to hand a copy, hand it up to the Court and to opposing counsel.

THE COURT: Certainly. That would be fine.

MR. SPETH: Since the wording of that regulation, and perhaps one other, may be of some issue, I thought it would be good if we all had a copy before us.

And again, Your Honor, this regulation is the basis for every decision which is cited in the memorandum that had been submitted to this Court and those decisions that have been decided in 10 out of the 11 federal circuits concerning WARN

10:31

and the single employer analysis, and this is recognized as the analysis that should apply in the single employer context.

There are five -- there's a five-factor test: Common ownership; common directors and officers; de facto exercise of control; unity of personnel policies emanating from a common source; and dependency of the operations. Those are the five factors that should be applied.

Now, in the situation of the joint employer analysis, from the WARN standpoint, the joint employer analysis again starts with the two entities being separate and conceding that they are separate entities, and you are looking at how they function vis-a-vis the employee who is in question as a plaintiff in the case or is accusing the company or companies of unlawful activity.

And again, what the courts have looked at in the joint employer situations are the terms and conditions of employment -- the central terms and conditions of employment.

These include hiring. Who made the hiring decision?

Compensation. Who determined the individual's compensation? Who determined how they would be paid, when they would be paid, the work hours? Who determines when the employee comes to work? Who determines when they take a break? Who determines when they go to lunch? Who determines when they leave work?

Their work schedule. Do they work a day shift, night

10:33 shift, that sort of thing?

Job assignments. Who assigns the employee their job assignments from each day or in each hour they are at work?

Performance evaluations. Who does the performance evaluations of the employees? Who disciplines employees and who ultimately is responsible for terminating the employees?

Those are the core essential terms and conditions of employment which must be analyzed in the joint employer situation.

Now, you find no cases -- or I found no cases that have found a joint employer under WARN. There's at least one case that we cite where the decision was made that it wasn't a joint employer situation and that is because of a specific DOL regulation, 20 CFR 639(e). And again, I'd like to hand that up to the Court also since it is of critical nature in this case.

In essence --

Michael, can I get that handed up? Did you hand -- you handed all three up?

MR. HENTHORNE: All three have been handed out.

MR. SPETH: Okay.

In essence, Your Honor, that definition creates a bar to the joint employer situation under WARN. I mean, it is very clear, it says a consultant or a contract employee who has a relationship with another employer and is paid by that employer is not an affected employee. An affected employee is an

10:34 employee that is covered by WARN of the business which he is assigned to. So that appears to be a complete bar to the application of the joint employer situation in the WARN context.

Now, with this background, I think there are several questions facing the Court.

First, can the Court -- can there be a finding by this Court of a single employer relationship when, as the plaintiff has conceded here, and I will go into that in detail, that there is no common ownership and no common directors or officers, that is, No. 1 -- factor 1 and 2 of the DOL regulations are not present?

And then also where the terms and conditions of employment, including hiring, compensation, work, job scheduling, and termination have all been decided by someone else?

Now, looking at the single employer, if the factors -- I think the plaintiffs in this case urged the Court that factors 1 and 2, that is, common ownership and common directors and officers, is at best inconsequential, so assuming that is the case, then do they prove the other three factors?

And I would point to the Court that one factor that is the factor concerning the dependency of the operations, the plaintiffs say in their memorandum that that also does not apply in this situation. I think they take the position that

10:36 factors 1 and 2 just don't apply, period, in any WARN situation; and then the dependency of operations don't apply in this situation, so all the Court should conclude -- use to conclude whether there's a single employer relationship are two factors.

And then the question becomes, have they put forth facts in their amended complaint which would satisfy those two factors? And we think they haven't. So that's the first question the Court has to deal with.

The second is, even if the Court could accept the premises that neither common ownership and common directors are needed, again, do the facts that are alleged meet the other criteria?

And then the final question is, if the plaintiffs cannot meet the five-factor test, can they do what they are trying to do in their legal memorandum, that is, somehow blend the joint employer analysis and the single employer analysis to create some sort of brand new theory that has never been adopted by a court before to create a multi-employer liability in this situation.

Now, with those questions in mind, I want to review the facts in this case, and one of the things that plaintiffs contend is that this is a very complicated -- I think they use a once-in-a-lifetime kind of situation with these two nuclear reactors and all the things that are involved in it.

10:38

I'd like to offer the Court an analogy that I think will demonstrate, number one, how straightforward these facts are and actually how common they are in society.

And the analogy would go as follows. I buy a lot here in Columbia. I want to build a house on it. There is an architectural firm who is also a general contractor that is building a number of houses in the area. They've got a good reputation.

So I go to them and I say, would you draw me the plans, spec out the plans, give me a cost, give me a time line, I want a turnkey job, and if we can agree to the cost and the time line and the plans for the house, then I'll enter an agreement with you.

They do that. I review them. I agree. We reach a contract, enter a contract, and they're going to build my house for me on this piece of property which I own.

They begin building the house. They hire subcontractors to do the plumbing, perhaps the electrical work, the masonry work, that are working under this general contractor. They get about halfway through and, unbeknownst to me, the general contractor is not doing a good job marshaling his finances. In fact, he has gotten in grave financial difficulty and he has actually been using a wealthy uncle to support him.

And he goes to that uncle and says, I need some more

10:39

money to keep my business afloat. The uncle says, I've given you all I'm going to give you. I'm not going to give you any more. I think your only option is bankruptcy. So he files Chapter 11 reorganization bankruptcy.

He comes to me and tells me, I've filed bankruptcy. I can't honor the deal that we've put together so we've got to make some sort of other arrangement.

I say, well, let's do this. Give me 30 days. I want a 30-day assessment period to see if I can go forward with this house, if it's financially feasible for me to do it. I said, I would like you to continue the construction during that 30-day period. We reach an agreement that I will pay him X amount of money during that period of time to continue the construction.

Also, at the same time, a couple of subs come to me and they say, listen, we haven't been paid in two months. We're not going to continue to work on here unless you agree to make up the back pay that -- the two months' payment we haven't received from this contractor and pay us directly going forward. I reach a deal with them.

And part of the deal with all of them is, you don't do anything -- we reach a deal, how much money I'm going to pay you, you don't do anything that increases that cost without my approval. You don't go out and hire additional people. You do not have people working overtime other than what you've projected. You don't go out and lease new equipment that I've

10:40

got to pay for. You've got to come to me and get my permission if the cost is going to rise or it's going to affect how long the project is going to take. We all agree to that.

So the other change that takes place is I've been going by maybe once, twice a week to look at this house that's being built, and I decide since this is at a critical juncture I need to go by more often, so I go by at least once a day, maybe several times a day, and if there's something going on that I don't think is quite right, I may say something to one of the subs, I may say something to the general contractor, and say, you need to look into this. Is this affecting the cost? Is this affecting the time line?

They may come to me and say, we need to work overtime to get this done in the time frame and I'll either say yes or no. If I say yes, they determine who works the overtime and when they work the overtime. I don't, but they make that decision.

Then, during this process, I'm out there one day and they say, well, tomorrow we're going to pour the concrete driveway. And I know the landscaper's coming in tomorrow to do the sodding in the yard and I say, whoa, whoa, whoa, that won't work, the two of you all can't -- you just can't function together, you've got to put off pouring the concrete for one day.

Okay. So 30 days go by. I do the assessment and I

10:42 determine I can't afford the house, not under the new -- this new agreement. I just cannot do it. So I walk on the property the last day of the 30-day period and I tell the contractor and subcontractors, I'm pulling the plug, I'm stopping, it's over, today is the end, I've paid you up through today, that's it.

So the question is, am I the employer of the contractor's employees? Am I the employer of the subcontractor's employees? Because that is the factual situation here.

Let me now go through the facts that we have before this Court. First, Mr. Pennington -- well, let me go through a few facts, though, first that are in the complaint, they are just an example of probably about 80 percent of the facts that are alleged that, in my opinion, have nothing to do this case.

SCANA's interaction with the South Carolina legislature in 2007 to get this project off the ground has nothing to do with this case.

South Carolina's interaction with the Public Service Commission in 2007 and later concerning this project has nothing to do with this case.

The projected and actual cost of the nuclear reactors have nothing to do with the case.

The passage of the Base Load Review Act by the legislature in 2008 has nothing to do with this case.

The payment for the project by the customers, the

10:43 ratepayers, you and me, under the Base Load Review Act, have nothing to do with the claims in this case.

What SCANA has proposed regarding charging for the project going forward since the termination of the project has nothing to do with the issues in this case.

So those are just examples of many of the facts that are alleged that just simply are either offered to try to make the case seem more complicated than it really is; or perhaps just to get an emotional rise from the situation which we all regret has happened at V.C. Summer.

So let me go through what the facts are as pled in the amended complaint.

First, we know that Mr. Pennington is employed directly by one of the Fluor entities.

We know that Mr. Lorentz is employed by Westinghouse or one of the Westinghouse entities.

We know Fluor Daniel Maintenance Services, one of the defendants, is a Delaware corporation, has its offices in Irving, Texas. It's a global engineering and construction company.

We know that SCANA is a South Carolina corporation with offices in Cayce, South Carolina.

We know SCE&G is a wholly-owned subsidiary of SCANA and it generates and distributes electricity.

Westinghouse, we know, is a global company in the

10:44

energy field providing goods and services to power generating companies. Their corporate offices are in Cranberry Township, Pennsylvania.

Toshiba is the parent corporation of Westinghouse, according to the amended complaint.

We know that in 2008, SCE&G entered into an agreement with Westinghouse and others to begin the engineering process and oversee the construction of the building of two new nuclear reactors at the V.C. Summer Nuclear Station in Jenkinsville, South Carolina.

We know that is an existing site that is owned by SCE&G.

We also know from the amended complaint that in 2016, late 2016 and 2017, Westinghouse began to experience significant financial problems. We know that Westinghouse filed for bankruptcy in the Southern District -- bankruptcy court in the Southern District of New York on March 29, 2017. We know that Westinghouse was directed to file bankruptcy by its parent corporation, Toshiba.

On or about the same time as the bankruptcy filing, we know from the amended complaint that Westinghouse and SCE&G entered into an interim assessment agreement to determine the feasibility of completing the construction project.

Thus far, the facts track my analogy point by point.

We know that, as the plaintiffs have claimed, that

10:46

SCE&G agreed to fund the continuing cost of the project during the assessment period, including making payments directly to Fluor, the subcontractor of Westinghouse, for the work it performed during this period of time.

We know that as part of this agreement, Westinghouse had to obtain approval from SCE&G for any expenditures that would exceed the agreed-upon budget and for any work that may create or elongate the time period of the project.

We know in July 31st, 2017, SCE&G informed Westinghouse and Fluor that it had determined that the project was not financially viable or feasible and that it was abandoning the project and to cease all work at once.

We know that SCE&G provided its affected employees -- and that's using the legal term from the Act -- with 60 days' advance notice as required under WARN of their termination on that day, that is, on July 31st, 2017.

Plaintiffs assert they were terminated that day. SCE&G has no knowledge of that. They weren't involved in the termination decision. They can't say they were or they weren't, but for the purposes of this motion right now, we would take that as being a fact.

More importantly, they say -- and this is an important distinction -- they say they were not given their 60-day WARN notice on that date by either Fluor or by Westinghouse. And again, SCANA has no involvement in that decision as to who --

10:47 what Westinghouse or Fluor would or would not do concerning the WARN obligation and wouldn't know whether they were or were not given that notice. But for the purposes of this argument, we'll concede that they weren't.

And what's important about those two events, that is, termination, and I'll take one more, Mr. Tighe mentioned closing of the facility was an issue in this litigation, closing of the facility is not an issue in this litigation. That is not unlawful under WARN. Terminating the employment of the employees is not an issue in this litigation. That is not an obli- -- this is not a wrongful discharge case. We don't have race, sex, national origin, disability claims of any kind. This is purely a WARN case.

The only issue in this case was, were the employees given their 60-day notice? Was a notice provided? And then who should have provided it? It's not -- closing of the facility and terminations have really nothing to do with the legal issues and the legal liability in this case. It's the 60-day notice that is the issue that is here.

Now, let me move to applying these facts first to the single employer test, and the first factor under the single employer test is common ownership. And the normal situation you find in the majority of these cases, Your Honor, at least early on, the single employer was when you had a parent or subsidiary or two sister corporations and how they interacted

10:49 with one another. And if there is a parent-subsidiary, then clearly there's going to be an ownership relationship there that always exists.

Where the issue has arisen in the litigation over the last several decades under WARN is not with the parent-subsidiary so much as the lender-borrower relationship, and that is, when an entity that actually employs the individuals who had the WARN issue have borrowed a substantial amount of monies from a lender and what kind of control that lender has over the borrower based upon the debt. And that situation has created some, I think, difficulties for the court.

And I think the case that is most helpful here, because it does address the importance, I think, of the common ownership and the common officers and directors, is the *Pearson versus Component Technologies* case out of the Third Circuit. It's a 198- -- excuse me, a 2001 decision. And that was a lender-borrower situation. Pearson was the employee of Component Technologies. Component Technologies had borrowed, through several mechanisms, over a period of time a substantial amount of money from GE Capital. Ultimately, the Component Technology facility where the plaintiff worked was closed due to its financial insolvency and Mr. Pearson sued both Component Technology and GE Capital under the single employer theory.

The court, in analyzing that, in wrestling with, how

10:51

do you deal with this borrower-lender -- and as the court says, it's easy when it's a parent-subsidiary. You've generally got automatically common ownership, common officers and directors. But in this borrower-lender, is there a way that that lender can stand in the shoes of a parent corporation?

So the court in that instance spent a lot of time, in fact, the vast majority of the case, analyzing factor 1, common ownership, and factor 2, common directors, and I think that shows -- should show the Court exactly how important those two common factors are. That they are critically important because that's the -- if you look at that opinion, the most time spent was the court wrestling with those two factors and saying, how can we apply it, can it be applied, and how should it be applied in the borrower-lender -- lender-borrower situation?

Ultimately, the court found that based upon the actions of GE Capital, that is, they had the ability to control who the officers were, they hired and fired the president, they hired and fired the CFO of Component Technologies, they put in consultants to try to run the company to keep it -- to get it back on track, all those actions, ultimately the Third Circuit found that, yes, they really are in the shoes of a parent and a subsidiary and that shows, due to their financial investment and their ability to dictate who the officers were of the company, they meet the first two criteria.

But it didn't just, as the plaintiffs would have you

10:53 do here, dismiss those two as inconsequential. In fact, just the opposite —— I think it recognized how critical they were.

Now, interestingly, in that case the issue came up as to the importance of those first two criteria vis-a-vis the other three criteria, and that's where the plaintiffs cite a number of cases that say the first two criteria are not -- not the most important criteria. The other three are necessary criteria.

And where that normally comes up, and the Court pointed this out, I think the issue before the Third Circuit is just like here, I think the plaintiffs in that case were saying, you don't have to deal with this in this lender-borrower. Criteria 1 and 2 are really inconsequential. They really don't mean anything. You don't have to have them. And the court rejected that notion and then went into great analysis. But in the end, it dealt with all these cases that say the more important factors are the other three factors.

And where that arises is you'll have a plaintiff coming in to the court, coming in to you, Your Honor, and saying, look, this is a parent-subsidiary. The parent wholly owns the company, just like SCANA owns SCE&G. They, you know, control, they have commingled the officers and directors, so we've met 1 and 2 in the scenario. There's liability.

And the courts in those instances said, no, no, wait a minute. Even if 1 and 2 are present, that does not create

10:54 liability. You must have some evidence that some or all of the other three criteria are met. That is the -- that is how that issue comes up and how that statement is made. It's not like the plaintiffs urge in this case and the plaintiffs urged in the Third Circuit case, the *Pearson* case, that those first two criteria are inconsequential and don't even need to be analyzed.

However, in this case the plaintiffs concede that there is no common ownership here. SCANA does not own any interest, it's not alleged they own any interest in Westinghouse. In fact, the plaintiffs say that Westinghouse's parent corporation is Toshiba. It's not alleged that SCANA owns any interest in Fluor. So there is no allegation whatsoever that there is any common ownership in this situation.

And Your Honor, I'd point you, on the *Pearson* case, just before I leave this, to look on page 494, in quoting the case, in dealing with this issue of the first two criteria versus the other three, the court says, and I quote, "These statements mean only that, by itself, ownership -- and even ownership coupled with common management -- is not a sufficient basis for liability."

THE COURT: But it doesn't seem like the plaintiffs focus there. They seem to focus on the fact that once the project was continuing on after the bankruptcy, that SCANA

10:56 participated in more of the operational decision-making along the way.

MR. SPETH: Yeah, Your Honor, that would be a great focus from a joint employer analysis if it applied. It has nothing to do with the single employer analysis. Again, the enterprise level, you've got to look at the top level. They're not talking about, you know, do they share -- do they have managers on-site at the plant? This is the enterprise test. Again, quoting the language from many of the decisions, you're looking at the top level. You know, is Kevin Marsh and David Seaton the same person, that is, the two CEOs at the time of Fluor and SCANA? They're not. I mean, do they share -- have common board members? They don't. There's no allegation they do. I mean, there's no evidence that they don't here, I'm overstating that, but there is not one single allegation in the complaint of common ownership.

The plaintiffs try to focus, again, that's why they shifted to this joint employer theory, they're wanting you to focus down on the project level and that has nothing to do with the single employer analysis.

THE COURT: And then commenting on that, it's not until the plaintiffs' response to your motion to dismiss that we hear really about the joint employer analysis.

MR. SPETH: That's right.

THE COURT: Okay.

10:58

MR. SPETH: There are several bars I think -- legal bars to the joint employer analysis which I'll get into when I get there --

THE COURT: Right.

MR. SPETH: -- but I think even before you go into analyzing whether there was a joint employer relationship, there's several bars to that theory even proceeding in this case.

THE COURT: And one of the bars you would suggest is that the WARN Act does not apply to joint employers.

MR. SPETH: Exactly. If you look at 639.3(e), the WARN Act would not apply to a joint employer situation.

Now, the plaintiffs do have a couple of things that they point out. I mean, they do say that the factor is not something that is significant, but then they do say a couple of things I think I need to address.

One, they say in their memo that SCANA forced Westinghouse into bankruptcy, and this is directly contrary to the facts in the amended complaint. In the amended complaint, they say that Westinghouse's parent corporation Toshiba forced it into bankruptcy. What they said was that Westinghouse, just like my analogy, went to Toshiba, their rich uncle, and said, we need more financing to keep our ship afloat and Toshiba said to them, the only way I'll provide more financing to you is if you get -- seek and obtain bankruptcy protection. That's

10:59 what's in the amended complaint. There's not a single allegation that SCANA had anything to do with the bankruptcy filing of Westinghouse.

And then when you look at Fluor, there's no allegation of them even having filed bankruptcy, period. I mean, Fluor has continued to exist.

And again, but what's completely absent is, at the enterprise level, any allegation that there are common directors or officers of the corporation. So I think the reason the plaintiffs are so adamant that this factor should not apply is because they can't -- they know they can't meet it. I don't think there's going to be any allegation here that at the enterprise level there were sharing of officers and directors or those common -- I'm sorry, that there was some sort of common ownership on the officers and directors.

Interestingly, and I handed to the Court an exhibit I put together, and it's got A, B, C, and D, and four factors --

THE COURT: I've got it in front of me.

MR. SPETH: -- those actually came directly out of the plaintiffs' memorandum and they said these -- they first say, we are going to use the DOL five-factor test to argue our case, and then they argue four factors, and the one that is missing is common directors and owners. They have no section that addresses that. In fact, the only place it's addressed in their entire memorandum is on page 21 in footnote 3.

11:01

And they do two things in footnote 3. As they did with the common ownership, they urge the Court that this factor is really inconsequential and doesn't need to be applied in this case, but they also concede in footnote 3 that there indeed are no common owners or directors between SCANA and Westinghouse or SCANA and Fluor.

Now I'd like to go to the third fact, and that's de facto control. This is -- you know, this factor has to do, again at the enterprise level, whether SCANA had control over Westinghouse or over Fluor. Now, where this is often proven is in a bankruptcy situation where a parent corporation or a lender forces a borrower or a subsidiary into bankruptcy. That shows de facto control over that entity, just as Toshiba in this instance showed de facto control over Westinghouse.

But I think the Court could look at 20 CFR 639.6(b) to see why SCANA wouldn't have de facto control over this decision as it relates to the Fluor and Westinghouse employees. That defines who must receive notice and it says that the affected employees must receive notice. SCANA had no idea. It knew who its affected employees were, I mean, they had had a list of them, their addresses, everything it needed. It had no idea who the affected employees were of either Westinghouse or of Fluor. It didn't know who they were terminating. It didn't know whether they were giving them notice. It had no way of communicating to those people because they weren't their

11:03 employees. So it is impossible for SCANA to have that kind of de facto control even if you go down to the project level like the plaintiffs would say in this situation.

THE COURT: So in offering the payroll to Fluor, it was just basically a financial transaction, not any direct --

MR. SPETH: The complaint is very specifically worded on that, Your Honor, the amended complaint. It says that the payroll was paid by funds provided by SCANA to Westinghouse and to Fluor.

Now, I would submit to this Court that any time goods and services, or goods are provided by one entity to another entity or to an individual, there's money paid by that individual which goes to paying the payroll of the employees. I mean, if I buy a Coca-Cola from a vending machine, I know that money is going to pay -- some of it -- to the employees who bottle the Coke, who put it in the vending machine. Does that mean I have got de facto control over Coca-Cola? I don't think so.

So the fact that -- and I don't think there will be any allegation -- there's no allegation in the complaint that Mr. Pennington received a SCANA paycheck. There's no allegation in the complaint that Mr. Lorentz received a SCANA paycheck. What it is, is that SCANA paid monies from which their compensation was paid, and I think inferentially it is by their respective employers. I mean, there's absolutely void of

11:05 any allegation of them getting a SCANA paycheck.

In fact, I would say, Your Honor, if you look at the enterprise level, the entities that exercised the de facto control over this whole situation are Toshiba and Westinghouse.

And the facts go like this. Westinghouse needed more money to stay afloat. It went to Toshiba and said, need more money. Toshiba said, you'll get it only if you file bankruptcy, forcing Westinghouse into bankruptcy. When Westinghouse went into bankruptcy, just like with my house and the deal I had, it got voided, and the deal with SCANA got voided to the fixed fee -- there was a fixed fee deal in place and that got voided.

So SCANA then, just like in my house situation, said, I want an assessment period to determine what we can do with this. And they reached a financial arrangement with Westinghouse and with Fluor, all of this is in their amended complaint, to proceed through this assessment period.

And at the end of it, SCANA just couldn't afford to keep going forward as things existed at that point and pulled the plug on the project and abandoned it. And at that point the employees apparently were terminated. And at that point Fluor decided not to give the 60-day notice and Westinghouse decided not to give the 60-day notice.

Now, the de facto control that started this whole set of dominos was Westinghouse going to Toshiba saying, I need

11:06

more money, and Toshiba saying, you're going to file bankruptcy and get out from under these obligations that you've got if you're going to get any money from us, and everything else was a domino that fell. Neither SCANA nor Fluor, quite frankly, controlled anything beyond that point. That's not to say the situation we're all in isn't unfortunate, but it's just that's where the de facto control would lie if you used the proper analysis.

Now, the next factor I want to talk about is unity of personnel policies. And, you know, there's several cases. One of them, probably the most helpful, is *In Re: Consolidated Bedding*, which was a bankruptcy case in 2010 in which there was a WARN issue. And it dealt with, what does that mean? And it means that the entities involved, again, these two entities that are alleging to be separate, must have centralized hiring. In this situation, SCANA -- and again, we're looking at the enterprise level. That this is all centralized in some single location where there's centralized hiring, there's centralized decision-making of terminations, payment of wages, and by "payment of wages," what employees with paid, when they are paid, how they are paid, how often they are paid, or is it all centralized?

Personnel benefits. Health insurance, life insurance, disability insurance, retirement benefits are all centralized.

There is centralized record-keeping. That is, the

11:08

employees, you know, for FLSA purposes, you know, when they work and how much they work is all centralized.

When people take vacations and how much vacation is all centralized.

There is absolutely no argument here that that existed between either SCANA and Westinghouse or SCANA and Fluor, and that's either at the enterprise level, which I think this is the right level for the Court to look, or at the level of the plant itself.

Again, the plaintiffs do make, and I think this is where they make this point, that there was -- that their paychecks were funded by SCANA, to use their, quote, language, or funded by the SCANA payments to Westinghouse and Fluor. I don't argue that. That's probably exactly what happened, that SCANA was writing a check to each of those entities on some periodic basis for all the work that they were doing on the site and some portion of that went to pay the wages of Mr. Pennington and Mr. Lorentz and the other Westinghouse and Fluor employees on the site.

Plaintiffs also say that this -- evidence of this factor being met -- again, they are looking at the site, but I would submit to the Court that's improper, but even if it were proper, they say the fact that Westinghouse or Fluor had to get preapproval to have employees work overtime, yeah, that is nothing more -- you see the cases that deal with these kind of

11:10 issues all the time, SCANA has a right to control the financial aspects of that project without becoming a single employer or without this box, this item being checked, and that's all they were doing.

What is absent from the allegations in the complaint is they say -- they don't say that once SCANA approved overtime, that SCANA had any -- was involved in any of the selection of employees who worked there overtime, when the overtime would be worked, how much overtime would be worked. I mean, Mr. Pennington doesn't say, you know, I was selected by SCANA to work this overtime. There's no allegation that that kind of involvement was present in this case.

THE COURT: You would also suggest that SCANA was not involved in the general operations of the project.

MR. SPETH: I'm sorry?

THE COURT: Was not involved in the general operations of the project as alleged by plaintiffs.

MR. SPETH: Well, I think there is no doubt that SCANA had always been involved in the general operations of the project. They had 600 people on-site. It would be hard for us to deny that. And I don't think there's any doubt that after the bankruptcy and when you're in this critical assessment period, that they probably had more involvement in the financial aspects of that site. But again, it's the financial aspects. There is no -- there's no facts alleged that say

11:11 SCANA came in and, let's say, made hiring decisions.

THE COURT: Or even directed these employees?

MR. SPETH: No. I mean, there's no --

THE COURT: Okay. That's what I'm trying to get at. That's the plaintiffs' allegations, that when they say "involved," I understand what you mean by "involved," because they had their own employees even on-site, but plaintiffs are arguing that the involvement is broader, that they were directing even the other set of employees.

MR. SPETH: Well, that goes to the joint employer. Let me again try to clarify this. When we're talking about single employer, we're not talking about what SCANA is doing with Mr. Pennington or Mr. Lorentz. When we're talking about joint employer, we are absolutely talking about what SCANA is doing vis-a-vis Mr. Lorentz and Mr. Pennington.

THE COURT: But then you double back to say, however, joint employer doesn't apply under WARN.

MR. SPETH: That's right, that's right.

THE COURT: Okay.

MR. SPETH: But what I'm saying here is, again, this is where the dichotomy of these two analyses are critical. You need to look at SCANA on this unity of policies from a -- from an enterprise level. Are they influencing -- you know, do they influence, you know, Westinghouse as a worldwide, global engineering and design firm? Are they -- does SCANA have such

11:12 influence that they are influencing their hiring, firing, disciplining, wages on a global, worldwide process of Westinghouse? There's no allegation in the complaint that SCANA had that kind of influence over either Fluor or Westinghouse, both of whom were global companies.

When you get down to the individual, and I'll deal with this more, but since you brought it up, Your Honor, I want to deal with it now because it obviously is on your mind, and that is, did SCANA do things with individual employees?

On the joint employer situation, again, the focus is down to the employee, and in that situation, assuming the two bars weren't there that we've discussed, it is how SCANA dealt with Mr. Lorentz and Mr. Pennington. That's the issue. Did SCANA make decisions? Did they have a manager that made decisions concerning when Mr. Pennington showed up to work? What piece of equipment he operated? How long he operated that equipment? When he took his lunch? What he got paid? Whether or not he worked overtime? Evaluated his performance? The same series of questions with Mr. Lorentz.

And in that situation, it's a very fact-specific employee-by-employee situation. I mean, perhaps SCANA did exert some sort of control, if it could get around the bars, over some employee, but there's no allegations by Mr. Pennington or Mr. Lorentz that any SCANA manager did anything with them.

11:14 What their allegations are, are number one, SCANA had to approve overtime. Again, that's purely a financial decision.

Number two, it says if new employees had to be added, if additional employees had to be added, SCANA had to approve those. True. That's a financial decision.

What's missing in that, though, Your Honor, is there's no allegation that SCANA sat through the interviews, there's no allegation that they screened the applicants, there's no allegation that they used a SCANA application, there's no allegation that they made the decision who to hire out of a group. Those are the kind of decisions that -- again, that all goes to the joint employer situation, but those are the kind of decisions that have to be alleged in order to create a joint employer situation.

And I've jumped ahead of myself from a single employer, but again, that's where they are deficient, besides the two legal hurdles that they have to go over even to apply.

But getting back to this, the last item I want to -- in the single employer analysis is the pendency of operation, and again, this is at an enterprise level. I mean, the ultimate question is, do these operations, are they so dependent upon one another that they cease to exist when their relationship stops? That is, when the operation shut down at V.C. Summer, did all three just go away and not exist the next

11:16 day?

Now, clearly Westinghouse was already bankruptcied, but they're in Chapter 11 reorganization, they haven't ceased to exist. Fluor is still thriving, as far as I know, and SCANA still exists. So there is no -- at the enterprise level, there is no dependency of operation.

And the things the courts have looked at to determine that is, are there shared administrative functions, again, at the corporate level? Is there shared purchasing? Is there an exchange of employees on a regular basis? Is there an exchange of equipment on a regular basis? Are there commingling of finances among the companies? And again, that is the *In Re: Consolidated Bedding Company*, Your Honor. And there are no allegations in the amended complaint at any place that allege any of those items occurred among these three entities.

So in summary, I think the plaintiffs have conceded that three out of the five criteria they can't establish: That's the common ownership, common management and directors, and then the dependency of operations. I think they concede that those are not present.

Then that leaves you only with the de facto control and unity of personnel practices, and we think factually the complaint is completely void of any facts at enterprise level that would warrant a finding of a single employer in that situation.

11:17

Now, I'll try to briefly do the joint employer. Again, first and foremost, we've already hit it and I won't beat it to death, but there are two legal hurdles. One is 639.3(e), which I think that in itself bars the joint employer application, and if you look, there's a case on that that's been cited in our brief. It is the *Dupree-Crockett versus The Franklin Mint* case. And in that case, it was a classic joint employer relationship. The Franklin Mint manufactured collectible items, and because of that obviously Christmas was a big time and their work force fluctuated substantially. So they contracted with Randstad Corporation, which is a national-international temporary employment service, to provide employees in the times when they were most busy, a large amount of employees to work for them. Apparently they worked at Randstad's facility, worked on their line, production lines, they worked under their supervisors, they did the same thing the other coworkers were doing. Just, again, a classic joint employer situation.

Dupree-Crockett was laid off with a number of other employees and was not given a 60-day notice. Sued Franklin Mint under WARN. And the court made short-shrift of this in a 12(b)(6) motion granting it, saying and relying upon 639.3(e), that in that situation, Dupree-Crockett was an employee, direct employee of Randstad and his paycheck came from Randstad and because of those two factors he couldn't -- he wasn't covered

11:19 by WARN for the purposes of suing The Franklin Mint.

The second hurdle they have to overcome is just what the Court brought up earlier. And the first time we heard the term "joint employer" was in the memorandum opposing the motion for summary judgment. It appears nowhere in the amended complaint. Not one single reference to the joint employer theory is in the amended complaint. It is -- all the references, and there are numerous ones, are to the single employer analysis. And I think, again, you just -- it is clear that those two are starkly different analyses. You have to go no farther than the 1982 *Browning-Ferris Industries* case to see that that is the case. And even the WARN cases that have all dealt with this have, you know, analyzed single employer in one way and then The Franklin Mint, the joint employer, in another.

So I think the plaintiffs have a difficult time overcoming either of those legal hurdles to ever even urge the Court to determine if there's a joint employer situation. But even if they could, Your Honor, based upon many of the facts we've already discussed, we don't think there is direct control over terms and conditions of employment.

Now, I suspect the plaintiffs' counsel will take exception with my use of the term "direct," but let me tell you why I use that. They will cite to the *Salinas* case which says that it can be direct or indirect control, but I'll deal with *Salinas* in a minute, but if you look at the WARN decisions and

11:21 you look at the NLRB decisions under joint employer, it's got to be direct control.

In fact, there is a very recent NLRB decision, the *Hy-Brand* decision, which came out on December the 14th of last year, in which it said that there must be direct control over the essential terms and conditions of employment.

And again, those terms and conditions of employment are, who hires you? Neither Mr. Pennington nor Mr. Lorentz said they were hired by SCANA.

Who determines how much you're going to be paid? Neither Mr. Pennington nor Mr. Lorentz allege that SCANA determined how much they were going to be paid.

When you're going to be paid, what method you're going to be paid, how often you're going to be paid? Again, neither Mr. Lorentz nor Mr. Pennington have alleged that SCANA has control over that.

Employment evaluations. Who evaluates your performance? Neither Mr. Pennington nor Mr. Lorentz have alleged that SCANA does that.

And who made the termination decision? What the amended complaint says, that SCANA closed down the project, but it was Fluor, they both admit that Fluor and respectfully Westinghouse made the termination decision. But more important to this case is who made the decision not to provide the 60-day notice to those employees.

11:22 So I think if you look at the -- again, you remember the triangle, you've got the two employers out here and we've got SCANA at one point and you've got Fluor or Westinghouse at the other, and then down at the bottom of the triangle you have in one instance Mr. Pennington and in the other instance Mr. Lorentz, what has Mr. Pennington said that SCANA did that controlled one single term or condition of his employment? There is not one allegation in this long-winded complaint where Mr. Pennington says, SCANA did this to me, which is evidence of their controlling my employment.

And the same thing with Mr. Lorentz. You can go through the entire complaint. What has SCANA done to control Mr. Lorentz, the terms and conditions of Mr. Lorentz's employment? And there is not one allegation in that entire lengthy complaint by Mr. Lorentz that SCANA did this, that SCANA hired me, that SCANA decided what my salary was, that SCANA set my vacation, that SCANA gave me my job duties, that SCANA, you know, did my evaluation. There are no allegations at all in the complaint by either of these employees that would address that issue.

So, Your Honor, I feel like -- we would take the position that the joint employer doctrine is barred in this situation first by the Department of Labor regulations as it has been interpreted in *The Franklin Mint* case.

Secondly, by the failure of the plaintiffs to bring it

11:24 up in their amended complaint. They cannot use -- Judge Currie has a fairly recent decision on this -- they cannot use a motion -- a memorandum in response to a motion to dismiss to amend the complaint to state a new cause of action. And so I think those are two bars.

But even if you got by that, there is just no facts in the complaint that go to specifically Mr. Pennington and Mr. Lorentz, that they had a joint employment relationship. Again, I can't say that some employee didn't. I mean, maybe SCANA did oversee some employee directly, but he or she is not a party to this case at this point and there are no allegations specifically about that individual. And if you look at the two named plaintiffs, it's just devoid of any information.

THE COURT: And if you would just speak briefly to what may be a request for amending the complaint, would it be futile?

MR. SPETH: I think it would be, Your Honor. I don't think they can -- I think the reason that there's no allegations is they can't make any allegations.

THE COURT: This is not to say that I have ruled with you, I'm just asking --

MR. SPETH: Yeah, but I think, you know, they've had three bites of the apple. I mean, I think that's enough. And, you know, we are now, what, this thing started in August of last year. And, you know, Mr. Pennington and Mr. Lorentz are

11:25 represented by very able counsel. I mean, we're very familiar with Outten lawyers. Our firm deals with them on a regular basis. They know what they're doing, and if the facts were there, I have no doubt that they would have alleged them already.

So as a final point I want to address is the application of the *Salinas versus Commercial Interiors* case. Now, again, applying this case, that is a joint employer analysis by the Fourth Circuit under the Fair Labor Standards Act. I think just like we had -- we had just discussed under joint employer, it has -- the same application of that case to this matter under WARN has the same two legal bars, and that is the 639.3(e) issue and the failure to bring it up in the amended complaint.

But putting that aside, there are other reasons, and some significant reasons, that that case doesn't apply. First and foremost, the Fourth Circuit went to great pains to talk about the definition of "employee" under the Fair Labor Standards Act. And to quote the Act, it is to employ, to suffer and permit work.

The Fourth Circuit said there are only two statutes known that use that term and they said that term is a very broad term. It's broader than the normal master-servant agency relationship. It's broader than is contained in many or most other statutes. The only other statute which contains that

11:27

term is the Migrant Workers Protection Act.

And the court went on to say specifically that this definition of "employer" and the breadth of this definition, that it will be applied in this joint employer analysis, would not apply in like a Title VII case, would not apply in a National Labor Relations Act case, because those definitions are substantially narrower.

I think the same is true of WARN. There is no language in WARN that has -- defines "employee" with the breadth that is defined in the *Salinas* case.

And in reading the Fourth Circuit case, I think it is abundantly clear the court went to painstaking detail to make sure that their definition of who an employee is is not applied in cases beyond the FLSA and perhaps the Migrant Worker Protection Act.

So I just think by the own limiting language the court spent a great deal of time in that case going through and making sure that everyone understood it was limited to those two statutes, it cannot be applied in this situation.

But even if it could, let's look at the factual differences in these two cases. First, who are the parties? You've got in this case the Commercial Interiors, which is a general contractor that did upfitting on interior office spaces generally, sometimes homes, and so they were a general contractor that would be hired to upfit an office space and

11:29 they would hire subcontractors to come in and do specific work.

J.I. is a subcontractor involved in this instance and J.I. is a drywall contractor that was hired and contracted with Commercial to do the drywalling on jobs that Commercial was doing. And then the employees, who are the plaintiffs, are employees of J.I., the drywalling company.

So if you draw an analogy to our case, Commercial would stand in the shoes of Westinghouse, the prime contractor. J.I. would stand in the shoes of Fluor, the subcontractor. And the employees would stand in the shoes of the plaintiffs. Who is missing? SCANA. That is, the owner of the building that's being -- the work is being done in or the one that has contracted with the interior company to do the work, they are not a party. The entity that would be in SCANA's shoes is not a party in this case, which makes it dramatically different from a factual standpoint. They did not sue, again, the entity that was having the work done, they sued the general contractor and the subcontractor.

Now, there are other different facts too. First, J.I. worked just about exclusively for Commercial. There is no allegation in our case that Westinghouse, the only work they ever did was for SCANA anywhere in the world. There's no allegation that the only work Fluor did was for SCANA.

Secondly, Commercial threatened to fire one or more of the plaintiffs in that case. There's no allegation by

11:31

Mr. Pennington that SCANA ever threatened to fire him for performance or any other way. There's no allegation by Mr. Lorentz that SCANA threatened to fire them.

Commercial covered the plaintiffs under their health insurance plan on at least one job where apparently the plaintiffs had to be covered by health insurance and it covered them under its employee health insurance plan. There's no allegation here that Mr. Pennington was covered by SCANA's health insurance plan. There's no allegation here that Mr. Lorentz was covered by SCANA's health insurance plan.

Several of the plaintiffs were required to complete Commercial employment applications and to work directly for Commercial on several projects. Again, there's no allegation here that Mr. Pennington or Mr. Lorentz ever filled out a SCANA application or ever worked directly for SCANA.

Plaintiffs, on occasion, received paychecks directly from Commercial. Again, we talked about that. There's no allegation that they ever received a direct paycheck, a SCANA paycheck, by Mr. Lorentz or Mr. Pennington.

Commercial determined on a weekly basis plaintiffs' start times and their end times. There's no allegation by Mr. Pennington that SCANA set his start times and end times. Same thing with Mr. Lorentz.

Commercial foremen told plaintiffs when they had to work additional hours beyond their normal work hours and on

11:32 weekends. There's no allegation by Mr. Pennington or Mr. Lorentz that SCANA ever told them they had to work additional hours or on weekends.

Plaintiffs wore hard hats and other clothing apparel that had Commercial logos on them. Now, there's an allegation here that SCANA paid for the clothing or some of the safety equipment that the employees used, and maybe they did for Mr. Pennington or Mr. Lorentz, but there's no allegation that those items bore a SCANA logo.

Plaintiffs were instructed to tell anyone who asked them, if they were asked, that they were Commercial employees. There's no allegation by either Mr. Pennington or Mr. Lorentz that they were told to say they were SCANA employees.

Plaintiffs filled out Commercial time sheets. I mean, when they came to work they clocked in using a time sheet that had a Commercial logo on it and was a Commercial time sheet, and when they clocked out, they clocked out on that time sheet. There's no allegation in this case that either Mr. Pennington or Mr. Lorentz clocked in and out on it using a SCANA time sheet or any SCANA information.

Commercial maintained the time records of the plaintiffs in this case, and, in opposite, J.I. did not. There's no allegation in this case that SCANA maintained the work records of either of the named plaintiffs or that their respective employers, that is, Fluor and Westinghouse, did not.

11:34 So again, if you look at the facts of this case, they are starkly different than the case before this Court at this point. Therefore, even if the joint employer analysis could be applied, and I think it's clear that that Fourth Circuit analysis cannot be applied, the facts are just different. They're just not here. You don't have the control of terms and conditions of employment of Mr. Pennington and Mr. Lorentz that would suffice.

THE COURT: Okay. You can conclude.

MR. SPETH: That's it, Your Honor. I'm done. Thank you for your patience.

THE COURT: Okay. All right.

MR. RAISNER: Good morning, Your Honor, Jack Raisner of Outten & Golden on behalf of Harry Pennington and Timothy Lorentz.

Your Honor, in view of the hour, my colleague spent a lot of time making many assertions, and I don't want to try anyone's patience, especially the Court's, in going through those, but if I do, we are going on for a pretty long time, so I would certainly offer that we --

THE COURT: Yeah, you're going to have your due course, yes. Go ahead.

MR. RAISNER: If a break were necessary, interrupt me.

THE COURT: Okay, fine.

MR. RAISNER: Your Honor, on the morning of July 31st,

11:36

2017, SCANA ordered that all operations at its V.C. Summer project, nuclear reactor project, be halted. That order immediately and permanently did away with the positions of approximately 5,000 employees who were working at that site.

Some of those employees, as my colleague just stated, about 600, were employees of SCANA as their direct employer. Others were direct employees of contractors. And Harry Pennington was one of those whose job was done away with that morning and his direct employer was Fluor. Mr. Lorentz' direct employer was Westinghouse, and then as Mr. Speth has acknowledged, those jobs disappeared and they were terminated both on that very same day. In other words, their position was shut down by SCANA and their employment immediately was terminated by their direct employers.

The --

THE COURT: So the notice comes from the direct employer, but by virtue of the project shutting down.

MR. RAISNER: These individuals have brought an action against both their direct employers and SCANA, and the reason for that, Your Honor, is that SCANA, as an employer, of course not only gave its own employees notice that day, but promised to pay a full 60 days for WARN for all of those 600 employees whose jobs would be terminated.

Mr. Pennington and Mr. Lorentz have brought suit against SCANA, however, for not doing the same for the

11:38 contractor employees.

The claim that has been alleged, Your Honor, is a plant closing under the WARN Act, and I would just like to state what the elements of those are.

It is that any employer shuts down a site.

Two, that 60 days' notice was not given.

And three, that it resulted in employment loss. Clearly, Mr. Pennington and Mr. Lorentz both had that happen. They have alleged that -- and it's been admitted today that SCANA had shut down a site and that they have experienced employment loss.

What SCANA's argument is in this case is that it didn't have to give notice to the contractor employees because they were not its employees. The cases of this circuit and every other circuit, Your Honor, provide a very well-trod path for the resolution of this claim, and because the labor laws of the United States are so clear and stringent when it comes to enforcing mandates that are required for minimum labor standards, SCANA's liability will only yield if SCANA can show that it was not the decision-maker who was responsible for the employment practice, the plant closing that is the basis of this litigation.

That rule, that liability attaches to the affiliated employer who is responsible for making the decision or for giving the direction for the employment practice on which the

11:40

litigation is founded. That rule, Your Honor, permeates all of the labor laws and all of the theories under the labor laws.

It is very interesting that in the one-hour analysis of those laws, my colleague did not mention that this is the dominant rule in the labor laws, and of course we did brief it on pages 24, 25, 26 of our opposition brief, and it was completely ignored in the reply and it's completely ignored today because, under that rule, it's obvious that SCANA was the decision-maker for the practice that gave rise to this litigation.

THE COURT: So you are essentially saying by that rule the plaintiffs' direct employers could not have given the 60-day warning if SCANA didn't give their 60-day warning as well --

MR. RAISNER: Of course.

THE COURT: -- because they're --

MR. RAISNER: Yes, of course.

THE COURT: -- in charge of the operation.

MR. RAISNER: Of course. Westinghouse and Fluor had no notion on the day before -- the 60 days before that there was a shutdown that was being prepared or planned by SCANA, and SCANA needed only have let people know that it was making this plan 60 days earlier and of course Westinghouse and Fluor would have been -- had the option to give notices as well. If SCANA had just given notice or filed a notice 60 days earlier, then

11:42

Westinghouse and Fluor could have used whatever independence they might have had to act and exercise their independence and decide to give a WARN notice or not themselves. But their independence was taken away from them because SCANA withheld its decision until the day of.

Your Honor, this rule is actually found in the brief of my colleague in the joint employer explanation that's given in *Browning-Ferris* that my colleague has mentioned, in the National Labor Relations Act area, and it says that, while Mr. Speth is right, it begins with two separate corporations who are assumed to be independent legal entities, assumed to be what they say they are, when they choose to handle jointly employment matters, then they become joint employers, and at that point the essential aspect to be determined is which of those employers controls labor relations of a given group of employees? In other words, whatever the given group is. That's the rule in their brief.

But while it's in a big block cut and paste, it's never applied in the rest of the brief and it's never mentioned here. That's the basis for various iterations of the same rule on and on. It's next brought up in cases called swallows (phonetic). And by the way, I am mainly relying on *Pearson*, which gives a broad overview of the origins of all of these strains and comes up with a final determination of what the prevailing rule will be, and it is, which decision-maker is

11:44 responsible for making the employment decision that is the basis of the litigation?

THE COURT: Okay. Let's just walk back a little bit. If, in your complaint, you're alleging single employer, start there with that analysis, but then you come to, in the response, the joint employer.

MR. RAISNER: Your Honor, there is no such thing as single employer or joint employer with regard to WARN. It's called various things. Affiliated employer, controlling employer, one company, these are handles that are used as convenience, they are rubrics that are used for which there is no common consensus, and that is why even in the joint employer context, the *Salinas* case and the *Hall* case from the circuit struck others as being something different from what joint employer means. Or the NLRB decision that was just brought up of last month by the new -- that changes it. So I mean, these handles cannot be used whatsoever.

The reason I cited *Salinas* is because the *Salinas* and *Hall* courts in the Fourth Circuit said look beyond these labels. Look at the realities. Let's look at the actual regulations for once and not just go on somebody's version.

Well, the actual regulation in the WARN case, Your Honor, specifically says we are not going to join up with any of these parties, joint employer or single employer. The regulation says, and it was handed out by my colleague and so

11:45

Your Honor does have it, but it was never mentioned in his brief or in the argument. I don't have my copy with me, but it says "under existing legal rules." Those are the first four words. "Under existing legal rules" is the entire panoply of legal rules that have to do with this issue of affiliated employee and et cetera. It says that the rule is going to be that independent contractors and subsidiaries of parents that wholly or partially own it, those subsidiaries and independent contractors will be treated as either separate or apart of the parent or contracting company depending on the degree of independence. That is the Department of Labor's synthesis of what all the existing rules say about the issue in this case, which is an independent contractor's liability for the employment -- for the WARN violations to the employees of its independent contractor. That's the rule we should be looking at, but it is ignored by my colleagues.

That rule, Your Honor, happens to be very, very similar to 791.2, which as Your Honor knows is the joint employer rule of the Fair Labor Standards Act. I'm not looking at case law, but I would look at case law because *Salinas* does look back at those words, and that rule is there. It says that when you have two employers who are not completely disassociated, just as an independent contractor is not completely disassociated from the contracting party, when they are going to take on or look at -- take control over the

11:48 individual employee, they will be deemed as sharing control over the individual employee, either directly or indirectly, by reason of the fact that one of the companies either controls the other, one of the companies is controlled by the other, or together they are controlled under a common ownership. That is a -- once you have that finding, those two employers are considered as one, because one is controlling the other and vice versa. That's what this DOL rule is saying about independence of an independent contractor. If it is not independent, to the extent that it is controlled by the contracting party, then they are one together, they both bear joint and several liability.

So there is a confluence between the FLSA and WARN. And in fact, the Department of Labor, in its explanation and statutory comments in the sixteen zero fifty-four, in which it gives further explanation, says that we should look at NLRA, FLSA, and ERISA, which are common statutes. It mentions joint employer as being something that can be used as a reference for interpretation and that's simply -- I'll bring to the Court's attention that *Salinas* does a good job at cutting away some of the other growth that has been added up on the joint employer to figure out what that means at least in this circuit, but we think that it goes back to the original 791.2 and this idea of the two parties that are undertaking to -- who are going to be deemed as jointly controlling the employee, indirectly or

11:50 directly.

THE COURT: And then how would you contrast that with the 639.3(e), affected employees with consultant or contract employees who have a separate employment relationship with another employer and are paid by that other employer?

MR. RAISNER: This is a magical argument, one of the two or three magical arguments that my colleague makes by truncating the analysis, using tunnel vision. Of course, the Department of Labor is saying that rule in the normal situation. An independent contract and contracting party do start out as being separate, and in that case the contracting party does not have to give notice to the independent contractor, but in the event that there is a finding that those two are one by application of the rule that the Department of Labor has said three sentences before, obviously we are in -- that means that they are one and therefore the independent contracting employees are part of the contracting party. In other words, Westinghouse and Fluor's employees are considered, by law, part of SCANA. If that's not what single employer means, whatever you want to call it, then single employer means nothing, it's totally meaningless.

THE COURT: Okay. Well, then get to what you would say is how I get to that finding, though, because you said that under 639.3 we need to go there, you know, based on the record I have before me.

11:51

MR. RAISNER: 639.3 is very --

THE COURT: Under the existing rules.

MR. RAISNER: -- is very similar --

THE COURT: Okay.

MR. RAISNER: Oh, you're talking about under --

THE COURT: Yes.

MR. RAISNER: Okay.

THE COURT: In other words --

MR. RAISNER: Yeah, sure.

THE COURT: -- you start with that legal premise --

MR. RAISNER: Oh, absolutely.

THE COURT: -- under existing rules this is joint.

MR. RAISNER: Absolutely. You know, Your Honor, you sort of hit on it, which was by withholding notice until the last day, how much independence did SCANA allow its independent contractors to give WARN notice? And I think Your Honor understands, it gave them zero independence.

Well, the *Pearson* case, Your Honor, amplifies the rule, which says that the final decision-maker who makes the employment practice decision is going to be liable, it amplifies it by saying if the decision is particularly egregious because it ignores the separate legal personality of the independent contractor, then that evidence alone warrants a finding of liability against the contracting party in this case.

11:52

In other words, liability is warranted if there is -- and no other factors need to be satisfied -- if there is a striking decision that completely deprives any independence to the independent contractors, then the absence of all the other five factors can be excused and warranty can be attached based on the egregiousness or the striking nature of such a decision. That has been quoted in *Pearson*. It's in the *Esmark versus NLRB* ruling from the Seventh Circuit. It's an old rule from the NLRA. But it was quoted in *Pearson* and it has been quoted, along with the rule I just mentioned, the final decision-maker rule, in virtually every single one of the WARN cases that has been decided before it and certainly after *Pearson*. They all have quoted that language. That is the center-most rule. Because after all, if that rule is satisfied, all the other factors don't even need to be in evidence.

And that's the case here, Your Honor. We think that it is so striking that we might have a litigation simply around that issue and it relieves us of going point by point over the other five factors, but we are happy -- I mean, this is the de facto exercise of control, Your Honor. And I'm perfectly willing to go, and I will go, through the five factors with you, but I just want to --

THE COURT: Just to make clear, even though you mentioned joint employer in your response, you're suggesting that your complaint without using that term is always referring

11:54

that these entities are essentially merged in this analysis of how the execution of the notice came about.

MR. RAISNER: That's correct, Your Honor.

THE COURT: At least as to this decision.

MR. RAISNER: Correct.

THE COURT: So do I need to go back any further than kind of, you know, the events leading up immediately to the decision, so to speak? In other words, do I have to suggest that, you know, six months out, a year out, that, you know, all of this commonality was occurring, or do I go with what you're arguing now as kind of right then and there the inability to dissect these companies from the standpoint of your employers, meaning Fluor or Westinghouse, being able to give notice to the employees right then and there was the violation?

MR. RAISNER: Yes, Your Honor. I --

THE COURT: And there's a lot packed in there.

MR. RAISNER: No, no, I hear you, and I hear the question. I believe that really the scope of this motion is whether we have pled a complaint or not, and we submit that we have allegations that support liability and the rest usually is left off at the litigation.

However, I do think that this is a striking decision-making circumstance. That has not only SCANA made the decision, but it has directed the alleged illegal activity giving rise to this litigation. It directs the shutdown to

11:56 others. To be both the decision-maker responsible and to be the entity directing the action is the definition of egregious. I mean, they could have come to Westinghouse and Fluor and said, we are planning to do this. How do you want to do it? How shall we do it? Well, then you have some opportunity for independence and you have some opportunity to do it in an organized, fair way. And of course they could have given notice to everybody, they just had to ask Westinghouse and Fluor just for their address list, it's a compilated list that they had. So, I mean, they could have done it in such a manner as to respect and recognize some legal personality.

THE COURT: Because essentially it's made -- under your argument, again understanding -- trying to understand your argument, it has essentially made Fluor a defendant --

MR. RAISNER: Absolutely, exactly right.

THE COURT: -- because it didn't have the opportunity to exercise...

MR. RAISNER: That's right, and unfortunately or not, the direct employer is always going to be the one who presses the button --

THE COURT: Right.

MR. RAISNER: -- and sends out the termination, so we're always talking here about the affiliated employer's liability.

Fluor will make its defenses as to why it didn't have

11:57 no- -- it has already mentioned those, it had a business circumstances defense and so it's relieved of that, but in the first instance no one argues to the contrary that it's their joint and several liability.

THE COURT: I understand by virtue --

MR. RAISNER: So Your Honor --

THE COURT: -- of the nature of the relationship, but the action of why WARN exists about the notice and all of that, you're suggesting that Fluor didn't have the opportunity to relieve itself of the specific allegations of WARN.

MR. RAISNER: That's how we understand the circumstances and how we framed the complaint. And I think we're entitled to also discovery. I'm sure Fluor wants, you know, to not just take it from, you know, so --

THE COURT: Okay. And that was a note that I made for myself. Do I have what I need to go ahead and make the decision on 12(b)(6) based on either parties' argument of single employer or joint employer or how to interpret the 639.3 employer, 639.3(a)(2) under existing legal rules, that portion, or the 639.3(e), affected employees decision, or is there any limited discovery needed on this issue or is everything in play right now?

MR. RAISNER: Yes, I think it's a question of getting the right legal test that's appropriate, that has been tailor-made and has been used unanimously by the WARN courts,

11:59 which is what I've just described.

If I might, Your Honor, if there's any question, that the *Pearson* test recognizes that what is being used is a hybrid test. It comes from both what used to be called the integrated enterprise test, but also the direct control test. Reading from page 491 of 247 F.3d, the *Pearson* court said, "We also interpret DOL's inclusion of the 'de facto exercise of control' factor to be an endorsement of the hybrid direct liability analysis heretofore employed in the context of the integrated enterprise test. Thus, the 'de facto exercise of control' prong allows the fact-finder to consider whether the parent has specifically directed the allegedly illegal employment practice that forms the basis for the litigation."

And the bottom line of the *Pearson* decision, which my colleague spent a good deal of time talking about, but didn't read the bottom line, quote, on page 503 to 504, said the *Pearson* court, "Those five factors present a hybrid test that combines the single integrated enterprise test that is based on the interrelation of operations with the de facto exercise of control test with respect to the labor relations regarding the given group of workers." Those are the words I just mentioned a little while ago, Your Honor, that was from the *Browning-Ferris*. That's the ancient old, and it's about the given proof of workers, Your Honor, it's not about the full enterprise. Mr. Speth said it doesn't have anything -- you

12:01 know, it's about the whole corporation.

Let me just finish. "Under both tests, the bottom line is the same: Who was the decision-maker responsible for the employment practice giving rise to the litigation?"

So, Your Honor, for our purposes no one can really say that is a joint employer test, no one can say that is a single employer test, that is the special WARN test that has never been given a handy moniker, and maybe we need to give it one, you know. The contracting employer test or the controlling employer test. But that's the test. That's the law. All the facts in our complaint were geared towards that test, that rule. Our legal arguments are all geared to that rule, irrespective of label "joint employer" or not. Just looking for a handle, and we thought that joint employer, because of the similarity, as it happens, with 29 U.S.C. 791.2, which is the FLSA test, this ought to be looked at for once as a joint employer proposition because it is a closer to, at least in the *Salinas* court's interpretation, to any other court's connection between the two statutes.

But you get what I'm saying, Your Honor. We can look behind labels at the substance of the complaint and what the legal arguments are and none of them have changed in our complaint to our brief. Nothing -- we do not seek at this point a third or fourth bite of the apple we're told that we've done, we don't think we have, but if necessary we will -- we

12:02 think we can amend because this is our first motion to dismiss obviously that we've had to litigate, but...

THE COURT: But what if anything would you need to amend?

MR. RAISNER: Well, that's right, I don't -- Mr. Speth has mentioned a whole bunch of flaws that we have not pled, but he has been using tests at the periphery of the center-most test, so he is using an entire enterprise corporate level where at the end of the day the corporations don't exist. I never saw that in the law. I don't know what test he's talking about.

He's talking about a test that has to do with the actual terms and conditions. Terms and conditions comes from National Labor Relations Act and bargaining, a collective bargaining decision. It has nothing to do with WARN. But he is -- he is making strong man arguments so that he can tear us down, but not showing where these arguments are founded.

He says that the affected employee rule that he talked about, that's 639(e) -- 639.3(e), that's the affected employee test, he says that that has something to do with our case because a court said that an independent contractor couldn't expect to get a notice.

But it doesn't have to do with our case because there was no allegation in that case of any kind of joint employer or of a single employer. No one alleged that. So again, we have

12:04 to look after there is a finding of joint employer whether that rule applies, which it can't.

Similarly is his long analysis of a hypothetical of someone who builds a house and all these people come, which is his whole case basically founded on a fallacy. The person who is having his house built is not an employer in the first place. SCANA was an employer of 600 people in the first place. So this isn't going to open floodgates, Your Honor. To say that SCANA as a contracting party is going to be liable and therefore everyone who builds an extension on his house is going to be liable, that's fallacious because people who are building in their driveway are not employers in the first place.

And all of our rules, this joint employer rule, they're all built on two individuals who are jointly deciding to handle important employee matters. The most important employee matter of all is whether the job exists. When you take away the position, that is a decision that goes to the heart of terms and conditions. It is the heart of the NLRA, do not take away jobs, it's the heart of every employment law, and we know from, as I've said, the full body of employment law, that it's the party that's responsible for making the decision that's got to be held accountable to the affected employees.

THE COURT: Thank you.

MR. RAISNER: Thank you, Your Honor.

12:05

THE COURT: All right. Mr. Speth, just a very brief reply only to what's been in the response, not repeating your arguments.

MR. SPETH: I'll be very brief.

THE COURT: Okay.

MR. SPETH: Mr. Raisner and I do agree on one thing, that is, this is a legal question for the Court to decide and decide now. You've got all the facts you need. The amended complaint, for better or for worse, are the facts that are before this case, and I'm not going to rehash where I think they are woefully short because obviously I think they are.

Where we disagree is Mr. Raisner said, and I think I'm quoting this, that the single employer and joint employer analysis really don't exist, there's no such thing.

Your Honor, the First Circuit, the Second -- courts out of the First Circuit, courts out of the Second Circuit, courts out of the Third Circuit, courts out of the Fourth Circuit, courts out of the Fifth Circuit, courts out of the Sixth Circuit, out of the Seventh Circuit, the Eighth Circuit, Ninth Circuit, and Eleventh Circuit all have -- think the single employer and joint employer analysis exist. Maybe they're as foolish as I am that it really does exist, but I think clearly, to quote the Star Trek analogy, Mr. Raisner is asking you to go where no human has ever gone before, and that is to create a brand new theory that is not promulgated by any

12:07 court, by any statute, by any regulation to deal with the facts that are set forth in this amended complaint.

And I agree with him. Only if this Court comes up with some unique theory that has never been applied before can they prevail under our motion to dismiss.

Another thing I want to address, and I did hit this before, but Mr. Raisner said plant closing and job loss equal unlawful activity. In fact, he said a direct shutdown, SCANA's direct shutdown of that is the illegal activity under WARN.

I don't see anything under WARN that says an employer -- it is unlawful for an employer to decide to shut down an operation under any circumstance, it's unlawful for an employer to lay off employees, it's unlawful for an employer to terminate employees. There is nothing in WARN that says that. That does not create liability.

What creates liability is a failure to give your employees who were then affected by that shutdown 60 days' notice.

THE COURT: Okay. And let's just go to that. Is there any dispute that SCANA makes the decision to shut down the plant?

MR. SPETH: Oh, absolutely not, no.

THE COURT: Okay. And then on the date of the decision, was there a 60-day period to SCANA employees?

MR. SPETH: Yes.

12:08

THE COURT: Okay.

MR. SPETH: Now, there wasn't a 60-day work period, Your Honor.

THE COURT: Okay.

MR. SPETH: They just continued to pay them for 60 days.

THE COURT: Okay.

MR. SPETH: The facility was shut down.

THE COURT: Okay. So but you believe that then for Fluor to comply with the WARN Act, then Fluor basically was in a position that it just needed to pay its employees --

MR. SPETH: Yeah.

THE COURT: -- for 60 days.

MR. SPETH: For 60 days.

THE COURT: And then we --

MR. SPETH: That's what happens --

THE COURT: -- wouldn't be here.

MR. SPETH: -- to the vast majority of these cases, Your Honor.

THE COURT: Okay.

MR. SPETH: That the plant shuts down, but because of the application of WARN, the employees continue to be paid.

THE COURT: And that's just a risk of doing business with SCANA or any entity that is in that situation, that if you -- if they end up needing to shut down, they just needed to

12:09 be in a financial position to say, okay, here is your --

MR. SPETH: Yeah.

THE COURT: -- 60-day notice and then here is your pay.

MR. SPETH: And WARN actually addressed that very situation. The situation that he says SCANA is liable for is dealt with in WARN under the unforeseen business circumstance.

If you've got a second entity, and because of the shutdown and they don't foresee this, and this is the defense that's being raised both by Fluor and by Westinghouse -- and by the way, Your Honor, there are four cases pending in federal court against Westinghouse and Fluor. There are three cases against Westinghouse that have been -- WARN cases that have been filed in the bankruptcy court in New York. All of them claim that Westinghouse is the liable party for the WARN notice. Those plaintiffs, I guess, disagree with the plaintiffs in this case.

The Butler case which Your Honor is very familiar with does not include SCANA. Those plaintiffs are saying that Fluor is the liable party.

But going back to how the statute deals with this, it says if an entity makes a decision to shut down and employees of another entity are affected, or that is, they're terminated, not affected, using legally, if they are terminated, but that entity had no -- could not foresee, had no ability to foresee

12:11

those circumstances arising, then those employees are not affected employees under the WARN Act and are not covered and there's no liability.

And what, in essence, the plaintiffs are urging here is saying, Your Honor, we want you to say that position -- that provision of WARN shouldn't have been included and I'm going to rewrite the statute and nullify that.

And obviously I think we would both agree that that would be improper for a court to do, but that specific -- the specific scenario that Mr. Raisner brought up is addressed in WARN in the unforeseen business circumstance and it is going to be probably the issue that ultimately this Court is going to have to decide in regards to at least Fluor, and the bankruptcy court in New York is going to have to decide in regards to Westinghouse, and that's going to be the end product.

But that does not mean -- I mean, to hold SCANA liable and say, oh, the entity making the shutdown, the shutdown is the illegal act, that that's what WARN is saying, the shutdown is not the illegal act, the illegal act is failing to give the 60-day notice, and in certain instances they don't have to give 60-day notices to employees if it's unforeseen circumstances.

So those are the points I'd make, Your Honor. Thank you for your patience with us today.

THE COURT: Okay. Thank you all. I will study your briefs again and thank you for the arguments. They were very

12:12 helpful.

MR. SPETH: Thank you, Your Honor.

MR. RAISNER: Thank you, Your Honor.

THE COURT: All right. Take care.

COURT SECURITY OFFICER: All rise.

(Proceedings concluded at 12:12 p.m.)

* * * * *

UNITED STATES OF AMERICA )
) ss:
DISTRICT OF SOUTH CAROLINA )

C E R T I F I C A T E

I, Carly L. Horenkamp, Certified Shorthand Reporter in and for the United States District Court for the District of South Carolina, do hereby certify that I was present at and reported in machine shorthand the proceedings had the 14th day of February, 2018, in the above-mentioned court; and that the foregoing transcript is a true, correct, and complete transcript of my stenographic notes.

I further certify that this transcript contains pages 1 - 87.

IN WITNESS WHEREOF, I have hereunto set my hand at Columbia, South Carolina, this 27th day of February, 2018.

/s/ Carly Horenkamp

Carly L. Horenkamp, RMR, CRR, CRC
Certified Shorthand Reporter

ALL COUNSEL: [1] 4/3
COURT SECURITY OFFICER: [1] 86/4
MR. ERCOLE: [7] 13/11 13/13 13/15 16/1 16/15 16/20 16/22
MR. HENTHORNE: [1] 25/18
MR. RAISNER: [29] 63/12 63/22 63/24 64/17 66/14 66/16 66/18 68/6 71/5 71/25 72/2 72/4 72/6 72/8 72/10 72/12 74/2 74/4 74/14 74/16 75/14 75/17 75/21 76/5 76/10 76/22 79/4 80/24 86/2
MR. SPETH: [37] 17/7 17/12 17/14 17/22 23/18 25/19 40/2 40/23 40/25 41/4 41/10 42/18 44/5 48/14 48/17 49/2 49/9 49/17 49/19 57/16 57/21 63/9 81/3 81/5 82/21 82/24 83/1 83/4 83/7 83/11 83/13 83/15 83/17 83/20 84/1 84/4 86/1
MR. TIGHE: [18] 4/17 4/25 5/2 5/6 5/25 7/1 7/15 7/18 7/25 8/14 8/19 8/22 9/2 12/19 12/22 13/1 16/24 17/2
MS. GAFFNEY: [2] 13/3 13/6
THE COURT: [93]

'

'de [2] 77/7 77/10
'de facto [2] 77/7 77/10

0

02201 [1] 4/12
0:17-CV-02094-JMC [3] 1/2 1/7 4/8
0:17-CV-02201 [1] 4/12
0:17-CV-02201-JMC [2] 1/2 1/16

1

10 [1] 23/25
10017 [1] 2/5
1075 [2] 2/14 3/13
10:00 [1] 1/4
10:02 [1] 4/1
11 [3] 23/25 29/4 52/3
12 [2] 53/22 76/17
12:12 [1] 86/6
14 [1] 1/3
1400 [1] 3/4
14th [2] 55/4 87/9
1835 [1] 3/3
19103 [1] 3/4
198 [1] 36/17
1982 [2] 19/17 54/11

2

20 [1] 23/7
20 CFR 639 [1] 25/14
20 CFR 639.3 [1] 23/15
20 CFR 639.6 [1] 43/15
2001 [1] 36/17
2007 [2] 31/16 31/19
2008 [2] 31/24 33/6
201 [1] 2/7
2010 [1] 46/12
2016 [2] 33/13 33/14
2017 [6] 18/25 33/14 33/17 34/9 34/16 64/1
2018 [3] 1/3 87/9 87/15
21 [1] 42/25
2142 [1] 2/18
220 [1] 2/22
222 [1] 2/22
23 [1] 14/5
24 [1] 66/6
242 [1] 2/7
247 F.3d [1] 77/6
25 [1] 66/6
25th [1] 2/4
26 [1] 66/6
27th [1] 87/15
29 [1] 33/17
29 U.S.C. 791.2 [1] 78/15
29033-3701 [1] 2/23
29201 [4] 2/12 2/19 3/11 3/18
29204 [1] 3/7
29464 [1] 2/8

3

30 [2] 29/8 30/25
30-day [3] 29/9 29/11 31/3
30326 [2] 2/15 3/14
31st [3] 34/9 34/16 63/25
320 [2] 2/11 3/10
3500 [2] 2/14 3/14
3700 [1] 3/6
3701 [1] 2/23

4

400 [2] 3/7 14/21
401 [1] 2/19
491 [1] 77/6
494 [1] 39/17

5

5,000 [1] 64/4
503 [1] 77/16
504 [1] 77/16

6

60 [10] 34/14 64/22 65/6 66/20 66/23 66/25 82/17 83/5 83/13 83/14
60-day [14] 34/23 35/15 35/19 45/22 45/23 53/20 55/24 66/13 66/13 82/24 83/2 84/3 85/20 85/21
600 [4] 48/20 64/6
64/22 80/7
624 [1] 10/25
639 [2] 25/14 79/19
639.3 [12] 23/15 41/11 53/4 53/22 58/13 71/3 71/24 72/1 76/18 76/19 76/20 79/19
639.6 [1] 43/15
685 [1] 2/4

7

750 [2] 2/11 3/11
791.2 [3] 69/18 70/23 78/15

8

80 percent [1] 31/13
87 [2] 1/18 87/13

9

901 [1] 3/17
954.557.5504 [1] 3/18

A

a lot [3] 37/6 63/17 74/16
a.m [2] 1/4 4/1
abandoned [1] 45/20
abandoning [1] 34/12
ability [3] 37/16 37/23 84/25
able [3] 8/12 58/1 74/13
about [40] 8/18 10/21 11/1 12/4 13/21 14/7 14/14 14/15 15/21 15/25 17/6 28/20 31/13 33/20 35/5 40/7 40/23 46/9 49/11 49/12 49/13 49/14 57/12 58/18 60/20 61/17 64/6 69/12 70/8 72/5 74/2 75/23 76/8 77/15 77/23 77/24 78/1 79/11 79/12 79/19
above [1] 87/9
above-mentioned [1] 87/9
absence [1] 73/4
absent [2] 42/7 48/5
absolutely [8] 17/5 44/25 47/5 49/14 72/11 72/13 75/15 82/22
abundantly [1] 59/12
accept [1] 27/10
accommodate [1] 18/10
Accompanying [1] 17/17
according [2] 20/21 33/5
accountable [1] 80/23
accusing [1] 24/13
ACE [3] 11/9 11/15 11/17
acknowledged [1] 64/11
act [38] 5/16 9/10 9/11 9/12 9/25 11/7 11/7 13/17 15/2 15/5 15/9 18/4 18/5 18/13 19/21 21/7 22/10 31/23 32/1 34/14 41/10 41/12 58/10 58/19 58/19 59/1 59/6 59/15 65/3 67/2 67/9 69/19 79/14 83/10 85/2 85/18 85/19 85/19
action [19] 4/8 4/12 6/15 6/18 9/11 9/12 11/2 11/5 11/6 11/6 12/8 12/9 14/5 14/14 15/7 57/4 64/18 75/2 76/8
actions [6] 7/8 8/7 13/24 21/15 37/16 37/20
activity [5] 20/14 24/14 74/24 82/8 82/9
actual [4] 31/21 68/20 68/22 79/13
actually [6] 28/3 28/23 36/7 42/19 67/6 84/5
adamant [1] 42/10
added [3] 51/4 51/5 70/21
additional [5] 11/5 29/23 51/5 61/25 62/3
address [14] 10/13 14/13 18/10 18/11 18/19 18/20 22/6 22/7 36/14 41/16 56/20 58/6 75/9 82/6
addressed [4] 15/20 42/24 84/5 85/10
addresses [3] 10/14 42/24 43/21
addressing [2] 14/5 19/25
adequately [1] 14/16
Adjustment [1] 18/4
administrative [1] 52/8
admit [1] 55/22
admitted [2] 14/6 65/9
adopted [1] 27/19
advance [2] 5/13 34/15
affect [1] 30/2
affected [15] 25/25 25/25 34/13 43/18 43/20 43/22 71/3 76/20 79/18 79/19 80/23 82/17 84/23 84/24 85/2
affecting [2] 30/11 30/12
affiliated [4] 65/23 68/9 69/5 75/23
afford [2] 31/1 45/18
afloat [3] 29/1 41/23 45/6
after [7] 22/7 22/10 39/25 48/21 73/12 73/14 80/1
again [49] 5/14 10/22 11/7 14/8 14/23 15/10 15/17 15/20 16/7 23/22 24/9 24/15 25/14 27/12 34/25 40/5 40/9 40/17 42/7 43/9 46/14 46/16 47/10 47/21 48/24 49/11 49/20 50/10 51/2 51/12 51/17 51/21 52/8 52/13 53/2 53/17 54/9 55/7 55/14 56/1 57/9 58/8 60/16 61/13 61/17 63/1 75/13 79/25 85/25
against [6] 19/2 64/19 64/25 72/24 84/12 84/13
agency [1] 58/23
ago [4] 8/5 14/6 16/8 77/22
agree [11] 5/23 13/16 16/2 16/3 28/11 28/14 29/16 30/3 81/6 82/3 85/8
agreed [6] 6/19 16/3 16/4 20/22 34/1 34/7
agreed-upon [1] 34/7
agreement [10] 8/13 8/17 15/25 20/22 28/13 29/12 31/2 33/6 33/22 34/5
ahead [3] 51/16 63/22 76/16
al [3] 3/2 4/7 4/9
all [75] 1/4 4/6 4/10 4/22 6/2 6/3 7/7 12/2 13/3 14/13 14/19 15/1 15/1 17/2 17/6 21/6 22/21 22/22 23/1 23/21 25/18 25/19 26/15 27/3 27/25 29/2 29/20 30/3 30/22 32/9 34/12 37/20 38/16 39/1 45/16 46/6 46/17 46/21 46/24 47/2 47/4 47/16 48/1 48/3 51/12 51/25 54/7 54/12 56/19 63/12 64/1 64/22 66/1 66/2 67/23 69/12 73/4 73/12 73/14 73/14 74/9 76/8 78/10 78/12 80/4 80/14 80/15 80/17 81/1 81/8 81/20 84/14 85/24 86/4 86/5
allegation [35] 39/13 40/13 40/15 42/2 42/4 42/8 42/12 44/20 44/20 44/22 45/1 48/11 50/3 51/8 51/9 51/10 51/11 56/8 56/14 60/21 60/23 60/25 61/2 61/8 61/9 61/13 61/18 61/21 62/1 62/5 62/8 62/12 62/18 62/23 79/24
allegations [12] 19/2 48/5 49/5 50/23 51/1 52/14 56/18 57/11 57/19 57/19 74/20 76/10
allege [2] 52/14 55/11
alleged [17] 18/12 18/17 27/12 31/14 32/7 39/10 39/12 48/17 48/25 51/14 55/15 55/19 58/4 65/2 65/9 74/24 79/25
allegedly [1] 77/12
alleging [2] 46/15 68/4

A

allow [1] 72/15
allows [1] 77/11
almost [1] 6/17
alone [1] 72/23
along [3] 7/23 40/1 73/10
already [10] 5/20 8/6 11/25 12/13 14/18 52/2 53/2 54/19 58/5 76/1
also [22] 4/9 9/18 10/10 10/14 10/24 12/12 17/21 18/6 18/15 22/25 25/15 26/13 26/24 28/6 29/14 33/13 43/4 47/20 48/13 76/13 77/5 77/6
although [1] 14/24
always [6] 15/11 36/3 48/19 73/25 75/19 75/23
am [6] 5/22 17/15 31/6 31/7 67/22 81/22
amend [6] 9/10 9/10 9/16 57/4 79/1 79/4
amended [19] 18/17 27/7 32/12 33/5 33/13 33/21 41/19 41/19 42/1 44/7 45/16 52/14 54/5 54/7 55/21 57/1 58/14 81/8 82/2
amending [1] 57/15
AMERICA [1] 87/1
among [2] 52/12 52/15
amount [4] 29/12 36/9 36/21 53/13
amplifies [2] 72/18 72/21
Amy [2] 3/5 13/5
analogy [6] 28/1 28/4 33/24 41/22 60/7 81/23
analyses [4] 22/5 23/8 49/21 54/10
analysis [41] 18/12 19/1 19/10 19/11 19/12 19/22 20/12 21/18 21/19 22/16 22/22 23/1 23/9 23/11 24/1 24/2 24/8 24/9 27/17 27/17 38/16 40/4 40/5 40/20 40/23 41/2 46/8 51/20 54/9 58/9 59/4 63/3 63/5 66/3 68/5 71/8 74/1 77/9 80/3 81/14 81/21
analyze [2] 19/9 22/12
analyzed [3] 25/8 39/7 54/13
analyzing [4] 19/16 36/25 37/7 41/6
ancient [1] 77/23
another [16] 4/15 9/6 9/11 10/22 19/14 20/2 21/17 21/22 25/24 36/1 44/11 51/23 54/14 71/5 82/6 84/23
answer [2] 12/17 16/9
any [49] 5/19 6/22 11/4 12/6 12/17 16/4 16/25 18/10 27/1 29/2 34/6 34/7 35/12 39/9 39/10 39/13 39/14 42/8 42/12 44/5 44/10 44/20 45/1 46/3 48/7 48/7 48/21 50/24 52/14 52/15 52/23 57/13 57/19 61/2 62/20 65/5 68/23 73/3 74/6 76/20 77/2 78/18 79/24 81/25 82/1 82/1 82/12 82/20 83/24
anybody [1] 12/11
anyone [1] 62/10
anyone's [1] 63/18
anything [10] 16/24 29/21 29/22 38/14 42/2 46/5 50/25 77/25 79/3 82/10
anywhere [1] 60/22
apart [3] 20/2 20/16 69/9
apparel [1] 62/4
apparently [3] 45/21 53/14 61/5
appealing [1] 12/15
Appeals [2] 19/17 22/20
appear [3] 19/14 20/1 20/9
Appearances [4] 1/24 2/1 2/24 3/1
appearing [2] 12/22 12/24
appears [2] 26/2 54/5
applaud [1] 8/11
apple [2] 57/23 78/24
applicants [1] 51/9
application [9] 18/22 26/3 51/10 53/5 58/7 58/11 61/15 71/14 83/22
applications [1] 61/12
applied [17] 7/22 9/14 11/8 14/25 21/18 24/7 37/13 37/14 40/4 43/3 59/4 59/13 59/19 63/4 63/5 67/19 82/4
applies [2] 18/2 80/2
apply [20] 6/5 7/7 11/23 12/3 13/22 19/23 23/11 24/2 26/25 27/1 27/2 37/13 41/10 41/12 42/11 49/17 51/18 58/16 59/5 59/5
applying [5] 6/23 10/5 19/23 35/20 58/8
appointed [3] 14/8 14/10 16/10
appointing [1] 8/19
appointment [1] 16/6
appropriate [2] 16/7 76/24
approval [2] 29/23 34/6
approve [2] 51/2 51/5
approved [1] 48/6
approximately [1] 64/4
architectural [1] 28/6
are [184]
area [5] 18/19 22/18 23/8 28/7 67/9
argue [3] 42/21 42/22 47/14
argues [1] 76/3
arguing [4] 4/23 13/9 49/8 74/11
argument [16] 10/14 13/21 14/6 15/8 16/8 16/18 17/23 18/7 35/3 47/5 65/12 69/2 71/6 75/13 75/14 76/17
arguments [8] 9/25 71/7 78/12 78/22 79/16 79/17 81/3 85/25
arisen [1] 36/4
arises [1] 38/18
arising [1] 85/1
around [4] 17/4 21/11 50/22 73/17
arrangement [2] 29/7 45/15
as [81] 4/15 4/15 4/24 8/6 8/23 11/18 11/21 12/8 12/12 12/14 13/22 14/4 14/25 15/8 15/18 15/18 15/18 15/25 16/8 16/13 18/5 18/6 20/4 20/6 20/13 21/8 22/11 24/1 24/12 26/8 28/4 32/11 33/20 33/25 34/5 34/15 34/21 34/25 36/6 37/1 37/25 38/1 38/3 43/1 43/13 43/17 45/19 48/17 49/24 52/4 52/4 56/23 58/6 64/5 64/6 64/10 64/20 66/13 66/24 68/7 68/10 68/14 69/9 69/18 69/23 70/1 70/7 70/18 70/18 70/25 71/11 74/4 74/11 75/11 75/25 78/15 78/16 80/9 80/21 81/22 81/22
aside [1] 58/15
ask [2] 12/15 75/8
asked [3] 14/8 62/10 62/11
asking [4] 8/2 14/9 57/21 81/24
aspect [1] 67/14
aspects [3] 48/2 48/24 48/25
assert [2] 20/23 34/17
assertions [1] 63/17
assessment [7] 29/9 30/25 33/22 34/2 45/14 45/17 48/22
assigned [1] 26/2
assignments [2] 25/2 25/3
assigns [1] 25/2
Assistant [1] 2/21
assumed [2] 67/11 67/11
assuming [2] 26/20 50/11
at [117]
Atlanta [2] 2/15 3/14
attached [1] 73/5
attaches [1] 65/23
attention [3] 8/25 9/19 70/20
attorneys [4] 6/22 8/9 10/11 10/12
attorneys' [1] 5/10
August [1] 57/24
authority [2] 10/3 10/6
automatically [1] 37/3
Avenue [1] 2/4
avoiding [2] 7/8 12/1
away [7] 51/25 64/3 64/8 67/4 70/20 80/18 80/20

B

back [11] 20/3 20/5 29/17 37/20 49/16 51/19 68/3 69/21 70/23 74/6 84/21
background [1] 26/5
bankruptcied [1] 52/2
bankruptcy [23] 29/3 29/4 29/5 33/16 33/16 33/18 33/20 39/25 41/18 41/21 41/25 42/2 42/5 43/11 43/12 45/8 45/8 45/9 46/1 46/12 48/22 84/14 85/13
bar [2] 25/21 26/2
bargaining [2] 79/14 79/15
barred [1] 56/22
bars [9] 41/1 41/2 41/7 41/9 50/12 50/22 53/4 57/5 58/12
Base [3] 2/18 31/23 32/1
based [8] 16/14 36/10 37/15 54/18 71/24 73/5 76/17 77/18
basic [1] 15/10
basically [3] 44/5 80/5 83/10
basis [11] 23/22 39/22 47/16 52/10 52/11 58/3 61/20 65/21 67/20 68/2 77/13
be [102]
bear [1] 70/11
beat [1] 53/3
because [44] 4/23 5/22 7/13 10/3 14/9 15/3 15/3 15/11 17/8 21/3 21/21 25/13 31/8 36/14 37/10 42/11 43/25 49/6 50/8 53/9 53/25 59/6 65/13 65/16 66/8 66/16 67/4 68/18 69/20 70/7 71/23 72/22 73/14 75/12 75/16 78/14 78/17 79/1 79/21 79/23 80/11 81/11 83/21 84/8
become [1] 67/13
becomes [1] 27/6
becoming [1] 48/2
Bedding [2] 46/12 52/13
been [38] 6/9 6/13 6/21 8/10 9/11 9/12 15/22 19/8 22/14 23/6 23/8 23/24 23/24 25/19 26/15 27/18 28/23 29/15 30/4 48/19 53/6 56/24 65/2 65/9 66/24 70/21 73/7 73/9 73/12 76/24 76/25 78/8 79/7 81/2 82/4 84/13 84/14 85/6
before [32] 1/21 6/4 6/6 6/7 8/3 9/20 10/1 10/5 10/23 11/1 11/7 11/14 11/15 11/19 13/23 17/25 23/21 27/19 31/10 38/10 39/17 41/5 63/2 66/20 66/20 71/15 71/25 73/12 81/10 81/24 82/4 82/7
began [1] 33/14
begin [4] 9/9 12/12 28/17 33/7
beginning [2] 10/17 16/3
begins [1] 67/10
behalf [5] 1/4 4/6 4/10 13/5 63/14
behind [2] 20/4 78/21
being [21] 4/11 5/12 8/8 8/11 11/6 14/18 21/25 24/10 30/6 34/21 47/21 48/3 60/12 60/12 66/21 68/14 70/18 71/11 74/13 77/3 84/10
believe [4] 4/15 4/18 74/18 83/9
below [1] 10/18
benefit [1] 11/5
benefits [2] 46/23 46/24
BERNARD [1] 1/13
besides [1] 51/17
best [2] 15/14 26/20
better [2] 17/9 81/9
between [5] 20/20 43/5 47/6 70/13 78/19
beyond [4] 46/5 59/14 61/25 68/19
BFI [1] 20/21
big [2] 53/10 67/18
bit [2] 17/4 68/3
bite [1] 78/24
bites [1] 57/23
blend [1] 27/16
block [1] 67/18
BLOODGOOD [1] 2/6
blush [1] 19/15
board [1] 40/13
body [1] 80/21
bore [1] 62/9
borrowed [2] 36/8 36/19
borrower [9] 36/6 36/10 36/18 37/1 37/4 37/14 37/14 38/13 43/12
borrower-lender [3]

B
borrower-lender... [3] 37/1 37/4 37/14
both [31] 4/20 5/10 5/19 7/3 7/10 7/21 8/8 8/20 11/18 12/24 12/24 13/20 18/2 19/12 19/23 20/17 20/21 20/22 21/25 36/23 50/5 55/22 64/12 64/19 65/8 70/11 75/1 77/4 78/2 84/10 85/8
bottle [1] 44/16
bottom [6] 20/17 21/20 56/4 77/14 77/16 78/2
box [1] 48/3
Boyce [1] 2/18
brand [3] 27/18 55/4 81/25
BRANZBURG [1] 3/3
breadth [2] 59/3 59/10
break [2] 24/22 63/23
brief [11] 22/17 53/6 66/5 66/6 67/6 67/17 67/19 69/2 78/23 81/1 81/4
briefed [2] 6/3 13/22
briefly [2] 53/1 57/14
briefs [1] 85/25
bring [7] 8/25 9/9 9/10 9/10 56/25 58/13 70/19
bringing [1] 6/17
broad [2] 58/23 67/23
broader [3] 49/8 58/23 58/24
brought [7] 50/7 54/3 64/18 64/24 67/21 68/15 85/10
Browning [5] 19/18 21/6 54/11 67/8 77/23
Browning-Ferris [5] 19/18 21/6 54/11 67/8 77/23
Brumbach [2] 2/20 17/18
budget [1] 34/7
build [2] 28/5 28/15
building [6] 2/18 28/7 28/17 33/8 60/11 80/12
builds [2] 80/4 80/10
built [3] 30/6 80/6 80/15
bullet [1] 15/12
bunch [1] 79/6
business [6] 26/1 29/1 76/1 83/23 84/7 85/11
businesses [1] 19/4
busy [1] 53/13
but [90]
BUTLER [14] 1/13 3/1 3/2 4/9 4/18 4/19 4/20 4/25 5/21 12/7 12/13 13/5 14/16 84/18
Butler's [1] 5/20
button [1] 75/20
buy [2] 28/4 44/14

C
C-222 [1] 2/22
call [1] 71/20
called [3] 67/21 68/9 77/4
came [7] 38/3 42/19 49/1 53/24 55/4 62/15 74/2
can [29] 4/22 16/10 17/9 19/3 20/23 25/17 26/7 26/7 27/15 28/11 29/9 37/5 37/13 37/13 45/14 54/24 56/11 57/18 63/9 65/19 70/18 73/5 73/5 78/5 78/6 78/20 79/1 79/16 82/4
can't [11] 29/6 30/22 30/22 31/1 34/19 42/11 42/11 52/17 57/9 57/19 80/2
cannot [7] 27/15 31/2 57/1 57/2 59/19 63/5 68/17
Capital [3] 36/21 36/24 37/16
care [1] 86/4
Carly [3] 3/16 87/5 87/18
CAROLINA [12] 1/1 1/9 2/17 4/14 17/16 31/15 32/21 32/22 33/10 87/2 87/7 87/15
Carolina's [1] 31/18
case [147]
cases [42] 6/5 6/16 6/20 6/21 7/3 7/7 7/14 7/20 7/23 8/8 8/24 9/18 9/25 11/7 12/2 12/4 14/20 14/23 15/1 15/2 15/10 21/6 21/6 21/7 23/7 25/10 25/10 35/23 38/6 38/16 46/10 47/25 54/12 59/14 59/21 65/14 67/21 73/11 83/18 84/11 84/12 84/13
Casualty [2] 11/10 11/15
cause [2] 6/18 57/4
Cayce [2] 2/23 32/22
cease [2] 34/12 51/23
ceased [1] 52/3
center [2] 73/13 79/7
center-most [2] 73/13 79/7
central [1] 24/17
centralized [9] 46/15 46/17 46/18 46/18 46/22 46/24 46/25 47/2 47/4
CEOs [1] 40/11
certain [1] 85/20
certainly [5] 5/25 8/15 23/18 63/20 73/12
certification [5] 13/20 14/13 14/17 15/18 16/5
certified [3] 12/10 87/5 87/19
certify [2] 87/7 87/12
cetera [1] 69/6
CFO [1] 37/18
CFR [3] 23/15 25/14 43/15
change [1] 30/4
changed [1] 78/22
changes [1] 68/16
Chapter [2] 29/4 52/3
charge [1] 66/18
charging [1] 32/3
Charles [3] 2/16 3/2 13/8
CHE [1] 1/14
check [1] 47/15
checked [1] 48/3
CHILDS [1] 1/21
choose [1] 67/12
Christmas [1] 53/9
circuit [37] 6/10 7/1 7/3 10/3 10/4 10/6 18/24 19/17 22/20 23/3 23/4 36/16 37/20 38/10 39/5 58/9 58/17 58/21 59/11 63/4 65/14 65/15 68/13 68/19 70/22 73/8 81/15 81/16 81/16 81/17 81/18 81/18 81/19 81/19 81/19 81/20 81/20
circuits [2] 22/25 23/25
circumstance [4] 74/23 82/12 84/7 85/11
circumstances [4] 76/2 76/12 85/1 85/21
cite [3] 25/12 38/5 54/23
cited [9] 6/21 7/4 11/20 14/23 19/18 23/7 23/23 53/6 68/18
Civil [2] 4/8 4/12
claim [6] 18/3 20/9 22/3 65/2 65/16 84/15
claimed [1] 33/25
claiming [2] 19/13 20/14
claims [5] 5/9 6/18 11/14 32/2 35/12
clarification [1] 16/22
clarify [1] 49/11
Clark [1] 2/6
class [13] 9/11 9/12 12/8 12/9 12/10 13/20 14/5 14/8 14/10 14/13 14/17 15/18 16/5
classic [3] 14/24 53/7 53/17
clear [8] 7/4 11/18 25/23 54/9 59/12 63/4 65/17 73/23
clearly [4] 36/2 52/2 65/8 81/23
clerk's [1] 8/11
clocked [4] 62/15 62/17 62/17 62/19
closed [2] 36/22 55/21
closer [1] 78/17
closing [8] 5/12 5/13 35/7 35/8 35/16 65/3 65/21 82/7
clothing [2] 62/4 62/6
Co [1] 2/18
Coca [2] 44/14 44/17
Coca-Cola [2] 44/14 44/17
Code [1] 2/22
Coke [1] 44/16
Cola [2] 44/14 44/17
colleague [8] 63/16 64/5 66/4 67/7 67/8 68/25 71/7 77/15
colleagues [1] 69/16
collectible [1] 53/9
collective [1] 79/14
Columbia [7] 2/12 2/19 3/7 3/11 3/18 28/5 87/15
combined [1] 14/20
combines [1] 77/18
come [11] 7/20 7/21 17/6 21/10 29/14 30/1 30/13 60/1 68/5 75/3 80/4
comes [10] 24/22 29/5 38/9 39/3 64/16 65/17 67/24 77/4 79/13 82/3
comfortable [1] 17/7
coming [3] 30/20 38/19 38/19
commenting [1] 40/21
comments [2] 10/21 70/15
Commercial [20] 18/23 58/7 59/22 60/4 60/4 60/7 60/20 60/24 61/4 61/12 61/13 61/17 61/20 61/24 62/5 62/11 62/14 62/16 62/16 62/21
commingled [1] 38/22
commingling [1] 52/11
Commission [1] 31/19
common [34] 24/3 24/4 24/5 26/10 26/10 26/19 26/19 27/11 27/11 28/3 35/22 36/14 36/15 37/3 37/3 37/7 37/8 37/10 39/9 39/14 39/21 40/13 40/16 42/8 42/14 42/15 42/23 43/2 43/5 52/18 52/18 68/12 70/5 70/17
commonality [1] 74/10
communicating [1] 43/25
companies [7] 24/13 33/2 50/5 52/12 70/3 70/4 74/12
company [15] 1/10 11/10 11/16 17/16 24/13 32/20 32/25 37/19 37/24 38/21 52/13 60/6 60/13 68/10 69/10
compensation [4] 24/19 24/20 26/14 44/24
compilated [1] 75/9
complaint [42] 9/10 18/17 27/7 31/12 32/12 33/5 33/13 33/21 40/16 41/19 41/19 42/1 44/6 44/7 44/20 44/22 45/17 48/5 50/3 52/14 52/23 54/6 54/7 55/21 56/8 56/12 56/15 56/19 57/1 57/4 57/7 57/15 58/14 68/4 73/25 74/19 76/12 78/11 78/21 78/23 81/9 82/2
complete [3] 26/2 61/11 87/11
completely [10] 19/13 20/10 20/16 42/7 52/23 66/7 66/7 69/22 69/24 73/3
completing [1] 33/23
complicated [3] 8/7 27/23 32/8
comply [1] 83/10
Component [6] 36/16 36/19 36/19 36/21 36/23 37/18
concede [4] 35/4 39/8 43/4 52/19
conceded [2] 26/9 52/16
conceding [1] 24/10
concern [1] 8/3
concerning [5] 23/25 26/23 31/19 35/1 50/15
concerns [1] 14/13
conclude [3] 27/3 27/4 63/9
concluded [1] 86/6
concludes [1] 10/19
concrete [2] 30/19 30/23
concurrent [1] 6/11
condition [1] 56/7
conditions [13] 20/23 24/16 24/17 25/7 26/13 54/20 55/6 55/7 56/13 63/7 79/13 79/13 80/19
conduct [2] 19/5 19/9
confluence [1] 70/13
conjunction [1] 21/23
connection [1] 78/18
consensus [1] 68/12
consent [2] 5/21 12/14
conserve [2] 5/9 7/9
consider [2] 12/16 77/11
considered [2] 70/7 71/18
consistent [2] 22/22 23/1
consolidate [2] 5/18 12/5
Consolidated [2] 46/11 52/13
consolidates [1] 14/12
consolidation [7] 5/21 8/14 8/18 12/14 16/1 16/4 16/9
construction [5] 29/11 29/13 32/19 33/8 33/23
consultant [2] 25/23

C
consultant... [1] 71/3
consultants [1] 37/19
contained [2] 1/24 58/24
contains [2] 58/25 87/12
contend [1] 27/23
context [5] 7/20 24/2 26/4 68/13 77/9
continue [6] 2/24 8/22 29/11 29/13 29/16 83/22
continued [2] 42/6 83/5
continuing [2] 34/1 39/25
contract [5] 25/23 28/15 28/15 71/3 71/10
contracted [3] 53/11 60/3 60/13
contracting [10] 69/10 69/24 70/11 71/10 71/11 71/17 71/17 72/24 78/9 80/9
contractor [19] 28/6 28/20 28/21 29/18 30/10 31/3 59/23 59/25 60/3 60/8 60/17 65/1 65/13 69/15 69/23 70/9 71/13 72/23 79/21
contractor's [2] 31/7 69/13
contractors [5] 64/7 69/7 69/9 72/16 73/4
contrary [2] 41/18 76/3
contrast [1] 71/2
control [30] 20/23 24/5 36/9 37/16 38/22 43/8 43/9 43/13 43/14 43/16 44/2 44/17 45/4 45/24 46/7 48/1 50/22 52/21 54/19 54/24 55/2 55/5 55/16 56/12 63/6 69/25 70/1 73/20 77/5 77/20
control' [2] 77/7 77/10
controlled [5] 46/5 56/7 70/4 70/5 70/10
controlling [5] 56/10 68/9 70/7 70/25 78/9
controls [2] 67/15 70/3
convenience [2] 14/1 68/11
copies [1] 9/1
copy [4] 23/15 23/16 23/21 69/2
core [1] 25/7
Corp [4] 2/10 2/17 2/21 3/9
corporate [3] 33/2 52/9 79/8
corporation [19] 1/8 1/9 1/17 4/7 4/11 4/14 17/17 17/19 32/18 32/21 33/4 33/19 37/5 39/12 41/20 42/9 43/11 53/11 78/1
corporations [4] 21/14 35/25 67/10 79/9
correct [8] 4/17 7/2 7/19 13/23 16/16 74/3 74/5 87/10
cost [7] 28/10 28/11 29/22 30/2 30/11 31/21 34/1
could [13] 8/15 27/10 43/15 50/22 54/18 59/20 63/3 66/12 67/1 75/3 75/7 75/10 84/25
couldn't [3] 45/18 53/25 79/21
counsel [15] 2/21 5/20 7/4 8/19 10/13 14/8 14/11 14/22 16/6 16/10 16/11 17/18 23/17 54/21 58/1
couple [4] 8/5 29/14 41/13 41/15
coupled [1] 39/21
course [12] 5/11 7/9 18/9 63/22 64/20 66/5 66/15 66/17 66/19 66/23 71/8 75/7
court [100]
court's [8] 5/11 8/18 9/19 10/19 63/18 70/19 78/18 78/18
courtroom [1] 4/23
courts [15] 6/11 7/14 7/22 22/24 24/15 38/24 52/7 68/19 76/25 81/15 81/16 81/17 81/17 81/18 81/18
covered [9] 12/9 26/1 53/25 61/4 61/6 61/6 61/8 61/10 85/2
covering [1] 6/12
coworkers [1] 53/17
Cranberry [1] 33/2
CRC [2] 3/16 87/18
create [7] 27/18 27/19 34/8 38/25 51/14 81/25 82/15
created [1] 36/11
creates [2] 25/21 82/16
criteria [12] 27/13 37/24 38/4 38/5 38/6 38/7 38/8 38/13 39/2 39/6 39/18 52/17
critical [6] 22/4 25/15 30/6 38/2 48/22 49/21
critically [1] 37/10
Crockett [3] 53/6 53/19 53/23
CRR [2] 3/16 87/18
cured [1] 8/13
curious [1] 14/3
Currie [1] 57/1
curtain [1] 20/4
customers [1] 31/25
cut [2] 6/1 67/18
cutting [1] 70/20
CV [6] 1/2 1/2 1/7 1/16 4/8 4/12

D
DANIEL [3] 1/8 2/11 32/17
DARRON [1] 1/13
DARWISH [1] 1/13
date [2] 34/24 82/23
Dave [1] 12/23
David [3] 2/13 3/12 40/10
day [37] 12/11 13/19 24/25 25/3 29/9 29/11 30/7 30/8 30/18 30/24 31/3 31/3 34/16 34/17 34/23 35/15 35/19 45/22 45/23 52/1 53/20 55/24 64/12 64/21 66/13 66/13 66/20 67/5 72/15 79/9 82/24 83/2 84/3 85/20 85/21 87/9 87/15
days [9] 29/8 30/25 64/22 66/20 66/23 66/25 83/6 83/13 83/14
days' [3] 34/14 65/6 82/17
de [13] 24/4 43/8 43/13 43/14 43/16 44/2 44/17 45/3 45/24 46/7 52/21 73/20 77/19
de facto [13] 24/4 43/8 43/13 43/14 43/16 44/2 44/17 45/3 45/24 46/7 52/21 73/20 77/19
DEAKINS [1] 2/17
deal [20] 4/16 9/19 23/8 27/9 29/6 29/19 29/20 29/21 37/1 38/12 45/10 45/10 45/11 47/25 50/6 50/8 54/24 59/17 77/15 82/1
dealing [2] 23/13 39/18
deals [2] 58/2 84/21
dealt [5] 38/16 46/13 50/12 54/13 84/7
death [1] 53/3
debt [1] 36/10
decades [1] 36/5
December [1] 55/4
decide [9] 11/22 12/4 30/6 67/3 81/7 81/8 82/11 85/13 85/14
decided [8] 11/11 18/25 23/25 26/15 45/22 45/23 56/16 73/12
decides [1] 14/12
deciding [3] 7/6 11/23 80/15
decision [57] 8/18 9/24 9/24 11/12 15/2 18/24 19/17 19/19 22/15 23/4 23/23 24/18 25/12 30/17 34/19 34/25 36/17 40/1 43/16 46/19 51/3 51/6 51/11 55/3 55/4 55/20 55/23 55/24 57/2 65/20 65/24 66/9 67/5 67/25 68/1 68/15 72/19 72/20 72/21 73/3 73/6 73/10 74/4 74/8 74/23 74/24 75/1 76/17 76/20 77/14 78/3 79/15 80/18 80/22 82/20 82/24 84/22
decision-maker [7] 65/20 66/9 67/25 72/19 73/10 75/1 78/3
decision-making [3] 40/1 46/19 74/23
decisions [13] 13/25 22/19 22/21 22/25 23/24 40/9 49/1 50/14 50/15 51/12 51/14 54/25 55/1
deemed [2] 70/1 70/25
defend [1] 5/9
defendant [2] 17/13 75/14
defendants [7] 1/11 1/18 2/9 2/16 3/9 4/13 32/18
defense [2] 76/2 84/9
defenses [1] 75/25
deference [1] 6/14
deficient [1] 51/17
defined [2] 22/10 59/10
defines [2] 43/18 59/9
definition [6] 25/21 58/18 59/3 59/3 59/13 75/2
definitions [1] 59/6
degree [1] 69/10
Delaware [1] 32/18
demonstrate [3] 5/15 12/2 28/2
denied [1] 9/16
denies [1] 15/19
deny [1] 48/21
Department [8] 21/11 22/10 23/12 56/23 69/11 70/14 71/9 71/14
dependency [5] 24/6 26/23 27/2 52/6 52/19
dependent [2] 21/16 51/23
depending [1] 69/10
deprives [1] 73/3
described [1] 77/1
design [1] 49/25
detail [2] 26/9 59/12
determination [1] 67/24
determine [8] 19/9 20/19 30/15 31/1 33/22 45/14 52/7 54/17
determined [7] 21/21 24/19 24/20 34/10 55/12 61/20 67/14
determines [5] 24/21 24/22 24/23 24/23 55/10
determining [1] 23/11
developed [1] 19/8
devoid [1] 57/13
dichotomy [1] 49/21
dictate [1] 37/23
did [31] 5/12 5/13 5/15 9/8 11/21 25/17 43/1 50/9 50/13 50/14 50/21 50/24 51/25 53/16 56/6 56/9 56/15 56/18 57/10 59/23 60/16 60/22 60/23 62/7 62/22 62/25 64/3 66/4 66/5 72/15 82/6
didn't [10] 37/25 43/23 43/23 57/9 65/13 66/13 75/16 75/25 76/9 77/15
differences [1] 59/21
different [12] 7/13 7/14 7/17 13/25 19/22 21/4 54/10 60/15 60/19 63/2 63/5 68/14
difficult [2] 8/10 54/15
difficulties [1] 36/11
difficulty [1] 28/23
direct [21] 44/5 53/23 54/19 54/22 54/24 55/2 55/5 61/18 64/6 64/7 64/9 64/9 64/14 64/16 64/19 66/12 75/19 77/5 77/8 82/8 82/9
directed [4] 33/18 49/2 74/24 77/12
directing [2] 49/9 75/2
direction [1] 65/25
directly [11] 29/18 32/14 34/2 41/18 42/19 57/10 61/12 61/15 61/16 70/2 71/1
directors [14] 24/4 26/10 26/19 27/11 36/15 37/3 37/8 38/22 42/9 42/14 42/15 42/23 43/5 52/18
directs [1] 74/25
disability [2] 35/12 46/24
disagree [2] 81/12 84/16
disappeared [1] 64/11
disassociated [2] 69/23 69/24
discharge [1] 35/11
disciplines [1] 25/5
disciplining [1] 50/2
discovery [3] 11/3 76/13 76/21
discretion [7] 6/13 7/5 10/7 10/19 11/22 12/3 15/23
discretionary [2] 6/25 13/23
discuss [2] 18/8 19/1
discussed [7] 11/25 13/18 19/21 22/13 50/12 54/19 58/10
discussion [1] 10/21
discussions [1] 11/4
dismiss [16] 4/13 4/15 5/8 5/17 5/24 6/14 11/19 12/5 14/9 15/19 15/23 38/1 40/22 57/3 79/1 82/5
dismissed [4] 10/20

D

dismissed... [3] 10/22 15/11 15/16
dismissing [3] 12/16 15/1 16/14
dispute [1] 82/20
dissect [1] 74/12
distinct [2] 19/7 19/14
distinction [2] 22/4 34/23
distinctly [1] 19/22
distributes [1] 32/24
district [15] 1/1 1/1 1/21 3/17 6/11 7/21 9/7 9/20 22/24 23/4 33/16 33/17 87/2 87/6 87/7
DIVISION [1] 1/2
do [80] 4/19 4/20 7/7 9/11 10/8 13/24 14/20 16/13 16/24 17/8 18/17 24/25 26/21 27/12 27/15 27/16 28/14 28/18 29/8 29/10 29/20 29/22 29/23 30/20 30/25 31/2 31/14 31/17 31/20 31/22 31/24 32/2 32/5 35/1 35/17 37/1 38/1 40/5 40/7 40/7 40/12 40/14 40/19 41/13 41/14 41/15 42/2 43/1 43/8 45/14 47/10 49/23 50/9 51/22 53/1 60/1 60/4 60/13 63/19 69/5 71/10 74/6 74/8 74/10 74/22 75/4 75/4 75/4 75/5 75/6 76/16 78/23 79/12 79/15 79/20 79/23 80/19 81/6 85/9 87/7
docket [1] 11/18
doctrine [1] 56/22
does [25] 7/20 8/2 10/13 11/22 20/12 20/12 23/3 25/4 26/24 36/14 38/25 39/9 41/10 44/16 46/13 49/25 55/19 69/1 69/20 70/20 71/12 81/22 82/15 84/19 85/16
doesn't [7] 39/23 43/3 48/10 49/17 58/16 77/25 79/23
dog [1] 14/7
doing [13] 18/15 21/21 21/23 28/21 47/16 48/4 49/12 49/15 53/17 58/3 60/5 64/25 83/23
DOL [4] 25/13 26/11 42/21 70/8
DOL's [1] 77/7
dominant [1] 66/5
domino [1] 46/4
dominos [1] 45/25
don't [41] 14/1 14/7 15/21 15/24 17/1 20/16 27/1 27/2 29/20 29/22 29/23 29/25 30/9 30/16 35/11 38/12 38/14 38/14 39/6 40/13 40/14 42/12 44/17 44/19 47/14 48/6 48/21 54/19 57/17 63/6 63/17 69/2 73/15 78/25 79/5 79/9 79/10 81/14 82/10 84/9 85/20
done [8] 30/14 56/12 60/12 60/17 63/10 64/8 75/10 78/25
double [1] 49/16
doubt [3] 48/18 48/21 58/4
down [19] 20/16 40/19 44/2 50/6 50/11 51/24 55/21 56/4 64/13 64/17 65/5 65/10 79/17 82/12 82/20 83/8 83/21 83/25 84/22
dramatically [1] 60/15
draw [3] 9/18 28/9 60/7
Drive [1] 3/6
driveway [2] 30/20 80/12
drywall [1] 60/3
drywalling [2] 60/4 60/6
due [3] 36/22 37/22 63/21
duly [1] 4/20
duplicative [5] 7/8 7/8 11/1 12/1 13/24
Dupree [3] 53/6 53/19 53/23
Dupree-Crockett [3] 53/6 53/19 53/23
during [6] 17/23 29/11 29/13 30/18 34/1 34/4
duties [1] 56/17

E

each [4] 11/2 25/3 25/3 47/15
earlier [7] 10/24 11/21 15/4 15/13 54/3 66/23 66/25
earlier-filed [2] 15/4 15/13
early [1] 35/24
easy [1] 37/2
EDWARDS [1] 3/6
effectively [1] 14/9
efficient [3] 5/9 5/10 5/15
egregious [2] 72/22 75/2
egregiousness [1] 73/6
Eighth [2] 22/24 81/19
EIGNER [1] 1/13
either [19] 15/22 20/22 23/4 30/14 32/7 34/24 43/22 47/6 47/7 50/4 54/16 56/19 62/12 62/18 62/24 69/9 70/2 70/3 76/17
ELECTRIC [4] 1/10 2/18 4/14 17/16
electrical [1] 28/18
electricity [1] 32/24
elements [1] 65/4
Eleventh [2] 22/25 81/20
elongate [1] 34/8
else [4] 12/22 16/24 26/16 46/3
emanating [1] 24/5
emotional [1] 32/9
employ [1] 58/19
employed [3] 32/13 32/15 77/9
employee [33] 9/7 20/14 20/17 21/25 22/3 24/12 24/22 25/2 25/23 25/25 25/25 26/1 36/18 50/11 50/21 50/21 50/23 53/23 53/24 57/9 57/10 58/18 59/9 59/13 61/7 69/6 70/1 70/2 70/25 79/18 79/19 80/16 80/17
employee's [2] 20/24 20/24
employee-by-employee [1] 50/21
employees [69] 19/5 22/3 25/5 25/5 25/6 31/7 31/8 34/13 35/10 35/14 43/17 43/19 43/20 43/22 44/1 44/13 44/15 45/21 46/20 47/1 47/19 47/24 48/8 49/2 49/7 49/9 50/9 51/4 51/5 52/10 53/13 53/14 53/20 55/25 56/19 60/5 60/6 60/10 62/7 62/11 62/13 64/4 64/5 64/6 64/7 64/21 64/22 65/1 65/13 65/14 67/16 69/14 71/3 71/4 71/17 71/18 74/14 76/20 80/23 82/13 82/14 82/17 82/24 83/11 83/22 84/22 85/1 85/2 85/21
employer [132]
employer's [1] 75/23
employers [13] 41/10 44/25 56/2 62/25 64/14 64/19 66/12 67/13 67/15 69/22 70/6 74/12 80/12
employment [30] 24/17 24/17 25/8 26/14 35/9 53/12 54/20 55/6 55/7 55/17 56/7 56/10 56/14 57/8 61/12 63/7 64/13 65/7 65/11 65/21 65/25 67/13 68/1 69/14 71/4 72/20 77/12 78/4 80/20 80/21
employs [1] 36/7
enacted [1] 22/11
end [10] 5/18 14/15 31/5 38/16 45/18 61/21 61/22 79/9 83/25 85/15
endorsement [1] 77/8
energy [1] 33/1
enforcing [1] 65/18
engineering [3] 32/19 33/7 49/25
enough [1] 57/23
enter [2] 28/12 28/15
entered [2] 33/6 33/22
enterprise [21] 21/5 21/8 21/12 21/13 40/6 40/8 42/8 42/13 43/9 45/3 46/17 47/7 49/23 51/21 52/5 52/23 77/5 77/10 77/18 77/25 79/8
ENTERPRISES [5] 1/8 1/17 2/10 3/10 4/11
entire [5] 42/25 56/12 56/14 69/4 79/8
entirely [1] 21/3
entities [26] 18/1 19/2 19/6 19/13 20/1 20/2 20/5 20/7 20/10 20/15 20/18 20/21 21/20 22/1 22/1 24/10 24/11 32/14 32/16 45/3 46/14 46/14 47/15 52/15 67/11 74/1
entitled [2] 14/21 76/13
entity [18] 18/13 19/8 20/3 20/6 20/6 36/7 43/13 44/11 44/12 60/14 60/16 75/2 83/24 84/8 84/22 84/23 84/25 85/17
environment [1] 20/24
equal [1] 82/7
equipment [5] 29/25 50/16 50/17 52/11 62/7
Ercole [3] 3/2 13/8 13/9
ERISA [1] 70/17
Esmark [1] 73/7
especially [1] 63/18
Esq [15] 2/2 2/3 2/6 2/9 2/10 2/13 2/16 2/17 2/20 3/2 3/2 3/5 3/9 3/9 3/12
essence [3] 25/16 25/21 85/4
essential [4] 20/23 25/7 55/6 67/14
essentially [5] 13/21 66/11 74/1 75/12 75/14
establish [1] 52/17
et [4] 3/2 4/7 4/9 69/6
et al [2] 4/7 4/9
et cetera [1] 69/6
Evaluated [1] 50/18
evaluates [1] 55/17
evaluation [1] 56/18
evaluations [3] 25/4 25/5 55/17
even [25] 7/17 11/1 12/3 27/10 38/25 39/6 39/20 41/5 41/7 42/5 44/2 47/22 49/2 49/7 49/9 51/18 54/12 54/16 54/18 57/6 59/20 63/3 68/12 73/15 73/23
event [1] 71/13
events [2] 35/5 74/7
ever [9] 20/16 54/16 60/22 61/1 61/14 61/15 61/18 62/2 81/24
every [6] 20/13 22/14 23/23 65/15 73/11 80/20
everybody [2] 6/19 75/8
everyone [3] 4/3 59/18 80/10
everything [3] 43/21 46/3 76/21
evidence [7] 14/2 39/1 40/14 47/20 56/9 72/23 73/15
exactly [8] 6/17 7/2 20/8 20/8 37/9 41/11 47/14 75/15
example [1] 31/13
examples [1] 32/6
exceed [1] 34/7
exception [1] 54/22
exchange [2] 52/10 52/10
exclusively [1] 60/20
excuse [2] 12/7 36/17
excused [1] 73/5
execution [1] 74/2
exercise [9] 10/18 15/23 24/4 67/2 73/20 75/17 77/7 77/10 77/19
exercised [1] 45/3
exercising [1] 10/7
exert [1] 50/22
exhibit [1] 42/16
exist [8] 42/6 51/23 51/25 52/4 79/8 81/14 81/21 81/22
existed [2] 45/19 47/5
existing [7] 33/11 69/3 69/4 69/12 72/2 72/12 76/19
exists [4] 36/3 52/5 76/8 80/17
expect [1] 79/22
expenditures [1] 34/6
experience [1] 33/14
experienced [1] 65/10
explained [1] 10/18
explanation [3] 67/7 70/14 70/16
extension [1] 80/10
extensively [1] 13/22
extent [1] 70/10
eyes [1] 17/8

F

F.3d [1] 77/6
facility [6] 35/7 35/8 35/17 36/22 53/15 83/8
facing [1] 26/6
fact [21] 5/19 6/24 14/19 21/5 28/22 34/21 37/7 38/1 39/11 39/24 42/24 43/7 44/19 45/2 47/23 50/20 55/3 70/3 70/14 77/11 82/8
fact-finder [1] 77/11
fact-specific [1] 50/20

F

facto [15] 24/4 43/8 43/13 43/14 43/16 44/2 44/17 45/3 45/24 46/7 52/21 73/20 77/7 77/10 77/19
factor [17] 22/13 24/3 26/11 26/22 26/23 27/15 35/21 37/7 37/8 41/14 42/10 42/21 43/2 43/8 46/9 47/21 77/8
factors [23] 15/12 19/23 21/18 24/7 26/17 26/19 26/21 27/1 27/5 27/8 37/10 37/12 38/17 38/17 42/17 42/22 53/25 73/2 73/5 73/15 73/19 73/21 77/17
facts [28] 9/13 18/14 18/16 27/7 27/12 27/22 28/2 31/10 31/12 31/13 32/6 32/11 33/24 35/20 41/19 45/5 48/25 52/23 54/18 57/6 58/3 60/19 63/1 63/5 78/11 81/8 81/9 82/1
factual [3] 31/8 59/20 60/16
factually [1] 52/22
failing [1] 85/19
failure [3] 56/25 58/13 82/16
fair [4] 58/9 58/18 69/19 75/7
fairly [2] 8/7 57/2
fallacious [1] 80/11
fallacy [1] 80/5
familiar [2] 58/1 84/18
far [2] 33/24 52/4
farther [1] 54/11
feasibility [1] 33/23
feasible [2] 29/10 34/11
FEBRUARY [3] 1/3 87/9 87/15
federal [6] 6/11 7/14 7/17 18/4 23/25 84/11
fee [2] 45/11 45/11
feel [1] 56/21
fell [1] 46/4
Ferris [5] 19/18 21/6 54/11 67/8 77/23
Ferry [1] 2/7
few [2] 7/23 31/12
field [1] 33/1
Fifth [2] 22/20 81/18
fifty [1] 70/15
fifty-four [1] 70/15
fight [1] 14/7
figure [1] 70/22
file [21] 6/3 6/4 6/13 6/24 9/14 10/5 10/15 11/8 11/21 11/23 12/3 12/16 13/21 14/25 15/3 15/11 16/14 16/17 33/18 45/7 46/1
filed [25] 6/14 6/15 7/14 8/8 9/9 10/19 10/22 11/6 12/8 13/18 13/19 13/19 15/1 15/4 15/7 15/8 15/10 15/13 15/16 23/6 29/5 33/16 42/5 66/25 84/14
files [1] 29/3
filing [4] 5/7 8/9 33/20 42/3
filled [2] 61/14 62/14
final [5] 27/14 58/6 67/24 72/19 73/10
Finally [1] 11/9
finances [2] 28/22 52/12
financial [12] 28/22 33/15 36/23 37/22 44/5 45/15 48/1 48/24 48/24 51/2 51/6 84/1
financially [2] 29/10 34/11
financing [2] 41/23 41/24
find [5] 5/8 9/15 11/4 25/10 35/23
finder [1] 77/11
finding [7] 26/7 52/24 70/6 71/13 71/23 72/24 80/1
fine [3] 4/24 23/18 63/24
finish [1] 78/2
fire [3] 60/24 61/1 61/3
fired [2] 37/17 37/18
firing [1] 50/1
firm [10] 5/4 13/8 15/7 15/13 15/14 17/20 17/21 28/6 49/25 58/2
firms [2] 15/5 16/11
first [60] 2/18 4/16 4/20 4/21 4/25 6/3 6/4 6/13 6/15 6/24 9/3 9/14 9/22 10/5 10/15 11/8 11/21 11/23 12/3 12/16 13/21 14/25 15/3 15/11 16/14 16/17 18/11 19/1 19/11 19/15 22/9 22/24 23/10 26/7 27/8 31/11 31/12 32/13 35/20 35/21 37/24 38/4 38/6 39/5 39/18 42/20 53/2 54/3 56/23 58/16 59/21 60/19 69/3 76/3 79/1 80/6 80/7 80/12 81/15 81/16
first-filed [1] 6/15
first-to-file [14] 6/3 6/4 6/13 6/24 9/14 10/5 11/8 11/21 11/23 12/3 12/16 14/25 15/11 16/17
FISHER [6] 2/10 2/13 3/10 3/13 12/23 12/25
five [11] 22/13 24/3 24/3 24/6 27/15 42/21 52/17 73/5 73/19 73/21 77/17
five-factor [4] 22/13 24/3 27/15 42/21
fixed [2] 45/11 45/11
flaws [1] 79/6
floodgates [1] 80/8
Floor [1] 2/4
FLSA [5] 47/1 59/14 70/13 70/17 78/16
fluctuated [1] 53/10
FLUOR [74] 1/8 1/8 1/8 1/17 1/17 2/1 2/10 2/10 2/11 3/1 3/9 3/9 4/7 4/11 4/11 5/4 5/8 5/12 5/13 5/15 5/19 9/8 13/17 14/3 14/6 17/16 32/14 32/17 34/3 34/10 34/24 35/1 39/13 40/12 42/4 42/5 43/6 43/10 43/17 43/23 44/4 44/9 45/16 45/22 46/4 47/6 47/13 47/19 47/23 50/4 52/4 55/22 55/22 56/3 60/9 60/23 62/25 64/9 66/19 66/23 67/1 74/13 75/3 75/9 75/14 75/25 76/9 76/13 83/10 83/10 84/10 84/12 84/19 85/13
Fluor's [5] 13/10 14/13 15/19 15/23 71/18
focus [11] 21/2 21/3 21/5 22/1 22/2 39/24 39/24 40/4 40/17 40/19 50/10
followed [1] 4/21
following [1] 1/24
follows [1] 28/4
foolish [1] 81/22
footnote [3] 42/25 43/1 43/4
force [1] 53/10
forced [2] 41/17 41/20
forces [1] 43/12
forcing [1] 45/8
foregoing [1] 87/10
foremen [1] 61/24
foremost [2] 53/2 58/17
foresee [3] 84/9 84/25 84/25
Forest [1] 3/6
formal [1] 20/22
former [1] 9/7
forms [1] 77/13
forth [2] 27/6 82/2
forward [5] 8/8 29/9 29/19 32/4 45/19
found [5] 25/10 25/11 37/15 37/21 67/6
founded [3] 66/1 79/17 80/5
four [5] 42/17 42/22 69/3 70/15 84/11
fourth [14] 6/9 7/1 7/3 10/6 18/24 22/24 58/9 58/17 58/21 59/11 63/4 68/19 78/24 81/17
frame [1] 30/14
framed [1] 76/12
Franklin [6] 53/7 53/8 53/20 54/1 54/14 56/24
frankly [2] 22/14 46/4
front [2] 5/18 42/18
full [3] 64/22 77/24 80/21
function [2] 24/12 30/22
functional [1] 20/10
functioning [1] 20/6
functions [1] 52/8
fund [1] 34/1
funded [2] 47/12 47/13
funds [1] 44/8
further [3] 70/16 74/6 87/12
futile [1] 57/16

G

G-U-I-L-L [1] 9/22
GA [2] 2/15 3/14
Gaffney [3] 3/5 3/6 13/5
GAS [4] 1/10 2/18 4/14 17/16
gave [4] 56/17 64/21 66/9 72/17
GE [3] 36/21 36/24 37/16
geared [2] 78/11 78/12
general [13] 2/21 6/9 11/25 28/6 28/19 28/21 30/10 48/14 48/16 48/19 59/23 59/24 60/17
generally [3] 18/20 37/2 59/24
generates [1] 32/24
generating [1] 33/1
get [23] 15/17 16/19 25/17 28/20 30/1 30/14 31/16 32/9 37/19 41/2 41/3 41/25 45/7 46/2 46/3 47/23 49/4 50/6 50/22 71/22 71/23 78/20 79/22
gets [2] 14/10 16/10
getting [5] 8/7 14/10 45/1 51/19 76/23
give [19] 17/3 28/10 28/10 29/2 29/2 29/8 45/22 45/23 65/13 66/13 66/24 67/3 71/12 72/16 74/13 78/8 82/16 85/19 85/20
given [16] 14/18 29/1 34/23 35/3 35/15 53/20 65/6 66/12 66/25 67/7 67/15 67/16 75/7 77/21 77/24 78/8
gives [2] 67/23 70/16
giving [4] 43/24 65/25 74/25 78/4
glad [1] 18/10
Glenn [2] 14/24 15/8
global [7] 10/9 14/23 32/19 32/25 49/24 50/2 50/5
go [34] 8/20 18/6 24/23 26/9 28/4 28/9 29/9 29/23 29/25 30/7 30/7 30/25 31/10 31/11 32/11 41/5 43/7 44/2 45/5 51/18 51/25 54/10 56/11 57/7 63/22 68/21 71/24 73/21 73/21 74/6 74/10 76/16 81/24 82/19
goal [2] 5/7 5/14
goes [6] 28/25 44/13 49/10 51/13 70/23 80/18
going [56] 5/14 5/22 5/23 7/22 8/6 8/8 8/11 14/7 17/4 28/15 29/2 29/2 29/16 29/18 29/21 30/2 30/2 30/3 30/5 30/8 30/19 32/4 36/2 42/12 42/21 44/15 45/19 45/25 46/1 46/3 55/10 55/12 55/13 55/13 55/14 59/17 63/18 63/19 63/21 68/23 69/6 69/25 70/24 72/20 73/18 75/19 80/8 80/9 80/11 81/10 84/21 85/6 85/11 85/12 85/14 85/15
GOLDEN [3] 2/3 15/6 63/14
gone [1] 81/24
good [11] 4/3 4/4 5/4 13/12 13/13 23/21 28/7 28/21 63/13 70/20 77/15
goods [3] 33/1 44/10 44/11
got [29] 6/16 7/10 8/7 11/7 20/17 28/7 29/6 30/1 30/1 30/23 37/2 40/6 42/17 42/18 44/17 45/10 45/10 45/12 46/2 50/17 55/1 56/2 56/3 56/3 57/6 59/22 80/23 81/8 84/8
gotten [1] 28/22
governing [1] 9/13
granting [1] 53/22
grave [1] 28/22
great [6] 22/13 23/8 38/15 40/3 58/17 59/17
Green [1] 11/6
Greene [2] 11/5 15/7
ground [1] 31/16
group [6] 11/12 19/4 51/12 67/15 67/16 77/21
growth [1] 70/21
guess [1] 84/16
guidance [1] 22/18
Guill [2] 9/22 9/23

H

had [59] 6/19 8/8 8/9 9/11 10/23 11/13 11/14 15/5 15/8 23/6 23/21 23/23 34/6 34/10 35/24 36/8 36/19 37/16 42/2 43/9 43/19 43/20 43/20 43/21 43/24 45/10

H
had... [33] 47/23 48/7 48/19 48/20 48/23 49/7 50/4 51/1 51/4 51/5 51/5 57/8 57/22 58/10 58/10 61/6 61/24 62/2 62/5 62/16 65/8 65/10 66/19 66/24 66/25 67/2 75/8 75/10 76/1 79/2 84/25 84/25 87/9
Hagood [3] 2/9 3/9 5/3
halfway [1] 28/20
Hall [2] 68/13 68/19
halted [1] 64/2
hand [10] 7/11 7/22 8/21 8/21 9/1 23/16 23/16 25/14 25/17 87/14
hand-in-hand [1] 8/21
handed [6] 11/13 25/17 25/18 25/19 42/16 68/25
handle [3] 67/12 78/14 80/16
handles [2] 68/10 68/17
handy [1] 78/8
happen [1] 65/8
happened [2] 32/10 47/14
happens [3] 69/17 78/15 83/16
happy [3] 5/4 12/17 73/19
hard [2] 48/20 62/4
HARRISON [3] 3/3 13/8 15/6
HARRY [4] 1/3 4/5 63/14 64/7
HARVEY [1] 3/3
Harwood [1] 15/7
has [71] 6/13 7/3 7/7 7/21 12/3 13/17 15/13 15/21 18/9 21/3 21/10 21/11 22/14 22/15 23/8 23/8 25/23 26/9 27/9 27/18 28/22 28/23 31/16 31/19 31/24 32/3 32/4 32/10 32/18 34/18 34/25 36/4 36/10 36/11 40/4 40/19 42/6 43/8 48/1 55/15 56/6 56/12 56/24 57/2 58/11 58/12 59/9 60/12 64/10 65/2 67/8 70/21 71/15 73/7 73/9 73/11 74/23 74/24 75/14 76/1 76/24 76/25 77/11 78/7 79/6 79/7 79/12 79/15 79/20 81/24 82/4
hats [1] 62/4
have [137]
haven't [4] 27/8 29/15 29/17 52/3
having [5] 12/11 14/14 42/5 60/17 80/6
he [26] 14/15 16/17 26/1 28/22 28/23 28/25 29/3 29/5 50/16 50/16 50/17 50/17 50/18 53/25 53/25 57/10 79/7 79/8 79/15 79/16 79/16 79/18 79/18 79/20 82/8 84/6
he's [2] 79/10 79/12
health [6] 46/23 61/4 61/6 61/7 61/9 61/10
hear [3] 40/23 74/17 74/17
heard [2] 11/20 54/3
hearing [3] 1/20 6/19 8/5
heart [4] 6/1 80/19 80/19 80/20
held [2] 19/4 80/23
helpful [3] 36/13 46/11 86/1
Henthorne [2] 2/17 17/19
her [1] 10/7
here [37] 4/5 4/22 6/2 7/10 8/3 8/5 10/2 10/12 15/17 20/8 20/15 26/9 28/4 29/16 31/9 35/19 36/13 38/1 38/11 39/9 40/14 42/12 47/5 49/20 56/2 61/8 61/9 61/14 62/6 63/6 67/20 73/16 75/23 83/17 84/1 84/3 85/4
hereby [1] 87/7
heretofore [1] 77/9
hereunto [1] 87/14
HILL [1] 1/2
him [4] 28/24 29/12 61/1 82/3
hire [4] 28/17 29/23 51/11 60/1
hired [6] 37/17 37/18 55/9 56/16 59/25 60/3
hires [1] 55/8
hiring [7] 24/18 24/18 26/14 46/15 46/18 49/1 50/1
his [13] 10/17 28/22 50/17 50/18 53/24 56/7 61/22 64/9 69/1 80/3 80/5 80/6 80/10
hit [3] 53/2 72/14 82/6
hold [1] 85/16
homes [1] 59/24
honor [70] 4/4 4/18 5/3 5/24 8/3 8/24 9/3 10/7 11/11 11/22 12/17 13/4 13/12 16/23 17/3 17/8 17/13 23/22 25/21 29/6 35/23 38/19 39/16 40/3 44/7 45/2 50/7 51/7 52/13 54/18 56/21 57/17 63/10 63/13 63/16 63/25 64/20 65/2 65/15 66/1 67/6 68/7 68/23 69/1 69/17 69/18 72/13 72/16 72/18 73/16 73/20 74/3 74/15 76/6 77/2 77/22 77/24 78/5 78/20 80/8 80/25 81/15 83/3 83/19 84/11 84/18 85/5 85/22 86/2 86/3
Honor's [1] 10/24
HONORABLE [1] 1/21
Horenkamp [3] 3/16 87/5 87/18
hour [3] 25/3 63/16 66/3
hours [4] 24/21 61/25 61/25 62/3
house [13] 17/18 28/5 28/12 28/15 28/17 29/10 30/5 31/1 45/9 45/13 80/4 80/6 80/10
houses [1] 28/7
how [43] 11/23 15/3 18/5 18/9 19/22 21/25 22/1 22/2 22/12 24/11 24/20 28/2 28/3 29/21 30/2 35/25 36/25 37/9 37/12 37/13 38/2 39/2 39/3 46/21 46/21 47/2 47/3 48/9 50/12 50/16 55/10 55/12 55/14 71/2 71/23 72/15 74/2 75/4 75/5 76/11 76/12 76/18 84/21
however [5] 20/12 39/8 49/16 64/25 74/22
human [1] 81/24
Humphrey [3] 9/4 9/4 9/6
hurdle [1] 54/2
hurdles [3] 51/18 53/3 54/16
Hy [1] 55/4
Hy-Brand [1] 55/4
hybrid [3] 77/3 77/8 77/17
hypothetical [1] 80/3

I
I'd [16] 5/18 6/1 8/24 8/25 9/3 9/18 10/9 11/9 12/17 22/6 23/16 25/14 28/1 39/16 43/7 85/22
I'll [12] 10/16 10/25 28/12 30/14 35/6 41/2 41/24 50/6 53/1 54/24 70/19 81/4
I'm [26] 4/20 5/23 6/10 7/22 9/23 18/10 29/2 29/2 29/21 30/18 31/4 31/4 40/14 42/14 48/15 49/4 49/20 57/21 63/10 69/19 73/20 76/13 78/20 81/10 81/12 85/6
I've [12] 9/5 10/10 11/13 29/1 29/5 29/25 30/4 31/5 42/18 51/16 77/1 80/21
idea [4] 9/23 43/19 43/21 70/23
identical [1] 11/3
if [78] 4/23 5/24 6/17 7/23 8/15 12/10 12/14 14/12 15/13 15/21 17/3 18/9 18/16 21/5 23/15 23/21 26/17 27/10 27/14 28/11 29/9 29/10 30/2 30/8 30/15 36/1 37/11 38/25 40/4 41/11 41/24 44/2 44/14 45/2 45/7 46/2 46/7 47/22 50/22 51/4 51/5 53/5 54/17 54/18 54/25 56/1 57/6 57/12 57/14 58/3 59/20 60/7 62/11 63/1 63/3 63/19 63/23 65/19 66/13 66/24 68/4 70/9 71/19 72/21 73/1 73/2 73/14 77/2 77/2 78/25 79/3 82/3 83/24 83/25 84/8 84/22 84/24 85/21
ignored [3] 66/7 66/7 69/16
ignores [1] 72/22
II [1] 2/16
III [1] 1/3
illegal [6] 74/24 77/12 82/9 85/18 85/19 85/19
immediately [3] 64/3 64/13 74/7
importance [2] 36/14 38/4
important [11] 21/1 22/4 34/22 35/5 37/9 37/10 38/7 38/17 55/23 80/16 80/16
importantly [1] 34/22
impossible [1] 44/1
improper [2] 47/22 85/9
in [379]
in-house [1] 17/18
inability [1] 74/11
inapplication [1] 18/22
INC [5] 1/8 1/9 1/17 2/10 3/10
include [2] 24/18 84/19
included [1] 85/6
including [2] 26/14 34/2
inclusion [1] 77/7
inconsequential [5] 26/20 38/1 38/13 39/6 43/3
inconsistent [1] 13/25
increases [1] 29/22
indeed [1] 43/5
independence [9] 67/1 67/2 67/4 69/11 70/9 72/15 72/17 73/3 75/6
independent [16] 21/22 67/11 69/7 69/8 69/13 69/15 69/23 70/9 70/10 71/10 71/12 71/16 72/15 72/23 73/4 79/21
indicate [4] 4/22 6/22 16/10 22/17
indicated [3] 5/20 10/2 12/13
indirect [1] 54/24
indirectly [2] 70/2 70/25
individual [7] 44/12 44/13 50/6 50/9 57/12 70/1 70/2
individual's [1] 24/19
individually [1] 4/10
individuals [3] 36/8 64/18 80/15
Industries [2] 19/18 54/11
inferentially [1] 44/24
influence [3] 49/24 50/1 50/4
influencing [2] 49/23 50/1
information [2] 57/13 62/20
informed [1] 34/9
initially [2] 14/4 20/1
insolvency [1] 36/23
instance [6] 37/6 43/14 56/5 56/5 60/2 76/3
instances [3] 10/16 38/24 85/20
instructed [1] 62/10
insurance [10] 11/10 11/16 46/23 46/23 46/24 61/5 61/6 61/7 61/9 61/10
integrated [3] 77/4 77/9 77/18
interact [2] 22/2 22/2
interacted [1] 35/25
interaction [2] 31/15 31/18
interest [3] 39/10 39/10 39/13
interesting [1] 66/3
interestingly [2] 38/3 42/16
interim [1] 33/22
interior [3] 18/23 59/23 60/13
Interiors [2] 58/7 59/22
international [1] 53/12
interpret [2] 76/18 77/7
interpretation [2] 70/19 78/18
interpreted [1] 56/24
interrelation [1] 77/19
interrupt [1] 63/23
interviews [1] 51/8
into [14] 15/18 16/19 26/9 30/11 33/6 33/22 38/15 41/2 41/5 41/18 41/21 43/12 45/8 45/9
introduce [1] 12/22
investment [1] 37/22
involve [1] 11/2
involved [14] 10/12 14/10 16/12 18/15 27/25 34/18 46/14 48/7 48/14 48/16 48/19 49/6 49/6 60/2
involvement [4] 34/25 48/12 48/23 49/8
involving [1] 9/25
irrespective [1] 78/13
Irving [1] 32/19
is [386]
isn't [3] 6/25 46/6 80/8

I
issue [27] 6/2 6/4 16/6 16/14 22/11 23/13 23/20 35/7 35/8 35/10 35/14 35/19 36/4 36/8 38/3 38/10 39/3 39/18 46/13 50/13 56/20 58/13 69/5 69/12 73/18 76/21 85/12
issued [5] 21/11 22/15 22/21 22/25 23/12
issues [9] 6/12 9/13 13/24 15/22 17/25 18/18 32/5 35/18 48/1
it [189]
it's [57] 7/1 7/13 8/10 11/12 13/23 13/23 13/25 15/3 15/12 21/17 29/10 30/2 31/4 32/19 35/16 35/18 36/17 37/2 37/2 39/3 39/10 39/12 40/21 42/17 42/24 46/6 48/24 50/20 55/1 57/13 58/23 58/24 63/4 65/9 66/7 66/8 67/18 67/18 67/19 67/21 68/8 71/21 73/7 73/8 75/9 75/12 76/2 76/3 76/23 77/23 77/24 78/1 80/20 80/22 82/12 82/13 85/21
item [2] 48/3 51/19
items [3] 52/15 53/9 62/9
iterations [1] 67/20
its [15] 32/18 33/19 34/13 36/23 43/20 61/7 64/1 64/21 65/14 67/5 69/14 70/14 72/15 75/25 83/11
itself [7] 20/25 22/11 22/22 39/20 47/9 53/4 76/10

J
J.I [6] 60/2 60/3 60/6 60/9 60/19 62/22
Jack [2] 2/2 63/13
January [1] 14/5
January 23 [1] 14/5
Jenkinsville [1] 33/9
JIMI [1] 1/14
JMC [5] 1/2 1/2 1/7 1/16 4/8
job [12] 21/24 25/2 25/2 26/14 28/11 28/21 56/17 61/5 64/8 70/20 80/17 82/7
jobs [4] 60/4 64/11 64/23 80/20
John [2] 2/9 3/9
JOHNSON [1] 1/14
join [1] 68/23
joint [67] 18/21 19/11 20/7 20/19 21/19 22/7 24/8 24/9 24/15 25/8 25/11 25/13 25/22 26/3 27/17 40/4 40/18 40/23 41/2 41/6 41/10 41/12 49/10 49/14 49/17 50/10 51/13 51/14 53/1 53/4 53/7 53/17 54/4 54/6 54/14 54/17 55/1 56/22 57/8 58/8 58/11 59/4 63/3 67/7 67/13 68/6 68/8 68/12 68/14 68/24 69/18 70/12 70/17 70/21 72/12 73/24 76/4 76/18 78/6 78/13 78/14 78/16 79/24 80/1 80/14 81/13 81/21
jointly [5] 19/4 21/22 67/12 70/25 80/15
JR [1] 1/13
judge [18] 1/21 6/7 6/7 9/14 9/21 10/2 10/4 10/6 10/17 10/23 10/25 11/2 11/2 11/8 13/24 14/24 15/8 57/1
judges [1] 7/6
judgment [1] 54/5
judicial [2] 7/9 22/19
July [3] 34/9 34/16 63/25
July 31st [3] 34/9 34/16 63/25
Jump [1] 17/20
jumped [1] 51/16
juncture [1] 30/6
jurisdiction [2] 6/11 13/25
jurisdictions [1] 7/18
just [64] 4/22 5/23 7/23 12/21 14/4 16/22 17/6 22/19 27/1 30/22 31/2 31/13 32/6 32/7 32/9 37/25 38/1 38/11 38/21 39/17 41/21 43/13 44/5 45/9 45/13 45/18 46/6 51/25 53/17 54/2 54/9 57/6 57/13 57/14 57/21 58/10 58/10 59/16 60/20 63/5 63/6 64/5 65/3 66/25 68/3 68/15 68/21 69/23 73/10 73/22 73/23 75/8 75/9 76/14 77/1 77/21 78/2 78/13 81/1 82/19 83/5 83/11 83/23 83/25
justification [1] 7/6
justifications [1] 11/24

K
keep [6] 8/10 8/12 29/1 37/19 41/23 45/19
keeping [1] 46/25
Kevin [1] 40/10
key [2] 6/4 6/7
kind [12] 27/24 35/12 36/9 44/1 47/25 48/12 50/4 51/12 51/13 74/7 74/11 79/24
KLEHR [3] 3/3 13/8 15/6
knew [1] 43/19
know [58] 5/13 6/3 8/1 8/3 12/12 15/21 16/17 30/20 32/13 32/15 32/17 32/21 32/23 32/25 33/6 33/11 33/13 33/15 33/18 33/21 33/25 34/5 34/9 34/13 35/2 38/21 40/7 40/10 42/11 43/8 43/23 43/24 44/14 46/10 47/1 47/1 48/10 49/23 49/24 52/4 54/13 56/18 57/22 57/24 57/25 58/3 66/22 71/24 72/13 74/7 74/9 74/9 76/14 76/14 78/1 78/9 79/10 80/21
knowledge [1] 34/18
known [1] 58/22
knows [1] 69/18
Korn [3] 2/10 3/9 12/24
Kresser [3] 2/13 3/12 12/23

L
label [1] 78/13
labels [2] 68/20 78/21
labor [22] 19/21 21/7 21/11 22/10 23/12 56/23 58/9 58/18 59/6 65/16 65/18 66/2 66/2 66/5 67/9 67/15 69/19 70/14 71/9 71/15 77/20 79/14
Labor's [1] 69/11
laid [1] 53/19
LAKEISHA [1] 1/13
landscaper's [1] 30/20
language [5] 40/9 47/12 59/9 59/16 73/13
Lankenau [1] 15/6
large [1] 53/13
largely [1] 6/20
largest [1] 15/15
last [10] 6/19 10/19 11/12 31/3 36/5 51/19 55/4 57/25 68/16 72/15
last-filed [1] 10/19
late [1] 33/14
later [6] 6/14 15/1 15/7 15/10 15/16 31/19
later-filed [5] 6/14 15/1 15/7 15/10 15/16
latter [2] 10/22 11/6
latter-filed [2] 10/22 11/6
law [10] 13/8 17/19 17/21 69/20 69/20 71/19 78/10 79/10 80/20 80/21
LAWRENCE [2] 1/13 4/9
laws [5] 65/16 66/2 66/2 66/4 66/5
lawyers [1] 58/2
lay [1] 82/13
lead [3] 10/13 16/10 16/11
leading [1] 74/7
lease [1] 29/25
least [9] 22/18 25/11 30/7 35/23 61/5 70/22 74/4 78/17 85/13
leave [2] 24/24 39/17
leaves [1] 52/21
Lee [2] 3/2 13/7
left [1] 74/21
legal [27] 18/12 18/18 19/1 19/7 19/22 19/23 27/16 34/14 35/18 35/18 41/1 51/18 53/3 54/16 58/12 67/11 69/3 69/4 69/5 72/10 72/22 75/11 76/19 76/24 78/12 78/22 81/7
legally [1] 84/24
legislature [2] 31/16 31/24
lender [11] 36/6 36/9 36/10 36/18 37/1 37/4 37/4 37/14 37/14 38/13 43/12
lender-borrower [4] 36/6 36/18 37/14 38/13
length [1] 22/13
lengthy [1] 56/15
less [1] 23/7
let [9] 19/1 31/10 31/11 32/11 35/20 49/11 54/22 66/22 78/2
let's [6] 29/8 49/1 59/20 68/3 68/20 82/19
level [25] 21/5 21/13 21/14 21/17 21/20 21/21 40/6 40/6 40/10 40/19 42/8 42/13 43/9 44/2 45/3 46/17 47/7 47/8 47/8 49/23 51/21 52/5 52/9 52/23 79/8
LEWIS [1] 3/6
liability [19] 19/3 27/19 35/18 38/23 39/1 39/22 65/19 65/23 69/13 70/12 72/24 73/1 74/20 75/24 76/4 77/8 82/15 82/16 85/3
liable [8] 19/4 72/20 80/9 80/11 84/6 84/15 84/20 85/16
lie [1] 46/7
life [1] 46/23
lifetime [1] 27/24
like [28] 5/18 6/1 8/24 8/25 9/3 9/18 11/9 12/4 18/11 22/6 23/16 25/14 28/1 29/11 38/11 38/21 39/3 39/23 41/22 43/7 44/2 45/5 45/9 45/13 56/21 58/10 59/5 65/3
likely [1] 11/2
limitation [1] 6/23
limited [2] 59/18 76/21
limiting [1] 59/16
line [7] 28/10 28/12 30/12 53/15 77/14 77/16 78/3
lines [2] 7/23 53/15
list [3] 43/20 75/9 75/9
listen [1] 29/15
litigate [2] 13/17 79/2
litigated [1] 5/12
litigation [18] 6/12 7/8 11/1 12/1 15/14 35/7 35/8 35/10 36/4 65/22 66/1 66/10 68/2 73/17 74/21 74/25 77/13 78/4
little [8] 7/13 14/3 16/17 16/18 17/4 22/18 68/3 77/22
LLC [1] 3/6
LLP [6] 2/3 2/10 2/13 3/3 3/10 3/13
Load [2] 31/23 32/1
location [2] 14/2 46/18
Logging [2] 11/10 11/16
logo [2] 62/9 62/16
logos [1] 62/5
Lohr [1] 3/5
long [6] 15/18 30/2 50/16 56/8 63/19 80/3
long-winded [1] 56/8
look [35] 20/4 20/12 21/4 21/14 21/23 21/25 23/10 30/5 30/11 37/11 38/20 39/17 40/6 41/11 42/4 43/15 45/2 47/8 49/22 53/5 54/25 55/1 56/1 57/12 59/20 63/1 68/19 68/20 68/20 69/20 69/21 69/25 70/16 78/20 80/1
looked [4] 21/5 24/15 52/7 78/16
looking [11] 7/12 7/14 21/2 24/11 26/17 40/10 46/16 47/21 69/15 69/19 78/13
looks [5] 20/13 20/20 21/12 21/13 21/20
LORENTZ [34] 1/4 2/3 4/6 32/15 44/22 47/18 49/13 49/15 50/13 50/19 50/24 55/8 55/11 55/15 55/18 56/6 56/11 56/13 56/15 57/8 57/25 61/3 61/10 61/14 61/19 61/23 62/2 62/8 62/12 62/19 63/7 63/15 64/24 65/8
Lorentz' [1] 64/9
Lorentz's [1] 56/13
loss [3] 65/7 65/11 82/7
lot [4] 28/4 37/6 63/17 74/16
Lucy [1] 2/6
lunch [2] 24/23 50/17

M
ma'am [9] 7/2 7/16 7/19 8/16 8/20 12/20 12/23 13/2 16/25
machine [3] 44/14 44/16 87/8
made [20] 7/4 14/15 15/2 16/17 16/17 24/18

M
made... [14] 25/12 39/3 49/1 50/14 51/11 53/21 55/20 55/23 55/24 74/23 75/12 75/14 76/15 76/25
magical [2] 71/6 71/7
Mail [1] 2/22
Main [2] 2/11 3/10
mainly [1] 67/22
Maint [1] 2/11
maintained [2] 62/21 62/23
MAINTENANCE [2] 1/9 32/17
majority [5] 18/16 18/16 35/23 37/7 83/18
make [13] 29/7 29/17 30/16 32/7 47/10 47/11 50/14 57/19 59/12 73/23 75/25 76/16 85/22
maker [7] 65/20 66/9 67/25 72/19 73/10 75/1 78/3
makes [6] 11/18 60/15 71/7 72/19 82/20 84/22
making [14] 13/21 22/3 34/2 40/1 46/19 59/18 63/17 65/24 66/22 68/1 74/23 79/16 80/22 85/17
man [1] 79/16
management [2] 39/21 52/18
manager [2] 50/14 50/24
managers [1] 40/8
mandates [1] 65/18
manner [1] 75/10
manufactured [1] 53/8
many [7] 10/11 21/6 32/6 40/9 54/18 58/24 63/17
March [1] 33/17
March 29 [1] 33/17
Market [1] 3/3
Marsh [1] 40/10
marshaling [1] 28/21
masonry [1] 28/19
master [1] 58/23
master-servant [1] 58/23
material [1] 18/14
Mathis [1] 2/7
Matt [1] 12/24
matter [13] 4/9 5/4 5/21 5/22 6/24 12/8 12/16 14/25 17/2 17/12 17/17 58/12 80/17
matters [9] 4/5 9/20 10/23 11/13 11/15 11/18 16/15 67/13 80/16
Matthew [2] 2/10 3/9
may [12] 5/1 13/4 13/14 17/15 22/18 23/15 23/20 30/9 30/10 30/13 34/7 57/15
maybe [7] 7/17 30/5 30/8 57/9 62/7 78/8 81/21
me [34] 8/10 12/7 12/24 13/7 19/1 20/18 28/9 28/10 28/10 28/16 28/21 29/5 29/5 29/8 29/10 29/14 30/1 30/13 31/10 31/11 32/1 32/11 35/20 36/17 42/18 49/11 54/22 56/9 56/16 56/17 63/23 69/2 71/25 78/2
mean [29] 16/3 23/12 25/22 38/14 39/20 40/12 40/14 41/14 42/5 43/20 44/14 44/17 44/25 46/13 48/10 49/3 49/6 50/21 51/21 57/9 57/23 58/1 62/14 68/16 73/19 75/3 75/10 85/16 85/16
meaning [1] 74/13
meaningless [1] 71/21
means [6] 46/14 68/15 70/22 71/16 71/20 71/20
mechanisms [1] 36/20
meet [4] 27/12 27/15 37/24 42/11
Melissa [1] 17/20
members [1] 40/13
memo [1] 41/17
memorandum [11] 18/21 19/19 22/14 23/6 23/23 26/24 27/16 42/20 42/25 54/4 57/3
mention [4] 9/4 17/23 18/1 66/4
mentioned [10] 35/6 67/8 67/19 69/1 73/10 73/24 76/1 77/21 79/6 87/9
mentions [1] 70/17
merge [2] 20/3 20/16
merged [2] 21/10 74/1
merits [1] 16/19
met [3] 38/23 39/2 47/21
method [1] 55/13
MF [2] 10/9 14/23
MF Global [2] 10/9 14/23
Michael [3] 2/17 17/19 25/17
MICHELLE [1] 1/21
might [5] 4/23 12/18 67/2 73/17 77/2
Migrant [2] 59/1 59/14
Miller [1] 15/6
mind [3] 22/6 27/21 50/8
minimum [1] 65/18
Mint [6] 53/7 53/8 53/21 54/1 54/14 56/24
minute [3] 17/3 38/25 54/25
minutes [1] 7/23
missing [3] 42/22 51/7 60/11
moment [1] 13/18
money [10] 29/1 29/13 29/21 36/21 44/12 44/15 45/6 45/7 46/1 46/3
monies [2] 36/9 44/23
moniker [1] 78/8
month [1] 68/16
months [2] 29/15 74/9
months' [1] 29/17
more [21] 14/20 15/3 17/7 28/25 29/3 30/7 32/8 34/22 35/6 38/17 40/1 41/23 41/24 45/5 45/6 46/1 47/25 48/23 50/7 55/23 60/24
morning [10] 4/3 4/4 4/17 5/4 11/25 13/12 13/13 63/13 63/25 64/9
most [13] 5/9 5/14 14/19 15/13 36/13 37/11 38/7 46/11 53/13 58/24 73/13 79/7 80/16
motion [29] 4/15 5/8 5/17 5/17 5/23 9/9 9/16 11/3 11/19 13/10 13/19 13/20 14/4 14/9 15/18 15/19 15/23 16/13 17/25 18/21 34/20 40/22 53/22 54/4 57/3 57/3 74/18 79/1 82/5
motions [5] 1/20 4/13 8/8 8/9 14/5
Mount [1] 2/8
move [3] 5/23 17/2 35/20
Moylan [2] 3/2 13/7
Mr [13] 2/2 2/3 2/9 2/10 2/13 2/16 2/17 2/20 3/2 3/2 3/9 3/9 3/12
Mr. [81] 13/9 13/16 16/17 16/24 17/18 17/19 31/11 32/13 32/15 35/6 36/23 44/21 44/22 47/18 47/18 48/10 49/13 49/13 49/15 49/15 50/13 50/13 50/15 50/19 50/24 50/24 55/8 55/8 55/11 55/11 55/15 55/15 55/18 55/18 56/5 56/6 56/6 56/9 56/11 56/13 56/13 56/15 57/7 57/8 57/25 57/25 61/1 61/3 61/8 61/10 61/14 61/14 61/19 61/19 61/22 61/23 62/1 62/2 62/8 62/8 62/12 62/12 62/18 62/19 63/7 63/7 64/9 64/10 64/24 64/24 65/8 65/8 67/10 77/25 79/5 81/1 81/6 81/12 81/23 82/7 85/10
Mr. Ercole [1] 13/9
Mr. Lorentz [30] 32/15 44/22 47/18 49/13 49/15 50/13 50/19 50/24 55/8 55/11 55/15 55/18 56/6 56/11 56/13 56/15 57/8 57/25 61/3 61/10 61/14 61/19 61/23 62/2 62/8 62/12 62/19 63/7 64/24 65/8
Mr. Lorentz' [1] 64/9
Mr. Lorentz's [1] 56/13
Mr. Michael [1] 17/19
Mr. Pearson [1] 36/23
Mr. Pennington [31] 31/11 32/13 44/21 47/18 48/10 49/13 49/15 50/13 50/15 50/24 55/8 55/11 55/15 55/18 56/5 56/6 56/9 57/7 57/25 61/1 61/8 61/14 61/19 61/22 62/1 62/8 62/12 62/18 63/7 64/24 65/8
Mr. Raisner [5] 81/6 81/12 81/23 82/7 85/10
Mr. Speth [5] 64/10 67/10 77/25 79/5 81/1
Mr. Tighe [4] 13/16 16/17 16/24 35/6
Mr. Will [1] 17/18
Ms [3] 2/6 3/5 3/16
Ms. [1] 17/20
Ms. Melissa [1] 17/20
much [10] 15/3 20/13 29/21 36/6 47/2 47/3 48/9 55/10 55/12 72/15
multi [5] 18/13 19/8 19/8 19/24 27/19
multi-employer [3] 19/8 19/24 27/19
multi-entity [2] 18/13 19/8
multiple [4] 17/24 19/2 19/3 19/19
must [6] 25/8 39/1 43/18 43/19 46/15 55/5
my [33] 5/3 5/3 17/8 17/19 17/20 17/23 28/15 29/1 29/22 30/1 31/14 33/24 41/22 45/9 45/13 54/22 56/10 56/16 56/17 56/17 56/18 63/16 64/5 66/4 67/7 67/8 68/25 69/2 69/16 71/7 77/14 87/11 87/14
myself [2] 51/16 76/16
N
name [1] 5/3
named [2] 57/13 62/24
narrower [1] 59/7
NASH [1] 2/17
national [7] 19/21 21/7 35/12 53/12 59/6 67/9 79/14
national-international [1] 53/12
nature [4] 10/14 25/15 73/6 76/7
NE [2] 2/14 3/13
necessary [3] 38/7 63/23 78/25
need [19] 28/25 30/7 30/11 30/13 39/6 41/16 41/23 43/3 45/6 45/25 49/22 71/24 73/2 73/15 74/6 76/16 78/8 79/3 81/8
needed [7] 27/12 43/21 45/5 66/22 76/21 83/11 83/25
needing [1] 83/25
neither [6] 27/11 46/4 55/8 55/11 55/14 55/18
never [8] 15/8 27/18 67/19 67/19 69/1 78/7 79/9 82/4
new [13] 2/5 27/18 29/25 31/1 31/2 33/8 33/17 51/4 57/4 68/16 81/25 84/14 85/14
New York [3] 33/17 84/14 85/14
next [5] 2/24 17/2 46/9 51/25 67/21
night [1] 24/25
Ninth [2] 22/21 81/20
NLRA [3] 70/16 73/9 80/19
NLRB [6] 19/18 19/20 55/1 55/3 68/15 73/8
no [88]
No. [1] 26/11
No. 1 [1] 26/11
none [2] 6/21 78/22
nor [5] 46/4 55/8 55/11 55/15 55/18
normal [4] 35/22 58/23 61/25 71/9
normally [1] 38/9
not [132]
note [3] 14/3 18/15 76/15
noted [1] 15/8
notes [1] 87/11
nothing [17] 16/16 18/17 31/14 31/17 31/20 31/22 31/24 32/2 32/5 35/17 40/5 40/19 47/25 71/21 78/23 79/15 82/14
notice [32] 34/15 34/24 35/3 35/15 35/15 35/19 43/18 43/19 43/24 45/22 45/23 53/20 55/25 64/16 64/21 65/6 65/13 66/25 66/25 67/3 71/12 72/14 72/16 74/2 74/13 75/8 76/8 79/22 82/18 84/3 84/16 85/20
noticed [1] 4/16
notices [2] 66/24 85/21
notion [2] 38/15 66/20
now [33] 9/4 12/19 16/2 21/1 21/10 22/6 24/8

N

now... [26] 25/10 26/5 26/17 27/21 31/10 34/20 35/20 38/3 41/13 43/7 43/10 44/10 45/24 46/9 50/8 52/2 53/1 54/21 57/24 58/8 60/19 62/5 74/11 76/22 81/8 83/2
nowhere [1] 54/5
nuclear [5] 27/24 31/21 33/8 33/9 64/2
nullify [1] 85/7
number [9] 7/20 10/16 15/15 28/2 28/7 38/6 51/1 51/4 53/19
numerous [1] 54/8
NY [1] 2/5

O

obli [1] 35/11
obligation [1] 35/2
obligations [1] 46/2
obtain [2] 34/6 41/25
obvious [1] 66/8
obviously [6] 50/8 53/9 71/15 79/2 81/11 85/8
occasion [1] 61/16
occurred [1] 52/15
occurring [1] 74/10
off [5] 30/23 31/16 53/19 74/21 82/13
offer [2] 28/1 63/20
offered [1] 32/7
offering [1] 44/4
office [3] 8/11 59/23 59/25
officers [12] 21/15 24/4 26/11 26/20 36/15 37/3 37/17 37/23 38/22 42/9 42/13 42/15
offices [3] 32/18 32/22 33/2
Official [1] 3/16
often [5] 18/5 30/7 43/10 46/21 55/14
OGLETREE [1] 2/17
oh [4] 72/5 72/11 82/22 85/17
okay [42] 4/2 4/19 5/24 5/25 7/24 8/22 9/1 12/21 13/1 13/6 13/11 15/24 16/13 16/20 16/21 16/22 17/11 17/14 17/22 25/20 30/25 40/25 49/4 49/19 63/9 63/12 63/24 68/3 71/22 72/4 72/7 76/15 81/5 82/19 82/23 83/1 83/4 83/7 83/9 83/20 84/1 85/24
old [2] 73/8 77/23
on [110]
on-site [3] 40/8 48/20 49/7
once [10] 14/12 27/24 30/5 30/7 34/12 39/24 48/6 68/21 70/6 78/16
once-in-a-lifetime [1] 27/24
one [77] 4/23 8/1 8/4 8/9 9/5 11/12 11/15 11/24 12/4 13/17 14/18 14/24 18/1 18/3 19/5 19/11 19/14 20/2 20/3 20/5 20/6 20/17 21/1 21/16 21/16 21/22 23/20 25/11 26/22 27/22 28/2 30/9 30/18 30/23 32/14 32/16 32/17 35/6 36/1 40/15 41/9 41/17 42/22 44/11 46/10 51/1 51/23 53/3 54/6 54/13 56/3 56/5 56/7 56/8 56/14 60/12 60/24 61/5 64/8 66/3 68/10 70/3 70/4 70/7 70/7 70/11 71/6 71/14 71/16 73/11 75/19 76/3 78/5 78/6 78/8 79/25 81/6
one-hour [1] 66/3
ones [2] 14/18 54/8
onion [2] 20/3 20/4
only [21] 4/23 13/17 16/13 23/3 29/3 35/14 39/20 41/24 42/24 45/7 52/21 58/21 58/25 60/21 60/23 64/21 65/19 66/22 74/23 81/2 82/3
open [3] 4/1 14/6 80/8
opening [1] 16/18
operated [2] 50/16 50/16
operating [2] 20/6 21/22
operation [6] 2/22 51/20 51/24 52/6 66/18 82/12
operational [2] 20/10 40/1
operations [10] 24/6 26/23 27/2 48/14 48/16 48/19 51/22 52/19 64/1 77/19
opinion [4] 10/17 11/20 31/14 37/11
opportunity [4] 75/5 75/6 75/16 76/9
opposed [1] 14/4
opposing [4] 7/4 18/21 23/17 54/4
opposite [2] 38/2 62/22
opposition [3] 13/9 13/20 66/6
option [2] 29/3 66/24
options [1] 5/19
or [120]
oral [1] 15/8
order [6] 5/12 9/5 10/10 10/13 51/14 64/2
ordered [1] 64/1
orders [1] 23/9
organized [1] 75/7
origin [1] 35/12
original [1] 70/23
origins [1] 67/23
other [52] 6/22 8/9 9/18 10/20 10/21 12/7 12/17 14/19 15/12 15/22 16/4 16/11 23/20 26/21 27/12 29/7 29/24 30/4 38/5 38/7 38/17 39/2 39/19 47/18 49/9 53/17 53/19 56/4 56/5 58/15 58/25 58/25 60/19 61/2 62/4 64/12 65/15 67/16 70/4 70/4 70/7 70/21 71/5 71/18 72/8 73/1 73/2 73/4 73/14 73/19 74/8 78/18
others [7] 1/4 4/7 18/9 33/7 64/7 68/14 75/1
ought [1] 78/16
our [28] 5/7 5/9 5/14 5/17 13/20 14/10 15/20 15/22 16/8 18/21 19/19 41/23 42/21 53/6 58/2 60/7 60/21 66/6 78/5 78/11 78/12 78/22 78/23 79/1 79/20 79/23 80/14 82/5
out [43] 5/18 8/1 9/8 10/9 10/25 11/22 11/24 12/6 16/5 20/8 23/25 25/19 28/10 29/23 29/25 30/18 36/16 38/10 41/14 42/19 46/2 51/11 52/17 55/4 56/2 61/14 62/14 62/17 62/17 62/19 68/25 70/22 71/11 74/9 74/9 75/22 81/16 81/16 81/17 81/17 81/18 81/18 81/19
outset [2] 19/12 21/1
OUTTEN [4] 2/3 15/6 58/2 63/14
over [23] 6/11 14/21 20/23 31/4 36/4 36/10 36/20 43/9 43/10 43/13 43/14 43/16 44/17 45/4 50/4 50/23 51/18 54/20 55/5 55/16 69/25 70/2 73/18
overcome [1] 54/2
overcoming [1] 54/16
oversee [2] 33/8 57/10
overstating [1] 40/15
overtime [12] 29/24 30/13 30/15 30/16 47/24 48/7 48/8 48/9 48/9 48/11 50/18 51/2
overview [1] 67/23
own [8] 15/25 28/16 39/9 39/10 49/7 59/16 64/21 69/8
owned [2] 32/23 33/11
owner [1] 60/11
owners [2] 42/23 43/5
ownership [18] 24/4 26/10 26/19 27/11 31/25 46/19 46/20
owns [3] 38/21 38/21 39/13

P

p.m [1] 86/6
PA [1] 3/4
packed [1] 74/16
page [6] 2/24 10/25 39/17 42/25 77/6 77/16
pages [4] 1/18 1/24 66/6 87/13
pages 1 [1] 87/13
paid [22] 24/20 24/21 25/24 29/15 31/5 44/8 44/12 44/23 44/24 46/20 46/21 46/21 46/21 50/17 55/10 55/12 55/13 55/14 55/14 62/6 71/5 83/22
pains [1] 58/17
painstaking [1] 59/12
panoply [1] 69/4
papers [1] 15/20
paralegal [1] 17/20
parallel [1] 8/7
parent [15] 33/4 33/19 35/24 36/1 36/6 37/2 37/5 37/21 38/20 38/20 39/12 41/20 43/11 69/10 77/11
parent-subsidiary [4] 36/1 36/6 37/2 38/20
parents [1] 69/7
part [8] 6/7 6/8 15/18 16/8 29/20 34/5 71/17 71/19
partially [1] 69/8
participated [1] 40/1
particularly [1] 72/21
parties [5] 6/2 17/11 59/21 68/24 70/24
parties' [2] 5/10 76/17
party [13] 57/11 60/14 60/15 69/24 70/11 71/10 71/12 71/17 72/24 80/9 80/22 84/15 84/20
passage [1] 31/23
paste [1] 67/18
path [1] 65/15
patience [3] 63/11 63/18 85/23
Pause [1] 17/10
pay [11] 29/12 29/17 29/18 29/21 30/1 44/15 47/17 64/22 83/5 83/11 84/4
paycheck [6] 44/21 44/23 45/1 53/24 61/18 61/19
paychecks [2] 47/12 61/16
paying [1] 44/13
payment [4] 29/17 35/22 36/2 36/15 37/3 37/8 39/9 39/14 39/20 39/21 40/16 42/15 43/2 52/18 70/5
payments [2] 34/2 47/13
payroll [3] 44/4 44/8 44/13
PC [1] 2/17
Peachtree [2] 2/14 3/13
Pearson [14] 36/15 36/18 36/23 39/5 39/16 67/22 72/18 73/7 73/9 73/12 77/3 77/6 77/14 77/17
peel [2] 20/2 20/4
pendency [1] 51/20
pending [7] 9/7 9/20 10/23 11/14 11/15 11/19 84/11
PENNINGTON [46] 1/3 2/1 2/3 4/6 4/14 4/16 4/21 5/22 12/8 13/19 17/12 17/17 18/3 31/11 32/13 44/21 47/18 48/10 49/13 49/15 50/13 50/15 50/24 55/8 55/11 55/15 55/18 56/5 56/6 56/9 57/7 57/25 61/1 61/8 61/14 61/19 61/22 62/1 62/8 62/12 62/18 63/7 63/14 64/8 64/24 65/8
Pennsylvania [1] 33/3
people [9] 29/23 29/24 43/25 47/3 48/20 66/22 80/4 80/7 80/11
percent [1] 31/13
perfectly [1] 73/20
performance [5] 25/4 25/4 50/18 55/18 61/2
performed [1] 34/4
perhaps [7] 7/15 18/22 23/20 28/18 32/8 50/21 59/14
period [15] 27/1 29/9 29/12 29/13 31/3 34/2 34/4 34/8 36/20 42/5 45/14 45/17 48/23 82/24 83/2
periodic [1] 47/16
periphery [1] 79/7
permanently [1] 64/3
permeates [1] 66/1
permission [2] 8/25 30/1
permit [1] 58/20
permitted [2] 9/11 9/15
permitting [1] 11/5
person [2] 40/11 80/5
personality [2] 72/22 75/11
personnel [4] 24/5 46/10 46/23 52/22
Philadelphia [2] 3/4 13/9
PHILLIPS [6] 2/10 2/13 3/10 3/13 12/24 12/25
phonetic [1] 67/22
piece [2] 28/16 50/16
place [10] 5/14 18/1

P

place... [8] 23/10 30/4 42/24 45/11 52/14 80/7 80/7 80/13
plaintiff [4] 24/13 26/8 36/22 38/18
plaintiffs [58] 1/6 1/15 2/2 3/2 12/7 12/9 12/14 13/5 14/16 14/19 14/20 14/21 15/15 18/24 22/17 26/18 26/24 27/14 27/22 33/25 34/17 37/25 38/5 38/11 39/4 39/4 39/8 39/11 39/23 40/17 41/13 42/10 44/3 47/10 47/20 48/17 49/7 52/16 54/15 56/25 57/13 60/5 60/10 60/25 61/4 61/6 61/11 61/16 61/24 62/4 62/10 62/14 62/22 62/24 84/16 84/17 84/19 85/4
plaintiffs' [10] 9/16 10/11 10/12 18/20 40/22 42/20 49/5 54/21 61/20 66/12
plan [6] 18/8 61/5 61/7 61/9 61/10 66/23
planned [1] 66/21
planning [2] 21/15 75/4
plans [3] 28/10 28/10 28/12
plant [8] 21/24 40/8 47/9 65/3 65/21 82/7 82/21 83/21
play [2] 15/12 76/21
Pleasant [1] 2/8
please [5] 4/2 5/1 13/4 13/14 17/15
pled [3] 32/11 74/19 79/6
plenty [1] 14/18
plug [2] 31/4 45/20
plumbing [1] 28/18
podium [1] 17/6
point [26] 5/18 8/1 10/9 11/9 12/6 14/15 16/19 23/14 26/22 33/24 33/24 39/16 41/14 45/19 45/20 45/21 46/5 47/11 56/3 57/11 58/6 63/3 67/14 73/18 73/18 78/24
pointed [3] 10/25 11/24 38/10
pointing [1] 11/22
points [1] 85/22
policies [3] 24/5 46/10 49/22
portion [2] 47/17 76/19
position [12] 15/22 15/25 18/20 22/23 23/2 26/25 56/22 64/12 80/18 83/11 84/1 85/5
positions [1] 64/3
possibly [1] 11/3
pour [1] 30/19
pouring [1] 30/23
power [1] 33/1
practice [8] 11/3 20/22 65/21 65/25 66/9 72/20 77/12 78/4
practices [2] 17/19 52/22
preapproval [1] 47/24
prejudice [1] 12/6
premiere [1] 15/5
premise [1] 72/10
premises [1] 27/11
prepared [2] 4/20 66/21
present [6] 26/12 38/25 48/12 52/20 77/17 87/8
presented [2] 10/1 10/1
president [1] 37/17
presses [1] 75/19
pretty [1] 63/19
prevail [1] 82/5
prevailing [1] 67/25
prevent [1] 10/7
prevented [1] 10/4
preventing [1] 12/11
primary [2] 7/6 14/18
prime [1] 60/8
principle [1] 12/1
principles [1] 7/10
probably [9] 16/9 17/24 18/16 19/14 31/13 46/11 47/14 48/23 85/12
problems [1] 33/15
proceed [5] 8/6 11/5 16/7 17/11 45/17
proceeding [1] 41/7
proceedings [3] 16/5 86/6 87/8
process [3] 30/18 33/7 50/2
processes [1] 22/4
product [1] 85/15
production [1] 53/15
project [24] 21/23 30/3 31/16 31/19 31/25 32/4 32/4 33/23 34/1 34/8 34/10 34/12 39/25 40/19 44/2 45/20 48/2 48/14 48/17 48/20 55/21 64/2 64/2 64/17
projected [2] 29/25 31/21
projects [1] 61/13
promised [1] 64/21
promulgated [1] 81/25
prong [1] 77/11
proof [1] 77/24
proper [4] 18/12 19/1 46/7 47/23
property [5] 11/10 11/15 11/17 28/16 31/2
proposed [1] 32/3
proposition [1] 78/17
protection [3] 41/25 59/1 59/15
prove [1] 26/21
proven [1] 43/10
provide [4] 41/24 53/12 55/24 65/15
provided [7] 9/5 10/10 34/13 35/15 35/16 44/8 44/11
providing [1] 33/1
provision [1] 85/6
Public [1] 31/18
published [1] 23/3
pulled [1] 45/19
pulling [1] 31/4
purchasing [1] 52/9
purely [3] 7/5 35/13 51/2
purposes [7] 17/24 19/3 34/20 35/3 47/1 54/1 78/5
pursuing [1] 15/14
put [6] 27/6 29/6 30/23 37/18 42/17 44/16
putative [1] 12/9
putting [1] 58/15

Q

qualified [3] 15/4 15/13 15/14
question [14] 8/2 10/24 16/9 19/3 24/12 27/6 27/9 27/14 31/6 51/22 74/18 76/23 77/2 81/7
questions [6] 12/17 15/21 16/25 26/6 27/21 50/19
quite [4] 22/14 23/9 30/9 46/4
quote [7] 10/17 10/25 39/19 47/12 58/19 77/16 81/23
quoted [4] 73/7 73/9 73/9 73/13
quoting [3] 39/17 40/9 81/13

R

race [1] 35/12
raised [3] 15/22 16/16 84/10
Raisner [7] 2/2 63/13 81/6 81/12 81/23 82/7 85/10
Randstad [3] 53/11 53/24 53/24
Randstad's [1] 53/15
ratepayers [1] 32/1
Re [2] 46/11 52/12
reach [4] 28/14 29/12 29/19 29/21
reached [1] 45/15
reactor [1] 64/2
reactors [3] 27/25 31/21 33/9
read [1] 77/16
reading [2] 59/11 77/5
ready [1] 17/11
realities [1] 68/20
realize [1] 10/11
really [14] 20/4 20/5 21/16 32/8 35/17 37/21 38/13 38/14 40/23 43/3 74/18 78/5 81/14 81/22
rearrange [1] 18/9
reason [6] 15/2 42/10 57/18 64/19 68/18 70/3
reasons [5] 8/4 10/18 14/18 58/15 58/16
receive [2] 43/18 43/19
received [6] 9/6 29/18 44/21 44/22 61/16 61/18
recent [2] 55/3 57/2
recognize [1] 75/11
recognized [2] 24/1 38/2
recognizes [1] 77/3
record [2] 46/25 71/24
record-keeping [1] 46/25
records [2] 62/21 62/24
refer [1] 18/6
reference [3] 21/8 54/6 70/18
references [1] 54/8
referred [1] 18/5
referring [1] 73/25
regard [1] 68/8
regarding [2] 32/3 77/20
regards [2] 85/13 85/14
regret [1] 32/10
regular [3] 52/10 52/11 58/2
regulation [8] 23/14 23/16 23/19 23/22 25/14 68/22 68/25 82/1
regulations [7] 21/11 22/11 23/11 23/13 26/12 56/23 68/21
rehash [1] 81/10
rejected [1] 38/15
relate [1] 8/2
relates [1] 43/17
relating [1] 10/24
relations [7] 19/21 21/7 59/6 67/9 67/15 77/20 79/14
relationship [15] 20/13 20/13 20/20 25/24 26/8 27/4 36/2 36/6 41/6 51/24 53/8 57/8 58/24 71/4 76/7
relied [1] 18/24
relieve [1] 76/10
relieved [1] 76/2
relieves [1] 73/18
relying [2] 53/22 67/22
remember [1] 56/1
Rene [1] 2/3
reorganization [2] 29/4 52/3
repeating [1] 81/2
reply [2] 66/7 81/2
reported [2] 3/16 87/8
Reporter [3] 3/16 87/6 87/19
represent [1] 17/16
representative [1] 14/16
represented [1] 58/1
represents [1] 5/4
reputation [1] 28/8
request [1] 57/15
required [3] 34/15 61/11 65/18
resolution [1] 65/16
resources [1] 7/9
respect [3] 16/1 75/11 77/20
respectfully [1] 55/22
respective [2] 44/25 62/25
responded [1] 14/4
response [5] 40/22 57/3 68/6 73/24 81/2
responsible [7] 25/6 65/20 65/24 68/1 75/1 78/3 80/22
rest [2] 67/19 74/20
restriction [1] 6/23
resulted [1] 65/7
retirement [1] 46/24
Retraining [1] 18/4
review [5] 18/14 27/21 28/14 31/23 32/1
rewrite [1] 85/7
rich [1] 41/22
Richland [1] 3/17
right [24] 9/23 13/3 13/17 17/2 30/9 34/20 40/24 41/4 47/8 48/1 49/18 49/18 63/12 67/10 74/11 74/14 75/15 75/18 75/21 76/22 76/24 79/5 81/1 86/4
rise [6] 30/2 32/9 66/9 74/25 78/4 86/5
risk [2] 11/1 83/23
RMR [2] 3/16 87/18
Road [1] 2/7
ROCK [1] 1/2
Roupinian [1] 2/3
rubrics [1] 68/11
rule [48] 6/3 6/4 6/5 6/9 6/13 6/24 6/25 7/1 7/7 7/13 9/15 10/5 11/8 11/21 11/23 12/3 12/16 14/25 15/11 16/17 65/23 66/1 66/5 66/8 66/11 67/6 67/17 67/20 67/25 69/6 69/15 69/17 69/19 69/21 70/8 71/9 71/14 72/19 73/8 73/10 73/11 73/13 73/14 78/12 78/12 79/18 80/2 80/14
ruled [1] 57/20
rules [8] 69/3 69/4 69/5 69/12 72/2 72/12 76/19 80/14
ruling [1] 73/8
run [1] 37/19

S

safety [1] 62/6
said [33] 4/18 7/3 10/17 11/2 16/7 16/8 20/1

S
said... [26] 29/10 38/24 41/21 41/22 41/23 42/20 45/6 45/7 45/13 55/5 55/9 56/6 58/21 58/22 68/19 71/15 71/23 75/4 77/6 77/16 77/25 79/21 80/21 81/12 82/7 82/8
salary [1] 56/16
Salinas [11] 18/23 54/23 54/25 58/7 59/10 68/13 68/18 68/18 69/20 70/20 78/18
same [41] 5/6 6/6 6/6 6/6 6/7 6/12 6/17 6/18 6/18 6/20 7/21 7/21 9/7 9/13 9/20 9/20 9/25 10/6 10/8 10/23 11/1 11/8 13/19 13/21 13/24 18/1 21/16 29/14 33/20 40/11 50/19 53/16 56/11 58/11 58/12 59/8 61/23 64/12 64/25 67/20 78/3
Sanders [2] 2/6 2/6
sat [1] 51/8
satisfied [2] 73/2 73/14
satisfy [1] 27/7
saw [2] 8/4 79/10
say [51] 17/6 20/4 21/19 26/24 28/9 29/8 29/15 30/9 30/10 30/11 30/13 30/14 30/15 30/19 30/21 34/19 34/22 34/23 38/6 38/17 39/11 41/14 41/15 41/17 41/20 42/20 44/3 45/2 46/5 47/20 47/23 48/6 48/6 48/10 48/25 49/1 49/5 49/16 57/9 57/20 59/2 62/13 67/12 69/12 71/23 78/5 78/6 80/8 84/1 85/5 85/17
saying [17] 8/24 9/23 37/12 38/12 38/20 45/25 46/1 49/20 53/22 66/11 70/8 71/9 72/21 78/20 84/19 85/5 85/18
says [26] 20/17 25/23 28/25 29/1 37/1 39/19 43/18 44/7 51/4 54/23 55/21 56/9 67/9 68/23 68/25 69/3 69/6 69/21 70/16 72/19 79/18 79/20 82/10 82/14 84/6 84/22
SC [7] 2/8 2/12 2/19 2/23 3/7 3/11 3/18
SCANA [117]
SCANA's [9] 22/23 23/2 31/15 60/14 61/8 61/10 65/12 65/19 82/8
SCE [11] 17/24 32/23 33/6 33/12 33/21 34/1 34/6 34/9 34/13 34/18 38/21
scenario [2] 38/23 85/10
schedule [1] 24/25
scheduling [1] 26/15
scope [1] 74/18
screened [1] 51/9
Seaton [1] 40/11
seats [3] 4/2 17/4 17/7
second [11] 7/9 10/9 11/16 18/14 19/11 22/20 27/10 54/2 81/15 81/16 84/8
Secondly [2] 56/25 60/24
section [1] 42/23
see [9] 8/6 15/25 16/13 17/9 29/9 43/16 47/25 54/11 82/10
seek [2] 41/25 78/23
seem [3] 32/8 39/23 39/24
selected [1] 48/10
selection [1] 48/8
sends [1] 75/22
sentences [1] 71/15
separate [14] 19/7 19/13 20/2 20/5 20/8 20/10 24/10 24/11 46/15 67/10 69/9 71/4 71/11 72/22
series [1] 50/19
servant [1] 58/23
service [2] 31/18 53/12
services [4] 1/9 32/17 33/1 44/11
set [7] 4/22 45/24 49/9 56/17 61/22 82/2 87/14
settlement [1] 11/4
Seventh [5] 10/3 10/4 22/24 73/8 81/19
several [13] 8/24 10/20 26/5 30/8 36/5 36/20 41/1 41/7 46/10 61/11 61/13 70/12 76/4
severally [1] 19/4
sex [1] 35/12
shall [1] 75/5
share [2] 40/7 40/12
shared [2] 52/8 52/9
sharing [2] 42/13 70/1
she [1] 57/10
sheet [4] 62/15 62/16 62/17 62/20
sheets [1] 62/14
shift [2] 24/25 25/1
shifted [1] 40/18
ship [1] 41/23
shoes [6] 37/5 37/21 60/8 60/9 60/10 60/14
short [2] 53/21 81/11
short-shrift [1] 53/21
shorthand [3] 87/5 87/8 87/19
should [21] 6/5 9/15 10/13 10/20 10/22 14/21 15/16 15/23 16/11 16/11 19/23 23/10 24/2 24/7 27/3 35/16 37/9 37/13 42/10 69/15 70/16
shouldn't [2] 13/22 85/6
show [2] 37/9 65/19
showed [2] 43/14 50/15
showing [1] 79/17
shows [3] 37/9 37/22 43/13
shrift [1] 53/21
shut [8] 51/24 64/13 65/10 82/11 82/20 83/8 83/25 84/22
shutdown [9] 66/21 74/25 82/8 82/9 82/17 84/9 85/17 85/17 85/18
shuts [2] 65/5 83/21
shutting [1] 64/17
side [1] 6/22
significant [3] 33/15 41/15 58/16
silver [1] 15/12
similar [4] 6/17 21/12 69/18 72/3
similarity [1] 78/15
similarly [5] 1/5 4/7 4/10 10/6 80/3
simple [2] 5/8 19/16
simply [4] 22/19 32/7 70/19 73/17
since [7] 5/22 21/10 23/19 25/15 30/6 32/4 50/7
single [52] 14/14 19/10 19/25 20/6 20/6 21/4 21/8 21/17 22/6 22/9 22/12 22/15 22/15 22/21 22/25 23/7 24/1 24/2 26/8 26/17 27/4 27/17 35/21 35/21 35/24 36/24 40/5 40/15 40/20 42/1 46/17 48/2 49/12 51/16 51/20 52/24 54/6 54/8 54/13 56/7 68/4 68/8 68/24 71/19 71/20 73/11 76/18 77/18 78/6 79/25 81/13 81/21
sister [1] 35/25
site [13] 9/8 21/24 33/11 40/8 47/17 47/19 47/21 48/20 48/24 49/7 64/4 65/5 65/10
sitting [1] 20/8
situated [3] 1/5 4/7 4/10
situation [54] 6/16 7/13 9/17 14/1 15/10 15/17 18/13 18/21 19/9 19/24 19/25 20/7 21/4 22/12 24/8 25/9 25/13 25/22 26/3 26/25 27/2 27/3 27/20 27/24 31/9 32/9 35/22 36/11 36/18 37/14 39/15 41/12 43/11 44/3 45/4 45/13 46/6 46/16 50/10 50/11 50/20 50/21 51/13 51/15 52/25 53/18 53/23 54/17 56/23 59/19 71/10 83/24 84/6 84/6
situations [3] 9/19 19/12 24/16
six [1] 74/9
sixteen [1] 70/15
Sixth [1] 81/19
Skipper [1] 11/17
SMOAK [1] 2/17
so [85] 4/19 4/20 4/21 4/25 5/14 8/23 11/7 12/9 12/10 14/1 14/3 14/8 15/5 15/10 15/20 17/2 18/1 18/15 19/14 20/13 20/14 20/25 21/17 22/1 23/7 26/2 26/20 27/3 27/8 28/9 29/3 29/6 30/4 30/7 30/25 31/2 31/6 32/6 32/11 36/6 37/6 38/22 39/13 42/9 42/10 44/1 44/4 44/18 44/19 45/13 51/22 52/5 52/16 53/10 54/15 56/1 56/21 57/4 58/6 59/16 59/24 60/7 63/1 63/19 64/16 65/17 66/11 68/16 68/25 70/13 73/17 74/6 74/8 75/10 75/22 76/2 76/6 76/14 78/5 79/8 79/16 79/25 80/8 83/9 85/22
society [1] 28/3
sodding [1] 30/21
some [28] 7/23 16/19 19/5 23/9 23/20 27/18 28/25 29/7 36/11 39/1 39/1 42/14 44/15 46/17 47/15 47/17 50/22 50/23 57/9 57/10 58/16 62/6 64/5 70/20 75/5 75/6 75/11 82/4
somebody's [1] 68/21
somehow [1] 27/16
someone [2] 26/15 80/4
something [7] 30/8 30/9 30/10 41/15 68/14 70/18 79/20
sometimes [1] 59/24
sorry [2] 42/14 48/15
sort [10] 19/5 20/15 21/2 21/10 25/1 27/18 29/7 42/15 50/22 72/14
sorts [3] 6/18 9/25 16/5
source [1] 24/6
SOUTH [13] 1/1 1/9 2/17 4/14 17/16 31/15 31/18 32/21 32/22 33/10 87/2 87/7 87/15
Southern [2] 33/16 33/17
sp [1] 17/20
space [1] 59/25
spaces [1] 59/23
speak [3] 15/24 57/14 74/8
spec [1] 28/10
special [1] 78/7
Specialty [2] 11/10 11/16
specific [10] 15/21 22/11 23/12 23/13 25/13 50/20 60/1 76/10 85/9 85/10
specifically [9] 6/25 18/22 21/24 44/6 57/7 57/12 59/2 68/23 77/12
spent [5] 37/6 37/11 59/17 63/16 77/15
Speth [7] 2/16 17/15 64/10 67/10 77/25 79/5 81/1
ss [1] 87/1
stack [1] 9/6
stand [5] 18/1 37/5 60/8 60/9 60/10
standards [4] 58/9 58/19 65/19 69/19
standpoint [4] 20/11 24/9 60/16 74/12
Star [1] 81/23
starkly [2] 54/10 63/2
start [5] 61/21 61/22 68/4 71/11 72/10
started [2] 45/24 57/24
starts [1] 24/10
state [2] 57/4 65/4
stated [3] 6/9 12/12 64/5
statement [1] 39/3
statements [1] 39/20
STATES [5] 1/1 1/21 65/17 87/1 87/6
Station [1] 33/9
statute [5] 18/6 58/25 82/1 84/21 85/7
statutes [5] 58/21 58/25 59/19 70/17 78/19
statutory [1] 70/15
stay [6] 5/17 6/14 12/5 16/4 20/16 45/6
stenographic [1] 87/11
STENOGRAPHICALLY [1] 3/16
STEWART [1] 2/17
still [2] 52/4 52/5
stopping [1] 31/4
stops [1] 51/24
straight [2] 6/1 8/12
straightforward [1] 28/2
strains [1] 67/24
strategic [1] 21/15
Street [7] 2/11 2/14 2/18 3/3 3/10 3/13 3/17
striking [4] 73/3 73/6 73/17 74/22
stringent [1] 65/17
strong [1] 79/16
struck [1] 68/14
study [1] 85/24
subcontractor [4] 34/3 60/2 60/9 60/18
subcontractor's [1] 31/8
subcontractors [3] 28/18 31/4 60/1
subject [1] 23/8
submit [3] 44/10 47/22

S
submit... [1] 74/19
submitted [1] 23/24
subs [2] 29/14 30/10
subsidiaries [2] 69/7 69/8
subsidiary [8] 32/23 35/25 36/1 36/6 37/2 37/22 38/20 43/12
substance [1] 78/21
substantial [2] 36/8 36/20
substantially [5] 6/6 6/12 6/17 53/10 59/7
substantive [1] 16/15
such [5] 49/25 68/7 73/6 75/10 81/14
sue [1] 60/16
sued [3] 36/23 53/20 60/17
suffer [1] 58/20
suffice [1] 63/8
sufficient [2] 12/19 39/21
suggest [3] 41/9 48/13 74/8
suggesting [2] 73/24 76/9
suing [1] 54/1
suit [2] 6/14 64/24
suitable [1] 5/19
Suite [8] 2/7 2/11 2/14 2/19 3/4 3/7 3/11 3/14
suited [1] 15/14
summarizing [2] 6/10 11/21
summary [2] 52/16 54/5
Summer [4] 32/10 33/9 51/25 64/1
supervisors [1] 53/16
support [2] 28/24 74/20
sure [5] 7/25 59/13 59/18 72/9 76/13
suspect [1] 54/21
SUTTON [1] 1/14
swallows [1] 67/21
swap [1] 17/4
synthesis [1] 69/11

T
tailor [1] 76/25
tailor-made [1] 76/25
take [17] 4/2 5/14 17/5 24/22 26/25 30/3 34/21 35/6 47/3 54/21 56/21 69/25 69/25 76/14 80/18 80/20 86/4
taken [1] 67/4
takes [1] 30/4
talk [2] 46/9 58/17
talked [2] 61/17 79/18
talking [12] 10/25 12/4 40/7 49/11 49/12 49/13 49/14 72/5 75/23 77/15 79/10 79/12
teams [1] 15/4
tear [1] 79/16
technical [1] 14/25
technically [1] 14/24
Technologies [4] 36/16 36/19 36/19 37/18
Technology [2] 36/22 36/24
Ted [1] 17/15
tell [3] 31/3 54/22 62/10
tells [1] 29/5
temporary [1] 53/12
Tenth [1] 23/5
term [9] 34/14 54/4 54/22 56/7 58/22 58/22 58/23 59/1 73/25
terminate [1] 82/14
terminated [7] 34/17 45/21 64/11 64/14 64/23 84/23 84/24
terminating [3] 25/6 35/9 43/23
termination [8] 26/15 32/4 34/15 34/19 35/6 55/20 55/23 75/22
terminations [2] 35/17 46/19
terms [13] 20/23 24/16 24/17 25/7 26/13 54/20 55/6 55/7 56/13 63/6 79/13 79/13 80/19
test [35] 21/8 21/8 21/9 21/12 22/7 22/8 22/9 22/13 24/3 27/15 35/21 35/22 40/8 42/21 76/24 77/3 77/4 77/5 77/5 77/10 77/17 77/18 77/20 78/6 78/7 78/7 78/9 78/10 78/10 78/11 78/16 79/8 79/10 79/12 79/20
tests [2] 78/2 79/7
Texas [1] 32/19
than [9] 14/20 23/7 29/24 32/8 54/11 58/23 58/24 63/2 74/6
thank [19] 4/2 5/7 8/23 12/20 12/21 13/2 13/4 13/11 16/23 17/1 17/22 63/10 80/24 80/25 85/22 85/24 85/25 86/2 86/3
that [643]
that's [67] 4/24 5/12 5/24 6/9 7/23 10/3 12/19 15/17 16/19 18/5 22/3 22/12 27/8 30/5 31/5 34/14 37/11 38/5 40/17 40/24 41/25 43/7 46/5 46/6 47/7 47/14 47/22 48/3 49/4 49/5 49/18 49/18 50/13 51/2 51/6 51/17 52/18 53/5 57/23 60/11 63/10 67/7 67/17 67/20 69/15 70/8 70/19 71/19 73/16 74/3 75/18 76/11 76/24 77/23 78/10 78/10 79/5 79/19 79/19 80/11 80/22 80/23 83/16
83/23 84/10 85/15 85/18
their [54] 9/10 12/11 13/18 13/20 14/21 18/20 22/17 24/25 25/2 26/24 27/7 27/16 33/2 34/15 34/23 35/15 37/22 37/23 41/17 41/22 42/25 43/21 43/25 44/24 44/25 45/16 47/11 47/12 49/7 50/1 51/1 51/23 53/10 53/15 53/16 56/10 57/1 59/13 61/4 61/21 61/25 62/24 64/6 64/12 64/13 64/14 64/19 66/13 67/2 67/3 67/17 75/9 76/3 80/12
them [27] 13/18 14/8 28/9 28/14 29/19 29/20 38/14 41/24 42/5 43/21 43/24 45/1 46/11 50/25 53/14 58/2 58/4 61/3 61/7 62/2 62/5 62/11 67/4 72/17 78/22 83/5 84/14
themselves [4] 1/4 4/6 23/12 67/3
then [59] 4/9 4/21 4/22 7/8 8/17 8/18 10/20 12/4 14/5 15/15 15/24 16/9 17/2 18/14 18/19 20/5 22/7 22/14 26/13 26/21 27/2 27/6 27/14 28/12 30/18 35/15 36/1 38/15 40/21 41/15 42/4 42/22 45/13 49/16 52/19 52/21 54/14 56/4 60/5 64/10 66/25 67/13 68/5 70/11 71/2 71/20 71/22 72/23 73/4 74/11 74/14 75/5 82/17 82/23 83/9 83/10 83/15 84/3 85/1
theories [9] 19/7 19/10 19/16 19/21 19/23 20/25 21/2 21/3 66/2
theory [7] 27/18 36/24 40/18 41/7 54/7 81/25 82/4
there [97]
there's [54] 6/22 10/6 18/3 22/18 24/3 25/11 27/4 30/8 36/2 38/23 40/13 40/14 41/7 42/1 42/4 42/12 44/12 44/20 44/21 44/25 46/10 46/18 46/18 48/11 48/21 48/25 49/3 50/3 50/23 51/7 51/8 51/9 51/10 53/5 54/17 57/18 60/22 60/25 61/2 61/7 61/9 61/13 61/17 61/21 62/1 62/5 62/8 62/12 62/18 62/23 74/16 77/2 81/14 85/3
therefore [4] 9/16 63/3 71/16 80/10
these [43] 11/14 11/18 12/2 18/10 19/10 19/12 19/16 19/21 20/20 21/2 21/3 21/15 21/25 22/4 22/5 24/18 27/24 28/2 35/20 35/23 38/16 39/19 42/20 46/2 46/14 47/25 49/2 49/21 51/22 52/15 56/19 59/21 64/18 67/23 68/10 68/16 68/19 68/24 74/1 74/12 79/17 80/4 83/18
they [210]
they're [13] 21/22 21/23 28/15 40/6 40/12 40/18 52/3 58/3 63/6 66/16 80/15 81/22 84/23
they've [3] 16/16 28/7 57/22
thing [11] 8/1 21/1 25/1 53/16 56/11 57/24 61/23 68/7 81/6 81/14 82/6
things [10] 10/14 27/22 27/25 41/13 41/16 43/1 45/19 50/9 52/7 68/9
think [75] 6/2 6/3 6/7 6/19 7/10 8/4 8/5 8/20 9/22 12/2 12/13 15/20 16/6 23/10 26/5 26/18 26/25 27/8 27/23 28/1 29/3 30/9 36/11 36/13 36/14 37/8 38/2 38/10 38/11 41/1 41/5 41/16 42/9 42/12 43/15 44/18 44/19 44/24 47/7 47/10 48/18 48/21 52/16 52/19 52/22 53/4 54/9 54/15 54/19 56/1 57/5 57/17 57/18 57/18 57/22 57/23 58/10 59/8 59/11 59/16 63/4 70/23 72/16 73/16 74/22 76/12 76/23 78/25 79/1 81/10 81/11 81/12 81/20 81/23 85/8
third [12] 2/4 9/12 18/19 19/17 22/20 36/16 37/20 38/10 39/5 43/7 78/24 81/17
this [198]
those [66] 4/10 5/19 7/10 7/23 8/20 15/1 17/25 19/5 19/23 20/17 20/21 20/25 21/10 23/24 24/6 25/7 27/7 27/21 32/6 35/5 37/9 37/12 37/20 38/1 38/4 38/24 39/5 42/14 42/19 43/25 47/15 51/6 51/12 51/13 52/15 52/20 53/25 54/10 54/16 55/7 55/25 57/5 59/6 59/18 62/9 63/19 64/5 64/8 64/11 64/22 65/4 66/4 67/15 69/3 69/8 69/21 70/6 71/13 76/1 77/17 77/21 84/16 84/19 85/1
85/1 85/22
though [4] 31/12 51/7 71/23 73/23
thought [2] 23/20 78/14
threatened [3] 60/24 61/1 61/3
three [21] 9/18 12/2 14/20 15/5 18/8 25/18 25/19 26/21 38/5 38/7 38/17 39/2 39/19 51/25 52/15 52/17 57/23 65/7 71/7 71/15 84/12
thriving [1] 52/4
through [14] 1/18 18/6 28/20 31/5 31/10 31/11 32/11 36/20 45/17 51/8 56/12 59/17 63/18 73/21
Thus [2] 33/24 77/10
Tighe [7] 2/9 3/9 5/3 13/16 16/17 16/24 35/6
time [35] 5/10 5/10 5/11 6/19 11/19 17/5 23/9 28/10 28/12 29/13 29/14 30/12 30/14 33/20 34/4 34/8 36/20 37/6 37/11 40/11 44/10 48/1 53/10 54/3 54/15 59/17 62/14 62/15 62/16 62/17 62/19 62/21 63/17 63/19 77/15
times [8] 17/24 19/19 30/8 53/13 61/21 61/21 61/22 61/22
TIMOTHY [3] 1/4 4/6 63/14
Title [1] 59/5
Title VII [1] 59/5
today [18] 5/7 5/13 6/4 8/3 9/13 10/12 12/4 13/7 15/19 17/17 17/23 17/25 17/25 31/5 31/5 65/9 66/8 85/23
today's [1] 18/6
together [6] 20/3 29/6 30/23 42/17 70/5 70/11
told [4] 61/24 62/2 62/13 78/24
tomorrow [2] 30/19 30/20
too [1] 60/19
took [2] 22/11 50/17
top [9] 9/5 21/13 21/14 21/14 21/15 21/15 21/21 40/6 40/10
topic [2] 18/11 18/19
topics [2] 18/8 18/10
Toshiba [12] 33/4 33/19 39/12 41/20 41/22 41/23 43/13 45/4 45/6 45/7 45/25 46/1
totally [1] 71/21
towards [1] 78/11
Township [1] 33/2
track [3] 8/10 33/24 37/20
transaction [1] 44/5

T
transcript [4] 1/20 87/10 87/11 87/12
treated [3] 20/18 21/25 69/9
Trek [1] 81/23
trial [1] 11/3
triangle [3] 20/15 56/2 56/4
trod [1] 65/15
true [3] 51/6 59/8 87/10
truncating [1] 71/8
try [6] 32/7 37/19 40/17 49/11 53/1 63/17
trying [4] 5/8 27/16 49/4 75/13
tunnel [1] 71/8
turnkey [1] 28/11
twice [1] 30/5
two [73] 4/13 6/5 6/10 6/16 8/7 9/25 10/23 11/13 11/14 14/6 16/7 18/1 19/7 19/12 19/16 19/21 20/1 20/1 20/5 20/7 20/9 20/15 20/20 20/25 21/3 21/10 21/20 22/4 22/5 24/10 27/4 27/7 27/24 29/15 29/17 30/22 33/8 35/5 35/25 37/9 37/12 37/24 38/1 38/4 38/6 39/5 39/18 40/11 43/1 46/14 49/21 50/11 51/4 51/18 53/3 53/25 54/10 56/2 57/5 57/12 58/12 58/21 59/19 59/21 65/6 67/10 69/22 70/6 70/24 71/7 71/14 78/19 80/15

U
U.S [1] 3/17
U.S.C. [1] 78/15
ultimate [2] 8/18 51/22
ultimately [7] 14/25 16/8 25/6 36/21 37/15 37/20 85/12
unable [1] 11/4
unanimously [1] 76/25
unbeknownst [1] 28/20
uncle [4] 28/23 28/25 29/1 41/22
under [49] 12/10 18/4 18/13 22/9 22/15 22/21 22/22 23/1 23/13 25/11 25/22 28/19 31/1 32/1 34/15 35/9 35/21 36/5 36/24 46/2 49/17 53/16 53/21 55/1 58/9 58/10 58/12 58/18 61/4 61/7 65/3 66/2 66/8 69/3 69/4 70/5 71/24 72/2 72/5 72/12 75/12 76/19 78/2 82/5 82/9 82/10 82/12 84/7 85/2
underlying [1] 18/18
understand [5] 14/17 49/6 75/13 76/5 76/11
understanding [1] 75/13
understands [1] 72/17
understood [1] 59/18
undertaking [1] 70/24
unforeseen [3] 84/7 85/11 85/21
unfortunate [1] 46/6
unfortunately [1] 75/18
unique [1] 82/4
UNITED [5] 1/1 1/21 65/17 87/1 87/6
unity [4] 24/5 46/9 49/22 52/22
unlawful [9] 19/5 19/10 20/14 24/14 35/9 82/8 82/11 82/12 82/13
unlawfully [1] 20/18
unless [2] 16/25 29/16
unpublished [2] 9/24 11/12
until [4] 16/5 40/22 67/5 72/14
unyielding [1] 7/1
up [30] 4/22 6/18 7/20 7/21 7/22 9/1 11/13 23/16 25/14 25/17 25/18 29/17 31/5 38/3 38/9 39/3 50/7 50/15 54/3 57/1 58/13 67/21 67/24 68/15 68/23 70/21 74/7 82/3 83/25 85/10
upfit [1] 59/25
upfitting [1] 59/23
upon [9] 18/24 21/16 22/11 34/7 36/10 37/15 51/23 53/22 54/18
urge [3] 39/4 43/2 54/16
urged [2] 26/18 39/4
urging [1] 85/4
us [10] 5/9 14/3 17/3 23/21 29/18 46/3 48/20 73/18 79/16 85/23
use [10] 11/23 27/3 27/23 42/21 47/12 54/22 54/23 57/1 57/2 58/22
used [13] 6/13 22/14 46/7 51/10 62/7 67/1 68/10 68/11 68/17 70/18 76/25 77/3 77/4
using [10] 12/16 28/23 34/14 62/15 62/19 71/8 73/25 79/7 79/8 84/24
usually [4] 7/12 7/14 7/19 74/20

V
V.C. [4] 32/10 33/9 51/25 64/1
V.C. Summer [4] 32/10 33/9 51/25 64/1
vacation [2] 47/3 56/17
vacations [1] 47/3
Valentine's [1] 5/5
various [2] 67/20 68/9
vast [3] 18/16 37/7 83/18
vending [2] 44/14 44/16
versa [1] 70/8
version [1] 68/21
versus [12] 4/7 4/11 11/10 11/16 11/17 18/23 19/18 36/16 39/19 53/6 58/7 73/7
very [25] 5/8 8/10 21/1 21/12 22/18 25/22 27/23 44/6 50/20 55/3 58/1 58/1 58/22 64/12 65/15 66/3 69/17 69/17 72/1 72/3 81/1 81/4 84/5 84/18 85/25
viable [1] 34/11
vice [1] 70/8
view [1] 63/16
VII [1] 59/5
violate [1] 5/16
violated [1] 16/18
violation [1] 74/14
violations [1] 69/14
virtually [2] 21/6 73/11
virtue [2] 64/17 76/5
vis [6] 24/12 24/12 38/4 38/4 49/15 49/15
vis-a-vis [3] 24/12 38/4 49/15
vision [1] 71/8
void [2] 44/25 52/23
voided [3] 45/10 45/11 45/12

W
W-A-R-N [1] 18/5
wages [4] 46/19 46/20 47/17 50/2
wait [1] 38/24
walk [2] 31/2 68/3
want [16] 12/21 27/21 28/5 28/11 29/8 45/14 46/9 50/7 51/19 58/6 63/17 71/20 73/22 75/4 82/6 85/5
wanted [1] 16/22
wanting [1] 40/18
wants [1] 76/13
WARN [77] 5/16 9/9 9/10 9/11 9/12 9/25 11/7 11/7 11/14 13/17 15/2 15/5 15/8 16/18 18/5 18/13 19/20 21/10 22/9 22/10 22/15 22/22 23/1 23/7 23/13 23/25 24/9 25/11 25/22 26/1 26/3 27/1 34/15 34/23 35/2 35/9 35/13 36/5 36/8 41/10 41/12 46/13 49/17 53/21 54/1 54/12 54/25 58/12 59/8 59/9 64/22 65/3 67/3 68/8 68/22 69/14 70/13 72/16 73/11 76/8 76/10 76/25 78/7 79/15 82/9 82/10 82/14 83/10 83/22 84/5 84/7 84/13 84/15 85/2 85/6 85/11 85/18
warning [2] 66/13 66/13
warrant [1] 52/24
warranted [1] 73/1
warrants [1] 72/23
warranty [1] 73/5
was [99]
wasn't [3] 25/12 53/25 83/2
way [14] 2/22 5/9 5/15 16/7 18/10 37/4 40/2 41/24 43/24 54/14 61/2 67/22 75/7 84/11
we [116]
we'll [6] 4/19 4/20 15/17 16/19 17/2 35/4
we're [15] 8/6 12/4 12/10 17/4 29/16 30/19 46/6 46/16 49/11 49/12 49/13 58/1 75/23 76/13 78/24
we've [19] 6/16 7/10 8/7 8/8 8/9 11/7 13/18 13/22 14/17 15/20 29/6 29/6 38/23 50/12 53/2 54/19 56/2 78/24 79/2
wealthy [1] 28/23
week [1] 30/5
weekends [2] 62/1 62/3
weekly [1] 61/20
weeks [3] 8/5 14/6 16/7
welcome [2] 13/1 17/6
well [18] 4/15 4/24 8/17 12/14 22/9 29/8 30/19 31/11 48/18 49/10 65/15 66/14 66/24 68/22 71/22 72/18 75/5 79/5
well-trod [1] 65/15
went [8] 38/15 41/22 45/6 45/9 47/17 58/17 59/2 59/12
were [51] 6/20 8/5 10/1 10/3 10/12 11/14 11/19 15/4 34/17 34/19 34/23 35/2 35/2 35/14 37/17 37/23 38/2 38/11 42/13 43/20 43/22 43/23 43/24 45/21 47/12 47/16 47/22 48/4 49/8 50/5 53/13 53/17 55/9 55/12 58/3 59/24 61/11 62/10 62/11 62/11 62/13 62/13 63/23 64/4 64/6 64/7 64/11 65/14 78/11 82/17 85/25
weren't [5] 34/18 34/20 35/4 43/25 50/12
Westinghouse [57] 32/15 32/16 32/25 33/4 33/7 33/14 33/15 33/18 33/21 34/3 34/5 34/10 34/24 35/1 39/11 41/18 41/21 42/3 43/6 43/10 43/14 43/17 43/22 44/8 45/4 45/5 45/8 45/9 45/16 45/22 45/25 47/6 47/13 47/18 47/23 49/24 50/3 50/5 52/2 55/23 56/3 60/8 60/21 62/25 64/10 66/19 66/23 67/1 71/18 74/13 75/3 75/8 84/10 84/12 84/13 84/15 85/15
Westinghouse's [2] 39/11 41/20
what [67] 6/2 6/3 11/24 15/25 16/11 19/22 19/25 20/9 20/12 20/20 21/19 21/20 21/23 24/15 27/15 29/24 32/3 32/11 35/1 36/9 41/21 44/23 45/14 46/13 46/20 47/14 48/5 49/4 49/6 49/12 49/14 49/20 50/16 50/17 51/1 54/2 55/13 55/20 56/6 56/12 56/16 57/15 57/24 58/3 65/4 65/12 67/12 67/24 68/14 69/12 70/8 70/22 71/19 71/22 74/10 76/16 77/1 77/3 77/4 78/20 78/21 79/3 79/10 82/16 83/16 85/4 85/18
what's [6] 8/11 35/5 42/1 42/7 51/7 81/2
whatever [3] 67/1 67/16 71/20
whatsoever [2] 39/14 68/17
when [49] 6/5 7/6 7/12 8/4 10/25 12/10 13/23 18/1 19/3 20/2 20/3 21/4 21/14 24/20 24/21 24/22 24/23 24/23 26/8 30/16 35/24 36/7 37/2 41/2 42/4 45/8 46/20 47/1 47/3 48/8 48/22 49/5 49/11 49/13 50/6 50/15 50/17 51/23 51/24 53/13 55/13 61/24 62/15 62/17 65/17 67/12 69/22 69/24 80/17
where [30] 6/10 7/21 9/19 10/3 10/17 10/23 15/10 19/2 22/18 25/12 26/13 36/4 36/22 38/5 38/9 38/18 43/10 43/11 46/7 46/18 47/11 49/21 51/17 56/8 61/5 79/8 79/17 81/10 81/12 81/24
WHEREOF [1] 87/14
whether [15] 6/5 7/7 10/21 12/5 20/19 27/4 35/2 41/6 43/9 43/24 50/17 74/19 77/11 80/1 80/17
which [50] 9/5 11/11 18/23 18/24 18/24 19/9 19/18 20/1 20/15 22/13 22/22 23/1 23/23 25/8 26/1 27/7 28/16 32/9 41/2 44/13 44/23 46/12 46/12 47/7 53/4 53/11

W

which... [24] 54/23 55/4 55/5 56/9 58/25 59/22 60/15 65/25 67/14 67/23 67/25 68/11 69/13 69/18 70/15 70/17 72/14 72/19 77/1 77/14 78/15 80/2 80/4 84/18
whichever [1] 17/7
while [3] 67/9 67/18 77/22
who [73] 4/22 9/7 10/12 10/13 12/22 14/7 14/10 14/21 15/7 16/10 16/10 17/18 17/19 17/20 18/12 19/9 20/14 20/17 22/3 24/12 24/18 24/19 24/20 24/21 24/22 24/23 24/23 25/2 25/4 25/5 25/6 25/23 28/6 30/15 34/25 35/16 36/8 37/17 37/23 43/18 43/19 43/22 43/23 44/16 44/16 48/8 51/11 55/8 55/10 55/17 55/20 55/24 59/13 59/21 60/5 60/10 62/10 64/4 65/20 65/24 67/11 69/22 70/24 71/4 72/19 75/19 78/3 80/4 80/5 80/10 80/11 80/15 82/17
whoa [3] 30/21 30/21 30/21
whole [5] 45/4 45/24 78/1 79/6 80/5
wholly [3] 32/23 38/20 69/8
wholly-owned [1] 32/23
whom [1] 50/5
whose [2] 64/8 64/23
why [10] 8/3 13/22 15/2 15/24 40/17 43/16 54/23 68/12 75/25 76/8
will [31] 2/20 8/20 11/2 12/6 13/9 14/13 14/16 14/17 17/18 17/23 18/6 18/14 18/15 18/19 18/20 22/7 26/9 28/2 29/12 44/19 54/21 54/23 59/4 65/19 67/25 69/9 70/1 73/21 75/25 78/25 85/24
willing [2] 12/13 73/21
winded [1] 56/8
wishes [1] 18/9
withdraw [1] 14/9
withheld [1] 67/4
withholding [1] 72/14
within [2] 7/5 7/21
without [4] 29/22 48/2 48/3 73/25
WITNESS [1] 87/14
witnesses [1] 14/1
woefully [1] 81/11
won't [3] 12/6 30/21 53/2
Wooten [1] 9/14
worded [1] 44/6
wording [1] 23/19
words [9] 64/12 67/16 69/4 69/21 71/18 72/8 73/1 74/8 77/21
wore [1] 62/4
work [41] 20/24 20/24 20/25 24/21 24/22 24/24 24/25 24/25 25/3 26/14 28/18 28/19 29/16 30/13 30/16 30/22 34/3 34/7 34/12 47/2 47/2 47/16 47/24 48/11 50/15 53/10 53/14 58/20 60/1 60/12 60/13 60/17 60/21 60/23 61/12 61/25 61/25 62/2 62/15 62/24 83/2
worked [11] 9/8 36/22 48/8 48/9 48/9 50/18 53/14 53/15 53/16 60/20 61/15
Worker [1] 59/14
workers [4] 18/4 59/1 77/21 77/24
working [3] 28/19 29/24 64/4
works [1] 30/15
world [1] 60/22
worldwide [2] 49/24 50/2
worse [1] 81/9
would [69] 4/16 5/20 8/1 9/12 10/7 12/9 12/15 12/15 16/2 16/2 16/3 16/4 18/11 18/11 19/9 21/19 23/14 23/18 23/20 24/20 24/21 26/22 27/7 28/4 28/9 29/11 34/7 34/21 35/1 35/1 37/25 40/3 41/9 41/12 44/3 44/10 45/2 46/7 47/22 48/9 48/9 48/13 48/20 52/24 56/19 56/21 57/14 57/15 57/17 58/4 59/4 59/5 59/25 60/1 60/8 60/9 60/10 60/14 63/8 63/20 64/23 65/3 66/23 69/20 71/2 71/22 79/3 85/8 85/9
wouldn't [3] 35/2 43/16 83/17
wrestling [2] 36/25 37/12
writing [1] 47/15
wrongful [1] 35/11

Y

yard [1] 30/21
yeah [7] 40/3 47/24 57/22 63/21 72/9 83/12 84/2
year [3] 55/5 57/25 74/9
yes [21] 5/2 7/2 7/16 7/19 8/15 8/20 9/2 12/23 13/15 15/15 16/2 16/19 30/14 30/15 37/21 63/22 66/17 72/6 74/15 76/23 82/25
yield [1] 65/19
York [4] 2/5 33/17 84/14 85/14
you [167]
you'll [3] 17/3 38/18 45/7
you're [17] 7/2 7/12 7/13 40/9 46/1 46/3 48/22 55/10 55/13 55/13 55/14 63/21 68/4 72/5 73/24 74/10 76/9
you've [13] 9/6 20/17 29/24 30/1 30/23 37/2 40/6 46/2 56/2 56/3 59/22 81/8 84/8
your [96]

Z

zero [2] 70/15 72/17

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
ROCK HILL DIVISION

Harry Pennington III and Timothy Lorentz, on behalf of themselves and all others similarly situated,

Plaintiffs,

v.

Fluor Corporation, Fluor Enterprises, Inc., Fluor Daniel Maintenance Services, Inc., SCANA Corporation, and South Carolina Electric & Gas Company,

Defendants.

CA No. 0:17-cv-02094-JMC

**DEFENDANTS SCANA CORPORATION'S AND SOUTH CAROLINA ELECTRIC AND GAS COMPANY'S REPLY TO PLAINTIFF'S SUPPLEMENTAL RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

On February 27, 2018, Plaintiffs Harry Pennington III and Timothy Lorentz filed a Supplemental Response in Opposition to Defendants SCANA Corporation's ("SCANA") and South Carolina Electric and Gas Company's ("SCE&G") Motion to Dismiss and Memorandum in Support ("Plaintiffs' Supplement"). (ECF No. 90.) This Reply supplements and further supports SCANA's and SCE&G's Motion to Dismiss and Memorandum in Support. (ECF No. 69.)

## I. Introduction

In their Supplement, Plaintiffs asked the Court to take judicial notice of the National Labor Relations Board's ("NLRB") Order, issued on February 26, 2018, which vacated its prior decision in *Hy-Brand Indus. Contractors, Ltd.*, 365 NLRB No. 156 (Dec. 14, 2017). (ECF No. 90.) Plaintiffs mistakenly claim that SCANA and SCE&G relied "virtually exclusively" on the *Hy-Brand* case which required "direct control" over matters that are not "limited and routine" in order

to be considered a joint employer with Fluor or Westinghouse, by which Plaintiffs were directly and separately employed. (ECF No. 90 at 3.) As a result, Plaintiffs suggest that the allegations of the Amended Complaint may be sufficient to state a claim under the WARN Act based on a joint-employer theory. (*Id*. at 4.) However, for the reasons discussed below, the vacating of the NLRB's *Hy-Brand* decision has no impact on SCANA's and SCE&G's Motion to Dismiss.

## II. Plaintiffs' Joint-Employer Theory Fails Despite the NLRB's Order Vacating its Decision in *Hy-Brand Indus. Contractors, Ltd.*

On February 26, 2018, after SCANA and SCE&G filed their Reply in Support of their Motion to Dismiss and after the Court heard oral arguments on SCANA's and SCE&G's Motion, the NLRB issued an order vacating its prior decision in *Hy-Brand*. (ECF No. 90-1.) However, the NLRB's order vacating its *Hy-Brand* decision does not affect the numerous arguments made by SCANA and SCE&G in their Reply in Support of their Motion to Dismiss and at oral argument held on February 14, 2018, regarding Plaintiffs' newly raised joint-employer theory. Even setting aside the NLRB's vacated decision in *Hy-Brand*, Plaintiffs have not overcome the following hurdles in order to state a plausible claim under the WARN Act based on a joint-employment theory:

A. Plaintiffs did not raise the joint-employment theory as a basis for attaching WARN Act liability to SCANA or SCE&G in their initial Complaint or their Amended Complaint. (*See generally* ECF Nos. 1 and 41.) Instead, Plaintiff raised the joint-employer theory for the first time in their Response to SCANA's and SCE&G's Motion to Dismiss, and it is well-settled that a party cannot amend their complaint to assert a new theory through a brief in opposition to a motion to dismiss. (ECF No. 78 at 5-7) (citing *Fieger v. Supreme Court of S.C.*, 2010 WL 3521606, at *4 (D.S.C. Aug. 16, 2010) (a plaintiff "cannot amend his Complaint to change his

theory of the case via a memorandum in opposition to the defendants' motion to dismiss"), *report and recommendation adopted*, 2010 WL 3521605 (D.S.C. Sept. 7, 2010); *Bartley v. Wells Fargo Bank, NA*, 2015 WL 5158708, at *3 (D.S.C. Sept. 2, 2015) ("It is also well-settled that a complaint cannot be amended by Plaintiff's briefs in opposition to a motion to dismiss."); *Zachair, Ltd. V. Driggs*, 965 F. Supp. 741, 748 n.4 (D. Md. 1997) (stating that a plaintiff "is bound by the allegations contained in its complaint and cannot, through the use of motion briefs, amend the complaint"), *aff'd*, 141 F.3d 1162 (4th Cir. 1998); *Mylan Labs., Inc. v. Akzo, N.V.*, 770 F. Supp. 1053, 1068 (D. Md. 1991) (disregarding allegations in an opposition brief which are not contained in the complaint because "it is axiomatic that the complaint may not be amended by the briefs in opposition to a motion to dismiss. The Court, therefore, restricts its consideration to allegations which do appear in the complaint.")).

B. In their Supplement, Plaintiffs erroneously state that SCANA and SCE&G rely "virtually exclusively" on the NLRB's recently vacated decision in *Hy-Brand*. (ECF No. 90 at 3.) To the contrary, SCANA and SCE&G primarily relied on the Third Circuit's decision in *N.L.R.B v. Browning-Ferris Indus. of Pennsylvania, Inc.*, 691 F.2d 1117 (3d Cir. 1982), which explained the stark differences between the single and joint employer theories and their attending standards as set forth by the Supreme Court of the United States. (ECF No. 78 at 8-11.) The NLRB's order vacating the *Hy-Brand* decision had no impact on the Third Circuit decision in *Browning-Ferris* or the Supreme Court precedent to which it cites.

C. Even applying the "indirect control" test as reinstated by the NLRB's order vacating the *Hy-Brand* decision, Plaintiffs have not pointed to one single fact in their Amended Complaint which renders it plausible that SCANA or SCE&G exercised *any* control – whether direct or indirect – over the essential terms and conditions of Plaintiff Pennington's or Plaintiff Lorentz' employment individually. In other words, while Plaintiffs may have vaguely alluded that SCANA and SCE&G may have exercised some minimal control over other unidentified individuals, neither Plaintiff has set forth any facts to show that they themselves were individually controlled in any way whatsoever by SCANA or SCE&G. (*See* ECF No. 78 at 13-25.)

D. Even if Plaintiffs had pled sufficient facts to satisfy a joint-employment test based on an "indirect control" standard, their claims under the WARN Act still fail. That is because the joint employer concept actually recognizes that the business entities involved are in fact separate. (ECF No. 78 at 11.) As a result, Plaintiffs were directly employed by a "separate" legal entity – specifically, Fluor and Westinghouse – and, therefore, cannot meet the WARN Act's definition of "affected employees." *See* 20 C.F.R. § 639.3(e) (individuals who have a "separate employment relationship" with another employer and are paid by that employer are not "affected employees"); *see also* ECF No. 78 at 11 and 25-26.

E. Plaintiffs, through their counsel, abandoned their single and joint employer theories at oral argument on February 14, 2018. As stated by Plaintiffs' counsel: "Your Honor, there is no such thing as single employer or joint employer with regard to

WARN." (Transcript 68:7-9.)[1] After this startling declaration, counsel urged the Court to manufacture some amorphous, never before recognized legal theory that would create liability simply based on what Plaintiffs claim was inappropriate conduct by SCANA when it chose to abandon the construction of two nuclear reactors at the V.C. Summer Nuclear Station. Again, as stated by Plaintiff's counsel: ". . . liability is warranted if there is - - and no other factors need to be satisfied - - if there is a striking decision that completely deprives any independence to the independent contractors, then the absence of all five factors can be excused . . ." (Transcript 73:1-5.) "So, Your Honor, for our purpose no one can really say that is a joint employer test, no one can say that is a single employer test, that is the special WARN test that has never been given a handy moniker, and maybe we need to give it one . . . ." (Transcript 78:5-8.)

**III. Conclusion**

For the reasons explained above, the NLRB's order which vacated its decision in *Hy-Brand* does not save the day for Plaintiffs. As stated in SCANA's and SCE&G's Motion to Dismiss and Memorandum in Support (ECF No. 69), their Reply in Support of their Motion to Dismiss (ECF No. 78), and at oral argument before the Court on February 14, 2018, Plaintiffs have failed to state a plausible claim for relief under either a single or joint employer theory. Accordingly, their WARN Act claim as alleged against SCANA and SCE&G should be dismissed with prejudice pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.

[1] Citations to the Transcript of Hearing on Motions Before the Honorable J. Michelle Childs, United States District Judge, conducted on February 14, 2018, will be "Transcript" followed by the page and line numbers. These excerpts to the Transcript are attached hereto as Exhibit A.

Dated this 2nd day of March 2018.

Respectfully submitted,

OGLETREE, DEAKINS, NASH,
SMOAK & STEWART, P.C.

By: *s/Charles T. Speth II*
Charles T. Speth II (Fed. ID No. 4258)

*s/D. Michael Henthorne*
D. Michael Henthorne (Fed. ID No. 6386)

*s/James H. Fowles, III*
James H. Fowles, III (Fed. ID No. 6492)

*s/Christopher R. Thomas*
Christopher R. Thomas (Fed. ID No. 11793)

First Base Building
2142 Boyce Street, Suite 401
Columbia, SC 29201
803.252.1300 (telephone)
803.254.6517 (facsimile)
ted.speth@ogletree.com
michael.henthorne@ogletree.com
james.fowles@ogletree.com
christopher.r.thomas@ogletree.com

**ATTORNEYS FOR DEFENDANTS SCANA CORPORATION AND SOUTH CAROLINA ELECTRIC AND GAS COMPANY**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**ROCK HILL DIVISION**

Harry Pennington III and Timothy Lorentz, on behalf of themselves and all others similarly situated,

Plaintiffs,

v.

Fluor Corporation, Fluor Enterprises, Inc., Fluor Daniel Maintenance Services, Inc., SCANA Corporation, and South Carolina Electric & Gas Company,

Defendants.

Civil Action No.: 0:17-cv-02094-JMC

**ORDER AND OPINION**

Plaintiffs Harry Pennington III and Timothy Lorentz (together "Plaintiffs") filed this putative class action against Fluor Corporation, Fluor Enterprises, Inc., Fluor Daniel Maintenance Services, Inc. ("Fluor Daniel"), SCANA Corporation ("SCANA") and South Carolina Electric & Gas Company ("SCE&G") (collectively "Defendants") alleging that the termination of their employment on July 31, 2017, was in violation of the Worker Adjustment and Retraining Notification Act, 29 U.S.C. §§ 2101–2109 (the "WARN Act").[1] (ECF No. 41.)

This matter is before the court by way of a Motion to Dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure filed by SCANA and SCE&G (together "SCANA Defendants"). (ECF No. 69.) In their Motion, SCANA Defendants generally argue that dismissal is appropriate because they "were not, as a matter of law, Plaintiffs' employer." (*Id.* at

[1] In a related matter, Plaintiffs Lawrence Butler, Lakeisha Darwish, Darron Eigner Jr., Bernard A. Johnson, and Jimi Che Sutton (collectively the "Butler Plaintiffs") also filed WARN Act claims resulting from their terminations on July 31, 2017, against Fluor Corporation and Fluor Enterprises, Inc. (together with Fluor Daniel, the "Fluor Defendants") in the matter of *Butler v. Fluor Corp.*, C/A No. 0:17-cv-02201-JMC, ECF No. 1 (D.S.C. 2017).

1.) Plaintiffs oppose the Motion in its entirety because "the Complaint sufficiently alleges SCANA [Defendants] w[][ere] a joint employer of the terminated employees." (ECF No. 71 at 40.) For the reasons set forth below, the court **DENIES** SCANA Defendants' Motion to Dismiss.

## I. BACKGROUND RELEVANT TO INSTANT MOTION

This case arises out of the decision on July 31, 2017, to stop all construction at the V.C. Summer Nuclear Station ("VC Summer") in Jenkinsville, South Carolina. (ECF No. 41 at 2 ¶ 4.) As a result of that decision, approximately 5,000 employees were laid off who had been working and/or receiving assignments at VC Summer. (*Id.* at 5 ¶ 23.) Until their respective terminations, Pennington worked for Fluor Daniel at VC Summer as a Heavy Equipment Operator and Lorenz was employed by Westinghouse Electric Company LLC ("WEC") as a Project Manager. (*Id.* at 4 ¶¶ 14, 15.)

In their Amended Complaint, Plaintiffs allege that in 2008, SCANA Defendants entered into an agreement with WEC for the purpose of constructing "two AP-1000[2] nuclear reactors known as VC Summer 2 and 3." (ECF No. 41 at 6 ¶ 31.) Plaintiffs allege that as the general contractor "WEC was generally responsible for the design, manufacture, and procurement of the nuclear reactor, steam turbines, and generators." (*Id.* at 7 ¶ 34.) Plaintiffs further allege that in or around 2015, Fluor Corporation was brought in as a subcontractor to WEC to "provide staffing for craft (manual labor) employees and [] take primary responsibility for on-site construction" to include "responsibility for the craft, field engineers, and project controls personnel including the costs and scheduling of personnel." (*Id.* ¶¶ 37, 38.) At the same time,

[2] "The AP1000 is a nuclear power plant designed and sold by Westinghouse Electric Company, now majority owned by Toshiba." AP1000, https://en.wikipedia.org/wiki/AP1000 (last visited May 28, 2018). "The plant is a pressurized water reactor with improved use of passive nuclear safety." *Id.*

WEC "generally accepted liability for the cost overruns on the Summer Project, by agreeing to build it for a 'fixed-price' at SCANA [Defendants]' option," which option was exercised in May 2016 thus "capping [] costs for the Summer Project at close to $14 billion." (*Id.* ¶¶ 39, 40.)

Plaintiffs next allege that "[i]n early 2017, WEC experienced cash shortfalls related to the Summer Project and a deepening liquidity crisis," which eventually led to WEC and its subsidiaries fil[][ing] [] voluntary petitions for relief under Chapter 11 of Title 11 of the United States Bankruptcy Code in the Southern District of New York" on March 29, 2017. (ECF No. 41 at 8 ¶¶ 44, 45.) Plaintiffs allege that as a result of WEC's bankruptcy "SCANA [Defendants] became financially accountable for the ongoing costs and plan of completion" for the VC Summer Project. (ECF No. 71 at 10.) Moreover, Plaintiffs assert that SCANA Defendants took over complete control of the VC Summer Project as demonstrated by the following post-bankruptcy conduct:

- "SCANA [Defendants] began paying Fluor's payroll directly to Fluor" (ECF No. 41 at 10 ¶ 57);
- SCANA Defendants "reassigned Fluor and WEC employees in a line of supervision interspersed with SCANA's own managers to whom Fluor and WEC employees would report at various levels" (*id.* at 11 ¶ 61);
- "SCANA [Defendants]'[] ground-level overseers attended all significant construction events, such as crane lifts and major concrete placements, and they attended the continual meetings across the site that took place throughout the day between Fluor and WEC and their respective crews dealing with the operational nuts-and-bolts of the constructions tasks" (*id.* ¶ 64);
- "SCANA [Defendants]'[] input into day-to-day operations became proactive, intrusive, and decisional, in keeping with its assumption of CEO-type control and leadership" (*id.* at 13 ¶ 72);
- "SCANA [Defendants'] field monitors, who had previously been silent, became vocal in directing Fluor/WEC personnel" (*id.* ¶ 73);
- "SCANA [Defendants] gave specific orders and directions concerning virtually all facets of the project, including construction, and safety - particularly concerning anything that would cause a delay or add cost" (*id.* ¶ 75);
- SCANA [Defendants] used their authority to "set the levels of craft personnel

needed to perform assignments" or determine whether to hire highly skilled employees for specialized jobs (*id.* at14 ¶¶ 76, 77, 80);

- SCANA [Defendants] controlled the work schedules of employees of WEC and Fluor to include whether they worked overtime, the number of overtime hours, their days off or days designated as holidays (*id.* at 15 ¶¶ 82–84); and
- SCANA [Defendants] provided the facilities, equipment, tools [heavy construction equipment] and materials necessary to complete the work (*id.* ¶¶ 85, 86).

Plaintiffs allege that after SCANA Defendants gained control of the VC Summer Project, they recognized by "at least March 2017, [that] mass layoffs and shutdowns were almost inevitable at the Summer Project in mid-summer." (ECF No. 41 at 17 ¶ 91.) Subsequently, on July 31, 2017, SCANA Defendants sent WARN Act correspondence to the Director of Business Services for the South Carolina Department of Employment and Workforce containing the following relevant information:

> This notice is provided in compliance with the Worker Adjustment Retraining and Notification Act and regulations promulgated thereunder.
>
> SCANA, the parent company of SCE&G, has decided to stop the construction of both Unit 2 and Unit 3 and file a petition for approval of abandonment with the Public Service Commission of South Carolina. Unfortunately, this process is expected to involve immediate, total, and permanent termination of the new nuclear construction project at VC Summer Nuclear Station, . . . . This complete termination of the construction project will affect 617 SCE&G employees and a currently unknown number of employees of affiliated companies that provide administrative support to the project.
>
> The separations are expected to begin on: September 30, 2017.

(ECF No. 9-4 at 2.) Also on July 31, 2017, Plaintiffs allege that their employers were told by SCE&G "to cease work on the project immediately" resulting in the immediate termination of Plaintiffs' employment. (ECF No. 41 at 17 ¶¶ 95–96.)

As a result of the foregoing, Pennington filed a putative class action Complaint in this court against Defendants Fluor Corporation, Fluor Enterprises, Inc. and SCANA on August 8, 2017, alleging violation of the WARN Act. (ECF No. 1.) In his Complaint, Pennington sought

to represent "all other similarly situated former employees, pursuant to 29 U.S.C. § 2104(a)(5) and Fed. R. Civ. P. 23(a), who worked at, reported to, or received assignments from one of Defendants' Facilities and were terminated without cause on or about July 31, 2017, and within 30 days of that date, or were terminated without cause as the reasonably foreseeable consequence of the mass layoffs and/or plant closings ordered by Defendants on or about July 31, 2017, . . . ." (ECF No. 1 at 3–4 ¶ 16.) Pennington further alleged that Fluor Corporation, Fluor Enterprises, Inc. and SCANA knowingly failed to give their employees at least 60 days prior notice of termination of their employment as required by the WARN Act. (ECF No. 1 at 2 ¶ 3.) On October 25, 2017, Pennington filed an Amended Class Action Complaint, which provided additional WARN Act allegations and added Timothy Lorentz as Plaintiff and Fluor Daniel and SCE&G as Defendants. (ECF No. 41.)

On December 4, 2017, SCANA Defendants filed the instant Motion to Dismiss. (ECF No. 69.) Thereafter, on December 29, 2017, Plaintiffs filed opposition to the Motion to which SCANA Defendants filed a Reply in support of dismissal on January 12, 2018. (ECF Nos. 71, 78.) On February 14, 2018, the court heard argument from the parties on the pending Motion. (ECF No. 85.)

## II. JURISDICTION

This court has jurisdiction over Plaintiffs' WARN Act cause of action via 28 U.S.C. § 1331, as it arises under a law of the United States, and also via 29 U.S.C. § 2104(a)(5), which empowers district courts to hear claims alleging violation of the WARN Act.

## III. LEGAL STANDARD

### A. Motions to Dismiss Pursuant to Rule 12(b)(6)

A motion to dismiss pursuant to Rule 12(b)(6) for failure to state a claim upon which

relief can be granted "challenges the legal sufficiency of a complaint." *Francis v. Giacomelli*, 588 F.3d 186, 192 (4th Cir. 2009) (citations omitted); *see also Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992) ("A motion to dismiss under Rule 12(b)(6) . . . does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses."). "In considering a 12(b)(6) challenge to the sufficiency of a complaint, this Rule must be applied in conjunction with the liberal pleading standard set forth in Federal Rule of Civil Procedure 8(a)." *Jenkins v. Fed. Bureau of Prisons*, C/A No. 3:10-1968-CMC-JRM, 2011 WL 4482074, at *2 (D.S.C. Sept. 26, 2011). Rule 8(a) provides that to be legally sufficient, a pleading must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2).

A motion to dismiss pursuant to Rule 12(b)(6) for failure to state a claim should not be granted unless it appears certain that the plaintiff can prove no set of facts that would support her claim and would entitle her to relief. *Mylan Labs., Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993). When considering a motion to dismiss, the court should accept as true all well-pleaded allegations and should view the complaint in a light most favorable to the plaintiff. *Ostrzenski v. Seigel*, 177 F.3d 245, 251 (4th Cir. 1999); *Mylan Labs., Inc.*, 7 F.3d at 1134. "In so doing, a court may consider documents attached to the complaint or the motion to dismiss 'so long as they are integral to the complaint and authentic.'" *Kensington Volunteer Fire Dep't, Inc. v. Montgomery Cty., Md.*, 684 F.3d 462, 467 (4th Cir. 2012) (quoting *Philips v. Pitt Cty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009)). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content

that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

B. The WARN Act Generally

The Court of Appeals for the Fourth Circuit has described the WARN Act as follows:

> The WARN Act was enacted in 1988 to provide notice of sudden, significant employment loss so that workers could seek alternative employment and their communities could prepare for the economic disruption of a mass layoff. *Bader v. N. Line Layers, Inc.*, 503 F.3d 813 (9th Cir. 2007); 20 C.F.R. § 639.1(a). The Act requires certain employers to provide affected employees with sixty-days notice of a plant closing or "mass layoff." 29 U.S.C. § 2102(a). An employer who fails to provide this notice is liable to each affected employee for backpay, benefits, and attorney's fees. 29 U.S.C. § 2104(a). The statute defines "mass layoff" as a reduction in work force at a "single site of employment" that affects at least thirty-three percent of the employees and a minimum of fifty employees in a thirty-day period. 29 U.S.C. § 2101(a)(3). . . .The WARN Act itself does not define "single site of employment." However, the Secretary of Labor, pursuant to her authority, has promulgated interpretive regulations. 29 U.S.C. § 2107. These regulations are entitled to "controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute." *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 844, 104 S. Ct. 2778, 81 L.Ed.2d 694 (1984).

*Meson v. GATX Tech. Servs. Corp.*, 507 F.3d 803, 808 (4th Cir. 2007).

## IV. ANALYSIS

A. The Parties' Arguments

*1. SCANA Defendants*

In their Motion, SCANA Defendants argue that Plaintiffs' Amended Complaint "fails to state a claim upon which relief can be granted" because SCANA Defendants "were not, as a matter of law, [either] Plaintiffs' employer," or part of a single integrated enterprise. (ECF No. 69 at 1, 3.) In support of their argument, SCANA Defendants assert that Plaintiffs have failed to allege facts in the Amended Complaint to meet any of the factors identified in the regulations as necessary to demonstrate that SCANA Defendants should be liable under the WARN Act as a

single employer with the other Defendants. (*Id.* at 8–17 (citing 20 C.F.R. § 639.3(a)(2)[3]).) More specifically, SCANA Defendants assert that Plaintiffs' allegations do not demonstrate "common ownership amongst the co-Defendants," "common directors or officers," the exercise by SCANA Defendants of "de factor control over Fluor or Westinghouse," a "unity of personnel policies," or "a plausible inference of dependency of operations." (*Id.*) In this regard, SCANA Defendants assert that Plaintiffs' "allegations do not support a plausible inference that SCANA or SCE&G became so entangled with the other co-defendants' operations that they together constitute a single employer under the WARN Act." (*Id.* at 3.) Accordingly, SCANA Defendants assert that they are entitled to dismissal of the Amended Complaint. (*Id.* at 19.)

*2. Plaintiffs*

Plaintiffs oppose SCANA Defendants' Motion to Dismiss arguing that they were a joint employer with WEC and Fluor Defendants because the Amended Complaint alleges facts sufficiently demonstrating (1) the common ownership factor, (2) the de facto exercise of control factor, (3) the unity of personnel policies factor and (4) the dependency of operations factor. (ECF No. 71 at 26–40.) As a result, Plaintiffs assert that SCANA Defendants Motion should be denied or, in the alternative, Plaintiffs should be allowed leave to replead. (*Id.* at 40.)

*3. SCANA Defendants in Reply*

In their Reply brief, SCANA Defendants argue that they are entitled to dismissal of the Amended Complaint because (1) "joint-employer theory is absent from the Amended

---

[3] "Under existing legal rules, independent contractors and subsidiaries which are wholly or partially owned by a parent company are treated as separate employers or as a part of the parent or contracting company depending upon the degree of their independence from the parent." 20 C.F.R. § 639.3(a)(2). "Some of the factors to be considered in making this determination are (i) common ownership, (ii) common directors and/or officers, (iii) de facto exercise of control, (iv) unity of personnel policies emanating from a common source, and (v) the dependency of operations." *Id.*

Complaint," (2) "the facts of the Amended Complaint do not support it" and (3) "the WARN Act makes clear that an employer has no WARN obligations to workers on another company's payroll, even if the company in question is a joint employer of those workers." (ECF No. 78 at 2; *see also id*. at 4 (referencing 20 C.F.R. § 639.3(e)[4].)

B. The Court's Review

SCANA Defendants seek dismissal of the WARN Act claims alleged against them on the basis that they are unable to be held liable under the WARN Act because they were not Plaintiffs' employer. The WARN Act defines an employer as "any business enterprise that employs—(A) 100 or more employees, excluding part-time employees; or (B) 100 or more employees who in the aggregate work at least 4,000 hours per week (exclusive of hours of overtime); . . . ." 29 U.S.C. § 2101(a)(1). An integral part of the parties' dispute is whether the determination regarding SCANA Defendants' status as Plaintiffs' employer should be made pursuant to a single employer or joint employer concept in relation to the other Defendants and WEC. Upon consideration of the foregoing, the court observes that Plaintiffs clearly allege a single employer theory of liability in the Amended Complaint (*see* ECF No. 41 at 2 ¶¶ 5, 6; 3 ¶ 7; 19 ¶ 103; and 22 ¶ 118), but then argue joint employer status in their Opposition to SCANA Defendants' Motion to Dismiss. (*E.g.*, ECF No. 71 at 7, 20, 22, 22 n.2 & 25.) Therefore, because the pending Motion to Dismiss challenges the legal sufficiency of the Amended Complaint's allegations, the court is compelled to apply the single employer concept in its analysis. *Cf. Mylan Labs., Inc. v. Akzo, N.V.*, 770 F. Supp. 1053, 1068 (D. Md. 1991) ("[I]t is axiomatic that the complaint may not be amended by the briefs in opposition to a motion to

[4] The term "affected employees" . . . does not include . . . [c]onsultant or contract employees who have a separate employment relationship with another employer and are paid by that other employer, or who are self-employed, are not "affected employees" of the business to which they are assigned." 20 C.F.R. § 639.3(e).

dismiss.") (citation omitted).

At the outset, the court observes that the Court of Appeals for the Fourth Circuit has not provided specific guidance regarding what standard a district court should use to evaluate single employer status under the WARN Act. Nevertheless, this court is not without persuasive guidance. Specifically, the WARN Act regulations set forth the following five non-exclusive factors that can be used to determine if WARN liability should be imposed on an entity: (i) common ownership, (ii) common directors and/or officers, (iii) de facto exercise of control, (iv) unity of personnel policies emanating from a common source, and (v) the dependency of operations." 20 C.F.R. § 639.3(a)(2)[5]; *see also Pearson v. Component Tech. Corp.*, 247 F.3d 471, 490 (3d Cir. 2001) ("[T]he DOL factors are the best method for determining WARN Act liability because they were created with WARN Act policies in mind and, unlike traditional veil-piercing and some of the other theories, focus particularly on circumstances relevant to labor relations."). "As in any balancing test, application of these factors requires a fact-specific inquiry, no one factor set out by the DOL is controlling, and all factors need not be present for liability to attach." *Guippone v. BH S & B Holdings LLC*, 737 F.3d 221, 226 (2d Cir. 2013). Using the aforementioned WARN Act factors, the court considers below whether Plaintiffs' Amended Complaint contains allegations that state a claim against SCANA Defendants for violation of the WARN Act.

*1. Common Ownership*

The common ownership factor "inquires as to whether a parent or related entity directly

---

[5] "Although [] DOL regulation [639.3(a)(2)] specifically addresses the relationship between a parent and subsidiary, [] courts have applied the DOL factors to determine whether business entities that are not wholly or partly owned by a parent are subject to WARN Act liability as an employer." *Administaff Cos., Inc. v. N.Y. Joint Bd.*, C/A No. 4:01-cv-01498, ECF No. 39 at 19–20 (S.D. Tex. Sept. 30, 2002) (citations omitted).

owns a separate corporate entity." *Guippone v. BH S & B Holdings LLC*, No. 09 Civ. 1029(CM), 2010 WL 2077189, at *4 (S.D.N.Y. May 18, 2010) (citing *Vogt v. Greenmarine Holding, LLC*, 318 F. Supp. 2d 136, 140 (S.D.N.Y. 2004)). Upon review, the court observes that there are no allegations in the Amended Complaint that SCANA Defendants have a direct ownership interest in WEC or Fluor Defendants. Accordingly, the common ownership factor disfavors allowing Plaintiffs to continue this action against SCANA Defendants under the WARN Act.

*2. Common Directors and/or Officers*

The common directors and/or officers factor "ordinarily looks to whether the two nominally separate corporations: (1) actually have the same people occupying officer or director positions with both companies; (2) repeatedly transfer management-level personnel between the companies; or (3) have officers and directors of one company occupying some sort of formal management position with respect to the second company." *Pearson*, 247 F.3d at 497. Plaintiffs admit that they "do not allege there were 'common directors and/or officers.'" (ECF No. 71 at 26 n.3.) Thus, this factor also disfavors allowing Plaintiffs to continue this action against SCANA Defendants under the WARN Act.

*3. De Facto Control*

The de facto control factor is concerned with "whether one company was the decision-maker responsible for the employment practice giving rise to the litigation." *Garner v. Behrman Bros. IV, LLC*, 260 F. Supp. 3d 369, 378 (S.D.N.Y. 2017) (quoting *Guippone*, 737 F.3d at 227). That is exactly the case here, where the basis for Plaintiffs' WARN Act claims is that SCANA Defendants made the decision to effect a mass layoff with no regard for the statutory warning time. More specifically, Plaintiffs allege that SCANA Defendants (a) knew "from at least March

2017, mass layoffs and shutdowns were almost inevitable"; (b) "sent a WARN Act notice to the South Carolina Department of Employment and Workforce"; (c) "informed Fluor and Westinghouse of its decision to abandon the project . . . [and] asked them to cease all work on the project immediately"; (d) "stopped paying the cost of employing over 5,000 employees on the site" and (e) "controlled the decision to terminate all the employees on the site without advance notice." (ECF No. 41 at 17 ¶¶ 91, 93, 95 & 96.) Assuming that they are true, these allegations of SCANA Defendants' de facto control weigh strongly in favor of allowing Plaintiffs to continue this action against SCANA Defendants under the WARN Act.

*4. Unity of Personnel Policies*

The unity of personnel policies factor "is analogous to the aspect in the federal labor law test concerning 'centralized control of labor operations,'" and includes such elements as "centralized hiring and firing, payment of wages, maintenance of personnel records, benefits and participation in collective bargaining." *Vogt*, 318 F. Supp. 2d at 142–43. Upon review, the court observes that there are numerous allegations in the Amended Complaint positing that SCANA Defendants controlled day-to-day personnel policy and labor decisions after WEC declared bankruptcy. (*E.g.*, ECF No. 41 at 14 ¶¶ 76, 77, 80 & 15 ¶¶ 82–84.) Plaintiffs further allege that SCANA Defendants "controlled the decision to terminate all the employees on the [VC Summer] site without advance notice." (*Id.* at 17 ¶ 96.) Because "[i]n the context of the WARN Act, the decision to effect a mass layoff is the single most important personnel policy," *Vogt*, 318 F. Supp. 2d at 143, the court is persuaded that this factor weighs strongly in favor of allowing Plaintiffs to continue this action against SCANA Defendants under the WARN Act.

*5. Dependency of Operations*

The dependency of operations factor "addresses three areas of overlap between related

corporations; (1) sharing of administrative or purchasing services, (2) interchanges of employees or equipment, or (3) commingled finances." *Guippone*, 2010 WL 2077189, at *6 (citation omitted). Upon review, the court observes that Plaintiffs' allegations specify that after WEC's bankruptcy, there was an interrelation between SCANA Defendants and the other Defendants as it relates to employees and equipment. (*See* ECF No. 41 at 15 ¶¶ 85–86 & 13 ¶¶ 73–74.) Assuming these allegations to be true as the court is required to do under Rule 12(b)(6), the court finds that the dependency of operations factor weighs slightly in favor of allowing Plaintiffs to continue this action against SCANA Defendants under the WARN Act.

After considering the WARN Act factors in the context of the allegations in Plaintiffs' Amended Complaint, the court concludes that the factors of unity of personnel policies, de facto control and dependency of operations weigh in favor of allowing Plaintiffs to continue this action against SCANA Defendants under the WARN Act, and outweigh the countervailing factors of common ownership, common directors and/or officers. Therefore, SCANA Defendants are not entitled to dismissal of this matter pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.

## V. CONCLUSION

Upon careful consideration of the entire record and the arguments of the parties, the court hereby **DENIES** the Motion to Dismiss of Defendants SCANA Corporation and South Carolina Electric & Gas Company. (ECF No. 69.) The court further lifts the stay in this action and **INSTRUCTS** the parties that the following briefing schedule should be used as it relates to Plaintiffs' pending Motion to Certify Class and Motion to Appoint Counsel: (1) Plaintiffs shall supplement their Motion to Certify Class and Motion to Appoint Counsel on or by June 13, 2018; Defendants shall file opposition to the Motion to Certify Class and Motion to Appoint

Counsel on or by June 27, 2018; and Plaintiffs shall file any reply to the opposition to their Motion to Certify Class and Motion to Appoint Counsel on or by July 6, 2018.

**IT IS SO ORDERED.**

J. Michelle Childs
United States District Judge

May 30, 2018
Columbia, South Carolina

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
ROCK HILL DIVISION

Harry Pennington III and Timothy Lorentz, on behalf of themselves and all others similarly situated,

Plaintiffs,

v.

Fluor Corporation, Fluor Enterprises, Inc., Fluor Daniel Maintenance Services, Inc., SCANA Corporation, and South Carolina Electric & Gas Company,

Defendants.

CA No. 0:17-cv-02094-JMC

**DEFENDANT SCANA CORPORATION'S AND SOUTH CAROLINA ELECTRIC & GAS COMPANY'S ANSWER TO AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF WARN ACT, 29 U.S.C. § 2101, *ET SEQ*.**

COME NOW Defendants SCANA Corporation ("SCANA") and South Carolina Electric & Gas Company ("SCE&G") (collectively referred to herein as "Defendants"), by and through their counsel, and files this Answer in response to the allegations in the Amended Complaint of Plaintiffs Harry Pennington, III, Timothy Lorentz, and all others similarly situated.

**FOR A FIRST DEFENSE**
**(Failure to State a Claim)**

The Amended Complaint fails to state a claim upon which relief should be granted and, therefore, should be dismissed.

**FOR A SECOND DEFENSE**
**(Response to Numbered Paragraphs)**

With regard to the specific allegations contained in the Amended Complaint, Defendants respond to each separately numbered paragraph below. Any allegations not herein specifically admitted, modified, or explained are expressly denied.

**NATURE OF THE ACTION[1]**

1. Defendants admit that Plaintiff Pennington was an employee of Fluor Daniel Maintenance Services, Inc. Defendants do not know the date of Plaintiff Pennington's termination or whether he received notice prior to it. Defendants otherwise deny Paragraph 1.

2. Defendants admit that Plaintiff Lorentz was an employee of Westinghouse Electric Company. Defendants do not know the date of Plaintiff Lorentz's termination or whether he received notice prior to it. Defendants otherwise deny Paragraph 2.

3. Defendants lack sufficient knowledge to admit or deny the allegations in Paragraph 3 because Plaintiffs were not employed by SCANA or SCE&G. Therefore, Defendants deny the allegations in Paragraph 3.

4. Defendants admit that Plaintiffs purport to bring a claim pursuant to the Worker Adjustment and Retraining Notification Act ("WARN Act"), 29 U.S.C. §§ 2101, *et seq*., and that this action arises from the construction stoppage at the V.C. Summer Nuclear Station in Jenkinsville, South Carolina. Defendants lack sufficient knowledge or information to admit or deny allegations as to the dates of Plaintiffs' terminations or whether Plaintiffs received 60-days advance notice because Plaintiffs were not employed by SCANA or SCE&G. As to the individuals employed by SCANA subsidiaries, including SCE&G, pursuant to the WARN Act, those

[1] The Amended Complaint's headings are used herein as a matter of consistency. Their use herein shall not constitute an admission of any kind.

individuals received advance written notice of their terminations, which occurred at least 60 days after July 31, 2017, and notice was also provided to the appropriate governmental contacts, including the South Carolina Department of Employment and Workforce. Defendants otherwise deny Paragraph 4.

5. Paragraph 5 sets forth legal conclusions to which no response is required. Additionally, Plaintiffs quote and paraphrase the regulatory language of 20 C.F.R. § 639.3(a)(2), which speaks for itself and to which no response is required. To the extent a response is deemed necessary, Defendants deny any liability as a "single employer" and deny that Plaintiffs can establish such theory.

6. Defendants lack sufficient knowledge or information to form a belief as to the relationship between Fluor and its subsidiaries and, therefore, deny that allegation. Defendants otherwise deny Paragraph 6.

7. Defendants lack sufficient knowledge or information to form a belief as to the relationship between WEC and its subsidiaries and, therefore, deny that allegation. Defendants otherwise deny Paragraph 7.

8. Defendants deny the allegations contained in Paragraph 8 and deny that Plaintiffs are entitled to the requested relief or any relief whatsoever.

9. Defendants admit that Plaintiff Pennington filed the original Complaint in this action on August 8, 2017.

10. Defendants admit that claims have been asserted against WECTEC, LLC, and Stone & Webster Services, LLC, in the United States Bankruptcy Court for the Southern District of New York. (*Fleetwood, et al., v. WECTEC, LLC, et al.*, 17-ap-01110-MEW (Bankr. S.D.N.Y.).

## JURISDICTION AND VENUE

11. Defendants do not dispute that this Court has jurisdiction over this matter. To the extent Paragraph 11 calls for a legal conclusion, Defendants need not respond.

12. Defendants do not dispute the propriety of venue in this case. To the extent Paragraph 12 calls for a legal conclusion, Defendants need not respond.

13. Defendants do not dispute the propriety of this matter being assigned to the Rock Hill Division. To the extent Paragraph 13 calls for a legal conclusion, Defendants need not respond.

## THE PARTIES

***Plaintiffs***

14. Defendants admit that Plaintiff Pennington was employed by Fluor Daniel Maintenance Services, Inc. Defendants SCANA and SCE&G did not employ Plaintiff Pennington and, therefore, lack sufficient knowledge to admit or deny his specific job title or whether Plaintiff Pennington's employment was terminated by his employer. Defendants otherwise deny Paragraph 14.

15. Defendants admit that Plaintiff Lorentz was employed by Westinghouse Electric Company, LLC. Defendants SCANA and SCE&G did not employ Plaintiff Lorentz and, therefore, lack sufficient knowledge to admit or deny his specific job title.

***Defendants***

16. Defendants admit, upon information and belief, that Defendant Fluor Corporation is a Delaware corporation with its principal place of business in Irving, Texas.

17. Defendants deny the allegations contained in Paragraph 17.

18.     Defendants admit, upon information and belief, that Defendant Fluor Daniel Maintenance Services, Inc., is a Delaware Corporation with its principal place of business in Irving, Texas.

19.     Defendants deny the allegations of Paragraph 19.

20.     SCANA Corporation admits that it is a South Carolina corporation with its principal place of business in Cayce, South Carolina.

21.     SCE&G admits that it is a regulated public utility and is wholly owned by SCANA Corporation.  SCE&G further admits that it is engaged in the generation, transmission, distribution, and sale of electricity in South Carolina.

22.     SCE&G admits that it is incorporated in South Carolina.  Defendants otherwise deny Paragraph 22.

23.     Defendants deny the allegations contained in Paragraph 23.

**SUBSTANTIVE ALLEGATIONS**

24.     Defendants admit that SCANA is a holding company and that SCE&G is a wholly-owned subsidiary of SCANA.  Defendants further admit that SCE&G is engaged in the generation, transmission, distribution, and sale of electricity in South Carolina.

25.     SCE&G admits it filed a Combined Application for Certificate of Environment Compatibility and Public Convenience and Necessity and for a Base Load Review Order with the Public Service Commission of South Carolina ("Commission") to construct and operate a two 1,117 net megawatt nuclear facility to be located at the V.C. Summer Nuclear Station.  Defendants admit to owning 55% of the project, with the South Carolina Public Service Authority (Santee Cooper) owning the remaining 45% of the project.  Defendants otherwise deny Paragraph 25.

26.    Defendants state that the expected cost of the V.C. Summer Project is included in the public filings that SCE&G made with the Commission and such public filings speak for themselves. Defendants otherwise deny any allegations in Paragraph 26 inconsistent with the public filings with the Commission.

27.    Defendants deny the allegations contained in Paragraph 27.

28.    Defendants aver that the Base Load Review Act speaks for itself. Defendants otherwise deny Paragraph 28.

29.    Defendants deny the allegation that SCANA terminated the project. Defendants aver that the public filings with the Commission speak for themselves.

30.    Defendants deny the allegations contained in Paragraph 30.

31.    Defendants admit that SCE&G, and not SCANA, for itself, and as an agent for Santee Cooper, entered into an Engineering, Procurement and Construction Agreement in May 2008 with a consortium consisting of Westinghouse Electric Company, LLC, and Stone & Webster, Inc., for the construction of two AP-1000 nuclear reactors at the V.C. Summer Nuclear Station. Defendants otherwise deny Paragraph 31.

32.    Defendants admit that the construction of Units 2 and 3 at V.C. Summer Nuclear Station and similar reactors in Georgia represent the first new generation of nuclear power plant construction in the United States in 30 years. Defendants otherwise deny Paragraph 32.

33.    Defendants admit that the EPC Agreement required the consortium to substantially complete one unit by April 1, 2016, and the second unit by January 1, 2019.

34.    Defendants admit the allegations contained in Paragraph 34.

35.     Defendants admit that issues arose amongst the owners (SCE&G and Santee Cooper) and the consortium members regarding project costs and delays.  Defendants otherwise deny Paragraph 35.

36.     Defendants lack sufficient knowledge or information to admit or deny the allegations contained in Paragraph 36 and, therefore, deny them.

37.     Defendants admit that Fluor Enterprises, Inc., became a subcontractor of Westinghouse Electric Company for purposes of the V.C. Summer Nuclear Project.  Defendants further admit that Fluor employed craft employees on the project and took responsibility for management of on-site construction while Westinghouse remained responsible for designing, engineering, construction, and project management.  Defendants otherwise deny Paragraph 37.

38.     Defendants admit that Fluor took responsibility for managing craft and field engineers.  However, Westinghouse, WECTEC, and Fluor were responsible for project controls and personnel costs and scheduling.  Defendants otherwise deny Paragraph 38.

39.     Defendants admit that Westinghouse granted SCE&G an irrevocable option to fix nearly all of the EPC Contract price for the project, and that Westinghouse would be responsible for cost overruns associated with the fixed price portion of the project.  Defendants otherwise deny Paragraph 39.

40.     Defendants admit that SCE&G exercised the option in May 2016, but deny the remaining allegations contained in Paragraph 40.

41.     Defendants admit that Westinghouse and Fluor were working on an Estimate to Complete report ("ETC") which would forecast hours and costs necessary to complete the V.C. Summer project.  Defendants otherwise deny Paragraph 41.

42.     Defendants lack sufficient knowledge or information to form a belief as to the allegations contained in Paragraph 42 and, therefore, deny them.

43.     Defendants lack sufficient knowledge or information to form a belief as to the allegations contained in Paragraph 43 and, therefore, deny them.

44.     Defendants lack sufficient knowledge or information to form a belief as to the allegations contained in Paragraph 44 and, therefore, deny them.

45.     Defendants admit, upon information and belief, the allegations contained in Paragraph 45.

46.     Defendants admit that SCE&G agreed to pay the costs for work performed or services rendered during the Interim Assessment Period until alternatives could be developed. Defendants otherwise deny Paragraph 46.

47.     Defendants state that the owners used the Interim Assessment Period to determine if it were feasible to complete the project.  Defendants otherwise deny Paragraph 47.

48.     Defendants deny the allegations contained in Paragraph 48.

49.     Defendants deny the allegations contained in Paragraph 49.

50.     Defendants deny the allegations contained in Paragraph 50.

51.     Defendants admit that SCE&G's general manager of nuclear plant construction, who had employees reporting to him, provided project oversight before and after Westinghouse's bankruptcy filing, in accordance with Nuclear Regulatory Commission regulations and licensing requirements.  Defendants otherwise deny Paragraph 51.

52.     Defendants aver that the agreement between Westinghouse and Fluor speaks for itself.

53.    Defendants deny the allegations contained in Paragraph 53.  Upon Westinghouse Electric Company becoming the primary contractor of the project, Westinghouse was ultimately responsible for managing and directing the project.  Prior to that time, the consortium consisting of Westinghouse Electric Company and Stone & Webster, Inc., were responsible for managing and directing the project.

54.    Defendants admit that neither SCANA nor SCE&G ever became responsible for directing the means and methods of the project.  Upon Westinghouse Electric Company becoming the primary contractor of the project, Westinghouse was ultimately responsible for managing and directing the project.  Prior to that time, the consortium consisting of Westinghouse Electric Company and Stone & Webster, Inc., were responsible for managing and directing the project. Defendants deny the remaining allegations contained in Paragraph 54.

55.    Defendants deny the allegations contained in Paragraph 55.

56.    Defendants deny the allegations contained in Paragraph 56.

57.    Defendants admit that SCE&G paid a fixed amount of money to Westinghouse Electric Company as the primary contractor for the construction project at V.C. Summer Nuclear Station.  The monies Westinghouse Electric Company paid to its subcontractors and whether the monies were used to fund their respective payrolls is unknown to Defendants.  On or about March 27, 2017, SCE&G agreed to make a payment directly to Fluor in exchange for Fluor removing mechanics' liens from the project, to the extent payment was received from SCE&G and its partner.  Defendants further admit that SCE&G paid Fluor for invoices it received, but denies that it paid Fluor's payroll.  Defendants deny the remaining allegations of Paragraph 57.

58.    Defendants deny the allegations contained in Paragraph 58.

59.    Defendants deny the allegations contained in Paragraph 59.

60.     Defendants admit that SCE&G prepared its own Estimate to Completion to examine the costs of completing the project under an owner-directed model.  However, an owner-directed model was never implemented.  Defendants otherwise deny Paragraph 60.

61.     Defendants deny the allegations contained in Paragraph 61.

62.     Defendants admit that SCE&G made decisions regarding costs of the project, but deny that such decisions gave effect to an owner-directed model.  Defendants otherwise deny Paragraph 62.

63.     Defendants admit that SCE&G's general manager of nuclear plant construction, who had employees reporting to him, was responsible for overseeing the construction project before and after Westinghouse's bankruptcy filing, in accordance with Nuclear Regulatory Commission regulations and licensing requirements.  Defendants otherwise deny Paragraph 63.

64.     Defendants admit that select SCE&G employees who oversaw the construction project attended significant construction events and on-site meetings regarding the operational aspects of construction tasks as required by the Nuclear Regulatory Commission.  Defendants aver that attendance by SCE&G employees at these meetings occurred both before and after the WEC bankruptcy as required by the Nuclear Regulatory Commission.  Defendants otherwise deny Paragraph 64.

65.     Defendants admit that, depending on the SCE&G personnel attending the event or meeting, SCE&G may have been vocal or may have remained silent at construction events and meetings.  Defendants further admit that information regarding the construction event or meeting was reported up to the general manager of nuclear plant construction.  Defendants otherwise deny Paragraph 65.

66.     Defendants admit that Plan of the Day meetings were generally held on weekdays and lasted approximately one hour.  Information from the construction events or meetings may have been discussed at the Plan of the Day meetings; however, this Paragraph does not reference a specific "message" or Plan of the Day meeting.  As such, Defendants deny Plaintiffs' blanket assertion of "messages" being discussed between SCANA, Fluor, and Westinghouse.

67.     Defendants admit the allegations contained in Paragraph 67.

68.     Defendants admit the allegations contained in Paragraph 68.

69.     Defendants admit that Westinghouse Electric Company, at the Plan of the Day meetings, discussed its project plans and invited comments on those plans.  Defendants further admit that field issues were discussed, consistent with Westinghouse Electric Company's corrective action processes and procedures.  Defendants further admit that Westinghouse Electric Company had control over the manner and means in which the construction work was completed, and that Westinghouse Electric Company and Fluor had control over their respective personnel. Defendants otherwise deny Paragraph 69.

70.     Defendants admit that SCE&G, pursuant to Nuclear Regulatory Commission requirements, was required to raise concerns about construction discrepancies or mistakes and seek corrective action.

71.     Defendants admit that Westinghouse Electric Company would address and resolve construction discrepancies and mistakes, consistent with their correction action processes and procedures.  Defendants further admit that Westinghouse Electric Company had control over the manner and means in which the construction was performed, and Westinghouse Electric Company controlled the decision to take corrective actions once issues were raised by SCE&G as the client. Defendants otherwise deny Paragraph 71.

72.    Defendants admit that SCE&G became more vocal about spending, but denies that it assumed CEO-type control and leadership over the project.  Further responding, Defendants state that Westinghouse Electric Company retained control over the manner and means in which the construction was performed, even after filing its bankruptcy petition, pursuant to the EPC agreement.  Defendants otherwise deny Paragraph 72.

73.    Defendants admit that SCE&G could, pursuant to Nuclear Regulatory Commission requirements, express disagreement with how a task had been performed.  Defendants lack sufficient knowledge or information as to how a disagreement was interpreted and, therefore, denies that such was taken as a directive.  Defendants otherwise deny Paragraph 73.

74.    Defendants lack sufficient knowledge or information to form a belief as to how Fluor or Westinghouse Electric Company personnel interpreted or understood a disagreement raised by SCE&G personnel and, therefore, deny Paragraph 74.

75.    Paragraph 75 lacks reference to any specific order or direction regarding the project and, therefore, Defendants are unable to admit or deny those generalized allegations.  However, any orders or directions by SCE&G were within the scope of the EPC and Interim Assessment Agreements, which speak for themselves, or were necessitated by SCE&G's obligations as the licensee to the project.

76.    Defendants admit that Westinghouse Electric Company and Fluor sought approval from SCE&G for headcount levels to control project costs following Westinghouse Electric Company's bankruptcy filing.  Defendants deny that Fluor and Westinghouse Electric Company requisitioned new hires from SCANA or SCE&G.  Defendants deny the remaining allegations contained in Paragraph 76.

77. Defendants admit that Westinghouse Electric Company entered into an agreement with Bechtel, under which approximately 85 Bechtel employees were interspersed within Fluor and WECTEC crews to manage craft labor. Defendants otherwise deny Paragraph 77.

78. Defendants deny the allegations contained in Paragraph 78.

79. Defendants deny the allegations contained in Paragraph 79.

80. Defendants admit that Fluor and Westinghouse Electric Company sought approval from SCE&G to hire additional personnel for the project following Westinghouse Electric Company's bankruptcy filing, and that SCE&G decisions were based on costs. Defendants otherwise deny Paragraph 80.

81. Defendants admit that it requested that a manager be removed and that request was granted. Defendants otherwise deny Paragraph 81.

82. Defendants admit that, in accordance with SCE&G's oversight of the project both before and after Westinghouse Electric Company's bankruptcy filing, SCE&G could request that a construction event be performed on a certain day in order to manage costs and risk. Defendants otherwise deny Paragraph 82.

83. Defendants admit that the Project Management Office maintained by Westinghouse Electric Company approved all overtime hours prior to the bankruptcy filing. Defendants further admit that, after Westinghouse Electric Company filed for bankruptcy, the Project Management Office outlined the approximate amount of overtime hours expected in a week, and that approval for those hours was sought from SCE&G. Defendants otherwise deny Paragraph 83.

84. Defendants admit that the 2017 Memorial Day weekend was treated as a three-day weekend. Defendants otherwise deny Paragraph 84.

85. Defendants admit that SCE&G provided the facilities at the V.C. Summer Nuclear Station project. Equipment, tools, materials, helmets, vests, and other safety gear and protective clothing were purchased by Westinghouse Electric Company and Fluor and invoiced to SCE&G as part of the cost of the project. Defendants otherwise deny Paragraph 85.

86. Defendants deny the allegations contained in Paragraph 86. Heavy construction equipment was rented by Westinghouse Electric Company or Fluor and invoiced to SCE&G as part of the cost of the project.

87. Defendants admit that the construction work took place on SCE&G's premises where SCE&G employed workers of its own. Defendants further admit that SCE&G employees operated the pre-existing nuclear reactor, V.C. Summer Unit 1, while other SCE&G employees were dedicated to the construction of Units 2 and 3. Defendants further admit that all of Westinghouse Electric Company's and Fluor's employees at the site were dedicated solely to the construction of Units 2 and 3. Defendants otherwise deny Paragraph 87.

88. Defendants deny the allegations contained in Paragraph 88.

89. Defendants deny the allegations contained in Paragraph 89.

90. Defendants deny the allegations contained in Paragraph 90.

91. Defendants deny the allegations contained in Paragraph 91.

92. Defendants deny the allegations contained in Paragraph 92.

93. Defendants admit that SCANA sent a WARN Act notice to the South Carolina Department of Employment and Workforce on July 31, 2017. Defendants aver that the letter speaks for itself, but nevertheless deny Plaintiffs' quote of the letter.

94. Defendants admit that the July 31, 2017, termination of the construction project affected 617 SCE&G employees, and that the termination of those employees was not effective until a future date of September 30, 2017.

95. Defendants admit that SCE&G informed Fluor and Westinghouse Electric Company of the decision to abandon the project on July 31, 2017. Defendants further admit that Fluor and Westinghouse Electric Company were asked to immediately stop work on the project. Defendants further state that SCE&G continued receiving invoices for the costs of the project and continued to pay those project costs following the construction stoppage. Defendants otherwise deny Paragraph 95.

96. Defendants deny the allegations contained in Paragraph 96.

97. Defendants admit that SCE&G provided 60-days advance notice to its employees once the decision was made to abandon the project. Defendants otherwise deny Paragraph 97.

98. Defendants admit that SCE&G conducted an Allowable Ex Parte Communication Briefing before the Commission on August 1, 2017. As for statements made during that briefing, Defendants aver that the public record of the briefing speaks for itself.

99. Defendants admit that SCE&G conducted an Allowable Ex Parte Briefing before the Commission on August 1, 2017. As for statements made during that briefing, Defendants aver that the public record of the briefing speaks for itself. Defendants deny that they implemented an owner-directed model during the pendency of the project. Defendants otherwise deny Paragraph 99.

**WARN CLASS ALLEGATIONS**

100. Defendants admit that Plaintiff Pennington purports to bring a claim pursuant to the WARN Act for himself and on behalf of other allegedly similarly situated individuals arising from

the construction stoppage at V.C. Summer Nuclear Station.  Defendants lack sufficient knowledge to admit or deny whether Plaintiff Pennington received 60-days advance written notice because Plaintiff Pennington was not employed by SCANA or SCE&G and, therefore, neither SCANA nor SCE&G was obligated to provide Plaintiff Pennington notice pursuant to the WARN Act.  As for the individuals employed by SCANA subsidiaries at the V.C. Summer Nuclear Station construction site, those individuals received advance written notice pursuant to the WARN Act in addition to the appropriate governmental contacts, including the South Carolina Department of Employment and Workforce.  Defendants otherwise deny Paragraph 100.

101.  Defendants admit that Plaintiff Lorentz purports to bring a claim pursuant to the WARN Act for himself and on behalf of other allegedly similarly situated individuals arising from the construction stoppage at V.C. Summer Nuclear Station.  Defendants lack sufficient knowledge to admit or deny whether Plaintiff Lorentz received 60-days advance written notice because Plaintiff Lorentz was not employed by SCANA or SCE&G and, therefore, neither SCANA nor SCE&G were obligated to provide Plaintiff Lorentz notice pursuant to the WARN Act.  As for the individuals employed by SCANA subsidiaries at the V.C. Summer Nuclear Station construction site, those individuals received advance written notice pursuant to the WARN Act in addition to the appropriate governmental contacts, including the South Carolina Department of Employment and Workforce.  Defendants otherwise deny Paragraph 101.

102.  Paragraph 102 sets forth legal conclusions to which no response is required.  To the extent a response is required, Defendants deny Paragraph 102.

103.  Defendants deny the allegations of Paragraph 103.

104.  Defendants admit that SCE&G maintains records concerning its employees who worked at the V.C. Summer Nuclear Station construction site.  Defendants deny that such

employees fall within the definition of WARN Class Members because the individuals employed

by SCE&G at the V.C. Summer Nuclear Station construction site received advance written notice

pursuant to the WARN Act and notice was also provided to the appropriate governmental contacts,

including the South Carolina Department of Employment and Workforce.  Defendants lack

sufficient knowledge or information to form a belief as to the remaining allegations contained in

Paragraph 104 and, therefore, deny them.

105.    Defendants admit that SCE&G maintains records concerning its employees who

worked at the V.C. Summer Nuclear Station construction site.  Defendants deny that such

employees fall within the definition of WARN Class Members because the individuals employed

by SCE&G at the V.C. Summer Nuclear Station construction site received advance written notice

pursuant to the WARN Act and notice was also provided to appropriate governmental contacts,

including the South Carolina Department of Employment and Workforce.  Defendants do not

maintain records regarding the pay and benefits of individuals employed by other entities,

including Plaintiffs Pennington and Lorentz and, therefore, deny the remaining allegations.

106.    Defendants deny liability to individuals that Plaintiffs seek to include in the

definition of WARN Class Members because the individuals employed by SCE&G at the V.C.

Summer Nuclear Station construction site received advance written notice pursuant to the WARN

Act and notice was also provided to appropriate governmental contacts, including the South

Carolina Department of Employment and Workforce.  Further responding, neither SCANA nor its

subsidiaries employed Plaintiffs.  Therefore, Defendants were not obligated to provide notice to

Plaintiffs and could not have possibly terminated Plaintiffs' employment.  To the extent Paragraph

106 sets forth legal conclusions, Defendants need not respond.  Defendants otherwise deny

Paragraph 106.

107. Plaintiffs were not employed by SCANA or SCE&G. Therefore, Defendants were not obligated to provide notice to Plaintiffs, and could not have possibly terminated Plaintiffs' employment. Further responding, Defendants have no employees who fall within the definition of the WARN Class Members because the individuals employed by SCE&G at the V.C. Summer Nuclear Station construction site received advance written notice pursuant to the WARN Act. To the extent Paragraph 107 sets forth legal conclusions, Defendants need not respond. Defendants otherwise deny Paragraph 107.

108. Paragraph 108 sets forth legal conclusions to which no response is required. To the extent a response is required, Defendants deny Paragraph 108.

109. Paragraph 109 sets forth legal conclusions to which no response is required. To the extent a response is required, Defendants deny Paragraph 109.

110. Defendants deny the allegations contained in Paragraph 110.

111. Defendants deny the allegations contained in Paragraph 111.

112. Paragraph 112 sets forth legal conclusions to which no response is required. To the extent a response is required, Defendants deny Paragraph 112.

113. Paragraph 113 sets forth legal conclusions to which no response is required. To the extent a response is required, Defendants deny Paragraph 113.

114. Defendants lack sufficient knowledge to admit or deny the allegations in Paragraph 114 and, therefore, deny them.

**CLAIMS FOR RELIEF**
**Violation of the WARN Act, 29 U.S.C. § 2104**

115. Defendants reassert and incorporate by reference each and every response contained in Paragraphs 1 through 114 above.

116.    Defendants deny the allegations contained in Paragraph 116 as it pertains to SCANA.  SCE&G admits that it employed more than 100 employees who in the aggregate worked at least 4,000 hours per week, exclusive of overtime.  Defendants deny that SCANA or SCE&G employed Plaintiffs.

117.    Defendants deny the allegations contained in Paragraph 117.

118.    Defendants deny the allegations contained in Paragraph 118.

119.    Defendants admit that the termination of the construction project at V.C. Summer Nuclear Station affected approximately 617 employees of SCE&G, to whom notice under the WARN Act was provided.  Defendants deny that SCANA or SCE&G employed Plaintiffs. Defendants otherwise deny Paragraph 119.

120.    Defendants admit that the termination of the construction project at V.C. Summer Nuclear Station affected approximately 617 employees of SCE&G, to whom notice under the WARN Act was provided.  Defendants deny that SCANA or SCE&G employed Plaintiffs. Defendants otherwise deny Paragraph 120.

121.    Plaintiffs were not employed by SCANA or SCE&G.  Therefore, Defendants were not obligated to provide notice to Plaintiffs, and could not have possibly terminated Plaintiffs' employment.  Further responding, Defendants have no employees who fall within the definition of the WARN Class Members because the individuals employed by SCE&G at the V.C. Summer Nuclear Station construction site received advance written notice pursuant to the WARN Act.  To the extent Paragraph 121 sets forth legal conclusions, Defendants need not respond.  Defendants otherwise deny Paragraph 121.

122.    Defendants deny the allegations contained in Paragraph 122.

123.    Defendants deny the allegations contained in Paragraph 123.

124. Plaintiffs were not employed by SCANA or SCE&G. Therefore, Defendants were not obligated to provide notice to Plaintiffs. Further responding, Defendants have no employees who fall within the definition of the WARN Class Members because the individuals employed by SCE&G at the V.C. Summer Nuclear Station construction site received advance written notice pursuant to the WARN Act. Defendants otherwise deny Paragraph 124.

125. Defendants deny the allegations contained in Paragraph 125.

126. Plaintiffs were not employed by SCANA or SCE&G. Further responding, Defendants have no employees who fall within the definition of the WARN Class Members because the individuals employed by SCE&G at the V.C. Summer Nuclear Station construction site were provided notice. Therefore, Defendants were not obligated to make the payments alleged in Paragraph 126. Defendants otherwise deny Paragraph 126.

**PRAYER FOR RELIEF**

With regard to the Prayer for Relief, including the Paragraph beginning "WHEREFORE," and its subparts A-F, Defendants deny each and every allegation contained therein and denies that Plaintiffs or the purported WARN Class Members are entitled to the requested relief or any relief whatsoever.

**FOR A THIRD DEFENSE**

All acts or omissions in this matter were taken in good faith and based on reasonable grounds for believing that the WARN Act was not violated. Therefore, while Defendants deny any liability, any WARN Act liability or damages sought should be eliminated or reduced pursuant to 29 U.S.C. § 2104(4).

**FOR A FOURTH DEFENSE**

Plaintiffs' claims, and those of any purported class member, are barred or limited by the unforeseen business circumstances defense as set forth in 29 U.S.C. § 2102(b)(2)(A) because the events which led to the abandonment of the project were not reasonably foreseeable.

**FOR A FIFTH DEFENSE**

Defendants will rely upon all proper defenses lawfully available that may be disclosed by evidence and reserves the right to amend this Answer to state such other affirmative and additional defenses and/or otherwise supplement this Answer upon discovery of facts or evidence rendering such action appropriate.

WHEREFORE, having fully answered the Amended Complaint, Defendants respectfully request that they be dismissed from this action with prejudice, that judgment be entered in their favor, that Defendants be awarded their costs and attorneys' fees in defending this matter, and that the Court order such other and further relief to Defendants that it may deem necessary and proper.

**[SIGNATURE PAGE TO FOLLOW]**

Dated this 13th day of June 2018.

Respectfully submitted,

OGLETREE, DEAKINS, NASH,
SMOAK & STEWART, P.C.

By: *s/Charles T. Speth II*
Charles T. Speth II (Fed. ID No. 4258)

*s/D. Michael Henthorne*
D. Michael Henthorne (Fed. ID No. 6386)

*s/James H. Fowles, III*
James H. Fowles, III (Fed. ID No. 6492)

*s/Christopher R. Thomas*
Christopher R. Thomas (Fed. ID No. 11793)

First Base Building
2142 Boyce Street, Suite 401
Columbia, SC 29201
803.252.1300 (telephone)
803.254.6517 (facsimile)
ted.speth@ogletree.com
michael.henthorne@ogletree.com
james.fowles@ogletree.com
christopher.r.thomas@ogletree.com

**ATTORNEYS FOR DEFENDANTS SCANA CORPORATION AND SOUTH CAROLINA ELECTRIC AND GAS COMPANY**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF SOUTH CAROLINA**
**ROCK HILL DIVISION**

HARRY PENNINGTON III and TIMOTHY LORENTZ, on behalf of themselves and all others similarly situated,

Plaintiffs,

v.

FLUOR CORPORATION, FLUOR ENTERPRISES, INC., FLUOR DANIEL MAINTENANCE SERVICES, INC., SCANA CORPORATION, and SOUTH CAROLINA ELECTRIC & GAS COMPANY,

Defendants.

CASE NO. 0:17-02094-JMC

**PLAINTIFFS' RESPONSE IN OPPOSITION TO FLUOR'S MOTION FOR JUDGMENT ON THE PLEADINGS**

**TABLE OF CONTENTS**

INTRODUCTION .......... 1

A. It Is Premature to Consider Fluor's Defense that it Did Not Order a Plant Closing because it is a disputed fact that must be construed in favor of Plaintiffs .......... 2

B. Judgment Cannot be Granted on Fluor's Affirmative "Unforeseeable Business Circumstances" Defense Because it has Not Proffered Sufficient Evidence to Consider the Exception. .......... 6

1. Consideration of the elements of the UBC defense is premature because Fluor has not made the prerequisite showing that it can avail itself of the exception. .......... 6
2. Fluor's reliance on colloquy that is not integral to the complaint must be ignored .......... 8
3. Fluor's attempt to transform colloquy into judicial admissions is unavailing .......... 9

# Table of Authorities

**Page(s)**

**Cases**

*1899 Holdings, LLC v. 1899 Liab. Co.*,
568 F. App'x 219 (4th Cir. 2014) ....................10

*Administaff Companies, Inc. v. New York Joint Bd., Shirt & Leisurewear Div.*,
337 F.3d 454 (5th Cir. 2003) ....................4

*Anand v. Ocwen Loan Servicing, LLC*,
754 F.3d 195 (4th Cir. 2014) ....................9

*Chesapeake Bay Found., Inc. v. Severstal Sparrows Point, LLC*,
794 F.Supp.2d 602 (D. Md. 2011) ....................9

*Childress v. Darby Lumber Inc.*,
126 F. Supp. 2d 1310 (D. Mont. 2001), *aff'd*, 357 F.3d 1000 (9th Cir. 2004) ..8

*In re Dewey & LeBoeuf LLP*,
507 B.R. 522 (Bankr. S.D.N.Y. 2014) ....................7

*Doosan Mach. Tools Am. Corp. v. Mach. Sols., Inc.*,
No. 3:17-CV-00876-JMC, 2018 WL 1374066 (D.S.C. Mar. 19, 2018)...2, 5, 9, 13

*Edwards v. City of Goldsboro*,
178 F.3d 231 (4th Cir. 1999) ....................9

*Flowers v. Here to Serve Restaurants, Inc.*,
No. 1:15-CV-3563-SCJ, 2016 WL 8792243 (N.D. Ga. Mar. 29, 2016)...........4

*Fraternal Order of Police Lodge No. 89 v. Prince George's Cnty., Md.*,
608 F.3d 183 (4th Cir.2010) ....................10, 12

*Graphic Communications, International Local v. Bureau of Engraving*,
2003 WL 21639146 (D. Minn. 2003) ....................7

*Guippone v. BH S & B Holdings LLC*,
737 F.3d 221 (2d Cir. 2013)....................3

*Harrison v. United States Postal Serv.*,
840 F.2d 1149 (4th Cir.1988) ....................9

*Kozel v. Kozel,*
299 F. Supp. 3d 737 (D.S.C. 2018)....................9

*In re Jamesway*,
235 B.R. 329 (Bankr. S.D.N.Y. 1999) ..... 7

*Meyer v. Berkshire Life Ins. Co.*,
372 F.3d 261 (4th Cir.2004) ..... 9

*Minter v. Wells Fargo Bank, N.A.*,
762 F.3d 339 (4th Cir. 2014) ..... 11

*Organogenesis*, *Inc. v. Andrews*,
316 B.R. 574 (D. Mass. 2004) ..... 7

*Oscanyan v. Arms Co.*,
103 U.S. 261, 26 L. Ed. 539 (1880) ..... 10

*In re Quantegy, Inc.*,
343 B.R. 689 (Bankr. M.D. Ala. 2006) ..... 7

*Torres v. Niche, Inc.*,
2013 WL 6655415 (D. Mass. Dec. 18, 2013) ..... 7

*In re Tweeter Opco, Inc.*,
453 B.R. 534 (Bankr. D. Del. 2011) ..... 7

*United Paperworkers Int'l Union v. Alden Corrugated Container Corp.*,
901 F.Supp. 426 (D. Mass. 1995) ..... 7

*United States v. Blood*,
806 F.2d 1218 (4th Cir. 1986) ..... 11, 12

*Watts v. Marco Holdings*,
1998 WL 211770 (N.D. Miss. 1998) ..... 7

**Statutes**

WARN Act, 29 U.S.C. § 2101 *et seq* ..... 4, 6, 7

29 U.S.C. § 2104 ..... 3

29 U.S.C. § 2104 (a)(1) ..... 2

29 U.S.C. § 2102 (b)(3) ..... 6

**Other Authorities**

Fed. R. Civ. P. 10(c) ..... 9

Fed. R. Civ P. 56(d) ..... 2, 9

Fed. R. Civ. P. 12(b)(6)....................................................................................9

Fed. R. Civ. P. 12(c) .......................................................................................9

Harry Pennington III and Timothy Lorentz submit on behalf of themselves and a putative class of similarly situated former employees (collectively, the "Employees") of Fluor Corporation, Fluor Daniel Maintenance Services, Inc., and Fluor Enterprises, Inc. (collectively, the "Fluor Defendants") this response in opposition to their Motion on the Pleadings (Case No. 0:17-cv-02094-JMC, hereinafter "Pennington Docket", ECF No. 110) (the "Motion") and respectfully state as follows:

**INTRODUCTION**

Fluor's Motion should be denied because it fails make any argument that derails the case against it.

Fluor claims that Plaintiffs have admitted two dispositive facts that forfeit their case. The first is that Fluor did not "order" the plant closing. The second is that the closing was not "reasonably foreseeable." These facts, however, are not facts they are conclusions. Fluor arrives at them by drawing inferences. The claimed "admissions" are simply inferences Fluor draws from words that do not state the conclusions Fluor wants. For the purposes of this motion, Fluor's two "facts" must be deemed to be false because they arise from inferences that must be construed against Fluor. But even were the "facts" deemed true, the case must go on because, in all event, they are not dispositive.

Fluor's denial that it gave plant closing orders flatly contradicts the allegations of the Complaint which must be taken as true. Plaintiffs agree that SCANA made the decision to close the plant. But, Fluor in complying, gave its own orders to its employees to stop work and leave. give the order. Fluor – while not the decisionmaker - was an employer ordering a plant closing when it directed its employees to stop work and leave. At this point, that allegation must be

taken as true. *Doosan Mach. Tools Am. Corp. v. Mach. Sols., Inc.,* No. 3:17-CV-00876-JMC, 2018 WL 1374066, at *3 (D.S.C. Mar. 19, 2018).

Fluor's allegation that SCANA's decision was not reasonably foreseeable – again, is not a fact but a conclusion. But even if it were true, it would not support a judgment by itself. The unforeseeable business circumstances ("UBC") exception is an affirmative defense. Before affirmative defenses may be considered, the WARN Act requires that an employer show that it delivered a valid WARN notice to its employees. Because Fluor has not taken that first step, the Court cannot contemplate a judgment on its potential UBC defense.

At bottom, the Court should deny Fluor's motion on the defensive pleadings. Alternatively, if it finds material factual disputes exist, the Court should permit Plaintiffs to take discovery under Rule 56(d) before having to address Fluor's defenses.

### A. It is Premature to Consider Fluor's Defense that it Did Not Order a Plant Closing Because it is a Disputed Fact.

Fluor's first contention, that it is free of WARN liability unless it "ordered" the V. C. Summer plant closing, lacks merit. 29 U.S.C. § 2104 (a)(1). That section states, in pertinent part: "Any employer who orders a plant closing … [is liable]." Fluor clearly qualifies as such an employer regardless of the role of SCANA and of other contractors.

Fluor has not, and cannot overcome the conclusion that it is "an employer who orders a plant closing." Its orders, to it 4,000 employees, arguable closed a plant. That any third party told Fluor to give that order, such as a landlord or bank, would not alter the conclusion that Fluor was "an employer who ordered a plant closing." That conclusion should not change simply because SCANA, and not a bank, gave Fluor the directive. SCANA may be held liable, itself, as a single employer for having made the final decision. Fluor need not have make the decision to be liable. Fluor just had to give the order, which it did. In all events, a fact finder may

reasonably conclude Fluor's order was that of "an employer who orders a plant closing." Hence, no judgment can be rendered in favor of Fluor at this point.

Even if all inferences were all drawn in Fluor's favor, which they cannot, a judgment in its favor would still be unwarranted. Here, there is a plausible allegation that SCANA and Fluor were a single employer enterprise. Taken as true, the single employer allegation makes the "order" distinction irrelevant. It is the single employer that gives the order, not separate employers, especially since the exercise of de facto control was pronounced at that juncture.

The Second Circuit Court of Appeals recognized that the term "order" is fluid and perhaps extraneous in the single employer context. In *Guippone v. BH S & B Holdings LLC,* the parent entity urged the district court to interpret "order" narrowly. It sought absolution because it did not "order" the plant closing, its subsidiary did. 737 F.3d 221 (2d Cir. 2013). The District Court agreed and held "there is no evidence to suggest that [the parent] ordered anyone to do anything with regard to the layoffs." *Id*. at 227. On appeal, the panel reversed. It recognized single employer liability for the parent did not turn on allegations of any "order" - it was enough that it authorized the layoff. 737 F.3d 221, 227 (2d Cir. 2013)

As *Guippone* illustrates, it is normal in a single employer relationship that the "decision-maker" (*e.g*., the parent or contracting party) will communicate its plant closing decision to the operating entity. The executives of the operating entity then order the workforce to carry out the decision. It cannot be, as Fluor assumes, that the parent-level decision-maker's communication to the operating entity is the only operative "order" under 29 U.S.C. § 2104. That would mean that the operating company's orders to its workforce would be discounted. If that were true, WARN law would be rife with cases in which operating entities were excused from liability because they simply passed on orders from on high. Fluor has found no such case. It goes

without saying that operating, direct employer who orders a mass layoff or plant closing, regardless of who pressured it to do so, is a liable employer. That is the reasonable construction of § 2104.

Fluor is not helped by the opinions it cites. The cases in which the single employer allegations failed due to facts that make them easily distinguishable. Pennington Docket, ECF No. 105 at 13, citing *Administaff Companies, Inc. v. New York Joint Bd., Shirt & Leisurewear Div.,* 337 F.3d 454 (5th Cir. 2003); *Flowers v. Here to Serve Restaurants, Inc.,* No. 1:15-CV-3563-SCJ, 2016 WL 8792243, at *1 (N.D. Ga. Mar. 29, 2016).

In *Administaff* and *Here to Serve*, the plaintiff-employees were employed directly by the employer that both made the its decision and ordered its own plant closing or mass layoff. This employer however used an outside payroll processor. The employees sued the payroll processor under the WARN Act but failed to state a claim because they could not allege, no less prove, that the payroll processor made decisions or gave orders concerning the WARN event. The employees should have sued their direct employer. Here, Fluor might enjoy the payroll processors' defense were it being sued by the employees of SCANA. But Mr. Pennington was a Fluor employee and is suing Fluor as the direct employer of the Fluor employees. *Administaff* and *Here to Serve Restaurants* do no address the significance of "orders" given in either the separate or single employer contexts when employees sue their direct employer.

Nor is Fluor aided by the remarks made by Plaintiffs' counsel. Fluor argues that Plaintiffs' counsel made admissions in oral argument that excuse Fluor. They must run a gauntlet of tests in the Fourth Circuit before they can be deemed admissions. *See* Point B. 3,

below, and Pennington Docket, ECF No. 105 at 3-4.[1] The remarks Fluor quotes are not stipulations averring that Fluor did not order a "plant closing." They are ambiguous and do not state the proposition Fluor seeks, without the drawing of an inference. True, counsel stated SCANA ordered operations cease and it shut down positions, the site, etc. But, he did not state that Fluor did not do those things as well. All Fluor can do is ask the Court to draw an inference in its favor, *i.e.*, that Fluor did not order a "plant closing" because counsel said SCANA did. Fluor's inference must be considered false for the purposes of its motion. "The court must accept all well pleaded factual allegations in the non-moving party's pleadings as true and reject all contravening assertions in the moving party's pleadings as false." *Doosan Mach. Tools Am. Corp. v. Mach. Sols., Inc.,* at *3.

The fact that Fluor is the movant compels the conclusion for now that Fluor *did* order a plant to close. It is up to the trier of fact to determine what the evidence is concerning the plant closing and whether it supports liability in this context.

---

[1] "Your Honor, on the morning of July 31st, 2017, *SCANA ordered* that all operations at its V.C. Summer project, nuclear reactor project, be halted. *That order* immediately and permanently did away with the positions of approximately 5,000 employees who were working at that site." Ex. A, February 14, 2018, Hearing Transcript, at 63:25 – 64:2 (emphasis added).
Comment
 "In other words, [Plaintiffs'] position *was shut down by SCANA* and their employment immediately was terminated by their direct employers." Ex. A. at 64:12-14 (emphasis added).
Comment
 "[Plaintiffs] have alleged that – and it's been admitted today that *SCANA had shut down a site* and that [Plaintiffs] have experienced employment loss." Ex. A at 65:9-11 (emphasis added).
Comment
 "I do think this is a striking decision-making circumstance. . . . *SCANA made the decision . . . It direct[ed] the shutdown* . . . ." Ex. A at 74:22 – 25 (emphasis added).

**B. Judgment Cannot be Granted on Fluor's Affirmative "Unforeseeable Business Circumstances" Defense Because it has Not Proffered Sufficient Evidence to Consider the Exception.**

Next, Fluor contends that foreseeability is a dispositive issue. It argues that because it could not foresee the V.C. Summer shut down, it can be awarded judgment now. Fluor sets up a debate about foreseeability now because it thinks it has another ace in the hole – an "admission" – that it can wield to avoid this litigation. But, the court cannot contemplate this defense at all now.

It is true that the requirement that the cause of a plant closing be "unforeseeable" is a major element of the UBC defense. But for that fact to gain significance under the WARN Act, Fluor cannot merely argue it in a void. Fluor must first *avail* itself of the defense. To do that, Fluor must first satisfy a gating requirement to make the UBC exception applicable, which it has not sought to do.

**1. Consideration of the elements of the UBC defense is premature because Fluor has not made the prerequisite showing that it can avail itself of the exception.**

To avail itself of the defense, Fluor must establish that it delivered a timely WARN notice with the requisite content – a necessary step that Fluor inexcusably skips.

Fluor itself states the gating rule: "**To avail itself** of the unforeseeable business circumstances defense, an employer "shall give as much notice as is practicable and at that time shall give a brief statement of the basis for reducing the notification period." 29 U.S.C. § 2102(b)(3). Pennington Docket, ECF No. 105 at 9 (emphasis added). Fluor has not established that it delivered to its employees a notice that meets the mandatory content and timeliness requirements.

In the absence of such evidence, judgment on the UBC affirmative defense is appropriate *against* Fluor, not in its favor.

Absent such evidence, courts, on motions to strike, have undeviatingly knocked down or barred the defense. *See In re Dewey & LeBoeuf LLP*, 507 B.R. 522 (Bankr. S.D.N.Y. 2014) (granting partial summary judgment striking the unforeseeable business circumstances defense because the employer's written notices did not contain a brief statement of the basis for reducing the notice period); *Torres v. Niche, Inc.*, 2013 WL 6655415, at *3 (D. Mass. Dec. 18, 2013) (holding unforeseeable business circumstances defense was inapplicable because no advance notice was given); *Watts v. Marco Holdings*, 1998 WL 211770 (N.D. Miss. 1998) (finding that layoffs were caused by unforeseeable businesses circumstances but rejecting unforeseeable business circumstances defense because employer gave no notice at all); *Graphic Communications, International Local v. Bureau of Engraving*, 2003 WL 21639146 (D. Minn. 2003) (holding WARN defense inapplicable because of the employer's failure to provide notice that met the statutory requirements); *Organogenesis*, *Inc. v. Andrews*, 316 B.R. 574 (D. Mass. 2004) (holding that defendant cannot rely on the unforeseeable business circumstances, faltering company or good faith defenses and it liable for maximum violation period because "[t]he Debtor has admitted its failure to give *any* written notice whatsoever under the WARN Act to the Claimants."); *United Paperworkers Int'l Union v. Alden Corrugated Container Corp.*, 901 F.Supp. 426, 440 (D. Mass. 1995) (indicating in dicta that defendants "failed to provide any written notification" and "that this failure alone would constitute sufficient grounds to deny the applicability of the [WARN Act's] exemption provisions."). *See also In re Tweeter Opco, Inc.*, 453 B.R. 534, 546-47 (Bankr. D. Del. 2011) (same); *In re Quantegy, Inc.,* 343 B.R. 689, 696 (Bankr. M.D. Ala. 2006) (same). *See also In re Jamesway*, 235 B.R. 329, 336-344 (Bankr. S.D.N.Y. 1999) (granting plaintiffs' motion for summary judgment in part because the employer's inadequate notices precluded its affirmative defenses).

As these cases explain, one of the purposes of the WARN notice is to explain to employees why the employer gave less than 60 days' notice. The litigation may then test whether the stated basis for the shortened notice was in fact the cause of the shortened notice. If it was not, the notice may be found inadequate and the defense will fail even if there is proof that the circumstances that caused the shutdown were unforeseeable as Fluor claims they were. The employer "would still be liable even if any of the exceptions applied because its notice was inadequate." *Childress v. Darby Lumber Inc.,* 126 F. Supp. 2d 1310, 1318 (D. Mont. 2001), *aff'd*, 357 F.3d 1000 (9th Cir. 2004). Hence, "an employer omits vital information at its peril from the notice". *Id.*

Here, Fluor does not even purport to have provided a notice. Accordingly, Fluor cannot avail itself of the unforeseeable business circumstances exception at this point.

**2. Fluor's reliance on colloquy that is not integral to the complaint must be ignored.**

Even if Fluor were allowed to present his UBC defense, it must still *prove* all its elements. Fluor must proffer evidence showing that a person in its shoes exercising reasonable commercial judgment could not reasonably have foreseen SCANA's decision to shut down V.C. Summer. (The "unforeseeable business circumstances" exception, provides that "[a]n employer may order a plant closing . . . before the conclusion of the 60-day period if the closing . . . is caused by business circumstances that were **not reasonably foreseeable** as of the time that notice would have been required." *Id.* § 2102(b)(2)(A)(emphasis added.)).

Fluor does not attempt to carry its evidentiary burden in this motion. Rather, it backhandedly attaches clipped passages from an oral argument transcript from the hearing on SCANA's motion to dismiss, and a transcript of various persons' out-of-court statements made in a state commission hearing. These documents are not integral to the Complaint, nor do they

contain judicially noticed facts. Plaintiffs' legal rights did not arise from these documents. They must, therefore, be disregarded. *See Chesapeake Bay Found., Inc. v. Severstal Sparrows Point, LLC*, 794 F.Supp.2d 602, 611 (D. Md. 2011); *Kozel v. Kozel*, 299 F. Supp. 3d 737 (D.S.C. 2018).[2] Because Plaintiffs have not been given the benefit of taking discovery due to the stays in this case, they are entitled to seek discovery to respond, under Fed. R. Civ P. 56(d), to what is effectively Fluor's motion for summary judgment on the issue of foreseeability.

**3. Fluor's attempt to transform colloquy into judicial admissions is unavailing.**

Even if these transcripts were to be considered, Fluor cannot show that they contain "judicial admissions." Judicial admissions are "formal concessions in the pleadings, or stipulations by a party or its counsel, that are binding upon the party making them")). *Meyer v. Berkshire Life Ins. Co.,* 372 F.3d 261, 264 (4th Cir.2004). They are unqualified "intentional and unambiguous waivers that release the opposing party from its burden to prove the facts necessary

[2] In adjudicating a motion for judgment on the pleadings, the court "can only consider the Complaint itself, Answers to the Complaint, any judicially noted facts, and documents that are "integral to the Complaint and authentic." Such documents might be a copy of a written instrument which is an exhibit to a pleading, is a part thereof for all purposes. *See* Fed. R. Civ. P. 10(c); *Anand v. Ocwen Loan Servicing, LLC*, 754 F.3d 195, 198 (4th Cir. 2014) (citing *Philips v. Pitt Cty. Mem. Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009)) (explaining what the court can consider at the motion to dismiss phase); *Chesapeake Bay Found., Inc. v. Severstal Sparrows Point, LLC*, 794 F.Supp.2d 602, 611 (D. Md. 2011) ("[a]n integral document is a document that by its 'very existence, and *not the mere information it contains*, gives rise to the legal rights asserted.' "). Because Rule 12(c) motion are disposed of according to the standards of Rule 12(b)(6), Fluor's Motion should only be granted if, after accepting all well-pleaded allegations in Plaintiffs' Complaint as true and drawing all reasonable factual inferences from those facts in Plaintiffs' favor, it appears certain that Plaintiffs cannot prove any set of facts in support of their claim entitling them to relief. *Edwards v. City of Goldsboro*, 178 F.3d 231, 244 (4th Cir. 1999); *Harrison v. United States Postal Serv.,* 840 F.2d 1149, 1152 (4th Cir.1988))("we must not dismiss the complaint unless it appears to a certainty that the plaintiff would not be entitled to relief under any legal theory which might plausibly be suggested by the facts alleged."); *Doosan Mach. Tools Am. Corp. v. Mach. Sols., Inc.,* No. 3:17-CV-00876-JMC, 2018 WL 1374066, at *6 (D.S.C. Mar. 19, 2018).

to establish the waived conclusion of law." *Id.* at 264–65. None of these statements are binding unless they are " 'deliberate, clear, and unambiguous[.]' ". *Fraternal Order of Police Lodge No. 89 v. Prince George's Cnty., Md.,* 608 F.3d 183, 190 (4th Cir.2010) (quoting *Meyer,* 372 F.3d at 265 n. 2).

To be unqualified, counsel making open court statements must be apprised of "all of the facts." *Oscanyan v. Arms Co.*, 103 U.S. 261, 263–64, 26 L. Ed. 539 (1880). In *Oscanyan*, the lawyer in his opening statement was "fully apprised of all the facts out of which his client's claim originated," and "seldom was a case opened with greater fullness of detail." The counsel "dwelt upon and reiterated the statement of the fact which constituted the ground of the court's action in directing a verdict for the defendant." *Id.*

To be unqualified, the lawyer making the statement must be given a chance to qualify it before taking it as an admission. "He should be allowed to explain and qualify it, so far as the truth will permit; but if, with such explanation and qualification, it should clearly appear that there could be no recovery, the court should not hesitate to so declare and give such direction as will dispose of the action." *Id.*

Given these formal requirements, it is not surprising that the courts of the Fourth Circuit refused to find judicial admissions in all but one of the cases cited by Fluor. In that exceptional case, the lawyer said his client performed action A before action B. It was not a tangential comment. That sequence was the focus of the whole inquiry. It was stated by an attorney in a position to speak with certitude about his client's own conduct and, therefore, could be relied on by the court as an admitted fact in rendering judgment. *1899 Holdings, LLC v. 1899 Liab. Co.*, 568 F. App'x 219, 225 (4th Cir. 2014) ("*They* [the conversations] were *certainly* ... before the [Amendment]." (emphasis added)). Here, none of the "admissions" in question were about what

Plaintiffs' own clients did, foresaw or ordered. They were about that what the Defendants allegedly did or thought outside of the Plaintiffs' lens. They were not made at hearing who purpose was to determine Fluor's liability.

Unless the proponent seeking the "admission" flags the issue in live court to remove ambiguities or doubt – the statement is unlikely to be characterized as a formal stipulation. In the leading case, *Minter v. Wells Fargo Bank, N.A.*, 762 F.3d 339, 348 (4th Cir. 2014), counsel stated as *true* the dispositive fact that his client sought to *disprove*. The Court recognized that "[t]aken alone, [Long & Foster's counsel's] statement could possibly be considered an admission [,]" But "giving due regard to the *context* of this litigation and considerations of fairness, the Court was "troubled by the fact that the supposed admission is being raised for the first time post-verdict." *Id*. (emphasis added). Because "no one at the trial" argued that "the remarks in question constituted an admission of the nature here urged," the Court believed "it would be decidedly unfair and inconsistent" to allow the opposing party to do "what they failed to do at trial." The Court found that **"the fact that it occurred to no one at trial that [an] isolated remark constituted a binding admission undercuts the notion that the statement was sufficiently deliberate and clear so as to have preclusive effect."** *Minter v. Wells Fargo Bank, N.A.*, 762 F.3d 339, 348 (4th Cir. 2014)(emphasis added).

The Fourth Circuit also took context into account in *United States v. Blood*, 806 F.2d 1218, 1221 (4th Cir. 1986). There, the defendant tried to bind the prosecutor to his statements in voir dire and his opening that the prepaid legal insurance plan was "insurance" and not an ERISA welfare benefits plan. The court found that the "government counsel's characterization of the Plans in opening statement was not evidence" it was just a "statement by the government. It doesn't mean anything.... [b]ecause they called it [an] insurance plan it doesn't make it one … [it]

"was not clear and unambiguous admission that plans were insurance." *United States v. Blood*, 806 F.2d 1218, 1221 (4th Cir. 1986).

In *Fraternal Order of Police Lodge No. 89 v. Prince George's Cty., MD*, 608 F.3d 183, 190 (4th Cir. 2010), the union contended that the County had abandoned its contention that collective bargaining agreements were "not impaired," because it appeared to admit they were "impaired" in colloquy with the Court. The transcript appears to show County counsel agreeing with the Court's statement that the CBA were impaired, as follows:

> THE COURT: Well, let's get that out the way right now. There was an impairment. Now, all the cases say that. Now, let's understand that.
> COUNSEL: Yes.
> THE COURT: So, we're not going to debate that. There's a significant impairment here—
> COUNSEL: Correct.
> THE COURT: of this contract. So, that's not a dispute with me. So, the issue, again, is what's required, what's necessary and so forth. That's what we're talking about. Correct. All right.

On appeal, the Fourth Circuit panel held the statements were not binding admissions because when assessed in context they showed the focus of counsel's argument was not on a factual issue the union claimed was abandoned.

Similarly, Plaintiffs' counsel's utterances at oral argument do not carry the significance Fluor seeks to attach to them. Fluor may contend there was nothing ambiguous and unclear about Plaintiffs' counsel's statements at oral argument which appear to exonerate Fluor of liability by affirming SCANA give orders and Fluor had no reason to foresee SCANA's decision to halt operations. But, as explained above, all of these conclusions rest on negative inferences drawn from positive statements, and at this stage – such inferences must be drawn in Plaintiffs' favor. Plaintiffs' counsel never clearly and unambiguously stated as a fact that the shutdown

was not reasonably foreseeable to Fluor. Fluor's allegation, that it did not foresee SCANA's decision, must be deemed to be false. *Doosan Mach. Tools Am. Corp. v. Mach. Sols., Inc.,* at *3.

What was said about foreseeability at the hearing was indirect and only relevant to the issue of whether *SCANA* had a good defense against being deemed an employer. Plaintiffs were asked by the Court to confirm by illustration how SCANA might have exercised de facto control as a decisionmaker. In colloquy, SCANA was described as functioning like a valve, regulating the flow of information about its plans. If SCANA let others know it had have decided to end the project 60 days before the closing, the contractors could have given more notice. By withholding its plan, SCANA gave others less time for notice, making a violation more certain. This illustration may have made the single employer claim against SCANA more plausible, but it settled no facts. Plaintiffs still have to prove SCANA exercised de facto control. Fluor must still bear its burden of proving all the elements of a UBC defense.

Plaintiffs' counsel remarks should have erased any erroneous impression that Plaintiffs were abandoning their claims against Fluor. He did not waive Fluor's defense, he anticipated they would be brought, remarking that: "**Fluor will make its defenses as to why it didn't have no** [sic]- -- **it has already mentioned those, it had a business circumstances defense"** and so "in the first instance no one argues to the contrary that it's their joint and several liability." "**I think we're entitled to also discovery**." Pennington Docket, ECF No. 105 at 3-4.

Given these statements by Plaintiffs' counsel, no reasonable jurist who attended the oral argument could assume Plaintiff's counsel was "fully apprised of all of the relevant facts" as to what Fluor knew. No one could interpret his remarks as a stipulation and waiver of claims against Fluor. Anyone with a doubt could have asked him and avoided this unnecessary round of briefing.

Date: June 13, 2018

By: /s/ Lucy C. Sanders
Lucy C. Sanders
**BLOODGOOD & SANDERS, LLC**
242 Mathis Ferry Road, Suite 201
Mt. Pleasant, South Carolina 29464
Telephone: (843) 972-0313
Facsimile: (843) 352-2714
E-mail: lsanders@bloodgoodsanders.com

/s/ Jack. A. Raisner
Jack A. Raisner
René S. Roupinian
OUTTEN & GOLDEN LLP
685 Third Avenue, 25th Floor
New York, New York 10017
Telephone:(212) 245-1000
Facsimile: (646) 509-2060
E-mail:    jar@outtengolden.com
            rsr@outtengolden.com

*Attorneys for Plaintiffs and the putative class*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**ROCK HILL DIVISION**

| | |
|---|---|
| Harry Pennington III and Timothy Lorentz, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>Fluor Corporation, Fluor Enterprises, Inc., Fluor Daniel Maintenance Services, Inc., SCANA Corporation, and South Carolina Electric & Gas Company,<br><br>Defendants. | C/A No. 0:17-2094-JMC |
| Lawrence Butler, Lakeisha Darwish, and Jimi Che Sutton,<br><br>Plaintiffs,<br><br>v.<br><br>Fluor Corporation and Fluor Enterprises, Inc.,<br><br>Defendants. | C/A No. 0:17-2201-JMC |

Whereas, the parties to this Consent Confidentiality Order ("parties"), have stipulated that certain discovery material is and should be treated as confidential, and have agreed to the terms of this order; accordingly, it is this 18th day of February, 2020, ORDERED:

1. **Scope.** All documents produced in the course of discovery, all responses to discovery requests and all deposition testimony and deposition exhibits and any other materials which may be subject to discovery (hereinafter collectively "documents"), including any

documents produced by any party or non-party, shall be subject to this Order concerning confidential information as set forth below.

2. **Form and Timing of Designation.** Confidential documents shall be so designated by placing or affixing the word "CONFIDENTIAL" on the document in a manner which will not interfere with the legibility of the document and which will permit complete removal of the CONFIDENTIAL designation. Documents shall be designated prior to, or contemporaneously with, the production or disclosure of the documents except for documents produced for inspection under the "Reading Room" provisions set forth in paragraph 4 below. Inadvertent or unintentional production of documents without prior designation as confidential shall not be deemed a waiver, in whole or in part, of the right to designate documents as confidential as otherwise allowed by this Order.

3. **Documents Which May be Designated CONFIDENTIAL.** Any party, or non-party producing documents in this matter, may designate documents as CONFIDENTIAL but only after review of the documents by an attorney[1] who has, in good faith, determined that the documents contain information protected from disclosure by statute, sensitive personal information, trade secrets, or confidential research, development, or commercial information. The certification shall be made concurrently with the disclosure of the documents, using the form attached hereto at Attachment A, which shall be executed subject to the standards of Rule 11 of the Federal Rules of Civil Procedure. Information or documents which are available in the public sector may not be designated as CONFIDENTIAL.

[1] The attorney who reviews the documents and certifies them to be confidential must be admitted to the Bar of at least one state but need not be admitted to practice in the District of South Carolina and need not apply for *pro hac vice* admission. By signing the certification, counsel submits to the jurisdiction of this Court in regard to the certification.

4. **Reading Room.** In order to facilitate timely disclosure of large numbers of documents which may contain confidential documents, but which have not yet been reviewed and marked, the following "Reading Room" provisions may be utilized.

a. Documents about which Counsel is, in good faith, unsure whether they reveal technical, proprietary, or other confidential information and for which consultation with Counsels' clients would be necessary to determine if the documents should be marked as CONFIDENTIAL may be produced for review at a controlled location convenient to the receiving Counsel or in another convenient controlled manner ("Reading Room"), prior to designation as CONFIDENTIAL and will be marked "SENSITIVE." After review of these documents, the party seeking discovery may specify those for which further production is requested. The producing party shall then copy the requested documents for production. To the extent any of the requested documents warrant a CONFIDENTIAL designation, the copies shall be so marked prior to further production.

b. Unless otherwise agreed or ordered, copies of Reading Room documents shall be requested within twenty days of review in the Reading Room and shall be produced within thirty days after the request is made.

c. The producing party shall maintain a log of persons who have reviewed documents in the Reading Room and the dates and times of their presence.

d. The production of documents for review within the confines of a Reading Room shall not be deemed a waiver of any claim of confidentiality, so long as the reviewing parties are advised that the Reading Room production is pursuant to this provision and that the Reading Room may contain confidential materials which have not yet been marked as CONFIDENTIAL.

e.    Until such time as further production is made of documents reviewed in a Reading Room, the reviewing party shall treat all material reviewed as if it was marked CONFIDENTIAL at the time reviewed.

5.    **Depositions.**   Portions of depositions shall be deemed confidential only if designated as such when the deposition is taken or within seven business days after receipt of the transcript.  Such designation shall be specific as to the portions to be protected.

6.    **Protection of CONFIDENTIAL Material.**

a.    **General Protections.**  Documents designated CONFIDENTIAL under this Order shall not be used or disclosed by the parties or counsel for the parties or any other persons identified below (¶ 6.b.) for any purposes whatsoever other than preparing for and conducting the litigation in which the documents were disclosed (including any appeal of that litigation).  The parties shall not disclose documents designated as CONFIDENTIAL to putative class members not named as plaintiffs in putative class litigation unless and until one or more classes have been certified.

b.    **Limited Third Party Disclosures.**  The parties and counsel for the parties shall not disclose or permit the disclosure of any documents designated CONFIDENTIAL under the terms of this Order to any other person or entity except as set forth in subparagraphs 6.b.(1)-(5) below, and then only after the person to whom disclosure is to be made has executed an acknowledgment (in the form set forth at Attachment B hereto), that he or she has read and understands the terms of this Order and is bound by it. Subject to these requirements, the following categories of persons may be allowed to review documents which have been designated CONFIDENTIAL pursuant to this Order:

(1) counsel and employees of counsel for the parties who have responsibility for the preparation and trial of the lawsuit;

(2) parties and employees of a party to this Order, but only to the extent counsel shall certify that the specifically named individual party or employee's assistance is necessary to the conduct of the litigation in which the information is disclosed[2];

(3) court reporters engaged for depositions and those persons, if any, specifically engaged for the limited purpose of making photocopies of documents;

(4) consultants, investigators, or experts (hereinafter referred to collectively as "experts") employed by the parties or counsel for the parties to assist in the preparation and trial of the lawsuit; and

(5) other persons only upon consent of the producing party or upon order of the court and on such conditions as are agreed to or ordered.

c. **Control of Documents.** Counsel for the parties shall make reasonable efforts to prevent unauthorized disclosure of documents designated as CONFIDENTIAL pursuant to the terms of this order. Counsel shall maintain a record of those persons, including employees of counsel, who have reviewed or been given access to the documents along with the originals of the forms signed by those persons acknowledging their obligations under this Order.

d. **Copies.** All copies, duplicates, extracts, summaries or descriptions (hereinafter referred to collectively as "copies"), of documents designated as CONFIDENTIAL under

[2] At or prior to the time such party or employee completes his or her acknowledgment of review of this Order and agreement to be bound by it (Attachment B hereto), counsel shall complete a certification in the form shown at Attachment C hereto. Counsel shall retain the certification together with the form signed by the party or employee.

this Order or any portion of such a document, shall be immediately affixed with the designation "CONFIDENTIAL" if the word does not already appear on the copy. All such copies shall be afforded the full protection of this Order.

7. **Filing of CONFIDENTIAL Materials.** In the event a party seeks to file any material that is subject to protection under this Order with the court, that party shall take appropriate action to insure that the documents receive proper protection from public disclosure including: (1) filing a redacted document with the consent of the party who designated the document as CONFIDENTIAL; (2) where appropriate (*e.g.* in relation to discovery and evidentiary motions), submitting the documents solely for *in camera* review; or (3) where the preceding measures are not adequate, seeking permission to file the document under seal pursuant to the procedural steps set forth in Local Civil Rule 5.03, DSC, or such other rule or procedure as may apply in the relevant jurisdiction. Absent extraordinary circumstances making prior consultation impractical or inappropriate, the party seeking to submit the document to the Court shall first consult with counsel for the party who designated the document as CONFIDENTIAL to determine if some measure less restrictive than filing the document under seal may serve to provide adequate protection. This duty exists irrespective of the duty to consult on the underlying motion. Nothing in this Order shall be construed as a prior directive to the Clerk of Court to allow any document be filed under seal. The parties understand that documents may be filed under seal only with the permission of the Court after proper motion pursuant to Local Civil Rule 5.03.

8. **Greater Protection of Specific Documents.** No party may withhold information from discovery on the ground that it requires protection greater than that afforded by this Order unless the party moves for an Order providing such special protection.

9.    **Challenges to Designation as CONFIDENTIAL.**    Any CONFIDENTIAL designation is subject to challenge.  The following procedures shall apply to any such challenge.

a.    The burden of proving the necessity of a CONFIDENTIAL designation remains with the party asserting confidentiality.

b.    A party who contends that documents designated CONFIDENTIAL are not entitled to confidential treatment shall give written notice to the party who affixed the designation of the specific basis for the challenge.  The party who so designated the documents shall have fifteen (15) days from service of the written notice to determine if the dispute can be resolved without judicial intervention and, if not, to move for an Order confirming the CONFIDENTIAL designation.

c.    Notwithstanding any challenge to the designation of documents as CONFIDENTIAL, all material previously designated CONFIDENTIAL shall continue to be treated as subject to the full protections of this Order until one of the following occurs:

(1)    the party who claims that the documents are CONFIDENTIAL withdraws such designation in writing;

(2)    the party who claims that the documents are CONFIDENTIAL fails to move timely for an Order designating the documents as CONFIDENTIAL as set forth in paragraph 9.b. above; or

(3)    the court rules that the documents should no longer be designated as CONFIDENTIAL information.

d.    Challenges to the confidentiality of documents may be made at any time and are not waived by the failure to raise the challenge at the time of initial disclosure or designation.

10. **Treatment on Conclusion of Litigation.**

a. **Order Remains in Effect.** All provisions of this Order restricting the use of documents designated CONFIDENTIAL shall continue to be binding after the conclusion of the litigation unless otherwise agreed or ordered.

b. **Return of CONFIDENTIAL Documents.** Within thirty (30) days after the conclusion of the litigation, including conclusion of any appeal, all documents treated as CONFIDENTIAL under this Order, including copies as defined above (¶6.d.) shall be returned to the producing party unless: (1) the document has been entered as evidence or filed (unless introduced or filed under seal); (2) the parties stipulate to destruction in lieu of return; or (3) as to documents containing the notations, summations, or other mental impressions of the receiving party, that party elects destruction. Notwithstanding the above requirements to return or destroy documents, counsel may retain attorney work product including an index which refers or relates to information designated CONFIDENTIAL so long as that work product does not duplicate verbatim substantial portions of the text of CONFIDENTIAL documents. This work product continues to be CONFIDENTIAL under the terms of this Order. An attorney may use his or her work product in a subsequent litigation provided that its use does not disclose the CONFIDENTIAL documents.

11. **Order Subject to Modification.** This Order shall be subject to modification on motion of any party or any other person who may show an adequate interest in the matter to intervene for purposes of addressing the scope and terms of this Order. The Order shall not, however, be modified until the parties shall have been given notice and an opportunity to be heard on the proposed modification.

12. **No Judicial Determination.** This Order is entered based on the representations and agreements of the parties and for the purpose of facilitating discovery. Nothing herein shall be construed or presented as a judicial determination that any specific document or item of information designated as CONFIDENTIAL by counsel is subject to protection under Rule 26(c) of the Federal Rules of Civil Procedure or otherwise until such time as a document-specific ruling shall have been made.

13. **Persons Bound.** This Order shall take effect when entered and shall be binding upon: (1) counsel who signed below and their respective law firms; and (2) their respective clients.

IT IS SO ORDERED.

s/J. Michelle Childs
UNITED STATES DISTRICT JUDGE

February 18, 2020
Columbia, South Carolina

**ATTACHMENT A**
**CERTIFICATION BY COUNSEL OF DESIGNATION OF INFORMATION AS CONFIDENTIAL**

**IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF SOUTH CAROLINA ROCK HILL DIVISION**

| | | |
|---|---|---|
| Harry Pennington III and Timothy Lorentz, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>Fluor Corporation, Fluor Enterprises, Inc., Fluor Daniel Maintenance Services, Inc., SCANA Corporation, and South Carolina Electric & Gas Company,<br><br>Defendants. | ) | C/A No. 0:17-cv-02094-JMC |
| Lawrence Butler, Lakeisha Darwish, and Jimi Che Sutton,<br><br>Plaintiffs,<br><br>v.<br><br>Fluor Corporation and Fluor Enterprises, Inc.,<br><br>Defendants. | ) | C/A No. 0:17-cv-02201-JMC |

**CERTIFICATION BY COUNSEL OF DESIGNATION OF INFORMATION AS CONFIDENTIAL**

Documents produced herewith **[whose bates numbers are listed below (or) which are listed on the attached index]** have been marked as CONFIDENTIAL subject to the Confidentiality Order entered in this action which Order is dated [confidentiality order date].

By signing below, I am certifying that I have personally reviewed the marked documents and believe, based on that review, that they are properly subject to protection under the terms of Paragraph 3 of the Confidentiality Order.

Check and complete one of the two options below.

❑        I am a member of the Bar of the United States District Court for the District of
         South Carolina. My District Court Bar number is [District Court Bar #].

❑        I am not a member of the Bar of the United States District Court for the District of
         South Carolina but am admitted to the bar of one or more states.  The state in
         which I conduct the majority of my practice is [state in which I practice most]
         where my Bar number is [that state's Bar #]. I understand that by completing this
         certification I am submitting to the jurisdiction of the United States District Court
         for the District of South Carolina as to any matter relating to this certification.

Date:   [date attachment A signed]                    [Signature of Counsel [s/name]]
                                                      Signature of Counsel

                                                      [Printed Name of Counsel [A]]
                                                      Printed Name of Counsel

**ATTACHMENT B**

**ACKNOWLEDGMENT OF UNDERSTANDING**
**AND**
**AGREEMENT TO BE BOUND**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**ROCK HILL DIVISION**

| | |
|---|---|
| Harry Pennington III and Timothy Lorentz, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>Fluor Corporation, Fluor Enterprises, Inc., Fluor Daniel Maintenance Services, Inc., SCANA Corporation, and South Carolina Electric & Gas Company,<br><br>Defendants. | C/A No. 0:17-cv-02094-JMC |
| Lawrence Butler, Lakeisha Darwish, and Jimi Che Sutton,<br><br>Plaintiffs,<br><br>v.<br><br>Fluor Corporation and Fluor Enterprises, Inc.,<br><br>Defendants. | C/A No. 0:17-cv-02201-JMC |

**ACKNOWLEDGEMENT OF UNDERSTANDING**
**AND AGREEMENT TO BE BOUND**

The undersigned hereby acknowledges that he or she has read the Confidentiality Order dated [confidentiality order date], in the above captioned action, understands the terms thereof, and agrees to be bound by such terms. The undersigned submits to the jurisdiction of the United States District Court for the District of South Carolina in matters relating to the Confidentiality Order and understands that the terms of said Order obligate him/her to use discovery materials

designated CONFIDENTIAL solely for the purposes of the above-captioned action, and not to disclose any such confidential information to any other person, firm or concern.

The undersigned acknowledges that violation of the Stipulated Confidentiality Order may result in penalties for contempt of court.

Name: [undersigned name [att B]]

Job Title: [Job Title [att B]]

Employer: [Employer [att B]]

Business Address: [Business Address [att B]]

Date: **[date attachment B signed]**

[Signature [attachment B]]
Signature

**ATTACHMENT C**

**CERTIFICATION OF COUNSEL OF NEED FOR ASSISTANCE OF PARTY/EMPLOYEE**

**IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF SOUTH CAROLINA ROCK HILL DIVISION**

Harry Pennington III and Timothy Lorentz, on behalf of themselves and all others similarly situated,

Plaintiffs,

v.

Fluor Corporation, Fluor Enterprises, Inc., Fluor Daniel Maintenance Services, Inc., SCANA Corporation, and South Carolina Electric & Gas Company,

Defendants.

C/A No. 0:17-cv-02094-JMC

Lawrence Butler, Lakeisha Darwish, and Jimi Che Sutton,

Plaintiffs,

v.

Fluor Corporation and Fluor Enterprises, Inc.,

Defendants.

C/A No. 0:17-cv-02201-JMC

**CERTIFICATION OF COUNSEL OF NEED FOR ASSISTANCE OF PARTY/EMPLOYEE**

Pursuant to the Confidentiality Order entered in this action, most particularly the provisions of Paragraph 6.b.2., I certify that the assistance of <u>[name of assistant [att C]]</u> is reasonably necessary to the conduct of this litigation and that this assistance requires the disclosure to this individual of information which has been designated as CONFIDENTIAL.

I have explained the terms of the Confidentiality Order to the individual named above and will obtain his or her signature on an "Acknowledgment of Understanding and Agreement to be Bound" prior to releasing any confidential documents to the named individual and I will release only such confidential documents as are reasonably necessary to the conduct of the litigation.

The individual named above is:

❑ A named party;

❑ An employee of named party [employee of named party]. This employee's job title is [employee's job title] and work address is [employee's work address].

Date: **[date attachment C signed]**

[Signature [attachment C]]
Signature

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**ROCK HILL DIVISION**

Lawrence Butler, Lakeisha Darwish, and Jimi Che Sutton,

Plaintiffs,

v.

Fluor Corporation and Fluor Enterprises, Inc.,

Defendants.

Civil Action No.: 0:17-cv-02201-JMC

---

Harry Pennington III and Timothy Lorentz, individually and on behalf of all those similarly situated,

Plaintiffs,

v.

Fluor Corporation, Fluor Enterprises, Inc., Fluor Daniel Maintenance Services, Inc., SCANA Corporation, and South Carolina Electric & Gas Company,

Defendants.

Civil Action No.: 0:17-cv-02094-JMC

**ORDER**

Pending before the court are six substantially similar Motions for Protective Order in two related cases: *Butler et al v. Fluor Corporation et al*, 0:17-cv-02201-JMC ("Butler") and *Pennington et al v. Flour Corporation et al*, 0:17-cv-02094-JMC ("Pennington"). Non-party movants Stephen Byrne, Jimmy Addison, and Kevin Marsh (collectively, "Movants") seek protective orders based on their recent invocations of the Fifth Amendment during deposition

testimony. (ECF Nos. 175, 178, 179 (Butler); 220, 222, 223 (Pennington).) No party in either case has offered a position on the pending motions. For the reason below, the court **GRANTS** the Motions for Protective Order. (ECF Nos. 175, 178, 179 (Butler); 220, 222, 223 (Pennington).)

## I. DISCUSSION

Movants contend that, at their respective depositions for the instant civil cases, they were repeatedly "asked questions that go directly to the core of the Department of Justice's ongoing criminal investigation into the construction and abandonment of the V.C. Summer nuclear project," the answers to which could have been used against each Movant in a subsequent criminal prosecution. (ECF No. 175 at 3 (Butler); 220 at 3 (Pennington).)

It is well known that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. A witness may assert this Constitutional privilege in a civil proceeding to protect the witness "against any disclosures which the witness reasonably believes could be used in a criminal prosecution or could lead to other evidence that might be so used." *Kastigar v. United States*, 406 U.S. 441, 444-45 (1972). Invocation of the Fifth Amendment ensures that an individual will not be compelled to produce evidence against himself in a later criminal proceeding. *See Maness v. Meyers*, 419 U.S. 449, 461 (1975); *see United States v. Riley*, 920 F.3d 200, 207 (4th Cir.), *cert. denied*, 140 S. Ct. 391 (2019); *cf. United States v. Miller*, 434 F. App'x 287, 292 (4th Cir. 2011) (noting "[t]he Supreme Court has 'broadly construed' the protection afforded by the Fifth Amendment privilege against self-incrimination") (citation omitted).

South Carolina Local Civil Rule 30.04(c) provides that when counsel directs a witness not to answer a question, counsel shall move the court for a protective order under Federal Rule of Civil Procedure 26(c) or 30(d)(3) within seven days of the termination of the deposition. Failure to timely file such a motion constitutes a waiver of the objection and "the deposition may be

reconvened." Local Civil Rule 30.04(c) DSC; *Motsinger v. Nationwide Mut. Ins. Co.*, No. 4:11-CV-01734-JMC, 2013 WL 2242447, at *1 (D.S.C. May 21, 2013).

Here, the court finds Movants properly invoked their Fifth Amendment privileges. It seems reasonable that Movants declined to answer questions purported to be "at the core of" an ongoing criminal investigation into the underlying facts of the instant civil case, as such answers could be used in a later criminal proceeding. Moreover, the parties have offered no opposition to the pending motions. The court thus grants the Motions for Protective Order as set forth below.

## II. CONCLUSION

Accordingly, the court **GRANTS** the Motions for Protective Order for movants Stephen Byrne, Jimmy Addison, and Kevin Marsh in *Butler et al v. Fluor Corporation et al*, 0:17-cv-02201-JMC (ECF Nos. 175, 178, 179), and **GRANTS** the Motions for Protective Order for movants Stephen Byrne, Jimmy Addison, and Kevin Marsh in *Pennington et al v. Flour Corporation et al*, 0:17-cv-02094-JMC. (ECF Nos. 220, 222, 223.)

**IT IS SO ORDERED.**

J. Michelle Childs
United States District Judge

August 31, 2020
Columbia, South Carolina

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
ROCK HILL DIVISION**

Harry Pennington III and Timothy Lorentz, on behalf of themselves and all others similarly situated,

Plaintiffs,

v.

Fluor Corporation, Fluor Enterprises, Inc., Fluor Daniel Maintenance Services, Inc., SCANA Corporation, and South Carolina Electric & Gas Company,

Defendants.

C/A No. 0:17-cv-02094-JMC

Lawrence Butler, Lakeisha Darwish, and Jimi Che Sutton,

Plaintiffs,

v.

Fluor Corporation and Fluor Enterprises, Inc.,

Defendants.

C/A No. 0:17-cv-02201-JMC

**FLUOR DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, Defendants, Fluor Corporation,[1] Fluor Enterprises, Inc., and Fluor Daniel Maintenance Services, Inc. (collectively "Fluor"), by and through their undersigned counsel, respectfully move this Court for an Order granting summary judgment on Plaintiffs' claims alleging a violation of the Worker Adjustment

[1] Fluor Corporation did not have any employees assigned to the Project, as Fluor Corporation does not have any employees. *See* Ex. 45, Philpott Decl. ¶3; Ex. 20, Cartee Decl. ¶3. Therefore, Fluor Corporation should be dismissed because it does not have 100 employees as required to be covered by the WARN Act. *See* 29 U.S.C. §§ 2101(a)(1), 2102.

and Retraining Notification Act, 29 U.S.C. §§ 2101 *et seq.* ("WARN Act"). Summary judgment is appropriate with respect to all of Plaintiffs' claims on the grounds that there exists no material issue of fact.

Fluor requests that the Court grant summary judgment on Plaintiffs' claims for the following reasons:

1. Fluor did not order the closure of the Project and, therefore, cannot be held liable under the WARN Act;

2. The abandonment of the Project on July 31 constituted an unforeseeable business circumstance with respect to Fluor, and Fluor provided notice to affected employees as soon as practicable following the closure;

3. Affected craft employees were notified of the temporary status of the project and, therefore, were not entitled to additional advance notice of the closure;

4. Plaintiffs' single employer theory is unsupportable because Fluor and SCANA were not a single employer under the WARN Act. The WARN Act was not designed to impute liability to a subcontracting party as Plaintiffs advocate here; and/or

5. Fluor acted in good faith and, therefore, even if Fluor violated the WARN Act, the Court should exercise its discretion to eliminate or reduce any award of damages.

This Motion is based on the grounds and authorities set forth more fully in the accompanying Memorandum in Support of Motion for Summary Judgment, as well as the deposition testimony, sworn declarations, and other exhibits filed herewith.

**FISHER & PHILLIPS LLP**

s/ J. Hagood Tighe
J. Hagood Tighe (FID 6506)
htighe@fisherphillips.com
Matthew R. Korn (FID 11579)

mkorn@fisherphillips.com
1320 Main Street, Suite 750
Columbia, South Carolina 29201
Phone: (803) 255-0000
Fax: (803) 255-0202

David R. Kresser
(Admitted *pro hac vice*)
dkresser@fisherphillips.com
1074 Peachtree Street, NE, Suite 3500
Atlanta, GA 30309
Phone: (404) 240-4221

COUNSEL FOR FLUOR DEFENDANTS

Dated this 2nd day of October, 2020.

# EXHIBIT 1

| Issues/Facts | Testimony |
| --- | --- |
| **I. PLAINTIFFS' OWN TESTIMONY UNDERMINES THEIR SINGLE EMPLOYER THEORY** | |
| **A. THERE WAS NO DE FACTO EXERCISE OF CONTROL** | |
| **1. SCANA Had an Oversight Role and Did Not Direct Work Performed by Fluor Employees.** | **Pennington** Dep. (Ex. 2) 68:24-69:9; 90:11-93:17; 99:17-100:2<br>**Lorentz** Dep. (Ex. 3) 29:16-20; 100:14-17; 107:2-5; 158:21-23; 160:7-24; 165:5-16<br>**Tate** Dep. (Ex. 4) 63:23-64:2<br>**Bland** Dep. (Ex. 5) 56:25-57:8; 82:18-84:2<br>**Cavalieri** Dep. (Ex. 6) 99:10-15; 103:18-21; 113:14-23; 231:10-24; 232:13-24; 237:7-11; 252:6-13; 256:1-7; 265:3-17<br>**Donahoe** Dep. (Ex. 7) 52:24-53:15; 96:15-98:4; 129:14-21<br>**Dunne** Dep. (Ex. 8) 128:23-129:5<br>**Sauer** Dep. (Ex. 9) 31:19-32:23; 45:20-46:6; 52:15-20; 59:12-61:13; 83:19-84:25; 92:10-17 |
| **2. Fluor Provided Day-To-Day Instructions and Supervision to Fluor Employees, Not SCANA.** | **Butler** Dep. (Ex. 10) 57:2-59:23; 60:17-20; 114:21-117:5<br>**Darwish** Dep. (Ex. 11) 69:10-21; 100:17-20<br>**Sutton** Dep. (Ex. 12) 48:5-49:5; 66:10-67:8<br>**Tate** Dep. (Ex. 4) 64:3-6<br>**Bland** Dep. (Ex. 5) 57:4-6<br>**Cavalieri** Dep. (Ex. 6) 255:18-24<br>**Donahoe** Dep. (Ex. 7) 128:14-129:13<br>**Dunne** Dep. (Ex. 8) 128:17-22; 129:17-21<br>**Sauer** Dep. (Ex. 9) 78:15-22 |
| **3. Fluor Determined Work Shifts of Fluor Employees, Not SCANA.** | **Butler** Dep. (Ex. 10) 48:20-49:25<br>**Darwish** Dep. (Ex. 11) 62:21-23<br>**Sutton** Dep. (Ex. 12) 55:4-6; 61:6-8<br>**Tate** Dep. (Ex. 4) 59:20-23; 60:4-6<br>**Bentz** Dep. (Ex. 13) 103:18-23<br>**Bland** Dep. (Ex. 5) 50:22-24; 94:4-6<br>**Donahoe** Dep. (Ex. 7) 72:12-73:15; 92:19-22; 93:14-16; 131:11-16<br>**Dunne** Dep. (Ex. 8) 67:2-12; 124:3-19<br>**Sauer** Dep. (Ex. 9) 47:25-48:16 |

# EXHIBIT 1

| Issues/Facts | Testimony |
|---|---|
| **4. Fluor Disciplined Fluor Employees, Not SCANA.** | **Butler** Dep. (Ex. 10) 70:21-72:14<br>**Lorentz** Dep. (Ex. 3) 163:11-19<br>**Darwish** Dep. (Ex. 11) 72:23-73:22<br>**Sutton** Dep. (Ex. 12) 90:15-20<br>**Tate** Dep. (Ex. 4) 73:6-8<br>**Bentz** Dep. (Ex. 13) 111:18-24; 113:22-115:1<br>**Bland** Dep. (Ex. 5) 64:12-24<br>**Cavalieri** Dep. (Ex. 6) 254:15-17<br>**Donahoe** Dep. (Ex. 7) 60:10-61:24; 67:10-70:5; 130:13-21<br>**Keen** Dep. (Ex. 14) 88:9-11<br>**Sauer** Dep. (Ex. 9) 62:1-3 |
| **5. Employees' Day-To-Day Activities and Supervisors Did Not Change After WEC Bankruptcy.** | **Lorentz** Dep. (Ex. 3) 110:16-19<br>**Sutton** Dep. (Ex. 12) 115:12-116:15<br>**Bland** Dep. (Ex. 5) 75:13-25<br>**Cavalieri** Dep. (Ex. 6) 104:3-9<br>**Donahoe** Dep. (Ex. 7) 82:21-83:6<br>**Dunne** Dep. (Ex. 8) 142:20-22<br>**Butler** Dep. (Ex. 10) 116:4-23<br>**Keen** Dep. (Ex. 14) 55:7-11<br>**Sauer** Dep. (Ex. 9) 78:8-22 |
| **B. THERE WAS NO UNITY OF PERSONNEL POLICIES FROM A COMMON SOURCE** | |
| **1. Fluor Hired and Trained Its Own Employees.** | **Pennington** Dep. (Ex. 2) 64:21-23<br>**Butler** Dep. (Ex. 10) 32:12-20; 35:24-36:4; 42:10-45:6<br>**Lorentz** Dep. (Ex. 3) 160:25-162:1<br>**Sutton** Dep. (Ex. 12) 26:15-27:9; 30:20-31:10, 41:13-43:4<br>**Tate** Dep. (Ex. 4) 44:7-23; 47:17-22<br>**Bentz** Dep. (Ex. 13) 59:24-60:1; 86:4-7; 160:20-161:15<br>**Bland** Dep. (Ex. 5) 25:23-25; 35:7-36:17<br>**Cavalieri** Dep. (Ex. 6) 176:22-177:21; 253:16-25; 254:6-8<br>**Donahoe** Dep. (Ex. 7) 30:9-32:2; 40:6-21; 41:15-21; 129:22-130:8<br>**Dunne** Dep. (Ex. 8) 29:12-35:2<br>**Sauer** Dep. (Ex. 9) 38:11-40:24; 66:10-14 |

# EXHIBIT 1

| Issues/Facts | Testimony |
| --- | --- |
| **2. Fluor Paid and Provided Benefits to Its Own Employees.** | **Butler** Dep. (Ex. 10) 35:17-20; 50:1-53:19; 62:3-66:9; 140:22-141:21<br>**Pennington** Dep. (Ex. 2) 75:14-21; 86:10-19; 125:15-126:5; 131:12-19<br>**Sutton** Dep. (Ex. 12) 49:15-18; 55:14-19; 58:3-7; 68:18-21; 70:15-25; 117:15-118:12; 133:16-134:7<br>**Tate** Dep. (Ex. 4) 48:17-49:18; 72:24-73:1; 84:23-85:4; 86:21-87:2<br>**Bentz** Dep. (Ex. 13) 57:13-21; 79:1-80:24; 84:13-85:9; 92:6-18; 108:25-109:2<br>**Bland** Dep. (Ex. 5) 33:15-35:6; 49:18-50:4; 55:2-4; 61:2-3<br>**Cavalieri** Dep. (Ex. 6) 254:12-14, 21-23<br>**Donahoe** Dep. (Ex. 7) 38:16-20; 42:7-43:6; 103:10-20; 131:17-132:5<br>**Dunne** Dep. (Ex. 8) 73:20-24; 124:20-125:9; 129:24-130:7; 139:20-23<br>**Keen** Dep. (Ex. 14) 80:25-81:3; 87:13-15<br>**Darwish** Dep. (Ex. 11) 70:2-71:22<br>**Sauer** Dep. (Ex. 9) 38:11-40:24; 46:7-15; 50:1-51:3; 58:12-22; 72:24-73:4 |
| **3. Fluor Employees Interacted with Fluor HR, Not SCANA HR.** | **Butler** Dep. (Ex. 10) 39:8-21; 41:11-42:5<br>**Tate** Dep. (Ex. 4) 62:16-63:20<br>**Donahoe** Dep. (Ex. 7) 63:11-69:24<br>**Dunne** Dep. (Ex. 8) 74:16-18; 75:12-17<br>**Keen** Dep. (Ex. 14) 79:14-80:8<br>**Bland** Dep. (Ex. 5) 36:11-15; 69:1-8<br>**Bentz** Dep. (Ex. 13) 81:20-24<br>**Pennington** Dep. (Ex. 2) 131:2-9 |
| **4. Fluor Provided Performance Evaluations to Fluor Employees with No SCANA Involvement.** | **Butler** Dep. (Ex. 10) 60:5-16<br>**Lorentz** Dep. (Ex. 3) 149:11-23<br>**Darwish** Dep. (Ex. 11) 60:14-61:19<br>**Tate** Dep. (Ex. 4) 91:8-10<br>**Bentz** Dep. (Ex. 13) 111:6-8<br>**Bland** Dep. (Ex. 5) 48:16-23<br>**Cavalieri** Dep. (Ex. 6) 254:9-11<br>**Donahoe** Dep. (Ex. 7) 59:5-60:3; 62:14-16; 130:22-131:4<br>**Sauer** Dep. (Ex. 9) 50:16-51:20 |

# EXHIBIT 1

| Issues/Facts | Testimony |
|---|---|
| **5. Fluor Employees Worked Under Fluor Handbook and Work Policies.** | **Pennington** Dep. (Ex. 2) 105:8-106:16<br>**Butler** Dep. (Ex. 10) 55:2-6; 79:22-80:12; 136:8-140:5<br>**Darwish** Dep. (Ex. 11) 50:10-18<br>**Sutton** Dep. (Ex. 12) 89:2-20; 97:2-98:6; 158:19-21<br>**Tate** Dep. (Ex. 4) 48:11-16; 66:9-69:6<br>**Bentz** Dep. (Ex. 13) 87:6-92:21<br>**Donahoe** Dep. (Ex. 7) 42:15-22; 100:1-103:20<br>**Dunne** Dep. (Ex. 8) 29:12-42:12<br>**Keen** Dep. (Ex. 14) 72:18-85:6<br>**Sauer** Dep. (Ex. 9) 49:20-23; 62:11-67:3 |
| **6. Plaintiffs Are Unaware of Any SCANA Handbook or Policies That Applied to Them.** | **Lorentz** Dep. (Ex. 3) 164:21-165:4<br>**Pennington** Dep. (Ex. 2) 106:17-108:1<br>**Butler** Dep. (Ex. 10) 55:7-9; 112:3-11<br>**Darwish** Dep. (Ex. 11) 68:24-69:1<br>**Sutton** Dep. (Ex. 12) 43:14-17; 89:21-90:2<br>**Tate** Dep. (Ex. 4) 49:19-21; 69:7-15<br>**Bentz** Dep. (Ex. 13) 173:18-23<br>**Bland** Dep. (Ex. 5) 51:22-52:7<br>**Donahoe** Dep. (Ex. 7) 43:7-9<br>**Dunne** Dep. (Ex. 8) 139:20-23<br>**Keen** Dep. (Ex. 14) 79:10-13; 83:7-9; 83:24-84:2<br>**Sauer** Dep. (Ex. 9) 49:24-25; 87:24-88:1 |
| **7. Fluor Managers Approved Time Off Requests by Fluor Employees, Not SCANA.** | **Pennington** Dep. (Ex. 2) 103:21-104:6<br>**Darwish** Dep. (Ex. 11) 64:7-68:14<br>**Sutton** Dep. (Ex. 12) 81:15-87:12<br>**Tate** Dep. (Ex. 4) 61:1-12<br>**Bentz** Dep. (Ex. 13) 108:7-24<br>**Bland** Dep. (Ex. 5) 51:4-21<br>**Donahoe** Dep. (Ex. 7) 58:16-19; 96:2-4<br>**Dunne** Dep. (Ex. 8) 68:15-69:22<br>**Keen** Dep. (Ex. 14) 77:19-78:2<br>**Sauer** Dep. (Ex. 9) 48:19-49:19 |

# EXHIBIT 1

| Issues/Facts | Testimony |
|---|---|
| **8. Fluor Employees Never Claim They Were SCANA Employees.** | **Butler** Dep. (Ex. 10) 68:24-69:1<br>**Pennington** Dep. (Ex. 2) 61:14-64:20; 128:19-129:3<br>**Darwish** Dep. (Ex. 11) 30:4-6; 41:3-5; 62:10-12<br>**Sutton** Dep. (Ex. 12) 32:12-33:3; 71:6-72:9; 72:24-73:1; 135:1-4; 160:8-9; 163:2-6<br>**Tate** Dep. (Ex. 4) 40:20-21; 64:21-66:23; 71:14-23; 73:2-5<br>**Bentz** Dep. (Ex. 13) 57:8-21<br>**Bland** Dep. (Ex. 5) 81:24-82:3<br>**Dunne** Dep. (Ex. 8) 50:3-8; 120:16-18; 132:19-21; 140:2-3<br>**Keen** Dep. (Ex. 14) 78:11-15; 79:25-80:3<br>**Sauer** Dep. (Ex. 9) 31:3-10; 56:10-14; 58:8-11 |

**II. PLAINTIFF'S OWN TESTIMONY SUPPORTS FLUOR'S UBC DEFENSE**

| Issues/Facts | Testimony |
|---|---|
| **1. Plaintiffs Did Not Learn About Abandonment Until July 31, 2017.** | **Pennington** Dep. (Ex. 2) 116:9-118:11<br>**Lorentz** Dep. (Ex. 3) 112:20-113:18<br>**Butler** Dep. (Ex. 10) 86:4-24<br>**Darwish** Dep. (Ex. 11) 78:3-80:6<br>**Sutton** Dep. (Ex. 12) 91:7-92:18; 104:4-10<br>**Tate** Dep. (Ex. 4) 73:12-76:1<br>**Bentz** Dep. (Ex. 13) 122:12-20<br>**Bland** Dep. (Ex. 5) 64:25-66:14<br>**Cavalieri** Dep. (Ex. 6) 182:10-184:21<br>**Donahoe** Dep. (Ex. 7) 103:21-104:8<br>**Dunne** Dep. (Ex. 8) 97:19-100:18<br>**Keen** Dep. (Ex. 14) 85:25-87:2<br>**Sauer** Dep. (Ex. 9) 67:6-14 |
| **2. Plaintiffs Were Surprised or Shocked by Abandonment.** | **Lorentz** Dep. (Ex. 3) 167:24-168:7<br>**Butler** Dep. (Ex. 10) 86:25-87:1<br>**Darwish** Dep. (Ex. 11) 80:15-83:6<br>**Tate** Dep. (Ex. 4) 76:2-12<br>**Bentz** Dep. (Ex. 13) 133:2-5<br>**Bland** Dep. (Ex. 5) 66:15-16<br>**Cavalieri** Dep. (Ex. 6) 193:10-12<br>**Donahoe** Dep. (Ex. 7) 112:4-11<br>**Dunne** Dep. (Ex. 8) 100:19-23<br>**Sauer** Dep. (Ex. 9) 68:5-70:18 |

# EXHIBIT 1

| Issues/Facts | Testimony |
|---|---|
| **3. Plaintiffs Are Not Aware of Any Facts to Suggest Fluor Knew Abandonment Was More Likely Than Not 60 Days Before.** | **Pennington** Dep. (Ex. 2) 133:13-24<br>**Lorentz** Dep. (Ex. 3) 114:5-21<br>**Butler** Dep. (Ex. 10) 103:5-24<br>**Darwish** Dep. (Ex. 11) 93:8-94:6<br>**Tate** Dep. (Ex. 4) 79:14-22<br>**Bentz** Dep. (Ex. 13) 137:24-138:3<br>**Cavalieri** Dep. (Ex. 6) 278:19-279:1; 279:22-280:10<br>**Donahoe** Dep. (Ex. 7) 134:9-12<br>**Dunne** Dep. (Ex. 8) 110:9-12; 139:11-17<br>**Sauer** Dep. (Ex. 9) 75:1-10 |
| **4. Fluor Employees Admit to Receiving WARN Notice or Cannot Recall Whether They Received It.** | **Pennington** Dep. (Ex. 2) 122:20-124:2<br>**Darwish** Dep. (Ex. 11) 87:22-89:25<br>**Sutton** Dep. (Ex. 12) 98:7-99:10<br>**Bentz** Dep. (Ex. 13) 136:7-21; 139:5-142:14<br>**Bland** Dep. (Ex. 5) 70:18-71:15<br>**Donahoe** Dep. (Ex. 7) 123:8-22; 124:16-125:12<br>**Keen** Dep. (Ex. 14) 87:2-8<br>**Sauer** Dep. (Ex. 9) 73:5-17<br>**Butler** Dep. (Ex. 10) 97:25-98:10<br>**Tate** Dep. (Ex. 4) 77:16-78:7 |

AGREEMENT

AMENDMENT TO THE ENGINEERING, PROCUREMENT AND CONSTRUCTION AGREEMENT BETWEEN SOUTH CAROLINA ELECTRIC & GAS COMPANY, FOR ITSELF AND AS AGENT FOR THE SOUTH CAROLINA PUBLIC SERVICE AUTHORITY AND A CONSORTIUM CONSISTING OF WESTINGHOUSE ELECTRIC COMPANY LLC AND STONE & WEBSTER, INC., FOR AP1000® NUCLEAR POWER PLANTS

THIS AMENDMENT ("October 2015 Amendment") to the Engineering, Procurement and Construction Agreement dated May 23, 2008 ("EPC Agreement") for the AP1000 Power Plants at the Virgil C. Summer Nuclear Generating Station ("Project") is entered into this 27th day of October 2015, by and between South Carolina Electric & Gas Company ("SCE&G"), for itself and as agent for the South Carolina Public Service Authority ("SCPSA") (collectively "Owner") and a consortium consisting of Westinghouse Electric Company LLC ("Westinghouse") and CB&I Stone & Webster, Inc. ("Stone & Webster") (collectively "Contractor"). Owner and Contractor may be referred to individually as a "Party" and collectively as the "Parties."

WHEREAS, Westinghouse has represented to Owner that it intends to acquire the stock of Stone & Webster from Chicago Bridge & Iron ("CB&I") (the "Transaction"); that CB&I will have no further involvement in the Project except for certain supply agreements; and that Westinghouse intends to hire Fluor Corporation ("Fluor") or its affiliate(s) as a subcontracted construction manager;

In consideration of the mutual promises herein and other good and valuable consideration, the receipt and sufficiency of which the Parties acknowledge, the Parties, intending to be legally bound, stipulate and agree as follows:

1. The Parties agree that this October 2015 Amendment will be a binding obligation between Owner and Westinghouse upon the approval of the boards of directors of both Owners and the authorization of the board of SCPSA for its management to execute the necessary documentation and the execution of those documents, which shall become effective upon the consummation of the Transaction ("Effective Time"), and in the event the Transaction is not consummated by March 31, 2016, this October 2015 Amendment shall be null and void in all respects. Westinghouse shall cause its wholly owned subsidiary, Stone & Webster, to execute this October 2015 Amendment.

2. Contractor hereby grants Owner until November 1, 2016 ("Option Deadline"), the irrevocable option to exercise an agreement, subject to regulatory approvals, to amend the EPC Agreement by revising the Contract Price and other specific aspects of the EPC Agreement, as stated in the amendment that is attached as Exhibit D ("Option Amendment"). Contemporaneously with the execution of this October 2015 Amendment, Contractor will execute the Option Amendment. Thereafter, Owner may, in its sole discretion, implement the Option Amendment by executing it at any time on or before the Option Deadline. The Option Amendment will not take effect unless and until Owner executes the Option Amendment, before

the Option Deadline, and all conditions precedent to effectiveness stated in the Option Amendment are satisfied or waived by Owner.

3. Owner agrees to pay Contractor the total sum of $300,000,000 (current year U.S. Dollars) and increase the Fixed Price Contract Price by said amount. Further, Contractor agrees to provide Owner with a credit to the Target Price in the amount of $50,000,000 (current year U.S. Dollars). The net $250,000,000 will be paid in twelve equal monthly installments beginning five days after the Effective Time. In exchange, Owner and Contractor agree to a full resolution by settlement and release of any and all disputes outstanding under the EPC Agreement or otherwise concerning the Project as of the Effective Time, including the following:

a. Contractor claims for additional payments for any of the items on Exhibit A, as well as claims for additional payment for cyber security and the site layout phase 2 Change Order (Change Order 26).

b. Contractor claims for amounts referenced in letters no. VSP _ VSG_003111, VSP _ VSG_003115, VSP _ VSG_ 3145, VSP _ VSG_3502 and VSP _ VSG_3522, which totaled approximately $83,518,046 as of August 21, 2015, as set forth on Exhibit B.

c. Contractor claims for amounts in other cases in which the entitlement is in dispute, which totaled approximately $29,729,785 as of August 31, 2015, as set forth on Exhibit B.

d. Contractor claims for amounts in dispute due to billings that have been held because a Change Order has not been executed, which totaled approximately $5,565,845 as of August 31, 2015, as set forth on Exhibit B.

e. Contractor claims for all amounts in dispute in cases in which only the timing is disputed, which totaled approximately $110,190,504 as of August 31, 2015, as set forth on Exhibit B.

f. Contractor claims for the balance of 10% withheld by Owner in connection with certain invoices for which the Owner has only paid 90% because the Owner disputed the invoice

g. Owner claims for refunds in connection with invoiced amounts for which Owner has paid 90% of the invoiced amount and for which Owner had previously intended to seek a refund.

h. Owner claims arising out of the employee fuel expense audit and procurement irregularities.

Subparagraphs a through h do not provide an exhaustive list of all claims, disputes, and amounts that are satisfied by this October 2015 Amendment, it being the Parties' intent that all disputes outstanding under the EPC Agreement or concerning the Project as of the Effective Time are settled and resolved. By way of further clarifications, under this October 2015 Amendment, the Parties waive and settle any and all claims currently pending or threatened by either Party against the other Party and of any and all claims currently known or reasonably foreseeable by either Party against the other Party. Whether or not the Option Amendment becomes effective, all pending Change Orders, and formal and informal notices of potential Change Orders, including but not limited to those arising from Uncontrollable Circumstances and Changes in Law, are

hereby settled and resolved. Each Party represents and warrants to the other Party that it is not aware of the basis for any other claim against the other, including but not limited to those arising from Uncontrollable Circumstances and Changes in Law, and that it is not aware of any facts or circumstances that could be expected to give rise to a claim, the sole exceptions being those claims addressed in paragraph 4. For the avoidance of doubt, in the event that the Option Amendment becomes effective, the $300,000,000 payment and the $50,000,000 credit to the Target Price set forth in this paragraph 3 will be part of (and not in addition to) the total Fixed Price amount of $6.082 billion set forth in the Option Amendment.

The Parties shall execute a mutual release effectuating the provisions of this paragraph 3.

4. Notwithstanding the foregoing, the Parties have identified on Exhibit C to this Amendment all work items that they contend are required or contemplated for the Project but that are not included within the release contained in paragraph 3. Said work items are not resolved, settled or released under this October 2015 Amendment. The Parties shall cooperate in good faith to resolve all such work items expeditiously so as to not impact the Project. In the event a work item cannot be resolved, it shall be submitted to the Dispute Resolution Board as referenced in paragraphs 13 and 16. Similarly, with respect to the cyber security item listed in Exhibit A, the Parties shall cooperate in good faith to resolve all issues relating to scope expeditiously. Contractor acknowledges its obligation to commence and continue work in compliance with current NRC regulations on cyber security, pending issuance of a Change Order, so as not to impact the Project schedule, and its obligation to complete the Cyber Security work within the GSCDs stated in paragraph 6In the event a scope item cannot be resolved, it shall be submitted to the Dispute Resolution Board as referenced in paragraphs 13 and 16. Except for the items on Exhibit C and the Time and Material Work set forth in paragraph 2 of the Option Agreement, the cyber security item listed in Exhibit A and without waiving its rights concerning unknown Changes under Article 9 of the EPC Agreement, Contractor is not aware of any additions to the Scope of Work that will be required for the Project to reach Substantial Completion.

5. The Contractor acknowledges and agrees that its Scope of Work includes providing Owner with a Facility that meets the standards of DCD Rev. 19.

6. The Guaranteed Substantial Completion Dates ("GSCDs") are revised, as follows: August 31, 2019 for Unit 2 and August 31, 2020 for Unit 3. The Standard Equipment Warranty Period(s) and the Services Warranty Period(s) shall commence upon Substantial Completion of each Unit at no additional cost to Owner. To the extent a Change under Article 9 of the EPC Agreement adversely affects Contractor's ability to achieve Substantial Completion as provided in this paragraph 6, Contractor shall be entitled to equitable adjustment of the EPC Agreement as appropriate.

7. Section 13.1 of the EPC Agreement is revised to state that Delay Liquidated Damages for each Unit will commence on the applicable GSCDs stated in paragraph7, and will be computed as follows:

a. For the first thirty (30) days following the GSCD: $200,000/day; and

b. For the next thirty-one (31) to ninety (90) days: $300,000/day; and
c. For the next ninety-one (91) to one hundred fifty (150) days: $ 400,000/day; and
d. For the next one hundred fifty-one (151) to seven hundred thirty (730) days: $500,000/day; and
e. Seven hundred thirty-one (731) days or beyond: $0/day.

8. The Parties agree to share the loss if either or both Units do not qualify for production tax credits under Federal law. If a Unit is not "placed in service," as that term is used in Section 45J of the Internal Revenue Code, before January 1, 2021, Contractor agrees to reimburse Owner by February 1, 2021, the sum of $250 million per Unit, expressed as a one-time lump sum payment. For purposes of this paragraph, the January 1, 2021 date can only be extended for the following reasons (i) material actions or omissions of Owner that cause a Unit not to qualify for tax credits; or (ii) extension of the tax credit date by the U.S. government. If Contractor becomes aware of any actions or omissions of Owner that Contractor believes may cause a Unit not to qualify for tax credits, Contractor shall provide Owner with reasonable notice of such actions or omissions.

9. The maximum amount paid by Contractor to Owner under paragraphs 7 and 8 above will be limited to $338 million per Unit, if the Option Amendment becomes effective. In the event the Option Amendment does not become effective, the maximum amount paid by Contractor to Owner under paragraphs 7 and 8 above will be limited to $463 million per Unit.

10. Owner will pay Contractor an early completion bonus consisting of $150,000,000 per Unit for each Unit that is "placed in service," as that term is used in Section 45J of the Internal Revenue Code, in advance of January 1, 2021, if the Option Amendment becomes effective. In the event the Option Amendment does not become effective, Owner will pay Contractor an early completion bonus consisting of $275,000,000 per Unit for each Unit that is "placed in service," as that term is used in Section 45J of the Internal Revenue Code, in advance of January 1, 2021. For purposes of this paragraph, the January 1, 2021 date can only be extended for the following reasons (i) material actions or omissions of Owner that cause a Unit not to qualify for tax credits; or (ii) extension of the tax credit date by the U.S. government. If Contractor become aware of any actions or omissions of Owner that Contractor believes may cause a Unit not to qualify for tax credits, Contractor shall provide Owner with reasonable notice of such actions or omissions.

11. The Parties agree that no new Inspection, Tests, Analyses and Acceptance Criteria ("ITAACs") have been issued or proposed as of the Effective Time that would affect the GCSDs or entitle the Contractor to a Change Order.

12. The Parties shall cooperate in good faith to develop a new milestone payment schedule ("Construction Milestone Payment Schedule") to include all unpaid or overpaid amounts. While such good faith efforts are ongoing, Owner agrees to make payments to Contractor in the amount of $100,000,000 per month for the first five (5) months following the Effective Time. Said payments shall be in lieu of all payments for Fixed Price, Firm Price, Target Price and Time and Material Work. Once developed, Contractor agrees that Owner is to make such payments to Contractor according to the Construction Milestone Payment Schedule, instead of the existing Payment Schedules. If the Parties fail to agree to a Construction Milestone Payment Schedule by the date that is six months from the Effective Time, the matter shall be referred to the Dispute

Confidential Trade Secret Information - Subject to Restricted Procedures

Resolution Board ("DRB") process for resolution. Unless otherwise agreed by the Parties, the DRB shall issue its report on the Construction Milestone Payment Schedule within sixty (60) days. For the 60 day period during which the DRB is reviewing the Construction Milestone Payment Schedule, Owner shall pay the sum of $100,000,000 per month in lieu of all other payments, and such payments will be treated in the same manner as the payments referenced in paragraph 3.

Contractor will continue to invoice Owner according to previous procedures (i.e. Contractor will provide parallel invoices for Target, T&M, and Firm and Fixed Price categories) to enable calculation of the amount by which the payments described in paragraphs 3 and 12 exceed what would otherwise be due Contractor. After these advance payments cease, the excess or deficit portion of such advance payments shall be adjusted against future invoices submitted by Contractor to Owner under the EPC Agreement, at the Owner's sole discretion. Actual payments will be trued up to parallel invoices in months 6, 12 or when the Option Amendment becomes effective.

In the event that the Option Amendment is exercised and takes effect, the actual payments made under paragraphs 3 and 12 will be deducted from the amount referenced in section 1 of the Option Amendment. If the Option Amendment does not take effect, billing procedures for Target and T&M Work scopes will revert back to the EPC Agreement terms, as amended, incorporating the adjusted terms in paragraph 3 above, and Firm Price and Fixed Price scopes will continue to be billed based on the Construction Milestone Payment Schedule. For the avoidance of doubt, the cash flows of the Construction Milestone Payment Schedule will be reduced to reflect the lower amounts remaining in the Fixed Price and Firm Price categories as defined in Exhibit H of the EPC Agreement.

13. Within ten (10) days of establishing the Construction Milestone Payment Schedule, Owner shall advance a deposit of seventy-five million dollars ($75,000,000) with the Contractor.

a. After the deposit is made, Owners will not be obligated to pay to Contractor the disputed portion of any invoiced amounts submitted by Contractor to Owners.
b. The Parties shall revise the dispute resolution procedures in Article 27 of the EPC Agreement to eliminate the requirement or ability to institute litigation during the course of the Project absent a suspension or termination of the EPC Agreement.
c. The Parties shall establish a DRB process for the interim, non-final resolution of disputes, as described more fully in paragraph 16 below and Exhibit E.
d. Owner agrees to make payment to Contractor within thirty (30) days of any award entered in favor of Contractor by the DRB.
e. At Project completion, the deposit amount of $75,000,000 shall be credited against Owner's final milestone payment owed Contractor.

14. The definition of "Change in Law" in the EPC Agreement is modified so that a Change in Law occurs only in case of (a) the formal written adoption by a Government Authority of a new statute, regulation, requirement or code that did not exist as of the date of the October 2015 Amendment; or (b) where the NRC is the involved Government Authority, the NRC's official issuance or promulgation, after the date of the October 2015 Amendment, of a final and official

version of Regulatory Guides (NUREGs), Branch Technical Positions, Standard Review Plans, Interim Staff Guidance, Bulletins, Orders, or written directives, in which NRC acknowledges a new regulatory requirement or a change to an existing requirement that did not apply before the date of the October 2015 Amendment. Where Contractor cannot demonstrate a Change in Law under this paragraph, Contractor shall also be precluded from claiming that the purported Change in Law is an Uncontrollable Circumstance.

15. The Parties agree to participate in meetings with the Nuclear Regulatory Commission ("NRC") and develop strategies in an effort to alleviate issues that have arisen due to the NRC's inspections at the Project, while still affording the NRC the ability to conduct appropriate inspections. Owner cannot agree in advance to adopt the Contractor's position on every issue, but Owner will work with Contractor in good faith. In the event the Option becomes effective, Owner shall have no obligation to pay Contractor for regulatory support associated with License Amendment Requests or ITAACs, except those that arise due to a Change. In the event the Option Amendment does not become effective, such matters shall be submitted to the DRB process established pursuant to this October 2015 Amendment. For the period of time between the Effective Time and the Option Deadline, the Parties agree to suspend the DRB process for matters relating to regulatory support associated with License Amendment Requests and ITAACs. In the event the Option Amendment does not become effective, the suspended DRB matters will be administered. If the Option becomes effective, those matters suspended by the preceding sentence shall be deemed to be included in the Fixed Price.

16. Consistent with paragraph 13 above, Article 27 of the EPC Agreement is revised to eliminate the requirement or ability to bring suit during the course of the Project. The Parties agree to empanel a DRB for the interim, non-final resolution of disputes in accordance with the Dispute Resolution Agreement that is attached as Exhibit E.

17. Owner hereby waives and cancels the Chicago Bridge & Iron Parent Company Guaranty. Owner agrees that Contractor shall be relieved of any obligation to furnish a parent company guaranty on behalf of S&W under the EPC Agreement. Owner and CB&I shall execute a mutual release of all claims relating to the EPC Agreement, the Project, the S&W Parent Guarantee and the CB&I Guarantee.

18. The Parties agree to hold a face-to-face meeting among Owner, Westinghouse, the President and Chief Executive Officer of Power Systems Company, and Mr. Shiga Shigenori, the Representative Executive Officer and Corporate Senior Executive Vice President of Toshiba Corporation (or his successor) to allow Owner to describe its concerns with the Project to date and to discuss Toshiba's commitment to completing the Project and to the terms of this Agreement. In addition, at Owner's option, Toshiba, Owner, Contractor, and Fluor will hold quarterly meetings to discuss Project progress.

19. Contractor's profit on any future Change Orders under the EPC Agreement shall be capped at 7 ¾%.

20. The Parties agree that Article 13.3 is deleted from the EPC Agreement.

21. The provisions of Section 8.6(d) of the EPC Agreement are revised to provide that SCE&G or Santee Cooper shall not be required to furnish Contractor with an irrevocable, standby letter of credit, provided the Credit Rating of SCE&G or Santee Cooper, as applicable, remains at or above investment grade (Standard and Poor's BBB-; Moody's Baa3). If the Credit Rating of SCE&G or Santee Cooper falls below investment grade, Contractor may request the letter of credit, and SCE&G or Santee Cooper must furnish the letter of credit at no expense to Contractor.

22. The Parties agree to cooperate with respect to the involvement of Owner's Project consultant and/or Owner's Engineer with the work scheduled to be done by Owner's consultant.

a. Contractor shall carefully consider all matters raised by the consultant, however the consultant shall have no authority to direct the Work of Contactor.
b. Contractor agrees to provide the consultant with access to relevant documents reasonably requested by the consultant, provided such documents are necessary for the consultant to complete its work for Owners.
c. For relevant documents provided under subparagraph (b) above, Contractor may provide confidential and proprietary documents in redacted form, including redaction of any pricing information. Contractor will provide unredacted documents to the consultant, provided Contractor determines in its reasonable discretion that it is given suitable protections from Owners and/or the consultant against misuse or further disclosure of such documents.

23. Contractor acknowledges Owner's right to discuss any and all operational and project execution issues with the Vogtle owners. Owner is not permitted to disclose to the Vogtle owners information relating to any disputes, commercial issues or the terms and conditions of this agreement and any related documents or agreements.

24. All capitalized terms in this October 2015 Amendment, except for those defined in this October 2015 Amendment, shall have the meanings given to them in the EPC Agreement.

25. All provisions of the EPC Agreement not modified, expressly or by necessary implication, remain in full force and effect. All Exhibit references are to this October 2015 Amendment.

26. While the Parties acknowledge the existence of various confidentiality agreements between themselves, they also recognize that certain disclosures must be made to satisfy various securities laws and for regulatory purposes. Each Party is free to make such disclosures as it deems prudent, but the disclosing Party must provide a copy of any intended written disclosure to the other Parties before such disclosure is made.

27. Upon execution of this October 2015 Amendment, Contractor will provide written details of its relationship and structure with Fluor, including a scope of work description, sufficient to allow the Owner to understand the roles and responsibilities of Fluor on the Project. In the event of a material change in the relationship, structure, or scope, Contractor will provide details of the

change. In the event the Option Amendment does not become effective, Contractor shall submit construction related billings consistent with the existing provisions of the EPC Agreement.

28. To the extent not prohibited by its existing contracts, Contractor agrees to afford Owner and Owner's consultant access to its facilities and those of its suppliers and subcontractors at any tier, for the purpose of completing Owner's consultant's assessment and monitoring of the Project and the Project Schedule.

29. In the form of Exhibit F, Contractors will provide written consent of Toshiba Corporation to this October 2015 Agreement, affirming that the corporate guaranty of Toshiba remains in place, notwithstanding this October 2015 Agreement. This signed exhibit must be provided to Owner's prior to the Effective Time.

[Balance of Page Intentionally Blank]

USCA4 Appeal: 21-1141 Doc: 30-1 Filed: 04/19/2021 Pg: 483 of 563
0:17-cv-02094-JMC Date Filed 10/02/20 Entry Number 233-30 Page 9 of 38

Confidential Trade Secret Information - Subject to Restricted Procedures

**IN WITNESS WHEREOF**, the Parties have duly executed this October 2015 Amendment to the EPC Agreement as of the date first above written, with Toshiba Corporation, as the parent corporation of Westinghouse, indicating its express consent hereto.

SOUTH CAROLINA ELECTRIC & GAS COMPANY, for itself and as agent for South Carolina Public Service Authority
By:
Name: [signature]
Title: Chairman + CEO

WESTINGHOUSE ELECTRIC COMPANY LLC
By:
Name: ____________________
Title: ____________________

STONE & WEBSTER, INC.
By:
Name: ____________________
Title: ____________________

9

SCANA_DEFS_000471

JA 451

USCA4 Appeal: 21-1141 Doc: 30-1 Filed: 04/19/2021 Pg: 484 of 563
3:17-cv-02094-JMC Date Filed 10/02/20 Entry Number 233-30 Page 10 of 38

Confidential Trade Secret Information - Subject to Restricted Procedures

**IN WITNESS WHEREOF**, the Parties have duly executed this October 2015 Amendment to the EPC Agreement as of the date first above written, with Toshiba Corporation, as the parent corporation of Westinghouse, indicating its express consent hereto.

SOUTH CAROLINA ELECTRIC & GAS COMPANY, for itself and as agent for South Carolina Public Service Authority
By:
Name: ____________________
Title: ____________________

WESTINGHOUSE ELECTRIC COMPANY LLC
By:
Name: [signature]
Title: President & Chief Executive Officer

STONE & WEBSTER, INC.
By:
Name: ____________________
Title: ____________________

9

SCANA_DEFS_000472

JA 452

USCA4 Appeal: 21-1141 Doc: 30-1 Filed: 04/19/2021 Pg: 485 of 563
0:17-cv-02094-JMC Date Filed 10/02/20 Entry Number 233-30 Page 11 of 38

# Exhibit A

SCANA_DEFS_000473

JA 453

## Exhibit A

| Count | Issue | Issue Description | Deliverable |
|---|---|---|---|
| 29 | CAS and PRS Support | Primarily due to delayed design completion, the simulators delivered by the Consortium (intended to be PRSs) to the Owner do not have the functionality to support being certified by the Nuclear Regulatory Commission. As a result, the Owner has had to pursue the CAS alternative due primarily to repeated delays in ISV testing by the Consortium, which have most recently impacted the completion of ISV testing in time to support the Owner NRC exams that had been scheduled to occur in May 2015. This issue puts at risk the Owner's ability to train and certify operators in time to support Units 2 and 3 fuel loads. | (1) At no additional cost to Owner, Westinghouse to provide a Commission Approved Simulator to include: All fixes as identified to support a successful CAS implementation (fixes delivered, support to install, and fixes to fixes as necessary); End state deliverable is a simulator ready and capable of conducting license operator exams<br><br>(2) If CAS is unsuccessful, at no additional cost to Owner, WEC to provide: All ISV/HEDs (Priority 1 and 2 ) fixed and included in a baseline 7+ simulator capable of closing the ISV ITAAC by June 2017; The HFE/ISV ITAAC should be closed such that we can answer the question in the NRC Inspection Procedure IP41502 for PRS "Is the ISV ITAAC closed?" Yes; The simulator must be delivered to site by June 2017; Success will be measured by successful completion of Inspection Procedure 41502 by NRC Region II resulting in us having a PRS<br><br>(3) If CAS is successful, at no additional cost to Owner, Westinghouse to provide: All ISV/HEDs (Priority 1 and 2 ) fixed and included in a baseline 8 simulator capable of closing the ISV ITAAC by Mar 2018; The HFE/ISV ITAAC should be closed such that we can answer the question in the NRC Inspection Procedure IP41502 for PRS "Is the ISV ITAAC closed?" Yes; The simulator must be delivered to site by March 2018; Success will be measured by successful completion of Inspection Procedure 41502 by NRC Region II resulting in us having a PRS.<br><br>(4) Commercially, CAS, CAS fixes and BL7+ ITAAC closure (if necessary) is all part of completion of ISV and delivery of a BL7 simulator and as such is already a paid for deliverable. As part of that, the BL8 Fuel Load baseline should be considered the deliverable for CO #19. |
| 30 | Design Basis Assessments (5 included in the scope) | Licensing and Regulatory compliance reviews of high risk portions of the AP1000 design is to uncover License and Regulatory noncompliance issues prior to Construction to preclude delays to Project completion similar to those encountered during construction of the Nuclear Island basemat in 2012. The results of these reviews have uncovered License noncompliance issues including Tier 1 and Tier 2* issues and successfully mitigated them through a Licensing or design change without adverse impact to the Project schedules. It is likely that these items would not have been uncovered prior to Construction without the undertaking of these reviews. It is also likely that, if these items were uncovered after Construction had commenced, work delays of multiple months would have been experienced while the issues were resolved. Westinghouse contends that the AP1000 design is consistent with all requirements of the Licensing Basis and that assessments are unnecessary.<br><br>Westinghouse has charged the Owners for support necessary to perform the assessments citing that no assessments were necessary. SCE&G believes that the value of the assessments to the Projects and to Westinghouse have been demonstrated. In addition to the benefits of reduced schedule and regulatory risk mentioned above, Westinghouse receives the benefit of independent assessment of key areas of the AP1000s unique design. | SCE&G requests that Westinghouse move forward with assessments (five additional assessments are desired) and cover their internal costs such that each Party participating in the review is responsible for its own cost. In this manner, each Party shares in the costs and benefits through reduced Project schedule risk and reduced regulatory risk. |
| 31 | WEC home office and site licensing efforts | For Contractor initiated Design Changes, processing Contractor's desired changes to the design and licensing basis is resource intensive. The Contractor has initiated and processed thousands of DCPs and hundreds of LCPs. Changes are made at the request of the Contractor for convenience or in order to address challenges within the Contractor's original design that was purchased by the Owner under the EPC Agreement. The Owner has incurred considerable cost to process Contractor's desired changes to the VCS 2/3 licensing basis. Such changes are made for the Contractor's convenience. The EPC did not account for the changes to the licensing basis requested by the Contractor. The EPC was based on Owner purchase of a design from the Contractor and the Owner has incurred costs to allocate resources and obtain additional contract assistance in order to support Contractor requested changes. In addition, Contractor has requested reimbursement of expenses for implementing changes to the extent that work relates to site-specific Tier 1, Tier 2*, COL, or Tech Spec requirements. An example is the EP ITAAC Table 7.5-1 and 7.5-201 in COL Appendix C. These tables were cited by the NRC as an EP ITAAC to show required plant equipment to support EP. This equipment was also described in the DCD and if changed by the Contractor requires a site specific supporting change to the COL. | Subject to Paragraph 15 of the October 2105 Amendment, Westinghouse should be responsible for its costs incurred to make changes to the Owner's Current Licensing Basis (CLB), attributable to its DCPs and LCPs. This includes efforts to resolve Owner comments prior to incorporation of change into the VCS 2/3 CLB, whether made on a draft or final revision of the proposed change package. It is reasonable to expect that some changes may require multiple comment review cycles due complexity and number of parties involved. Westinghouse should also be responsible for its costs incurred for implementing changes to the extent that work relates to site-specific Tier 1, Tier 2*, COL or Tech Spec requirements. The Owner will be responsible for Owner-directed changes. |
| 32 | WEC's position on CB&I Service claim against WEC for CV costs (delay and other) | CB&I Services (WEC's subcontractor) Containment Vessel safety-related Work was delayed from January 19, 2011 through July 31, 2011. WEC invoiced the Owner $1,405,811.35 (Target Price). CB&I Services' work was delayed due to CB&I Services' ineffective QA program; Westinghouse and its subcontractors are required to have a QA program that meets the requirements of the EPC Agreement. The Owner should not be liable for any charges associated with a delay period during which CB&I Services had to take actions necessary to meet its contractual QA program obligations. | WEC should retract this invoice as no longer owed by the Owner. Whatever settlement WEC reached with CB&I Services associated with this delay should remain between WEC and its subcontractor. No further invoices will be issued to Owner related to the costs for schedule delay impacts on the CV unless related to a Change under Article 9 of the EPC Agreement. |
| 33 | Secondary Lab and Sampling Room in Turbine Building | Per Exhibit A of the EPC Agreement, the Turbine Building is to be provided as a complete structure and finishes inclusive of all equipment, components and commodities. Consortium's position is that they are entitled to a Change Order for the completion of Secondary Chemistry Laboratory including utilities (e.g. gas lines, water lines, faucets, drain lines, electrical outlets) and fixtures (e.g. sampling panels, fume hood, sinks, high purity water treatment unit) to be located in the laboratory that interface with multiple plant systems including the Main AC power System, Waste Water System, Potable Water System, Demineralized Water System, and the Turbine Building Ventilation System. | The Consortium should supply the secondary chemistry lab furnished to the scope of supply outlined in the attachment titled "Secondary Chemistry Lab Scope of Supply" attached to SCE&G letter NND-15-0085 dated February 4, 2015. |

| | | | |
|---|---|---|---|
| 34 | Site inspections and Vendor Inspections by NRC | For site inspections performed by the NRC, because the Contractor is responsible for design, construction, and testing of the AP1000 and maintains responsibility for the Facility Information during construction, the Contractor is obligated to provide knowledgeable personnel to support NRC inspections associated with design, construction and testing. These personnel may include subject matter experts whose work location is off site. From time to time, certain inspections may be generic in nature or rely solely on software/services. For these inspections it may be most effective, for all parties, to execute the inspection at the specific Contractor work location. This location may be off site at a contractor facility. For inspections performed by the NRC at Contractor's vendor facilities, it is the Owner's reasonable expectation that the Contractor and Contractor's vendors retain responsibility of Vendor inspection support. There has been no Change in Law since agreement of EPC. In fact, the NRC specifically identified their intended vendor inspection activities to include ITAAC on 6/27/2007 through SECY-07-0105. The inspections performed at vendors assure compliance with Appendix B and 10CFR21 as required by procurement documents. These inspections are not intended to confirm ITAACs but to ensure the associated QA activities are implemented in accordance with Appendix B. | At no additional cost to Owner, Westinghouse to provide the Owner with all information requested by NRC inspectors and any information requested by the Owner to properly prepare for the inspection, in addition to routine oversight. Westinghouse will need to coordinate with their vendors, as needed, to address NRC questions related to ITAAC associated activities performed by vendors or sub-vendors. For any NRC violations requiring licensee response, related to work activities within Contractor scope, the Contractor will provide information to Owner as requested by Owner to respond and address the violation. Depending on significance, these activities may require additional engineering effort or re-work in the field. For Conditions Adverse to Quality (CAQ) which have been evaluated for 10 CFR 50.55(e) reportability or are associated with an NRC Finding, the Contractor is obligated to provide any Causal Analysis which has been performed for Owner review to support any follow up. The NRC expectation is that in accordance with 10 CFR 52.99, the Owner considers vendor inspection findings during ITAAC closure. As such, the Owner expects Contractor to share information pertaining to vendor/contractor notices of nonconformance identified by NRC and their resolution to support ITAAC closure. It is also reasonable that the Contractor share inspection results with the Owner after inspection exit to ensure the Owner can capture any issues potentially affecting ITAAC into the Corrective Action Program in a timely manner. Finally, the nature of the standard plant design obliges the Contractor to successfully manage NRC vendor inspections to support construction and operation of the first AP 1000 plants. |
| 35 | ID/labeling of subcomponents | Labeling of the plant is a Consortium (construction) responsibility as outlined in the Agreement, related Project Execution Plans, and other related Project documents. In accordance with Exhibit A.2, titled "Phase II," of the Agreement, the Consortium is to provide the Owner with "one (1) or two (2) complete AP1OOO Nuclear Power Plant Units ...except for those items listed in Table 1 as Owner's Responsibility." This section further describes the AP1000 Nuclear Power Plant Units as the Standard Plant description as described in Revision 16 of the AP1000 Design Control Document (DCD). Section 18.8.4.1.9 of Revision 16 of the AP1000 DCD, titled "Coding and Labeling, states the following as it relates to labeling of components: "Equipment located in the AP1000 has a unique identifier and plant descriptive name. The configuration management system includes the identification of the equipment in the plant. Each component is assigned an identifier during the design process. The identifier is maintained through manufacturing, construction, and operation. The components are labeled according to the assigned identifier. These labels help avoid errors in operating or working on the wrong equipment and in reporting problems or conditions observed in the plant. The labels help reduce the training burden for operating and maintenance personnel. Color, syntax, abbreviations and symbols are consistently applied. The labels are located in an easily visible location on the component and are not hidden by insulation, equipment covers, or surrounding equipment. Labels are fastened to the component to prevent easy detachment of the label." APP-GW-GZP-002, "AP1000 Component Identification Labeling Procedure" contains guidance for Project groups to use in developing and affixing component identification and operator aid labels. This document lays out roles and responsibilities, label content, label material, and label placement. This procedure has been reviewed and endorsed by the Owner as an acceptable method for labeling the AP1000 Plant. Further review of the Project Execution Plans for System Turnover (APP-GW-GBH-350, Rev. 0) indicate that all system tagging labeling installation is a pre-requisite responsibility of Construction prior to turnover to Pre-Operational Testing. This approach is consistent with the expectations of SCE&G for system turnover and collaboration of station personnel in the testing and startup activities. In addition, it is the Owner's understanding that the current Work In Progress (WIP) MELs exclude the following equipment types and are not anticipated to be numbered or labeled (note: this list is not comprehensive): Subcomponents to skids and packages; Components within I&C and Electrical Cabinets (breakers, switches, and etc.); Fuses (Master Fuse List required per UFSAR); Pipe Hangers/Snubbers; Electrical equipment controls (i.e., solenoid valves for equipment). | Consortium to provide a plan outlining the labeling of the V.C. Summer AP1000 Nuclear Power Plant. At no additional cost to Owner, Consortium to label the V.C. Summer AP1000 Units 2 and 3 in accordance with APP-GW-GZP-002. |
| 36 | FPOT/F3POT | The Owner's position is that the Consortium is responsible for all testing in accordance with Article 11 of the EPC Agreement. This testing includes the First Plant Only Test (FPOT) and the First Three Plants Only (F3POT). The Owner acknowledges that the Consortium made an effort to take credit for the China FPOT and F3POT and results, but that the NRC was not supportive of this approach. As a result, the Consortium has incorporated the FPOT and F3POT into the testing program and schedule to be performed on site for the Units. The Owner agrees with including this testing in the T&M scope of work in the EPC Agreement, but does not agree that this testing is outside the EPC Agreement scope and warrants a change order. The Consortium and Owner positions are included in VSP_VSG_002399 and NND-13-0486, respectively. | The Consortium to perform the FPOT and F3POT as part of the testing program in accordance with Article 11 of the EPC Agreement. |
| 37 | Timely access to vendor technical manuals. | The Owner needs information turnover to develop the programs, processes and procedures to operate the plant. Furthermore, the Owner needs those documents produced and delivered in a timely fashion to facilitate the proper level of Owner review and acceptance. To date, the flow of engineering information not directly used to build the plant, i.e. placed in ShawDocs, has been insufficient. The EPC references in a number of locations that the Consortium will provide various documentation to the Owner prior to system turnover. Section A.2 states that "Documentation to be provided by the Contractor to the Owner as developed for the Facility as listed in Table. 2" and section 3.3.3 states "Contractor shall provide to Owner the necessary inputs, test procedures, technical manuals, and other Documentation related to forgoing tests." The Owner interprets these statements to mean that as the documents are developed to a revision 0 product, they will be made available to the owner via ShawDocs or CAPA. | As the documents are developed (revision 0), at no additional cost to Owner, Westinghouse to make those documents available for Owner review. For example, if the RCS system design is complete, those documents, to include vendor technical manuals, should all be available for owner review and acceptance, well before the system testing has begun. This process should begin immediately. |
| 38 | BEACON | The WEC AP1000 reactor Standard Plant design contains a core power distribution measurement system designated as the Incore Instrumentation System (IIS). The AP1000 has been designed to use the BEACON system as part of its required control system. BEACON is an advanced core monitoring and support package. According to DCD Revision 16, this online core monitoring system provides the operator with the current allowable operating space, detailed current power distribution information, thermal margin assessment and operational recommendations to manage and maintain required thermal margins. It is understood that the AP1000 Standard Plant initial startup cannot occur without BEACON hardware and software and, as the AP1000 is designed, it cannot be operated without BEACON. In addition, per the Agreement, WEC is obligated to provide to Owner an AP1000 Standard Plant as described in DCD Revision 16. For the IIS, the system is to be supplied complete and inclusive of all equipment, components and commodities including any specialty handling tools and equipment as described in the DCD. | WEC to provide BEACON-DMM hardware and software to support fuel load, startup testing and operations as part of the EPC Agreement and without additional charge to the Owner. |

| | | | |
|---|---|---|---|
| 39 | Shield Building Door, Annex, Auxiliary Building, Aircraft Impact Assessment. | The Consortium sent to Owner Notice of Change letters (VSP_VSG_003096 and VSP_VSG_003450) claiming that a new NRC Rule entitled "Consideration of Aircraft Impact for New Nuclear Power Reactors" (the AIA Rule) impacts other structures in the Nuclear Island. Specifically, the Consortium claims that it is required to make changes to the Annex and Auxiliary Buildings' wall design, as well as Annex and Auxiliary and Shield Building doors to comply with the NRC Rule. The Consortium further claims that this scope of work is outside that of the EPC Agreement and warrants a change order. The Owner has taken exception to the Consortium claim in NND-15-0007 and NND-15-0323 based on the availability and knowledge of the draft AIA Rule prior to execution of the EPC Agreement and the comprehensive Agreement between the Consortium and the Owner executed on July 11, 2012 and resolving all issues associated with the AIA Rule impact. | Consortium to implement the necessary design and construction changes to the Shield Building Door and Annex and Auxiliary Buildings impacted by the AIA Rule in accordance with the EPC Agreement and July 11, 2012 Agreement. |
| 40 | Loss of Large Areas of the Plant due to Explosions or Fire Testing | On March 27, 2009, the NRC amended 10 CFR Part 50 and 10 CFR Part 52 with new requirements to address loss of large areas (LOLAs) of the plant due to explosions or fires from a Beyond Design Basis Event. The NRC issued Interim Staff Guidance DCD/COL-ISG-016 to assist new applicants or holders of COLs to address the LOLA requirements. These requirements were not included in DCD Revision 16, which is the design basis for the Agreement (Reference 1). In Reference 2, Owner notified the NRC that changes would be made to a future revision of the V.C. Summer Units 2 & 3 COLA in accordance with 10 CFR 52.80(d) and 10 CFR 50.54(hh)(2) to address LOLA. Owner provided the NRC with a Mitigative Strategies Description (MSD), which described the preoperational testing required to provide a reasonable confirmation of adequate spent fuel pool spray coverage. These requirements were incorporated into Owner's COL Section 2.D.(12).(e).8 as a license condition. The Consortium has offered to perform this work for SCE&G as a change order. | Consortium to perform the testing and other work required to meet Owner's LOLA obligations under the COL Section 2.D.(12).(e).8 as a license condition at no additional cost to Owner. |
| 41 | Pre-Service Testing Program Development, Pre-Service Test Conduct, ITP | The Owner and Consortium have a difference of opinion on the Initial Test Program scope as related to the following items referenced in VSP_VSG_003669:<br>1. Pre-service testing, including baseline in-service testing<br>2. Initial core load and post core load vessel assembly<br>3. Any spent fuel pool spray flow and makeup testing required to support the Loss of Large Area (LOLA) Mitigation Strategy Document (reference item 40 on Commercial List)<br>4. Cooling Towers testing<br>5. Preoperational testing for:<br>a. Storm Drains; b. Site-specific Seismic Monitoring System; c. Offsite AC Power Systems; d. Raw Water System; e. Sanitary Drain System; f. Fire Brigade Support Equipment; g. Portable Personnel Monitors and Radiation Survey Instruments; h. Physical Security Plan equipment implied in UFSAR Section 14.4.5; and, i. External/Offsite Communications<br>The Consortiums position is that these items are not included in the EPC Agreement scope. The Owner's position is that the items above are in the EPC Agreement ITP scope.<br>Additional ITP expectations include the following:<br>1. All FPOT and F3POT testing and associated activities to include test specification and procedure development, material/equipment procurement, test planning, test scheduling, test performance, data analysis and generation of final test report. Reference item 36 on Commercial List.<br>2. All testing associated with "site specific" systems listed in EPC Agreement Exhibit A, Table 1. Activities to include test specification and procedure development, material and equipment procurement, test planning, test scheduling, test performance, data analysis and generation of test report.<br>3. ASME Pre-service Test Plan development and implementation as noted in the first section above based on the current revision of the ASME-OM document.<br>4. Steam Generator Moisture Carryover Test procedure development, material and equipment procurement, test planning, test scheduling, test performance, data analysis and generation of test report. Reference item 45 on Commercial List<br>5. Large Area Testing. Reference item 40 on Commercial List. | Consortium to include all of these items in the ITP at no additional cost to Owner. |
| 42 | Procedure revisions from Technical Specification Upgrade (Owner, WEC 50/50) | This issue deals with LAR 13-037 (Technical Specification Upgrade) and the Owner's position that the technical specifications as written were not usable and would not allow the Owner to successfully operate the plants (reference NND-14-0479). Technical specification examples were given in NND-14-0479 relating to the Steam Generator Isolation Valves flow path, Reactor Coolant Pump minimum flow parameters and the Radioactive Effluent Control Program. | Contractor to provide a proposal to APOG for the requested scope per letter dated October 7, 2015 from APOG with subject: APOG-2015-007 Request for Quote - Technical Specifications Upgrade Impacts. Scope will be performed in accordance with and under the terms of an APOG purchase order. In the event the work is not performed through APOG, Westinghouse to provide technical specifications that are technically accurate and easily understandable and Contractor to complete items #1-5 in VSP_VSG_002989. |
| 43 | Providing As-Built Drawings | EPC Table 2-1 makes reference to As-Built and As-Designed separately from each other. Consortium members have verbally communicated that they interpret As-Built to be the As-Designed document combined with the associated change documentation. This is not consistent with SCE&G's understanding of the term As-Built. WEC procedure APP-GW-GAP-615, Appendix F5 states - To pass release for the core load and turnover to the Owner, the design shall: The design input document shall have no open items or unincorporated changes; Design output documents shall be complete, numeric, and consistently relate to the design input document. A numeric revision, verified compliance document is required and shall demonstrate that the design output documents have met all design input requirements. Design output shall have considered and reconciled the impact from as built and as-tested conditions that may impact core load.<br>NRC Inspection Manual, Inspection Procedure 65001, "Inspections of Inspections, Tests, Analyses and Acceptance Criteria (ITAAC) Related Work", Attachment 65001.A, requires the following: 02.04 Review As-Built Deviations / Non-Conformances: a. Review a sample of documents that were used to identify differences between the as-designed and as-built SSCs to determine if: i. The difference, if not corrected to comply with the as-designed conditions, was properly documented and incorporated in the final as-built drawings. | To preclude any discussion or confusion regarding what may or may not impact core load, at no additional cost to Owner, WEC to turn over to SCE&G all documents as described in EPC Table 2-1, in an as-built state, with all changes and dimensional discrepancies incorporated into the document. Owner understands the engineering backlog on change paper is growing and immediate actions are required to be able to deliver "clean paper". Owner understands that additional changes may occur after Turnover and is prepared to address processes to handle these changes. |
| 44 | Operating Procedure Configuration Control (Owner to incorporate All post-Baseline 7 Design Changes) | Westinghouse continues to make design changes to the Facility that effect standard operating procedures delivered to the Owner. Identification of the affected procedures is essential to ensure that the operating plant procedures are consistent with the plant design as required. | At no additional cost to Owner, Westinghouse to identify the impact of all design changes on operating procedures and provide this information to Owner. |
| 45 | Steam Generator Moisture Carryover Test | Refer to item 41 on Commercial List. | Refer to item 41 on Commercial List. |
| 47 | Communication System and BIS Power Allocation | For the Communication System issue, the initial Consortium design did not take into account the site layout of the plants sold to SCE&G. Designs were for a single unit and ended at the security fencing. The Consortium's initial position was that their responsibility for wireless and wired phones, paging system, radios and networking systems ends at the "fence line." SCE&G contends that the Consortium is responsible to extend these systems to the site specific areas like RWS intake structure, CWS cooling towers, and OWS facility.<br><br>For the BIS Power Allocation issue, power allocated for Communications is not sufficient for SCE&G needs (e.g. powering phones, cameras, etc.). Per design documents, 48.6kW total power was allocated for both BIS and EFS networks. EFS would be allocated 35kW with the remaining 13.6kW allocated for BIS. SCE&G determined that the BIS power use was 38.4kW versus the 13.6kW allotted in the design. | For the Communication System issue, Consortium letter VSG_VSP_002475 dated October 9, 2013 established an acceptable DOR addressing the majority of the issues and site layout change order 26 resolved the remaining issues.<br><br>For the BIS Power Allocation issue, Consortium to work with Owner to achieve adequate BIS power to support SCE&G communication needs at no additional cost to Owner. |

| | | | |
|---|---|---|---|
| 49 | Site Security System Backup Power | AP1000 Design Change Proposal APP-GW-GEE-2710 "Annex Building Security Features Update" identifies the back-up duration for the security system to be less than that identified in APP-GW-GLR-066 "AP1000 Safeguards Threat Assessment" and section 3.6.9 of NUREG-1793, "Final Safety Evaluation Report Related to Certification of the AP1000 Standard Design." The Owner does not accept this reduction in back-up power reduction as referenced in NND-14-0689. | Westinghouse to provide the required back-up power duration. The Owner is willing to consider the reduced back-up power duration contingent upon WEC's integration of the Plant Security Systems (SES) for Units 2 and 3 (Reference NND-14-0689). |
| 50 | OWS Security Plan | The Offsite Water System (OWS) Treatment Facility includes security and fencing plans that have been discussed with the Consortium and incorporated in the pricing for the latest draft Change Order 17 dated May 10, 2015. Correspondence relating to the OWS Security Plan includes VSP_VSG_001469, NND-11-0444, VSP_VSG_001605 and NND-12-0034. Incremental OWS security plan costs required to meet Owner corporate standards became a commercial issue, specifically the security and fencing requirements and the fire alarm system and fire detection system. Other OWS commercial issues included in the draft CO 17 are the numbering and tagging of equipment and coatings and pipe color requirements. It is noted that the primary OWS change reflected in the draft CO 17 is the addition of the reverse osmosis system to remove bromides from the water. The Owner and Consortium negotiated a "no EPC Agreement price increase" change order for CO 17 which included the OWS security and fencing plans as well as the other items referenced herein. The draft CO 17 also includes other commercial items agreed upon by the Owner and Consortium. | That the Consortium complete the installation of the OWS security, fencing and other items above to the satisfaction of the Owner. CO 17 is addressed in Commercial List item #70. |
| 55 | PEB Design Change | The Consortium and SCE&G could not initially come to agreement on the design requirements of the Plant Entry Building. | This issue was resolved with the issue of change order 26. |
| 57 | Fire Alarm monitoring | Due to the delay in the project schedule, the Owner is concerned about the increasing value of inventory in the onsite warehouses 20A, 20B and 57 in relation to the insurability of the warehouses and their content under the Owner's Builder's Risk Policy. Owner has elected to implement enhancements to the fire alarm monitoring for these warehouses, which includes monitoring of sprinkler system water flow switches in the three warehouses and interconnecting the new system to the existing yard fire alarm system. On October 7, 2015, the Consortium provided to the Owner a draft CO for Owner's review and comment. | The Consortium to install new local fire alarm control panels in Warehouses 20A and 57; the flow switches will be monitored locally at each of these 2 warehouses. A new main fire alarm panel will be installed in Warehouse 20B. This new main fire alarm panel will monitor the Warehouses 20A and 57. The new main fire alarm panel will be network connected to the existing Siemens fire alarm system using single mode fiber optic connections. Spare fibers which run between the buildings shall be assigned for this purpose. All alarms from the new warehouse fire detection system will be monitored by the existing system's main fire alarm panel located in the main plant entry guard shack. Physical connection with the existing system's network shall be made at the YFS fire pump house. The new fire detection system for the three warehouses will be designed as a Class B system; Class A monitoring is not required to satisfy the requirements of the authority having jurisdiction codes for these warehouses. |
| 60 | Laurens Piping Quality Issues | CB&I Laurens issued a self-imposed Stop Ship on March 12 following a CB&I Power Audit (V2015-035), which included two Level 1 findings and three Level 2 findings. Most of the issues were repeat Findings from previous Audits/Surveillances performed by CB&I Power.<br><br>CB&I Laurens issued a Stop Work Order (SWO) on all Safety Related (SR) ASME Section III piping on March 17. The issuance of this SWO was during the March NRC inspection which found many similar issues documented in the CB&I Audit (V2015-035). The major issues being addressed by the SWO are CGD and Qualification of Vendors, Internal and External Audit Programs, Document Control, and Corrective Action Program.<br><br>During CB&I Power Surveillance 2015-172, which occurred in August 2015, the surveillance team discovered that issues with CGD and Qualification of Vendors had not been fully addressed by CB&I Laurens. This was also noted as an indicator that the corrective actions with the CAP had not been fully effective.<br><br>July 2015, CB&I Site QC inspection of pipe spools not signed off by Laurens ANI resulted in an approximate reject rate of 65%. These were due to minimum wall violations, dimensional issues, and misfabrications. These results have raised questions on inspection methodologies between Summer, Laurens, Vogtle, and Source Inspection.<br><br>An additional CBI Laurens self-imposed SWO was put in place on 10/09/15 regarding the incorrect VALVES being place in a pipe spool. The preliminary investigation determined that this does not affect Section III Safety Related pipe spools and has only effected a single spool. However, this investigation is only preliminary and a full Extent of Condition has not been performed. In addition to the Laurens SWO CBI Power has issued QRL restrictions for shipping of Laurens ASME SR spools unless they are released (after enhanced inspection) by the CB&I site QA Directors. Currently Pipe Spools have only been released in phases 1-3 of a 4 phase SWO. No spools will be released to phase 4 until completion of First Article Survey(FAS) by CB&I Power. Once all Spools are completed through Phase 4, the SWO will be lifted. | 1. Completion of Corrective Actions associated with stop work /stop ship and lifting of restrictions.<br>2. Agreement on inspection methodologies between Vogtle, Summer, Laurens, and Source Inspection.<br>3. Completion of Enhanced Inspections on post SWO pipe spools performed by VC Summer QC.<br>4. Sustainable Improvements in programmatic systems reported from Audit/Surveillance results performed by CB&I Power. |
| 67 | Common Q/Ovation MTS | Owner needs to have an Ovation MTS so Owner can train its technicians and engineers on Ovation equipment in the Ovation Maintenance and Ovation Core Team training areas. The Ovation MTS provides an offline environment with a representative sample of system hardware representing the Distributed Control and Information System (DCIS). In the plant, the Ovation platform is used for the Plant Control System, the Data Display and Processing System, and portions of the Operator Interface of the Operations and Control Centers System (collectively DCIS). Owner provided a revised scope of work to Westinghouse on September 9, 2015 and requested an updated cost proposal. [Note: Common Q MTS CO was in August 2015] | Westinghouse to provide the Ovation MTS, to include the hardware, software, documentation and support, as described in the revised scope of work, which was emailed to Westinghouse on September 9, 2015. |
| 69 | Path forward to execute CO16 | CO#17 provides clarification information for CO#16. If CO #17 is to be executed, the 2 COs need to be executed together. However, the project schedule upon which CO#16 was based no longer reconciles with the current working schedule. | 1. Reach agreement with Consortium on execution of CO #16 and/or CO #17<br>2. If CO #16 is executed, determine whether schedule language in CO #16 should be modified<br>3. If schedule language needs to be modified, reach agreement with Consortium on updated language<br>4. Reach agreement with Consortium on whether Exhibit F schedules should be included in the CO, specific to CO #16. Consortium has proposed not including Exhibit F tables, since the information would be stale at the time of CO execution; instead the impacts of CO #16 to the Exhibit F milestones would be incorporated into an EPC Amendment.<br>5. Execute alone or simultaneously with CO #17 |
| 70 | Path forward to execute CO17 | CO#17 provides clarification information for CO#16; If CO #17 is to be executed, the 2 COs need to be executed together. However, the project schedule upon which CO#16 was based no longer reconciles with the current working schedule | 1. Reach agreement with Consortium on execution of CO #16 and/or CO #17<br>2. If CO #17 executed, reach agreement with Consortium on whether Exhibit F schedules should be included in the CO, specific to CO #17 (Tables F.1.6 (f-h)). Consortium has proposed not including Exhibit F tables, since the information would be stale at the time of CO execution; instead the impacts of CO #17 to the Exhibit F milestones would be incorporated into an EPC Amendment.<br>3. Owner to transmit agreed-to de-escalation process since it is not included in CO as Owner requested.<br>4. If executed, execute simultaneously with CO #16 |

| | | | |
|---|---|---|---|
| 77 | TEDV DAQ Funding | Purchase agreement between Westinghouse, Southern and SCE&G is to provide the data acquisition system and capability to support thermal expansion and dynamic evaluation of plant components during testing. | Westinghouse to deliver TEDV DAQ in accordance with purchase agreement. |
| 96 | Offsite Storage and Lay down – Leases, Equipment, and FNM Per Diem (area 14, Blythewood, Metro) | During Phase I of the EPC Agreement scope of work, the Owner paid the Contractor to develop the requirements for all temporary facilities on the Site, to include warehouses and equipment and material laydown areas. The Contractor developed the requirements, was given unlimited access to the Site and was in control of the Target Price budget for construction of the appropriate facilities. The Contractor now estimates significantly more warehouse facilities and laydown area space than it originally planned. The Owner contends that this additional warehouse and laydown area space is attributed to either inadequate planning on the part of the Contractor or structural module delay. The facilities and laydown area in question at this point are the Blythewood warehouse facility, Metro warehouse facility and laydown area 18. The Blythewood warehouse is being utilized and the lease payments invoiced to the Owner have been disputed. The Metro facility renovation is essentially complete and ready to receive equipment and material. The Contractor will begin invoicing the Owner for the lease and other expenses. The Area 14 laydown area construction has been out for bids by the Contractor who has been having discussions with the Owner on the invoicing process. The Contractor claims entitlement to a change order for these warehouse facilities and laydown area expenses since they are located off-site. The Owner disagrees and is willing to treat these facilities as target scope work under the EPC Agreement with no justification for a change order. Also, the Owner's position is that CO 8 applies which transferred target dollars to fixed/firm dollars for items such as construction equipment and field non-manual living expenses. | The Contractor invoice the Owner for the Blythewood and Metro warehouses and Area 15 laydown area construction under the Target Price category per the EPC Agreement, applying the CO 8 cost categories to the invoicing. The total costs for these facilities and laydown area will remain in dispute per the EPC Agreement due to the structural module delay with resolution dependent upon senior executive negotiations. |
| 97 | Warranty impact due to delay and specific warranty claims; and extending warranties based on actual completion dates | The warranty requirements are specified in Article 14 of the EPC Agreement. Specifically, a 24 month warranty period for Equipment begins upon the actual Substantial Completion Dates for Units 2 and 3. The presently approved Guaranteed Substantial Completion Dates for Units 2 and 3 are March 15, 2017 and May 15, 2018, respectively. The Owner's position is that the 24 month warranty period and other warranty provisions in the EPC Agreement should be effective upon the actual Substantial Completion dates due to the structural module delay impact on the Project Schedule. Also, there are specific warranty claims that the Consortium is responsible for resolving. For example, the Units 2 and 3 Switchyard has experienced component failures, specifically related to capacitors, as noted in Owner correspondence NND-14-0335, NND-14-0337, NND-14-0514 and NND-14-0627. Other components also sustained damages, but were replaced by the Consortium with extended warranties (reference VSP_VSG_002978). The Consortium has been working with the Owner and capacitor manufacturer (ABB/Maxwell) to perform analyses and testing to determine root cause. In the meantime, capacitors have been removed from the Switchyard, which is presently operating at partial capacity due to these capacitor issues. | 1. Consortium extends 24 month warranty provision and other warranty provisions of Article 14 of the EPC Agreement to be effective upon the actual Substantial Completion Dates for Units 2 and 3.<br>2. Consortium resolves all outstanding warranty claims, to include the Switchyard capacitor failure claim, to the Owner's satisfaction. This will include component extended warranties as applicable. |
| 98 | Cyber-Security | The Owner's position is that the Consortium is committed in the EPC Agreement to provide a cyber security program for VCS Units 2 and 3 that complies with APP-GW-GLR-104, "AP1000 Cyber Security Implementation," dated May 2007 (also referred to as TR-104). TR-104 is a requirement included in the AP1000 Design Control Document (DCD) Revision 16 which is referenced in the EPC Agreement. The Owner acknowledges that the NRC issued Regulatory Guide (RG) 5.71, "Cyber Security programs for Nuclear Facilities," subsequent to the execution of the EPC Agreement and that there is a level of incremental scope of work which has not been satisfactorily resolved to the satisfaction of the Owner. The Owner and Consortium agreed to a Phase I Cyber Security CO (#14), which was executed on March 14, 2012 The Owner and Consortium have attempted to negotiate a Phase 2 Cyber Security CO but have been unsuccessful to date. A significant impasse dealt with the Consortium's refusal to accept project schedule risk and mandate to Owner a release of the Guaranteed Substantial Completion date for Unit 2. A Phase 2 Cyber Security technical scope of work has been agreed upon and is included in the latest draft Cyber Security CO dated February 19, 2015 (VSP_VSG_003270). This technical scope is entitled "Technical Description for Consortium for AP1000 Consortium Cyber Security Scope of Supply." The Owner and Consortium have discussed scopes of work beyond Phase 2, although no Technical Description for Phase 3 has been defined. For example, in a previous draft Cyber Security CO dated February 28, 2013, Phase 3 scope topics were addressed to include potential warehouse modifications to handle storage and handling of Critical Digital Assets (CDA's), the training of site personnel to deal with CDA's and site installation and Field Change Notices associated with hardware and software modification. The Owner and Consortium have also had discussions that Phase 3 work would involve dealing with suppliers of equipment for potential smart equipment upgrades. The Owner is concerned that the negotiations on cyber security have been unnecessarily delayed as evidenced by timelines maintained by the Owner and the Consortium's decision to hold up work on cyber security and demobilize personnel earlier this year. It is noted that the Owner had authorized dollars for the Consortium to perform cyber security work during the negotiations and had requested that the Consortium continue with the interim funding provided by the Owner. | Subject to Paragraph 4 of the October 2105 Amendment, Consortium to provide a cyber security program in accordance with RG 5.71 and accept schedule risk to meet Guaranteed Substantial Completion Dates agreed to between Owner and Consortium. All phases of the Cyber Security Program are included in this scope, which also includes the Phase 2 technical scope referenced in the draft CO dated February 19, 2015. |

0:17-cv-02094-JMC Date Filed 10/02/20 Entry Number 233-30 Page 17 of 38
USCA4 Appeal: 21-1141 Doc: 30-1 Filed: 04/19/2021 Pg: 491 of 563

# Exhibit B

SCANA_DEFS_000479

JA 459

**Disputed and Returned Payments**
**Exhibit B**
**As of August 21, 2015**

| | |
|---|---|
| **WEC Claim** | |
| Regulatory Delay Claim | **$ 83,518,046** |
| | |
| **Payment Entitlement in Dispute** | |
| Capped Esc due to Structural Module Delay | $ 6,275,414 |
| Cyber Security | $ 374,613 |
| Target Invoice Returns (storage, tents, firm price) | $ 13,289,433 |
| Target Invoice Withholding (10%) Due to Delay and Performance Inefficiencies | $ 7,657,127 |
| Interest Expense on Returned Invoices | $ 2,133,198 |
| **Total** | **$ 29,729,785** |
| | |
| **No Dispute, Payments Pending CO Execution** | |
| HW Escalation Calculation | $ 5,565,845 |
| **Total** | **$ 5,565,845** |
| | |
| **Timing of Payment in Dispute** | |
| Progress Payments | $ 99,066,205 |
| Milestones Not Complete | $ 11,124,299 |
| **Total** | **$ 110,190,504** |

SCANA_DEFS_000480

0:17-cv-02094-JMC Date Filed 10/02/20 Entry Number 233-30 Page 19 of 38
USCA4 Appeal: 21-1141 Doc: 30-1 Filed: 04/19/2021 Pg: 493 of 563

# Exhibit C

SCANA_DEFS_000481

JA 461

**EXHIBIT C**

**Items Not Resolved or Released under October 2015 Amendment**

| Description | Reference |
|---|---|
| Data Turnover and documentation required | |
| Containment Debris Margin Increase | NND-11-0166; VSP_VSG_001218 |
| Auxiliary Boiler design capability | |
| Electromagnetic Capability (EMC) with Protection & Safety Monitoring System (PMS) - | |
| American Society of Mechanical Engineers(ASME) Boiler and Pressure Vessel Code Section VIII pressure vessel over pressure protection | NND-15-0460; VSP_VSG_003682 |
| Site Layout changes, Phase 3, due to security regulatory changes | |
| Onsite automation/I&C Support to Owner during post initial core load | |
| Onsite switchyard preoperational test | |
| Plant Security System (SES) testing | |
| Plant Security System (SES) Unit 2&3 Computer Integration | |

0:17-cv-02094-JMC Date Filed 10/02/20 Entry Number 233-30 Page 21 of 38
USCA4 Appeal: 21-1141 Doc: 30-1 Filed: 04/19/2021 Pg: 495 of 563

# Exhibit D

SCANA_DEFS_000483

JA 463

# AGREEMENT

AMENDMENT TO THE ENGINEERING, PROCUREMENT AND CONSTRUCTION AGREEMENT BETWEEN SOUTH CAROLINA ELECTRIC & GAS COMPANY, FOR ITSELF AND AS AGENT FOR THE SOUTH CAROLINA PUBLIC SERVICE AUTHORITY AND A CONSORTIUM CONSISTING OF WESTINGHOUSE ELECTRIC COMPANY LLC AND STONE & WEBSTER, INC., FOR AP1000® NUCLEAR POWER PLANTS

THIS AMENDMENT to the Engineering, Procurement and Construction Agreement dated May 23, 2008 ("EPC Agreement") for the AP1000 Power Plants at the Virgil C. Summer Nuclear Generating Station ("Project") by and between South Carolina Electric & Gas Company, for itself and as agent for the South Carolina Public Service Authority ("Owner") and a consortium consisting of Westinghouse Electric Company LLC ("Westinghouse") and CB&I Stone & Webster, Inc. ("S&W"), (collectively "Contractor") is executed on behalf of Westinghouse, shall be executed on behalf S&W upon the consummation of the Transaction (as defined in the October 2015 Amendment) and shall become effective upon execution by Owner and approval of the Public Service Commission of South Carolina, so long as execution occurs by the 1st day of November 2016, unless such approval is waived by the Owner or the date is waived by the Contractor ("Option Amendment"). If execution does not occur by November 1, 2016, this Option Amendment shall be null and void in all respects. Owner and Contractor may be referred to individually as a "Party" or collectively as the "Parties."

In consideration of the mutual promises herein and other good and valuable consideration, the receipt and sufficiency of which the Parties acknowledge, the Parties, intending to be legally bound, stipulate and agree as follows:

1. Except as provided in paragraph 2, all remaining Work under the EPC Agreement as of the Effective Time (defined in the October 2015 Amendment referenced below) shall be converted to a Fixed Price in exchange for the remaining Contract Price being adjusted to $6.082 billion in current U.S. Dollars. The remaining Contract Price adjustment represents the cost to complete the Project beyond what has been paid through June 30, 2015. Payments made after June 30, 2015 will be credited against the $6.082 billion amount.

2. The following Time and Material Work is not included in the Fixed Price described in paragraph 1: sales tax, performance bond and insurance premiums, import duties, Mandatory Spare Parts and Extended Equipment Warranty costs (other than the costs associated with the warranty extensions provided for in paragraph 7 of the October 2015 Amendment, because those warranty extensions are at no cost to Owner). This Work will be billed under the existing terms of the EPC Agreement.

3. The categories of Target Price and Firm Price are eliminated.

4. The capitalized terms in this Amendment, except for those defined in this Amendment, shall have the meanings given to them in the EPC Agreement.

5. All provisions of the EPC Agreement not modified, expressly or by necessary implication, remain in full force and effect.

0:17-cv-02094-JMC Date Filed 10/02/20 Entry Number 233-30 Page 23 of 38
USCA4 Appeal: 21-1141 Doc: 30-1 Filed: 04/19/2021 Pg: 497 of 563

Confidential Trade Secret Information - Subject to Restricted Procedures

**IN WITNESS WHEREOF**, the Parties have duly executed this Amendment as of the date first above written.

SOUTH CAROLINA ELECTRIC & GAS COMPANY, for itself and as agent for South Carolina Public Service Authority
By:
Name: ____________________
Title: ____________________

WESTINGHOUSE ELECTRIC COMPANY LLC
By:
Name: [signature]
Title: President & Chief Executive Officer

STONE & WEBSTER, INC.
By:
Name: ____________________
Title: ____________________

2

SCANA_DEFS_000485

JA 465

USCA4 Appeal: 21-1141 Doc: 30-1 Filed: 04/19/2021 Pg: 498 of 563
0:17-cv-02094-JMC Date Filed 10/02/20 Entry Number 233-30 Page 24 of 38

# Exhibit E

SCANA_DEFS_000486

JA 466

# Dispute Review Board Agreement

THIS DISPUTE REVIEW BOARD AGREEMENT ("DRB Agreement") concerning the Engineering, Procurement and Construction Agreement dated May 23, 2008 ("EPC Agreement") for the AP1000 Power Plants at the Virgil C Summer Nuclear Generating Station ("Project") is effective the ___ day of ______________ 2015, by and between South Carolina Electric & Gas Company, for itself and as agent for the South Carolina Public Service Authority ("Owner") and a consortium consisting of Westinghouse Electric Company LLC and Stone & Webster, Inc., (collectively "Contractor"). Owner and Contractor may be referred to individually as a "Party" and collectively as the "Parties."

WHEREAS, the Parties wish to establish a Dispute Resolution Board ("DRB") for addressing all Claims, as defined in the EPC Agreement, and other disputes that may arise out of or relate to the Project and provisionally resolving such claims.

NOW, THEREFORE, in consideration of the recital, the mutual promises herein and other good and valuable consideration, the receipt and sufficiency of which the Parties acknowledge, the Parties, intending to be legally bound, stipulate and agree as follows:

1. Owner and Contractor agree to the establishment of a DRB in accordance with this DRB Agreement to assist in timely, impartial resolution of Claims and other disputes. All Claims and other disputes arising out of or relating to the EPC Agreement shall be governed by this DRB Agreement, until Substantial Completion of both Units.

2. For Claims and other disputes under $5 million, determinations of the DRB shall be binding on the Parties.

3. For Claims and other disputes of $5 million or higher, determinations of the DRB shall be treated as binding on the Parties on an interim basis until Substantial Completion of both Units. Upon Substantial Completion of both Units, either Party may proceed de novo with dispute resolution in accordance with Article 27 of the EPC Agreement. Determinations of the DRB will not be admissible in any de novo proceedings pursuant to Article 27 of the EPC Agreement.

4. For Claims and other disputes of $5 million or higher, Owner and Contractor shall submit their written acceptance or rejection of the DRB's report concurrently to the other Party and to the DRB within fourteen (14) days of receipt of the report. Failure by either Party to accept or reject within the specified period shall be deemed acceptance of the report by that Party. If both Parties accept the report, then it shall be final, without qualification. If one or both Parties reject the report, they shall nonetheless treat the report as binding until thirty (30) days after Substantial Completion of both Units, at which point the report will have no force or effect.

5. The process outlined in this DRB Agreement shall be the exclusive dispute resolution process for all Claims and other disputes under the EPC Agreement and shall be in lieu of the process set forth in Articles 27.3 and 27.4 of the EPC Agreement, until Substantial Completion of both Units. Thereafter, for Claims or other disputes covered by Paragraph 3 of this DRB Agreement, the Parties may proceed as stated in Paragraph 3.

6. Within thirty (30) days of the execution of the November 2015 Amendment, each Party shall submit to the other Party for approval the names of its nominees for membership on the DRB. The Parties shall mutually agree on the three members of the DRB. Once constituted, the DRB members shall designate one of them as Chair of the DRB. The DRB shall serve until Substantial Completion of both Units.

7. Members of the DRB shall be experienced in the interpretation of contract documents, the resolution of construction disputes, and with complex power plant projects. At least one of the DRB members must be a licensed attorney. To assist the Parties in the review and approval process, nominated members shall provide the following, in addition to the nominee's full name and contact information, to both Parties:

A. Resume showing construction experience qualifying the person as a DRB member.

B. Resume showing past DRB participation, if any. This resume will each DRB assignment separately, and state the name and location of the project, dates of DRB service, name of owner, name of contractor, contract value, nominating party if applicable, names of the other DRB members, and the number of disputes heard.

C. All three members of the DRB are to be neutral and must affirm their neutrality, under oath, once the DRB is fully constituted and before the DRB takes any action.

D. Disclosure statement describing past, present, and anticipated relationships or financial ties, including indirect relationships through the nominee's full-time employer, if any, to the Project, and with the Parties and with all other entities directly and indirectly involved in the EPC Contract. Entities indirectly involved include Fluor, designers, architects, engineers, or other professional service firms or consultants, joint-venture partners, subcontractors of any tier, and suppliers on the Project. The disclosure statement will also disclose close professional or personal relationships with key members of the Parties and these entities.

E. Neutrality and disclosure is a continuing obligation of all DRB members throughout the life of the EPC Contract.

F. Each member of the DRB shall execute non-disclosure agreements as required by the Parties.

G. No DRB member shall be allowed to act as an arbitrator or appear as a witness in any subsequent arbitration or litigation related to or arising out of the EPC Agreement.

8. Once fully constituted, the DRB will visit the project site and meet with representatives of the Parties at periodic intervals and as requested by the Parties. Any discussion and field observation shall be attended by personnel of the Owner and Contractor.

9. Owner and Contractor shall enter into good-faith negotiations to settle a dispute before referring such dispute to the DRB. These good-faith negotiations shall be involve full and timely disclosure of each Party's position to the other Party, including the exchange, where applicable, of pertinent supporting records, analyses, expert reports, and similar documentation, and shall proceed without delay following the inception of the dispute. Such good-faith negotiations may involve the solicitation and rendering of a DRB advisory opinion as described herein.

10. Either Owner or Contractor may refer a dispute to the DRB. The dispute referral shall be made in writing to the DRB Chair with a copy concurrently provided to the other DRB members and the other Party.

11. The dispute referral shall concisely define the nature and specifics of the dispute that are to be considered by the DRB and the scope of the determination requested. The DRB Chair shall confer with the Parties to establish a due date for delivering pre-hearing submittals, and a date, time, and location for convening the DRB hearing. Hearings shall be convened, at a location mutually agreed by the Parties. Absent such agreement by the Parties, the DRB shall determine the location of the hearings.

12. The procedures governing the hearings shall be established by agreement of the Parties. Absent such agreement, the DRB shall establish such hearing procedures.

13. The DRB's determination of a dispute will be formalized in a written report with format as determined by the DRB and signed by all DRB members. The report shall consist of a concise description of the dispute, short statements of each Party's position, findings as to the facts of the dispute, discussion and rationale for the determination, and the determination. The report shall be submitted concurrently to the Parties, no later than thirty (30) days after completion of the hearing as agreed by all Parties.

14. Owner and Contractor shall each bear their respective costs and attorney's fees. Owner and Contractor shall equally bear the cost of the DRB's services.

IN WITNESS WHEREOF, the Parties have duly executed this DRB Agreement as of the date first above written.

SOUTH CAROLINA ELECTRIC & GAS COMPANY, for itself and as agent for South Carolina Public Service Authority
By:
Name: ____________________
Title: ____________________

WESTINGHOUSE ELECTRIC COMPANY LLC
By:
Name: ____________________
Title: ____________________

STONE & WEBSTER, INC.
By:
Name: ____________________
Title: ____________________

0:17-cv-02094-JMC Date Filed 10/02/20 Entry Number 233-30 Page 28 of 38
USCA4 Appeal: 21-1141 Doc: 30-1 Filed: 04/19/2021 Pg: 502 of 563

# Exhibit F

SCANA_DEFS_000490

JA 470

0:17-cv-02094-JMC Date Filed 10/02/20 Entry Number 233-30 Page 29 of 38

**EXHIBIT F**

CONSENT OF GUARANTOR

**This Consent** is made by TOSHIBA CORPORATION ("Guarantor"), a corporation duly organized and existing under the laws of Japan and the indirect parent of Westinghouse Electric Company LLC ("Westinghouse").

**WHEREAS**, Westinghouse and Stone & Webster, Inc. ("Stone & Webster", and collectively with Westinghouse, the "Contractor") and South Carolina Electric & Gas Company, for itself and as agent for the South Carolina Public Service Authority (collectively, the "Counterparty") are parties to the Engineering, Procurement and Construction Agreement between the Contractor and the Counterparty, dated as of May 23, 2008 (the "Agreement"); and

**WHEREAS**, in connection with the Agreement, Guarantor executed and delivered to Counterparty a guaranty of the payment obligations of Westinghouse under the terms of the Agreement (the "Guaranty"); and

**WHEREAS**, the Agreement is being amended by an Amendment dated October 27, 2015 (the "October 2015 Amendment"); and

**WHEREAS**, Guarantor, as indirect parent of Westinghouse, shall receive benefit from the transaction contemplated by the Agreement as previously amended and as amended by the October 2015 Amendment and has agreed to give this Consent to provide assurance for Westinghouse's payment obligations in connection with the Agreement as so amended; and

**WHEREAS**, Guarantor acknowledges the execution and delivery of this Consent is required by the terms of the October 2015 Amendment.

**NOW, THEREFORE**, in consideration of the premises and other good and valuable consideration, the adequacy, receipt and sufficiency of which are hereby acknowledged, Guarantor hereby agrees as follows:

1. Guarantor acknowledges the terms of the October 2015 Amendment.

2. The definition of Guaranteed Obligations in the Guaranty includes all payment obligations of Westinghouse under the terms of the Agreement, as previously amended and as amended by the October 2015 Amendment.

3. Guarantor hereby reaffirms the Guaranty and agrees that, except as provided herein, the Guaranty shall remain unchanged and in full force and effect. Each and every term, covenant and condition of the Guaranty is hereby incorporated herein such that the Guaranty and this Consent shall be read and construed as one instrument.

4. The validity, construction, and performance of this Consent of Guarantor shall be governed by and interpreted in accordance with the laws of the State of New York, without

giving effect to the principles thereof relating to conflicts of laws except Section 5-1401 of the New York General Obligations Law.

IN WITNESS WHEREOF, Guarantor has caused this Consent to be executed in its corporate name by its duly authorized representative.

TOSHIBA CORPORATION

By: [signature]
Name: Shigenori Shiga
Title: Representative Executive Officer
Date: October 27, 2015

Acknowledged and Agreed by Counterparty as of this 27 day of October, 2015, by:

[signature]
Name: KEVIN B. MARSH
Title: CEO, SCANA CORP.

# MUTUAL RELEASE

This Mutual Release ("Mutual Release") is executed this 27th day of October, 2015, by South Carolina Electric & Gas Company, a South Carolina corporation having a place of business in Cayce, South Carolina, for itself and as agent for the South Carolina Public Service Authority, a body corporate and politic created by the laws of the State of South Carolina (collectively, "Owners") and Chicago Bridge & Iron Company N.V. ("CB&I"), a corporation organized under the laws of the Netherlands.

## RECITALS

**WHEREAS**, Owners and a consortium consisting of Westinghouse Electric Company LLC ("Westinghouse") and CB&I Stone & Webster, Inc. ("S&W") (collectively, the "Contractor") entered into an Engineering, Procurement and Construction Agreement with an effective date of May 23, 2008 (as amended or supplemented, the "EPC Agreement") pursuant to which the Contractor agreed to assist Owners in the licensing of and to design, engineer, procure, construct and test two AP1000 Nuclear Power Plants and related facilities, structures and improvements known as Units 2 and 3 located at the V.C. Summer station in Jenkinsville, South Carolina, and owned by Owners (the "Project");

**WHEREAS**, pursuant to the EPC Agreement, S&W furnished to Owners a Corporate Guarantee dated and effective as of May 23, 2008 and issued and executed by S&W's then-ultimate holding corporation, The Shaw Group, Inc. ("Shaw Group") (as amended or supplemented, the "S&W Parent Guarantee");

**WHEREAS**, thereafter, in connection with the acquisition by CB&I of Shaw Group, CB&I executed and furnished to Owners a Corporate Guarantee dated April 29, 2013 (the "CB&I Guarantee"), which replaced the S&W Parent Guarantee;

**WHEREAS**, Contractor has submitted various notices of Change and Change Dispute Notices pursuant to the EPC Agreement that remain unresolved and various commercial issues, Change Disputes and Claims (as defined in the EPC Agreement) are pending under the EPC Agreement (collectively, "EPC Claims");

**WHEREAS**, simultaneously with the execution and delivery of this Mutual Release, Owners and Westinghouse are entering into a binding Settlement and Release Agreement (the "Settlement Agreement"), with respect to, among other things, the EPC Claims;

**WHEREAS**, Westinghouse, S&W, an affiliate of Westinghouse ("Purchaser"), and CB&I are entering into a Purchase Agreement pursuant to which, among other things, Purchaser will purchase all of the outstanding capital stock of S&W; and

**WHEREAS**, effective upon the Effective Time (as defined in Paragraph 3), Owners and CB&I agree to release one another from any and all past, current and future duties, obligations, claims and liabilities arising out of or related to the EPC Claims, the EPC Agreement, the Project, the S&W Parent Guarantee and the CB&I Guarantee.

**NOW, THEREFORE**, in consideration of the recitals and the mutual promises, covenants and agreements contained in the Settlement Agreement and herein, and for other good and valuable consideration, the receipt, adequacy and sufficiency of which are hereby acknowledged, Owners and CB&I mutually, release one another as follows.

**RELEASE**

1. Effective upon the Effective Time, Owners, for themselves and their respective officers, agents, directors, partners, managing members, stockholders, owners, employees, attorneys, advisors, representatives, insurers, sureties, predecessors, successors, assigns, parents, subsidiaries and affiliated entities, heirs, executors and administrators (collectively, the "Owner Releasing Parties") and each of them, hereby unconditionally and irrevocably fully release, forever discharge and covenant not to sue, except for the Excepted Party as defined in Paragraph 2 hereof, CB&I and its past, present, and future officers, agents, directors, partners, managing members, stockholders, owners, employees, attorneys, advisors, representatives, insurers, sureties, predecessors, successors, assigns, parents, subsidiaries, and affiliated entities, heirs, executors and administrators (collectively, the "CB&I Released Parties"), and each of them, from any and all manner of actions, controversies, suits, matters, liens, rights, liabilities, losses, debts, dues, damages, claims, guarantees, warranties, judgments, bonds, executions, obligations, accounts, fines, regulatory penalties (whether civil or criminal), costs and expenses (including attorneys' fees) and demands (collectively, "Claims/Obligations") of every nature, kind and description whatsoever in law or in equity, whether known or unknown, or whether suspected or unsuspected, or whether matured or un-matured, whether liquidated or unliquidated, under any theory, including joint and several liability, which Owners had, now have, or hereafter can, shall or may have against CB&I or any of the other CB&I Released Parties arising out of any manner or event relating to, or otherwise in connection with or concerning, the EPC Claims, the EPC Agreement, the Project, the S&W Parent Guarantee and the CB&I Guarantee.

2. This Mutual Release is not in favor, and does not inure to the benefit, of S&W (being referred to herein as the "Excepted Party") and it being understood and acknowledged that any release in favor of S&W is solely as set forth in the Settlement Agreement. Except for the Excepted Party as defined in Paragraph 1 hereof, effective upon the Effective Time, CB&I, for itself and its respective officers, agents, directors, partners, managing members, stockholders, owners, employees, attorneys, advisors, representatives, insurers, sureties, predecessors, successors, assigns, parents, subsidiaries and affiliated entities (but only to the extent any such subsidiary or affiliated entity is a subsidiary or affiliated entity after the Effective Time), heirs, executors and administrators (collectively, the "CB&I Releasing Parties") and each of them, hereby unconditionally and irrevocably fully release, forever discharge and covenant not to sue, Owners and their past, present, and future officers, agents, directors, partners, managing members, stockholders, owners, employees, attorneys, advisors, representatives, insurers, sureties, predecessors, successors, assigns, parents, subsidiaries, and affiliated entities, heirs, executors and administrators (collectively, the "Owners Released Parties"), and each of them, from any and all manner of actions, controversies, suits, matters, liens, rights, liabilities, losses, debts, dues, damages, claims, guarantees, warranties, judgments, bonds, executions, obligations, accounts, fines, regulatory penalties (whether civil or criminal), costs and expenses (including

attorneys' fees) and demands (collectively, "Claims/Obligations") of every nature, kind and description whatsoever in law or in equity, whether known or unknown, or whether suspected or unsuspected, or whether matured or un-matured, whether liquidated or unliquidated, under any theory, including joint and several liability, which CB&I had, now have, or hereafter can, shall or may have against Owners or any of the other Owners Released Parties arising out of any manner or event relating to, or otherwise in connection with or concerning, the EPC Claims, the EPC Agreement, the Project, the S&W Parent Guarantee and the CB&I Guarantee.

3. This Mutual Release does not release any rights of S&W, the Excepted Party, it being understood and acknowledged that any release by S&W is solely as set forth in the Settlement Agreement.

4. Westinghouse and Owners have agreed that the Settlement Agreement will automatically become effective upon the closing of the purchase by Westinghouse or an affiliate of Westinghouse of all of the outstanding capital stock of S&W (such time of closing, the "Effective Time").

5. This Mutual Release and the application and interpretation thereof shall be governed exclusively by the laws of the State of New York without regard to conflicts of laws principles.

6. This Mutual Release shall be fully binding upon each Owner, CB&I and their respective legal representatives, successors and assigns.

7. The releases contemplated by Section 1 and 2 are intended to be as broad as permitted by law, provided that nothing in Section 1 or 2 shall apply to any action by any releasee to enforce the rights and obligations imposed by this Mutual Release. Without limiting the foregoing, for the avoidance of doubt, the releases contemplated by Section 1 and 2 are intended to, and do, extinguish suspected, unmatured, unliquidated and unknown Claims/Obligations even if, confirmation, maturation or knowledge of those Claims/Obligations on the date hereof would have affected the decision to enter into this Mutual Release. The release of suspected, unmatured, unliquidated or unknown Claims/Obligations was separately bargained for and was a key element of this Mutual Release, relied upon by each party in entering this Mutual Release. The Owner Releasing Parties and the CB&I Releasing Parties shall be deemed to have, and by execution of this Mutual Release shall have, expressly waived and relinquished, to the fullest extent permitted by law, any rights or benefits they may have under state law, federal law, foreign law or common law that may have the effect of limiting the release set forth in Section 1, including any rights or benefits conferred by Section 1542 of the California Civil Code or any provision similar, comparable or equivalent to Section 1542 or successor provision to Section 1542 of the California Civil Code, which provides that: A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM MUST HAVE MATERIALLY AFFECTED HIS SETTLEMENT WITH THE DEBTOR.

8. Each of the persons executing this Mutual Release on behalf of its respective principals warrants that he or she is legally entitled to enter into this Mutual Release and release the CB&I Released Parties and the Owner Released Parties from every claim and liability, whether potential or actual, herein referred to, and that he or she has the authority to bind his or her respective principals and has full authority to enter into this Mutual Release.

9. Owners and CB&I acknowledge and represent that they have each relied solely upon facts obtained from their own independent investigations in executing this Mutual Release and that they each have not relied upon any statements or representations of any nature from the parties to the Settlement Agreement or any other individuals or entities, or such other parties', individuals' or entities' attorneys or representatives. Each Owner and CB&I represent that they have had sufficient opportunity to consult their own legal counsel with regard to the negotiation and preparation, as well as the scope and effect, of this Mutual Release.

10. Owners and CB&I agree to execute any further documents necessary and take such other actions as to effectuate this Mutual Release.

11. This Mutual Release may be executed in counterparts, each of which shall be deemed an original and all of which together shall constitute one and the same instrument.

**IN WITNESS WHEREOF**, Owners and CB&I execute this Release by their duly authorized representatives.

**South Carolina Electric & Gas Company,**
for itself and as agent for the South Carolina Public Service Authority

By [signature]

Title Chairman & CEO

Date October 27 2015

**Chicago Bridge & Iron Company N.V.**

By____________________________

Title____________________________

Date____________________________

8. Each of the persons executing this Mutual Release on behalf of its respective principals warrants that he or she is legally entitled to enter into this Mutual Release and release the CB&I Released Parties and the Owner Released Parties from every claim and liability, whether potential or actual, herein referred to, and that he or she has the authority to bind his or her respective principals and has full authority to enter into this Mutual Release.

9. Owners and CB&I acknowledge and represent that they have each relied solely upon facts obtained from their own independent investigations in executing this Mutual Release and that they each have not relied upon any statements or representations of any nature from the parties to the Settlement Agreement or any other individuals or entities, or such other parties', individuals' or entities' attorneys or representatives. Each Owner and CB&I represent that they have had sufficient opportunity to consult their own legal counsel with regard to the negotiation and preparation, as well as the scope and effect, of this Mutual Release.

10. Owners and CB&I agree to execute any further documents necessary and take such other actions as to effectuate this Mutual Release.

11. This Mutual Release may be executed in counterparts, each of which shall be deemed an original and all of which together shall constitute one and the same instrument.

**IN WITNESS WHEREOF**, Owners and CB&I execute this Release by their duly authorized representatives.

**South Carolina Electric & Gas Company,**
for itself and as agent for the South Carolina Public Service Authority

By_______________________________

Title_____________________________

Date_____________________________

**Chicago Bridge & Iron Company N.V.**

By [signature]

Title EVP, Chief Legal Officer & Sec'y

Date Oct 27, 2015

# MUTUAL RELEASE

This Mutual Release is entered into this 27th day of October, 2015, and becomes effective as described herein, by and among Westinghouse Electric Company LLC, a Delaware limited liability company having a place of business in Cranberry, Pennsylvania ("Westinghouse"), CB&I Stone & Webster, Inc., a Louisiana corporation with a place of business in Charlotte, North Carolina ("S&W"), and South Carolina Electric & Gas Company ("SCE&G"), for itself and as agent for the South Carolina Public Service Authority, a body corporate and politic created by the laws of South Carolina ("Santee Cooper") (collectively "Owners"). Westinghouse, S&W and Owners may be referred to individually as "Party" or collectively as "Parties."

## RECITALS

**WHEREAS**, Owners and a consortium consisting of Westinghouse and S&W (collectively "Contractor") entered into an Engineering, Procurement and Construction Agreement on May 23, 2008 ("EPC Agreement") pursuant to which Contractor agreed to design and construct two new nuclear electrical generating units known as V.C. Summer Units 2 and 3 (the "Units") located at the V.C. Summer Nuclear Generating Station in Jenkinsville, South Carolina (the "Project");

**WHEREAS**, Contractor has submitted various notices of Change and Change Dispute Notices pursuant to the EPC Agreement that remain unresolved and various commercial issues, Change Disputes and Claims (as defined in the EPC Agreement) are pending under the EPC Agreement (collectively, "EPC Claims");

**WHEREAS**, Owners and Westinghouse are entering into a binding Amendment Agreement ("October 2015 Amendment") with respect to, among other things, the EPC Claims;

**WHEREAS**, a Westinghouse affiliate, Chicago Bridge & Iron Company N.V. ("CB&I"), and S&W are entering into a Stock Purchase Agreement pursuant to which, among other things, Westinghouse or an affiliate of Westinghouse will purchase all of the outstanding capital stock of S&W (the "SPA");

**WHEREAS**, upon the execution the SPA, Westinghouse shall execute this Mutual Release on its own behalf, and upon the consummation of the SPA (the "Effective Time") shall cause S&W to execute this Mutual Release on behalf of S&W; and

**WHEREAS**, upon execution of this Mutual Release by Westinghouse and S&W, this Mutual Release shall become effective as of the Effective Time, and in the event the SPA is not consummated, this Mutual Release shall not become effective and shall be null and void in all respects.

**NOW, THEREFORE**, in consideration of the recitals and the mutual promises, covenants and agreements contained in the October 2015 Amendment and herein, and for other good and valuable consideration, the receipt, adequacy and sufficiency of which are hereby acknowledged, Owners, Westinghouse and S&W hereby provide mutual releases as follows.

**RELEASE**

1. Except as otherwise provided in the October 2015 Amendment (including Exhibit C to the October 2015 Amendment), upon the Effective Time, Owners, for themselves and their respective officers, agents, directors, partners, managing members, stockholders, owners, employees, attorneys, advisors, representatives, insurers, sureties, predecessors, successors, assigns, parents, subsidiaries and affiliated corporations, heirs, executors and administrators and each of them, hereby unconditionally and irrevocably fully release, forever discharge and covenant not to sue Westinghouse, S&W and their past, present, and future officers, agents, directors, partners, managing members, stockholders, owners, employees, attorneys, advisors, representatives, insurers, sureties, predecessors, successors, assigns, parents, subsidiaries, and affiliated corporations, and each of them, from any and all manner of actions, controversies, suits, liens, losses, debts, dues, damages, claims, attorney fees, guarantees, warranties, judgments, bonds, executions and demands of every nature, kind and description whatsoever in law or in equity, whether known or unknown, or whether suspected or unsuspected, or whether matured or unmatured, whether liquidated or unliquidated, under any theory, including joint and several liability, which Owners had, now have, or hereafter can, shall or may have against Westinghouse and/or S&W for any events or circumstances occurring as of the Effective Time and arising out of any manner or event relating to, or otherwise in connection with or concerning, the EPC Claims, the EPC Agreement and the Project.

2. Except as otherwise provided in the October 2015 Amendment (including Exhibit C to the October 2015 Amendment), upon the Effective Time, Westinghouse and S&W, for themselves and their respective officers, agents, directors, partners, managing members, stockholders, owners, employees, attorneys, advisors, representatives, insurers, sureties, predecessors, successors, assigns, parents, subsidiaries and affiliated corporations, heirs, executors and administrators and each of them, hereby unconditionally and irrevocably fully release, forever discharge and covenant not to sue Owners and their past, present, and future officers, agents, directors, partners, managing members, stockholders, owners, employees, attorneys, advisors, representatives, insurers, sureties, predecessors, successors, assigns, parents, subsidiaries, and affiliated corporations, and each of them, from any and all manner of actions, controversies, suits, liens, losses, debts, dues, damages, claims, attorney fees, guarantees, warranties, judgments, bonds, executions and demands of every nature, kind and description whatsoever in law or in equity, whether known or unknown, or whether suspected or unsuspected, or whether matured or unmatured, whether liquidated or unliquidated, under any theory, including joint and several liability, which Westinghouse and/or S&W had, now have, or hereafter can, shall or may have against Owners for any events or circumstances occurring as of the Effective Time and arising out of any manner or event relating to, or otherwise in connection with or concerning, the EPC Claims, the EPC Agreement and the Project.

3. This Mutual Release and the application and interpretation thereof shall be governed exclusively by the laws of the State of New York without regard to conflicts of laws principles.

4. This Mutual Release shall be fully binding upon Owners, Westinghouse and S&W and their respective legal representatives, successors and assigns.

5. Each of the persons executing this Mutual Release on behalf of their respective principals warrants that he or she is legally entitled to enter into this Mutual Release and release every claim and liability, whether potential or actual, herein referred to, and that he or she has the authority to bind his or her respective principals and has full authority to enter into this Mutual Release.

6. Owners, Westinghouse and S&W acknowledge and represent that each has had sufficient opportunity to consult its own legal counsel with regard to the negotiation and preparation, as well as the scope and effect, of this Mutual Release.

7. Owners, Westinghouse and S&W agree to execute any further documents necessary and take such other actions as to effectuate this Mutual Release.

8. This Mutual Release may be executed in counterparts, each of which shall be deemed an original and all of which together shall constitute one and the same instrument.

**IN WITNESS WHEREOF**, the Parties execute this Mutual Release by their duly authorized representatives.

**Westinghouse Electric Company LLC**

By [signature]

Title President & Chief Executive Officer

Date October 27, 2015

**CB&I Stone & Webster, Inc.**

By________________

Title________________

Date________________

**South Carolina Electric & Gas Company, for itself and as agent for the South Carolina Public Service Authority**

By [signature]

Title Chairman · CEO

Date October 27 2015

SCANA_DEFS_000500

EXHIBIT 31

# BEFORE THE PUBLIC SERVICE COMMISSION OF SOUTH CAROLINA

## COLUMBIA, SOUTH CAROLINA

**PROCEEDING #17-10607 APRIL 12, 2017 2:30 P.M.**

**ALLOWABLE EX PARTE BRIEFING - ND-2017-12-E**

**SOUTH CAROLINA ELECTRIC & GAS COMPANY -** Request for Allowable Ex Parte Briefing to Discuss Updates Regarding the New Nuclear Units at V.C. Summer Nuclear Station and Status of the Contractor, Westinghouse Electric Company, LLC

**TRANSCRIPT OF ALLOWABLE PROCEEDINGS** **EX PARTE BRIEFING**

**COMMISSION MEMBERS PRESENT**: Swain E. WHITFIELD, CHAIRMAN; Comer H. 'Randy' RANDALL, VICE CHAIRMAN; and COMMISSIONERS John E. 'Butch' HOWARD, Elliott F. ELAM, Jr., Elizabeth B. 'Lib' FLEMING, Nikiya M. 'Nikki' HALL, and G. O'Neal HAMILTON

ADVISOR TO COMMISSION: Joseph Melchers, Esq.
General Counsel

**STAFF:** F. David Butler, Senior Counsel; James Spearman, Ph.D., Executive Assistant to Commissioners; Josh Minges, Esq., and David W. Stark, III, Esq., Legal Staff; Philip Riley, Doug Pratt, Tom Ellison, William O. Richardson, and John Powers, Advisory Staff; Jo Elizabeth M. Wheat, CVR-CM/M-GNSC, Court Reporter; and Deborah Easterling, Calvin Woods, and Afton Ellison, Hearing Room Assistants

**APPEARANCES:**

***MATTHEW GISSENDANNER, ESQUIRE,*** and ***BELTON ZEIGLER, ESQUIRE,*** together with ***KEVIN B. MARSH*** [Chairman/CEO, SCE&G and SCANA], ***JIMMY E. ADDISON*** [Executive VP/CFO, SCANA] *and* ***STEPHEN A. BYRNE*** [Executive VP, SCANA; COO and President/Generation & Transmission, SCE&G], representing and presenting for **SOUTH CAROLINA ELECTRIC & GAS COMPANY**

***JEFFREY M. NELSON, ESQUIRE,*** representing **THE OFFICE OF REGULATORY STAFF**

USCA4 Appeal: 21-1141 Doc: 30-1 Filed: 04/19/2021 Pg: 514 of 563
0:17-cv-02094-JMC Date Filed 10/02/20 Entry Number 233-32 Page 2 of 51

*Ex Parte* *SCE&G / V.C. Summer Units 2 & 3* 2
*Updates Regarding Units and Status of Contractor, Westinghouse*

# I N D E X

**PAGE**

**OPENING MATTERS** .................................... 3-8

**PRESENTATION**

**Kevin B. Marsh [SCANA]** .............................. 9

**Jimmy E. Addison [SCANA]** ............................ 15

**Stephen A. Byrne [SCANA/SCE&G]** ...................... 23

Question(s)/Comment by Commissioner Elam.................. 40

Question(s)/Comment by Commissioner Fleming............... 41

Question(s)/Comment by Chairman Whitfield................ 44

Question(s)/Comment by Commissioner Fleming............... 47

Question(s)/Comment by Chairman Whitfield................ 48

Question(s)/Comment by Commissioner Hamilton.............. 49

**CLOSING MATTERS** .................................... 50

**REPORTER'S CERTIFICATE** ............................. 51

Note: For identification of additional referenced materials and/or links for same, please see Certification correspondence filed by the Office of Regulatory Staff.

Please note the following inclusions/attachments to the record:

- PowerPoint Presentation Slides (PDF)

4/12/17

**PUBLIC SERVICE COMMISSION OF SOUTH CAROLINA**
FLR001496

JA 482

P R O C E E D I N G S

**CHAIRMAN WHITFIELD**: Please be seated. I'll call this allowable ex parte briefing to order and turn it over to our attorney, Mr. Melchers, to read the docket.

**MR. MELCHERS**: Thank you, Mr. Chairman. Commissioners, we are here pursuant to a Notice of Request for Allowable Ex Parte Communication Briefing filed by South Carolina Electric & Gas Company. The date and time of the briefing is April 12, 2017, at 2:30, here in the Commission's chambers, and the subject matter to be discussed at this briefing is: Update regarding the progress of construction of the new nuclear units at V.C. Summer Nuclear Station and status of the Contractor, Westinghouse Electric Company LLC.

Thank you, Mr. Chairman.

**CHAIRMAN WHITFIELD**: Thank you, Mr. Melchers.

I'll call on the South Carolina Office of Regulatory Staff to give us our ground rules for this allowable ex parte briefing.

**MR. NELSON**: Thank you, Mr. Chairman.

**CHAIRMAN WHITFIELD**: Mr. Nelson.

**MR. NELSON**: Good afternoon. My name is Jeff Nelson. For those of you who don't know me, I am

the Chief Counsel for the Office of Regulatory Staff, and I want to briefly explain to you the process here today, because this is a little different from maybe what a lot of you have been to before, which would be like a contested case hearing.

This is an allowable ex parte briefing. It's conducted according to the rules that govern this under South Carolina Law. I'm here today as the Designee of the Executive Director of the Office of Regulatory Staff, which is Mr. Dukes Scott. And the ex parte will have to be conducted by the Commission in accordance with the provisions of South Carolina Code Annotated Section 58-3-260(C).

As the ORS representative, it's my duty to certify the record of this proceeding to the Chief Clerk of the Public Service Commission, Ms. Jocelyn Boyd, within the next 72 hours, and to verify this briefing was conducted in compliance with the provisions of 58-3-260. The requirements of that statute are, in part, that the allowable ex parte be confined to the subject matter that has been noticed today. In this case, the Notice that was issued was for, quote, "Updates regarding the new nuclear units at V.C. Summer Nuclear Station, and

status of the Contractor, Westinghouse Electric Company, LLC," end quote. I would therefore ask that both the presenters, the Commissioners, and the staff that all participate today, please refrain from discussing any matters not related to these specific issues.

Secondly, the statute prohibits any participants, Commissioners, or Commission Staff from requesting or giving any commitment, predetermination, or prediction regarding any action by any Commissioner as to any ultimate or penultimate issue which either is before or is likely to come before the Commission. In short, what that means is the presenters are not allowed to ask the Commissioners for anything today, and the Commission and their staff are not allowed to give an opinion or pledge anything to the company on the topics that are being presented today.

Third, I would ask the participants, Commissioners, and staff, to refrain from referencing any reports, articles, statutes, or documents of any kind that aren't included in the presentation that's here today. If any such additional documents are mentioned, those would have to be provided to us within 48 hours so we

could certify that as part of the record.

Finally, I'd like to just explain what this is, because, like I said, this is a little different; this is a briefing. Any party, any person, can request to do a briefing in front of the Public Service Commission under the ex parte rules. SCE&G has requested to do this briefing here today. What it is, then, is just a presentation by them. There's no cross-examination or anything of that type. There's no order that comes out of this by the Commission at any time. This is just a one-sided briefing by one party. And, again, any party can request such a briefing be given to the Commission.

Finally, I'd like to note that everyone in attendance today must sign — you should've picked up, when you signed in — everybody needs to, first, sign in. Secondly, you should've been given a sheet when you came in. That sheet needs to be signed and turned in by you, and that is a verification that the ex parte briefing that's being conducted here today has been conducted in accordance with the rules that I just set out for you. If you have any questions about any of that, come talk to me, or you can come talk to the

Commission Staff before you turn that in. But everybody that is here today — including the Commissioners and the presenters — everybody has to sign that sheet before they leave today.

That's all I have. Thank you for your time, Mr. Chairman.

**CHAIRMAN WHITFIELD**: Thank you, Mr. Nelson. I believe everyone understands our ground rules. Now I would remind everyone we do have a no-cell-phone policy in here, and if your cell phones are not already off or on silent, please, I'd like to remind you to please do so at this time.

At this time, I'll call on Mr. Gissendanner. Mr. Gissendanner, I want to thank you and Mr. Burgess for promptly scheduling this allowable ex parte briefing. We realize this is impactful to all South Carolina citizens, and we look forward to your presentation and your information today. Mr. Gissendanner.

**MR. GISSENDANNER**: Thank you, Mr. Chairman. Good afternoon, Mr. Chairman, Mr. Vice Chairman, and members of the Commission. My name is Matthew Gissendanner and I'm corporate counsel for SCE&G.

The subject of the briefing today is the progress of construction of the new nuclear units

at V.C. Summer Nuclear Station and the status of the Contractor, Westinghouse Electric Company, LLC.

With me today, on behalf of SCE&G, is Mr. Kevin Marsh, Chairman and CEO of SCANA and SCE&G; Mr. Jimmy Addison, Executive Vice President and Chief Financial Officer of SCANA; and Mr. Steve Byrne, Executive Vice President of SCANA and Chief Operating Officer and President for Generation and Transmission of SCE&G. They will each provide remarks on the Westinghouse bankruptcy and its effect on the project, and then Mr. Byrne has a construction update, consisting of 28 slides. We anticipate the presentation taking approximately 45 minutes.

Mr. Chairman, we are here at your pleasure and we want to answer any questions that you all may have, so please feel free to stop us at any point during the presentation and ask whatever questions are on your mind. We're here to serve you and answer your questions.

With that said, I'll turn it over to Mr. Marsh, Mr. Addison, and Mr. Byrne. Thank you, Mr. Chairman.

**CHAIRMAN WHITFIELD**: Thank you, Mr. Gissendanner.

 Mr. Marsh.

**MR. KEVIN B. MARSH [SCE&G/SCANA]:** Good afternoon Chairman Whitfield and Commissioners. We are pleased to appear before you today. With me participating in this ex parte briefing are Mr. Jimmy Addison and Mr. Steve Byrne. We will all brief you on aspects of the Westinghouse bankruptcy. Mr. Byrne will also provide the twice-annual construction update required under Order 2016-794.

On March 29, 2017, Westinghouse filed to reorganize its business under the protection of Chapter 11 of the United States Bankruptcy Code. This is a reorganization filing. Westinghouse intends to continue in business as a provider of fuel, components, and services to the nuclear industry. The information Westinghouse has provided to the Bankruptcy Court indicates that these are profitable lines of business.

Westinghouse's announced goal in bankruptcy is to isolate its other businesses from new nuclear construction. For that reason, we anticipate that any plan to complete the units will include Westinghouse in some capacity, but not in a leader role as construction manager. We're discussing

USCA4 Appeal: 21-1141 Doc: 30-1 Filed: 04/19/2021 Pg: 522 of 563
0:17-cv-02094-JMC Date Filed 10/02/20 Entry Number 233-32 Page 10 of 51

*Ex Parte* *SCE&G / V.C. Summer Units 2 & 3* 10
*Updates Regarding Units and Status of Contractor, Westinghouse*

these matters with Fluor and other potential resources that could be part of a restructured project to complete the units.

Prior to Westinghouse's Chapter 11 filing, we, along with our project partner, Santee Cooper, worked with our bankruptcy counsel, financial advisors, and Westinghouse to reach an interim agreement which the Bankruptcy Court approved. Under this interim agreement, SCE&G and Santee Cooper are funding continued work on the units during a 30-day evaluation period while we evaluate our options. We may request an extension, if needed, which Westinghouse may agree to grant, or not.

This interim agreement is supporting continued work on the project of over 5000 construction workers who were on-site and working today. Mr. Addison and Mr. Byrne will discuss the interim agreement in more detail when they address the Commission.

During the interim period provided under the agreement, SCE&G and Santee Cooper are evaluating their options for continuing or canceling the units. The options presently being considered by SCE&G include: continue with the construction of

4/12/17
PUBLIC SERVICE COMMISSION OF SOUTH CAROLINA
FLR001504
JA 490

both units; focus on construction of one unit and delay construction of the other; continue with construction of one unit, abandon the other, and seek recovery of the abandoned unit under the BLRA; or abandon the project and seek recovery under the BLRA. Other options may arise during our review.

All other things being equal, our preference would be to complete the units for the benefits that they would provide for our system. We are giving all available options full and equal consideration on their merits. We are not prejudging any option.

Westinghouse is providing us with access to information concerning the estimated cost to complete the units and its commercial arrangements with Fluor, other contractors, and vendors. Through the agreement, we now have direct access to Fluor and other contractors and vendors to discuss commercial and other issues with them. We're using this information and access to evaluate the options for completing the units as a restructured project outside of the EPC contract.

As you would expect, a primary goal of the evaluation is to validate the cost to complete the units that was provided to us by Westinghouse. Our

New Nuclear team, supported by outside experts, is reviewing the inputs and assumptions used to generate this cost estimate. We cannot currently validate this estimate because we have not yet completed our evaluation.

If Westinghouse rejects the EPC contract on which our current cost estimates are based, Westinghouse and Toshiba will owe us damages. Mr. Addison will discuss in more detail the caps that apply to certain aspects of damages and the guarantee by Westinghouse's parent company, Toshiba, for payment of our claims against Westinghouse.

Based on what we know now, the amount of damages available under the cap is greater than or equal to the additional cost Westinghouse is currently estimating will be required to complete the project. This is one reason why validating Westinghouse's calculation of additional costs is so important.

The federal production tax credits potentially available to the project represent approximately $2.2 billion in value to SCE&G's customers, if both units are completed, and are an important part of our cost evaluation. Under current law, a unit

must be in service before January 1, 2021, to earn the credits. The current substantial completion dates provided by Westinghouse support earning the full value of the credits. Nevertheless, it is prudent to protect the eligibility for credits even if the current deadlines are missed. For that reason, we have worked closely with our Washington delegation to eliminate the tax credit deadline. South Carolina Representative Tom Rice and South Carolina Senator Tim Scott have introduced legislation to accomplish this and also to make it possible for Santee Cooper, as a non-income-tax-paying entity, to take advantage of its potential share of the credits.

In past BLRA proceedings, we have assessed the relative costs and benefits of completing the units against the costs and benefits of canceling the units and relying on other sources of generation. The evaluation we plan to conduct of our current operation will involve a similar assessment. When appropriate information as to cost and other matters is available, we plan to assess the relative costs and benefits of completing or canceling the units, just as we have in the past. That assessment would include a review of multiple

assumptions, consistent with our system modeling and the Integrated Resource Plan. Such an evaluation would also consider the effect of the various alternatives on generation mix, $CO_2$ emissions, and exposure to future fuel price risk.

Once these evaluations are complete, the company plans to come before the Commission for a full review and assessment of its chosen alternative before making a final commitment to any course of action. When that will take place depends on the timing of many factors that are not known at this time. We will continue to keep the Commission informed of these matters as allowed under ex parte rules.

We'll also stay in close contact with the Office of Regulatory Staff. Dukes Scott and his team at the ORS have been persistent in monitoring developments with Westinghouse and the project, and insisting that we keep the best interests of our customers and the State of South Carolina in the forefront of our thinking. We appreciate the positive contributions that ORS is making and plan to stay in close contact with Mr. Scott and his team as the situation progresses.

I will now turn our comments over to Mr.

Addison.

**MR. JIMMY E. ADDISON [SCANA]**: Thank you, Kevin.

Good afternoon, Chairman Whitfield, and fellow Commissioners. My goal today is to provide you with additional information concerning the Westinghouse plan for reorganization in bankruptcy, the damages Westinghouse will owe us if they reject their EPC obligations, the scope of the Toshiba parental guarantee to pay those damages, and the ability of Westinghouse and Toshiba to generate the cash required to make those payments. Then I'll also discuss the effect of the Westinghouse –

**CHAIRMAN WHITFIELD**: Mr. Addison, I'm sorry, could you get your mic on, please?

**MR. MELCHERS**: It is on; it just needs to be closer.

**CHAIRMAN WHITFIELD**: Just pull it a little closer.

**MR. JIMMY E. ADDISON [SCANA]**: How's that [indicating]?

**CHAIRMAN WHITFIELD**: Yeah.

**MR. JIMMY E. ADDISON [SCANA]**: And I'll also discuss the effect of the Westinghouse bankruptcy on SCANA and SCE&G's position in the capital

markets.

So Westinghouse has identified negative cash flow, as associated with its two AP1000 construction projects, as a source of its current financial difficulties. As Mr. Marsh has indicated, Westinghouse plans to use bankruptcy protection to reorganize around its profitable nuclear fuel, components, and services related businesses, which Westinghouse believes are valuable and financially sustainable. They intend to use bankruptcy to fence off the contractual liability for the two AP1000 construction projects from its other businesses.

Westinghouse does not list any secured debt on its books at the time of the bankruptcy filing. The unsecured debt listed is largely trade debt, most of which is identified as trade debt owed to suppliers of the AP1000 projects.

Westinghouse has disclosed that it has negotiated an $800 billion line of credit to support its ongoing operations after the bankruptcy filing. Draws against this line of credit will have priority of payback over other pre-petition debts, including any amounts owed to V.C. Summer and Vogtle project owners. However, Westinghouse

is not using its line of credit to defray the costs of continuing to work on the AP1000 projects during the current period. In fact, it's prohibited from doing so by the providers of that credit. Instead, they negotiated interim assessment agreements with the V.C. Summer and Vogtle project owners as a condition of the work going forward on the projects.

As Mr. Byrne will discuss, under these interim assessment agreements, the V.C. Summer and Vogtle project owners are paying Fluor directly and are funding Westinghouse weekly to pay for work done by other South Carolina contractors and vendors on our project. The V.C. Summer and Vogtle owners are also paying Westinghouse's internal costs of supporting the project during this period.

Westinghouse has publicly stated that the additional costs associated with completing the two AP1000 projects above what it could contractually require the V.C. Summer and Vogtle project owners to pay is approximately $4 billion. They recently informed SCE&G that the V.C. Summer project share of the additional $4 billion cost estimate is approximately $1.5 billion. The $4 billion is largely associated with the fixed-and-firm price

options that V.C. Summer and Vogtle project owners have negotiated for their projects. I stress that these are Westinghouse's estimates, and we have not yet validated the amounts. Bankruptcy gives Westinghouse the ability to reject or walk away from these fixed-price obligations. However, if it does so, SCE&G and Santee Cooper have the right to claim damages and collect them, along with the Vogtle project owners and other unsecured creditors, from the value of Westinghouse's businesses and assets. Those damages are subject to a contractual cap, as I will discuss in a moment.

In addition, Toshiba has given SCE&G and Santee Cooper a parental guarantee for Westinghouse's payment obligations under the EPC contract, including the obligation for damages. Under the parental guarantee, SCE&G has the right, in its discretion, to pursue either Westinghouse or Toshiba for any amounts, including damages, that are owed and not paid.

In general, the damages we can collect from Westinghouse and, therefore, Toshiba, are capped at 25 percent of the payments we have made to Westinghouse at the time it breaches the EPC

USCA4 Appeal: 21-1141 Doc: 30-1 Filed: 04/19/2021 Pg: 531 of 563
0:17-cv-02094-JMC Date Filed 10/02/20 Entry Number 233-32 Page 19 of 51
*Ex Parte* *SCE&G / V.C. Summer Units 2 & 3* 19
*Updates Regarding Units and Status of Contractor, Westinghouse*

contract. Given the payments made to date, if the breach occurred today, we would expect the amount of the cap to be approximately $1.7 billion for the total project, or approximately $940 million for SCE&G's 55 percent share. This amount will grow somewhat as further payments are made.

One source of payment for damages due from Westinghouse would be Westinghouse's value as a business. Their two principal lines of business, apart from the new nuclear construction, are its nuclear fuel and component manufacturing business, and its operating plants business. The nuclear fuel and component manufacturing business is the largest supplier of fuel for light water commercial reactors globally and supports 140 nuclear plants worldwide. The operating plants business is a leading supplier of nuclear services globally and supplies some degree of services to 80 percent of the operating nuclear power plants worldwide.

The bankruptcy filings indicate that, in fiscal year 2015, these two lines of business generated $305 million in EBITDA, or earnings before interest, taxes, depreciation, and amortization. There is significant value in this level of annual cash flow.

4/12/17
PUBLIC SERVICE COMMISSION OF SOUTH CAROLINA
FLR001513
JA 499

Westinghouse is also the owner of the AP1000 design, patents, license, and technology. The AP1000 still represents the most advanced passive-safety nuclear reactor design that has been licensed. Construction issues notwithstanding, the AP1000 technology is a valuable Westinghouse asset, going forward.

If they reject the EPC contract in bankruptcy, SCE&G and Santee Cooper can seek to recover their additional cost of completing the units from the value of these businesses through the bankruptcy court. We would likely do so along with the Vogtle project owners. Funds to pay unsecured creditors, like SCE&G, could be generated by recapitalizing Westinghouse or selling the company to a buyer. Unofficial reports indicate that several potential buyers, including some in the US, have expressed interest in purchasing Westinghouse out of bankruptcy. What they might pay is unknown.

SCE&G can also seek to recover its damages directly from Toshiba. Toshiba has a number of very valuable businesses, the most prominent of which is its flash memory business. In fact, they invented the flash memory and are Apple's principal flash memory supplier. Toshiba has indicated it

USCA4 Appeal: 21-1141 Doc: 30-1 Filed: 04/19/2021 Pg: 533 of 563
0:17-cv-02094-JMC Date Filed 10/02/20 Entry Number 233-32 Page 21 of 51
Ex Parte SCE&G / V.C. Summer Units 2 & 3 21
Updates Regarding Units and Status of Contractor, Westinghouse

will sell the controlling interest in its flash memory business to generate cash, and there appear to be multiple interested parties.

Our assessment is that there is substantial value at Toshiba to support our claim for damages if Westinghouse fails to pay SCE&G's claims. Again, let me stress that this is based on Westinghouse's current estimate that indicated it will require an additional $1.5 billion above the previously approved cost schedules to complete the units. That estimate is yet to be verified.

The potential effects of Westinghouse's bankruptcy on SCE&G and SCANA have attracted a great deal of attention from the financial community. The interest-rate cost on SCE&G's senior secured debt has increased by 1 to 4/10 of a percent since the Westinghouse bankruptcy was first publicly suggested. SCANA stock has lost approximately 18 percent of its value compared to its peers during this time. The rating agencies have put SCE&G and SCANA's debt ratings on Negative Outlook or Watch status, as they have all of the owners of the US AP1000 projects, including Santee Cooper. However, to date, the ratings themselves have not been changed.

4/12/17
PUBLIC SERVICE COMMISSION OF SOUTH CAROLINA
FLR001515
JA 501

While these implications have been significant, they have been substantially mitigated by the existence of the Base Load Review Act, or BLRA, and not just the existence of the law, but the fair and consistent application of the law over the last decade by the ORS and this Commission. It is of critical importance that this approach continue, particularly given the uncertainty of the present moment. There have been a number of questions about how capital investment in the project will be treated if we determine that canceling is in the best interest of our customers and the State. Perceptions profoundly influence markets' realities. For the market to become concerned that the regulatory risk disability were too great under either a cancel or continue scenario, SCE&G could lose the ability to raise capital on reasonable terms; and that fact, alone, could itself force us to cancel the project.

We are fortunate that we're not currently in a position where concerns about our ability to execute a plan of finance are materially limiting the options we can consider for the project. At this juncture, we do not know what, if any, long-term impact the Westinghouse bankruptcy will have

on our costs to complete the units. But we do know that, during this interim evaluation period, it's critically important that markets not lose confidence in the regulatory process in South Carolina. A loss of confidence during this critical time can make it difficult or impossible to effectively manage the finances of the project and the company, going forward.

I'll now turn the presentation over to Mr. Byrne.

**CHAIRMAN WHITFIELD**: Mr. Byrne?

**MR. STEPHEN A. BYRNE [SCE&G/SCANA]**: Thank you, Jimmy.

Good afternoon, Chairman Whitfield and members of the Commission. My goal is to provide you more detailed information about the interim assessment agreement, the effect of the bankruptcy on the construction site, and the evaluation we are undertaking concerning options to continue or not continue the project. As Mr. Marsh mentioned, I'll also provide the twice-annual update on construction progress since we were last before the Commission in October of 2016.

Work on the project is proceeding under the interim assessment agreement that has been in place

since March 29th of 2017. That's the date when Westinghouse filed for reorganization under the United States Bankruptcy Code. Under the interim assessment agreement, SCE&G is paying Fluor Corporation directly for its work. SCE&G is providing Westinghouse verification of those payments so they can be counted as EPC contract payments.

Each week, Westinghouse provides SCE&G with an estimate of its payments that it must make to other subcontractors and vendors. SCE&G transmits funds to Westinghouse to cover that estimate. The actual payments are trued up against disbursements. SCE&G also pays Westinghouse weekly for its costs to support the project. That support includes design engineering, field engineering, procurement, construction and project management, quality assurance, safety, information technology, licensing support, records management, and other costs.

Under the interim assessment agreement, SCE&G has the right, but not the obligation, to pay contractors and vendors who have past-due accounts or who have filed liens on the project. In isolated cases, such payment may be necessary to

prevent contractors who are critically important to the project from walking off the job. However, SCE&G is strictly limiting such payments. We advise unpaid subcontractors or vendors to take their claim to the Bankruptcy Court.

Payments made under the interim assessment agreement are counted as advance milestone payments under the EPC contract. The interim assessment agreement otherwise suspends the milestone payments.

Total payments have been running approximately $30 million a week, or approximately $120 million a month, and this is less than the anticipated value of the milestone payments.

The interim assessment agreement expires on April 28th of 2017, but can be canceled on five days' notice by the owners of the V.C. Summer project. The V.C. Summer owners may request an extension of the interim agreement, if necessary, to complete the evaluation of its options for the project. Westinghouse may or may not grant this request. SCE&G and Santee Cooper, along with the Georgia project partners, are sharing in the cost of Westinghouse's team of engineers and managers to support the AP1000 construction. For that reason,

USCA4 Appeal: 21-1141 Doc: 30-1 Filed: 04/19/2021 Pg: 538 of 563
0:17-cv-02094-JMC Date Filed 10/02/20 Entry Number 233-32 Page 26 of 51

the interim assessment agreement terminates if Georgia Power Company terminates its analogous agreement with Westinghouse and the V.C. Summer owners do not otherwise agree to extend the agreement.

In the interim assessment agreement, Westinghouse has agreed that it will not sell or attempt to sell project assets, nor will it attempt to grant any lien on those assets while that agreement is in place. Westinghouse has also agreed that it will not reject the EPC contract or its contractual obligations with Fluor and other vendors or subcontractors until the agreement expires. This ensures that the EPC contract and the contracts that support it will remain in place as the evaluation is conducted while the interim assessment agreement is in place.

The interim agreement also removes confidentiality constraints that previously limited SCE&G's ability to consult directly with Fluor and others concerning project status and contractual and commercial issues. Westinghouse has also contractually committed itself during the interim evaluation period to provide SCE&G with information about the project and the bankruptcy plan necessary

FLR001520

for SCE&G to investigate its options for completing the project.

A principal task of the New Nuclear team during this interim evaluation period is to determine the feasibility of completing the project. To that end, our team is validating Westinghouse's estimates of additional costs needed to complete the units. In testing and validating these cost estimates, the New Nuclear team is working closely with Fluor and Westinghouse and is assisted by outside construction costing and scheduling experts. As Mr. Marsh indicated, Westinghouse's recent planning and evaluation has focused on determining the additional costs to complete construction and the implications of those costs on the solvency of Westinghouse and Toshiba. Part of our evaluation will be to assess the likely completion dates in light of the construction schedules that the New Nuclear team is reviewing.

Important commercial issues must be considered in evaluating any owner-directed option. SCE&G must determine what contracts and subcontracts can or should be carried forward, what role Fluor can play in completing the project, and what additional internal and external resources will be required to

effectively direct the work. Westinghouse has informed us that it is willing to continue supporting engineering testing and startup requirements of the project even during the bankruptcy. We are assessing the terms of any potential engagement now.

A further task of the New Nuclear team is to evaluate the costs and activities that would be required to cancel the project. This involves assessing the cost of demobilization, structure removal, site restoration, and salvage value of the equipment and materials on the site.

Since the bankruptcy, Westinghouse has been generally cooperative and responsive to our requests for information. Our ability to obtain information and consult directly with Fluor and other contractors has greatly increased the efficiency of our evaluation. We believe that it is in Westinghouse's corporate interests for this project to proceed to a successful conclusion and for Westinghouse to be perceived as fully cooperative in the transition. For that reason, we expect this cooperation to continue as long as these interests are in play. However, 30 days is an extremely short period of time to conduct our

evaluations. An extension of the assessment and evaluation period may be in the project's best interest, and we would hope that it would be possible to obtain such an extension if needed.

Under the amended EPC contract, SCE&G has required Westinghouse to escrow intellectual property in the form of software and design information necessary to build and operate the units. Westinghouse has reported that substantially all of the required intellectual property has now been escrowed. We are attempting to verify that this information is present in usable form at this time.

In spite of the bankruptcy, work continues on-site without substantial disruption. More than 5000 contractor and subcontractor staff are working on the site. However, we are aware that Westinghouse has directed some reduction in craft overtime and weekend work.

Westinghouse continues to support the project under the interim assessment agreement. This work continues, as before the bankruptcy, although a great deal of attention is being focused on the evaluation and transition.

We do have a handful of vendors that have

filed construction liens on the project, and our attorneys are addressing those liens. One impact that we have seen from the bankruptcy is that, immediately following the announcement, Fluor reported a high incidence of new hires failing to report for training, as scheduled. We're monitoring this aspect of the project to see if that trend continues.

[Reference: Presentation Slide 1]

At this time, I'd like to provide an update of the activities at the construction site.

[Reference: Presentation Slide 2]

As you can see from the screen, and contrary to published reports, we are still constructing two AP1000 units at the Jenkinsville site. This is an aerial view of the project, from January of this year. You can see that I've labeled a number of components: Unit 3 near the top of the screen, Unit 2 more near the middle of the screen. Left-hand side, you can see the cooling towers, which are structurally complete. On the right-hand side, you can see the containment vessel rings. Obviously, there, you can see they are nearing completion. We've also labeled turbine buildings and the nuclear island.

Near the bottom of the screen, you can see the service building. This is a building that, in the last case, we pulled out of the EPC contract. We felt we could manage this better than Westinghouse could. We gave that construction to a local construction company, MB Kahn, and they're doing a good job. They're on schedule and on budget for that project.

[Reference: Presentation Slide 3]

Another aerial view. This shows you the relationship of Units 2 and 3 to Unit 1. Near the top of the screen, you can see our V.C. Summer Unit 1 on the shores of scenic Lake Monticello. It's been operating since 1982. You can see the level of completeness of the turbine building. And you can see Unit 3 near the bottom of the screen.

You'll also notice a lot of white structures on the site; those are tents. Those tents were not a part of the original plan, but as parts and pieces are finished and sent to the site, it has caused us some storage issues, so we are storing a lot of components in a lot of those tents on the site, as well as taking advantage of two off-site storage areas.

[Reference: Presentation Slide 4]

One of the things that was completed near our last briefing but that we didn't have pictures of was Unit 3's turbine building. And these are condensers. We have three condensers for each of the units, and this is the lower half of those condensers being lowered in with the heavy lift derrick.

[Reference: Presentation Slide 5]

In December of last year, we took the largest structural module – this is the structural model that we call CA01. It weighs about 2 million pounds; it is the heaviest lift that our derrick will have to make. And this is lifting that unit, which is about 80-by-85-by-90 feet, into the Unit 3 containment vessel.

[Reference: Presentation Slide 6]

This is a steam generator. This is the first steam generator for the units. There are two per plant, so a total of four steam generators. This was lowered into Unit 2 in January.

[Reference: Presentation Slide 7]

And this is a picture of it in its resting place, being temporarily supported, in the CA01 module, which I showed you a couple of slides ago.

[Reference: Presentation Slide 8]

This is the second ring section that was placed in February this year for Unit 2. So, each containment vessel has a lower bowl, three stackable rings, and then a top closure head. So this is the second of those three stackable rings.

[Reference: Presentation Slide 9]

And here you can see it in place. The rigging has stayed attached to this ring so that we can get a weld bead between the first ring section and the second ring section before we can disengage the rigging, which is now released.

[Reference: Presentation Slide 10]

This is the Unit 2 turbine island. Top left, you can just make out a very long tank; that was our most difficult logistical transport. It's now in place, called the deaerator.

Top right, that's a component being lifted onto the turbine deck. It's a stationary portion of the turbine generator called the stator.

Bottom left, that is a lower shell for one of the low-pressure turbines.

And the bottom right, you can make out the turbine building. Here, about half of the roof trusses were installed. Subsequently, all of the roof trusses have been installed, and we're

actually installing the roof decking now. The long yellow component on that turbine building is the turbine building's overhead crane.

[Reference: Presentation Slide 11]

This is a picture of Unit 3's turbine island. We took one from December of 2015 and a similar shot from February of this year. So, in that 14 months, you can see that we've made quite a bit of progress on the turbine island and, indeed, on the nuclear island, where you can see the containment vessel ring in place.

[Reference: Presentation Slide 12]

And this is the last of the four steam generators, as it makes its way from the Port of Charleston, via rail, to the Jenkinsville site. And this is it last month; while the USC team was up in New York playing in the tournament, this steam generator was going by the Colonial Life Arena.

[Reference: Presentation Slide 13]

I talked about some storage issues we've had on the site. These are shield building panels that I've got circled here. The shield building is being made by a company called Newport News, in Virginia. Our storage location for these is

 actually near our Fairfield Pumped Storage Facility, over a mile from this tabletop where the plants are being built. But because we've run out of room there, we're having to stack them up here on the construction site.

[Reference: Presentation Slide 14]

This is a foldout or rollout view of the shield building. Now, the shield building is a big cylinder, but if you roll that cylinder out, this is what it would look like. And each of these numbered squares is a panel that's being fabricated at Newport News. The block out there where there isn't anything, that's where the auxiliary building would go. So the shield building's purpose is to protect everything inside, so it protects the reactor vessel, the steam generators, the containment vessel. There's an annular gap between the containment vessel on this shield building.

It's a composite structure. It's steel, concrete, and steel. We get the steel panels from Newport News, we put them together in a ring, we weld them together, and then we fill them with concrete. And if it's green, that means it's been completed, so you can see the first five courses of these panels have been placed and have all been

filled with concrete. And you can see there's a total of 16 of these panels — 16 courses. I should mention we have 147 of the 167 panels we need for this cylinder on-site.

[Reference: Presentation Slide 15]

This is the same picture for Unit 3, and you see we've got 82 of 167 on-site. The first two courses have been placed, and those first two courses have been filled with concrete.

[Reference: Presentation Slide 16]

Major equipment, I will tell you that most of the major equipment for these units is on our site. On this major equipment manufacturing schedule, if it's in green, it's been completed and has been delivered to us. So you can see there's just four things on here that have not been delivered. I'll talk about those in more detail here.

[Reference: Presentation Slide 17]

So, there are four reactor coolant pumps for units, labeled RCPs, and we've actually received two of the Unit 2 reactor coolant pumps, so we've got another six, total, to come in. As you see here, they should all be in about the third quarter of this year. We've got some explosive valves called squib valves. We've received some of our

Unit 2 squib valves, but the remainder – you can see here – should all be in by the second quarter of the year.

[Reference: Presentation Slide 18]

Staffing: You're aware of the fact that Fluor took over as our construction manager, and all the craft work for Fluor Corporation. Fluor took over in – showed up at the site in January. They took over all of the staffing in April. So from April 2016 through February of '17, you can see they had increased the site total by about 1200. So Fluor has been actively out recruiting craft and professionals.

[Reference: Presentation Slide 19]

Progress at the site: The contractor is required to report to us what their progress has been. They break out the percent complete in different areas, so engineering, procurement, construction, and startup. So they would report out to us 63.4 percent completion, and the actual physical construction is about 33.7 percent complete. Obviously, Unit 2 would be a little more than that, and Unit 3 would be a little less than that, but on average 33.7. So this is the percent complete they report out to us.

[Reference: Presentation Slide 20]

I wanted to list a couple of the local companies that are involved. We talk a lot about Fluor Corporation obviously being — they run their nuclear operations out of Greenville, but we have a lot of other companies that are involved in this around the State. They range from very large contracts to small contracts. You can see Glenn and Associates actually is a Jenkinsville surveying company that's supporting our project. Tindall Corporation, precast concrete, in Spartanburg, they made all the concrete for the cooling tower, so that was a relatively large contract.

So this is just a listing of some of the companies and where they are from.

[Reference: Presentation Slide 21]

This is more.

[Reference: Presentation Slide 22]

More.

[Reference: Presentation Slide 23]

You see there's a lot of companies —

[Reference: Presentation Slide 24]

— involved from around —

[Reference: Presentation Slide 25]

— the State.

[Reference: Presentation Slide 26]

Transmission status: We have 377 circuit miles of transmission associated with the new units. We're finished with Unit 2's; they're 100 percent complete. Unit 3, within the transmission structures — we don't necessarily call them towers anymore because they don't look like the lattice structures that you see there; they're normally single pole now, of metal — 74 percent complete with the structures, and 69 percent of the wires. Overall for the project, about 85 percent of structures and 79 percent on wire. So the transmission construction is going very well.

[Reference: Presentation Slide 27]

We often get questions on the Sanmen units. There are two AP1000s being built at a site called Sanmen, in China. That's the picture here. There are also two being built at a site called Haiyang. You can see that these plants look like they're physically complete, and, indeed, Unit 1 has gone through its hot functional testing. Westinghouse, in its filings, report that they expect to load fuel soon at Sanmen 1 and Haiyang 1, and they expect that the Sanmen unit and the Haiyang unit — at least the first one — should come on-line

towards the end of 2017 or early 2018.

[Reference: Presentation Slide 28]

And we would now be glad to entertain any questions you might have.

**CHAIRMAN WHITFIELD**: Thank you for your presentations.

Commissioners, questions for our panelists? Commissioner Elam.

**COMMISSIONER ELAM**: Good afternoon. Can you tell me what contractors have the capability of completing the Summer Units 2 and 3?

**MR. STEPHEN A. BYRNE [SCE&G/SCANA]**: You're talking about the major construction contractors that would have that capability?

**COMMISSIONER ELAM**: Correct.

**MR. STEPHEN A. BYRNE [SCE&G/SCANA]**: That's a fairly small club. Certainly, Fluor has that capability. Bechtel would have that capability. And there are probably a handful of others. Perhaps AREVA, which is a French company. Domestically, probably Fluor and Bechtel would be the two biggest. There are probably one or two others, but it's not a big community.

**COMMISSIONER ELAM**: Thank you.

**CHAIRMAN WHITFIELD**: Thank you, Commissioner

Elam.

Commissioner Fleming.

**COMMISSIONER FLEMING**: Good afternoon. Thank you for coming before us today with this update on the project.

Could you talk about what the status of the AP1000 is, in China? I know they were constructing the units there at the same time.

**MR. STEPHEN A. BYRNE [SCE&G/SCANA]**: Right, so they're constructing four AP1000 units. They purportedly have plans to build many more. The four that they are constructing, two of them are physically complete; the other two are nearing completion. According to Toshiba, they have finished their hot functional testing at the first of those units, called Sanmen 1, and they are in the process of doing hot functional testing at the first unit at Haiyang — Haiyang Unit 1.

The hot functional testing takes the plant up to full rated temperature and pressure, without nuclear fuel in the vessel, so they can test out the plant and put it through its paces, depressurize it rapidly. They've got a whole series of tests they have to do. They finished that at the Haiyang unit — I'm sorry — at the

Sanmen unit. They did find a couple of issues. One was some material they used for insulation melted, so they had to change that material. Those will advantage us, because we won't have to learn those lessons, since they've learned them there. We actually had one of our startup managers that was seconded to the Westinghouse team working that project for a couple of months.

But they should complete that shortly. They'll prepare the things that they have to fix, and probably redo that portion of the test. We anticipate that they will load fuel – fuel was built, by the way, here, in Columbia, at the Westinghouse plant on Bluff Road. That has been received on-site at both sites. We expect that they'll load fuel probably in the second quarter of this year at Sanmen 1, and we anticipate that they will start up toward the end of the year – "start up" as in project finished and making power.

**COMMISSIONER FLEMING**: So, are they experiencing some of the difficulties that are being experienced in the States?

**MR. STEPHEN A. BYRNE [SCE&G/SCANA]**: They have experienced some difficulties on the China projects. Delays over there were similar, similar

USCA4 Appeal: 21-1141 Doc: 30-1 Filed: 04/19/2021 Pg: 555 of 563
0:17-cv-02094-JMC Date Filed 10/02/20 Entry Number 233-32 Page 43 of 51

*Ex Parte* *SCE&G / V.C. Summer Units 2 & 3* 43
*Updates Regarding Units and Status of Contractor, Westinghouse*

in length of time. We learned lessons from them, so we didn't go through exactly the same delays, or the same – the reasons were not the same for their delays. A lot of theirs were design-related, that we had resolved. They don't have the same regulatory structure that we have, so they wouldn't have similar delays to us in the regulatory process. And the model being used in China was more like the model that Westinghouse/Toshiba would like to use. Westinghouse was not the engineering, procurement, and construction contractor over there – called the EPC contractor – which basically means you're responsible for everything. In China, they have indigenous construction companies that handled the construction, so Westinghouse really provided the design, so they were the architect/engineer, if you will. But procurement, they did some of that; the Chinese did some of the procurement, and the Chinese did the construction. That's much closer to the model that Westinghouse would like to use in AP1000 construction, going forward, and we think it's much closer to the model we will end up with, what we call self-directed construction at the site, if we decide to continue.

**COMMISSIONER FLEMING**: Okay, thank you.

4/12/17

PUBLIC SERVICE COMMISSION OF SOUTH CAROLINA
FLR001537

JA 523

**CHAIRMAN WHITFIELD**: Thank you, Commissioner Fleming.

At this time, I've got a few questions I'd like to ask a couple of you. I guess, Mr. Byrne, first, what percentage of the components are on-site? I know you had a slide that had engineering completions and construction, but what percentage of components would you say are on-site now?

**MR. STEPHEN A. BYRNE [SCE&G/SCANA]**: Yeah, we generally break components up into major components and then others. Of the major components, I'd say we're about 90 percent. Of the total components, I would say we're probably in the 85 percent range.

**CHAIRMAN WHITFIELD**: Thank you. Also, I guess, Mr. Addison and Mr. Marsh, both of you mentioned possibly seeking an extension for this interim agreement, and I think you, even, Mr. Addison, said that, naturally, 30 days is a short time. How long would you seek for an extension, or what more could you tell us about that? I know you're still in an ongoing process now, but do you have any idea of when you might know more, or when you might know if you'll even seek an extension?

**MR. KEVIN B. MARSH [SCE&G/SCANA]**: I'll be glad to address that. We certainly have the team

engaged fully now, in trying to do these evaluations as quickly as possible. We would like to have had longer than 30 days under the initial contract, but that was the amount of time negotiated between us and Southern, and Westinghouse. I think it's likely we'd go beyond the 30 days to make sure we can examine all the information we feel like is necessary to make our recommendation as to the most prudent path forward, so I would expect this to fall in the 60-to-90-day timeframe before we do a full, completed analysis and come back to the Commission.

**CHAIRMAN WHITFIELD**: Thank you, Mr. Marsh.

Mr. Addison, I believe you described some revenue from some other businesses quite aptly that Westinghouse has. And you mentioned that you could possibly seek damages from Toshiba from some of their other businesses. And I guess you're talking about outside the parental guarantee, or could you share a little more info on that?

**MR. JIMMY E. ADDISON [SCANA]**: Sure. So, we are really indifferent to the source that it comes from; we just want to make sure that we, the customers, Santee, et cetera, are protected up to the limits of that liability, to the extent we

incur damages to that level. So whether they recapitalize the Westinghouse business and raise cash that way, or sell Westinghouse to some other company or investor group and raise cash, or whether they don't raise enough there and we have to go to Toshiba to realize that, we are fairly indifferent as to where it comes from, as long as it meets any incremental cost estimates. And they've estimated those today to be, as I said, about a billion and a half dollars for the entire Summer projects.

**CHAIRMAN WHITFIELD**: Lastly, and this is for any of you, given that the company expects growth in its service territory, can the company meet its pollution emissions requirements if Units 2 and 3 are not completed?

**MR. STEPHEN A. BYRNE [SCE&G/SCANA]**: Yeah, it – I can speak from what we know about the existing environmental rules and regulations. And I would say the answer is yes. We do have – you can see in our Integrated Resource Plan – a need for power. So we couldn't not build these and get by without them. So we do have a need for power. So that would have to likely come from a source like natural gas.

USCA4 Appeal: 21-1141 Doc: 30-1 Filed: 04/19/2021 Pg: 559 of 563
0:17-cv-02094-JMC Date Filed 10/02/20 Entry Number 233-32 Page 47 of 51

*Ex Parte* *SCE&G / V.C. Summer Units 2 & 3* 47
*Updates Regarding Units and Status of Contractor, Westinghouse*

**CHAIRMAN WHITFIELD**: Thank you, Mr. Byrne.

Commissioner Fleming, did you have a follow-up?

**COMMISSIONER FLEMING**: Yes. I wanted to ask about – we've heard a lot about the revised construction schedule and since, I think, about 2016, it was expected by the end of that year. Could you talk a little bit about what the status of the revised construction schedule is, presently?

**MR. STEPHEN A. BYRNE [SCE&G/SCANA]**: Certainly. Westinghouse has owed us that schedule for, really, quite some time. They solicited input from Fluor to that schedule for estimates of labor hours, unit rates, commodities, those kind of things. That was delivered to Westinghouse sometime late last year.

Westinghouse was then supposed to turn around and give it to us. They were deficient in getting back to us. The schedule got caught up in their financial crisis, when they recognized it was going to cost much more to finish the two projects, the Georgia project and the South Carolina project, than they anticipated. They basically put a pause on that information and giving it to us.

As of this time, they have not given us the

**4/12/17**
**PUBLIC SERVICE COMMISSION OF SOUTH CAROLINA**
FLR001541
JA 527

 schedule. I don't know, though, that I'm all that interested in their schedule any longer. And so, as a part of this process, we're going to run a schedule. Now, we'll use their inputs and validate the inputs, but we're going to run the schedule at some point in the future.

**COMMISSIONER FLEMING**: So will it be a part of the interim assessment?

**MR. STEPHEN A. BYRNE [SCE&G/SCANA]**: Us running the schedule and having an understanding of how long it takes to complete the units will be an integral part of that assessment.

**COMMISSIONER FLEMING**: So, when you come back to give us a follow-up, that could be part of it?

**MR. STEPHEN A. BYRNE [SCE&G/SCANA]**: Yeah, our anticipation is that we will be able to do that in the interim assessment period or, as Kevin pointed out, in some kind of an extension of that interim assessment period. Provided we don't have anything big that falls out of it, we ought to have that sometime within the next couple of months.

**COMMISSIONER FLEMING**: Thank you.

**CHAIRMAN WHITFIELD**: A follow-up to Commissioner Fleming's question just then to you, Mr. Byrne: You said you would run the schedule.

You mean, you, along with Fluor? Or you, independently? Or –

**MR. STEPHEN A. BYRNE [SCE&G/SCANA]**: We would look to run the schedule independently, but with Fluor's input. Now, if Fluor can bring scheduling expertise to the fore, I'd be glad to entertain that. But Fluor has not been asked to provide that by Westinghouse, previously. They certainly may have experience there. But we're capable of running a schedule, as well.

So we will take the inputs that heretofore have been proprietary even to us, and we'll run that schedule. But if Fluor wants to participate – their inputs will be valuable to us. If they want to run a schedule alongside of us, with us, that would be perfectly fine.

**CHAIRMAN WHITFIELD**: Thank you.

Commissioners, any other Commissioner questions? Commissioner Hamilton.

**COMMISSIONER HAMILTON**: Thank you, Mr. Chairman. I'd like to join the Commission in thanking you gentlemen for being here today. It's helpful information for the Commission.

And, Mr. Chairman, I would like to make a request of SCE&G that, when the interim report is

completed as promptly as possible, if we could have a follow-up ex parte to keep us informed.

**MR. KEVIN B. MARSH [SCE&G/SCANA]**: You have our commitment, as soon as that process is completed, we will be back to you as quickly as possible.

**COMMISSIONER HAMILTON**: Thank you, Mr. Marsh. Thank you, gentlemen.

Thank you, Mr. Chairman.

**CHAIRMAN WHITFIELD**: Thank you, Commissioner Hamilton.

If there are no further questions, Mr. Marsh, Mr. Addison, and Mr. Byrne, thank you for your presentation today. This is a project that's highly impactful to the citizens of South Carolina, and the Commission has great interest in being further apprised of the developments that you've addressed today and the results of the interim assessment. We look forward to another briefing upon completion of this, and periodic briefings thereafter.

With that, this allowable ex parte briefing is adjourned. Thank you.

[WHEREUPON, at 3:25 p.m., the proceedings in the above-entitled matter were adjourned.]

C E R T I F I C A T E

I, Jo Elizabeth M. Wheat, CVR-CM-GNSC, do hereby certify that the foregoing is, to the best of my skill and ability, a true and correct transcript of all the proceedings had in an Allowable Ex Parte Proceeding held before THE PUBLIC SERVICE COMMISSION OF SOUTH CAROLINA in Columbia, South Carolina, according to my verbatim record of same.

IN WITNESS WHEREOF, I have hereunto set my hand, on this the 12th day of April, 2017.

Jo Elizabeth M. Wheat, CVR-CM/M-GNSC
Hearings Reporter, PSC/SC
My Commission Expires: January 27, 2021.